# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| **HOYA CORPORATION and HOYA SURGICAL OPTICS, INC.,** | |
| **Plaintiffs,** | **Civil Action No. 3:20-cv-03629** |
| **v.** | |
| **ALCON INC., ALCON LABORATORIES, INC., and ALCON RESEARCH, LLC,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## APPENDIX TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

| Exhibit No. | Description | Appendix Range |
|---|---|---|
| | Declaration of Geoffrey L. Smith in support of Plaintiff's Opposition to Defendant's Motion to Dismiss | A001 – A006 |
| 1 | Alcon's Form 20-F for the fiscal year that ended on December 31, 2020 | A007 – A347 |
| 2 | Alcon's website https://professional.myalcon.com/cataract-surgery/intraocular-lens/ (last accessed March 10, 2021) | A348 – A353 |
| 3 | PDF print-out of Alcon's website https://2.myalcon.com/professional/cataract-surgery/intraocular-lens/ultrasert-preloaded-delivery-system/device-prep (last accessed March 11, 2021) | A354 – A356 |
| 4 | Alcon's website https://www.alcon.com/contact-us (last accessed March 11, 2021) | A357 – A361 |
| 5 | Alcon's website https://investor.alcon.com/governance/executive-committee/default.aspx?_ga=2.59572077.1530410099.1613450571-1424890942.1613450571 (last accessed March 11, 2021) | A362 – A371 |
| 6 | Alcon's website https://investor.alcon.com/governance/leadership-team/default.aspx?_ga=2.59572077.1530410099.1613450571-1424890942.1613450571 (last accessed March 11, 2021) | A372 – A388 |
| 7 | David Endicott's LinkedIn profile (last accessed March 11, 2021) | A389 – A393 |
| 8 | Sergio Duplan's LinkedIn profile (last accessed March 11, 2021) | A394 – A397 |
| 9 | Michael Onuscheck's LinkedIn profile (last accessed March 11, 2021) | A398 – A402 |
| 10 | Heather Attra's LinkedIn profile (last accessed March 11, 2021) | A403 – A406 |
| 11 | Jeannette Bankes's LinkedIn profile (last accessed March 11, 2021) | A407 – A410 |
| 12 | Royce Bedward's LinkedIn profile (last accessed March 11, 2021) | A411 – A415 |
| 13 | Frank Leveiller's LinkedIn profile (last accessed March 11, 2021) | A416 – A419 |
| 14 | Sue-Jean Lin's LinkedIn profile (last accessed March 11, 2021) | A420 – A426 |
| 15 | Kim Martin's LinkedIn profile (last accessed March 11, 2021) | A427 – A431 |
| 16 | Ed McGough's LinkedIn profile (last accessed March 11, 2021) | A432 – A435 |
| 17 | Andrew Pawson's LinkedIn profile (last accessed March 11, 2021) | A436 – A441 |
| 18 | Christopher Cook's LinkedIn profile (last accessed March 11, 2021) | A442 – A446 |
| 19 | Brent Chism's LinkedIn profile (last accessed March 11, 2021) | A447 – A451 |

| Exhibit No. | Description | Appendix Range |
|---|---|---|
| 20 | Curt Metzler's LinkedIn profile (last accessed March 11, 2021) | A452 – A454 |
| 21 | Juli Zoota's LinkedIn profile (last accessed March 11, 2021) | A455 – A460 |
| 22 | Jay Stark's LinkedIn profile (last accessed March 11, 2021) | A461 – A466 |
| 23 | Carla Mack's LinkedIn profile (last accessed March 11, 2021) | A467 – A472 |
| 24 | FDA Device Recall website accessible at FDA's website https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm?id=181244 (last accessed March 11, 2021) | A473 – A477 |
| 25 | Alcon's Form S-8 (April 10, 2019) | A478 – A486 |
| 26 | Alcon Inc.'s Regulations of the Board of Directors, its Committees and the Executive Committee dated effective May 6, 2020 | A487 – A517 |
| 27 | File History Excerpts from U.S. Patent App. No. 15/049,315 (10,588,780 Patent) | A518 – A543 |
| 28 | File History Excerpts from U.S. Patent App. No. 15/838,946 (10,568,735 Patent) | A544 – A552 |
| 29 | File History Excerpts from U.S. Patent App. No. 15/072,023 (10,172,706 Patent) | A553 – A560 |
| 30 | File History Excerpts from U.S. Patent App. No. 14/678,826 (10,010,408 Patent) | A561 – A569 |
| 31 | File History Excerpts from U.S. Patent App. No. 14/402,778 (9,724,191 Patent) | A570 – A577 |
| 32 | File History Excerpts from U.S. Patent App. No. 14/679,921 (10,188,506 Patent) | A578 – A584 |
| 33 | Darien Lee Reddick's Profile on Martindale.com (last accessed Mar. 10, 2021) | A585 – A587 |
| 34 | Darien Reddick's LinkedIn Profile (last accessed Mar. 3, 2021) | A588 – A594 |
| 35 | Excerpts from Alcon Ultrasert marketing materials | A595 – A597 |
| 36 | Alcon Ultrasert marketing materials | A598 – A604 |
| 37 | FDA Adverse Event Report website https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoi__id=2391866 (last accessed March 10, 2021) | A605 – A609 |
| 38 | FDA website – Acrysof PMA at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P930014S115 (last accessed March 10, 2021) | A610 – A613 |
| 39 | FDA website – Ultrasert PMA ahttps://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P930014S096 (last accessed March 10, 2021) | A614 – A617 |
| 40 | USPTO Assignment records for U.S. Patent Nos. 9,463,089; 9,724,191; 10,010,408; 10,172,706; 10,188,506; 10,568,735; and 10,588,780 | A618 – A630 |

Dated: March 12, 2021                            **MCKOOL SMITH, P.C.**

                                                 */s/ Theodore Stevenson, III*
                                                 Theodore Stevenson, III
                                                 Texas State Bar No. 19196650
                                                 tstevenson@mckoolsmith.com
                                                 **MCKOOL SMITH, P.C.**
                                                 300 Crescent Court Suite 1500
                                                 Dallas, TX 75201
                                                 Telephone: (214) 978-4000
                                                 Telecopier: (214) 978-4044

                                                 Lauren Fornarotto
                                                 New York State Bar No. 4804340
                                                 lfornarotto@mckoolsmith.com
                                                 **MCKOOL SMITH, P.C.**
                                                 One Manhattan West
                                                 395 9th Avenue, 50th Floor
                                                 New York, New York 10001-8603
                                                 Telephone: (212) 402-9400
                                                 Telecopier: (212) 402-9444

                                                 Geoffrey L. Smith
                                                 Texas State Bar No. 24041939
                                                 gsmith@mckoolsmtih.com
                                                 **MCKOOL SMITH, P.C.**
                                                 300 W. 6th Street, Suite 1700
                                                 Austin, Texas 78701
                                                 Telephone: (512) 692-8700
                                                 Telecopier: (512) 692-8744

                                                 **ATTORNEYS FOR PLAINTIFFS
                                                 HOYA CORPORATION and HOYA
                                                 SURGICAL OPTICS, INC.**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that counsel of record for Defendant is being served with this document pursuant to the Federal Rules of Civil Procedure and the Court's Local Rules on March 12, 2021.

                                        */s/ Theodore Stevenson, III*
                                        Theodore Stevenson, III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **HOYA CORPORATION and HOYA SURGICAL OPTICS, INC.,** | |
| **Plaintiffs,** | **Civil Action No.  3:20-cv-03629** |
| **v.** | |
| **ALCON INC., ALCON LABORATORIES, INC., and ALCON RESEARCH, LLC,** | **JURY TRIAL** |
| **Defendants.** | |

<u>**DECLARATION OF GEOFFREY L. SMITH IN SUPPORT OF PLAINTIFFS'**</u>
<u>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

1.       My name is Geoffrey L. Smith.  I am an attorney at McKool Smith P.C., counsel of record in this action for HOYA Corporation and HOYA Surgical Optics, Inc. (collectively, "HOYA").  I am one of the attorneys responsible for representation of HOYA.  I am fully competent to make this declaration and have personal knowledge of the facts stated herein.  I submit this declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss.

2.       Attached as Exhibit 1 is a true and correct copy of Alcon's Form 20-F for the fiscal year that ended on December 31, 2020, downloaded on March 11, 2021 from: http://d18rn0p25nwr6d.cloudfront.net/CIK-0001167379/c18a85a6-e69c-452e-af72-9e8ffe4695c0.pdf (2019 version cited in Complaint at ¶¶ 35-36).

3.       Attached as Exhibit 2 is a true and correct copy of a PDF print-out of Alcon's website, downloaded on March 10, 2021, from: https://professional.myalcon.com/cataract-surgery/intraocular-lens/

4.       Attached as Exhibit 3 is a true and correct copy of a PDF print-out of Alcon's

1

A001

website, downloaded on March 11, 2021, from: https://2.myalcon.com/professional/cataract-surgery/intraocular-lens/ultrasert-preloaded-delivery-system/device-prep

5.      Attached as Exhibit 4 is a true and correct copy of a PDF print-out of Alcon's website, downloaded on March 11, 2021, from: https://www.alcon.com/contact-us

6.      Attached as Exhibit 5 is a true and correct copy of a PDF print-out of Alcon's website, downloaded on March 11, 2021, from: https://investor.alcon.com/governance/executive-committee/default.aspx

7.      Attached as Exhibit 6 is a true and correct copy of a PDF print-out of Alcon's website, downloaded on March 11, 2021, from:

https://investor.alcon.com/governance/leadership-team/default.aspx

8.      Attached as Exhibit 7 is a true and correct copy of a PDF print-out of David Endicott's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/david-endicott-1072407a/

9.      Attached as Exhibit 8 is a true and correct copy of a PDF print-out of Sergio Duplan's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/sergio-duplan-5454462/

10.     Attached as Exhibit 9 is a true and correct copy of a PDF print-out of Michael Onuscheck's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/michael-onuscheck-292a524b/

11.     Attached as Exhibit 10 is a true and correct copy of a PDF print-out of Heather Attra's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/heather-attra-1220279/

12.     Attached as Exhibit 11 is a true and correct copy of a PDF print-out of Jeannette

A002

Bankes' LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/jeannettebankes/

13.     Attached as Exhibit 12 is a true and correct copy of a PDF print-out of Royce

Bedward's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/royce-bedward-b3960348/

14.     Attached as Exhibit 13 is a true and correct copy of a PDF print-out of Franck

Leveiller's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/franck-leveiller-b9459927/

15.     Attached as Exhibit 14 is a true and correct copy of a PDF print-out of Sue-Jean

Lin's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/suejeanlin/

16.     Attached as Exhibit 15 is a true and correct copy of a PDF print-out of Kim

Martin's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/dkhmartin01/

17.     Attached as Exhibit 16 is a true and correct copy of a PDF print-out of Ed

McGough's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/ed-mcgough-4a47aaa/

18.     Attached as Exhibit 17 is a true and correct copy of a PDF print-out of Andrew

Pawson's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/apawson/

19.     Attached as Exhibit 18 is a true and correct copy of a PDF print-out of

Christopher Cook's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/rchristophercook/

3

20.     Attached as Exhibit 19 is a true and correct copy of a PDF print-out of Brent

Chism's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/brent-chism-leader/

21.     Attached as Exhibit 20 is a true and correct copy of a PDF print-out of Curt

Metzler's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/curt-metzler-9523b919/

22.     Attached as Exhibit 21 is a true and correct copy of a PDF print-out of Juli

Zoota's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/juli-zoota-40134b2/

23.     Attached as Exhibit 22 is a true and correct copy of a PDF print-out of Jay Stark's

LinkedIn profile, downloaded on March 11, 2021 from: https://www.linkedin.com/in/jay-stark-
2477374/

24.     Attached as Exhibit 23 is a true and correct copy of a PDF print-out of Carla

Mack's LinkedIn profile, downloaded on March 11, 2021 from:

https://www.linkedin.com/in/carla-mack-od-mba-4787483/

25.     Attached as Exhibit 24 is a true and correct copy of a PDF print-out of the FDA's

website, downloaded on March 11, 2021, from:

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm?id=181244

26.     Attached as Exhibit 25 is a true and correct copy of Alcon's Form S-8, dated

April 10, 2019, downloaded on March 11, 2021, from https://sec.report/Document/0001104659-
19-020667/a19-7923_1s8.htm

27.     Attached as Exhibit 26 is a true and correct copy of the Regulations of the Board

of Directors, its Committees and the Executive Committee of Alcon Inc. dated effective May 6,

2020, downloaded on March 11, 2021 from,

https://s1.q4cdn.com/963204942/files/doc_downloads/governance_doc/2020/12/Alcon-

Regulations-of-the-Board-December-2020.pdf

  28. Attached as Exhibit 27 is a true and correct copy of excerpts from the file history

of U.S. Patent App. No. 15/049,315 (10,588,780 Patent) (highlighting added).

  29. Attached as Exhibit 28 is a true and correct copy of excerpts from the file history

of U.S. Patent App. No. 15/838,946 (10,568,735 Patent) (highlighting added).

  30. Attached as Exhibit 29 is a true and correct copy of excerpts from the file history

of U.S. Patent App. No. 15/072,023 (10,172,706 Patent) (highlighting added).

  31. Attached as Exhibit 30 is a true and correct copy of excerpts from the file history

of U.S. Patent App. No. 14/678,826 (10,010,408 Patent) (highlighting added).

  32. Attached as Exhibit 31 is a true and correct copy of excerpts from the file history

of U.S. Patent App. No. 14/402,778 (9,724,191 Patent) (highlighting added).

  33. Attached as Exhibit 32 is a true and correct copy of excerpts from the file history

of U.S. Patent App. No. 14/679,921 (10,188,506 Patent) (highlighting added).

  34. Attached as Exhibit 33 is a true and correct copy of a PDF print-out of Mr. Darien

Lee Reddick's Martindale.com profile, downloaded on March 10, 2021, from:

https://www.martindale.com/attorney/mr-darien-lee-reddick-3857919/

  35. Attached as Exhibit 34 is a true and correct copy of a PDF print-out of Mr. Darien

Reddick's LinkedIn profile, downloaded on March 3, 2021, from the following URL:

https://www.linkedin.com/in/darien-reddick

  36. Attached as Exhibit 35 is a true and correct copy of excerpts from Alcon UltraSert

marketing materials, downloaded on February 26, 2021, from: http://2018.asiateleophth.org/wp-

5

content/uploads/sites/2/2018/07/APTOS_ProgBooklet_singlepage.pdf

37.    Attached as Exhibit 36 is a true and correct copy of Alcon UltraSert marketing

materials, which were downloaded on February 22, 2021, from:

https://theophthalmologist.com/fileadmin/top/pdf/Alcon-UltraSert-0618-supplied.pdf

38.    Attached as Exhibit 37 is a true and correct copy of a PDF print-out of the FDA

website, downloaded on March 10, 2021, from:

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoi__id=2391866

39.    Attached as Exhibit 38 is a true and correct copy of a PDF print-out of the FDA

website, downloaded on March 10, 2021, from:

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P930014S115

40.    Attached as Exhibit 39 is a true and correct copy of a PDF print-out of the FDA

website, downloaded on March 10, 2021, from:

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P930014S096

41.    Attached as Exhibit 40 is a true and correct copy of assignment records for U.S.

Patent Nos. 9,463,089; 9,724,191; 10,010,408; 10,172,706; 10,188,506; 10,568,735; and

10,588,780, downloaded from the USPTO's website on March 12, 2021. (highlighting added).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 12, 2021, in Austin, TX.


/s/ *Geoffrey L. Smith*
Geoffrey L. Smith

# EXHIBIT 1

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

WASHINGTON, DC 20549

# FORM 20-F

☐      **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) or 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the fiscal year ended December 31, 2020**

OR

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the transition period from _____ to _____**

OR

☐      **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 Date of event requiring the shell company report _____**

**Commission file number: 001-31269**

# Alcon Inc.

(Exact name of Registrant as specified in its charter)

**N/A**

(Translation of Registrant's name into English)

**Switzerland**

(Jurisdiction of incorporation or organization)

**Rue Louis-d'Affry 6, 1701 Fribourg, Switzerland**

(Address of principal executive office)

**Royce Bedward, Chemin de Blandonnet 8, 1214 Vernier, Geneva, Switzerland; Tel: +41 58 911 20 00; Fax +41 58 911 32 22**

(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary Shares, nominal value CHF 0.04 per share | ALC | SIX Swiss Exchange<br>New York Stock Exchange |

Securities registered or to be registered pursuant to Section 12(g) of the Act. **None**

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act. **None**

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report. 489,219,355

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," and "emerging growth company" and in Rule 12b-2 of the Exchange Act.

Large Accelerated Filer ☒      Accelerated Filer ☐      Non-accelerated Filer ☐      Emerging Growth Company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended period for complying with any new or revised financial accounting standard† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐      International Financial Reporting Standards as issued by the International Accounting Standards Board ☒      Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow. Item 17 ☐    Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

| INDEX | | Page |
|---|---|---|
| Introduction and Use of Certain Terms | | 1 |
| Market Information | | 1 |
| Special Note About Forward-Looking Statements | | 2 |
| **PART I** | | |
| Item 1. | Identity of Directors, Senior Management and Advisers | 4 |
| Item 2. | Offer Statistics and Expected Timetable | 5 |
| Item 3. | Key Information | 6 |
| Item 4. | Information on the Company | 28 |
| Item 4A. | Unresolved Staff Comments | 52 |
| Item 5. | Operating and Financial Review and Prospects | 53 |
| Item 6. | Directors, Senior Management and Employees | 80 |
| Item 7. | Major Shareholders and Related Party Transactions | 138 |
| Item 8. | Financial Information | 139 |
| Item 9. | The Offer and Listing | 141 |
| Item 10. | Additional Information | 142 |
| Item 11. | Quantitative and Qualitative Disclosures About Market Risk | 153 |
| Item 12. | Description of Securities Other than Equity Securities | 154 |
| **PART II** | | |
| Item 13. | Defaults, Dividend Arrearages and Delinquencies | 155 |
| Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 156 |
| Item 15. | Controls and Procedures | 157 |
| Item 16A. | Audit Committee and Financial Expert | 158 |
| Item 16B. | Code of Ethics | 158 |
| Item 16C. | Principal Accountant Fees and Services | 158 |
| Item 16D. | Exemptions from the Listing Standards for Audit Committees | 159 |
| Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 160 |
| Item 16F. | Change in Registrant's Certifying Accountant | 161 |
| Item 16G. | Corporate Governance | 162 |
| Item 16H. | Mine Safety Disclosure | 162 |
| **PART III** | | |
| Item 17. | Financial Statements | 163 |
| Item 18. | Financial Statements | 163 |
| Item 19. | Exhibits | 164 |
| **Consolidated Financial Statements of Alcon Inc.** | | F-1 |

# INTRODUCTION AND USE OF CERTAIN TERMS

Alcon Inc. publishes Consolidated Financial Statements expressed in US dollars. Our Consolidated Financial Statements responsive to Item 18 of this Annual Report filed on Form 20-F with the US Securities and Exchange Commission (the "Annual Report") are prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB"). "Item 5. Operating and Financial Review and Prospects", together with "Item 4.B. Business Overview" and "Item 6.D. Employees", constitute the Operating and Financial Review ("Rapport annuel"), as defined by the Swiss Code of Obligations.

Unless the context requires otherwise, the words "we", "our", "us", "Alcon", "Company" and similar words or phrases in this Annual Report refer to Alcon Inc. and its consolidated subsidiaries and the words "Novartis", "Novartis Group" and "Former Parent" refer to Novartis AG and its consolidated affiliates. The term "Alcon Division" means the Alcon business as it was operated under Novartis. The term "Spin-off" refers to the distribution of a dividend-in-kind of Alcon shares to Novartis shareholders and ADR holders as approved by Novartis shareholders at their Annual General Meeting held on February 28, 2019. In this Annual Report, references to the "eye care market" are to the eye care market in which we participate, including the sale of ophthalmic surgical devices, contact lenses and ocular health products, but not including the sale of spectacles and prescription ophthalmic pharmaceutical products; references to "United States dollars", "US dollars", "USD" or "$" are to the lawful currency of the United States of America, and references to "CHF" are to Swiss francs, the lawful currency of Switzerland; references to "Latin America" are to Central and South America, including the Caribbean, unless the context otherwise requires; references to "associates" are to our employees; references to the "SEC" are to the US Securities and Exchange Commission, references to the "FDA" are to the US Food and Drug Administration, and references to "EMA" are to the European Medicines Agency, an agency of the EU; references to the "NYSE" are to the New York Stock Exchange, and references to the "SIX" are to the SIX Swiss Exchange; references to "AT-IOL" mean advanced technology intraocular lenses; and references to "Alcon shares" or "our shares" are to Alcon ordinary shares, nominal value CHF 0.04 per share, with ticker symbol "ALC."

All product names appearing in *italics* are trademarks owned by or licensed to Alcon or its subsidiaries. Product names identified by a "®" or a "™" are trademarks that are not owned by or licensed to Alcon or its subsidiaries and are the property of their respective owners.

# MARKET INFORMATION

This Annual Report contains certain industry and market data that were obtained from third-party sources, such as industry surveys and industry publications, including, but not limited to, publications by Market Scope, GfK and Nielsen. This Annual Report also contains other industry and market data, including market sizing estimates, growth and other projections and information regarding our competitive position, prepared by our management on the basis of such industry sources and our management's knowledge of and experience in the industry and markets in which we operate (including management's estimates and assumptions relating to such industry and markets based on that knowledge). Our management has developed its knowledge of such industry and markets through its experience and participation in these markets.

In addition, industry surveys and industry publications generally state that the information they contain has been obtained from sources believed to be reliable but that the accuracy and completeness of such information is not guaranteed and that any projections they contain are based on a number of significant assumptions. Forecasts, projections and other forward-looking information obtained from these sources involve risks and uncertainties and are subject to change based on various factors, including those discussed in the section "Special Note About Forward-Looking Statements" below. You should not place undue reliance on these statements.

# SPECIAL NOTE ABOUT FORWARD-LOOKING STATEMENTS

This Annual Report contains, and our officers and representatives may from time to time make, certain "forward-looking statements" within the meaning of the safe harbor provisions of the US Private Securities Litigation Reform Act of 1995. Forward-looking statements can be identified by words such as "anticipate," "intend," "commitment," "look forward," "maintain," "plan," "goal," "seek," "target," "assume," "believe," "project," "estimate," "expect," "strategy," "future," "likely," "may," "should," "will" and similar references to future periods. Examples of forward-looking statements include, among others, statements Alcon makes regarding its liquidity, revenue, gross margin, effective tax rate, foreign currency exchange movements, earnings per share, its plans and decisions relating to various capital expenditures, capital allocation priorities and other discretionary items, market growth assumptions, and generally, its expectations concerning its future performance and the effects of the COVID-19 pandemic on its businesses. You should not place undue reliance on these statements.

Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based only on Alcon's current beliefs, expectations and assumptions regarding the future of its business, future plans and strategies and other future conditions. Because forward-looking statements relate to the future, they are subject to inherent uncertainties and risks that are difficult to predict. Such forward-looking statements are subject to various risks and uncertainties facing Alcon, including:

- the effect of the COVID-19 pandemic as well as other viral or disease outbreaks;

- the commercial success of its products and its ability to maintain and strengthen its position in its markets;

- the success of its research and development efforts, including its ability to innovate to compete effectively;

- its success in completing and integrating strategic acquisitions;

- pricing pressure from changes in third party payor coverage and reimbursement methodologies;

- global and regional economic, financial, legal, tax, political and social change;

- data breaches or other disruptions of its information technology systems;

- ongoing industry consolidation;

- its ability to properly educate and train healthcare providers on its products;

- changes in inventory levels or buying patterns of its customers;

- the impact of a disruption in its global supply chain or important facilities;

- ability to service its debt obligations;

- its ability to comply with the US Foreign Corrupt Practices Act of 1977 and other applicable anti-corruption laws, particularly given that it has entered into a three-year Deferred Prosecution Agreement with the U.S. Department of Justice;

- uncertainty and impact relating to the potential phasing out of LIBOR and transition to alternative reference rates;

- the need for additional financing through the issuance of debt or equity;

- its reliance on outsourcing key business functions;

- its ability to protect its intellectual property;

- the impact on unauthorized importation of its products from countries with lower prices to countries with higher prices;

- uncertainties regarding the success of Alcon's separation and Spin-off from Novartis and the subsequent transformation program, including the expected separation and transformation costs, as well as any potential savings, incurred or realized by Alcon;

- the effects of litigation, including product liability lawsuits and governmental investigations;

- its ability to comply with all laws to which it may be subject;

- effect of product recalls or voluntary market withdrawals;

2

A012

- the implementation of its enterprise resource planning system;

- its ability to attract and retain qualified personnel;

- the accuracy of its accounting estimates and assumptions, including pension and other post-employment benefit plan obligations and the carrying value of intangible assets;

- the ability to obtain regulatory clearance and approval of its products as well as compliance with any post-approval obligations, including quality control of its manufacturing;

- legislative and regulatory reform;

- the ability of Alcon Pharmaceuticals Ltd. to comply with its investment tax incentive agreement with the Swiss State Secretariat for Economic Affairs in Switzerland and the Canton of Fribourg, Switzerland;

- its ability to manage environmental, social and governance matters to the satisfaction of its many stakeholders, some of which may have competing interests;

- its ability to operate as a stand-alone company;

- whether the transitional services Novartis has agreed to provide Alcon are sufficient;

- the impact of the Spin-off from Novartis on Alcon's shareholder base;

- the impact of being listed on two stock exchanges;

- the ability to declare and pay dividends;

- the different rights afforded to its shareholders as a Swiss corporation compared to a U.S. corporation; and

- the effect of maintaining or losing its foreign private issuer status under U.S. securities laws.

Some of these factors are discussed in more detail in this Annual Report, including under "Item 3. Key Information—3.D. Risk Factors", "Item 4. Information on the Company" and "Item 5. Operating and Financial Review and Prospects". Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those described in this Annual Report as anticipated, believed, estimated or expected. We provide the information in this Annual Report as of the date of its filing. We do not intend, and do not assume any obligation, to update any information or forward-looking statements set out in this Annual Report as a result of new information, future events or otherwise.

# PART I

# ITEM 1.   IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS

## 1.A.   DIRECTORS AND SENIOR MANAGEMENT

Not Applicable.

## 1.B.   ADVISERS

Not Applicable.

## 1.C.   AUDITORS

Not Applicable.

4

# ITEM 2.   OFFER STATISTICS AND EXPECTED TIMETABLE

Not Applicable.

5

# ITEM 3.   KEY INFORMATION

## 3.A.      [RESERVED]

## 3.B.      CAPITALIZATION AND INDEBTEDNESS

Not Applicable.

## 3.C.      REASONS FOR THE OFFER AND USE OF PROCEEDS

Not applicable.

6

## 3.D.          RISK FACTORS

You should carefully consider the risks described below, together with all of the other information included in this Annual Report, in evaluating Alcon and our securities. The following risk factors could adversely affect our business, financial condition, results of operations and the price of our securities.

## Risks Related to Our Business Generally

***The effects of the ongoing COVID-19 pandemic have had, and may continue to have, a material adverse impact on our business, net sales, profitability, financial condition, liquidity and cash flows.***

An outbreak of a strain of coronavirus that was discovered in China in late 2019 evolved into a global pandemic. To stem the spread of COVID-19 disease, in early 2020 nearly all major markets began to implement "stay-at-home" orders, business shutdowns, including offices of eye care professionals, and the deferral of non-urgent surgical procedures, leading to a global economic standstill. While these "stay-at-home" orders were largely lifted by mid-2020, some markets reintroduced targeted "stay-at-home" orders throughout the remainder of 2020.

The spread of COVID-19 caused us to modify aspects of our business practices, including restricting associate travel, encouraging office-based associates to work from home for a substantial part of 2020 and implementing social distancing measures at our manufacturing sites and, upon the return of our associates, in our office locations. Such actions have resulted in disruptions to our supply chain, operations, facilities and associate workforce. If "stay-at-home" orders, business shutdowns and the deferral of non-urgent surgical procedures are re-implemented broadly to combat the spread of COVID-19, our business, net sales, financial condition, liquidity and cash flows would be adversely affected further.

The magnitude of the continued negative impact of the COVID-19 pandemic on our business, net sales, financial condition, liquidity and cash flows depends on future developments that are unpredictable and most of which are outside of our control, including the duration and scope of the pandemic, related governmental advisories and restrictions to contain COVID-19, how quickly economic conditions improve once the COVID-19 pandemic subsides, the development of therapeutic medicines and vaccines and whether there are subsequent outbreaks. We may be unable to prevent or mitigate any or all of the pandemic's near- or long-term adverse impacts, which could be material, such as:

- Non-urgent medical procedures may be prohibited or restricted again. During 2020, most geographic markets prohibited or restricted non-urgent medical procedures. As a result, many eye care professionals delayed or canceled orders. While markets generally have reopened, some markets have reintroduced closures. Further, some patients remain reluctant to seek medical attention, and, for those who do, there has been a substantial backlog due to limited capacity and the need to social distance, which has had an adverse effect on our sales as markets recover from the pandemic. Also, we could have difficulty timely collecting accounts receivable due from eye care professionals as they themselves recover from the impact of the pandemic.

- We may be prevented from operating our manufacturing facilities or other workplaces due to the illness of our associates, regulations and associate inability or reluctance to appear for work or travel to our facilities, which may cause a material disruption to our supply chain. In 2020, we had some limited and temporary site shutdowns and implemented alternative working arrangements for all of our office-based associates, including working from home.

- The operations of our suppliers may be disrupted or may not operate effectively or efficiently, thereby negatively impacting our ability to purchase supplies for our business at historical prices and in sufficient amounts.

- Generating lower cash from operations could adversely affect our financial condition and the achievement of our strategic objectives. As a result, we may need to raise additional capital by incurring indebtedness or issuing equity securities beyond the $750 million of additional debt that we raised in 2020. Additionally, we may face credit rating downgrades as a result of weaker than anticipated performance of our businesses, higher debt levels, or other factors.

To the extent COVID-19 continues to adversely affect our operations and global economic conditions more generally, it may also have the effect of heightening many of the other risks described in this "Risk Factors" section including impeding our ability to launch new products and develop innovative products, the inability of our customers or suppliers to operate their businesses, the acceleration of industry consolidation, our inability to forecast demand accurately and our need to obtain additional financing.

***We operate in a highly competitive industry and if we fail to innovate, we may be unable to maintain our position in the markets in which we compete and unable to build and expand our markets.***

Our industry is highly competitive and, in both our surgical and vision care businesses, we face a mixture of competitors and intense competition from competitors' products. While we currently enjoy leading positions within our industry, our success highly depends on our ability to maintain or build on those leading positions. To compete effectively, we must continue to create, invest in, or acquire advanced technology, incorporate this technology into our proprietary products, obtain regulatory approvals in a timely manner where required and manufacture and successfully market our products. We may experience design, manufacturing, marketing or other difficulties that could delay or prevent our development, introduction or marketing of new products or new versions of our existing products. As a result of such difficulties and delays, our development expenses may increase and, as a consequence, our results of operations could suffer. Our failure to respond to competitive pressures in a timely manner could have a material adverse effect on our business, financial condition and results of operations.

For example, in our surgical business, we face a mixture of competitors ranging from large manufacturers with multiple business lines to small manufacturers that offer a limited selection of specialized products. Development by other companies of new or improved products, processes, or technologies may make our products or proposed products less competitive or obsolete. We also face competition from providers of alternative medical therapies such as pharmaceutical companies that have the potential to disrupt core elements of our business.

Shifts in industry market share can occur in connection with product issues, physician advisories, safety alerts and publications about our products. In the current environment of managed care, consolidation among healthcare providers, increased competition and declining reimbursement rates, and absent innovation, we must increasingly compete on the basis of price.

In addition, our vision care business operates within a highly competitive environment. In contact lenses, we face intense competition from competitors' products and may face increasing competition as other new products enter the market, for example, with increased product entries from contact lens manufacturers in Asia. New market entrants and existing competitors are also challenging distribution models with innovation in non-traditional, disruptive models such as direct-to-consumer, Internet and other e-commerce sales opportunities, which could adversely impact the traditional eye care professional ("ECP") channel in which Alcon has a significant presence. Our major competitors in contact lenses offer competitive products and differentiated materials, plus a variety of other eye care products including ophthalmic pharmaceuticals, which may give them a competitive advantage in marketing their lenses. Our vision care business also competes with manufacturers of eyeglasses and providers of other forms of vision correction including ophthalmic surgery. The market for contact lenses is intensely competitive and is characterized by declining sales volumes for older and reusable product lines and growing demand for daily lenses and advanced materials lenses. As the market for contact lenses shifts toward daily lenses, we expect our sales in daily lenses to, at least in part, cannibalize sales of our reusable contact lenses and contact lens care offerings. Furthermore, our ocular health product category is also highly competitive. We cannot predict the timing or impact of the introduction of competitive products, including new market entries, "generic" versions of our approved products, or private label products that treat the same conditions as those of our products. In addition, the introduction of alternatives in medical devices and medical prescriptions could also alter the dry eye product market and impede our sales growth. Our ability to respond to these competitive pressures will depend on our ability to decrease our costs and maintain gross margins and operating results and to introduce new products successfully and on a timely basis, and to achieve manufacturing efficiencies and sufficient manufacturing capacity and capabilities for such products.

Finally, our financial performance also depends on our ability to successfully build and expand our markets. For example, while we currently expect our key markets to grow, particularly in multifocal contact lenses and AT-IOLs, the size of the markets in which we compete may not increase above existing levels, we may not be able to regain or gain market share, expand our market penetration or the size of the market for our products, or compete effectively, and the number of procedures in which our products are used may not increase above existing levels. Decreases in market sizes or our market share and declines in average selling prices or procedural volumes could materially adversely affect our results of operations or financial condition. Furthermore, our failure to expand our markets beyond existing levels could impact our ability to grow in line with or above current industry standards.

***Our research and development efforts may not succeed in bringing new products to market, or may fail to do so in a cost-efficient manner, or in a manner sufficient to grow our business, replace lost sales or take advantage of new technologies.***

Our ability to continue to maintain and grow our business, to replace sales lost due to competition and to bring to market products that take advantage of new and potentially disruptive technologies depends heavily on the success of our research and development activities. Our success relies on our ability to identify and successfully develop cost-effective new products that address unmet medical and consumer needs. To accomplish this, we commit substantial financial, human and capital resources to product research and development, both through our internal dedicated resources and

through external investments, alliances, license arrangements, acquisitions and other transactions, which we collectively refer to as "BD&L" transactions. Developing and marketing new products involves a costly, lengthy and uncertain process. Since early 2020, COVID-19 related restrictions have delayed clinical trials and caused our research and development associates to work from home, which could have the effect of delaying new product launches. Even when our new product development projects make it to market, there have been, and in future may be, instances where projects are subsequently discontinued for technical, clinical, regulatory or commercial reasons. In spite of our investments, our research and development activities and external investments may not produce commercially successful new products that will enable us to replace sales lost to our competitors or increase revenue to grow our business. We may not be able to successfully identify and obtain value from our external business development and strategic collaborative efforts. In addition, our new products may cannibalize a portion of the revenues we derive from existing products, therefore driving replacement revenue instead of incremental revenue.

Further, even if we are able to secure regulatory approval and achieve initial commercial success of our products, our products may abruptly cease to be commercially viable due to the discovery of adverse health effects. See "—We may implement product recalls or voluntary market withdrawals of our products" below.

If we are unable to maintain a cost-effective flow of successful new products sufficient to maintain and grow our business, cover any sales erosion due to competition and take advantage of market opportunities, this lack of innovation could have a material adverse effect on our business, financial condition or results of operations. For a description of the government approval processes which must be followed to market our products, see "—Regulatory clearance and approval processes for our products are expensive, time-consuming and uncertain, and the failure to obtain and maintain required regulatory clearances and approvals could prevent us from commercializing our products" below and "Item 4. Information on the Company—4.B. Business Overview—Government Regulation".

***We may not successfully complete and integrate strategic acquisitions to expand or complement our business.***

As part of our growth strategy, we regularly evaluate and pursue strategic BD&L transactions to expand or complement our business. Such ventures may bring new technologies, products, or customers to enhance our prominent position in the ophthalmic industry. We may be unable to identify suitable acquisition candidates at attractive prices or at all. Acquisition activities can be thwarted by overtures from competitors for the targeted candidates and governmental regulation (including market concentration limitations and other competition laws).

Further, even if we are successful in completing an acquisition, we could face risks relating to our ability to:

- successfully integrate the venture due to corporate cultural differences, difficulties in retaining key personnel, customers and suppliers, coordination with other products and changing market preferences;

- maintain uniform standards, controls, procedures and policies throughout acquired companies, including effective integration of acquired companies into our internal control over financial reporting;

- achieve expected synergies and obtain the desired financial or strategic benefits from acquisitions within the anticipated time periods, if at all; and

- successfully enter categories and markets in which we may have limited or no prior experience.

Moreover, acquisitions demand significant company resources and could divert management's attention from our existing business, result in liabilities being incurred that were not known at the time of acquisition or create tax or accounting issues. Furthermore, acquisitions or ventures could also result in potentially dilutive issuances of equity securities, the incurrence of debt, the assumption of contingent liabilities, an increase in expenses related to certain assets and increased operating expenses, all of which could adversely affect our financial condition and results of operations. In addition, to the extent that the economic benefits associated with any of our acquisitions or investments diminish in the future, we may be required to record impairment charges related to goodwill, intangible assets or other assets associated with such transactions, which could adversely affect our financial condition and results of operations.

We often enter into option agreements to acquire early-stage technologies, which may fail in the development process or proof-of-concept stage. Even if such a failure occurs before we exercise our option to acquire the technology, we may have already made a significant investment in the failed technology. Further, if we complete the acquisition, we may not be able to successfully integrate the acquired technology into our business or otherwise use it to develop commercialized products. If we fail to timely recognize or address these matters or to devote adequate resources to them, we may fail to achieve our growth strategy or otherwise not realize the intended benefits of an acquisition.

***Changes in third-party payor coverage and reimbursement methodologies and potential regulatory price controls may adversely impact our ability to sell our products at prices necessary to support our current business strategy.***

The prices, sales and demand for some of our products, in particular our surgical products, could be adversely affected by the increased emphasis managed care organizations and governments continue to place on the delivery of more cost-effective medical therapies. In addition, some third-party payors will not provide reimbursement for a new product until

we demonstrate the innovative value or improved patient outcomes of the new product, which could impact our ability to grow the market for sales of the product. There have also been recent initiatives by third-party payors to challenge the prices charged for medical products. Physicians, eye care professionals and other healthcare providers may be reluctant to purchase our products if they do not receive adequate reimbursement from third-party payors to cover the cost of those products and for procedures performed using those products. Reductions in the prices for our products in response to these trends could reduce our profit margins, which would adversely affect our ability to invest and grow our business.

Outside the US, governmental programs that typically reimburse at predetermined fixed rates may also decrease or otherwise limit amounts available through reimbursement. For example, in the EU, member states impose controls on whether products are reimbursable by national or regional health service providers and on the prices at which medical devices are reimbursed under state-run healthcare schemes. Some member states operate reference pricing systems in which they set national reimbursement prices by reference to those in other member states. Countries implementing a volume-based procurement process, such as the one being introduced in China, can lead to decreased prices. Other governmental funding restrictions, legislative proposals and interpretations of policy may negatively impact amounts available through reimbursement, including by restricting payment increases to hospitals and other providers through reimbursement systems, or by restricting whether reimbursement is available for our products at all.

We expect that additional health care reform measures will be adopted in the future in the countries in which we operate, including those initiatives affecting coverage and reimbursement for our products, any of which could limit the amounts that governments will pay for health care products and services, which could adversely affect the growth of the market for our products or the demand for our products, or result in additional pricing pressures. We cannot predict the effect such reforms or the prospect of their enactment may have on our business.

***Changing economic and financial environments in many countries and increasing global political and social instability may adversely impact our business.***

We sell our products in more than 140 countries. As a result, local and regional economic and financial environments and political and social conditions throughout the world influence and affect our results of operations and business.

Unpredictable political and social conditions currently exist in various parts of the world, including a backlash against free trade, anti-immigrant sentiment, social unrest, a refugee crisis, food and water shortages, COVID-19 related actions, terrorism and the risk of direct conflicts between nations. In addition, the current trade environment is extremely volatile, including the imposition of trade tariffs, trade or economic sanctions, or other restrictions. Changes in trade policy vis-à-vis countries that we operate in could affect our ability to and/or the cost of doing business in such countries. For example, we expect that the ongoing trade dispute between the United States and China could potentially have an adverse effect on the export of our surgical equipment to China. In the United States, the elimination of the Affordable Care Act's individual mandate could have a negative impact on individuals' ability to afford health insurance. Similarly, following the UK's "Brexit" and with the rise of nationalist, separatist and populist sentiment in various countries, there is a risk that barriers to free trade and the free movement of people may rise in Europe. As we have a sizable commercial presence in the UK, the uncertainty surrounding the implementation and effect of "Brexit" may impact our business in the UK and the rest of Europe, including our costs and the distribution of our products in those markets. Further, significant conflicts continue in parts of the Middle East, including conflicts involving Saudi Arabia and Iran, and with respect to places such as North Korea. Collectively, such difficult conditions could, among other things, disturb the international flow of goods and increase the costs and difficulties of international transactions.

In addition, local economic conditions may adversely affect the ability of payors, as well as our distributors, customers, suppliers and service providers, to pay for our products, or otherwise to buy necessary inventory or raw materials, and to perform their obligations under agreements with us. Although we make efforts to monitor these third parties' financial condition and their liquidity, our ability to do so is limited, and some of them may become unable to pay their bills in a timely manner, or may even become insolvent, which could negatively impact our business and results of operations. These risks may be elevated with respect to our interactions with fiscally-challenged government payors, or with third parties with substantial exposure to such payors. For example, we have significant outstanding receivable balances that are dependent upon either direct or indirect payment by various governmental and non-governmental entities across the world. The ultimate payment of these receivables is dependent on the ability of these governments to maintain liquidity primarily through borrowing capacity, particularly in the EU. If certain governments are not able to maintain access to liquidity through borrowing capacity, the ultimate payment of their respective portion of outstanding receivables could be at risk and impact profits and cash flow.

Economic conditions in our markets may also deteriorate due to epidemics or pandemics; natural and man-made disasters, including climatic events (including any potential effect of climate change), power grid failures, acts of war or terrorism, political unrest, fires or explosions; and other external factors over which we have no control.

To the extent that economic and financial conditions directly affect consumers, some of our businesses, including the elective surgical and contact lens businesses, may be particularly sensitive to declines in consumer spending, as the costs of elective surgical procedures and discretionary purchases of contact lenses are typically borne by individuals with limited

10

A020

reimbursement from their medical insurance providers or government programs. For example, while cataract surgery involving our monofocal IOLs is generally fully covered by medical insurance providers or government reimbursement programs, implantation of certain of our AT-IOL products may only be partially covered, with the individual paying out-of-pocket for the non-covered component. Accordingly, individuals may be less willing to incur the costs of these private pay or discretionary procedures or purchases in weak or uncertain economic conditions and may elect to forgo such procedures or products or to trade down to more affordable options.

***Significant breaches of data security or disruptions of information technology systems and the use of Internet, social media and mobile technologies could adversely affect our business and expose people's personal information.***

We are heavily dependent on critical, complex and interdependent information technology systems, including Internet-based systems, to support our business processes. In addition, Alcon and our associates rely on the Internet, social media tools and mobile technologies as a means of communication and to gather information, which can include personal information. We are also increasingly seeking to develop technology-based products to improve patient welfare in a variety of ways, which could also result in us gathering personal information about patients and others electronically.

The size and complexity of these information technology systems, and, in some instances, their age, make them potentially vulnerable to external or internal security incidents, breakdowns, malicious intrusions, cybercrimes, including state-sponsored cybercrimes, malware, misplaced or lost data, programming or human errors, or other similar events. Furthermore, because cyber-threats continue to evolve, it is becoming increasingly difficult to detect and successfully defend against them. Consequently, there is a risk that a breach remains undetected for a period of time.

We also currently rely on a number of older legacy information systems that are increasingly difficult to maintain as we continue to upgrade and implement our new systems. By attempting to implement new systems while maintaining the legacy systems, we may be unable to integrate all of our systems to work together. See "—We may experience difficulties implementing our new enterprise resource planning system" below for more details on our ongoing implementation of a new Enterprise Resource Planning ("ERP") system.

Like many companies, our technology landscape has become more complex as we also rely on our third party partners to be cyber-resilient. We have experienced certain adverse incidents and expect to continue to experience them in the future and, as the external cyber-attack threat only keeps growing, we may not be able to prevent future breakdowns or breaches in our systems (or those of our third party partners) and we may not be able to prevent such events from having a material adverse effect on our business, financial condition, results of operations or reputation.

Any disruptive event could negatively impact important business processes, such as the conduct of scientific research and clinical trials, the submission of the results of such efforts to health authorities in support of requests for product approvals, the functioning of our manufacturing and supply chain processes, our compliance with legal obligations and our other key business activities, including our associates' ability to communicate with one another and with third parties. These risks were heightened during the ongoing pandemic with our office-based associates largely working from home. Such potential information technology issues could also lead to the loss of important information such as trade secrets or other intellectual property and could accelerate the development or manufacturing of competing products by third parties. Furthermore, malfunctions in software or in devices that make significant use of information technology, including our surgical equipment, could lead to a risk of harm to patients.

In addition, our routine business operations, including through the use of information technologies such as the Internet, social media, mobile technologies and technology-based medical devices like our surgical equipment, also increasingly involve our gathering personal information (including sensitive personal information) about patients, vendors, customers, associates, collaborators and others. Breaches of our systems or those of our third-party contractors, or other failures to protect such information, could expose such people's personal information to unauthorized persons. Any such event could give rise to significant potential liability and reputational harm, including potentially substantial monetary penalties. We also make significant efforts to ensure that any international transfers of personal data are done in compliance with applicable law. We are subject to certain privacy laws and regulations that continue to evolve, including Swiss privacy laws, the EU's General Data Protection Regulation and the California Consumer Privacy Act, which include operational and compliance requirements that are different than those previously in place and also includes significant penalties for non-compliance. Failure to comply with these laws could lead to significant liability. In addition, any additional restraints that may be placed on our ability to transfer such data could have a material adverse effect on our business, financial condition, results of operations and reputation.

We also use Internet, social media and mobile tools as a means to communicate with the public, including about our products or about the diseases our products are intended to treat. However, such uses create risks, such as the loss of trade secrets or other intellectual property. In addition, there continue to be significant uncertainties as to the rules and regulations that apply to such communications, and as to the interpretations that health authorities will apply in this context to the rules that do exist. As a result, despite our efforts to comply with applicable rules and regulations, there is a significant risk that our use of Internet, social media and mobile technologies for such purposes may cause us to nonetheless be found in violation of them.

11

Breaches of data security, technology disruptions, privacy violations, or similar issues could cause the loss of trade secrets or other intellectual property, expose personal information, interrupt our operations, all of which could result in enforcement actions or liability, including potential government fines, claims for damages and shareholders' litigation. Any such events could require us to expend significant resources beyond those we already invest to further modify or enhance our protective measures, to remediate any damage and to enable the continuity of our business.

***Financial markets, including inflation and volatile exchange rates, are unpredictable.***

Financial markets may adversely affect our earnings, the return on our financial investments and the value of some of our assets. For example, inflation could accelerate, which could lead to higher interest rates, increasing our costs of raising capital. Uncertainties around future central bank and other economic policies in the United States and EU, as well as high debt levels in certain other countries, could also impact world trade. Sudden increases in economic, currency or financial market volatility in different countries have also impacted, and may continue to impact, our business and results of operations, including the value of our investments in our pension plans. See "—We may be underestimating our future pension and other post-employment benefit plan obligations" below.

Changes in exchange rates between the US dollar, our reporting currency and other currencies can also result in significant increases or decreases in our reported sales, costs and earnings as expressed in US dollars, and in the reported value of our assets, liabilities and cash flows. Despite any measures we may undertake in the future to reduce, or hedge against, foreign currency exchange risks, because a significant portion of our earnings and expenditures are in currencies other than the US dollar, and the fact that our expenditures in Swiss francs and US dollars are significantly higher than our revenue in Swiss francs and US dollars, respectively, any such exchange rate volatility may negatively and materially impact our business, results of operations and financial condition, and may impact the reported value of our net sales, earnings, assets and liabilities. For more information on the effects of currency fluctuations on our Consolidated Financial Statements and on how we manage currency risk, see "Item 5. Operating and Financial Review and Prospects—5.A. Operating Results—Effects of Currency Fluctuations" and "Item 11. Quantitative and Qualitative Disclosures About Market Risk".

Countries facing financial difficulties, including countries experiencing high inflation rates and highly indebted countries facing large capital outflows, may impose controls on the exchange of foreign currency. Such exchange controls could limit our ability to distribute retained earnings from our local affiliates, or to pay intercompany payables due from those countries.

***Ongoing consolidation among distributors, retailers and healthcare provider organizations could increase both the purchasing leverage of key customers and the concentration of credit risk.***

Increasingly, a significant portion of our global sales are made to a relatively small number of distributors, retail chains and other purchasing organizations, as consolidation and vertical integration have the potential to disrupt existing channels. The recent trend, which is present globally including in the United States (our largest market), has been toward further consolidation among distributors, retailers and other eye care industry customers, such as eye care professionals, including through the acquisition of consolidated ophthalmology practices by private equity and other venture fund investors. As a result, our customers are gaining additional purchasing leverage, which increases the pricing pressures facing our businesses.

In our surgical business, healthcare providers, physician practices, hospitals and surgery centers around the world continue to consolidate in response to declining reimbursement rates and intensifying pressure to reduce healthcare delivery expenses. In vision care, private label growth and retailer-branded lenses may drive the commoditization of contact lenses and further boost the bargaining power of our distributors and retailers. This consolidation is increasing the ability of large groups to negotiate price, accelerating the transition of the decision maker from physicians to cost-focused professional buyers and potentially increasing price transparency or price referencing in instances of consolidation across borders.

Further, as our customers consolidate, if one or more of our major customers experienced financial difficulties, the effect on us would be substantially greater than in the past, and could include a substantial loss of sales and an inability to collect amounts owed to us.

***If we fail to properly educate and train healthcare providers on our products, then customers may not buy our products.***

We market our surgical products to healthcare providers, including ECPs, public and private hospitals, ambulatory surgical centers, eye clinics and ophthalmic surgeons' offices and group purchasing organizations and our vision care products to retailers and distributors. We have developed, and strive to maintain, strong relationships with members of each of these groups who assist in product research and development and advise us on how to satisfy the full range of consumer and surgeon needs. We rely on these groups to recommend our products to their patients and to other members of their organizations. Travel restrictions such as those due to the COVID-19 pandemic have increased the difficulty in maintaining these strong relationships.

Contact lens and lens care consumers have a tendency not to switch products regularly and are repeat consumers. As a result, the success of these products relies on an ECP's initial recommendation of our products, which may be based on our ability to educate the ECP on our products. Even if we are successful at educating ECPs on our products, ECPs may continue to lose influence in the consumer's selection of contact lenses, which would cause our business to become more dependent upon the success of educating consumers directly. If we had to increase our direct-to-consumer marketing, we could potentially face challenges in maintaining our good relationships with ECPs, who may view our direct-to-consumer marketing as a threat to their business.

In our surgical business, ophthalmic surgeons play a significant role in determining the course of treatment and, ultimately, the type of products that will be used to treat a patient for cataracts, vitreoretinal conditions, refractive errors and glaucoma, among other things. As a result, it is important for us to properly and effectively market our surgical products to surgeons. Acceptance of our surgical products also depends on our ability to train ophthalmic surgeons and their clinical staff on the safe and appropriate use of our products, which takes time. This training process may take longer than expected and may therefore affect our ability to increase sales. Following completion of training, we rely on the trained ophthalmic surgeons to advocate the benefits of our products in the broader marketplace. Convincing ophthalmic surgeons to dedicate the time and energy necessary for adequate training is challenging, and we may not be successful in these efforts. If we are not successful in convincing ophthalmic surgeons of the merits of our products or educating them on the use of our products, they may not use our products and we will be unable to fully commercialize or profit from such products.

***Our inability to forecast demand accurately may adversely affect our sales and earnings and add to sales variability from quarter to quarter.***

We balance the need to maintain inventory levels that are sufficient to ensure competitive lead times against the risk of inventory obsolescence because of changing customer requirements, fluctuating commodity prices, changes to our products, product transfers or the life cycle of our products. To successfully manage our inventories, we must estimate demand from our customers and produce products in sufficient quantity that substantially corresponds to that demand. If we fail to adequately forecast demand for any product, or fail to determine the optimal product mix for production purposes, we may face production capacity issues in manufacturing sufficient quantities of a given product, such as our IOLs, daily contact lenses or certain ocular health products. In addition, failures in our information technology systems, issues created by the implementation of our new ERP system or human error could also lead to inadequate forecasting of our overall demand or product mix.

As the number of unique products (SKUs) we offer grows, particularly an increasing number of IOL and contact lens styles with varying diopters, the demand forecasting precision required for us to avoid production capacity issues will also increase. Accordingly, the continued proliferation of unique SKUs in our surgical and vision care portfolios could increase the risk of product unavailability and lost sales. Moreover, an increasing number of SKUs could increase global inventory requirements, especially for consigned products such as IOLs, negatively impacting our working capital performance and leading to write-offs due to obsolescence and expired products.

Compounding the risk of inaccurate forecasts, the manufacturing process for our products has lengthy lead times to acquire and install new equipment and product lines to ramp up production. Thus, if we fail to adequately forecast demand, then we may be unable to scale production in a timely manner to meet unexpected higher demand.

Finally, a significant portion of our vision care products are sold to major healthcare distributors and major retail chains in certain markets. Consequently, our sales and quarterly growth comparisons, as well as our estimates for required inventory levels, may be affected by fluctuations in the buying patterns of such buyers. These fluctuations may result from seasonality, pricing, a recall of a competitor's product, large retailers' and distributors' buying decisions or other factors. If we overestimate demand and produce too much of a particular product, we face a risk of inventory obsolescence, leaving us with inventory that we cannot sell profitably or at all. By contrast, if we underestimate demand and produce insufficient quantities of a product, we could be forced to choose between producing additional unexpected quantities of that product at a higher price or foregoing sales.

***Disruptions in our global supply chain or important facilities could cause production interruptions, delays and inefficiencies.***

We are engaged in manufacturing and sourcing of products and materials on a global scale. Our operations and those of our suppliers could be disrupted by a number of factors, including: disruptions in logistics; strikes and other labor disputes; loss or impairment of key manufacturing sites; loss of key suppliers; supplier capacity constraints; raw material and product quality or safety issues; industrial accidents or other occupational health and safety issues; the impact on our suppliers of tighter credit or capital markets; epidemics and pandemics; and natural and man-made disasters, including climatic events (including any potential effect of climate change), power grid failures, acts of war or terrorism, political unrest, fires or explosions and other external factors over which we have no control.

13

A023

In addition, we single-source or rely on limited sources of supply for many components, raw materials and production services, such as sterilization, used in the production of our products. The loss of one of these suppliers or the inability of any such supplier to meet performance and quality specifications, requested quantities or delivery schedules could cause our sales and profitability to decline and have a negative impact on our customer relations. For example, some of our products and product components are sterilized using ethylene oxide ("EtO"), which we purchase from large-scale suppliers. Concerns about the impact of EtO on the environment when released at unsafe levels have led to regulatory enforcement activities against EtO suppliers, including closures of their facilities. Any facility closures or disruption to the operations of these EtO suppliers could delay or prevent our ability to commercialize our products and lead to product back orders for our customers, which could have a materially negative impact on our sales and profitability. In addition, any regulatory enforcement activities against us for our use of EtO could result in financial, legal, business and reputational harm to us. The need to sterilize equipment and personal protective equipment to combat COVID-19 has exacerbated the shortage of EtO. Moreover, a price increase from a supplier where we do not have a supply alternative could cause our profitability to decline if we cannot increase our prices to our customers. To ensure sufficient supply, we may determine that we need to provide financing to some of our single-source suppliers, which could increase our financial exposure to such suppliers.

Finally, in some cases, we manufacture our products at a single manufacturing facility. In many cases, regulatory approvals of our products are limited to a specifically approved manufacturing facility. If we fail to produce enough of a product at a facility, or if our manufacturing process at that facility is disrupted, we may be unable to deliver that product to our customers on a timely basis. Problems may arise during the manufacturing process for a variety of reasons, including technical, labor or other difficulties, equipment malfunction, contamination, failure to follow specific protocols and procedures, destruction of or damage to any facility (as a result of a natural or man-made disaster, use and storage of hazardous materials or other events), power grid failures, or other reasons. In the event of a quality control issue, we may voluntarily, or our regulators may require us to, close a facility indefinitely. If any such problems arise, we may be unable to purchase substitute products from third-party manufacturers to make up any resulting shortfall in the production of a product, as such third-party manufacturers may only exist in limited numbers or appropriate substitutes may not be available. This risk is particularly relevant with respect to products for which we represent a substantial portion of the market, such as vitreoretinal equipment and other vitreoretinal-related products. A failure to deliver products on a timely basis could lead to customer dissatisfaction and damage to our reputation. Significant delays in the delivery of our products or a delay in the delivery of a key product could also negatively impact our sales and profitability.

***Our existing debt may limit our flexibility to operate our business or adversely affect our business and our liquidity position.***

We have outstanding debt of $4.1 billion as of December 31, 2020, and we may incur additional indebtedness in the future for various reasons, including fluctuations in operating results, capital expenditures and potential acquisitions.

Our indebtedness may:

- make it difficult for us to satisfy our obligations, including making interest payments on our debt obligations;

- require us to dedicate a portion of our cash flows to payments on our debt, reducing our ability to use our cash flows to fund capital expenditures, BD&L or other strategic transactions, working capital and other general operational requirements, or to pay dividends to our shareholders;

- limit our flexibility to plan for and react to changes in our business;

- negatively impact our credit rating and increase the cost of servicing our debt;

- place us at a competitive disadvantage relative to some of our competitors that have less debt than us;

- increase our vulnerability to general adverse economic and industry conditions, including changes in interest rates or a downturn in our business or the economy; and

- make it difficult to refinance our existing debt or incur new debt on terms that we would consider to be commercially reasonable, if at all.

The occurrence of any one of these events could have a material adverse effect on our business, financial condition or result of operations or cause a significant decrease in our liquidity and impair our ability to pay amounts due on our indebtedness.

***Investigations by government authorities under the FCPA and other applicable anti-corruption laws may result in substantial fines and other adverse effects.***

On June 25, 2020, Alcon entered into a three-year Deferred Prosecution Agreement ("DPA") with the U.S. Department of Justice, or DoJ, regarding a charge that Alcon Pte Ltd. conspired to falsify financial books and records in violation of the US Foreign Corrupt Practices Act of 1977, as amended, or FCPA. The charge relates to payments made by a former distributor

14

A024

to health care providers in Vietnam between 2007 and 2014. Alcon agreed to pay the DoJ a penalty of $8.925 million, for which Novartis has indemnified Alcon under the Separation and Distribution Agreement.

Under the DPA, the DoJ has agreed to defer prosecution for three years of the facts acknowledged by us that occurred between 2007 and 2014, after which period the charges will be dismissed with prejudice if we do not violate the terms of the DPA. If the DoJ determines that we have breached the DPA, the length of the DPA could be extended and/or we could be subject to prosecution and additional fines or penalties, including the deferred charges. Criminal prosecution or sanctions could have a material adverse effect on our business, financial condition, results of operations, or cash flows.

***Uncertainty relating to the nature and timing of the potential phasing out of LIBOR and agreement on any new alternative reference rates may adversely impact our borrowing costs.***

On March 6, 2019, we entered into a $0.8 billion unsecured five-year term loan facility ("Facility B") and a $1.0 billion unsecured five-year committed multicurrency revolving credit facility (the "Revolving Facility"). The Revolving Facility was undrawn as of December 31, 2020. Facility B bears an interest rate equal to the interest rate benchmark (USD prevailing London Interbank Offered Rate ("LIBOR")), plus an applicable margin. In February 2021, the Revolving Facility term was extended to March 2026.

On July 27, 2017, the UK's Financial Conduct Authority, which regulates LIBOR, announced that it intends to stop persuading or compelling banks to submit rates for the calculation of LIBOR after 2021. The announcement indicates that the continuation of LIBOR on the current basis cannot and will not be guaranteed after 2021. It is impossible to predict whether and to what extent banks will continue to provide LIBOR submissions to the administrator of LIBOR, whether LIBOR rates will cease to be published or supported before or after December 2021 or whether any additional reforms to LIBOR may be enacted in the UK or elsewhere.

Our Facilities Agreement provides for an alternative reference rate in the event LIBOR is discontinued. The alternative reference rate is based on the rate for which each of three reference banks could fund itself in USD for the relevant period with reference to the unsecured wholesale funding market. This alternative reference rate may perform differently than LIBOR for a number of reasons, including the fact that LIBOR is calculated using a greater number of participating banks. As a result, we may incur significant costs to transition our borrowing arrangements from LIBOR, which may have an adverse effect on our results of operations.

***We may need to obtain additional financing which may not be available or, if it is available, may not be on favorable terms and may result in dilution of our then-existing shareholders.***

We may need to raise additional funds to:

- finance unanticipated working capital requirements or refinance our existing indebtedness;
- develop or enhance our infrastructure and our existing products and services;
- maintain sufficient liquidity as a result of the impact from COVID-19;
- engage in mergers and acquisitions or other strategic BD&L transactions;
- fund strategic relationships; and
- respond to competitive pressures.

If we raise additional funds by issuing equity or convertible debt securities, the percentage ownership of our then-existing shareholders may be diluted, and holders of these securities may have rights, preferences or privileges senior to those of our then-existing shareholders.

***Our reliance on outsourcing key business functions to third parties heightens the risks faced by our businesses.***

We outsource the performance of certain key business functions to third parties and invest a significant amount of effort and resources into doing so. Such outsourced functions can include research and development collaborations, clinical trial activities, manufacturing operations, human resources, warehousing and distribution activities, certain finance functions, submission of regulatory applications, marketing activities, data management and others. Outsourcing of services to third parties could expose us to suboptimal quality of service delivery or deliverables and potentially result in repercussions such as missed deadlines or other timeliness issues, erroneous data, supply disruptions, non-compliance (including with applicable legal or regulatory requirements and industry standards) and/or reputational harm, with potential negative effects on our results.

We continue to rely on our former parent for certain key business functions, including certain transitional services that are covered under the Transitional Services Agreement, certain manufacturing needs that are covered under the Manufacturing and Supply Agreement and certain transitional distribution services that are covered under a Transitional Distribution and Services Agreement. For example, we continue to rely on our former parent company for the production of our entire supply of viscoelastics. We currently sell viscoelastics on a standalone basis for procedures using our

15

A025

products and also use them as a component in our surgical pack offerings. As a result, a shortage in our supply of viscoelastics could not only cause a failure in our ability to meet our commitments to our customers, but could also have significant collateral impacts on other parts of our business due to related decreases in the rates of procedures requiring viscoelastics that feature our equipment or other products.

Ultimately, if the third parties, including our former parent company, fail to meet their obligations to us, we may lose our investment in the collaborations and fail to receive the expected benefits of these arrangements. Contractual remedies may be inadequate to compensate us for the damage to our business or lost profits. In addition, many of the companies to which we outsource key business functions may have more limited resources compared to us, and, in particular, may not have internal compliance resources comparable to those within our organization. Should any of these third parties fail to carry out their contractual duties or regulatory obligations or fail to comply with the law, including laws relating to export and trade controls, or should they act inappropriately in the course of their performance of services for us, there is a risk that we could be held responsible for their acts, that our reputation may suffer and that penalties may be imposed upon us. Any such failures by third parties could have a material adverse effect on our business, financial condition, results of operations or reputation.

***Even if we protect our intellectual property to the fullest extent permitted by applicable law, our competitors and other third parties could develop and commercialize products similar or identical to ours, which could impair our ability to compete.***

We rely on a combination of patents, trademarks and copyrights to protect our intellectual property. The scope, strength and duration of those intellectual property rights can vary significantly from product to product and country to country. We also rely on a variety of trade secrets, know-how and other confidential information to supplement these protections. In the aggregate, these intellectual property rights are of material importance to our business.

The protections afforded by these intellectual property rights may limit the ability of competitors to commercialize products covered by the applicable intellectual property rights, but they do not prevent competitors from marketing alternative products that compete with our products. In addition, these intellectual property rights may be challenged by third parties and regulatory agencies, and intellectual property treated as trade secrets and protected through confidentiality agreements may be independently developed by third parties and/or subject to misappropriation by others. Furthermore, in certain countries, particularly in China, due to ambiguities in the law and enforcement difficulties, intellectual property rights may not be as effective as in Western Europe or the United States. Therefore, even if we protect our intellectual property to the fullest extent permitted by applicable law, competitors and other third parties may nonetheless develop and commercialize products similar or identical to ours, which could impair our ability to compete and have an adverse effect on our business, financial condition and results of operations.

***Unauthorized or illegal distribution may harm our business and reputation.***

In the United States and elsewhere, our products are subject to competition from lower priced versions of our products and competing products from countries where there are government imposed price controls or other market dynamics that make the products lower priced. Despite government regulations aimed at limiting such imports, the volume of imports may continue to rise in certain countries. This importation may adversely affect our profitability in the United States and elsewhere and could become more significant in the future.

In addition, our industry continues to be challenged by the vulnerability of distribution channels to counterfeiting. Reports of increased levels of counterfeiting could materially affect consumer confidence in the authentic product and harm our business or lead to litigation.

***Litigation, including product liability lawsuits, and governmental investigations may harm our business or otherwise distract our management.***

We, from time to time, are, and may in the future be, subject to various investigations and legal proceedings that arise or may arise.

We also periodically receive inquiries from antitrust and competition authorities in various jurisdictions and, from time to time, are named as a defendant in antitrust lawsuits. For example, since the first quarter of 2015, more than 50 putative class action complaints have been filed in several courts across the US naming as defendants contact lens manufacturers, including Alcon, and alleging violations of federal antitrust law, as well as the antitrust, consumer protection and unfair competition laws of various states, in connection with the implementation of unilateral price policies by the defendants in the sale of contact lenses. The cases have been consolidated in the Middle District of Florida by the Judicial Panel on Multidistrict Litigation and the claims are being vigorously contested. See "Item 8. Financial Information—8.A. Consolidated Statements and Other Financial Information—Legal Proceedings".

In addition, from time to time, we are named as a defendant in product liability lawsuits and, to the extent we are, we may in the future incur material liabilities relating to such product liability claims, including claims alleging product defects and/or alleged failure to warn of product risks. The risk of material product liability litigation is increased in connection with

16

product recalls and voluntary market withdrawals. We have voluntarily taken products off the market in the past, including global voluntary market withdrawal of the CyPass micro-stent. The combination of our insurance coverage, cash flows and provisions may not be adequate to satisfy product liabilities that we may incur in the future. Successful product liability claims brought against us or recalls of any of our products could have a material adverse effect on our business, results of operations or our financial condition.

Because of our extensive international operations, we could be adversely affected by violations of worldwide anti-bribery laws, including those that prohibit companies and their intermediaries from making improper payments to government officials or other third parties for the purpose of obtaining or retaining business, such as the US Foreign Corrupt Practices Act (the "FCPA"), and laws that prohibit commercial bribery. Our internal control policies and procedures may not always protect us from reckless or criminal acts committed by our associates or agents. Violations of these laws, or allegations of such violations, could disrupt our business and adversely affect our reputation and our business, results of operations, cash flows and financial condition.

Substantial, complex or extended litigation could cause us to incur large expenditures, affect our ability to market and distribute our products and distract our management. For example, intellectual property litigation in which we are named as a defendant from time to time could result in significant damage awards and injunctions that could prevent the manufacture and sale of the affected products or require us to make significant royalty payments to continue to sell the affected products. Lawsuits by associates, shareholders, customers or competitors, or potential indemnification obligations and limitations of our director and officer liability insurance, could be very costly and substantially disrupt our business. Disputes with such companies or individuals from time to time are not uncommon, and we may be unable to resolve such disputes on terms favorable to us.

Even meritless claims could subject us to adverse publicity, hinder us from securing insurance coverage in the future or require us to incur significant legal costs. As a result, significant claims or legal proceedings to which we are a party could have a material adverse effect on our business, prospects, financial condition and results of operations.

***Failure to comply with law, legal proceedings and government investigations may have a significant negative effect on our results of operations.***

We are obligated to comply with the laws of all of the countries around the world in which we operate and sell products. These laws cover an extremely wide and growing range of activities. Such legal requirements can vary from country to country and new requirements may be imposed on us from time to time as government and public expectations regarding acceptable corporate behavior change, and enforcement authorities modify interpretations of legal and regulatory provisions and change enforcement priorities. In addition, our associates, independent contractors, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements, in violation of such laws and public expectations.

For example, we are faced with increasing pressures, including new laws and regulations from around the world, to be more transparent with respect to how we do business, including with respect to our interactions with healthcare professionals and organizations. These laws and regulations include requirements that we disclose payments or other transfers of value made to healthcare professionals and organizations, including by our associates or third parties acting on our behalf, as well as with regard to the prices for our products. We are also subject to certain privacy laws, including Swiss privacy laws, the EU's General Data Protection Regulation and the California Consumer Privacy Act, which include operational and compliance requirements that are different than those previously in place and also includes significant penalties for non-compliance.

In addition, we have significant activities in a number of developing countries around the world, both through our own associates and through third parties retained to assist us. In some of these countries, a culture of compliance with law may not be as fully developed as in other countries.

To help us in our efforts to comply with the many requirements that impact us, we have a significant global ethics and compliance program in place, and we devote substantial time and resources to efforts to conduct our business in a lawful and publicly acceptable manner. Nonetheless, our ethics and compliance program may be insufficient or associates may fail to comply with the training they received, and any actual or alleged failure to comply with law or with heightened public expectations could lead to substantial liabilities that may not be covered by insurance, or to other significant losses, and could affect our business, financial position and reputation.

In particular, in recent years, there has been a trend of increasing government investigations, legal proceedings and law enforcement activities against companies and executives operating in our industry. Increasingly, such activities can involve criminal proceedings and can retroactively challenge practices previously considered to be acceptable. For instance, in 2017 and 2018, Alcon and Novartis, as well as certain present and former executives and associates of Alcon and Novartis, received document requests and subpoenas from the DoJ and the SEC requesting information concerning Alcon accounting, internal controls and business practices in Asia and Russia, including revenue recognition for surgical equipment and related products and services and relationships with third-party distributors, both before and after Alcon

17

became part of the Novartis Group. The investigations by the DoJ and the SEC have concluded. Under our final settlement with the DoJ, we are subject to a three-year deferred prosecution agreement. Our failure to comply with the terms of the deferred prosecution agreement with the DoJ could result in resumed prosecution and other regulatory sanctions and could otherwise negatively affect our operations.

For additional information, including with respect to certain Novartis obligations to indemnify Alcon, see "Item 8. Financial Information—8.A. Consolidated Statements and Other Financial Information—Legal Proceedings".

Such proceedings are inherently unpredictable, and large judgments or penalties sometimes occur. As a consequence, we may in the future incur judgments or penalties that could involve large cash payments, including the potential repayment of amounts allegedly obtained improperly and other penalties, including enhanced damages. In addition, such proceedings may affect our reputation, create a risk of potential exclusion from government reimbursement programs and may lead to civil litigation. As a result, having taken into account all relevant factors, we may in the future enter into major settlements of such claims without bringing them to final legal adjudication by courts or other such bodies, despite having potentially significant defenses against them, in order to limit the risks they pose to our business and reputation. Such settlements may require us to pay significant sums of money and to enter into corporate integrity or similar agreements intended to regulate company behavior for a period of years, which can be costly to operate under.

Any such judgments or settlements, and any accruals that we may take with respect to potential judgments or settlements, could have a material adverse impact on our business, financial condition or results of operations, as well as on our reputation.

***We may implement product recalls or voluntary market withdrawals of our products.***

The manufacturing and marketing of medical devices, including surgical equipment and instruments, involve an inherent risk that our products may prove to be defective and cause a health risk. We are also subject to a number of laws and regulations requiring us to report adverse events associated with our products. Such adverse events and potential health risks identified in our monitoring efforts or from ongoing clinical studies may lead to voluntary or mandatory market actions, including recalls, product withdrawals or changes to the instructions for using our devices.

Governmental authorities throughout the world, including the FDA, have the authority to require the recall of our commercialized products in the event of material deficiencies or defects in, for example, design, labeling or manufacture.

We may also voluntarily initiate certain field actions, such as a correction or removal of our products in the future as a result of component failures, manufacturing errors, design or labeling defects or other deficiencies and issues. If a correction or removal of one of our devices is initiated to reduce a health risk posed by the device, or to remedy a violation of the Federal Food, Drug, and Cosmetic Act ("FDCA") caused by the device that may present a risk to health, the correction or removal must be reported to the FDA. Similarly, field actions conducted for safety reasons in the European Economic Area must be reported to the regulatory authority in each country where the field action occurs.

We have voluntarily taken products off the market in the past, including the global voluntary market withdrawal of the CyPass micro-stent. In the year ended December 31, 2018, we recognized an impairment charge of $337 million in relation to the CyPass micro-stent market withdrawal. Based on this experience, we believe that the occurrence of a recall could result in significant costs to us, potential disruptions in the supply of our products to our customers and adverse publicity, all of which could harm our ability to market our products. A recall of one of our products or a similar competing product manufactured by another manufacturer could impair sales and subsequent regulatory approvals of other similar products we market and lead to a general loss of customer confidence in our products. A product recall could also lead to a health authority inspection or other regulatory action or to us being named as a defendant in lawsuits. See "—Litigation, including product liability lawsuits, and governmental investigations may harm our business or otherwise distract our management" above.

***We may experience difficulties implementing our new enterprise resource planning system.***

We are engaged in a multi-year implementation of a new ERP system across our global commercial and manufacturing operations, which is intended to enhance and streamline our existing ERP system. ERP implementations are inherently complex and time-consuming projects that involve substantial expenditures on system software, implementation activities and business process reengineering. Any significant disruption or deficiency in the design and implementation of our new ERP system could adversely affect our ability to process orders, ship our products, provide services and customer support, fulfill contractual obligations or otherwise operate our business. For additional information, see "Item 4. Information on the Company—4.A. History and Development of the Company—Significant Acquisitions, Dispositions and other Events".

***We may be unable to attract and retain qualified personnel.***

We are highly dependent upon skilled personnel in key parts of our organization, and we invest heavily in recruiting, training and retaining qualified individuals, including significant efforts to enhance the diversity of our workforce. The loss of the service of key members of our organization—including senior members of our scientific and management teams,

high-quality researchers and development specialists and skilled personnel in developing countries—could delay or prevent the achievement of major business objectives.

In addition, our ability to hire qualified personnel also depends on the flexibility to reward superior performance and to pay competitive compensation. Laws, regulations and customary practice on executive compensation, including legislation and customary practice in our home country, Switzerland, may restrict our ability to attract, motivate and retain the required level of qualified personnel. For example, pay benchmarks for Swiss and other European companies may be inconsistent with the current market in the United States, making it more difficult to recruit US talent. Further, certain associates will be required to travel frequently between Switzerland and the US. These associates may be unwilling or unable to make such a commitment. Finally, changes to immigration policies in the numerous countries in which we operate, including the United States, as well as restrictions on global travel as a result of local or global public health crises requiring quarantines or other precautions to limit exposure to infectious diseases, may limit our ability to hire or retain talent in, or transfer talent to, specific locations.

***We may be underestimating our future pension and other post-employment benefit plan obligations.***

We sponsor pension and other post-employment benefit plans in various forms. While most of our plans are now defined contribution plans, certain of our associates remain under defined benefit plans. For these defined benefit plans, we are required to make significant assumptions and estimates about future events in calculating the present value of expected future plan expenses and liabilities. These include assumptions used to determine the discount rates we apply to estimated future liabilities and rates of future compensation increases. Assumptions and estimates we use may differ materially from the actual results we experience in the future, due to changing market and economic conditions, higher or lower withdrawal rates, or longer or shorter life spans of participants, among other variables. For example, in 2020, a decrease in the interest rate we apply in determining the present value of expected future total defined benefit plan obligations (consisting of pension and other post-employment benefit obligations) of one-quarter of one percent would have increased our year-end defined benefit obligation by $46 million. Any differences between our assumptions and estimates and our actual experience could require us to make additional contributions to our pension funds. Further, additional employer contributions might be required if plan funding falls below the levels required by local rules.

***Our operations in emerging markets, particularly China, expose us to heightened risks associated with conditions in those markets.***

Economic, social and political conditions, laws, practices and local customs vary widely among the countries, particularly in emerging markets, in which we sell our products. Our operations in emerging markets, particularly China, are subject to a number of heightened risks and potential costs, including lower profit margins, less stringent protection of intellectual property and economic, political and social uncertainty. For example, many emerging markets have currencies that fluctuate substantially. If currencies devalue and we cannot offset with price increases, our products may become less profitable. Inflation in emerging markets also can make our products less profitable and increase our exposure to credit risks. We have previously experienced currency fluctuations, unstable social and political conditions, inflation and volatile economic conditions in emerging markets, which have impacted our profitability in the emerging markets in which we operate and we may experience such impacts in the future.

Further, in many emerging markets, average income levels are relatively low, government reimbursement for the cost of healthcare products and services is limited and prices and demand are sensitive to general economic conditions. These challenges may prevent us from realizing the expected benefits of our investments in such emerging markets, which could have an adverse impact on our business, financial condition and results of operations.

***Regulatory clearance and approval processes for our products are expensive, time-consuming and uncertain, and the failure to obtain and maintain required regulatory clearances and approvals could prevent us from commercializing our products.***

Our businesses are subject to varying degrees of governmental regulation in the countries in which we operate, and the general trend is toward increasingly stringent regulation. The exercise of broad regulatory powers by the FDA continues to result in increases in the amounts of testing and documentation required for the commercialization of regulated products and a corresponding increase in the expense of product introduction. Similar trends are also evident in the EU and in other markets throughout the world. Compliance with these laws and regulations is costly and materially affects our business. Among other effects, health care regulations substantially increase the time, difficulty and costs incurred in obtaining and maintaining approval to market newly developed and existing products.

Most of our products are regulated as medical devices and face difficult development and approval processes in most jurisdictions we operate in, particularly in the US and EU; however other products may be regulated as other categories such as lasers, drug products, dietary supplements and medical foods. We discuss these regulations more thoroughly "Item 4. Information on the Company—4.B. Business Overview—Government Regulation—Product Approval and Monitoring*".*

19

The process of developing new products and obtaining necessary FDA clearance or approval, CE marking, or other regulatory marketing authorization is lengthy, expensive and uncertain. Our potential products could take a significantly longer time than we expect to gain marketing authorization or may never gain such marketing authorization. Regulatory authorities may require additional testing or clinical data to support marketing authorization, delaying authorization and market entry of our products. Even if the FDA or another regulatory agency or notified body approves a product, the approval may limit the indicated uses for a product, may otherwise limit our ability to promote, sell and distribute a product or may require post-marketing studies or impose other post-marketing obligations. We may be unable to obtain the necessary regulatory clearances or approvals for any product on a timely basis or at all. If a regulatory authority delays authorization of a potentially significant product, our market value and operating results may decline. Similarly, if we are unable to obtain regulatory approval or CE marking of our products, we will not be able to market these products, which would result in a decrease in our sales.

We may be unable to successfully maintain the registrations, licenses, clearances or other authorizations we have received or may receive in the future. We also routinely make minor modifications to our products, labeling, instructions for use, manufacturing process and packaging that may trigger a requirement to notify regulatory authorities or to update such registrations or authorizations. This may subsequently require us to manage multiple versions of individual products around the world, depending on the status of any re-registration approvals. Managing such multiple versions may require additional inventory in the form of "bridging stock", extensive redress operations and inventory increases that could exceed our manufacturing capacity or supply chain ability at the time. This could result in prolonged product shortages that could negatively impact our sales, both in terms of any unavailable products and the potential loss of customers that opt for another supplier.

The loss of previously received clearances or approvals, or the failure to comply with existing or future regulatory requirements could also have a material adverse effect on our business. For example, we offer custom surgical pack products that combine both Alcon and third-party products. Changes in local regulatory statutes, health authority practices, or local importation laws, or the failure of Alcon or our suppliers comply with them, could result in our products being barred from importation into a given territory. Continued growth in our sales and profits will depend, in part, on the timely and successful introduction and marketing of some or all of the products for which we are currently pursuing approval.

***The manufacture of our products is highly regulated and complex.***

The manufacture of our product portfolio is complex and heavily regulated by governmental health authorities around the world, including the FDA. Whether our products are manufactured at our own dedicated manufacturing facilities or by third parties, we must ensure that all manufacturing processes comply with current Good Manufacturing Practices, quality system requirements and other applicable regulations, as well as with our own high quality standards. In recent years, health authorities have substantially intensified their scrutiny of manufacturers' compliance with such requirements.

Any significant failure by us or our third-party suppliers to comply with these requirements or the health authorities' expectations may cause us to shut down our production facilities or production lines or we could be prevented from importing our products from one country to another. Moreover, if we fail to properly plan for manufacturing capacity, the complexity of our manufacturing process could lead to a long lead time to increase capacity. Any of these events could lead to product shortages, or to our being entirely unable to supply products to customers and consumers for an extended period of time. Such shortages or shutdowns have led to, and could continue to lead to, significant losses of sales revenue and to potential third-party litigation. In addition, health authorities have in some cases imposed significant penalties for such failures to comply with regulatory requirements. A failure to comply fully with regulatory requirements could also lead to a delay in the approval of new products to be manufactured at the impacted site.

***We may be subject to penalties if we fail to comply with post-approval legal and regulatory requirements and our products could be subject to restrictions or withdrawal from the market.***

The research, development, testing, manufacturing, sale and marketing of our products are subject to extensive governmental regulation. Government regulation includes inspection of and controls over testing, manufacturing, safety and environmental controls, efficacy, labeling, advertising, marketing, promotion, record keeping, tracking, reporting, distributing, import, export, samples, electronic records and electronic signatures.

Among other requirements, we are required to comply with applicable adverse event and malfunction reporting requirements for our products. For example, for our medical device products, in the US, we are required to report to the FDA any incident in which one of our marketed devices may have caused or contributed to a death or serious injury or has malfunctioned and the malfunction of the device or a similar device that we market would be likely to cause or contribute to death or serious injury if the malfunction were to recur. In addition, all manufacturers placing medical devices on the market in the European Economic Area are legally required to report any serious or potentially serious incidents involving devices produced or sold by the manufacturer to the relevant authority in those jurisdictions where any such incident occurred.

20

A030

Our advertising and promotional activities are also subject to stringent regulatory rules and oversight. The marketing approvals from the FDA and other regulators of certain of our products are, or are expected to be, limited to specific uses. We are prohibited from marketing or promoting any uncleared or unapproved use of our product, referred to as "off-label" use. In addition to promoting our products in a manner consistent with our clearances and approvals, we must have adequate substantiation for the claims we make for our products. If any of our claims are determined to be false, misleading or deceptive, we could be subject to enforcement action. As Alcon and our associates increasingly use social media to communicate, and given the speed of dissemination of information online, there is a heightened risk that Alcon or one of our associates sends a message that may be deemed inappropriate or prohibited by a regulatory authority. In addition, unsubstantiated claims also present a risk of consumer class action or consumer protection litigation and competitor challenges. In the past, we have had to change or discontinue promotional materials because of regulatory agency requests, and we are exposed to that possibility in the future.

Failure to comply with statutes and regulations administered by the FDA and other regulatory bodies or failure to adequately respond to any notices of violation or any similar reports could result in, among other things, any of the following enforcement actions:

- warning letters or untitled letters issued by the FDA;

- fines, civil penalties, in rem forfeiture proceedings, injunctions, consent decrees and criminal prosecution;

- detention of imported products;

- delays in approving, or refusal to approve, our products;

- withdrawal or suspension of approval of our products or those of our third-party suppliers by the FDA or other regulatory bodies;

- product recall or seizure;

- operating restrictions or interruption of production; and

- inability to export to certain countries.

If any of these items were to occur, it could result in unanticipated expenditures to address or defend such actions, could harm our reputation and could adversely affect our business, financial condition and results of operations.

***We are subject to laws targeting fraud and abuse in the healthcare industry.***

We are subject to various global laws pertaining to healthcare fraud and abuse, including anti-kickback laws and physician self-referral laws. For example, the US federal healthcare program anti-kickback statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration to induce, or in return for, purchasing, leasing, ordering, arranging for or recommending the purchase, lease or order of any healthcare item or service reimbursable under Medicare, Medicaid or other federally financed healthcare programs. These US laws have been interpreted to apply to arrangements between medical device manufacturers, on the one hand, and prescribers, purchasers, formulary managers and other healthcare-related professionals, on the other hand. The US government may assert that a claim including items or services resulting from a violation of the federal anti-kickback statute constitutes a false or fraudulent claim for purposes of the false claims statutes. Pricing and rebate programs for drugs reimbursed under federal healthcare programs must comply with the Medicaid drug rebate requirements of the Omnibus Budget Reconciliation Act of 1990, as amended, the Veterans Health Care Act of 1992, as amended, and the Deficit Reduction Act of 2005, as amended. The statutes and regulations governing the various price reporting requirements are complex and have changed over time, and the US government has not given clear guidance on many issues. In addition, recent statutory and regulatory developments have not yet been applied by the government or courts to specific factual situations. We believe that we are in compliance with all applicable government price reporting requirements, but there is the potential that the Centers for Medicare & Medicaid Services ("CMS"), other regulatory and law enforcement agencies or a court could arrive at different interpretations, with adverse financial or other consequences for us. If products are made available to authorized users of the Federal Supply Schedule of the General Services Administration, additional laws and requirements apply. All of these activities are also potentially subject to federal and state consumer protection and unfair competition laws. Some European Union bodies and most European Union member states and Japan impose controls and restrictions that are similar in nature or effect to those described above.

In recent years, the US government and several US states have enacted legislation requiring medical device companies to establish marketing compliance programs and file other periodic reports. Similar legislation is being considered in other US states. Many of these requirements are new and uncertain, and available guidance is limited. We could face enforcement action, fines and other penalties and could receive adverse publicity, all of which could harm our business, if it is alleged that we have failed to fully comply with such laws and regulations. Similarly, if the physicians or other providers or entities that we do business with are found to have not complied with applicable laws, they may be subject to sanctions, which could also have a negative impact on our business.

Depending on the circumstances, failure to meet these applicable legal and regulatory requirements can result in criminal prosecution, fines or other penalties, injunctions, recall or seizure of products, total or partial suspension of production, denial or withdrawal of pre-marketing product approvals, private "qui tam" actions brought by individual whistleblowers in the name of the government, or refusal to allow us to enter into supply contracts, including government contracts, any of which could have a material adverse effect on our business, financial condition or results of operations.

***Legislative and regulatory reforms may impact our ability to develop and commercialize our products.***

The global regulatory environment is increasingly stringent and unpredictable. Unexpected changes can have an adverse impact on our business, financial condition and results of operations.

First, it could be costly and onerous to comply with changes or new requirements relating to the regulatory approval process or postmarket requirements applicable to our products in various jurisdictions. As discussed in "Item 4. Information on the Company—4.B. Business Overview—Government Regulation—Product Approval and Monitoring" the EU has made recent changes to its regulatory regime. In addition, several countries that did not have regulatory requirements for medical devices have established such requirements in recent years, and other countries have expanded, or plan to expand, their existing regulations. While harmonization of global regulations has been pursued, requirements continue to differ significantly among countries. Further, the FDA is also pursuing various efforts to modernize its regulation of devices, including potential changes to the 510(k) pathway such as limiting reliance on older predicate devices and establishing an alternative 510(k) pathway that permits reliance on objective performance criteria. We expect this global regulatory environment to continue to evolve, which could impact the cost of, the time needed to approve and, ultimately, our ability to maintain existing approvals or obtain future approvals for, our products.

Second, new legislation and new regulations and interpretations of existing health care statutes and regulations are frequently adopted, any of which could affect our future business and results of operations. For example, in the US, there have been a number of health care reform legislative and regulatory measures proposed and adopted at the federal and state government levels that affect the health care system generally and that have had significant impact on our business.

Third, changes to current regulations in certain countries, including the United States, requiring a prescription for the purchase of contact lenses could have a significant impact on the way we market and distribute contact lens and contact lens care products, by limiting the role of the ECP as an intermediary in the sale of our vision care products. Such changes could require us to incur significant costs to update our marketing and distribution methodologies and could adversely affect the sales of our vision care products.

Finally, within our surgical business, a considerable portion of our sales and sales growth rely on patient-pay premium technologies, in markets where access to these technologies has been established. For example, in the US, two landmark rulings issued by the CMS established a bifurcated payment system for certain of our AT-IOLs pursuant to which part of the cost of the cataract surgery with such AT-IOLs would be reimbursed under Medicare, with the remaining cost paid out-of-pocket. For more details, see "Item 4. Information on the Company—4.B. Business Overview—Our Products—Surgical". To the extent regulatory bodies in the US, such as CMS, or other health authorities outside the US, decide to amend the regulations governing patient-pay reimbursement for advanced technologies, our sales and sales growth could be negatively impacted.

***We are subject to environmental, health and safety laws and regulations.***

We are subject to numerous national and local environmental, health and safety laws and regulations, including relating to the discharge of regulated materials into the environment, human health and safety, laboratory procedures and the generation, handling, use, storage, treatment, release and disposal of hazardous materials and wastes. Our operations involve the use of hazardous and flammable materials, including chemicals and biological materials. Our operations also produce hazardous waste products. We generally contract with third parties for the disposal of these hazardous materials and wastes. We cannot eliminate the risk of contamination or injury from these materials. In the event of contamination or injury resulting from our generation, handling, use, storage, treatment, release or disposal of hazardous materials or wastes, we could be held liable for any resulting damages, and any liability could materially adversely affect our business, operating results or financial condition. Our insurance may not provide adequate coverage against potential liabilities. If we fail to comply with applicable environmental, health and safety laws and regulations, we may face significant administrative, civil or criminal fines, penalties or other sanctions. In addition, we may incur substantial costs to comply with current or future environmental, health and safety laws and regulations, which have tended to become more stringent over time, including any potential laws and regulations that may be implemented in the future to address global climate change concerns. Compliance with current or future environmental, health and safety laws and regulations may increase our costs or impair our research, development or production efforts.

***We must comply with certain tax incentive agreements in Switzerland.***

While operating as a division of Novartis, our subsidiary, Alcon Pharmaceuticals Ltd. ("APL"), benefited from an investment tax incentive granted by the Swiss State Secretariat for Economic Affairs in Switzerland and the Canton of Fribourg, Switzerland in respect of both Swiss federal taxes and Fribourg cantonal / communal taxes for the fiscal years ended

December 31, 2007 through December 31, 2017. This tax incentive is subject to a five year "claw-back" period if Alcon does not continue to meet certain requirements related to its operations in Fribourg.

In connection with the Spin-off, our former parent retained certain assets of APL related to APL's former pharmaceutical business. As a result, Novartis agreed with the Canton of Fribourg that each of APL and a subsidiary of Novartis (Novartis Ophthalmics AG, Fribourg) will have separate and standalone obligations and potential liabilities in connection with the five year claw-back period relating to the Fribourg investment tax incentive granted to APL. In particular, APL may be required to pay a "claw-back" amount of up to CHF 1.3 billion to the Fribourg tax authorities if APL fails to continue certain business activities in Fribourg and if Alcon Inc., APL and Alcon Services AG fail to (i) remain tax resident in Fribourg, and (ii) employ a certain minimum number of associates in Fribourg. Since December 31, 2018, our "claw-back" obligation has begun to be reduced each year by 20% of the original maximum amount and will expire on December 31, 2022. As of December 31, 2020, the "claw-back" obligation amounted to CHF 520 million.

We intend to conduct APL's operations so as to comply with these requirements in all respects; however, we may be unable to meet, or the Canton of Fribourg may successfully challenge our compliance with, these requirements. If the Canton of Fribourg successfully challenges our compliance with these requirements, we would be required to pay all or a portion of the "claw-back" amount.

*We are a multinational business that operates in numerous tax jurisdictions.*

We conduct operations in multiple tax jurisdictions, and the tax laws of those jurisdictions generally require that the transfer prices between affiliated companies in different jurisdictions be the same as those between unrelated companies dealing at arm's length and that such prices are supported by contemporaneous documentation. While we believe that we operate in compliance with applicable transfer pricing laws and intend to continue to do so, our transfer pricing procedures are not binding on applicable tax authorities. If tax authorities in any of these jurisdictions were to successfully challenge our transfer prices as not reflecting arm's length transactions, they could require us to adjust our transfer prices and thereby reallocate our income to reflect these revised transfer prices, which could result in a higher overall tax liability to us and possibly interest and penalties.

Additionally, the integrated nature of our worldwide operations can produce conflicting claims from tax authorities in different countries as to the profits to be taxed in the individual countries. The majority of the jurisdictions in which we operate have double tax treaties with other foreign jurisdictions, which provide a framework for mitigating the impact of double taxation on our revenues and capital gains. However, mechanisms developed to resolve such conflicting claims are largely untested, can be expected to be very lengthy and do not always contain a mandatory dispute resolution clause.

In recent years, tax authorities around the world have increased their scrutiny of company tax filings and have become more rigid in exercising any discretion they may have. As part of this, the Organization for Economic Co-operation and Development ("OECD") has proposed certain changes to the International tax standards that have resulted and will continue to result in local tax law changes under its Base Erosion and Profit Shifting ("BEPS") Action Plans to address issues of transparency, coherence and substance. Most recently, the OECD has released its plans for proposing further amendments to the international tax standards, including a new attribution of the right to tax corporate profits where customers are located and a mechanism ensuring that all corporate profits would be subject to a minimum taxation level.

Furthermore, Switzerland and the various Swiss cantons in which Alcon is present have adopted their own corporate tax reform. The main elements of the Swiss tax reform became effective in 2020 and have resulted in an increase in Alcon's tax burden and effective tax rate in Switzerland.

In general, tax reform efforts, including with respect to tax base or rate, transfer pricing, intercompany dividends, cross border transactions, controlled corporations and limitations on tax relief allowed on the interest on intercompany debt, will require us to continually assess our organizational structure and could lead to an increased risk of international tax disputes, an increase in our effective tax rate and an adverse effect on our financial condition.

*Goodwill and other intangible assets on our books may lead to significant noncash impairment charges.*

We carry a significant amount of goodwill and other intangible assets on our consolidated balance sheet, primarily due to the value of the Alcon brand name, but also intangible assets associated with our technologies, acquired research and development, currently marketed products and marketing know-how. As a result, we may incur significant noncash impairment charges if the fair value of the intangible assets and the groupings of cash generating units containing goodwill would be less than their carrying value on our consolidated balance sheet at any point in time.

For a detailed discussion of how we determine whether an impairment has occurred, what factors could result in an impairment and the impact of impairment charges on our results of operations, see "Note 3. Selected Accounting Policies—Goodwill and intangible assets—Impairment of goodwill, Alcon brand name and definite lived intangible assets" to our Consolidated Financial Statements included elsewhere in this Annual Report.

***Our previously announced estimates for the costs we expect to incur in connection with our separation from Novartis and our previously announced transformation program may be inaccurate.***

We have previously announced that we expect to incur costs of $500 million in connection with our separation from Novartis. We have also previously announced that we expect to incur costs of $300 million and realize savings of $200 to $225 million on an annualized run rate by 2023 in connection with our transformation program. While we believe that these estimates are reasonable under the circumstances, they are subject to significant uncertainties, some of which are beyond our control. In addition, we may not be able to obtain the estimated cost savings and benefits that were initially anticipated in connection with our transformation program in a timely manner or at all. Should any of these estimates or underlying assumptions change or prove to have been incorrect, it could adversely affect our results of operations.

***Environmental, social and governance matters may impact our business and reputation.***

Increasingly, in addition to the importance of their financial performance, companies are being judged by their performance on a variety of environmental, social and governance ("ESG") matters, which are considered to contribute to the long-term sustainability of companies' performance.

A variety of organizations measure the performance of companies on such ESG topics, and the results of these assessments are widely publicized. In addition, investment in funds that specialize in companies that perform well in such assessments are increasingly popular, and major institutional investors have publicly emphasized the importance of such ESG measures to their investment decisions. Topics taken into account in such assessments include, among others, the company's efforts and impacts on climate change and human rights, ethics and compliance with law and the role of the company's board of directors in supervising various sustainability issues. In addition to the topics typically considered in such assessments, in the healthcare industry, issues of the public's ability to access our products and solutions are of particular importance.

We actively manage a broad range of such ESG matters, taking into consideration their expected impact on the sustainability of our business over time and the potential impact of our business on society and the environment. However, in light of investors' increased focus on ESG matters, there can be no certainty that we will manage such issues successfully, or that we will successfully meet society's expectations as to our proper role. Any failure or perceived failure by us in this regard could have a material adverse effect on our reputation and on our business, share price, financial condition, or results of operations, including the sustainability of our business over time.

## Risks Related to the Separation from Novartis

***Our ability to operate our business effectively may suffer if we do not, quickly and cost effectively, establish our own administrative and support functions necessary to operate as a stand-alone public company.***

As a division of Novartis, we historically relied on financial (including financial and compliance controls) and certain legal, administrative and other resources of Novartis to operate our business. In particular, Novartis Business Services ("NBS"), the Novartis shared service organization, historically provided us with services across the following service domains: human resources operations, real estate and facility services, procurement, information technology, commercial and medical support services and financial reporting and accounting operations.

Since our separation from Novartis, we have continued to expand our own financial, administrative, corporate governance and listed company compliance and other support systems, including for the services NBS had historically provided to us, or have contracted with third parties to replace Novartis systems that we are not establishing internally. This process has been complex, time consuming and costly.

Novartis will continue to provide support for certain of our key business functions until April 2021 pursuant to a Transitional Services Agreement and certain other agreements. Any failure or significant downtime in our own financial, administrative or other support systems or in the Novartis financial, administrative or other support systems during the transitional period in which Novartis provides us with support could negatively impact our results of operations or prevent us from paying our suppliers and associates, executing business combinations and foreign currency transactions or performing administrative or other services on a timely basis, which could negatively affect our results of operations.

***The transitional services Novartis has agreed to provide us may not be sufficient for our needs. In addition, we or Novartis may fail to perform under various transaction agreements that will be executed as part of the separation or we may fail to have necessary systems and services in place when certain of the transaction agreements expire.***

In connection with the separation, we entered into a Separation and Distribution Agreement and various other agreements with Novartis, including the Transitional Services Agreement, Tax Matters Agreement, Employee Matters Agreement, Manufacturing and Supply Agreement and other separation-related agreements. See "Item 10. Additional Information—10.C. Material Contracts—Our Agreements with Novartis". Certain of these agreements will provide for the performance of key business services by Novartis for our benefit for a period of time after the separation. These services

24

A034

may not be sufficient to meet our needs and the terms of such services may not be equal to or better than the terms we may have received from unaffiliated third parties, including our ability to obtain redress.

We rely on Novartis to satisfy its performance and payment obligations under these agreements. If Novartis does not satisfactorily perform its obligations under these agreements, including its indemnification obligations, we could incur operational difficulties or losses. If we do not have in place our own systems and services, or if we do not have agreements with other providers of these services once certain transitional agreements expire, we may not be able to operate our business effectively. In addition, after our agreements with Novartis expire, we may not be able to obtain these services at as favorable prices or on as favorable terms.

***The separation and Spin-off could result in significant tax liability. In addition, we agreed to certain restrictions designed to preserve the tax treatment of the separation and Spin-off.***

The relevant Swiss tax consequences of the separation and Spin-off have been taken up with the Swiss tax authorities. Novartis received written confirmations (the "Swiss Tax Rulings") from the Swiss Federal Tax Administration and from the tax administrations of the Canton of Basel-Stadt and the Canton of Fribourg addressing the relevant Swiss tax consequences of the separation and Spin-off. In addition, Novartis received a private letter ruling from the US Internal Revenue Service (the "IRS", and such ruling, the "IRS Ruling") and obtained a written opinion of Cravath, Swaine & Moore LLP, counsel to Novartis (the "Tax Opinion") to the effect that the separation and Spin-off should qualify for nonrecognition of gain and loss to Novartis and its shareholders under Section 355 of the Code.

If the separation and/or Spin-off were determined not to qualify for the treatments described in the Tax Rulings and Tax Opinion, or if any conditions in the Tax Rulings or Tax Opinion are not observed, then we could suffer adverse Swiss stamp duty and Novartis could suffer Swiss and US income, withholding and capital gains tax consequences and, under certain circumstances, we could have an indemnification obligation to Novartis with respect to some or all of the resulting tax to Novartis under the tax matters agreement (the "Tax Matters Agreement") we entered into with Novartis, as described in "Item 10. Additional Information—10.C. Material Contracts—Our Agreements with Novartis—Tax Matters Agreement".

In addition, under the Tax Matters Agreement, we agreed to certain restrictions designed to preserve the expected tax neutral nature of the separation and the Spin-off for Swiss tax and US federal income tax purposes. These restrictions may limit our ability to pursue strategic transactions or engage in new businesses or other transactions that might be beneficial and could discourage or delay strategic transactions that our shareholders may consider favorable. See "Item 10. Additional Information—10.C. Material Contracts—Our Agreements with Novartis—Tax Matters Agreement" for more information.

# Risks related to the Ownership of our Shares

***Your percentage ownership in Alcon may be diluted in the future.***

In the future, your percentage ownership in Alcon may be diluted because of equity issuances from acquisitions, capital markets transactions or otherwise, including equity awards that we may grant to our directors, officers and associates under our associate participation plans. These additional issuances will have a dilutive effect on our earnings per share, which could adversely affect the market price of our shares.

***Our maintenance of two exchange listings could result in pricing differentials of our ordinary shares between the two exchanges.***

Our shares trade on the NYSE in US dollars and on the SIX in Swiss francs, which may result in price differentials between the two exchanges for a variety of factors, including fluctuations in the US dollar/Swiss franc exchange rate and differences in trading schedules.

***We may not pay or declare dividends.***

Although Alcon expects that it will recommend the payment of a regular cash dividend based upon the prior year's core net income, we may not pay or declare dividends in the future. Due to the economic uncertainties resulting from the COVID-19 pandemic, our Board chose to recommend not paying a dividend in 2020. The declaration, timing and amount of any dividends to be paid by Alcon will be subject to the approval of shareholders at the relevant General Meeting of shareholders. The determination by the Board as to whether to recommend a dividend and the approval of any such proposed dividend by the shareholders will depend upon many factors, including our financial condition, earnings, corporate strategy, capital requirements of our operating subsidiaries, covenants, legal requirements and other factors deemed relevant by the Board and shareholders.

In addition, any dividends that we may declare will be denominated in Swiss francs. Consequently, exchange rate fluctuations will affect the US dollar equivalent of dividends received by holders of shares held via DTC or shares directly registered with Computershare Trust Company, N.A. in the US If the value of the Swiss franc decreases against the US dollar, the value of the US dollar equivalent of any dividend will decrease accordingly.

See "Item 8. Financial Information—8.A. Consolidated Statements and Other Financial Information—Dividend Policy" for more information.

***As a foreign private issuer, we are subject to different US securities laws and rules than a domestic issuer, which may limit the information publicly available to US shareholders.***

We report under the Securities Exchange Act of 1934 ("Exchange Act") as a non-US company with foreign private issuer status. Because we qualify as a foreign private issuer under the Exchange Act and although we are subject to Swiss laws and regulations with regard to such matters and intend to continue to furnish quarterly financial information to the SEC, we are exempt from certain provisions of the Exchange Act that are applicable to US domestic public companies, including (i) the sections of the Exchange Act regulating the solicitation of proxies, consents or authorizations in respect of a security registered under the Exchange Act, (ii) the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time and (iii) the rules under the Exchange Act requiring the filing with the SEC of quarterly reports on Form 10-Q containing unaudited financial and other specified information, or current reports on Form 8-K, upon the occurrence of specified significant events. In addition, foreign private issuers are not required to file their annual report on Form 20-F until four months after the end of each financial year, while US domestic issuers that are large accelerated filers are required to file their annual report on Form 10-K within 60 days after the end of each fiscal year. Foreign private issuers are also exempt from the Regulation Fair Disclosure, aimed at preventing issuers from making selective disclosures of material information.

In addition, as a foreign private issuer, we are entitled to rely on exceptions from certain corporate governance requirements of the NYSE. As a result of the above, you may not have the same protections afforded to shareholders of companies that are not foreign private issuers.

Furthermore, we prepare our financial statements under IFRS. There are, and may continue to be, certain significant differences between IFRS and US Generally Accepted Accounting Principles, or US GAAP, including but not limited to potentially significant differences related to the accounting and disclosure requirements relating to associate benefits, nonfinancial assets, taxation and impairment of long-lived assets. As a result, our financial information and reported earnings for historical or future periods could be significantly different if they were prepared in accordance with US GAAP, and you may not be able to meaningfully compare our financial statements under IFRS with those companies that prepare financial statements under US GAAP.

***We may lose our foreign private issuer status.***

We are a foreign private issuer and therefore we are not required to comply with all of the periodic disclosure and current reporting requirements of the Exchange Act applicable to US domestic issuers. To maintain our status as a foreign private issuer, either (a) a majority of our shares must be directly or indirectly owned of record by non-residents of the United States or (b)(i) a majority of our executive officers or directors may not be United States citizens or residents, (ii) more than 50 percent of our assets cannot be located in the United States and (iii) our business must be administered principally outside the United States.

If we were to lose our foreign private issuer status, we would be required to comply with the Exchange Act reporting and other requirements applicable to US domestic issuers, which are more detailed and extensive than the requirements for foreign private issuers. For instance, we would be required to change our basis of accounting from IFRS as issued by the IASB to US GAAP, which we expect would be difficult and costly and could also result in potentially material changes to historical financial statements previously prepared on the basis of IFRS. We may also be required to make changes in our corporate governance practices in accordance with various SEC and NYSE rules. The regulatory and compliance costs to us under US securities laws could be significantly higher than the costs we will incur as a foreign private issuer. As a result, a loss of foreign private issuer status would increase our legal and financial compliance costs and would make some activities highly time-consuming and costly. If we were required to comply with the rules and regulations applicable to US domestic issuers, it would make it more difficult and expensive for us to obtain director and officer liability insurance, and we could be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These rules and regulations could also make it more difficult for us to attract and retain qualified members of our Board.

***Our status as a Swiss corporation means that our shareholders enjoy certain rights that may limit our flexibility to raise capital, issue dividends and otherwise manage ongoing capital needs.***

Swiss law reserves for approval by shareholders certain corporate actions over which a board of directors would have authority in some other jurisdictions. For example, shareholders must approve the payment of dividends and cancellation of treasury shares. Swiss law also requires that our shareholders themselves resolve to, or authorize our Board to, increase our share capital. While our shareholders may authorize share capital that can be issued by our Board without additional shareholder approval, Swiss law limits this authorization to 50% of the issued share capital at the time of the authorization. The authorization, furthermore, has a limited duration of up to two years and must be renewed by the shareholders from time to time thereafter in order to be available for raising capital. Additionally, Swiss law grants pre-

26

emptive rights to existing shareholders to subscribe for new issuances of shares and advance-subscription rights to subscribe for convertible bonds or similar instruments with conversion or option rights. A resolution adopted at a shareholders' meeting by a qualified majority of two-thirds of the votes represented, and the absolute majority of the nominal value of the shares represented, may restrict or exclude such pre-emptive or advance-subscription rights in certain limited circumstances. In June 2020, the Swiss Parliament approved certain changes to Swiss corporate law including permitting the payment of interim dividends, subject to shareholders' approval, and providing a board of directors more flexibility to increase share capital. The enactment date for these changes has not yet been determined and may require an amendment to Alcon's articles of incorporation. Despite these prospective changes, Swiss law also does not provide as much flexibility in the various rights and regulations that can attach to different categories of shares as do the laws of some other jurisdictions. These Swiss law requirements relating to our capital management may limit our flexibility, and situations may arise where greater flexibility would have provided benefits to our shareholders.

***It may be difficult to enforce US judgments against us.***

We are organized under the laws of Switzerland. As a result, it may not be possible for investors to effect service of process within the United States upon us or upon such persons or to enforce against them judgments obtained in US courts, including judgments in actions predicated upon the civil liability provisions of the federal securities laws of the United States. We have been advised by our Swiss counsel that there is doubt as to the enforceability in Switzerland of original actions, or in actions for enforcement of judgments of US courts, of civil liabilities to the extent predicated upon the federal and state securities laws of the United States. Original actions against persons in Switzerland based solely upon the US federal or state securities laws are governed, among other things, by the principles set forth in the Swiss Federal Act on International Private Law. This statute provides that the application of provisions of non-Swiss law by the courts in Switzerland shall be precluded if the result is incompatible with Swiss public policy. Also, mandatory provisions of Swiss law may be applicable regardless of any other law that would otherwise apply.

Switzerland and the United States do not have a treaty providing for reciprocal recognition and enforcement of judgments in civil and commercial matters. The recognition and enforcement of a judgment of the courts of the United States in Switzerland are governed by the principles set forth in the Swiss Federal Act on Private International Law. This statute provides in principle that a judgment rendered by a non-Swiss court may be enforced in Switzerland only if:

- the non-Swiss court had jurisdiction pursuant to the Swiss Federal Act on Private International Law;

- the judgment of such non-Swiss court has become final and non-appealable;

- the judgment does not contravene Swiss public policy;

- the court procedures and the service of documents leading to the judgment were in accordance with the due process of law; and

- no proceeding involving the same position and the same subject matter was first brought in Switzerland, or adjudicated in Switzerland, or was earlier adjudicated in a third state and this decision is recognizable in Switzerland.

# ITEM 4.    INFORMATION ON THE COMPANY

## 4.A.    HISTORY AND DEVELOPMENT OF THE COMPANY

### General Corporate Information

Alcon is a stock corporation (*Aktiengesellschaft*) organized under the laws of Switzerland in accordance with article 620 et seq. of the Swiss Code of Obligations and registered with the Swiss Register of Commerce under registration number CHE-234.781.164. Alcon is registered in the Swiss Register of Commerce under each of Alcon AG, Alcon SA and Alcon Inc., all of which are stated in Alcon's Articles of Incorporation (our "Articles of Incorporation") as our corporate name. Alcon was formed for an unlimited duration, effective as of the date of the registration of Alcon in the Swiss Register of Commerce on September 21, 2018. As a result of Novartis' Spin-off of Alcon and its consolidated subsidiaries on April 9, 2019, Alcon became an independent, standalone corporation. Alcon's shares are listed on the SIX and the NYSE under the ticker symbol "ALC."

Alcon is domiciled in Fribourg, Switzerland and our registered office is located at Rue Louis-d'Affry 6, 1701 Fribourg, Switzerland. Our headquarters is located in Geneva, Switzerland at the following address: Chemin de Blandonnet 8, 1214 Vernier, Geneva, Switzerland. Our telephone number is +41 58 911 2110. Our principal website is *www.alcon.com*. The information contained on our website is not a part of this Form 20-F.

### General Development of Business

Alcon was originally founded in 1945 by pharmacists Robert Alexander and William Conner, who opened a small pharmacy under the "Alcon" name in Fort Worth, Texas. In 1947, Alcon Laboratories, Inc. was first incorporated and began manufacturing specialty pharmaceutical products to address ocular health needs. In the succeeding years, Alcon began operating internationally with the opening of an office in Canada and first formed its surgical division.

In 1977, Alcon was acquired by a Swiss subsidiary of Nestlé S.A. and, consequently, Alcon began operating as a wholly owned subsidiary of Nestlé until 2002. In 2001, the name of the entity was officially changed to Alcon, Inc. and, on March 20, 2002, Nestlé completed an initial public offering of approximately 25% of the outstanding common shares of Alcon, Inc. From March 20, 2002 until its 2011 merger into Novartis discussed below, Alcon was publicly listed and traded on the NYSE under the symbol "ACL".

On July 7, 2008, Nestlé sold to Novartis approximately 25% of the then outstanding Alcon shares and granted Novartis an option for Novartis to acquire Nestlé's remaining shares in Alcon beginning in 2010. On August 25, 2010, Novartis exercised its option and purchased the remaining approximately 52% of the total outstanding Alcon shares owned by Nestlé. Following this purchase, Novartis owned an approximate 77% interest in Alcon. On December 14, 2010, Novartis entered into a definitive agreement to acquire the remaining 23% of Alcon through a merger of Alcon, Inc. into Novartis in consideration for Novartis shares and a contingent value amount. The merger was consummated on April 8, 2011, creating the Alcon Division within Novartis. In connection with the Novartis acquisition of Alcon, Novartis also merged its then-existing contact lens and contact lens care unit, CIBA Vision, and certain of its ophthalmic pharmaceutical products into Alcon and moved the generic ophthalmic pharmaceutical business conducted by Alcon prior to the merger into the Sandoz Division of Novartis. In 2016, Novartis moved the management and reporting of Alcon ophthalmic pharmaceutical and over-the-counter ocular health products to the Innovative Medicines Division of Novartis. Subsequently, effective January 1, 2018, Novartis returned to Alcon the management and reporting of over-the-counter ocular health products and certain surgical diagnostic medications previously transferred from Alcon in 2016.

On June 29, 2018, Novartis announced its intention to seek shareholder approval for the Spin-off of its Alcon Division, following the complete legal and structural separation of Alcon into a stand-alone company consisting of Alcon Inc. and its consolidated subsidiaries. Novartis shareholders approved the Spin-off on February 28, 2019, and the Spin-off transaction was consummated on April 9, 2019. Following the Spin-off, Alcon became a stand-alone, independent company.

### Significant Acquisitions, Dispositions and other Events

### COVID-19 Pandemic

The COVID-19 pandemic had a significant impact on our financial results and operations in 2020, and we expect the pandemic to continue to have an impact on our financial results and operations into 2021. The 2020 financial impact is discussed in more detail in this Annual Report, including under "Item 5. Operating and Financial Review and Prospects".

28

A038

### Associate safety

To protect our associates, we implemented a response framework with recommended COVID-19 prevention, containment and mitigation measures. For example, we implemented procedures in early 2020 including limiting the number of people in one area at a time, modifying workstation arrangements, screening temperatures daily, minimizing the cross flow of people between shifts to reduce potential exposure and enhancing cleaning of our facilities. We have also mandated wearing masks, implemented robust contact tracing and are managing our return to the workplace in line with local conditions. Our sales and customer service teams are equipped with the tools to keep them healthy and safe, including pre-visit checklists and appropriate personal protective equipment ("PPE").

### Community support

To assist vulnerable populations affected, directly or indirectly, by COVID-19, the Alcon Foundation has made monetary donations to local, national and global organizations to support meal programs for children and seniors, provide essential supplies to shelters and aid public health emergency relief efforts. We donated PPE, including Alcon-manufactured hand sanitizer and splash guards, as well as eye drops for front line workers. We have also donated eye care products to support eye surgeries and other eye care services for under-served patients.

### Supply chain continuity

To protect our customers and the patients who depend on our products, we continue to manufacture and supply our products and are actively working to mitigate any potential supply chain disruptions. Prior to the current crisis, we developed a diverse manufacturing footprint, which has enabled us to maintain sufficient inventory on hand. We have enhanced our business continuity plans to ensure our supply chain is maintained. We generally target 12 weeks of customer-ready products in our supply chain and, for most of our products, we are at or close to this level. Our Procurement teams have stayed in close contact with our critical suppliers to maintain access to raw materials and other components. When necessary, we are also utilizing alternative methods of product distribution and supplier sourcing, as well as alternative shipping options where possible. In addition, we have partnered with industry trade groups and the medical community as they developed new protocols to serve patients safely during the pandemic.

## Significant Investments

In 2012, we began a multi-year software implementation project to standardize our processes, enhance data transparency and globally integrate our fragmented and aging information technology systems across our commercial, supply and manufacturing operations worldwide, through a new foundation of Systems, Applications and Products in Data Processing ("SAP"), which is an ERP software platform. We expect to pay a total of approximately $850 million relating to the implementation of the new ERP system. Through December 31, 2020, the total amount paid with respect to the implementation was $688 million.

In addition, we have made significant investments in certain of our manufacturing facilities to enhance our production capabilities. For more information, see "Item 4.D. Property, Plants and Equipment—Major Facilities".

## Acquisitions

In the past three years, we have also entered into certain acquisition transactions, including the acquisition of 100% of the outstanding shares and equity of PowerVision, Inc. on March 13, 2019, TrueVision Systems, Inc. on December 19, 2018 and Tear Film Innovations, Inc. on December 17, 2018. For further details on certain of our significant transactions in 2020, 2019 and 2018, see "Note 4 to the Consolidated Financial Statements."

## Debt Issuances

In connection with the Spin-off, as discussed in greater detail in "Item 10. Additional Information—10.C. Material Contracts," on March 6, 2019 we entered into a $1.5 billion Bridge Facility and the Facilities, including Facility A.

On September 23, 2019, AFC issued Senior Notes ("Notes") with maturity dates in 2026, 2029 and 2049, which are guaranteed by the Company. The Notes are unsecured senior obligations of AFC issued in a private placement. The total principal amount of the Notes is $2.0 billion. The Notes were issued at a discount totaling $7.0 million, which was recorded as a reduction to the carrying value of the Notes and will be amortized to Interest expense over the term of the Notes. AFC incurred $15 million of debt issuance costs, which were recorded as a reduction to the carrying value of the Notes and will be amortized to Other financial income & expense over the term of the Notes.

A039

The Notes consist of the following:

- Series 2026 Notes - $0.5 billion due in 2026 issued at 99.5%, 2.750% interest is payable twice per year in March and September, beginning in March 2020.

- Series 2029 Notes - $1.0 billion due in 2029 issued at 99.6%, 3.000% interest is payable twice per year in March and September, beginning March 2020.

- Series 2049 Notes - $0.5 billion due in 2049 issued at 99.8%, 3.800% interest is payable twice per year in March and September, beginning March 2020.

The funds borrowed through the issuance of the Initial Notes were used to repay the $1.5 billion Bridge Facility and $0.5 billion Facility A, both of which had been entered into on March 6, 2019. For more information on the Notes, see Note 17 to our Consolidated Financial Statements.

On May 27, 2020, AFC issued senior notes due in 2030 ("Series 2030 Notes"), which are guaranteed by the Company. The Series 2030 Notes are unsecured senior obligations of AFC issued in a private placement and rank equally in right of payment with the Series 2026, Series 2029 and Series 2049 notes. The total principal amount of the Senior 2030 Notes is $750 million. The Senior 2030 Notes were issued at 99.8% with 2.600% interest payable twice per year in May and November, beginning in November 2020. The Series 2030 Notes were issued at a discount totaling $1 million, which was recorded as a reduction to the carrying value of the Series 2030 notes and will be amortized to Interest expense over the term of the Series 2030 Notes. AFC incurred $5 million of debt issuance costs, which were recorded as a reduction to the carrying value of the Series 2030 Notes and will be amortized to Other financial income & expense over the term of the Series 2030 Notes. For more information on the Series 2030 Notes, see Note 17 to our Consolidated Financial Statements.

## Transformation Program

On November 19, 2019, we announced a multi-year transformation program to better align our organizational structure with the scope of Alcon's business operations globally. We created four shared business centers designed to create efficiencies for reinvestment into key growth drivers. We estimate that the transformation program will result in total charges of approximately $300 million by 2023. Through December 31, 2020, the total expense recognized with respect to the transformation program was $101 million.

## Additional Information

The SEC maintains an Internet website at *www.sec.gov* that contains reports, proxy and information statements and other information regarding companies that file documents electronically with the SEC. Our Internet website is *www.alcon.com*. The information included on our internet website or the information that might be accessed through such website is not included in this Annual Report and is not incorporated into this Annual Report by reference.

## 4.B.        BUSINESS OVERVIEW

## Overview

Alcon is the global leader in eye care with $6.8 billion in net sales during the year ended December 31, 2020. We research, develop, manufacture, distribute and sell a full suite of eye care products within two key businesses: Surgical and Vision Care. Based on sales for the year ended December 31, 2020, we are the number one company by global market share in the ophthalmic surgical market and a leader by global market share in the branded vision care market. We employ over 23,000 associates from more than 100 nationalities, operating in 75 countries and serving consumers and patients in over 140 countries. We believe our market leading position and global footprint allow us to benefit from economies of scale, maximize the potential of our commercialized products and pipeline and will permit us to effectively grow the market and expand into new product categories.

Our Surgical business is focused on ophthalmic products for cataract surgery, vitreoretinal surgery, refractive laser surgery and glaucoma surgery. Our broad surgical portfolio includes implantables, consumables and surgical equipment required for these procedures and supports the end-to-end needs of the ophthalmic surgeon. Our Vision Care business comprises daily disposable, reusable and color-enhancing contact lenses and a comprehensive portfolio of ocular health products, including devices and over-the-counter products for dry eye, contact lens care and ocular allergies, as well as ocular vitamins and redness relievers. Alongside our world-class products, Alcon provides best-in-class service, training, education and technical support for our customers.

Our Surgical and Vision Care businesses are complementary and benefit from synergies in research and development, manufacturing, distribution and consumer awareness and education. This allows us to position ourselves as a trusted partner for eye care products across the continuum of care from retail consumer, to optometry, to surgical ophthalmology. For example, in research and development, we can apply our expertise in material and surface chemistry to develop innovative next-generation products for both our IOL and contact lens product lines. Similarly, our global commercial footprint and expertise as a global organization provide us with product development, manufacturing, distribution and commercial promotion and marketing knowledge that can be applied to both of our businesses.

We are dedicated to providing innovative products that enhance quality of life by helping people see brilliantly. Our strong foundation is based on our longstanding success as a trusted brand, our legacy of industry firsts and advancements, our leading positions in the markets in which we compete and our continued commitment to substantial investment in innovation. With 75 years of history in the ophthalmic industry, we believe the Alcon brand name is synonymous with innovation, quality, service and leadership among eye care professionals worldwide.

## Our Markets

## Overview

We currently operate in the global ophthalmic surgical and vision care markets, which are large, dynamic and growing. As the world population grows and ages, the need for quality eye care is expanding and evolving, and we estimate that the size of the eye care market in which we operate is approximately $25 billion and is projected to grow at approximately 4% per year from 2019 to 2025.

Although it is estimated that 80% of all visual impairments are currently preventable, treatable or curable, we operate in markets that have substantial unmet medical and consumer needs. For example, based on market research, it is estimated that there are currently 65 million people with moderate to severe vision impairment due to cataracts, 1.8 billion who suffer from presbyopia, 153 million with uncorrected refractive errors, 146 million with diabetic retinopathy, 76 million living with glaucoma and approximately 1.4 billion who suffer from symptoms of dry eye, among other unaddressed ocular health conditions. In addition, there are 1 billion people living with some form of unaddressed visual impairment, as well as 70% of the global population needing basic vision correction. Below is a brief description of these ocular disorders.

31

A041



| Eye disorders and location | Disorder | Results in |
|---|---|---|
| **Refractive Errors**<br>Front of Eye | Myopia (nearsightedness), hyperopia (farsightedness) and astigmatism (oddly shaped cornea) | Blurred or impaired vision |
| **Presbyopia**<br>Intraocular Lens | Hardening of the natural lens due to age (35 years and older) | Inability to focus up close |
| **Dry Eye / Allergy**<br>Cornea | Poor quantity and quality of tears / Reactions to allergy-causing substances (e.g., pollen, dander, and mold) | Blurred vision, itching, redness, and general discomfort |
| **Cataracts**<br>Intraocular Lens | Clouding of the eye's natural lens | Blindness if untreated |
| **Retinal Diseases**<br>Retina | Vitreomacular traction, retinal detachment, severe eye trauma, ocular complications of diabetes (diabetic retinopathy) | Can cause irreversible loss of vision |
| **Glaucoma**<br>Optic Nerve | Damage to the eye's optic nerve, usually from increased pressure in the eye | Vision loss and blindness |

Our Surgical and Vision Care products are targeted at addressing many of these unmet medical and consumer needs. We expect the surgical and vision care markets to continue to grow, driven by multiple factors and trends, including but not limited to:

- Aging population with growing eye care needs:  A growing aging population continues to drive the increased prevalence of eye care conditions worldwide, as the number of persons aged 60 years or over is expected to more than double by 2050, rising from 962 million globally in 2017 to 2.1 billion in 2050.

- Innovation improving the quality of eye care:  Technology innovation in eye care is driving an increased variety of products that more effectively treat eye conditions. Given the importance of vision correction and preservation, which can provide a high return on healthcare spend, the resulting better patient outcomes are leading to increased coverage and reimbursement opportunities from governmental and private third-party payors, expanding patient access to such eye care products.

- Increasing wealth and growth from emerging economies:  It is estimated that by 2030 the global middle class population could exceed 5 billion people with the majority of growth coming in emerging markets. This major demographic shift is generating a large, new customer base with increased access to eye care products and services along with the resources to pay for them. The expansion of training opportunities for eye care professionals in emerging markets is also leading to increased patient awareness and access to premium eye care products and surgical procedures, facilitating their growth.

- Increasing prevalence of myopia, progressive myopia and digital eye strain:  It is estimated that by 2050, half of the world's population (nearly five billion people) will be myopic. Further, the modern work environment, along with leisure preferences, have increased the number of hours people spend in front of a screen, adversely impacting vision and increasing the risk of progressive myopia and digital eye strain.

## The Surgical Market

The surgical market in which we operate is estimated to be $10 billion and is projected to grow at 4% per year from 2019 to 2025. The surgical market includes sales of implantables, consumables and surgical equipment, including associated technical, clinical and service support and training. Surgical implantables are medical devices designed to remain in the eye, such as monofocal and AT-IOLs placed in the eye during cataract surgery. Consumables include hand-held instruments, surgical solutions, equipment cassettes, patient interfaces and other disposable items typically used during a single ophthalmic surgical procedure. Finally, surgical equipment includes multi-use surgical consoles, lasers and diagnostic instruments used across procedures to enable surgeons to visualize and conduct ophthalmic surgeries. Market growth is expected to be driven mainly by:

- Global growth of cataract and vitreoretinal procedures, driven by an aging population;

- Increased access to care, for example, in emerging markets and other markets outside the US where the cataract surgery rate is 2.5 procedures per 1,000 people as compared to 9.7 in the US;

32

**A042**

- Higher uptake of premium patient-pay technologies, for example AT-IOL penetration is only 9.8% outside the US versus 16.2% in the US;

- Increased adoption of advanced technologies, for example, improved diagnostic instruments, surgical options for glaucoma management and the growing use of phacoemulsification during cataract removal, which is utilized in less than 50% of cases in emerging markets versus over 95% in the US; and

- The increasing prevalence of diabetes, the incidence of which has nearly doubled from 4.7% in 1980 to 8.5% in 2014, and for which eye disease is a comorbidity, combined with improving diagnostics capabilities and new product innovations, is expected to drive an uptake of premium procedures.

The vision care market in which we operate is estimated to be $15 billion and is projected to grow at 4% per year from 2019 to 2025. The vision care market is comprised of products designed for use by eye care professionals and consumers. Products are largely categorized across two product lines: contact lenses and ocular health. Market growth is expected to be driven mainly by:

- Continued modality shift to daily disposable lenses from reusable lenses and the resulting sales premium (an increase of 2-3x sales per patient, after customary rebates and discounts) associated with daily disposable wearers as compared to users of reusable lenses;

- Advancements in specialty lenses combined with increasing demand for toric, multifocal and cosmetic lenses, which command an approximately 15-30% pricing premium over spherical lenses, allowing patients to continue wearing contact lenses as they become older and helping to expand the market;

- A significant population of approximately 194 million undiagnosed dry eye patients, with an additional 42 million self-diagnosed dry eye patients using unsuitable products for treatment, and advances in diagnostics and ocular health treatments, facilitating the increase in patient awareness of dry eye and treatment;

- Growing access and consumption of vision care products in emerging markets such as Asia, which had an estimated single-digit contact lens penetration as compared to double digits in the developed world; and

- Increasing consumer access through the expansion of distribution models, including internet sales and other direct-to-consumer channels.

## Our Business

### Overview

With $6.8 billion in net sales during the year ended December 31, 2020, we are the global leader in eye care. Our broad range of products represents one of the most complete portfolios in the ophthalmic device industry and comprises high-quality and technologically advanced products across all major product categories in the surgical and vision care markets. Our Surgical and Vision Care products are used in treating multiple ocular health conditions and offer leading eye care solutions for patients throughout their lives.

33

A043



Our leadership position across most of our product categories enhances our ability to extend our product offering through the launch of new and innovative products and to expand our geographic reach into ophthalmic markets worldwide. Our Surgical business had approximately $3.7 billion in net sales of implantables, consumables and equipment, as well as services and other surgical products, and our Vision Care business had approximately $3.1 billion in net sales of our contact lens and ocular health products, during the year ended December 31, 2020. The US accounted for 44% of our sales during the year ended December 31, 2020.



We believe the Alcon brand name is synonymous with innovation, quality, service and leadership among eye care professionals worldwide. In each of our markets, we rely on our strong relationships with eye care professionals and consumers to attract and retain customers and expand the market. We customize our selling efforts with the goal of surrounding eye care professionals with Alcon representatives that can help address each aspect of a customer's needs. Our field force supplements the direct promotion of our products by providing customers with access to clinical education programs, hands on training, data from clinical studies and technical service assistance.

We have 18 state-of-the-art manufacturing facilities that employ our proprietary technologies and know-how. We believe our global footprint, knowledge base in manufacturing, state-of-the-art facilities and capacity planning enable us to handle increased levels of product demand and product complexity. Furthermore, our global manufacturing and supply chain allows us to leverage economies of scale and reduce cost per unit as we ramp up production.

We have also made one of the largest commitments to research and development of any surgical and vision care company, with over 1,400 associates worldwide researching and developing treatments for vision conditions and eye

A044

diseases, and have sought innovation from both internal and external sources. In 2020, we invested $673 million in research and development. In addition to our in-house research and development capabilities, we also consider external innovation opportunities and routinely screen for companies developing emerging technologies that we believe could enhance our existing product offerings or develop into innovative new products. We intend to continue to pursue acquisition, licensing and collaboration opportunities as part of our goal of remaining a market leader in innovation.

## Our Surgical Business

We hold the number one position in the global surgical market, offering implantable products, consumables and equipment for use in surgical procedures to address cataracts, vitreoretinal conditions, refractive errors and glaucoma. Our Surgical business has the most complete line of ophthalmic surgical devices in the industry, creating a "one-stop shop" for our customers that we consider to be a key differentiator for our business. For the year ended December 31, 2020, our Surgical business had $3.7 billion in net sales.

## Our Vision Care Business

Our Vision Care business consists of an extensive portfolio of contact lens and ocular health products, aimed at helping consumers see better. Our product lines include daily disposable, reusable and color-enhancing contact lenses. We also offer a comprehensive portfolio of ocular health products, including devices and over-the-counter products for dry eye, over-the-counter products for contact lens care and ocular allergies, as well as ocular vitamins and redness relievers. With $3.1 billion in vision care net sales for the year ended December 31, 2020, we aim to continue to innovate across our vision care portfolio to improve the lives of consumers and eye care professionals around the world.

# Our Strengths

We have a strong foundation based on robust industry expertise, leading brands and excellence in customer service, backed by 75 years of history as a trusted brand. Our strengths include:

- **Global leader in highly attractive markets with the most complete brand portfolio.** With $6.8 billion in net sales in the year ended December 31, 2020, we are the leader in an attractive eye care market, which is supported by favorable population megatrends and is expected to grow at approximately 4% per year from 2019 to 2025. Our Surgical business is the market leader in sales of ophthalmic equipment used in the operating room and is supported by the largest installed base of equipment worldwide, which we use to cross-promote our surgical consumables and IOLs. In our Vision Care business, our extensive portfolio of contact lens and ocular health products includes well-recognized brands such as *DAILIES*, *Systane* and *Opti-Free*. We believe our global leadership position and extensive brand portfolio allow us to benefit and build on the robust fundamentals driving growth in our markets.

- **Innovation-focused with market leading development capabilities and investment.** We have made one of the largest commitments to research and development in the eye care market, with proven research and development capabilities in the areas of optical design, material and surface chemistry, automation and equipment platforms. Currently, we employ over 1,400 individuals dedicated to our research and development efforts, including physicians, doctors of optometry and PhDs. In addition, we actively seek opportunities to collaborate with third parties on advanced technologies to support our eye care business.

- **Global scale and reach supported by high-quality manufacturing network.** We have an extensive global commercial footprint that provides us with the scale and reach to support future growth, maximize the potential of new launches, enter new geographies efficiently and to take advantage of the large, dynamic and growing surgical and vision care markets. Our commercial footprint, which includes operations in 75 countries, reaches consumers and patients in over 140 countries and is supported by over 3,500 sales force associates, 18 state-of-the-art manufacturing facilities employing our proprietary technologies and know-how and our extensive global regulatory capability. Our extensive sales and distribution network, supported by our market leadership position and focus on innovation and customer experience, enhances our ability to expand our geographic reach and extend our product offerings through the launch of new and innovative products worldwide.

- **Outstanding customer relationships and a trusted reputation for customer service, training and education.** We believe that maintaining the highest levels of service excellence in our customer experience is a critical success factor in our industry. In our Vision Care business, we regularly meet with eye care practitioners to gain feedback and insights on our products and consumers' needs. We also provide training support at over 70 state-of-the-art interactive training centers around the world, as well as through numerous digital and event-based training programs that we provide for practitioners, clinical support staff, students, residents, patients and

consumers. In each of our businesses, we have built and maintained our relationships with key stakeholders to establish our trusted reputation in the industry.

- **World leading expertise in eye care led by a first-class management team.** Our expertise in eye care is driven by our 75-year history in the industry and is supported by a high-quality workforce of more than 23,000 associates. We believe our institutional knowledge provides a competitive advantage because our associates' industry expertise, relationships with our customers and understanding of the development, manufacture and sale of our products helps us to better identify new customer needs, assess markets for entry and identify promising technologies. In addition, we believe the diverse experience of our management team in running complex businesses allows them to add significant value to our company. In particular, we benefit from having a management team with an extensive background in the eye care industry. Led by David J. Endicott, our Chief Executive Officer, our management team's deep knowledge of eye care has created excitement among our workforce for our mission,

## Our Strategy

Our going-forward strategy builds on five key pillars in order to generate sustainable and profitable growth:

- **Maximize the potential of our near-term portfolio by growing key products.** In Surgical, we plan to build on our leading position in the IOL market through the launch of new AT-IOLs, where premium pricing drives market value. In addition, we expect improved diagnostics and new optical designs will address historical barriers to AT-IOL adoption to further grow this patient-pay market. We will also continue to invest behind our presbyopia-correcting products (e.g., *PanOptix*, *Vivity*) and execute on the development of our next generation equipment ecosystem for the operating room and office, leading to integration and intra-operability. In Vision Care, we intend to maintain and grow our leading position in most of our product categories through increased eye care professional and consumer education, supported by continuous production innovation. We intend to expand our position in the daily disposable category behind our *DAILIES TOTAL1* and *PRECISION1* family of products. We also aim to expand the dry eye product market by leveraging our well-recognized *Systane* family of eye drops and increasing investment in dry eye education and awareness, as well as address the allergy relief market with the *Pataday* family of products, where we see a significant unmet need and an opportunity for robust market growth.

- **Accelerate innovation and deliver the next wave of technologies.** We are committed to accelerating innovation by continuing to be one of the market leaders in investment in ophthalmic research and development. The research and development activities of our Surgical business are focused on expanding our AT-IOL portfolio to optimize the function of the IOL in restoring vision and reducing outcome variability, including through the use of advanced optics, light adjustable materials, accommodating lenses and modular platforms. We are also developing next-generation lasers, robotics and other equipment for cataract, vitreoretinal and laser-refractive surgery, as well as improved visualization equipment. In our Vision Care business, our focus is on developing and launching new contact lens materials, coatings and designs to extend our product lines and improve patient comfort, as well as on new products to expand our portfolio of dry eye diagnostic and treatment, presbyopia and ocular health products. Finally, we expect to continue to supplement our internal innovation investments by identifying and executing on attractive BD&L opportunities with leading academic institutions and early-stage companies.

- **Capture opportunities to expand markets and pursue adjacencies.** We believe there is a significant opportunity for growth in markets around the world due to under-penetration of both premium surgical devices, such as AT-IOLs, and of our Vision Care portfolio. We intend to facilitate this growth by continued investment in promotion and customer education across all of our markets. In emerging markets in particular, we believe that the growing number of eye care professionals and dedicated eye hospitals, increased levels of affluence, improving technology access and better patient awareness will increase the adoption of our products. In addition, we believe we have significant opportunities to expand into adjacent product categories in which Alcon has not significantly participated in the past, through a combination of internal development efforts and potential mergers and acquisitions activity. These opportunities include office-based diagnostics, surgical visualization, pharmaceuticals, solutions for myopia control and consumer driven ocular health products, where we expect our eye care expertise and global commercial footprint will allow us to attract and retain new customers.

- **Support new business models to expand customer experience.** In Surgical, we intend to continue to identify new business models that benefit healthcare providers and improve access to leading Alcon products and technologies. For example, we are pursuing value-based business models that reward improved patient outcomes, as well as models that contract the entire procedure versus individual products. In Vision Care, where e-commerce entries have created some disruption of traditional sales channels, we believe that digital technology can address pain points experienced in existing paths to purchase. We intend to continue investing and

36

innovating in digital capabilities to develop new business models in response to channel shifts and the increase in direct-to-consumer influence.

• **Leverage infrastructure to improve operating efficiencies and margin profile over time.** With the significant organizational and infrastructure investments we have made over the last several years, we believe we have established a stable foundation that will allow us to continue to enhance the productivity of our commercial resources and meaningfully improve our core operating income margins over time. Further, we intend to improve the mix of our products, implement further supply chain efficiency initiatives and support new lower-cost manufacturing platforms to drive future operating profit and cash flows.

# Our Industry

## Selected Conditions that are Treated by Eye Surgery and Surgical Products

### Cataracts

A cataract is the progressive clouding of the normally transparent natural lens in the eye. This clouding is usually caused by the aging process, although it can also be caused by heredity, diabetes, environmental factors and, in some cases, medications. As cataracts grow, they typically result in blurred vision and increased sensitivity to light. Cataract formations occur at different rates and may affect one or both eyes. Cataract surgery is one of the most frequently performed surgical procedures. According to the National Eye Institute, cataracts are the leading cause of blindness worldwide even though effective surgical treatment exists. Currently, surgical removal of the clouded lens followed by insertion of a transparent artificial replacement lens, called an IOL, is the preferred treatment for cataracts. The clouded lens is usually removed through a process known as phacoemulsification. During phacoemulsification, an ophthalmic surgeon makes a small surgical incision in the cornea (approximately 2-3 millimeters wide) and inserts an ultrasonic probe that breaks up, or emulsifies, the clouded lens while a hollow needle removes the pieces of the lens. Once the cataract is removed, the surgeon inserts an intraocular lens through the same surgical incision. An AT-IOL is a type of IOL that also corrects for refractive errors, like presbyopia and astigmatism, at the time of cataract surgery.

### Retinal Disorders

Vitreoretinal procedures involve surgery on the back portion of the eye, namely the retina and surrounding structures. Vitrectomy is the removal of the gel-like substance, known as vitreous, that fills the back portion of the eye. Removal of the vitreous allows a vitreoretinal surgeon to operate directly on the retina or on membranes or tissues that have covered the retina. These procedures typically treat conditions such as diabetic retinopathy, retinal detachment or tears, macular holes, complications of surgery on the front of the eye, diabetic macular edema, trauma, tumors and pediatric disorders. Vitreoretinal surgery can also involve electronic surgical equipment, lasers and hand-held microsurgical instruments as well as gases and liquids that are injected into the eye.

### Refractive Errors

Refractive errors, such as myopia, commonly known as near-sightedness, hyperopia, commonly known as far-sightedness, and astigmatism, a condition in which images are not focused at any one point, result from an inability of the cornea and the lens to focus images on the retina properly. If the curvature of the cornea is incorrect, light passing through it onto the retina is not properly focused and a blurred image results. For many years, eyeglasses and contact lenses were the only solutions for individuals afflicted with common visual impairments; however, they are not always convenient or attractive solutions. Laser refractive surgery offers an alternative to eyeglasses and contact lenses. Excimer lasers, which are low-temperature lasers that remove tissue without burning, are currently used to correct refractive errors by removing small amounts of tissue to reshape the cornea. These lasers remove tissue precisely without the use of heat and without affecting the surrounding tissue. In the LASIK procedure, the surgeon uses either a femtosecond laser or an automated microsurgical instrument, called a microkeratome, to create a thin corneal flap that remains hinged to the eye. The corneal flap is then folded back and excimer laser pulses are applied to the exposed layer of the cornea to change the shape of the cornea. The corneal flap is then returned to its normal position. LASIK has become the most commonly practiced form of laser refractive surgery globally.

### Presbyopia

Presbyopia occurs when the natural crystalline lens inside the eye becomes less flexible and loses the ability to focus on close objects. Presbyopia is a vision condition that accompanies the natural aging process of the eye. It cannot be prevented and affects nearly two billion people worldwide. Although the onset of presbyopia among patients may seem to occur suddenly, generally becoming noticeable when patients reach their mid- to late 30s or early to mid-40s, sight reduction typically occurs gradually over time and continues for the rest of the patient's life. Some signs of presbyopia

include difficulty reading materials held close to the reader, blurred vision while viewing a computer screen and eye fatigue along with headaches when reading. Presbyopia can be accompanied by other common vision conditions, such as myopia, hyperopia and astigmatism. Presbyopia, while most commonly managed with reading glasses, can be addressed surgically by the implantation of an AT-IOL that allows for the correction of presbyopia at the time of cataract surgery.

### Glaucoma

Glaucoma, a group of eye conditions that damage the optic nerve, is the second leading cause of blindness worldwide. While elevated intraocular pressure was historically considered to be synonymous with glaucoma, it is now known that many patients with glaucoma have normal intraocular pressure. Treating glaucoma is typically aimed at lowering intraocular pressure for patients with normal or elevated pressure.

Most commonly, glaucoma is managed using medication (e.g., drops). For cases requiring additional intervention, laser-based procedures and conventional surgical techniques, such as filtration surgery and tube shunts, have typically been used to lower IOP. Filtration surgeries, such as trabeculectomy, involve the creation of a new channel to drain aqueous humor from inside the eye. Similarly, tube shunts establish a route for fluid to exit through an implanted device. More recently, a new category of device and procedure-based surgical intervention, known as MIGS, has emerged and is experiencing rapid adoption among both glaucoma and cataract specialists.

## Selected Conditions and Eye Care Considerations that are Addressed by Vision Care Products

### Refractive Errors

Refractive errors such as myopia, hyperopia, astigmatism and presbyopia are commonly addressed by the use of contact lenses. Presbyopia, for example, can be addressed by the use of multifocal contact lenses.

### Dry Eye Disease

Dry eye disease is a ubiquitous, complex and multifactorial condition, and its effect on patients ranges from intermittent and irritating discomfort to a serious, chronic, progressive and irreversible vision-threatening disorder. The incidence of dry eyes rises with age, and longer life spans and aging populations throughout the world are key contributors to increased demand for treatment. Evolving patterns of work and play also contribute to increased demand for treatment, as more people spend significant amounts of time working on computers and other digital devices. Wealthier, professional and urban population segments are expanding in rapidly emerging economies and other developing nations, and these populations have greater access to health care and more resources with which to acquire treatment. In addition, more sophisticated diagnostic tools and a greater variety of dry eye products and treatments, such as artificial tear products, are offering improved effectiveness and greater relief as they simultaneously stimulate demand.

### Infections and Contamination due to Inadequate Contact Lens Care

Proper care of contact lenses through compliance with disinfection regimens is important in reducing the risk of infection and irritation associated with the use of reusable contact lenses, as contact lenses are subject to contamination from cosmetics, grease, bacteria, soaps, hand lotions and atmospheric pollutants, and from proteins contained in natural tears. When used properly, contact lens care products remove such contaminants from the surface of the contact lens. In addition, lens rewetting drops may be used to rehydrate the lens during wear and to clear away surface material.

### Ocular Allergies

Allergic conjunctivitis occurs when the conjunctiva of the eye becomes swollen from inflammation due to a reaction to pollen, dander, mold or other allergy-causing substances. When the eyes are exposed to allergy-causing substances, which can vary from person-to-person and are often dependent on geography, a substance called histamine is released by the body and causes blood vessels in the conjunctiva to swell. "Allergy eyes" can become red and itchy very quickly. Seasonal Allergic Conjunctivitis ("SAC") is the most common type of eye allergy. People affected by SAC experience symptoms during certain seasons of the year. Allergy eye can be treated with various ocular health products including medications, such as antihistamines, and combinations of antihistamines and redness relievers.

## Our Products

We research, develop, manufacture, distribute and sell eye care products. Our broad range of products represents one of the strongest portfolios in the eye care industry, with high-quality and technologically advanced products across all major

**A048**

product categories in ophthalmic surgical devices and vision care. We are organized into two global business segments: Surgical and Vision Care.

## Surgical

We hold the number one position in the global ophthalmic surgical market, offering implantable products, consumables and equipment for use in surgical procedures to address cataracts, vitreoretinal conditions, refractive errors and glaucoma. Our Surgical portfolio includes equipment, instrumentation and diagnostics, IOLs and other implantables and a broad line of consumables, including viscoelastics, surgical solutions, incisional instruments, surgical custom packs and other products. For the year ended December 31, 2020, net sales for our implantables, consumables and equipment and other surgical products were $1.1 billion, $2.0 billion and $0.6 billion, respectively.

Cataract, vitreoretinal, refractive and glaucoma surgeries are generally performed in hospitals or ambulatory surgery centers and are supported through a network of eye clinics, ophthalmic surgery offices and group purchasing organizations. The primary ophthalmic surgical procedures for cataract, vitreoretinal and glaucoma surgery are broadly reimbursed in most mature markets. Third-party coverage or patient co-pay options are also available for refractive laser correction and AT-IOLs. Finally, a growing private pay market for premium surgical devices provides a mutually beneficial environment for patients, providers and medical device companies by allowing patients to pay the non-reimbursable cost of a procedure associated with selecting premium devices, such as AT-IOLs.

Our installed base of equipment is core to our market leading position in our Surgical business, with best-in-class platforms in cataract and vitreoretinal equipment and the largest installed base of cataract phacoemulsification consoles, vitrectomy consoles and refractive lasers in the industry. These platforms each have long buying cycles that last approximately seven to ten years and act as anchoring technologies that drive recurring sales of our consumables and help cross-promote sales of our implantable devices.

Across our Surgical portfolio, we sell a tiered offering of products intended to meet the specific needs of customers in markets around the world at different price points. Newly launched offerings that bring considerable technology innovation to the market are typically introduced at a price premium to offset the cost of research and development. As these products age and/or competitive products advance, prices typically trend downward, requiring continuous innovation cycles to maintain and/or grow our margins. We also develop specific products to match customer needs in different customer segments, for example, premium-tier and mid-tier surgical consoles that can be manufactured and sold at different price points in different markets.



Our strong installed base of equipment and extensive clinician relationships drive sales of our IOLs and consumables. We consider the quality and breadth of our portfolio to be a key differentiator as a "one-stop-shop" offering for our customers, synonymous with quality, reliability and accessibility. Our Cataract Refractive Suite covers every stage of the surgical workflow from clinical planning to cataract removal and post-operative optimization.

In 2013, we launched our *Centurion* vision system for cataract surgery. This system includes Active Fluidics technology, an automated system that optimizes anterior chamber stability by allowing surgeons to proactively set and maintain target IOP within the eye during the cataract removal procedure, thereby delivering an unprecedented level of intraoperative control.

We also sell the *LenSx* laser system. The first femtosecond laser to receive FDA clearance for use in cataract surgery, *LenSx* is used to create incisions in the cornea, create a capsulorhexis and complete lens fragmentation as part of the cataract procedure. This enables surgeons to perform some of the most delicate manual steps of cataract surgery with image-guided visualization and micron precision.

Our *Verion* reference unit and *Verion* digital marker together form an advanced surgical planning, imaging and guidance technology designed to provide greater accuracy and efficiency during cataract surgery. Our *ORA System* also provides key intra-operative measurements to improve the placement precision of an implanted IOL during cataract surgery, for example, by aligning the rotation of a toric IOL to the axis of astigmatism. Post-operatively, our *ORA System* aids with outcomes analysis and ongoing optimization for improved outcomes.

Finally, the *NGENUITY* 3D visualization system provides surgeons improved visualization by combining a high-dynamic 3D camera, advanced high-speed image optimization, polarizing surgeon glasses and an ultra-high definition 4K OLED 3D display that offers improved depth perception. Within visualization, we also sell the *LuxOR* surgical ophthalmic microscope with its proprietary *ILLUMIN-i* technology, which provides an expanded illumination field with a 6x-larger, highly stable red reflex zone.



An IOL is a tiny, artificial lens for the eye, which replaces the eye's natural lens that is removed during cataract surgery. Our AcrySof IOL is the most implanted IOL in the world. AcrySof IOLs are made of the first material specifically engineered for use in intraocular lens.

We have a longstanding record of innovation within the IOL market. In 2005, we introduced a new class of IOLs to correct presbyopia with our multifocal *AcrySof ReSTOR* offering. In 2006, we also launched the *AcrySof* Toric IOL, designed to correct various levels of preexisting astigmatism in cataract patients. In 2009, the *AcrySof* IQ Toric lens was launched globally, incorporating the aspheric technology into a toric design.

We have continued to grow our *ReSTOR* portfolio. In 2016, the *AcrySof* IQ *ReSTOR* 3.0D Toric IOL was approved by the FDA and launched in the US to address presbyopia and preexisting astigmatism at the time of cataract surgery in adult patients who desire improved near, intermediate and distance vision with an increased potential for spectacle independence. In 2017, the *AcrySof* IQ *ReSTOR* +2.5D Toric IOL was approved by the FDA and launched in the US.

In recent years, presbyopia correction lenses have evolved to include trifocal designs. In 2015, we launched the *AcrySof* IQ *PanOptix* trifocal IOL in select markets outside the US to complement our *ReSTOR* multifocal offering. This novel diffractive optic sends light to three foci to support near, intermediate and distance vision. In 2017, the *AcrySof* IQ *PanOptix* Toric lens was launched in select markets outside the US to address both astigmatism and presbyopia. We launched the *AcrySof* IQ *PanOptix* trifocal IOL in the US and Japan in 2019. We also launched the *AcrySof* IQ *Vivity* non-diffractive extended depth of focus ("EDoF") IOL in 2019 in Europe, Australia and Latin America. This optic design allows for extended range of vision and presbyopia correction with the visual disturbance profile of a monofocal IOL.

We have also introduced several innovations to the delivery device used for introducing an IOL into the capsular bag during cataract surgery. Our *UltraSert* pre-loaded IOL delivery system combines the control of a manually loaded device with the safety and convenience of a disposable, pre-loaded injector to optimize the implantation of the *AcrySof* IQ Aspheric IOL into the cataract patient's eye.

In 2017, we received a European CE Mark for the *Clareon* IOL with the *AutonoMe* delivery system. *AutonoMe* is the first automated, disposable, pre-loaded IOL delivery system that enables precise delivery of the IOL into the capsular bag in patients undergoing cataract surgery. The new device is being introduced with the *Clareon* IOL, a new material with an advanced design that enables sharp, crisp vision, low edge glare and unsurpassed optic clarity.

Our AT-IOLs provide significant visual benefits to patients above standard monofocal IOLs. Accordingly, the price for these AT-IOLs is higher than the price for monofocal styles. This impacts the market penetration of AT-IOLs in the majority of countries, as patients must pay incremental charges above the cost of traditional cataract surgery to obtain an AT-IOL, and in some markets, must pay out-of-pocket for the entire surgical procedure and the AT-IOL.

In the US, our monofocal IOLs are generally fully covered by medical insurance providers or government reimbursement programs, whereas certain of our AT-IOLs may only be partially covered. This payment model was established by two landmark rulings issued by CMS in May 2005 and January 2007. The CMS rulings provide Medicare beneficiaries a choice between cataract surgery with a monofocal IOL, which would be reimbursed as a covered benefit under Medicare, or cataract surgery with an AT-IOL, such as our *AcrySof ReSTOR* lens and *AcrySof* Toric lens, which would be partially reimbursed under Medicare and partially paid out-of-pocket. Many commercial insurance plans mirror the CMS rulings, although commercial plans may vary based on third-party payor. The bifurcated payment for the implantation of AT-IOLs has increased the market acceptance of our AT-IOLs in the US Outside the US, payment and reimbursement models vary widely from country to country, generally depending on the policy adopted by the relevant local healthcare authority on coverage and payment.



To provide convenience, efficiency and value for ophthalmic surgeons, Alcon offers *Custom Pak* surgical procedure packs for use in ophthalmic surgery. Unlike conventional surgical procedure packs, our *Custom Pak* surgical procedure packs allow individual surgeons to customize the products included in their pack. Our *Custom Pak* surgical procedure packs include both our single-use products as well as third-party items not manufactured by Alcon. We believe that our *Custom Pak* offering allows ophthalmic surgeons to improve their efficiency in the operating room, while avoiding the complexity and cost of having to kit surgical items for each respective procedure. We offer more than 11,000 configurations of our *Custom Pak* surgical procedure packs globally, using more than 1,700 components.




Our vitreoretinal surgical product offering is one of the most comprehensive in the industry for surgical procedures for the back of the eye. We currently market our vitreoretinal surgical products in substantially all of the countries in which we sell products.

For vitrectomy procedures, we sell our *Constellation* vision system globally. We believe this system delivers a higher level of control to the physician through higher vitreous cutting rates and embedded laser technology. The *Constellation* vision system platform continues to drive our market share in the global premium segment of vitrectomy packs.

In addition to our *Constellation* vision system, we also sell a full line of vitreoretinal products, including procedure packs, lasers and hand-held microsurgical instruments, as well as our *Grieshaber* and *MIVS* lines of disposable retinal surgery instruments. We also sell a full line of scissors, forceps and micro-instruments in varying gauge sizes, as well as a range of medical grade vitreous tamponades, which replace vitreous humor during many retinal procedures.

We continue to advance our portfolio with smaller gauge (27+) instruments and higher cut speed vitrectomy probes. We also sell *Hypervit* high speed vitrectomy probes, which operate at a speed of 20,000 cuts per minute ("cpm"). This increased speed helps reduce traction that can cause iatrogenic tears and post-operative complications.



Our refractive products include lasers, disposable patient interfaces used during laser correction procedures, technology fees and diagnostic devices necessary to plan the refractive procedures. Our *WaveLight* refractive suite includes the EX500 excimer laser, designed to reshape the cornea, and the FS200 femtosecond laser, designed to create a corneal flap and to deliver laser refractive therapy as part of the LASIK refractive procedure.

We also launched *Contoura* Vision, a topography-guided LASIK treatment designed to provide surgeons with the ability to perform more personalized laser procedures for patients with near-sightedness, or near-sightedness with astigmatism. This procedure is based on the unique corneal topography of each eye, as measured through the *WaveLight Topolyzer* VARIO diagnostic device.

41

A051



Our *EX-PRESS* glaucoma filtration device is approved and marketed in the US, Europe, Canada, Australia and several other markets. This shunt is implanted under the scleral flap to enhance outflow of aqueous humor and reduce intraocular pressure in patients with open-angle glaucoma. The *EX-PRESS* glaucoma filtration device creates consistent and predictable outcomes when used as part of a trabeculectomy.

## Vision Care

Our Vision Care portfolio comprises daily disposable, reusable and color-enhancing contact lenses, as well as a comprehensive portfolio of ocular health products, including devices and over-the-counter products for dry eye, over-the-counter products for contact lens care and ocular allergies, as well as ocular vitamins and redness relievers. For the year ended December 31, 2020, net sales of our contact lens and ocular health products were $1.8 billion and $1.2 billion, respectively.

We serve our customers and patients through optometrists, ophthalmologists and other eye care professionals, retailers, optical chains and pharmacies, as well as distributors that resell directly to smaller retailers and eye care professionals, who sell the products to end-users. The vision care market is primarily private pay, with patients substantially paying for contact lenses and ocular health products out-of-pocket. Partial reimbursement is available in some countries for visits to eye care professionals and a portion of either spectacle or contact lens costs.

Sales of our contact lens and ocular health products are influenced by optometrist and other eye care professional recommendations, our marketing and consumer education efforts and consumer preferences. In addition to price, contact lenses compete on functionality, design and comfort, while ocular health products compete largely on product attributes, brand familiarity and professional recommendations. For our contact lens and ocular health products, we typically compete in the premium price segments of the market and we use improvements in functionality, design and consumer convenience to maintain our pricing position over time.



Alcon is the number two company in the branded contact lens market based on net sales in 2020. This position is driven largely by our core brands *TOTAL*, *PRECISION*, *DAILIES AquaComfort PLUS* and *Air Optix*.

Our *TOTAL* product line includes *DAILIES TOTAL1*, the first and only water gradient contact lens in the market, which is also offered in a multifocal design to address the fast growing presbyopia market. *DAILIES TOTAL1* with its water gradient technology reduces end-of-day dryness, as the water content approaches nearly 100% at the outermost surface of the lens, is designed to be a super-premium lens positioned to compete at the highest levels across the contact lens market. *DAILIES TOTAL1* in the multifocal offering provides a platform for expanding the presbyopia market, which we believe is a potential multibillion dollar opportunity for market participants.

*PRECISION1*, our new mainstream daily disposable silicone-hydrogel ("SiHy") lens with aqueous extraction and surface treatment, is priced in between the super-premium *DAILIES TOTAL1* and the more value-conscious *DAILIES AquaComfort PLUS*. *PRECISION1* was designed for long lasting performance and delivers precise vision, dependable comfort and ease of handing. We piloted *PRECISION1* for Astigmatism with US key opinion leaders in 2020 and expect to continue launching in different jurisdictions in 2021 to address the needs of astigmatic patients.

*DAILIES AquaComfort PLUS*, our most affordable daily disposable contact lens in monofocal, astigmatism-correcting and multifocal options, delivers dependable performance by working with tears to release moisture with every blink. Designed for value-conscious wearers who want the flexibility and simplicity of a daily disposable lens.

42

Our *Air Optix* monthly replacement product line features SiHy contact lenses in monofocal, astigmatism-correcting and multifocal options, as well as *Air Optix Colors* and *Air Optix plus HydraGlyde* contact lenses. *Air Optix plus HydraGlyde* brings together two innovative technologies—*SmartShield* technology and *HydraGlyde* moisture matrix—for a unique combination of deposit protection and longer-lasting lens surface moisture.

We continue to experience market growth driven by trade-up to premium lenses, expansion of toric and multifocal specialty lenses, as well as increasing penetration in emerging markets.



Our key brands in our ocular health portfolio include the *Systane* family of artificial tear and related dry eye products, including the *Systane iLux* MGD thermal pulsation system, *PATADAY* family of eye allergy products, as well as the *Opti-Free* and *Clear Care* lines of multi-purpose and hydrogen peroxide disinfecting solutions, respectively. Select ocular health products include artificial tear and related dry eye products marketed under the *Tears Naturale* and *Genteal* brands, *Naphcon-A* and *Zaditor* eye drops for the temporary relief of ocular itching due to allergies and vitamins for ocular health marketed under the *ICAPS* and *Vitalux* brands.

Alcon currently holds a market leading position in artificial tears. We continue to focus on core product performance while increasing promotion behind a best-in-class innovation portfolio under the brand leadership of *Systane* artificial tears. The *Systane* portfolio is a comprehensive offering of ocular health solutions, most of which are indicated for the temporary relief of burning and irritation due to dryness of the eye. The *Systane* portfolio includes products for daily and nighttime relief, as well as products for discomfort associated with contact lens wear. In 2020, we received CE Mark for *Systane* Ultra MDPF and *Systane* Hydration MDPF. By adding the option of multi-dose preservative free presentations to our portfolio, we address a key need by many eye care practitioners for effective dry eye relief without preservatives. We launched *Systane* Ultra MDPF in the EU and *Systane* Ultra Hydration MDPF in Canada in 2020. The *Systane* portfolio also includes the *Systane iLux* thermal pulsation dry eye device, designed to address the large unmet needs for dry eye and meibomian gland dysfunction patients.

In 2020, we successfully switched from prescription to over-the-counter the *PATADAY* family of allergy relief eye drops. *PATADAY* Twice Daily Relief and *PATADAY* Once Daily Relief eye drops were approved by the FDA and launched in the US in 2020. *PATADAY* Once Daily Extra Strength was approved in July 2020. The *PATADAY* brand contains olopatadine, the number one doctor-prescribed active ingredient for eye allergy relief. Since 2008, over 40 million prescriptions have been written for olopatadine.

Alcon is also a market leader in contact lens care in both multi-purpose (*Opti-Free PureMoist*) and hydrogen peroxide solutions (*Clear Care and AOSEPT* PLUS). The vast majority of our contact lens care products are comprised of disinfecting solutions to remove harmful micro-organisms on contact lenses, with a smaller amount of sales coming from cleaners to remove undesirable film and deposits from contact lenses and lens rewetting drops to improve wearing comfort for contact lenses. We benefit from strong synergies between our contact lens business and our contact lens care products; however, we expect demand for disinfecting solutions to continue to decrease as contact lens wearers shift their preference from reusable contact lenses to daily disposable lenses.

Finally, our ocular health portfolio also includes artificial tear and related dry eye products marketed under the *Tears Naturale* and *Genteal* brands, products for the temporary relief of ocular itching due to ocular allergies marketed under the *Naphcon-A* and *Zaditor* brands and vitamins for the maintenance of general ocular health marketed under the *ICAPS* and *Vitalux* brands.

Our ocular health portfolio is typically over the counter but, in a small number of our markets, certain of our ocular health products are regulated as pharmaceuticals and require a prescription.

## Principal Markets

Alcon serves consumers and patients in over 140 countries worldwide. The US is our largest market with 44% of our net sales in 2020, see Note 5. Segment information to the Consolidated Financial Statements for net sales by geography. US sales of the vast majority of our products are not subject to material changes in seasonal demand. However, sales of

43

certain of our vision care products, including those for allergies and dry eye, are subject to seasonal variation. In addition, sales of our surgical equipment are also subject to variation based on hospital or clinic purchasing cycles.

## Research and Development

Alcon has made one of the largest commitments to research and development in the eye care market, with proven research and development capabilities in the areas of optical design, material and surface chemistry, automation and equipment platforms. Currently, our research and development organization employs over 1,400 individuals dedicated to our research and development efforts, including physicians, doctors of optometry and PhDs. Our researchers have extensive experience in the field of ophthalmology and frequently have academic or practitioner backgrounds to complement their product development expertise.

We organize cross-functional development teams to drive new innovations to our customers and our patients around the world. New projects for our Surgical and Vision Care pipelines originate either from concepts developed internally by staff scientists and engineers, ideas from eye care professionals in ophthalmology, or through strategic partnerships with academic institutions or other companies. We have designed our research and development organization to achieve global registration of products through the efforts of a global clinical and regulatory affairs organization.

We invested approximately $673 million, $656 million and $587 million in research and development in 2020, 2019 and 2018, respectively. In addition to our in-house research and development capabilities, as part of our efforts to pursue strategic research and development partnerships with third parties, our dedicated business development team has completed over 30 BD&L transactions since 2016. For example, in 2019 we acquired US-based PowerVision, Inc., which is developing fluid-based accommodating IOLs for cataract patients. In addition, we expect our partnership with Philips Healthcare to enable us to launch a new digital health platform to support our cataract equipment that will allow us to deliver fully integrated information to ophthalmic surgeons. We continually review and refine our operating model to optimize for efficiency and productivity. Recent improvements in productivity coupled with a number of strategic partnerships have collectively led to more than 60% growth in the number of projects within our portfolio of internal and external innovation over the past five years. Across our Surgical and Vision Care pipelines, we have more than 100+ pipeline projects in process as of December 31, 2020, including 30 that have achieved positive proof of concept or are undergoing regulatory review.

Our research and development organization maintains an extensive network of relationships with top-tier scientists in academia and with leading healthcare professionals, surgeons, inventors and clinician-scientists working in ophthalmology. The principal purpose of these collaborative scientific interactions is to supplement our internal pipeline and leverage technological advancements in academia and the clinical setting.

While our primary focus is on delivering new products to our patients and customers, we also support the advancement of basic science through the Alcon Research Institute, which seeks to encourage, advance and support vision research. The Alcon Research Institute is one of the largest corporately funded research organizations devoted to vision research in the world. The Institute's activities are planned and directed by an autonomous Executive Steering Committee that is comprised of distinguished ophthalmologists and vision researchers. The Institute has worldwide representation and operates under the premise that improvements in the diagnosis and treatment of ocular diseases are dependent upon advances in basic science and clinical research carried out by independent investigators in institutions throughout the world. The Institute has also awarded more than 365 awards and research grants over the past 39 years.

Research and development activities within our Surgical business are focused on expanding intraocular lens capabilities to further improve surgical and refractive outcomes and on developing equipment and instrumentation for cataract, vitreoretinal, refractive and glaucoma surgeries, as well as new platforms for diagnostics and visualization. Our focus within the Vision Care business is on the research and development of new manufacturing platforms and novel contact lens materials, coatings and optical designs for various lens replacement schedules, with the ultimate goal of improving patient outcomes. In addition to our efforts to develop next-generation contact lens technologies, we are strengthening our ocular health portfolio with new products and novel technologies that safely provide relief from symptoms of dry eye and ocular allergies.

We continue to seek opportunities to collaborate with third parties on advanced technologies for various ophthalmic conditions. These include the potential to provide accommodative contact and intraocular lenses for patients living with presbyopia.

## Marketing and Sales

Alcon conducts sales and marketing activities throughout the world. During the year ended December 31, 2020, 44% of our sales were in the US. We are present in every significant market in the world where ophthalmology and optometry are

44

practiced, with operations in 75 countries supported by over 3,500 associates dedicated to direct sales and with products sold in over 140 countries.

Our global commercial capability is organized around sales and marketing organizations dedicated to our Surgical and Vision Care businesses and we customize these efforts to the medical practice needs of each customer. In addition to direct promotion of our products, our sales representatives provide customers with access to clinical education programs, data from clinical studies and technical service assistance. Our selling models also include focused efforts in key channels, including strategic accounts, key accounts and pharmacies.

In each of our markets, we rely on our strong relationships with eye care professionals to attract and retain customers. We engage healthcare professionals to serve as clinical consultants, to participate on advisory boards and to conduct presentations regarding our products. In addition, we have established or sponsor several long-standing programs that provide training and education to eye care professionals, including providing training support at over 70 state-of-the-art interactive training centers around the world. These facilities introduce ophthalmologists to our surgical equipment and cataract products through hands-on training in surgical techniques while exposing them to leading ophthalmologists.

In our Surgical business, our marketing efforts are supported by global advertising campaigns, claims from clinical registration and post-approval studies and by the participation of marketing and sales representatives in regional and global medical conferences. Technical service after the sale is provided using an integrated customer relationship management system in place in many markets. All of our technical service in the US, and a high percentage of that service outside the US, is provided by service technicians employed directly by Alcon. In countries where we do not have local operations or a scientific office, we use distributors to sell and handle the physical distribution of our products. Within our Surgical business, the practices of our marketing and sales representatives continue to change to meet emerging market trends, namely consolidation of providers, increasing pricing pressures, proliferation of smaller competitors, increasing demands for outcome evidence and a shift from relationship-based selling orientated toward physicians versus professional economic buyers focused on cost.

In our Vision Care business, we support our products with direct-to-consumer marketing campaigns, including advertising, promotions and other marketing materials, and with retailer-focused marketing and promotional materials. The fast-evolving landscape for our Vision Care business varies significantly by country. Three key trends in marketing and sales help drive the continuing evolution of our Vision Care business: (1) Internet-based purchasing is increasing, as online players grow and the Internet plays a bigger role as a source of consumer information and a platform for price referencing, (2) channel consolidation is accelerating, as chains grow in size and vertically integrate, and (3) independent eye care professionals vary in influence, as many align more closely with retailers. We see an opportunity to leverage digital technology to address pain points experienced by consumers and patients in existing paths to purchase. We also intend to continue investing and innovating in digital capabilities to develop new business models and practice implementation support in response to channel shifts and increases in direct-to-consumer influence.

While we market all of our products by calling on medical professionals, direct customers and distribution methods differ across our business lines. Surgical products are sold directly to hospitals and ambulatory surgical centers, although we sell through distributors in certain markets outside the US where we do not have local operations or a scientific office. In many countries, contact lenses are available only by prescription. Our contact lenses can be purchased from eye care professionals, optical chains and large retailers, subject to country regulation. Our ocular health products can be found in major drugstores, pharmacies, food stores and mass merchandising and optical retail chains globally, with access subject to country regulations, including free-sale, pharmacy-only and prescription regulations. No single customer accounted for more than 10% of our global sales in 2020.

## Manufacturing, Quality and Supplies

### Manufacturing

We generally organize our manufacturing facilities along product categories, with most plants being primarily dedicated to the manufacture of either our Surgical or Vision Care product offerings. As of December 2020, we employed approximately 4,000 people to manufacture surgical products at 10 facilities in the US, Belgium, Switzerland, Ireland, Germany and Israel and approximately 5,300 people to manufacture Vision Care products at eight facilities in the US, Germany, Singapore, Malaysia and Indonesia. Our functional division of plants reflects the unique differences in regulatory requirements governing the production of surgical medical devices as well as the different technical skills required of associates in these manufacturing environments. All of our manufacturing plants are ISO 13485 and ISO 14001:2015 certified. Currently, we manufacture approximately 90% of our products internally and rely on third-party manufacturers (including Novartis) for a limited number of products.

The goal of our supply chain strategy is to efficiently produce and distribute high quality products. To that end, we employ cost-reduction programs, known as continuous improvement programs, involving activities such as cycle-time reductions,

A055

efficiency improvements, automation, plant consolidations and procurement savings programs as a means to reduce manufacturing and component costs. To comply with good manufacturing practices and to improve the skills of our associates, we train our direct labor manufacturing staff throughout the year. Our professional associates are trained in various aspects of management, regulatory and technical issues through a combination of in-house seminars, local university classes and trade meetings.

The manufacture of our products is complex, involves advanced technology and is heavily regulated by governmental health authorities around the world, including the FDA. Risks inherent to the medical device industry, specifically as they relate to Class III devices, are part of our operations. If we or our third-party manufacturers fail to comply fully with regulations, there could be a product recall or other shutdown or disruption of our production activities. We have implemented a global manufacturing strategy to maximize business continuity in case of such events or other unforeseen catastrophic events.

## Quality

Product quality and patient safety are vitally important for Alcon and our industry. Our customers and patients must always feel safe when using our products. Our Quality Management Systems group ("QMS") is responsible for establishing and maintaining a robust and compliant quality control system across Alcon. QMS regularly monitors industry trends, as well as global and regulatory changes, and adjusts our processes and procedures to adhere to current standards and best practices. In addition, our Quality Compliance group audits our internal processes and suppliers for compliance with approved processes and procedures.

## Supplies

The components used in certain of our Surgical products, such as viscoelastics, and our ocular health products, such as our products for dry eye, are sourced from facilities that meet the regulatory requirements of the FDA or other applicable health regulatory authorities. Because of the proprietary nature and complexity of the production of these components, a number of them are only available from a single or limited number of FDA-approved sources. The majority of active chemicals, biological raw materials and selected inactive chemicals used in our products are acquired pursuant to long term supply contracts. The sourcing of components used in our Surgical products differs widely due to the breadth and variety of products, with a number of the components sourced from a single or limited number of suppliers. When we rely upon a sole source or limited sources of supply for certain components, we try to maintain a sufficient inventory consistent with prudent practice and production lead-times and to take other steps necessary to ensure our continued supply. The prices of our supplies are generally not volatile.

# Human Capital Management

Alcon's culture is summarized in the Alcon Blueprint. The Alcon Blueprint lists Alcon's values and behaviors and is the bedrock for how we attract, develop and retain top talent. We seek diverse talent that embodies our values and contributes to a culture that enables people to see brilliantly. Our talent acquisition process encompasses all facets of workforce planning, employer branding, talent assessment and selection and onboarding of new associates. Alcon focuses on the care and growth of associates through learning and development, performance management, career progress and associate engagement. We work with associates to set challenging performance and career goals, offer training and development opportunities and encourage growth through mentoring, challenging roles and assignments—all while ensuring competitive compensation and benefits. Our Chief Human Resources Officer, working with the Global Heads of Talent Acquisition and Talent Management and Organization Development, develops policies to support Alcon's ability to attract the best talent and promote diversity and cultural inclusivity.

# Intellectual Property

We strive to protect our investment in the research, development, manufacturing and marketing of our products through the use of patents, trademarks, copyrights, trade secrets and other intellectual property. We own or have rights to a number of patents, trademarks, copyrights, trade secrets and other intellectual property directly related and important to our businesses. As of December 31, 2020, we owned approximately 1,900 patent families.

We believe that our patents are important to our business but that no single patent, or group of related patents, currently is of material importance in relation to our business as a whole. Our strategy is to develop patent portfolios for our research and development projects in order to obtain market exclusivity for the innovative features of our products in our major markets. The scope and duration of protection provided by a patent can vary significantly from country to country.

46

**A056**

However, even after the expiration of all patents covering a product, we may continue to derive commercial benefits from such product.

We routinely monitor the activities of our competitors and other third parties with respect to their use of our intellectual property. When appropriate, we will enforce our intellectual property rights to ensure that we are receiving the protections they afford us. Similarly, we will staunchly defend our right to develop and market products against unfounded claims of infringement by others. We will aggressively pursue or defend our position in the appropriate courts if the dispute cannot otherwise be promptly resolved.

In addition to our patents and pending patent applications in the US and selected non-US markets, we rely on proprietary know-how and trade secrets in our businesses and work to ensure the confidentiality of this information, including through the use of confidentiality agreements with associates and third parties. In some instances, we also acquire, or obtain licenses to, intellectual property rights that are important to our businesses from third parties.

All of our major products are sold under trademarks that we consider in the aggregate to be important to our businesses as a whole. We consider trademark protection to be particularly important in the protection of our investment in the sales and marketing of our contact lens care and ocular health products. The scope and duration of trademark protection varies widely throughout the world.

We also rely on copyright protection in various jurisdictions to protect the software and printed materials our business relies upon, including software used in our surgical and diagnostic equipment. The scope and duration of copyright protection for these materials also varies widely throughout the world.

# Competition

The eye care industry is highly competitive and subject to rapid technological change and evolving industry requirements and standards. We compete with a number of different companies across our two business segments—Surgical and Vision Care. Companies within our industry compete on technological leadership and innovation, quality and efficacy of their products, relationships with eye care professionals and healthcare providers, breadth and depth of product offerings and pricing. The presence of these factors varies across our Surgical and Vision Care product offerings. Our principal competitors also sometimes form strategic alliances and enter into co-marketing agreements in an effort to better compete. We face strong local competitors in some markets, especially in developed markets, such as the US, Western Europe and Japan.

## Surgical

The surgical market is highly competitive. Superior technology and product performance give rise to category leadership in the surgical market. Service and long term relationships are also key factors in this competitive environment. Surgeons rely on the quality, convenience, value and efficiency of a product and the availability and quality of technical service. We primarily compete with Carl Zeiss Meditec AG, Bausch Health Companies Inc., Hoya Corporation and Johnson & Johnson in the surgical market.

We expect to compete against companies that offer alternative surgical treatment methodologies, including multifocal, tunable and accommodating AT-IOL approaches, and companies that promote alternative approaches for responding to the conditions our products address. At any time, our known competitors and other potential market entrants may develop new devices or treatment alternatives that may compete directly with our products. In addition, they may gain a market advantage by developing and patenting competitive products or processes earlier than we can or by obtaining regulatory approvals / clearances or market registrations more rapidly than we can.

We believe that the principal competitive factors in our surgical market include:

- disruptive product technology;
- alternative treatment modalities;
- breadth of product lines and product services;
- ability to identify new market trends;
- acceptance by ophthalmic surgeons;
- customer and clinical support;
- regulatory status and speed to market;
- price;

- product quality, reliability and performance;
- capacity to recruit engineers, scientists and other qualified associates;
- digital initiatives that change business models;
- reimbursement approval from governmental payors and private healthcare insurance providers; and
- reputation for technical leadership.

Shifts in industry market share can occur in connection with product issues, physician advisories, safety alerts and publications about our products. In the current environment of managed care, with consolidation among healthcare providers, increased competition and declining reimbursement rates, there is also increasing pressure on price.

## Vision Care

The vision care market is also highly competitive, and our primary competitors are Johnson & Johnson, Bausch Health Companies, Inc. and The Cooper Companies, Inc. For ocular health, our largest competitor is Allergan, Inc.

In contact lenses, all companies continue to focus on growing the daily disposable SiHy segment due to the price trade-up opportunity from non-SiHy and reusable lenses. We believe our *DAILIES TOTAL1* provides the most advanced daily disposable SiHy contact lens with its advanced "water gradient" technology, but currently only caters to the premium market given its higher price point. We also compete with manufacturers of eyeglasses and with surgical procedures that correct visual defects. We believe that there are opportunities for contact lenses to attract new customers in the markets in which we operate, particularly in markets where the penetration of contact lenses in the vision correction market is low. Additionally, we compete with new market entrants with disruptive distribution models that could potentially innovate to challenge traditional models, including the eye care professional channel in which we have a significant presence. We also believe that laser vision correction is not a significant threat to our sales of contact lenses based on the growth of the contact lens market over the past decade and our involvement in the laser vision correction market through our Surgical business.

In ocular health, the market is characterized by competition for market share through the introduction of products that provide superior effectiveness and reduced burden for treating eye conditions. Recommendations from eye care professionals and customer brand loyalty, as well as our product quality and price, are key factors in maintaining market share in these products.

# Government Regulation

## Overview

Our businesses are subject to varying degrees of governmental regulation in the countries in which we operate, and the general trend is toward increasingly stringent regulation. In the US, the drug, device and dietary supplement industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting. The exercise of broad regulatory powers by the FDA continues to result in increases in the amounts of testing and documentation required for the commercialization of regulated products and a corresponding increase in the expense of product introduction. Similar trends are also evident in the EU and in other markets throughout the world. In addition to market access regulation, our businesses are also subject to other forms of regulation, such as those relating to anti-bribery, data privacy and cybersecurity and trade regulation matters. We are also subject to regulations related to environmental and safety matters, which are discussed in greater detail in "Item 4.D. Property, Plants and Equipment—Environmental Matters".

## Product Approval and Monitoring

Most of our products are regulated as medical devices in the US and the EU. These jurisdictions each use a risk-based classification system to determine the type of information that must be provided to the local regulatory bodies in order to obtain the right to market a product. In the US, the FDA classifies devices into three classes: Class I (low risk), Class II (moderate risk) and Class III (high risk). Many of our devices are Class II or III devices that require premarket review by the FDA. The primary pathway for our Class II devices is FDA clearance of a premarket notification under section 510(k) of the FDCA. With a 510(k) submission, the manufacturer must submit a notification to the FDA that includes performance data that establish that the product is substantially equivalent to a "predicate device", which is typically another Class II previously-cleared device. Our Class III devices require FDA approval of a Premarket Approval application. With a Premarket Approval application, the manufacturer must submit extensive supporting evidence, including clinical data, sufficient to demonstrate a reasonable assurance that the device is safe and effective for its intended use.

48

A058

In the EU, CE marking is required for all medical devices sold. Prior to affixing the CE Mark, the manufacturer must demonstrate that their device conforms to the relevant essential requirements of the EU's Medical Device Directive through a conformity assessment procedure. The nature of the assessment depends upon the classification of the device. The method of assessing conformity varies depending on the type and classification of the product. For most Class I devices, the assessment is a self-certification process by the manufacturer. For all other devices, the conformity assessment procedure requires review by a "notified body", which is authorized or licensed to perform conformity assessments by national device regulatory authorities. The conformity assessment procedures require a technical review of the manufacturer's product and an assessment of relevant clinical data. Notified bodies may also perform audits of the manufacturer's quality system. If satisfied that the product conforms to the relevant essential requirements, the notified body issues a certificate of conformity, which the manufacturer uses as a basis for its own declaration of conformity and application of the CE mark.

The EU published a new Medical Device Regulation in 2017 which will impose significant additional requirements on medical device manufacturers, including with respect to clinical development, labeling, technical documentation and quality management systems. The regulation has a three-year implementation period. Medical devices placed on the market in the EU after May 2021 will require certification according to these new requirements, except that devices with valid CE certificates, issued pursuant to the Medical Device Directives before May 2022, can be placed on the market until those certificates expire, at the latest in May 2025, provided there are no significant changes in the design or intended purpose of the device.

We also market products that are regulated in other product categories, including lasers, drug products, dietary supplements and medical foods. These products are also subject to extensive government regulation, which vary by jurisdiction. For example, in the US, our drug products must either be marketed in compliance with an applicable over-the-counter drug monograph or receive FDA approval of a New Drug Application. In the European Economic Area, our drug products must receive a marketing authorization from the competent regulatory authority before they may be placed on the market. There are various application procedures available, depending on the type of product involved.

Clinical trials may be required to support the marketing of our drug or device products. In the US, clinical trials must be conducted in accordance with FDA requirements, including informed consent from study participants, and review and approval by an institutional review board ("IRB"), among other requirements. Additionally, FDA authorization of an Investigational Device Exemption ("IDE") application must be obtained for studies involving significant risk devices prior to commencing the studies. In the EU, clinical trials usually require the approval of an ethics review board and the prior notification to, or authorization of the study from, the regulatory authority in each country in which the trial will be conducted.

Regulations of the FDA and other regulatory agencies in and outside the US impose extensive manufacturing requirements as well as postmarket compliance and monitoring obligations on our business. The manufacture of our device, drug and dietary supplement products is subject to extensive and complex good manufacturing practice and quality system requirements, which govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, storage, handling and servicing of our products. We are also subject to requirements for product labeling and advertising, recordkeeping, reporting of adverse experiences and other information to identify potential problems with our marketed products, as well as recalls and field actions. We are also subject to periodic inspections for compliance with these requirements. We expect this regulatory environment will continue to require significant technical expertise and capital investment to ensure compliance.

Medical device, drug and dietary supplement manufacturers are also subject to taxes, as well as application, product, user, establishment and other fees. For example, in 2010, the Patient Protection and Affordable Care Act imposed an excise tax on medical device manufacturers and importers. This excise tax was subsequently repealed in December 2018; however, other similar taxes can be imposed in the future.

## Price Controls

The prices of our medical devices and drugs that require prescriptions are subject to reimbursement programs and price control mechanisms that vary from country to country. Due to increasing political pressure and governmental budget constraints, we expect these programs and mechanisms to remain robust and to potentially even be strengthened. As a result, such programs and mechanisms could have a negative influence on the prices we are able to charge for our medical device products, particularly those used in cataract and vitreoretinal surgeries.

## Regulations Governing Reimbursement

In the US, patient access to our drug and device products that require a prescription is determined in large part by the coverage and reimbursement policies of third-party health insurers, including government programs such as Medicare

49

and Medicaid. Both government and commercial health insurers are increasingly focused on containing health care costs and have imposed, and are continuing to consider, additional measures to exert downward pressure on device and drug prices. Outside the US, global trends toward cost-containment measures likewise may influence prices for healthcare products in those countries. Adverse decisions relating to either coverage for our products or the amount of reimbursement for our products, could significantly reduce the acceptance of and demand for our products and the prices that our customers are willing to pay for them.

## Health Care Fraud and Abuse; Anti-Bribery

We are subject to health care fraud and abuse and anti-bribery laws and regulations in the US and around the world, including state and federal anti-kickback, anti-self-referral and false claims laws in the US. These laws are complex and subject to evolving interpretation by government agencies and courts. For example, in the US, relationships between manufacturers of products paid for by federal and state healthcare programs and healthcare professionals are regulated by a series of federal and state laws and regulations, such as the Federal Anti-Kickback Statute, that restrict the types of financial relationships with referral sources that are permissible. As discussed in "Item 4.B. Business Overview—Marketing and Sales", we engage in marketing activities targeted at healthcare professionals, which include among others the provision of training programs. If one or more of these activities were found to be in violation of the Federal Anti-Kickback Statute or comparable state laws, or if we otherwise generally fail to comply with any of the health care fraud and abuse and anti-bribery laws and regulations or any other law or governmental regulation, or there are changes to the interpretation of any of the foregoing, we could be subject to, among other things, civil and criminal penalties, damages, fines, exclusion from the Medicare and Medicaid programs and the curtailment or restructuring of our operations.

## Data Privacy and Cybersecurity

The regulation of data privacy and security, and the protection of the confidentiality of certain personal information (including patient health information and financial information), is increasing. For example, the EU General Data Protection Regulation contains enhanced financial penalties for noncompliance. Similarly, the US Department of Health and Human Services has issued rules governing the use, disclosure and security of protected health information, and the FDA has issued further guidance concerning cybersecurity for medical devices.

In addition, certain countries have issued or are considering data localization laws, which limit companies' ability to transfer protected data across country borders. Failure to comply with data privacy and cybersecurity laws and regulations can result in enforcement actions, including civil or criminal penalties.

## Trade Regulation

The movement of products, services and investment across borders subject us to extensive trade regulations. A variety of laws and regulations in the countries in which we transact business apply to the sale, shipment and provision of goods, services and technology across borders. These laws and regulations govern, among other things, our import, export and other business activities. We are also subject to the risk that these laws and regulations could change in a way that would expose us to additional costs, penalties or liabilities. Some governments also impose economic sanctions against certain countries, persons or entities.

In addition to our need to comply with such regulations in connection with our direct activities, we also sell and provide goods, technology and services to agents, representatives and distributors who may export such items to customers and end-users. Failure by us or the third parties through which we do business to comply with applicable import, export control or economic sanctions laws and regulations may subject us to civil or criminal enforcement action and varying degrees of liability.

# 4.C.    ORGANIZATIONAL STRUCTURE

## Organizational Structure

See "Item 4.B. Business Overview" for additional information.

## Significant Subsidiaries

See "Item 6.C. Board Practice" for additional information.

50

# 4.D.   PROPERTY, PLANTS AND EQUIPMENT

Our corporate headquarters is located in Geneva, Switzerland. The principal office for our Swiss and international operations, which is also our registered office, is located in Fribourg, Switzerland, and the principal office for our US operations is located in Fort Worth, Texas.

We believe that our current manufacturing and production facilities have adequate capacity for our medium-term needs. To ensure that we have sufficient manufacturing capacity to meet future production needs, we regularly review the capacity and utilization of our manufacturing facilities. The FDA and other regulatory agencies regulate the approval for use of manufacturing facilities for medical devices, and compliance with these regulations requires a substantial amount of validation time prior to start-up and approval. Accordingly, it is important to our business that we ensure we have sufficient manufacturing capacity to meet our future production needs.

## Major Facilities

The following table sets forth our most significant production and research and development facilities:

| Location | Size of Site (in m²) | Major Activity |
|---|---|---|
| Fort Worth, Texas | 315,200 | Production, research and development for Surgical and Vision Care businesses |
| Johns Creek, Georgia | 84,100 | Production, research and development for Vision Care business |
| Grosswallstadt, Germany | 82,300 | Production, research and development for Vision Care business |
| Singapore | 69,000 | Production for Vision Care business |
| Johor, Malaysia | 43,900 | Production for Vision Care business |
| Irvine, California | 40,800 | Production, research and development for Surgical business |
| Houston, Texas | 37,400 | Production for Surgical business |
| Batam, Indonesia | 35,000 | Production for Vision Care business |
| Huntington, West Virginia | 27,500 | Production for Surgical business |
| Sinking Spring, Pennsylvania | 21,800 | Production for Surgical business |
| Cork, Ireland | 13,600 | Production for Surgical business |
| Erlangen/Pressath/Teltow, Germany | 10,700 | Production, research and development for Vision Care business |
| Puurs, Belgium | 8,000 | Production for Surgical business |
| Schaffhausen, Switzerland | 4,100 | Production for Surgical business |

We launched an expansion of our Johns Creek, Georgia facility in 2017 to add three production lines of *DAILIES TOTAL1* contact lenses. We completed the project in 2019 and incurred costs of approximately $100 million.

In March 2018, we commenced the second phase of expansion of our Grosswallstadt, Germany facility relating to the production of contact lenses. We expect to pay a total amount of approximately $450 million and the total amount paid and committed through December 31, 2020 is approximately $445 million. We expect to complete the project in mid-2021.

Also in March 2018, we commenced the second phase of expansion of our Singapore facility relating to the production of contact lenses. We completed the project in the second quarter of 2020 and paid a total of approximately $125 million.

In September 2019, we launched a further expansion of our Johns Creek, Georgia facility to add four production lines for *PRECISION1* and *DAILIES TOTAL1* contact lenses. This project is ongoing and was expanded in 2020. We expect to pay a total amount of approximately $224 million on this project. Through December 31, 2020, the total amount paid and committed was approximately $175 million.

We funded each of the projects discussed above from working capital.

## Environmental Matters

We integrate core values of environmental protection into our business strategy to protect the environment, to add value to the business, manage risk and enhance our reputation.

A061

We are subject to laws and regulations concerning the environment, safety matters, regulation of chemicals and product safety in the countries where we manufacture and sell our products or otherwise operate our business. As a result, we have established internal policies and standards that aid our operations in systematically identifying relevant hazards, assessing and mitigating risks and communicating risk information. These internal policies and standards are in place to ensure our operations comply with relevant environmental, health and safety laws and regulations and that periodic audits of our operations are conducted. The potential risks we identify are integrated into our business planning, including investments in reducing safety and health risks to our associates and reducing our impact on the environment. We have also dedicated resources to monitor legislative and regulatory developments and emerging issues to anticipate future requirements and undertake policy advocacy when strategically relevant.

# ITEM 4A.   UNRESOLVED STAFF COMMENTS

None.

# ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS

## 5.A.         OPERATING RESULTS

This operating and financial review should be read together with the section captioned "Item 4. Information on the Company—4.B. Business Overview" and our Consolidated Financial Statements and the related notes to those statements included elsewhere in this Annual Report. Among other things, those financial statements include more detailed information regarding the basis of preparation for the following information. This discussion contains forward-looking statements that involve risks and uncertainties. As a result of many factors, such as those set forth under "Item 3. Key Information —3.D. Risk Factors" and elsewhere in this Annual Report, Alcon's actual results may differ materially from those anticipated in these forward-looking statements. Please see "Special Note About Forward-Looking Statements" in this Annual Report. "Item 5. Operating and Financial Review and Prospects", together with "Item 4.B. Business Overview" and "Item 6.D. Employees", constitute the Operating and Financial Review ("Rapport annuel"), as defined by the Swiss Code of Obligations.

## Overview

Alcon researches, develops, manufactures, distributes and sells a full suite of eye care products within two segments: Surgical and Vision Care. The Surgical segment is focused on ophthalmic products for cataract surgery, vitreoretinal surgery, refractive laser surgery and glaucoma surgery, and includes implantables, consumables and surgical equipment required for these procedures. The Vision Care segment comprises daily disposable, reusable and color-enhancing contact lenses and a comprehensive portfolio of ocular health products, including products for dry eye, contact lens care and ocular allergies, as well as ocular vitamins and redness relievers.

We are dedicated to providing innovative products that enhance quality of life by helping people see better. Our strong foundation is based on our longstanding success as a trusted brand, our legacy of industry firsts and advancements, our leading positions in the markets in which we compete and our continued commitment to substantial investment in innovation. With 75 years of history in the ophthalmic industry, we believe the Alcon brand name is synonymous with innovation, quality, service and leadership among eye care professionals worldwide. We employ over 23,000 associates from more than 100 nationalities, operating in 75 countries and serving consumers and patients in over 140 countries.

In 2020, Alcon's net sales to third parties amounted to $6.8 billion. The United States accounted for $3.0 billion, or 44%, of total net sales, Japan accounted for $0.7 billion, or 10%, of total net sales, China accounted for $0.4 billion or 6%, of total net sales, Switzerland accounted for $55 million, or 1%, of total net sales, and the rest of the world accounted for the remaining $2.7 billion of total net sales.

Between 2011, when we were acquired by Novartis, and April 9, 2019, we operated as a division within Novartis. Novartis transferred to us substantially all of the assets and liabilities of its eye care devices business, consisting of our surgical and vision care businesses. Our financial statements include, in all periods presented, the assets, liabilities and results of operations of the ophthalmic over-the-counter products and a small portfolio of surgical diagnostics medications, which was transferred to Alcon from Novartis, effective as of January 1, 2018.

## Basis of preparation

The Consolidated Financial Statements included elsewhere in this Annual Report, which present our financial position, results of operations, comprehensive loss, and cash flows have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB").

The preparation of the Consolidated Financial Statements requires management to make certain estimates and assumptions, either at the balance sheet date or during the year, that affect the reported amounts of assets and liabilities as well as revenues and expenses. Actual outcomes and results could differ from these estimates and assumptions.

The businesses of Alcon did not form a separate legal group of companies prior to the Spin-off in 2019. For periods prior to the Spin-off, the financial statements were prepared on a combined basis and are derived (carved-out) from the Novartis Consolidated Financial Statements and accounting records, as if Alcon was a stand-alone company for all periods presented. Our Consolidated Financial Statements include the assets and liabilities within Novartis subsidiaries in such historical periods that are attributable to Alcon and exclude the assets and liabilities within Alcon subsidiaries in such historical periods not attributable to its businesses. For periods prior to the Spin-off, the Consolidated Financial

Statements include charges and allocation of expenses related to certain Novartis business support functions across the following service domains: human resources operations, real estate and facility services, including site security and executive protection, procurement, information technology, commercial and medical support services and financial reporting and accounting operations. In addition, allocations were made for Novartis corporate general and administrative functions in the areas of corporate governance, including board of directors, corporate responsibility and other corporate functions, such as tax, listed company compliance, investor relations, internal audit, treasury and communications functions.

Management believes that the allocation methodology used was reasonable and all allocations have been performed on a basis that reasonably reflects the services received by Alcon, the cost incurred on behalf of Alcon and the assets and liabilities of Alcon. Although the Consolidated Financial Statements reflect management's best estimate of all historical costs related to Alcon, this may however not necessarily reflect what the results of operations, financial position or cash flows of Alcon would have been had Alcon operated as an independent, publicly traded company for the periods prior to the Spin-off.

Agreements entered into between Alcon and Novartis in connection with the Spin-off govern the relationship between the parties following the Spin-off and provide for the allocation of various assets, liabilities, rights and obligations. These agreements also include arrangements for transition services to be provided on a temporary basis between the parties.

For further information on the basis of preparation of the Consolidated Financial Statements see Note 2 to the Consolidated Financial Statements included elsewhere in this Annual Report.

## Items you should consider when evaluating our consolidated financial statements

### COVID-19

In March 2020, the World Health Organization declared the outbreak of COVID-19 a pandemic. The COVID-19 pandemic has negatively impacted the global economy, disrupted global supply chains and created significant volatility and disruption of financial markets, resulting in widespread shelter-in-place orders, business shut-downs and the deferral of non-urgent surgeries. This has had an adverse effect on our net sales, operating results and cash flow.

### Periods prior to the Spin-off

For periods prior to the Spin-off, our results of operations, financial position and cash flows could differ from those that would have resulted if we operated autonomously or as an entity independent of Novartis. As a result, you should consider the following facts when evaluating our historical results of operations:

- For certain of the periods covered by our Consolidated Financial Statements, our business was operated within legal entities which hosted portions of other Novartis businesses. In addition, in all the periods presented, our Consolidated Financial Statements include the ophthalmic over-the-counter products and a small portfolio of surgical diagnostics medications, the management and reporting of which was transferred to Alcon from the Innovative Medicines Division of Novartis effective as of January 1, 2018.

- For periods prior to the Spin-off, income taxes attributable to the Alcon Division were determined using the separate return approach, under which current and deferred income taxes were calculated as if a separate tax return had been prepared in each tax jurisdiction. In various tax jurisdictions, Alcon and Novartis businesses operated within the same legal entity and certain Alcon subsidiaries were part of a Novartis tax group. This required an assumption that the subsidiaries and operations of Alcon in those tax jurisdictions operated on a standalone basis and constitute separate taxable entities. Actual outcomes and results could differ from these separate tax return estimates, including those estimates and assumptions related to realization of tax benefits within these Novartis tax groups.

- For periods prior to the Spin-off, our Consolidated Financial Statements also include an allocation and charges of expenses related to certain Novartis functions. However, the allocations and charges may not be indicative of the actual expense that would have been incurred had we operated as an independent, publicly traded company during those periods. For example, historically, our business has been charged with a significant portion of appropriate administrative costs, such as those related to services Alcon has received from Novartis across the following service domains: human resources operations, real estate and facility services, including site security and executive protection, procurement, information technology, commercial and medical support services and financial reporting and accounting operations, and these have been reflected in our Consolidated Financial Statements based on historical allocations and charges. Accordingly, these overhead costs were affected by the historical arrangements that existed between the historical reporting units of the Alcon Division and Novartis and typically did not include a profit margin.

54

A064

- For periods prior to the Spin-off, our Consolidated Financial Statements also include an allocation from Novartis of certain corporate related general and administrative expenses that we would have incurred as a publicly traded company. These include costs associated with corporate governance, including board of directors, corporate responsibility and other corporate functions, such as tax, corporate governance and listed company compliance, investor relations, internal audit, treasury and communications functions. The allocation of these additional expenses may not be indicative of the actual expense that would have been incurred had we operated as an independent, publicly traded company for those periods.

### CyPass voluntary market withdrawal

On August 28, 2018, we announced our immediate, voluntary market withdrawal of our CyPass micro-stent surgical glaucoma product from the global market. Our Consolidated Financial Statements include the sales of CyPass micro-stent products from and after the launch of the product in 2016 until our withdrawal of the product from the market in August 2018. As a result, in the year ended December 31, 2018, we recognized a one-time pre-tax charge of $282 million (after tax $206 million). This consisted of $11 million for the costs associated with the market withdrawal and $337 million for the impairment of the CyPass intangible assets. These charges were partially offset by the $66 million gain for the reduction in the related contingent consideration liability.

### Use of estimates and assumptions

The preparation of financial statements requires management to make certain estimates and assumptions, either at the balance sheet date or during the period that affects the reported amounts of assets and liabilities as well as revenues and expenses. In particular, due to the unknown future impacts of the ongoing COVID-19 pandemic and the fact that the presented Consolidated Financial Statements for periods prior to the Spin-off have been carved out from Novartis financial statements, actual outcomes and results could differ from those estimates and assumptions as indicated in the Critical accounting policies and estimates section of this document. See Note 3 to the Consolidated Financial Statements included elsewhere in this Annual Report and in the "Critical accounting policies and estimates" section within this Item 5.A.

### Segment description

Alcon has two identified reportable segments: Surgical and Vision Care. Both segments are supported by Research and Development and Manufacturing and Technical Operations, whose results are incorporated into the respective segment contribution. Segment contribution excludes amortization and impairment charges for acquired product rights or other intangibles, general and administrative expenses for corporate activities, spin readiness and separation costs, transformation costs, fair value adjustments of contingent consideration liabilities, past service costs primarily for post-employment benefit plan amendments, and certain other income and expense items. See Note 5 to the Consolidated Financial Statements included elsewhere in this Annual Report.

In Surgical, Alcon researches, develops, manufactures, distributes and sells ophthalmic products for cataract surgery, vitreoretinal surgery, refractive laser surgery and glaucoma surgery. The surgical portfolio also includes implantables, consumables and surgical equipment required for these procedures and supports the end-to-end procedure needs of the ophthalmic surgeon. Alcon also provides services, training, education and technical support for the Surgical business. In 2020, the Surgical segment accounted for $3.7 billion, or 55%, of Alcon net sales to third parties, and contributed $672 million, or 62%, of Alcon operating income (excluding unallocated income and expenses).

In Vision Care, Alcon researches, develops, manufactures, distributes and sells daily disposable, reusable, and color-enhancing contact lenses and a comprehensive portfolio of ocular health products, including products for dry eye, contact lens care and ocular allergies, as well as ocular vitamins and redness relievers. Alcon also provides services, training, education and technical support for the Vision Care business. In 2020, the Vision Care segment accounted for $3.1 billion, or 45%, of Alcon net sales to third parties, and contributed $419 million, or 38%, of Alcon operating income (excluding unallocated income and expenses).

# Opportunity and risk summary

The surgical and vision care markets in which Alcon operates are large, dynamic and growing. As the world population grows and ages, the need for quality eye care is expanding and evolving. In addition, although it is estimated that 80% of all visual impairments are currently preventable, treatable or curable, we operate in markets that have substantial unmet medical and consumer needs. Our surgical and vision care products are targeted at addressing many of these unmet medical and consumer needs through products that are used in treating multiple ocular health conditions and offer leading eye care solutions for patients throughout their lives.

The surgical market in which we operate includes sales of implantables, consumables and surgical equipment, including associated technical, clinical and service support and training, and is projected to grow at approximately 4% per year from 2019 to 2025. Growth drivers in the surgical market include: global growth of cataract and vitreoretinal procedures, driven by an aging population; increased access to care; higher uptake of premium patient-pay technologies; increased adoption of advanced technologies; and eye disease as a comorbidity linked to the global prevalence of diabetes.

The vision care market in which we operate is comprised of products designed for ocular care and consumer use, and is projected to grow at approximately 4% per year from 2019 to 2025. Growth drivers in the vision care market include: continued modality shift to daily disposable lenses from reusable lenses and the resulting sales premium; advancements in specialty lenses combined with increasing demand for toric, multifocal and cosmetic lenses; a significant population of approximately 194 million undiagnosed dry eye patients, with an additional 42 million self-diagnosed dry eye patients using unsuitable products for treatment; growing access and consumption of vision care products in emerging markets; and increasing consumer access through the expansion of distribution models.

In each of our markets, we rely on our strong relationships with eye care professionals and consumers to attract and retain customers and expand the market. We have also made one of the largest commitments to research and development in the eye care market, which we expect to continue through internal innovation investments and identifying and executing on attractive acquisition, licensing and collaboration opportunities.

We are in the middle of executing a turnaround plan to return Alcon to sustainable, profitable growth and address existing challenges. Prior to 2016, Alcon, as a division of Novartis, experienced challenges resulting from an under-investment in the business. In preparation for Alcon's Spin-off, we separated our strategic priorities plan into three phases:

- Fix the foundation (2016–2017): We started re-investing in promotion, capital and systems, reinvigorating the innovation pipeline and strengthening our customer relationships after a challenging period of under-investment. We increased our focus on fostering a culture of speed and simplicity, ownership and accountability necessary to sustain our leadership in the eye care business.

- Execute the growth plan (2018–2020): During the second phase of our plan, we focused on superior execution and accelerating our product development cycle in attractive markets. We introduced our leading advanced intraocular lens (AT-IOL), *PanOptix*, in our three largest markets—the US, Japan and China—and initiated a pilot program for a unique non-diffractive IOL, *Vivity*. The successful introduction of *PanOptix* enabled us to continue driving our share of the AT-IOL market. We expanded our vitreoretinal business by introducing innovative instrumentation and accelerating conversion from optical to digital surgery. In our vision care business, *DAILIES TOTAL1* continued to grow, and we launched *Precision1* in the US successfully, despite the COVID-19 pandemic. We have also expanded our offerings in the presbyopia category with *DAILIES TOTAL1* multifocals and expanded our toric parameters for *DAILIES AquaComfort PLUS*. We continued the global roll-out of *Systane* COMPLETE and introduced our first multi-dose preservative-free formation with *Systane* Hydration, opening the door for regional growth in the artificial tears category. Finally, we successfully made the over-the-counter switch for *Pataday* for ocular allergies in the US. Although we faced the challenges of a global health crisis in 2020, we were able to make significant progress in our separation and transformation programs.

- Deliver leading-edge solutions (2021 and beyond): As we complete the standing up and separation of Alcon as an independent company, we expect to increase our focus on creating breakthrough innovation, expanding market access and developing new business models to address market needs. The successful implementation of new enterprise systems enables us to increase efficiency from better data, increased analytics and automation. We have also started to build a new ecosystem for digital health by connecting our diagnostic equipment in the clinic with surgical equipment in the operating room and managing data in the cloud. We expect to increase investments in cutting-edge technology to deliver better patient outcomes and overcome barriers for visual acuity for customers and patients in every market.

Alcon's future expectations are subject to various risks and uncertainties, including market dynamics in the surgical and vision care markets, general economic conditions, the effects of the ongoing COVID-19 pandemic and the pace of innovation in our industry, as well as successfully achieving our growth strategies and efficiency initiatives. These expectations were, in the view of management, prepared on a reasonable basis, reflect the best currently available estimates and judgments and present, to the best of management's knowledge and belief, the expected future financial performance of Alcon. However, this information is not fact and should not be relied upon as necessarily indicative of future results, and you are cautioned not to place undue reliance on the prospective financial information. There will likely be differences between Alcon expectations and the actual results and those differences could be material. Alcon's expectations may not be achieved and we do not undertake any obligation to release publicly the results of any future revisions we may make to our expectations. When considering Alcon's expectations, you should keep in mind the risk

56

factors and other cautionary statements in "Item 3. Key Information—3.D Risk Factors" and "Special Note About Forward-Looking Statements" in this Annual Report.

Our financial results are affected to varying degrees by internal and external factors. For example, the effect of the Covid-19 pandemic (or other viral or disease outbreaks) may continue to impact our business. Further, our ability to grow depends on the commercial success of our products and our ability to maintain our position in the highly competitive markets in which we operate. Even if we protect our intellectual property to the fullest extent permitted by applicable law, competitors may market products that compete with our products. Our ability to grow also depends on the success of our research and development efforts and BD&L activities in bringing new products to market, as well as the commercial acceptance of our products. Increased pricing pressure in the healthcare industry in general could also impact our ability to generate returns and invest for the future. Additionally, our products are subject to competition from lower priced versions of our products, and our industry continues to be challenged by the vulnerability of distribution channels to counterfeiting. Product recalls or voluntary market withdrawals in connection with defects or unanticipated use of our products could also have a material adverse effect upon our business. We are also implementing new information technology systems and integrating those new systems into our legacy systems. All of our operations, including our information technology systems, can be vulnerable to a variety of business interruptions. We have incurred debt that we must continue to service, and we may need additional financing in debt or equity.

Further, our ability to grow may be impacted by the ongoing consolidation among distributors, retailers and healthcare provider organizations, which could increase both the purchasing leverage of key customers and the concentration of credit risk. We also may be adversely affected by changes in inventory levels or fluctuations in buying patterns by our large distributor and retail customers. If we overestimate demand and produce too much of a particular product, we face a risk of inventory obsolescence. In addition, for certain materials, components and services, we rely on sole or limited sources of supply. Our customer relations could be negatively impacted by the loss of our significant suppliers or the inability of any such supplier to meet certain specifications or delivery schedules. Further, we have developed strong relationships with numerous healthcare providers and rely on them to recommend our products to their patients and to other members of their organizations. Consumers in the eye health industry have a tendency not to switch products regularly and are repeat consumers, meaning that a physician's initial recommendation of our products, and a consumer's initial choice to use our products, have an impact on the success of our products. Therefore, it is important to our business and results of operations to retain and grow these relationships.

Given our global presence, our operations and business results are also influenced and affected by the global economic and financial environment, including unpredictable political conditions that currently exist in various parts of the world. Additionally, a portion of our operations are conducted in emerging markets and are subject to risks and potential costs such as economic, political and social uncertainty, as well as relatively low average income levels and limited government reimbursement for the cost of healthcare products and services. Our operations and business results are also affected by the varying degrees of governmental regulation in the countries in which we operate, making the process of developing new products and obtaining necessary regulatory marketing authorization lengthy, expensive and uncertain. The manufacture of our products is also highly regulated. Any changes or new requirements related to the regulatory approval process or postmarket requirements applicable to our products in any jurisdiction could be costly and onerous to comply with.

For more details on these trends and how they could impact our results, see "Item 3. Key Information—3.D. Risk Factors".

## Components of results of operations

### Net sales to third parties

Revenue on the sale of Alcon products and services, which is recorded as "Net sales to third parties" in the consolidated income statement, is recognized when a contractual promise to a customer (i.e., a performance obligation) has been fulfilled by transferring control over the promised goods and services to the customer, substantially all of which is at the point in time of shipment or receipt of the products by the customer or when the services are performed. If contracts contain customer acceptance provisions, revenue would be recognized upon the satisfaction of acceptance criteria. The amount of revenue to be recognized is based on the consideration Alcon expects to receive in exchange for its goods and services which may be fixed or variable. Variable consideration may include rebates, discounts including cash discounts, and sales returns. Variable consideration is only recognized when it is highly probable that a significant reversal of cumulative sales will not occur.

Surgical equipment may be sold together with other products and services under a single contract. The total consideration is allocated to the separate performance obligations based on the relative standalone selling price for each performance obligation. Revenue is recognized upon satisfaction of each performance obligation under the contract.

## Other revenues

"Other revenues" mainly include revenue from contract manufacturing services provided to our Former Parent which are recognized over time as the service obligations are completed. Associated costs incurred are recognized in "Cost of other revenues".

## Inventories

Inventory is valued at acquisition or production cost determined on a first-in, first-out basis. This value is used for the "Cost of net sales" and "Cost of other revenues" in the consolidated income statement. Unsalable inventory is fully written off in the consolidated income statement under "Cost of net sales" and "Cost of other revenues".

## Research & development

Internal research and development costs are fully charged to "Research & development" in the consolidated income statement in the period in which they are incurred. Alcon considers that regulatory and other uncertainties inherent in the development of new products preclude the capitalization of internal development expenses as an intangible asset until marketing approval from a regulatory authority is obtained in relevant major markets, such as the United States, the European Union, Switzerland, China or Japan.

# Critical accounting policies and estimates

Selected accounting policies are set out in Note 3 to the Consolidated Financial Statements included elsewhere in this Annual Report, which are prepared in accordance with IFRS as issued by the IASB.

Given the uncertainties inherent in our business activities, we must make certain estimates and assumptions that require difficult, subjective and complex judgments. Because of uncertainties inherent in such judgments, actual outcomes and results may differ from our assumptions and estimates, which could materially affect our Consolidated Financial Statements. We have assessed various accounting estimates and other matters, including those that require consideration of forecasted financial information, in context of the unknown future impacts of COVID-19 using information reasonably available to us at this time. The inherent uncertainties of COVID-19 including the duration, scope, and severity of the pandemic may result in actual outcomes that differ materially from our current assumptions and estimates.

Application of the following accounting policies requires certain assumptions and estimates that have the potential for the most significant impact on the Consolidated Financial Statements.

## Impairment of goodwill and intangible assets

We review long-lived intangible assets for impairment whenever events or changes in circumstance indicate that the carrying amount may not be recoverable. Goodwill, the Alcon brand name and intangible assets not yet ready for use are not amortized but are reviewed for impairment at least annually. Our annual impairment testing date is Alcon's year-end, December 31.

A cash generating unit to which goodwill has been allocated (reportable segments) is considered impaired when its carrying amount, including the goodwill, exceeds its recoverable amount, which is defined as the higher of its fair value less costs of disposal and its value in use. If the recoverable amount of the reportable segment is less than its carrying amount, an impairment loss shall be recognized.

An intangible asset other than goodwill is considered impaired when its balance sheet carrying amount exceeds its estimated recoverable amount, which is defined as the higher of its fair value less costs of disposal and its value in use. Usually, Alcon applies the fair value less costs of disposal method for its impairment assessment. In most cases, no direct or indirect observable market prices for identical or similar assets are available to measure the fair value less costs of disposal. Therefore, an estimate of fair value less costs of disposal is based on net present value techniques utilizing post-tax cash flows and discount rates. In the limited cases where the value in use method would be applied, net present value techniques would be applied using pre-tax cash flows and discount rates.

58

A068

Fair value less costs of disposal reflects estimates of assumptions that market participants would be expected to use when pricing the asset or cash generating units, and for this purpose management considers the range of economic conditions that are expected to exist over the remaining useful life of the asset. The estimates used in calculating net present values involve significant judgment by management and include assumptions with measurement uncertainty, such as the following:

- the amount and timing of projected cash flows;
- long-term sales forecasts for up to 25 years including sales growth rates;
- the timing and probability of regulatory and commercial success;
- the royalty rate for the Alcon brand name;
- the terminal growth rate; and
- the discount rate.

Generally, for intangible assets with a definite useful life Alcon uses cash flow projections for the whole useful life of these assets. For goodwill and the Alcon brand name, Alcon generally utilizes cash flow projections for a five-year period based on management forecasts, with a terminal value based on cash flow projections considering the long-term expected inflation rates and impact of demographic trends of the population to which Alcon products are prescribed, for later periods. Probability-weighted scenarios are typically used.

Discount rates used consider Alcon estimated weighted average cost of capital adjusted for specific country and currency risks associated with cash flow projections to approximate the weighted average cost of capital of a comparable market participant.

Due to the above factors and those further described in the "Opportunity and risk summary" section above, actual cash flows and values could vary significantly from forecasted future cash flows and related values derived using discounting techniques.

For additional information on intangible assets and impairment charges recognized, see Note 10 to the Consolidated Financial Statements included elsewhere in this Annual Report.

Goodwill and other intangible assets represent a significant part of our consolidated balance sheet, primarily due to acquisitions. Although no significant additional impairments are currently anticipated, impairment evaluation could lead to material impairment charges in the future.

## Business combinations

The acquisition method of accounting is used to account for all business combinations, regardless of whether equity instruments or other assets are acquired. Identifiable assets acquired and liabilities assumed in a business combination are measured initially at their fair values at the acquisition date. The excess of the consideration transferred over the fair value of the net identifiable assets acquired is recorded as goodwill, or directly in the income statement if it is a bargain purchase. Alcon primarily uses net present value techniques, utilizing post-tax cash flows and discount rates in calculating the fair value of identifiable assets acquired when allocating the purchase consideration paid for the acquisition. The estimates used in calculating fair values involve significant judgment by management and include assumptions with measurement uncertainty, such as the following:

- the amount and timing of projected cash flows;
- long-term sales forecasts;
- the timing and probability of regulatory and commercial success; and
- the discount rate.

Alcon may elect on a transaction-by-transaction basis to apply the optional concentration test to assess whether a trans-action qualifies as a business. Under the test, when substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or a group of similar identifiable assets, Alcon will account for the transaction as an asset purchase and not a business combination.

If the concentration test is not met, or Alcon elects not to apply this optional test, Alcon will perform an assessment focusing on the existence of inputs and processes that have the ability to create outputs to determine whether the transaction is an asset purchase or a business combination.

## Contingent consideration

In a business combination, it is necessary to recognize contingent future payments to previous owners, representing contractually defined potential amounts as a liability. Usually for Alcon these are linked to development or commercial milestones related to certain assets and are recognized as a financial liability at their fair value, which is then re-measured at each subsequent reporting date.

For the determination of the fair value of contingent consideration various unobservable inputs are used. A change in these inputs might result in a significantly higher or lower fair value measurement. The inputs used are, among others, the timing and probability of regulatory and commercial success, sales forecast and assumptions regarding the discount rate, timing and different scenarios of triggering events. The significance and usage of these inputs to each contingent consideration may vary due to differences in the timing and triggering events for payments or in the nature of the asset related to the contingent consideration. These estimations typically depend on factors such as technical milestones or market performance and are adjusted for the probability of their likelihood of payment, and if material, are appropriately discounted to reflect the impact of time.

Changes in the fair value of contingent consideration liabilities in subsequent periods are recognized in the consolidated income statement in "Cost of net sales" for currently marketed products and in "Research & development" for in-process research & development.

The effect of unwinding the discount over time is recognized in "Interest expense" in the consolidated income statement.

## Taxes

The estimated amounts for current and deferred tax assets or liabilities, including any amounts related to any uncertain tax positions, are based on currently known facts and circumstances. Tax returns are based on an interpretation of tax laws and regulations and reflect estimates based on these judgments and interpretations. The tax returns are subject to examination by the competent taxing authorities which may result in an assessment being made requiring payments of additional tax, interest or penalties. Inherent uncertainties exist in the estimates of the tax positions.

## Research & development

Internal research & development costs are fully charged to "Research & development" in the consolidated income statement in the period in which they are incurred. Alcon considers that regulatory and other uncertainties inherent in the development of new products preclude the capitalization of internal development expenses as an intangible asset usually until marketing approval from the regulatory authority is obtained in a relevant major market, such as the United States, the European Union, Switzerland, China or Japan.

# Factors affecting comparability of period to period results of operations

The comparability of the period to period results of our operations can be significantly affected by the COVID-19 pandemic, our Spin-off from Novartis, the issuance and refinancing of financial debts, and acquisitions. Our net sales, operating results and cash flows in 2020 were adversely affected by COVID-19. Additionally, one transaction of significance in 2020 is the issuance of senior notes due in 2030. The transactions of significance during 2019 included the acquisition of PowerVision, Inc., Spin-off from Novartis through a dividend in kind distribution to Novartis shareholders, and refinancing of the bridge and term loans which had been issued in April 2019. Transactions of significance during 2018 included the acquisitions of TrueVision Systems, Inc. and Tear Film Innovations, Inc. Refer to Note 4 to the Consolidated Financial Statements for details related to each of these significant transactions.

## Results of operations

In evaluating our performance, we consider not only the IFRS results, but also certain non-IFRS measures, including various "core" results and constant currency ("cc") results. These measures assist us in evaluating our ongoing performance from period to period and we believe this additional information is useful to investors in understanding the performance of our business. Refer to "Item 5.A. Operating Results —Non-IFRS measures as defined by the Company" section for additional information and reconciliation tables. These measures are not intended to be substitutes for the equivalent measures of financial performance prepared in accordance with IFRS and may differ from similarly titled non-IFRS measures of other companies.

### Key figures

| ($ millions unless indicated otherwise) | 2020 compared to 2019 | | | | 2019 compared to 2018 | | |
| | | | Change % | | | Change % | |
| | **2020** | **2019** | **$** | **cc[1]** | **2018** | **$** | **cc[1]** |
|---|---|---|---|---|---|---|---|
| Net sales to third parties | 6,763 | 7,362 | (8) | (8) | 7,149 | 3 | 5 |
| Gross profit | 2,940 | 3,662 | (20) | (19) | 3,192 | 15 | 19 |
| Operating (loss) | (482) | (187) | (158) | (138) | (248) | 25 | 54 |
| *Operating margin (%)* | *(7.1)* | *(2.5)* | | | *(3.5)* | | |
| **Net (loss)** | **(531)** | **(656)** | **19** | **24** | **(227)** | **(189)** | **(163)** |
| Basic and diluted (loss) per share ($)[2] | (1.09) | (1.34) | 19 | 24 | (0.46) | (191) | (163) |
| **Core results[1]** | | | | | | | |
| Core operating income | 789 | 1,265 | (38) | (35) | 1,212 | 4 | 11 |
| *Core operating margin %* | *11.7* | *17.2* | | | *17.0* | | |
| **Core net income** | **512** | **925** | **(45)** | **(42)** | **974** | **(5)** | **1** |
| Core basic earnings per share ($)[2] | 1.05 | 1.89 | (44) | (42) | 2.00 | (6) | 1 |
| Core diluted earnings per share ($)[3] | 1.04 | 1.89 | (45) | (42) | 2.00 | (6) | 1 |

(1)   Core results and constant currencies (cc) as presented in this table are non-IFRS measures. Alcon uses certain non-IFRS metrics when measuring performance, including when measuring current period results against prior periods. Refer to "Item 5.A. Operating Results —Non-IFRS measures as defined by the Company" section for additional information and reconciliation tables.

(2)   Calculated using 489.0 million weighted-average shares for the year ended December 31, 2020 and 488.2 million shares for prior year periods.

(3)   Calculated using 491.8 million, 490.1 million and 488.2 million weighted average diluted shares for the years ended December 31, 2020, 2019 and 2018, respectively.

61

**A071**

All comments below focus on constant currencies (cc) movements for the year ended December 31, 2020 compared to 2019 unless otherwise noted. Commentary for the year ended December 31, 2019 compared to 2018 may be found in Item 5 of the Company's Annual Report on Form 20-F filed with the Securities and Exchange Commission ("SEC") on February 25, 2020, ("2019 Form 20-F").

## Net sales by segment

The following table provides an overview of net sales to third parties by segment:

| ($ millions unless indicated otherwise) | 2020 compared to 2019 | | | | 2019 compared to 2018 | | |
| | | | Change % | | | Change % | |
| | 2020 | 2019 | $ | cc[1] | 2018 | $ | cc[1] |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Surgical** | | | | | | | |
| Implantables | 1,126 | 1,210 | (7) | (6) | 1,136 | 7 | 9 |
| Consumables | 1,952 | 2,304 | (15) | (15) | 2,227 | 3 | 6 |
| Equipment/other | 632 | 660 | (4) | (3) | 636 | 4 | 6 |
| **Total Surgical** | **3,710** | **4,174** | **(11)** | **(11)** | **3,999** | **4** | **7** |
| | | | | | | | |
| **Vision Care** | | | | | | | |
| Contact lenses | 1,838 | 1,969 | (7) | (7) | 1,928 | 2 | 4 |
| Ocular health | 1,215 | 1,219 | — | 1 | 1,222 | — | 2 |
| **Total Vision Care** | **3,053** | **3,188** | **(4)** | **(4)** | **3,150** | **1** | **3** |
| **Net sales to third parties** | **6,763** | **7,362** | **(8)** | **(8)** | **7,149** | **3** | **5** |

(1) Constant currencies is a non-IFRS measure. Refer to "Item 5.A. Operating Results—Non-IFRS measures as defined by the Company" section for additional information.

### Surgical

Surgical net sales were $3.7 billion (-11%, -11% cc), impacted by a broad slowdown in non-urgent surgeries due to the COVID-19 pandemic in the second quarter with substantial recovery in the second half of the year. Implantables declined (-7%, -6% cc) with lower demand in monofocal IOLs, partially offset by growth in Advanced Technology IOLs, mainly *AcrySof IQ PanOptix*. Consumables declined (-15%, -15% cc), primarily impacted by declining procedures due to the COVID-19 pandemic. Equipment/other declined (-4%, -3% cc), primarily due to a broad slowdown from the COVID-19 pandemic.

### Vision Care

Vision Care net sales were $3.1 billion (-4%, -4% cc), impacted by lower demand due to the COVID-19 pandemic. Contact lenses declined (-7%, -7% cc) across most categories and geographies, partially offset by the launch of *Precision1*. Ocular health grew slightly in cc (0%, +1% cc), as the strong *Pataday* launch was able to offset declines from the pandemic.

62

## Operating (loss)/income

| ($ millions unless indicated otherwise) | 2020 compared to 2019 | | | | 2019 compared to 2018 | | |
| | | | Change % | | | Change % | |
| | 2020 | 2019 | $ | cc[1] | 2018 | $ | cc[1] |
|---|---|---|---|---|---|---|---|
| **Gross profit** | **2,940** | **3,662** | **(20)** | **(19)** | **3,192** | **15** | **19** |
| Selling, general & administration | (2,694) | (2,847) | 5 | 5 | (2,801) | (2) | (4) |
| Research & development | (673) | (656) | (3) | (3) | (587) | (12) | (12) |
| Other income | 235 | 55 | nm | nm | 47 | 17 | 19 |
| Other expense | (290) | (401) | 28 | 28 | (99) | nm | nm |
| **Operating (loss)** | **(482)** | **(187)** | **(158)** | **(138)** | **(248)** | **25** | **54** |
| *Operating margin (%)* | *(7.1)* | *(2.5)* | | | *(3.5)* | | |
| | | | | | | | |
| **Core results[1]** | | | | | | | |
| Core gross profit | 4,092 | 4,663 | (12) | (12) | 4,541 | 3 | 6 |
| Core operating income | 789 | 1,265 | (38) | (35) | 1,212 | 4 | 11 |
| *Core operating margin (%)* | *11.7* | *17.2* | | | *17.0* | | |

nm = not meaningful

(1)    Core results and constant currencies are non-IFRS measures. Refer to "Item 5.A. Operating Results—Non-IFRS measures as defined by the Company" section for additional information and reconciliation tables.

Operating loss was $482 million, compared to $187 million in the prior year period. The COVID-19 pandemic resulted in lower sales, higher unabsorbed fixed overhead costs and labor inefficiencies of $120 million for manufacturing plants operating at below normal capacity, and increased provisions for expected credit losses, partially offset by reductions in discretionary spending. The current year period benefited from a $154 million net gain on post-employment benefit plan amendments, a gain relating to an extinguishment of certain potential liabilities under the employee matters agreement executed at Spin-off and lower separation costs. The current year period also included $167 million in impairments of intangible assets, increased inventory provisions, losses for manufacturing asset retirements, and higher investments in research and development. The prior year period included $72 million of spin readiness costs and $32 million in legal settlement costs. There was a negative 0.6 percentage point impact on operating margin from currency.

Adjustments to arrive at core operating income were $1.3 billion mainly due to $1.0 billion of amortization, $217 million of separation costs, $167 million in impairments of intangible assets, and $49 million of transformation program costs, partially offset by a $154 million net gain on post-employment benefit plan amendments and a $63 million benefit for fair value adjustments of contingent liabilities.

Core operating income was $789 million (-38%, -35% cc), compared to $1.3 billion in the prior year period. The COVID-19 pandemic resulted in lower sales, higher unabsorbed fixed overhead costs and labor inefficiencies of $120 million and increased provisions for expected credit losses, partially offset by reductions in discretionary spending. The current year period also included increased inventory provisions and higher investments in research and development. There was a negative 0.4 percentage point impact on core operating margin from currency.

A073

## Segment contribution

Certain income and expense items, primarily related to fair value adjustments of contingent consideration liabilities and option rights and integration related expenses, previously included in segment contribution in the prior year periods have been reclassified to conform with reporting of segment contribution to the CODM in the current period. The reclassifications resulted in an increase in Surgical and Vision Care segment contribution of $34 million and $17 million, respectively, in the year ended December 31, 2019 and an increase in Surgical and Vision Care segment contribution of $33 million and $6 million, respectively, in the year ended December 31, 2018. For additional information regarding segment contribution please refer to Note 5 to the Consolidated Financial Statements.

| ($ millions unless indicated otherwise) | 2020 compared to 2019 | | | | 2019 compared to 2018 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Change % | | | Change % | |
| | 2020 | 2019 | % | cc[1] | 2018 | $ | cc[1] |
| Surgical segment contribution | 672 | 957 | (30) | (28) | 846 | 13 | 19 |
| As % of net sales | 18.1 | 22.9 | | | 21.2 | | |
| Vision Care segment contribution | 419 | 580 | (28) | (25) | 600 | (3) | 1 |
| As % of net sales | 13.7 | 18.2 | | | 19.0 | | |
| Not allocated to segments | (1,573) | (1,724) | 9 | 9 | (1,694) | (2) | (2) |
| **Operating (loss)** | **(482)** | **(187)** | **(158)** | **(138)** | **(248)** | **25** | **54** |
| Core adjustments[1] | 1,271 | 1,452 | | | 1,460 | | |
| **Core operating income[1]** | **789** | **1,265** | **(38)** | **(35)** | **1,212** | **4** | **11** |

(1) Core results and constant currencies are non-IFRS measures. Refer to "Item 5.A. Operating Results—Non-IFRS measures as defined by the Company" section for additional information and reconciliation tables.

## Surgical

Surgical segment contribution was $672 million (-30%, -28% cc), compared to $957 million in the prior year period. The COVID-19 pandemic resulted in a slowdown in sales, and higher unabsorbed fixed overhead costs and labor inefficiencies and provisions for expected credit losses, partially offset by reductions in discretionary spending. The current year period also included higher investments in research and development. There was a negative 0.4 percentage point impact on segment contribution margin from currency.

## Vision Care

Vision Care segment contribution was $419 million (-28%, -25% cc), compared to $580 million in the prior year period. The COVID-19 pandemic resulted in lower sales and higher unabsorbed fixed overhead costs and labor inefficiencies, partially offset by reductions in discretionary spending. The current year period also included higher inventory provisions. There was a negative 0.4 percentage point impact on segment contribution margin from currency.

## Not allocated to segments

Operating loss not allocated to segments totaled $1.6 billion (+9%,+9% cc), compared to $1.7 billion in the prior year period. The prior year period was higher primarily due to $72 million of spin readiness costs and $32 million in legal settlement costs.

**A074**

## Non-operating income & expense

| ($ millions unless indicated otherwise) | 2020 compared to 2019 | | | | 2019 compared to 2018 | | |
|---|---|---|---|---|---|---|---|
| | | | Change % | | | Change % | |
| | 2020 | 2019 | $ | cc[1] | 2018 | $ | cc[1] |
| **Operating (loss)** | **(482)** | **(187)** | **(158)** | **(138)** | **(248)** | **25** | **54** |
| Interest expense | (124) | (113) | (10) | (11) | (24) | nm | nm |
| Other financial income & expense | (29) | (32) | 9 | 6 | (28) | (14) | (15) |
| **(Loss) before taxes** | **(635)** | **(332)** | **(91)** | **(81)** | **(300)** | **(11)** | **13** |
| Taxes | 104 | (324) | nm | nm | 73 | nm | nm |
| **Net (loss)** | **(531)** | **(656)** | **19** | **24** | **(227)** | **(189)** | **(163)** |
| Basic and diluted (loss) per share ($) | (1.09) | (1.34) | 19 | 24 | (0.46) | (191) | (163) |
| | | | | | | | |
| **Core results[1]** | | | | | | | |
| Core taxes | (124) | (195) | 36 | 34 | (186) | (5) | (12) |
| **Core net income** | **512** | **925** | **(45)** | **(42)** | **974** | **(5)** | **1** |
| Core basic earnings per share ($) | 1.05 | 1.89 | (44) | (42) | 2.00 | (6) | 1 |
| Core diluted earnings per share ($) | 1.04 | 1.89 | (45) | (42) | 2.00 | (6) | 1 |

nm = not meaningful

(1)   Core results and constant currencies are non-IFRS measures. Refer to "Item 5.A. Operating Results—Non-IFRS measures as defined by the Company" section for additional information and reconciliation tables.

### Interest expense

Interest expense was $124 million, compared with $113 million in the prior year period, driven by an increase in third party debt following the Spin-off from Novartis and additional senior notes issued in May 2020.

### Other financial income & expense

Other financial income & expense was a net expense of $29 million, compared with $32 million in the prior year period.

### Taxes

Tax benefit was $104 million, compared to a tax expense of $324 million in the prior year period. Taxes recognized in the prior year period include $304 million in non-cash tax expense related to the re-measurement of deferred tax assets and liabilities as a result of Swiss tax reform, tax expense related to rate changes in the US following legal entity reorganizations executed related to the Spin-off, non-cash tax expense related to re-measurement of deferred tax assets and liabilities following a tax rate change in India, and net changes in uncertain tax positions.

Adjustments to arrive at core tax expense were $228 million, primarily related to tax associated with operating income core adjustments.

Core tax expense was $124 million, compared to $195 million in the prior year period. The average core tax rate increased to 19.5% from 17.4% in the prior year period. The increase in the core effective tax rate was primarily driven by the increase in the Swiss tax rate, partially offset by a favorable mix of pre-tax income/(loss) across geographical tax jurisdictions, the tax benefit from a build of inventory in certain international markets, and net changes in uncertain tax positions.

### Net (loss)/income and (loss)/earnings per share

Net loss was $531 million, compared to $656 million in the prior year period. The change was mainly attributable to the increased operating loss, offset by the tax benefit in the current period compared to the large tax expense in the prior year period. The associated basic and diluted loss per share were $1.09, compared to $1.34 in the prior year period.

Core net income was $512 million, compared to $925 million in the prior year period, primarily due to lower core operating income. The associated core basic earnings per share were $1.05 compared to $1.89 in the prior year period, and core diluted earnings per share were $1.04 compared to $1.89 in the prior year period.

## Effects of currency fluctuations

We prepare our Consolidated Financial Statements in US dollars. As a result, fluctuations in the exchange rates between the US dollar and other currencies can have a significant effect on both our results of operations as well as on the reported value of our assets, liabilities and cash flows. This in turn may significantly affect reported earnings (both positively and negatively) and the comparability of period-to-period results of operations.

For purposes of our consolidated balance sheet, we translate assets and liabilities denominated in other currencies into US dollars at the prevailing market exchange rates as of the relevant balance sheet date. For purposes of our consolidated income statement and statement of cash flows, revenue, expense and cash flow items in local currencies are translated into US dollars at average exchange rates prevailing during the relevant period. As a result, even if the amounts or values of these items remain unchanged in the respective local currency, changes in exchange rates have an impact on the amounts or values of these items in our Consolidated Financial Statements.

Alcon manages its global currency exposure by engaging in hedging transactions where management deems appropriate (forward contracts and swaps). Specifically, Alcon enters into various contracts that reflect the changes in the value of foreign currency exchange rates to preserve the value of assets.

There is also a risk that certain countries could devalue their currency. If this occurs, then it could impact the effective prices we would be able to charge for our products and also have an adverse impact on both our consolidated income statement and balance sheet. Alcon is exposed to a potential adverse devaluation risk on its intercompany funding and total investment in certain subsidiaries operating in countries with exchange controls.

The hyperinflationary economies in which we operate are Argentina and Venezuela. Venezuela was hyperinflationary for all years presented, and Argentina became hyperinflationary effective July 1, 2018, requiring implementation of hyperinflation accounting as of January 1, 2018. Refer to Note 3 to the Consolidated Financial Statements included elsewhere in this Annual Report for additional information.

66

**A076**

## Foreign exchange rates for foreign currency translation

The following tables set forth the foreign exchange rates of the US dollar against key currencies used for foreign currency translation when preparing the Consolidated Financial Statements:

| ($ per unit unless indicated otherwise) | Average for year | | | As of December 31 | | |
|---|---|---|---|---|---|---|
| | **2020** | **2019** | **Change %** | **2020** | **2019** | **Change %** |
| AUD | 0.690 | 0.695 | (1) | 0.771 | 0.701 | 10 |
| BRL | 0.196 | 0.254 | (23) | 0.193 | 0.249 | (22) |
| CAD | 0.746 | 0.754 | (1) | 0.784 | 0.767 | 2 |
| CHF | 1.066 | 1.006 | 6 | 1.135 | 1.032 | 10 |
| CNY | 0.145 | 0.145 | — | 0.153 | 0.144 | 6 |
| EUR | 1.141 | 1.120 | 2 | 1.229 | 1.121 | 10 |
| GBP | 1.284 | 1.277 | 1 | 1.365 | 1.313 | 4 |
| JPY (100) | 0.937 | 0.917 | 2 | 0.970 | 0.920 | 5 |
| RUB (100) | 1.390 | 1.546 | (10) | 1.337 | 1.613 | (17) |

| ($ per unit unless indicated otherwise) | Average for year | | | As of December 31 | | |
|---|---|---|---|---|---|---|
| | **2019** | **2018** | **Change %** | **2019** | **2018** | **Change %** |
| AUD | 0.695 | 0.748 | (7) | 0.701 | 0.707 | (1) |
| BRL | 0.254 | 0.275 | (8) | 0.249 | 0.258 | (3) |
| CAD | 0.754 | 0.772 | (2) | 0.767 | 0.735 | 4 |
| CHF | 1.006 | 1.023 | (2) | 1.032 | 1.014 | 2 |
| CNY | 0.145 | 0.151 | (4) | 0.144 | 0.145 | (1) |
| EUR | 1.120 | 1.181 | (5) | 1.121 | 1.144 | (2) |
| GBP | 1.277 | 1.336 | (4) | 1.313 | 1.274 | 3 |
| JPY (100) | 0.917 | 0.906 | 1 | 0.920 | 0.907 | 1 |
| RUB (100) | 1.546 | 1.600 | (3) | 1.613 | 1.437 | 12 |

A077

The following table shows information concerning the rate of exchange of US dollar per Swiss franc based on exchange rate information found on Bloomberg Market System. The exchange rate in effect on February 19, 2021 as found on Bloomberg Market System was CHF 1.00 = USD 1.12.

| ($ per CHF) | Low[1] | High[1] |
|---|---|---|
| January 2020 | 1.03 | 1.04 |
| February 2020 | 1.03 | 1.04 |
| March 2020 | 1.03 | 1.04 |
| April 2020 | 1.02 | 1.04 |
| May 2020 | 1.04 | 1.04 |
| June 2020 | 1.05 | 1.06 |
| July 2020 | 1.09 | 1.10 |
| August 2020 | 1.10 | 1.11 |
| September 2020 | 1.08 | 1.09 |
| October 2020 | 1.09 | 1.09 |
| November 2020 | 1.10 | 1.11 |
| December 2020 | 1.13 | 1.14 |
| January 2021 | 1.12 | 1.13 |
| February 2021 (through February 19, 2021) | 1.11 | 1.12 |

(1) Represents the lowest and highest, respectively, of the exchange rates on the last day of each month during the year.

## Currency impact on key figures

The following table provides a summary of the currency impact on key company figures due to their conversion into US dollars, Alcon's reporting currency, of the financial data from entities reporting in non-US dollars.

| | 2020 compared to 2019 | | | 2019 compared to 2018 | | |
|---|---|---|---|---|---|---|
| | Change % | | Percentage point currency impact | Change % | | Percentage point currency impact |
| | $ | cc[1] | | $ | cc[1] | |
| Net sales to third parties | (8) | (8) | — | 3 | 5 | (2) |
| Gross profit | (20) | (19) | (1) | 15 | 19 | (4) |
| Operating (loss) | (158) | (138) | (20) | 25 | 54 | (29) |
| **Net (loss)** | **19** | **24** | **(5)** | **(189)** | **(163)** | **(26)** |
| Basic and diluted (loss) per share | 19 | 24 | (5) | (191) | (163) | (28) |
| | | | | | | |
| **Core results[1]** | | | | | | |
| Core operating income | (38) | (35) | (3) | 4 | 11 | (7) |
| Core net income | (45) | (42) | (3) | (5) | 1 | (6) |
| Core basic earnings per share | (44) | (42) | (2) | (6) | 1 | (7) |
| Core diluted earnings per share | (45) | (42) | (3) | (6) | 1 | (7) |

(1)   Core results and constant currencies (cc) as presented in this table are non-IFRS measures. Alcon uses certain non-IFRS metrics when measuring performance, including when measuring current period results against prior periods. Refer to "Item 5.A. Operating Results—Non-IFRS measures as defined by the Company" section for additional information.

A 1% movement in the USD versus our basket of currencies would have resulted in a $38 million change in annual net sales and a $12 million change in both annual operating income and core operating income.

A078

# Non-IFRS measures as defined by the Company

Alcon uses certain non-IFRS metrics when measuring performance, including when measuring current period results against prior periods, including core results, percentage changes measured in constant currencies, EBITDA, free cash flow, and net (debt)/liquidity.

Because of their non-standardized definitions, the non-IFRS measures (unlike IFRS measures) may not be comparable to the calculation of similar measures of other companies. These supplemental non-IFRS measures are presented solely to permit investors to more fully understand how Alcon management assesses underlying performance. These supplemental non-IFRS measures are not, and should not be viewed as, a substitute for IFRS measures.

## Core results

Alcon core results, including core operating income and core net income, exclude all amortization and impairment charges of intangible assets, excluding software, net gains and losses on fund investments and equity securities valued at fair value through profit and loss ("FVPL"), fair value adjustments of financial assets in the form of options to acquire a company carried at FVPL, obligations related to product recalls, and certain acquisition related items. The following items that exceed a threshold of $10 million and are deemed exceptional are also excluded from core results: integration and divestment related income and expenses, divestment gains and losses, restructuring charges/releases and related items, legal related items, gains/losses on early extinguishment of debt or debt modifications, past service costs for post-employment benefit plans, impairments of property, plant and equipment and software, as well as income and expense items that management deems exceptional and that are or are expected to accumulate within the year to be over a $10 million threshold.

Taxes on the adjustments between IFRS and core results take into account, for each individual item included in the adjustment, the tax rate that will finally be applicable to the item based on the jurisdiction where the adjustment will finally have a tax impact. Generally, this results in amortization and impairment of intangible assets and acquisition-related restructuring and integration items having a full tax impact. There is usually a tax impact on other items, although this is not always the case for items arising from legal settlements in certain jurisdictions.

Alcon believes that investor understanding of its performance is enhanced by disclosing core measures of performance because, since they exclude items that can vary significantly from period to period, the core measures enable a helpful comparison of business performance across periods. For this same reason, Alcon uses these core measures in addition to IFRS and other measures as important factors in assessing its performance.

A limitation of the core measures is that they provide a view of Alcon operations without including all events during a period, such as the effects of an acquisition, divestment, or amortization/impairments of purchased intangible assets and restructurings.

## Constant currencies

Changes in the relative values of non-US currencies to the US dollar can affect Alcon's financial results and financial position. To provide additional information that may be useful to investors, including changes in sales volume, we present information about changes in our net sales and various values relating to operating and net income that are adjusted for such foreign currency effects.

Constant currency calculations have the goal of eliminating two exchange rate effects so that an estimate can be made of underlying changes in the consolidated income statement excluding:

- the impact of translating the income statement of consolidated entities from their non-US dollar functional currencies to the US dollar; and
- the impact of exchange rate movements on the major transactions of consolidated entities performed in currencies other than their functional currency.

Alcon calculates constant currency measures by translating the current year's foreign currency values for sales and other income statement items into US dollars, using the average exchange rates from the prior year and comparing them to the prior year values in US dollars.

For additional information on the effects of foreign currencies, refer to "Item 5.A. Operating Results-Effects of currency fluctuations" section.

## EBITDA

Alcon defines earnings before interest, tax, depreciation and amortization ("EBITDA") as net (loss)/income excluding income taxes, depreciation of property, plant and equipment (including any related impairment charges), depreciation of right-of-use assets, amortization of intangible assets (including any related impairment charges), interest expense and other financial income and expense. Alcon management primarily uses EBITDA together with net (debt)/liquidity to monitor leverage associated with financial debts. For a reconciliation of EBITDA to the most directly comparable measure presented in accordance with IFRS, see "Item 5.B. Liquidity and Capital Resources—EBITDA (non-IFRS measure)" section.

## Free cash flow

Alcon defines free cash flow as net cash flows from operating activities less cash flow associated with the purchase or sale of property, plant and equipment. Free cash flow is presented as additional information because Alcon management believes it is a useful supplemental indicator of Alcon's ability to operate without reliance on additional borrowing or use of existing cash. Free cash flow is not intended to be a substitute measure for net cash flows from operating activities as determined under IFRS. For a reconciliation of free cash flow to the most directly comparable measure presented in accordance with IFRS, see "Item 5.B. Liquidity and Capital Resources—Free cash flow (non-IFRS measure)" section.

## Net (debt)/liquidity

Alcon defines net (debt)/liquidity as current and non-current financial debt less cash and cash equivalents, current investments and derivative financial instruments. Net (debt)/liquidity is presented as additional information because management believes it is a useful supplemental indicator of Alcon's ability to pay dividends, to meet financial commitments and to invest in new strategic opportunities, including strengthening its balance sheet. For a reconciliation of net (debt)/liquidity to the most directly comparable measure presented in accordance with IFRS, see "Item 5.B. Liquidity and Capital Resources—Net (debt)/liquidity (non-IFRS measure)" section.

## Growth rate and margin calculations

For ease of understanding, Alcon uses a sign convention for its growth rates such that a reduction in operating expenses or losses compared to the prior year is shown as a positive growth.

Gross margins, operating income/(loss) margins and core operating income margins are calculated based upon net sales to third parties unless otherwise noted.

A080

## Reconciliation of IFRS results to core results

### 2020

| ($ millions except (loss)/earnings per share) | IFRS results | Amortization of certain intangible assets[1] | Impairments[2] | Separation costs[3] | Transformation costs[4] | Post-employment benefits[5] | Other items[8] | Core results |
|---|---|---|---|---|---|---|---|---|
| Gross profit | 2,940 | 1,001 | 106 | 13 | — | | 32 | 4,092 |
| Operating (loss)/income | (482) | 1,021 | 167 | 217 | 49 | (154) | (29) | 789 |
| (Loss)/income before taxes | (635) | 1,021 | 167 | 217 | 49 | (154) | (29) | 636 |
| Taxes[9] | 104 | (172) | (34) | (37) | (10) | 38 | (13) | (124) |
| Net (loss)/income | (531) | 849 | 133 | 180 | 39 | (116) | (42) | 512 |
| Basic (loss)/earnings per share ($) | (1.09) | | | | | | | 1.05 |
| Diluted (loss)/earnings per share ($) | (1.09) | | | | | | | 1.04 |
| Basic - weighted average shares outstanding (millions)[10] | 489.0 | | | | | | | 489.0 |
| Diluted - weighted average shares outstanding (millions)[10] | 489.0 | | | | | | | 491.8 |

**Adjustments to arrive at core operating income**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Selling, general & administration | (2,694) | — | — | 22 | — | — | — | (2,672) |
| Research & development | (673) | 20 | 61 | — | — | — | (25) | (617) |
| Other income | 235 | — | — | — | — | (166) | (36) | 33 |
| Other expense | (290) | — | — | 182 | 49 | 12 | — | (47) |

Refer to the following page for associated explanatory footnotes.

### 2019

| ($ millions except (loss)/earnings per share) | IFRS results | Amortization of certain intangible assets[1] | Separation costs[3] | Transformation Costs[4] | Legal items[6] | Other items[8] | Core results |
|---|---|---|---|---|---|---|---|
| Gross profit | 3,662 | 1,007 | 10 | — | — | (16) | 4,663 |
| Operating (loss)/income | (187) | 1,040 | 237 | 52 | 32 | 91 | 1,265 |
| (Loss)/income before taxes | (332) | 1,040 | 237 | 52 | 32 | 91 | 1,120 |
| Taxes[9] | (324) | (140) | (54) | (7) | (8) | 338 | (195) |
| Net (loss)/income | (656) | 900 | 183 | 45 | 24 | 429 | 925 |
| Basic (loss)/earnings per share ($) | (1.34) | | | | | | 1.89 |
| Diluted (loss)/earnings per share ($) | (1.34) | | | | | | 1.89 |
| Basic - weighted average shares outstanding (millions)[10] | 488.2 | | | | | | 488.2 |
| Diluted - weighted average shares outstanding (millions)[10] | 488.2 | | | | | | 490.1 |

**Adjustments to arrive at core operating income**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Selling, general & administration | (2,847) | — | 30 | — | — | 15 | (2,802) |
| Research & development | (656) | 33 | 4 | — | — | 35 | (584) |
| Other income | 55 | — | — | — | — | (9) | 46 |
| Other expense | (401) | — | 193 | 52 | 32 | 66 | (58) |

Refer to the following page for associated explanatory footnotes.

A081

## Reconciliation of IFRS results to core results (continued)

### 2018

| ($ millions except (loss)/earnings per share) | IFRS results | Amortization of certain intangible assets[1] | Impairments[2] | Legal items[6] | Restructuring items[7] | Other items[8] | Core results |
|---|---|---|---|---|---|---|---|
| Gross profit | 3,192 | 996 | 376 | — | — | (23) | 4,541 |
| Operating (loss)/income | (248) | 1,007 | 378 | 28 | 9 | 38 | 1,212 |
| (Loss)/income before taxes | (300) | 1,007 | 378 | 28 | 9 | 38 | 1,160 |
| Taxes[9] | 73 | | | | | | (186) |
| Net (loss)/income | (227) | | | | | | 974 |
| Basic (loss)/earnings per share ($) | (0.46) | | | | | | 2.00 |
| Diluted (loss)/earnings per share ($) | (0.46) | | | | | | 2.00 |
| Basic - weighted average shares outstanding (millions)[10] | 488.2 | | | | | | 488.2 |
| Diluted - weighted average shares outstanding (millions)[10] | 488.2 | | | | | | 488.2 |
| | | | | | | | |
| **Adjustments to arrive at core operating income** | | | | | | | |
| Selling, general & administration | (2,801) | — | 2 | — | — | 13 | (2,786) |
| Research & development | (587) | 11 | — | — | — | 47 | (529) |
| Other income | 47 | — | — | — | (4) | (19) | 24 |
| Other expense | (99) | — | — | 28 | 13 | 20 | (38) |

## Explanatory footnotes to IFRS to Core reconciliation tables

(1) Includes recurring amortization for all intangible assets other than software.

(2) Includes impairment charges related to intangible assets.

(3) Separation costs are expected to be incurred over the two to three-year period following the completion of the Spin-off from Novartis and primarily include costs related to IT and third party consulting fees.

(4) Transformation costs, primarily related to restructuring and third party consulting fees, for the multi-year transformation program.

(5) Includes impacts from pension and other post-employment benefit plan amendments.

(6) For 2019, includes legal settlement costs and certain external legal fees. For 2018, includes legal costs related to an investigation.

(7) Includes restructuring income and charges and related items.

(8) For 2020, Gross profit includes $35 million primarily for losses on disposal of property, plant & equipment partially offset by $3 million in fair value adjustments of contingent consideration liabilities. Research & development includes $60 million in fair value adjustments of contingent consideration liabilities, partially offset by $35 million in expenses primarily related to the amortization of option rights. Other income includes a gain relating to an extinguishment of certain potential liabilities under the employee matters agreement executed at Spin-off and fair value adjustments of financial assets.

For 2019, Gross profit includes $37 million in fair value adjustments of contingent consideration liabilities, partially offset by $21 million in spin readiness costs, manufacturing sites consolidation activities, and integration of recent acquisitions. Selling, general & administration primarily includes spin readiness costs and the integration of recent acquisitions. Research & development includes $73 million for the amortization of option rights, post-marketing study following a product's voluntary market withdrawal, and the integration of recent acquisitions, partially offset by $38 million in fair value adjustments for contingent consideration liabilities. Other income primarily includes a realized gain on a financial asset. Other expense primarily includes spin readiness costs, fair value adjustments of a financial asset and other items.

For 2018, Gross profit, selling, general & administration and research & development include charges and reversal of charges related to a product's voluntary market withdrawal. Research & development also includes amortization of option rights and a fair value adjustment of a contingent consideration liability. Other income includes fair value adjustments on a financial asset. Other expense includes spin-readiness costs and other items.

A082

(9)  For 2020, total tax adjustments of $228 million include tax associated with operating income core adjustments and discrete tax items. Tax associated with operating income core adjustments of $1.3 billion totaled $221 million with an average tax rate of 17.4%. Core tax adjustments for discrete items totaled $7 million.

For 2019, total tax adjustments of $129 million include tax associated with operating income core adjustments and discrete tax items. Tax associated with operating income core adjustments of $1.5 billion totaled $215 million with an average tax rate of 14.8%. Core tax adjustments for discrete items totaled $344 million, primarily including $304 million in non-cash tax expense for re-measurement of deferred tax balances as a result of Swiss tax reform, tax expense related to rate changes in the US following legal entity reorganizations executed related to the Spin-off, non-cash tax expense related to the re-measurement of deferred tax assets and liabilities following a tax rate change in India, and net changes in uncertain tax positions.

For 2018, total tax adjustments of $259 million included tax associated with operating income core adjustments and discrete tax items. Tax associated with operating income core adjustments of $1.5 billion totaled $237 million with an average tax rate of 16.2%. Core tax adjustments for discrete items totaled $22 million, including a net out of period income tax benefit of $55 million partially offset by net changes in uncertain tax positions of $33 million.

(10) Core basic earnings per share is calculated using the weighted-average shares of common stock outstanding during the period. Core diluted earnings per share also contemplate dilutive shares associated with unvested equity-based awards as described in Note 8 to the Consolidated Financial Statements.

For periods prior to the Spin-off, the denominator for both core basic and diluted earnings per share was calculated using the shares of common stock distributed in the Spin-off.

## 5.B.          LIQUIDITY AND CAPITAL RESOURCES

Our sources of funds have consisted principally of cash flows from operations, issuance of senior notes, bank debt, credit facilities with lenders, and other financial liabilities to our Former Parent. Our uses of those funds (other than for operations) have consisted principally of investments in our growth plan, capital expenditures, cash paid for acquisitions and associated expenses and other obligations.

We believe that we have adequate liquidity to meet our needs. At December 31, 2020, we had cash and cash equivalents of $1.6 billion, compared to $822 million at December 31, 2019. At December 31, 2020, we had current financial debt of $169 million, compared to $261 million at December 31, 2019, consisting of bank and other financial debt. At December 31, 2020 we had non-current financial debt of $3.9 billion consisting of bank debt and senior notes primarily as a result of the Spin-off.

To date, all of our sales are generated by our subsidiaries and not directly by us. Thus, we are dependent on dividends, other payments or loans from our subsidiaries to meet our liquidity needs. Some of our subsidiaries may be subject to legal requirements of their respective jurisdictions of organization that may restrict their paying dividends or other payments, or making loans, to us.

Potential future uses of our liquidity include capital expenditures, acquisitions, debt repayments, dividend payments, and other general corporate purposes. As of December 31, 2020, commitments for purchases of property, plant & equipment were $136 million.

We use the US Dollar as our reporting currency and are therefore exposed to foreign currency exchange movements, primarily in Euros, Japanese Yen, Chinese Renminbi, Swiss Francs, and emerging market currencies. We manage our global currency exposure by engaging in hedging transactions where management deems appropriate (forward contracts and swaps) to preserve the value of assets. As of December 31, 2020 unsettled derivative positions included $3 million in unrealized gains and $7 million in unrealized losses.

All comments in this section relate to the year ended December 31, 2020 compared to 2019. Commentary for the year ended December 31, 2019 compared to 2018 may be found in Item 5 of the 2019 Form 20-F.

## Free cash flow (non-IFRS measure)

The following is a summary of Alcon free cash flow for 2020, 2019 and 2018, together with a reconciliation to net cash flows from operating activities, the most directly comparable IFRS measure.

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| **Net cash flows from operating activities** | **823** | **920** | **1,140** |
| Purchase of property, plant & equipment | (479) | (553) | (524) |
| Proceeds from sale of property, plant & equipment | 6 | — | — |
| **Free cash flow** | **350** | **367** | **616** |

Free cash flow amounted to an inflow of $350 million, compared to an inflow of $367 million in the prior year period, driven by decreased cash flows from operating activities partially offset by lower purchases of property, plant and equipment.

For additional information refer to "Item 5.A. Operating Results—Non-IFRS measures as defined by the Company".

## Cash flow and net (debt)/liquidity

| ($ millions) | 2020 | 2019 |
|---|---:|---:|
| Net cash flows from operating activities | 823 | 920 |
| Net cash flows used in investing activities | (572) | (1,011) |
| Net cash flows from financing activities | 466 | 659 |
| Effect of exchange rate changes on cash and cash equivalents | 18 | 27 |
| **Net change in cash and cash equivalents** | **735** | **595** |
| Change in derivative financial instrument assets | 2 | 1 |
| Change in current and non-current financial debts | (639) | (3,432) |
| Change in other financial liabilities to former parent | — | 67 |
| Change in other financial receivables from former parent | — | (39) |
| **Change in net (debt)** | **98** | **(2,808)** |
| Net (debt)/liquidity at January 1 | (2,656) | 152 |
| **Net (debt) at December 31** | **(2,558)** | **(2,656)** |

Net cash flows from operating activities amounted to $823 million in 2020, compared to $920 million in the prior year period. The current year was impacted by lower sales and reductions in discretionary spending due to the COVID-19 pandemic, changes in net working capital, decreased taxes paid due to the timing of payments and the COVID-19 pandemic, increased payments for restructuring activities, and increased interest payments on our financial debts following the Spin-off. The prior year period was impacted by changes in net working capital and payments due to a legal settlement.

Changes in net working capital in the current year were mainly due to increases in inventories, partially offset by changes in other current assets. The increases in inventories were primarily driven by inventory builds for new product launches and decreased demand due to the COVID-19 pandemic, while the reductions in other current assets were due to decreases in the current portion of long-term receivables and finance lease agreements from customers and other receivables. There were also decreases in trade payables related to operating activities due to management of discretionary spending and decreases in trade receivables as collections outpaced new sales. The net change in other current liabilities was driven by decreased accruals for annual associate short-term incentive payments and for obligations under the employee matters agreement executed at Spin-off, partially offset by increases in accruals for taxes other than income taxes. Changes in net working capital in the prior year period were primarily driven by increased trade receivables, in line with sales. The prior year period also included increases in other current assets due to manufacturing receivables from our Former Parent and increases in trade payables and other current liabilities primarily due to various transition agreements and separation costs incurred. Refer to Note 21 to the Consolidated Financial Statements for additional details regarding changes within net working capital.

Net cash flows used in investing activities amounted to $572 million, compared to $1.0 billion in the prior year period, primarily due to the acquisition of PowerVision in March 2019 and reduced capital spending in 2020 as a result of the COVID-19 pandemic. Refer to Notes 4 and 21 of the Consolidated Financial Statements for additional information on the PowerVision acquisition.

Net cash flows from financing activities amounted to $466 million, compared to $659 million in the prior year period. Cash inflows in the current year include the issuance of senior notes in May 2020, partially offset by repayments of current financial debts, realized foreign exchange losses, lease payments and withholding taxes paid upon net settlements of equity-based compensation. Cash inflows in the prior year period were attributable to net proceeds totaling $3.4 billion from the issuance and repayment of non-current and current financial debts, partially offset by $2.7 billion for net cash payments made to our Former Parent and its affiliates prior to the Spin-off. Refer to Notes 4, 17 and 21 of the Consolidated Financial Statements for additional information.

# Balance sheet

## Assets

Total non-current assets were $22.6 billion as of December 31, 2020, a decrease of $806 million compared to $23.4 billion as of December 31, 2019. There was a decrease of $1.1 billion in Intangible assets other than goodwill related to recurring amortization and asset impairments. Financial assets decreased $89 million primarily due to movement of balances to Other current assets as maturity has become less than twelve months. Property, plant, and equipment increased $312 million primarily due to capital expenditures, partially offset by depreciation.

Total current assets were $5.0 billion as of December 31, 2020, an increase of $751 million when compared to $4.2 billion as of December 31, 2019. Cash and cash equivalents increased $735 million attributable to the net impact of operating, investing, and financing activities as described in the preceding section. Inventories increased $139 million primarily driven by inventory builds for new product launches and decreased demand due to the COVID-19 pandemic. Other current assets decreased $98 million primarily due to utilization of amounts in escrow to settle contingent consideration obligations, amortization of option rights, decreases in the current portion of long-term receivables and finance lease agreements from customers, and other receivables.

The majority of the outstanding trade receivables from Greece, Italy, Portugal, Spain, Brazil, Russia, Turkey, Saudi Arabia, and Argentina (the closely monitored countries) are due directly from local governments or from government-funded entities except for Russia, Brazil, and Turkey. We evaluate trade receivables in these countries for potential collection risk. Should there be a substantial deterioration in our economic exposure with respect to those countries, we may increase our level of provisions by updating our expected loss provision or may change the terms of trade on which we operate.

The gross trade receivables from these countries at December 31, 2020 amounted to $211 million ($209 million at December 31, 2019), of which $14 million are past due for more than one year ($10 million at December 31, 2019) and for which provisions of $15 million have been recorded ($13 million at December 31, 2019). At December 31, 2020, amounts past due for more than one year are not significant in any of these countries.

The following table summarizes the aging of trade receivables as of December 31, 2020 and 2019:

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Not overdue | 1,137 | 1,135 |
| Past due for not more than one month | 109 | 118 |
| Past due for more than one month but less than three months | 67 | 81 |
| Past due for more than three months but less than six months | 36 | 47 |
| Past due for more than six months but less than one year | 31 | 21 |
| Past due for more than one year | 49 | 36 |
| Provisions for doubtful trade receivables | (68) | (48) |
| **Total trade receivables, net** | **1,361** | **1,390** |

There is also a risk that certain countries could devalue their currency. Currency exposures are described in more detail in the "Item 5.A. Operating Results — Effects of currency fluctuations" section.

## Liabilities

Total non-current liabilities were $6.5 billion as of December 31, 2020, an increase of $468 million when compared to $6.1 billion as of December 31, 2019. Financial debts increased $731 million, primarily due to the issuance of $750 million of senior notes on May 27, 2020. Deferred tax liabilities decreased $190 million in line with recurring amortization of intangible assets. Provisions and other non-current liabilities decreased $108 million primarily due to reductions in post-employment benefit obligations and contingent consideration liabilities.

Total current liabilities were $2.3 billion as of December 31, 2020, in line with prior year.

## Equity

Equity was $18.8 billion as of December 31, 2020, a decrease of $481 million when compared to $19.3 billion as of December 31, 2019.

A086

## Net (debt)/liquidity (non-IFRS measure)

The following is a summary of net (debt) as of December 31, 2020 and 2019, together with a reconciliation to total financial debt, the most directly comparable IFRS measure.

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Current financial debt | (169) | (261) |
| Non-current financial debt | (3,949) | (3,218) |
| **Total financial debt** | **(4,118)** | **(3,479)** |
| | | |
| **Less liquidity:** | | |
| Cash and cash equivalents | 1,557 | 822 |
| Derivative financial instruments | 3 | 1 |
| **Total liquidity** | **1,560** | **823** |
| **Net (debt)** | **(2,558)** | **(2,656)** |

Net debt of $2.6 billion as of December 31, 2020 decreased $98 million compared to $2.7 billion as of December 31, 2019. Alcon's liquidity amounted to $1.6 billion as of December 31, 2020, compared to $823 million as of December 31, 2019. Total financial debt amounted to $4.1 billion as of December 31, 2020, compared to $3.5 billion as of December 31, 2019. The average maturity of financial debts outstanding as of December 31, 2020 is 8.9 years.

The increase in non-current financial debts and corresponding increase in cash and cash equivalents are primarily attributable to the issuance of and proceeds from the $750 million of senior notes on May 27, 2020. Refer to Notes 4 and 17 to the Consolidated Financial Statements for additional information. The $1 billion revolving credit facility remained undrawn as of December 31, 2020 and February 23, 2021. For additional information regarding net (debt)/liquidity, which is a non-IFRS measure, see the explanation of non-IFRS measures in "Item 5. Operating and Financial Review and Prospects — 5.A. Operating Results —Non-IFRS measures as defined by the Company".

# Additional COVID-19 considerations

## Net sales trends

Surgical and Vision Care sales were primarily impacted by the COVID-19 pandemic in the second quarter of 2020. Surgical and Vision Care net sales substantially improved in the second half of the year with the fourth quarter of 2020 in line with prior year, led by North America and partially offset by International. Uncertainty remains as we expect the pace of recovery will continue to vary on a market by market basis, depending on existing capacity, differences between private and public channels, hospitals and non-hospital settings, the nature of patient needs and sense of safety. Based on these factors, we believe we will likely see a continued impact from COVID-19 during the first half of 2021.

## Financial measures

We ended 2020 with $1.6 billion in cash and cash equivalents, following the issuance of $750 million of senior notes in May 2020. Collections improved in the second half of the year and trade receivables are beginning to normalize; however, we may see delays or reductions in collections in the coming months as we work with our customers during this pandemic. As a result, we have taken significant steps to manage our cash flow as markets recover. These actions have included:

- Adjusting production volumes to align with demand expectations;

- Managing discretionary spending, in line with sales recovery, and phasing capital expenditures while continuing with separation, transformation and strategic investment priorities;

- Delaying initiation of our first dividend to 2021; and

- Issuing $750 million of senior notes in May 2020.

Because we believe these conditions are transitory, we are not making structural changes to our operational costs that could impede our ability to fully ramp up when most geographic markets recover.

## Key assumptions

Management has assessed the past and potential impact of the adverse effects of COVID-19 on Alcon's results of operation, cash flows, and liquidity. The preparation of financial statements requires management to make certain estimates and assumptions, either at the balance sheet date or during the period that affects the reported amounts of assets and liabilities as well as revenues and expenses. In particular, the Consolidated Financial Statements for the period ended December 31, 2020 required the use of significant estimates and assumptions pertaining to the impact of COVID-19 on Alcon's operations, results, and liquidity. Key assumptions include:

- The COVID-19 outbreak will have a continued impact on the the first half of 2021, but the pace of recovery will continue to vary on a market by market basis;

- Our manufacturing sites expect operating capacity to start to normalize in the first quarter 2021;

- We will retain our associates and meet supplier obligations while managing discretionary costs and phasing certain capital expenditures; and

- Separation, transformation and strategic investment priorities will continue.

Actual outcomes and results could differ materially from our estimates and assumptions. For example, extended or new COVID-19 related shut-down periods or slower recovery periods could result in an inability to manufacture products, reduced sales, incremental provisions for expected customer credit losses and inventory, incremental costs, reduced cash on hand, and increased debt or impairments of assets. We use the US Dollar as our reporting currency and are therefore also exposed to foreign currency exchange movements, primarily in Euros, Japanese Yen, Chinese Renminbi, Swiss Francs, and emerging market currencies.

## Financial debts

Our financial debts do not have any major maturities before 2024 and do not contain any financial covenants. Our $1 billion revolving credit facility remained undrawn as of February 23, 2021 and there are no current limitations on our ability to borrow under the facility.

## EBITDA (non-IFRS measure)

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| **Net (loss)** | **(531)** | **(656)** | **(227)** |
| Taxes | (104) | 324 | (73) |
| Depreciation of property, plant & equipment | 293 | 267 | 239 |
| Depreciation on right-of-use assets | 79 | 66 | — |
| Amortization of intangible assets | 1,078 | 1,084 | 1,019 |
| Impairments of property, plant & equipment, and intangible assets | 173 | 8 | 380 |
| Interest expense | 124 | 113 | 24 |
| Other financial income & expense | 29 | 32 | 28 |
| **EBITDA** | **1,141** | **1,238** | **1,390** |

A088

## Liquidity and financial debt by currency

The following table summarizes liquidity and financial debts by currency as of December 31, 2020 and 2019.

|  | Liquidity (%)[1] | | Financial debts (%)[2] | |
|---|---|---|---|---|
|  | 2020 | 2019 | 2020 | 2019 |
| USD | 90 | 63 | 86 | 80 |
| EUR | 3 | 6 | 11 | 11 |
| CHF | 1 | 1 | — | — |
| JPY | — | — | 2 | 5 |
| Other | 6 | 30 | 1 | 4 |
| **Total** | **100** | **100** | **100** | **100** |

(1)   Liquidity includes cash and cash equivalents and time deposits.

(2)   Financial debts includes non-current and current financial debts.

## 5.C.    RESEARCH AND DEVELOPMENT, PATENTS AND LICENSES, ETC.

Alcon research & development spending totaled $673 million, $656 million and $587 million for the years 2020, 2019 and 2018, respectively. As described in the "Risk Factors" section and elsewhere in this Annual Report, we are subject to varying degrees of governmental regulation in the countries in which we operate, which makes the process of developing new products and obtaining necessary regulatory marketing authorization lengthy, expensive and uncertain. See "Item 3. Key Information—3.D. Risk Factors". For further information on Alcon research and development policies and additional product information, as well as a description of the regulatory approval process, see "Item 4. Information on the Company—4.B. Business Overview".

## 5.D.    TREND INFORMATION

Please see "Item 5.A. Operating Results—Opportunity and risk summary" and "Item 4. Information on the Company—4.B. Business Overview" for trend information.

## 5.E.    OFF-BALANCE SHEET ARRANGEMENTS

We have no unconsolidated special purpose financing or partnership entities or other off balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources, that is material to investors. See also Note 26 to the Consolidated Financial Statements included elsewhere in this Annual Report.

A089

# ITEM 6.   DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

## 6.A.        DIRECTORS AND SENIOR MANAGEMENT

The information set forth under "Item 6.C. Board Practices—Corporate Governance—Board of Directors—Composition" and "Item 6.C. Board Practices—Corporate Governance—Executive Committee—Composition of the Executive Committee" is incorporated by reference.

A090

## 6.B.        COMPENSATION

# Introduction

## Dear Shareholder

On behalf of the Alcon Board of Directors ("Board") and Compensation Committee ("CC"), I am pleased to introduce the 2020 Compensation Report. It was the second financial year for Alcon as an independent, stand-alone company with listings on both the SIX Swiss Exchange ("SIX") and the New York Stock Exchange ("NYSE"). This report outlines Alcon's overall 2020 compensation framework and philosophy for the members of the Board of Directors as well as for the members of the Executive Committee of Alcon ("ECA").

This Compensation Report covers the financial year 2020 from January to December.

## Activities of the Compensation Committee in 2020

We believe in a strong pay-for-performance compensation philosophy that motivates our senior executives to create long-term value for the Company and its shareholders. During 2020, we continued to evaluate our overall compensation programs to ensure they support the Company's business objectives and reflect the best interests of our shareholders. Throughout the year, we engaged with our shareholders to seek their views on our compensation programs.

### Business Overview and Assessment of the COVID-19 Impact

2020 was a year like no other for our world, the medical device industry and our Company; the pandemic has significantly impacted all aspects of daily life. In response to the pandemic, Company management immediately took steps to protect the short-term and long-term health of our associates, customers and shareholders. These actions, summarized below, protected the Company and enabled the business to rebound and resume key product launches in the second half of 2020.

### Protect our Associates

- Maintained full employment and did not furlough associates;
- Maintained pay levels notwithstanding the significant reduction in manufacturing volumes and sales; and
- Implemented global health and safety protocols, such as mandatory temperature checks, use of personal protective equipment, social distancing and capacity restrictions across all campus and manufacturing sites under the supervision of the Alcon Crisis Management team.

### Serve our Customers

- Collaborated with the industry to develop new safety protocols and patient workflow strategies to enable practitioners and patients to stay safe;
- Allocated capital in organic investments resulting in the successful launch of new products such as *PanOptix*, *PRECISION1* and *Pataday*; and
- Donated ophthalmic equipment, vision care products and personal protective equipment to support frontline workers during the pandemic.

### Align with Shareholders

- Outperformed direct competitors' stock by 1700 basis points, maintained healthy valuation levels in a volatile market and ended the year +17% in the NYSE and +7% in the SIX markets;
- Gained market share in the US OTC ocular allergy category, daily disposable SiHy segment and global AT-IOL market; and
- Maintained financial flexibility with cost measures reducing $200 million of discretionary spend and by postponing our first dividend proposal to 2021.

The impact of COVID-19 and government mandates on eye care practices made it challenging for the Company to achieve its performance goals for the year since both short-term and long-term incentive plan targets were approved in February 2020 prior to the full knowledge of the COVID-19 impact on our global business.

Throughout the year, the Board and the CC were actively involved in monitoring Alcon's response to the pandemic and its impact on the entire medical device industry. Although Alcon did not meet the threshold performance level for the 2020 short-term incentive payout, the Board and CC approved a 2020 short-term incentive partial payout of 75% of target to the ECA based on their performance in stabilizing the business in these crucial times, rebounding in second half of the year from a financial perspective and positioning Alcon for success beyond 2020. On average, short-term incentive payout for all other Alcon associates inclusive of their individual performance factor was approximately 85% of target. Alcon essential workers, who came to work each day throughout the pandemic to ensure the continued delivery of critical medical products, received a 100% payout in recognition of their efforts. For the 2018 long-term incentive award, the Board and CC approved a payout of 83% based on actual performance against the existing performance metrics with no modification due to the pandemic. In addition, no modifications have been made to the in-flight 2019 and 2020 long-term incentive awards or their respective performance metrics.

## CEO Compensation Increase

In February 2020, the Board made the decision to increase the CEO's total direct compensation opportunity in line with the median CEO compensation of Alcon's peer group. Although both fixed and variable elements of the CEO's total direct compensation were below median, the Board decided to increase only the long-term incentive component, entirely paid in the form of performance shares vesting in three years, in order to align the increase with our pay-for-performance philosophy and focus on long-term value creation. The new 2020 CEO long-term incentive target is 430% of his base salary, bringing his total direct compensation closer to the median of our peer group.

## Engagement with Shareholders

We value shareholder engagement and feedback and take every opportunity to get better acquainted with our shareholder base. Therefore, we continued our extensive formal outreach to engage with shareholders.

During our formal outreach in the fall of 2020, we discussed our pay-for-performance commitment, sought feedback on our compensation programs and explained our approach to measuring performance as it relates to long-term shareholder value creation. We are pleased to find that investors are broadly supportive of our compensation approach. It is our intention to continue this dialogue with our shareholders and evaluate and consider their feedback to ensure better alignment between our compensation programs and shareholder interests.

## 2021 Annual General Meeting

In line with the Articles of Incorporation, we will ask our shareholders to cast a binding vote on the maximum aggregate amount of compensation for members of the Board for their term of office from the 2021 AGM to the 2022 AGM. We will also ask our shareholders to cast a binding vote on the maximum aggregate amount of compensation for members of the ECA for the 2022 financial year. In addition, we will ask our shareholders to endorse this 2020 Compensation Report in an advisory vote.

On behalf of the Board and the members of the CC, we thank you for your trust in Alcon and for your feedback.

Sincerely,

Karen May

Chair of the Compensation Committee

A092

# Compensation at a Glance

## 2020 ECA Compensation-Summary

The year 2020 represented the first full calendar year for Alcon as an independent, stand-alone company following the Spin-off from Novartis in April 2019 (the "Spin-off"). In 2020, we continued to build, with a few further minor modifications, the executive compensation program Alcon adopted in 2019.

The compensation program consisted of a balanced set of fixed and variable elements rewarding short-term and long-term performance through the delivery of cash payments and equity awards. Performance goals were aligned to the strategic plan in a mix of absolute and relative measures including financial and non-financial metrics.

**Exhibit 1**

|  | Annual Base Salary | Short-Term Incentive (annual incentive) | Long-Term Incentive | Benefits |
|---|---|---|---|---|
| **Purpose** | In line with global pay practices, reflects responsibilities, experience and skills | Rewards annual performance against key objectives | Rewards long-term value creation in line with Alcon's strategy and business priorities | Retirement savings and insurances in line with local market practices and benefits associated with global mobility and international relocation |
| **Payment** | Cash | Cash | Equity (Performance Stock Units) | Cash or in-kind, contributions to retirement savings and insurance policies |
| **Performance period** | — | One year | Three-year cliff vesting | — |
| **Performance measures** | — | Three financial performance measures, individual performance rating and a funding mechanism | Four equally weighted performance measures including financial, external and innovation metrics | — |
| **Payout range** | — | 0%-200% of the individual target award | 0%-200% of the number of Performance Stock Units granted | — |
| **Basis** | Fixed | Variable | Variable | Fixed in proportion of pay |

## Total Compensation for 2020

From January 1, 2020 to December 31, 2020, we awarded the ECA members the amounts set out below. For more detailed information, see section "ECA Compensation 2020" in this 2020 Compensation Report.

**Exhibit 2**

| Compensation | Fixed compensation | | Variable compensation | | Additional compensation | Totals |
|---|---|---|---|---|---|---|
| From January 1, 2020 to December 31, 2020 | Annual base salary | Pension and insurance benefits | 2020 short-term incentive award | 2020-2022 long-term incentive awards [1] | Other benefits | Total compensation |
| David J. Endicott, CEO | 1,225,049 | 160,771 | 1,102,544 | 4,975,110 | 635,708 | 8,099,182 |
| Other ECA members | 4,088,839 | 791,750 | 2,546,652 | 6,651,981 | 3,209,254 | 17,288,476 |
| **Totals in USD[2]** | **5,313,888** | **952,521** | **3,649,196** | **11,627,091** | **3,844,962** | **25,387,658** |
| *Totals in CHF[3]* | *4,988,348* | *894,168* | *3,425,639* | *10,914,792* | *3,609,412* | *23,832,358* |

[1] Performance Stock Units.

[2] Includes the CEO and six other ECA members.

[3] The amounts were converted at the rate of 1.0 CHF : 1.06526 USD.

## 2020 Board of Directors Compensation-Summary

We paid our Directors a fixed fee for services covering the term of their office from the 2020 Annual General Meeting ("2020 AGM") to the 2021 Annual General Meeting ("2021 AGM").

The fixed compensation consists of a base fee for Board membership and additional fees for service on Board committees. Board members and the Board Chair receive fifty percent of their compensation in cash and fifty percent in unrestricted Alcon shares. On a voluntary basis, a Board member may opt to receive all or part of the cash portion in additional shares. Alcon does not provide any performance-based components of pay to the members of the Board.

Effective as of the date of our 2020 AGM, the Board split the current responsibilities of the previous Compensation, Governance and Nomination Committee ("CGNC") into two separate committees: the Compensation Committee ("CC") and the Governance and Nomination Committee ("GNC"). The Board recognized the heavy workload assigned to the CC since the spin-off from Novartis; this split enables the two newly created committees to better focus on their respective key responsibilities. For the GNC, this includes a focus on leading governance practices and ESG topics in general, and for the CC, this includes a focus on human resource strategy and executive compensation. Finally, this reorganization is in line with best corporate governance standards. The annual fee for the Chair of the GNC is USD 53,263 (CHF 50,000) and each member received USD 26,632 (CHF 25,000). The fees for the Chair and the members of the CC are the same as the GNC.

**Exhibit 3**

| | Fee for the period from the 2020 AGM to the 2021 AGM | |
|---|---|---|
| **Board function** | USD[1] | CHF |
| **Annual base fee:** | | |
| Board Chair | 1,011,997 | 950 000 |
| Board member base fee (Board retainer fee) | 213,052 | 200 000 |
| **Additional fees:** | | |
| Vice Chair | 42,610 | 40 000 |
| Chair of the Audit and Risk Committee | 74,568 | 70 000 |
| Chair of the Compensation Committee | 53,263 | 50 000 |
| Chair of the Governance and Nomination Committee | 53,263 | 50 000 |
| Chair of the Innovation Committee | 53,263 | 50 000 |
| Member of the Audit and Risk Committee | 37,284 | 35 000 |
| Member of the Compensation Committee | 26,632 | 25 000 |
| Member of the Governance and Nomination Committee | 26,632 | 25 000 |
| Member of the Innovation Committee | 26,632 | 25 000 |

[1]   The Board fees are paid in Swiss Francs (CHF), converted at the rate of 1.0 CHF : 1.06526 USD.

## Alcon Board Fee Payments in 2020

In 2020, Alcon paid the members of the Board the following total amounts.

**Exhibit 4**

| | Payment in cash | Payment in shares | Number of shares | Other payments | Total fees |
|---|---|---|---|---|---|
| **Total fees paid in 2020**[1] in USD | **904,346** | **2,167,600** | **39,913** | **73,985** | **3,145,931** |
| Total fees paid in 2020 in CHF[2] | 848,944 | 2,034,808 | 39,913 | 69,453 | 2,953,205 |

[1]   Represents compensation for nine out of ten members of the Board as David J. Endicott does not receive additional compensation for his service as a member of the Board.

[2]   The payments in cash were made in Swiss Francs (CHF). For consistency all compensation payments are reported in USD in this report. The amounts were converted at the rate of 1.0 CHF : 1.06526 USD. All amounts are before deduction of the social security contributions and income tax due by the Board member.

For more details regarding the compensation paid to the individual members of the Board, see section "Board of Directors Compensation 2020" in this Compensation Report.

**A095**

## 2021 Compensation Outlook

### ECA Compensation

The CC is committed to a pay-for-performance compensation framework to align Company and executive performance with shareholder interests. Our executive compensation framework will continue to be benchmarked against a carefully selected peer group, consisting of European and North American companies with a blend of similar size, industry and geographic characteristics to Alcon. The inclusion of European and North American companies reflects our global footprint, business mix and source for management talent.

Based on the Company's business strategy, compensation philosophy and the analysis of peer group compensation practices, below are the key features of ECA compensation for 2021:

- Same overall structure of ECA compensation as compared to 2020 (base pay, STI, LTI and benefits);
- Broadly no significant change to the ECA members' compensation levels;
- Continuation of robust share ownership requirements; and
- No material changes to benefits provisions.

### Board Compensation

The Board compensation framework will remain unchanged for the upcoming term of office from the 2021 AGM to the 2022 AGM, including:

- Board Chair and Board member fees unchanged compared to 2020; and
- Same mix of fees payable in cash and shares as in 2020, including the option to elect a higher percentage in shares in lieu of cash.

In 2020, the CC commissioned a benchmarking study of Board pay against other SMI companies. The results of the study indicated that our Board pay is below the median level of SMI companies. Due to the magnitude of COVID-19 impact on the Company's financial results, the Board made the decision to not propose any compensation change at the 2021 AGM for the term 2021 AGM - 2022 AGM. The CC will reconsider possible increases to Board Pay in 2022.

## Corporate Governance

The Board makes decisions regarding Board compensation upon proposals from the CC. These proposals are based on analysis and review of board compensation practices, policies and benchmarking information. Similarly, the Board makes decisions regarding CEO compensation upon proposals from the CC. The CC makes decisions with regard to compensation of the other ECA members based upon the analysis of relevant executive compensation practices, policies and benchmarking information.

The Board is responsible for approving the Compensation Report and for the proposal of the aggregate budget of Board compensation and ECA compensation to the shareholders at the AGM. The Corporate Governance Report contained in our 2020 Annual Report in "Item 6.C. Board Practices" provides further details regarding the responsibilities of the CC.

A096

## Adherence to Strong Governance Practices

The CC evaluates many governance factors when designing and establishing compensation for members of the ECA. It uses these mechanisms to help guide its decisions to ensure that the Company is rewarding long-term success, discouraging excessive risk-taking and aligning executive and shareholder interests.

**Exhibit 5**

| What we do | What we don't do |
|---|---|
| • Provide a majority of executive pay in variable, rather than fixed, compensation in order to ensure pay for performance | • No severance agreements |
| • Tie 100% of Short-Term and Long-Term Incentive to appropriately ambitious performance metrics | • No single-trigger change in control payments |
| • Follow best practices in executive compensation design | • No change in control related excise tax gross ups |
| • Prohibit hedging, pledging and short sales of Company stock by executive officers and Directors | • No termination notice period in excess of twelve months |
| • Have robust share ownership requirements to reinforce alignment between executives and shareholders | • No stock option awards |
| • Include forfeiture and claw-back provisions for all variable compensation payments | • No active defined benefit pension plans |
| • Ensure that STI and LTI plans have target and maximum payout limits | • No guaranteed compensation |
| • Award all equity grants at market value | |
| • Conduct ongoing investor outreach | |

87

**A097**

# ECA Compensation 2020

## Compensation Program

In the financial year 2020, Alcon's ECA compensation framework includes the strategic objectives of:

- Paying for performance and the execution of the Alcon strategy;
- Pursuing value for shareholders over the long-term;
- Creating alignment in the interests of executives and shareholders; and
- Motivating and retaining executives for the long-term.

The general principles for ECA compensation are defined in Articles 31 and 32 of our Articles of Incorporation (http://investor.alcon.com/governance//default.aspx). ECA compensation comprises fixed and variable elements. Fixed elements include an annual base salary and benefits. Variable compensation consists of elements from short-term and long-term incentive plans, which are subject to performance measures and caps.

## Pay for Performance

Variable compensation represents a majority of total compensation and affirms our pay-for-performance philosophy (see more information in Exhibits 11 and 21). Actual payout is contingent on the achievement of Company and individual performance goals. Performance metrics and goals are aligned with the Company's business strategy and compensation philosophy as well as long-term value creation for shareholders and are approved annually by the CC and the Board.

## Peer Group

External peer compensation is an important reference point for consideration of market competitive compensation for the members of the ECA, including our CEO.

The CC believes that a consistent and relevant set of peer companies that are similar in size and scope enables shareholders to assess the appropriate levels and practices of compensation and allows for pay-for-performance comparisons. Alcon's revenue and market capitalization are approximately at the median of the peer group companies.

88

A098

**Exhibit 6**

**Global Peer Group**

| | |
|---|---|
| Agilent Technologies Inc. | EssilorLuxottica |
| Align Technology Inc. | Fresenius Medical Care |
| Allergan plc [1] | Givaudan |
| BauschHealthCompanies Inc. | Lonza Group |
| Baxter International Inc. | Merck KGaA |
| Becton Dickinson & Company | Smith & Nephew |
| Biogen Inc. | Stryker Corporation |
| Boston Scientific | The Cooper Companies Inc. |
| Dentsply Sirona Incl | UCB |
| Edwards Lifesciences Corporation | Zimmer Biomet Holding Inc. |

Revenue



45th percentile

Market capitalization



53th percentile

[1] acquired by AbbVie, will no longer be part of the peer group in 2021.

The annual total compensation of ECA members is targeted to the market median of benchmarks for comparable roles within this peer group. The CC considers compensation practices, structures and levels based on benchmarking information and advice provided by the committee's independent external advisors (see more information under the section "Compensation Governance").

The CC and the Board review the compensation of the CEO and the other ECA members periodically and consider relevant benchmark information. The CC will also review periodically the peer group and make adjustments to its composition as appropriate.

# Forfeiture and Claw-back Rules

Any variable compensation paid or payable to ECA members is subject to forfeiture and claw-back rules under our short-term incentive ("STI") and long-term incentive ("LTI") plans, which allow the Company to retain unpaid or unvested compensation (forfeiture) or even recover compensation already paid in cash or shares (claw-back). Such rules apply in cases where the action or behavior of an executive violates internal codes, guidelines or policies or conflicts with management standards, including Company and accounting rules and regulations or violates laws. These forfeiture or claw-back rules apply to payments under both the STI and LTI plans. The action to retain or recover variable compensation is subject to applicable law of the jurisdiction involved.

# Share Ownership Requirements for ECA Members

The Board has established share ownership requirements for members of the ECA in order to align executives' interests with those of shareholders. The ownership requirement is expressed as a multiple of the executive's annual base salary and is in line with the practices of our peer group. The following Exhibit illustrates those requirements.

**Exhibit 7**

| Leadership level | Share ownership requirement |
|---|---|
| David J. Endicott, CEO | 5 times annual base salary |
| Other members of the ECA | 3 times annual base salary |

All members of the ECA must meet these requirements within five years of service from the later of the date of the Spin-off or commencement of employment. If any of the ECA members fail to meet the requirement, or if they are not on track with the requirements, the CC may take several actions such as prohibiting the sale of Alcon shares until such time the requirement is met. At the end of 2020, each member of the ECA is on track to meet the applicable ownership requirement.

89

**A099**

# Compensation Governance

## Authority for ECA Compensation Decisions

All decisions regarding CEO compensation and performance are made by the Board as a whole, excluding the CEO who is recused from such matters. The Board has delegated the authority to make compensation decisions for ECA members, excluding the CEO, to the CC.

The CEO makes recommendations to the CC regarding the executive compensation policy and principles and incentive plan design and makes proposals to the CC regarding the compensation and performance targets of members of the ECA. The CEO also makes proposals regarding the assessment of performance achievements of members of the ECA. The CEO does not make proposals regarding his own compensation or performance.

**Exhibit 8**

| Authority levels in ECA compensation | CEO | CC | Board | AGM |
|---|---|---|---|---|
| ECA compensation policy and principles | R | A | | |
| CEO compensation and benefits | | R | A | |
| Other ECA member compensation and benefits | R | A | | |
| CEO performance targets and assessment of achievements | | R | A | |
| Other ECA members' performance targets and assessment of achievements | R | A | | |
| Share ownership requirements for the CEO and other members of the ECA | | R | A | |
| Maximum aggregate ECA compensation | | R | P | A[1] |
| Incentive plan design and rules | R | P | A | |
| Compensation report of the Company | | R | P | A[2] |

R  Recommend   P  Propose   A  Approve

[1]  binding vote
[2]  advisory vote

# Compensation Elements

Alcon's compensation program has three broad components: annual base salary, variable compensation elements and employment benefits. Variable compensation elements are geared towards encouraging executives to deliver outstanding results and create sustainable shareholder value. They are also designed to prevent executives from taking excessive risks. The compensation program balances:

- fixed and variable compensation elements;
- short-term and long-term incentive compensation; and
- Company and individual performance.

**Exhibit 9**

**Annual Base Salary**

| Annual Base Salary | Annual base salary is set and reviewed considering: |
|---|---|
| | • Market value of the role<br>• Benchmark information of peer companies<br>• Market median within the peer companies<br>• Executive's role, performance, experience and potential<br>• Increases in line with inflation and market<br>• Business performance and the external environment |

90

**Exhibit 10**

**Variable Compensation**

| Short-Term Incentive | The Short-Term Incentive (STI) is designed and delivers awards based on: |
|---|---|
| | **Target value** |
| | • Annual base salary (ABS) x STI target (% of ABS) = STI target value in USD/CHF |
| | **Performance measurement** |
| | • Measurement of financial performance (Business Performance Factor "BPF") and individual performance (Individual Performance Factor "IPF"), see the description of the STI below for more information |
| | • Utilize Core Net Income (CNI) as a funding mechanism to ensure achievement of CNI targets prior to exceeding target STI payouts |
| | **Payout** |
| | • Performance period: 1 year |
| | • Range 0%-200% of the target value |
| | • Payout formula: STI target value x IPF x BPF = STI payout |
| | • Paid in the first quarter of the following year |
| | • Delivered in cash |
| Long-Term Incentive | The Long-Term Incentive (LTI) is designed and delivers awards based on: |
| | **Target value** |
| | • Annual Base Salary (ABS) x LTI target (% of ABS) = Target value in USD/CHF |
| | **Target award** |
| | • Target value divided by the Alcon share price at grant date = number of Performance Stock Units (PSUs) at target |
| | • Granted at the onset of the performance period |
| | **Performance measurement** |
| | • Measurement of metrics (see the description of the LTI below for more information) |
| | **Payout** |
| | • Performance period: 3 years |
| | • Range 0%-200% of the target number of PSUs |
| | • Payout formula: Target number of PSUs x LTI payout factor = number of PSUs vested |
| | • Cliff vesting of PSUs (i.e., all PSUs vest at the end of the performance period, subject to performance conditions) |
| | • Conversion of vested PSUs to Alcon shares |
| | • Payout delivered in unrestricted Alcon shares |
| | • Paid in the first quarter of the year following the performance period |
| | • PSUs carry dividend equivalents payable in shares at the end of the performance period based on the number of PSU vested |

Variable compensation represents a large majority of total direct compensation for ECA members. At target opportunity, the variable compensation represents 85% of the CEO's total direct compensation. The average variable compensation of the other ECA members represents 71% of total direct compensation.

**A101**

**Exhibit 11**

**Mix of Fixed and Variable Compensation at Target**

| CEO | Other ECA members (excl. CEO) |
|---|---|
|  |  |

CEO ratios and average ratios of other ECA members are based on 2020 values of ABS, target STI and target 2020-2022 LTI. Graphics exclude retirement savings and insurance benefits as well as any other benefits

## CEO Compensation Increase

As a new stand alone company, in 2019 the CC spent significant time establishing a robust benchmarking ECA Peer Group (PG) in order for Alcon to competitively compensate executives. The benchmarking analysis against the established PG indicated that CEO target total direct compensation was significantly below the market median.

Based on this analysis, the CC indicated in the 2020 Outlook section of the 2019 Compensation Report the desire to adjust the 2020 target CEO compensation to the market median. In February 2020, the Board made the decision to increase the CEO's target total compensation opportunity in line with Mr. Endicott's deep experience in the industry and the median CEO compensation of Alcon's peer group. Although both fixed and variable elements of the CEO's compensation were below median, the Board made the decision to increase only the long-term incentive component, entirely paid in the form of performance shares vesting in three years, in order to align with our pay-for-performance philosophy and focus on long-term value creation. The new 2020 CEO long-term incentive target is 430% of his base salary and as such his total direct compensation is closer to the median of the peer group. This approach also ensures that any potential increase in realized pay is only earned if the company's long-term goals are achieved.

## Short-Term Incentive

The short-term incentive compensation element is designed to reward the ECA members for their contribution towards achieving annual Company results and for their individual annual performance. The metrics used for the Business Performance Factor are the same for all ECA members. The Individual Performance Factor varies by individual. Based on this design, each member of the ECA participates in the overall Company's success while also being rewarded for their individual contributions. The annual STI award value at target is based on a percentage of the ECA member's annual base salary.

**Exhibit 12**

| STI payout opportunity as a % of annual base salary | at target | at maximum |
|---|---|---|
| David J. Endicott, CEO | 120 % | 240 % |
| Other members of the ECA (average) | 80 % | 160 % |

The financial metrics for short-term performance in 2020 are set out in the Exhibit below. The payout of STI is calculated by multiplying the target award by the BPF and IPF.

**Exhibit 13**

| Metric | Financial metrics [1] | | | Non-financial metric [2] |
|---|---|---|---|---|
| | Group Net Sales | Core Operating Income | Free Cash Flow | Individual performance |
| **Definition** | Measures the Company's top line performance | Measures the Company's operating income | Measures the Company's capacity to realize cash | Measures the achievement of individual objectives and individual values and behaviors |
| **Rationale** | Fosters the Company's top line performance | Recognizes the primary indicator of profitability | Indicates the cash realized from operating activities | Considers individual contribution to the Company's results |
| **Weighting** | 40% | 40% | 20% | 100% |
| **Performance factors** | BPF (total weightings of financial metrics 100%) | | | IPF |
| **Payout formula** | ABS X STI Target X BPF X IPF = STI Payout | | | |
| | BPF maximum 150% x IPF maximum 150% = maximum 225% (capped at 200%) | | | |
| **Payout range** | 0 - 200% | | | |

**Note**

[1]  Financial achievements are measured in constant currencies to reflect operational performance.

[2]  Measures individual contribution to both short-term and long-term business results, execution of key strategic objectives, leadership capability and behavior, company values, succession planning.

Performance, thresholds, targets and maximum values for the financial performance metrics are determined at the onset of the one-year performance period. In line with good governance practice, the Board and the CC set targets that are appropriately ambitious and in support of the Company's business strategy and the Board's strategic plan without encouraging the ECA member to take undue risks.

At the end of the performance period, the Board and the CC determine the financial performance achievements against the targets originally set and determine the BPF. In addition, they consider the Individual Performance Factor (IPF) of the ECA members. The IPF is determined by the achievement of individual objectives and the demonstration of values and behaviors. The performance rating is the basis for setting the IPF between 0% and 150%. The CEO and other ECA members are not present when their IPF are discussed and determined.

The Board and the CC may apply discretion in determining the final outcome of the STI payout. At the end of the performance period of each STI award, the Company intends to disclose the details of the outcome of the final STI payout, in the applicable compensation report.

93

**A103**

## Long-Term Incentive

The long-term incentive program is designed to make a significant portion of compensation of ECA members contingent on long-term Company performance and to ensure alignment with shareholders' interests. LTI awards consist of PSUs, which convert to shares at vesting, contingent on the achievement of the performance measures. The annual LTI grant value at target is based on a percentage of the ECA member's annual base salary.

**Exhibit 14**

| LTI payout opportunity as a % of annual base salary | Below threshold | at target | at maximum[1] |
|---|---|---|---|
| David J. Endicott, CEO | 0% | 430% | 860% |
| Other members of the ECA (average) | 0% | 170% | 340% |

[1]  The maximum number of units that may be awarded is limited to 200% of the target number of units granted.

The financial metrics for the measurement of long-term performance are set out in the Exhibit below. The payout is calculated by adding the weighted achievements of the individual financial targets in a range from 0-200% and multiplying the number of PSUs granted by the resulting performance factor. We intend to disclose the outcome of the final LTI payout at the end of their respective performance period, in the applicable compensation report.

**Exhibit 15**

| Metric | Group Net Sales CAGR[1,2] | Core EPS CAGR[2] | Share of Peers[3] | Innovation scorecard[4] |
|---|---|---|---|---|
| Definition | Measures the Company's top-line performance | Measure of the profitability by the earnings per share | A set of measures to compare the Company to the market shares of competitors | Measure of key product pipeline and achievement of milestones |
| Rationale | Fosters the Company's top line performance | Aligns ECA with shareholders by measuring earnings per share | Indicates relative competitive position against peers in terms of market share | Delivery of future products and key future growth drivers |
| Weighting | 25% | 25% | 25% | 25% |
| Payout formula | ABS X LTI Target X Addition of weighted metrics = Performance Factor = Payout/Number of PSUs | | Metric 1 25% + Metric 2 25% + Metric 3 25% + Metric 4 25% | |
| | Weighted achievements of metrics = additive payout factor maximum 200% (cap) | | | |
| Payout range | 0-200% | | | |

**Notes**

[1]  CAGR means Compound Annual Growth Rate.

[2]  Financial achievements are measured in constant currencies to reflect operational performance.

[3]  Metric "Share of peers" measures Alcon's market share of key products in the Surgical and Vision Care segments against a peer group of competitors.

[4]  The innovation scorecard for 2020-2022 includes 10 milestones: one sales-related; one related to the cost of a development program; and eight related to the timeline of achievements. Each milestone is tied to a key internal development project. The LTI payout for the innovation metric will depend upon the overall achievement of the 10 milestones, within the relevant performance period. The milestones established are approved by the Board's Innovation Committee.

**A104**

Similar to the performance target-setting and measurement of the STI award, the thresholds, targets and maximum values for the LTI performance metrics are determined at the onset of the three-year performance period. In line with good governance practice, the Board and the CC set targets and ensure they are appropriately ambitious and in support of the strategic plan but do not encourage the ECA member to take undue risks.

At the end of the three-year performance period of each LTI award, the Board and the CC determine the performance achievements of each metric against the targets originally set. The Board's Innovation Committee is responsible for establishing and assessing the achievements and results of the innovation scorecard. The Board and the CC may apply discretion in determining the final outcome of the performance results used for the vesting of LTI awards. At the end of the performance period of each LTI award, the Company intends to disclose in the applicable compensation report details of the outcome of the final LTI payout.

## Benefits

All ECA members except one are enrolled in local benefit plans providing for retirement income savings and insurance for disability and loss of life. These plans are in line with local market practices and legislation and are subject to the Company's plan rules and policies. The ECA members and the Company pay statutory contributions. The sole ECA member with an employment contract governed by US law is enrolled in a Company-provided health insurance plan.

**Exhibit 16**

| Retirement savings and insurance contributions | **Retirement and insurance benefits plan contributions provided in line with local market practice (most governed by legal provisions)** |
|---|---|
| | Employer-paid |
| | • Contributions to retirement savings plan |
| | • Insurance premiums for disability and survivor benefits |
| | • Health insurance (only in the US) |
| | • Contributions to mandatory social security systems |
| Other benefits | • Expense and representation allowance in line with Swiss market practice (covering small expenses) |
| | • Mandatory allowances for children and education (only in Switzerland) |
| | • Car allowance |
| | • Employer-paid international benefits (e.g. relocation cost, cost of living adjustments, settling in allowance, international health insurance, housing, schooling/education fees) in line with Alcon's global mobility policies |

Alcon is a global company headquartered in Switzerland with multinational operations and international business strategies. As a result, from time to time, executives are relocated to Switzerland or will be relocated from their home country in the future. Relocated executives receive relocation support and are provided with international benefits in line with Alcon's global mobility and relocation policies (e.g. relocation support, tax and social security equalization, benefit equalization and other international benefits as appropriate).

95

**A105**

# Compensation Payments to the ECA Members

## ECA Compensation Payments FY 2020

The following Exhibit 17 sets forth the total compensation received by the CEO (highest paid member of the ECA) and the aggregate total compensation received by all of the other ECA members for the period from January 1, 2020 to December 31, 2020.

The compensation Alcon paid to the ECA members in 2020 remained within the 2020 budget.

**Exhibit 17**

| Compensation<br><br>From January 1, 2020 to December 31, 2020 | Fixed compensation | | Variable compensation | | Additional compensation | Totals |
|---|---|---|---|---|---|---|
| | Annual base salary[1] | Pension and insurance[2] | 2020 short-term incentive[3] | 2020-2022 long-term incentive[4] | Other benefits[5] | Total compensation |
| David J. Endicott, CEO | 1,225,049 | 160,771 | 1,102,544 | 4,975,110 | 635,708 | 8,099,182 |
| Aggregate amount of 6 other ECA members | 4,088,839 | 791,750 | 2,546,652 | 6,651,981 | 3,209,254 | 17,288,476 |
| **Totals in USD[6]** | **5,313,888** | **952,521** | **3,649,196** | **11,627,091** | **3,844,962** | **25,387,658** |
| *Totals in CHF* | *4,988,348* | *894,168* | *3,425,639* | *10,914,792* | *3,609,412* | *23,832,358* |

**Notes**

[1]  The total of Annual Base Salaries paid for the period from January 1, 2020 to December 31, 2020, including increases effective March 1 if applicable.

[2]  The retirement pension and insurance benefits are the actual contributions paid to benefit plans for the period from January 1 to December 31, 2020. It also includes the amount of USD 37,303 for mandatory contributions paid by Alcon to governmental social security systems for all ECA members, which provide the ECA members with the right to the maximum future insured government pension benefit. The aforementioned amount is a portion of a total amount of contributions of USD 1,138,868 paid by Alcon to the social security systems.

[3]  The STI award disclosed is the amount earned for the performance year 2020. It will be paid in March 2021 in cash.

[4]  The amounts of the 2020-2022 LTI awards represent the total value of the target number of PSUs granted to the seven active ECA members on February 18, 2020. The value of the PSUs is based on the closing price of the underlying Alcon share on the date of grant of USD 63.00.

[5]  The amounts of other benefits include the Company-paid benefits, values of benefits in kind, payments made and payments or values promised to ECA members for the relevant period in 2020. They include mostly benefits for international assignment (e.g. housing, schooling, tax and social security equalization, benefit equalization, other international relocation benefits).

[6]  Payments to ECA members were made in CHF and/or USD. The amounts were converted at the rate of 1.0 CHF : 1.06526 USD.

Alcon reports the 2020-2022 Long-Term Incentive Awards at the value at grant in accordance with Swiss market practice. The basis for disclosure is the target value of the PSU at grant, reflecting the assumption that the awards will vest at 100% achievement, excluding any share price movement that may occur over the performance period. The future payout will be determined only after the conclusion of the performance period in three years (i.e. at the end of 2022) and the awards will vest in February 2023. The payout range is between 0% and 200% of the target number of PSUs.

## ECA Compensation Payments FY 2019

The following Exhibit 18 sets forth the total compensation received by the CEO (highest paid member of the ECA) and the aggregate total compensation received by all of the other ECA members for the period from January 1, 2019 to December 31, 2019. These details were disclosed in our Compensation Report 2019.

**Exhibit 18**

| Compensation | Fixed compensation | | Variable compensation | | | Additional compensation | Totals |
|---|---|---|---|---|---|---|---|
| From January 1, 2019 to December 31, 2019 | Annual base salary[1] | Pension and insurance[2] | 2019 short-term incentive[3,4] cash shares | | 2019-2021 long-term incentive[5-9] | Other benefits[10] | Total compensation[11] |
| David J. Endicott, CEO[12] | 1,134,358 | 279,851 | 745,380 | 745,380 | 2,738,036 | 1,177,487 | 6,820,492 |
| Aggregate amount of 6 other ECA members[13] | 3,541,122 | 960,531 | 2,459,312 | 1,053,990 | 7,821,030 | 3,396,392 | 19,232,377 |
| **Totals in USD[14]** | **4,675,480** | **1,240,382** | **3,204,692** | **1,799,370** | **10,559,066** | **4,573,879** | **26,052,869** |
| *Totals in CHF[14]* | *4,647,132* | *1,232,862* | *3,185,262* | *1,788,460* | *10,495,046* | *4,546,148* | *25,894,910* |

**Notes**

[1]   Includes six designated ECA members pre-Spin-off date (including the CEO) and the seven active ECA members post Spin-off date (including the CEO).

[2]   Includes the amount of USD 71,994 for mandatory contributions, of a total amount of USD 622,142 paid by Alcon to the social security systems.

[3]   The STI award for the performance year 2019, paid in March 2020.

[4]   The aggregate Short-Term Incentive awards includes the STI award at target value paid to Alcon's former CFO.

[5]   The total amount of the 2019-2021 LTI awards includes the total values of the target number of PSUs based on the closing price of the underlying Novartis share on the date of grant of USD 88.32 or CHF 88.14 respectively.

[6]   Includes the prorated value of the target number of PSUs of the 2019-2021 LTI award granted to the seventh ECA member based on the underlying Novartis share price as described above.

[7]   Includes the value of the target number of PSUs of the 2019-2021 LTI award granted to the new CFO on April 10, 2019 based on the closing price of the underlying Alcon share on the date of grant of CHF 58.05.

[8]   Includes the total value of the target PSUs of additional 2019-2021 LTI awards granted to the ECA members (excluding the CFO) on April 10, 2019 based on the closing price of the underlying Alcon share on the date of grant of USD 58.04 and CHF 58.05 respectively.

[9]   Includes the value of the target number of PSUs of the special LTI award granted to the new CFO on April 10, 2019, based on the closing price of the underlying Alcon share as described above.

[10]   The amounts of other benefits include the Company-paid benefits, values of benefits in kind, payments made and payments or values promised to ECA members for the relevant period in 2019.

[11]   The vesting and forfeiture of Novartis shares and their replacement by Alcon shares is not included in the total compensation because they did not provide additional values.

[12]   The total compensation of the CEO from January 1, 2019 to December 31, 2019 including compensation under the Novartis compensation structure and terms up to the Spin-off date.

[13]   The compensation of the six other members of the ECA from January 1, 2019 to December 31, 2019 including compensation under the Novartis compensation structure up to the Spin-off date.

[14]   Payments to ECA members were made in CHF and/or USD. The amounts were converted at the rate of 1.0 CHF : 1.0061 USD.

For further details to the compensation payments FY 2019, please refer to the 2019 Compensation Report.

Alcon reported the 2019-2021 Long-Term Incentive Awards at the value at grant in accordance with Swiss market practice. The basis for disclosure is the target value of the PSU at grant, reflecting the assumption that the awards will vest at 100% achievement, excluding any share price movement that may occur over the performance period. The future payout will be determined only after the conclusion of the performance period in three years (i.e. at the end of 2021) and the awards will vest in January 2022. The payout range is between 0% and 200% of the target number of PSUs.

# Outcome of Performance Awards 2020

## 2020 Short-Term Incentive

Ambitious performance goals targeting above market growth in our global markets for the 2020 Alcon annual short-term incentive program were set and approved in mid-February 2020, prior to the full impacts of COVID-19 being known. These goals were based on an assumed market growth of 4.6% in 2020, but, due to the impacts of COVID-19, markets suffered significant declines during 2020.

Due to the COVID-19 impact on overall 2020 business results, we did not achieve the threshold financial performance set out under the short-term incentive plan goals. Based on the overall assessment of Alcon's 2020 financial and business performance, individual contributions of each ECA member including the factors outlined below; the CC applied discretion and approved a payout of 75% of target for the ECA. For all other Alcon associates, the average short-term incentive payout inclusive of their individual performance factor was approximately 85% of target. Alcon essential workers, who came to work each day throughout the pandemic to ensure the continued delivery of critical medical products, received a 100% payout in recognition of their efforts.

**Exhibit 19**

| | |
|---|---|
| **Protect our Associates** | • We maintained full employment of, and did not furlough, associates and maintained pay levels notwithstanding the significant reduction in manufacturing volumes and sales.<br>• Under the supervision of the Alcon Crisis Management team, global health and safety protocols, such as mandatory temperature checks, use of personal protective equipment, social distancing and capacity restrictions, were implemented across all campus and manufacturing sites. |
| **Serve our Customers** | • The company collaborated with the industry to develop new safety protocols and patient workflow strategies to enable practitioners and patients to stay safe.<br>• Capital allocation in organic investments has resulted in the successful launch of new products such as *PanOptix*, *Precision1* and *Pataday*.<br>• We accelerated digital training and engagement through Alcon Experience Academy.<br>• We also donated ophthalmic equipment, vision care products and personal protective equipment to support frontline workers during the pandemic. |
| **Align with Shareholders** | • Alcon's stock outperformed direct competitors' stock by 1700 basis points, maintained healthy valuation levels in a volatile market and ended the year +17% in the NYSE and +7% in the SIX markets.<br>• We gained market share in the US OTC ocular allergy category, daily disposable SiHy segment and global AT-IOL market<br>• Sales performance saw a significant improvement in the second half of 2020 due to strong execution and category out performance of the market.<br>• We maintained financial flexibility with cost measures reducing nearly $200 million of discretionary spend in the second quarter and by postponing our first dividend proposal to 2021. Our credit rating enabled a successful bond offering which raised $750 million in long-term notes in May 2020.<br>• Free cash flow* improved in the second half of 2020, driven by an improvement in sales and collections as well as lower capital spending.<br>• Core operating margin* improved in the second half of 2020 due to a strong sales recovery, expense discipline and product flow.<br>• Progress in its separation puts the company on track to complete the process by early 2021. The company also advanced the implementation of its transformation program. Both are key to standing up Alcon as an independent company and unlocking long-term operating margin improvement. |

*A non-IFRS measure. Refer to Item 5 of this Annual Report for additional information and a reconciliation to the most directly comparable measure presented in accordance with IFRS.

## 2018-2020 Long-Term Incentive

The 2018-2020 LTI awards for the CEO and other ECA members will vest in early 2021. As a result of Alcon being a division of Novartis prior to April 9, 2019, payouts under the program have been split into two periods (pre and post spin-off). For the first fifteen-month period while Alcon was a division of Novartis, ECA payouts were determined based upon overall Novartis performance, which is not disclosed in Alcon's 2020 Compensation Report.

For the truncated twenty-one-month period from post spin-off to the end of the performance period in December 2020 (Refill Awards), PSUs were subject to Alcon stand-alone performance.

The Alcon LTI program for the ECA consists of 100% PSUs. Currently, performance for the PSU consists of the following four metrics: Sales CAGR, EPS CAGR, Share of Peers and Innovation weighted equally. At spin, Alcon underwent a rigorous goal setting process to establish the construction of ambitious goals while balancing against incentivizing excessive risk taking. The CC considers a number of factors, both external and internal such as Alcon's forward-looking strategic plan, shareholders' and analysts' expectations regarding our future performance, general market outlook and the performance of our direct competitors to set targets that are appropriately challenging and aligned with shareholder expectations.

In contrast to the STI, PSU payout is based on a holistic evaluation of the Company's achievements against the stated metrics over the performance period. No modifications were made to the 2018-2020 PSU targets, and the CC did not apply discretion to override performance against these metrics despite the unanticipated impacts that COVID-19 visited on Alcon's financial performance.

As a result, we did not achieve the threshold levels for both the Sales and EPS CAGR metrics. However, we significantly outperformed our targets with respect to Share of Peer metric as we continued to gain share in the global AT-IOL market, driven by key launches in the US and Japan. The launches of *PRECISION1* and *DAILIES TOTAL1* multifocal also helped us to take share in the fast growing daily disposable SiHy segments. Furthermore, the successful over-the-counter switch of *PATADAY* Once Daily and *PATADAY* Twice Daily in the US contributed to share gains in the US OTC ocular allergy category, where Alcon continues to remain the leader. We have continued to execute on our research and development strategy during the pandemic and exceeded expectations on the innovation milestones set out for the 2018-2020 PSU cycle, bolstered, in part, by the success of Alcon's *PanOptix* IOL.

**Exhibit 20**

| Performance metric | Weighting | Achievement Level | Weighted Payout % (0-200%) |
|---|---|---|---|
| Sales CAGR | 25 % | 0 % | 0 % |
| EPS CAGR | 25 % | 0 % | 0 % |
| Share of Peers | 25 % | 200 % | 50 % |
| Innovation | 25 % | 130 % | 33 % |
| **PSU payout** | | | **83 %** |

Based on our results, the performance factor for the 2018-2020 PSU award was 83%.

## Fixed and Variable Compensation

Based on the compensation disclosed in Exhibit 17 that ECA members received over the period from January 1, 2020 to December 31, 2020, the mix of fixed and variable compensation is as follows:

**Exhibit 21**

**Mix of Fixed and Variable Compensation at Actual 2020 STI Payout and 2020-2022 LTI at Grant**



Average ratios are based on ABS, payout of 2020 STI (in March 2021) and grants of 2020-2022 LTI awards at grant value. Mix excludes retirement savings and insurance benefits as well as any other benefits.

100

**A110**

# Equity Instruments Granted to the ECA Members

## Equity Instruments Granted in FY 2020

The LTI awards (in PSUs) for the performance period 2020-2022 were granted on February 18, 2020 to the CEO and the six other members of the ECA. The number of PSU are set out in Exhibit 22 below. The values of the awards are based on the closing price of the underlying Alcon share on the date of grant and disclosed in section "ECA Compensation Payments FY 2020", Exhibit 17.

**Exhibit 22**

| Number of units granted to | 2020 RSUs based on the 2019 STI Award[1] | 2020 PSUs based on the 2020-2022 LTI target Award[2] |
|---|---|---|
| David J. Endicott, CEO | 14,032 | 78,970 |
| Other ECA members | 19,320 | 105,587 |
| **Total** | **33,352** | **184,557** |

**Notes**

[1] Although these shares were granted based on 2019 STI awards, the number of RSUs that were to be granted to the ECA members were not available at the time the 2019 Compensation Report was published. They are included in Exhibit 22 for reference. The value attributable to these RSUs is disclosed under "ECA compensation payments FY 2019" (Exhibit 18).

[2] The values of the awards in PSU are disclosed under "ECA compensation payments FY 2020" (Exhibit 17).

## Equity Instruments Granted in FY 2019

### Equity Grants in Alcon Shares

The LTI awards (in PSUs) for the performance period 2019-2021 were granted on January 22, 2019 to the seven members of the ECA in Novartis shares. Additional LTI awards were granted in April 2019. The number of PSUs are shown in Exhibit 23-25 respectively. The values of the awards were disclosed in the 2019 Compensation Report (see also Exhibit 18).

**Exhibit 23**

| Number of units granted to | Deferred Share Plan 2019 STI Award[1] | PSUs based on the 2019-2021 LTI target Award[2, 3] |
|---|---|---|
| David J. Endicott, CEO | 0 | 9,317 |
| Other ECA members | 0 | 85,086 |
| **Total** | **0** | **94,403** |

**Notes**

[1] The numbers of RSUs granted to the ECA members in 2020 on the basis of a portion of the STI 2019 delivered in equity were not available at the time of editing and publishing the 2019 Compensation Report. They relate to compensation for the year 2019 and are disclosed in Exhibit 22 above.

[2] Number of PSUs granted to the new CFO of a prorated LTI award for the performance period 2019-2021 and of a special LTI award subject to the same the performance period and conditions.

[3] Number of PSU granted to the ECA members (excluding the CFO) for increasing their pre-Spin-off target LTI award to the new target award level effective from Spin-off.

101

A111

The following Exhibit 24 sets out the number of Alcon share-based instruments granted to ECA members pursuant to the Alcon equity restoration plan applied in 2019 (Keep Whole and Refill Awards).

**Exhibit 24**

| Number of units granted to | Alcon equity units granted as Refill awards[1] | Alcon equity units granted as Keep Whole awards[2] |
|---|---|---|
| David, J. Endicott, CEO | 124,062 | 23,639 |
| Other ECA members | 222,966 | 39,764 |
| **Total** | **347,028** | **63,403** |

**Notes**

[1]  Number of Alcon shares granted to replace the forfeited value of Novartis share-based instruments.

[2]  Number of Alcon shares granted to compensate for the dividend in kind based on Novartis unvested PSUs and RSUs.

## Equity Grants in Novartis Shares

The LTI awards (in PSUs) for the performance period 2019-2021 were granted on January 22, 2019 to the then designated members of the ECA prior to the Alcon spin-off in Novartis shares.

**Exhibit 25**

| Number of units granted to | PSUs based on the 2019-2021 LTI target Award |
|---|---|
| David J. Endicott, CEO | 24,740 |
| Other ECA members[1] | 32,086 |
| **Total** | **56,826** |

**Notes**

[1]  Includes the number of Novartis PSUs, based on the underlying Novartis shares, granted to Alcon's former CFO who stepped down from the function when Alcon was a division of Novartis (prorated from January 1 to April 8, 2019). Furthermore it includes the number of Novartis PSUs granted to the seventh ECA member on the ECA (prorated from April 9, 2019 to the end of the performance period).

# Share Ownership of the ECA Members

The number of Alcon shares or share-based units held by ECA members and "persons closely linked" (as defined below) to them as of each of December 31, 2020 and December 31, 2019 is set out in the Exhibit below. As of each of these dates, no ECA members, either individually or together with "persons closely linked", owned 1% or more of the outstanding shares of Alcon.

**Exhibit 26**

| Number of units | December 31 | Vested shares | Unvested RSUs | Unvested target PSUs | Total |
|---|---|---|---|---|---|
| David J. Endicott | 2020 | 88,953 | 21,162 | 150,013 | 260,128 |
| | 2019 | 25,346 | 69,798 | 82,187 | 177,331 |
| Laurent Attias | 2020 | 16,820 | 2,602 | 29,922 | 49,344 |
| | 2019 | 0 | 24,855 | 22,435 | 47,290 |
| Ian Bell | 2020 | 19,527 | 7,508 | 39,266 | 66,301 |
| | 2019 | 0 | 36,432 | 27,836 | 64,268 |
| Leon Sergio Duplan Fraustro | 2020 | 16,530 | 8,174 | 38,610 | 63,314 |
| | 2019 | 4,183 | 29,393 | 26,595 | 60,171 |
| Rajkumar Narayanan | 2020 | 10,622 | 2,795 | 31,046 | 44,463 |
| | 2019 | 0 | 21,293 | 19,380 | 40,673 |
| Michael Onuscheck | 2020 | 28,241 | 9,056 | 49,825 | 87,122 |
| | 2019 | 6,424 | 36,524 | 35,877 | 78,825 |
| Tim C. Stonesifer | 2020 | 20,000 | 4,989 | 93,611 | 118,600 |
| | 2019 | 0 | 0 | 61,672 | 61,672 |
| **Total** | **2020** | **200,693** | **56,286** | **432,293** | **689,272** |
| | 2019 | 35,953 | 218,295 | 275,982 | 530,230 |

# Additional Disclosures

## Employment Agreements

The Company and the members of the ECA entered into employment agreements for an indefinite period of time. Six of seven ECA members' employment agreements are governed by Swiss law. The seventh ECA member's employment agreement is governed by US law.

All employment contracts with ECA members provide for advanced notice of termination of employment, none of which exceed a 12-month period in accordance with our Articles of Incorporation. None of the employment agreements with the ECA members provide for any severance payment.

Such employment agreements also prohibit the ECA member from competing against Alcon for a period up to 12 months after termination in accordance with our Articles of Incorporation.

## Payments to Current or Former Members of the ECA

During 2020, no payments (or waivers of claims) other than those set out in Exhibit 17 (including the related notes) under section "ECA Compensation Payments FY 2020" were made to current or former members of the ECA or to "persons closely linked" to them.

## Loans to Members of the ECA

Alcon's Articles of Incorporation and corporate policies do not permit loans to current or former members of the ECA or to "persons closely linked" to them. As a result, no loans were granted in 2020, and none were outstanding as of December 31, 2020.

## Persons Closely Linked

Persons closely linked to members of the ECA are (i) their spouse, (ii) their children below age 18, (iii) any legal entities that they own or otherwise control, and (iv) any legal or natural person who is acting as their fiduciary or agent.

## Compensation Expense 2020

The total expense for the year 2020 for compensation awarded to ECA members, using International Financial Reporting Standards (IFRS) measurement rules, is presented in Note 25 to the Company's audited consolidated financial statements. The numbers for compensation expense in the Note 25 may differ from the numbers reported in this 2020 Compensation Report due to the accounting and disclosure standards applied.

## Alcon Share-Based Units Awarded to Alcon Associates in 2020

In the financial year 2020, the total of approximately 2.1 million restricted shares, RSUs and target PSUs (all unvested) were granted, and approximately 1.1 million Alcon shares vested and were delivered to Alcon associates under the various equity-based incentive or participation plans. Current unvested equity instruments (restricted shares, RSUs and target PSUs) represent approximately 1% of issued shares. Alcon delivers treasury shares to associates to fulfill these obligations.

# Board of Directors Compensation 2020

## Compensation Framework

The Board compensation was set at a level that allowed for the attraction and appointment of high-caliber talent for Board roles with the relevant background and skills, including global experience in the medical devices and ophthalmology industry. The Board is comprised of both Swiss and international members.

Non-executive Board members are awarded a base fee. Further, they are entitled to additional fees for their roles of Chair and/or member on the Board committees. The Vice Chair also receives an additional fee. The Board Chair does not receive additional fees for work in committees. David J. Endicott, the CEO of Alcon, does not receive any fees for his Board membership.

Effective as of the date of our 2020 AGM, the Board split the current responsibilities of the previous Compensation, Governance and Nomination Committee ("CGNC") into two separate committees: the Compensation Committee ("CC") and the Governance and Nomination Committee ("GNC"). The Board recognized the heavy workload assigned to the CC since the spin-off from Novartis; this split enables the two newly created committees to better focus on their respective key responsibilities. For the GNC, this includes a focus on leading governance practices and ESG topics in general, and for the CC, this includes a focus on human resource strategy and executive compensation. Finally, this reorganization is in line with best corporate governance standards. The annual fee for the Chair of the GNC is USD 53,263 (CHF 50,000) and each member received USD 26,632 (CHF 25,000). The fees for the Chair and the members of the CC are the same as the GNC.

The following table sets out the compensation for the non-executive members of the Board from the 2020 AGM to the 2021 AGM:

**Exhibit 27**

| Board function | Fee for the period from 2020 AGM to 2021 AGM | |
|---|---|---|
| | USD[1] | CHF |
| Annual base fee: | | |
| Board Chair | 1,011,997 | 950 000 |
| Board member base fee (Board retainer fee) | 213,052 | 200 000 |
| **Additional fees:** | | |
| Vice Chair | 42,610 | 40 000 |
| Chair of the Audit and Risk Committee | 74,568 | 70 000 |
| Chair of the Compensation Committee | 53,263 | 50 000 |
| Chair of the Governance and Nomination Committee | 53,263 | 50 000 |
| Chair of the Innovation Committee | 53,263 | 50 000 |
| Member of the Audit and Risk Committee | 37,284 | 35 000 |
| Member of the Compensation Committee | 26,632 | 25 000 |
| Member of the Governance and Nomination Committee | 26,632 | 25 000 |
| Member of the Innovation Committee | 26,632 | 25 000 |

**Notes:**

[1] Converted into USD at a rate of CHF 1.0 = USD 1.06526.

In 2020, the following framework applied to the compensation of non-executive Board members:

- Fifty percent of the total fees is paid in shares on a mandatory basis in two installments: September 2020 and March 2021;
- Fifty percent of the total fees is paid in cash in four installments: June, September and December 2020 and March 2021;
- Each Board member may elect to receive up to one hundred percent of their fees in shares;
- The fees are paid in Swiss Francs;

- The shares delivered are unrestricted (free shares) listed at the SIX Swiss Exchange;
- The members of the Board are subject to share ownership requirements (see below);
- Board members bear the full cost of their own social security contributions; and
- Board members do not receive variable compensation, in line with their focus on corporate strategy, supervision and governance. Their payment in shares is in unrestricted shares. They do not receive share options or other share-based instruments.

The general principles of compensation of the members of the Board are defined in our Articles of Incorporation. According to our Articles of Incorporation, Alcon may enter into agreements with members of the Board relating to their compensation for a fixed term of up to one year.

## Share Ownership Requirements for Members of the Board

Board members are committed to align their interests with those of shareholders. The Board has set forth share ownership requirements which apply to the non-executive members of the Board.

Each member of the Board, including the Board Chair, is required to own Alcon shares that represent the value of his or her annual base fee. This requirement needs to be met within four years in office.

**Exhibit 28**

| Board level | Share ownership requirement |
|---|---|
| Board Chair | 1 times annual base fee, within 4 years |
| Other Board members | 1 times annual base fee, within 4 years |

Each member of the Board is on track to meet the ownership requirement. Board members are prohibited from hedging or pledging their ownership positions in Alcon shares that are part of the share ownership requirement.

## Compensation Governance

### Authority for Board Compensation Decisions

Decisions regarding Board compensation are taken by the Board upon proposals from the CC. The CC's proposals are based on analysis and review of compensation practices, policies and benchmarking information.

The Board is responsible for approving the Compensation Report and for proposing the aggregate budget of Board compensation subject to a shareholders' vote at the applicable AGM.

**Exhibit 29**

| Authority levels in Board compensation | CC | Board | AGM |
|---|---|---|---|
| Board compensation policy and principles | P | A | |
| Board Chair compensation | P | A | |
| Other Board member compensation | P | A | |
| Share ownership requirements for Board members | P | A | |
| Maximum aggregate compensation of the Board members | R | P | A[1] |
| Compensation Report of the company | R | P | A[2] |

R  Recommend    P  Propose    A  Approve

[1]  binding vote

[2]  advisory vote

The Corporate Governance Report in Item 6.C. Board Practices of this Annual Report provides further details to the authorities of the CC.

A116

## Independence of Members of the Compensation Committee

Each of the members of the CC meets the independence criteria set forth in our Board Regulations. Effective from the 2020 AGM, the CC has been comprised of the following four members: Karen J. May (Chair), Thomas H. Glanzmann, D. Keith Grossman and Ines Pöschel. At each AGM, the shareholders elect the CC Chair and its members individually for a term of office of one year. Our Articles of Incorporation permit re-election. The 2020 Corporate Governance Report in Item 6.B. of the Alcon 2020 Annual Report provides details regarding the members of the Board and the independence criteria for Board members. The Board Chair, the CEO and the Secretary of the Board attend the CC meetings by invitation. None is present when decisions relating to their own interest are taken.

## The Compensation Committee's External Advisors

During 2020, the CC retained Willis Towers Watson ("WTW") as its external compensation advisor. For the same period, the CC also retained HCM International (Switzerland) ("HCM") for advice with regard to Swiss compensation matters. The CC appointed each of them in 2019 following a thorough process of evaluating proposals from various consulting firms. During 2020, WTW provided additional services to Alcon related to, among other things, compensation programs, pension and benefit plans. During the same period, HCM did not provide additional services to Alcon.

At the end of 2020, the CC conducted a review of the support received from the selected external advisors and is satisfied with the result of the work completed in 2020. At least annually, the CC will evaluate the quality of the consulting services received and the need to use an additional advisor for specific matters.

# Compensation of the Members of the Board of Directors

## Board Compensation FY 2020

The following Exhibit 30 sets out the total compensation received by non-executive members of the Board during 2020. They received the compensation for their services on the Board from January 1, 2020 to December 31, 2020.

The disclosed compensation represents (i) the fees paid to the members of the Board in March 2020, which was the last installment of the fees for their term of office up to the 2020 AGM, and (ii) the fees paid up to December 31, 2020 for their term of office from the 2020 AGM to the 2021 AGM.

The installment of the fees paid in March 2020 completed the delivery of all fees due for the term of office from spin-off on April 9, 2019 to the 2020 AGM. The total of fees paid for that term remained within the approved budget.

The fees paid between the 2020 AGM and December 31, 2020 to the members of the Board of Directors are only a part of the total fees they will receive for the service on the Board during the term of office from the 2020 AGM to the 2021 AGM (three of four installments). In accordance with our normal payout schedule, a further payment of fees in cash and shares will be made in March 2021.

All members of the current Board of Alcon have taken their office from the AGM 2020. No payments (or waivers of claims) were made to them in 2020.

The CEO of Alcon, David J. Endicott, is not included in this Exhibit as he is not compensated for his Board membership.

107

**Exhibit 30**

| Board members, functions[1] | Payment in cash | Tax and other cash[2] | Payment in shares[3] | Number of shares[4] | Other payments[5] | Total fees 2020 |
|---|---|---|---|---|---|---|
| **F. Michael Ball**<br>Board Chair | 126,500 | 189,784 | 569,213 | 10,476 | - | **885,497** |
| **Lynn D. Bleil**<br>Member ARC and IC | 17,310 | 60,637 | 181,710 | 3,346 | - | **259,657** |
| **Arthur B. Cummings**<br>Member IC | 119,842 | 37,220 | 82,623 | 1,522 | 59,603 | **299,288** |
| **Thomas H. Glanzmann**<br>Chair IC, member GNC, CC | - | 16,405 | 289,857 | 5,339 | 4,794 | **311,056** |
| **D. Keith Grossman**<br>Vice Chair, Chair GNC, member CC, IC | 38,616 | 64,639 | 193,687 | 3,564 | - | **296,942** |
| **Scott H. Maw**<br>Chair ARC | - | 71,945 | 215,676 | 3,973 | - | **287,621** |
| **Karen J. May**<br>Chair CC, member ARC | - | 75,927 | 227,673 | 4,194 | - | **303,600** |
| **Ines Pöschel**<br>Member GNC, CC | 63,916 | 6,378 | 172,053 | 3,168 | 4,794 | **247,141** |
| **Dieter P. Spälti**<br>Member ARC | - | 15,227 | 235,108 | 4,331 | 4,794 | **255,129** |
| **Total fees paid in 2020 in USD [6]** | **366,184** | **538,162** | **2,167,600** | **39,913** | **73,985** | **3,145,931** |
| *Total fees paid in 2020 in CHF [7]* | *343,751* | *505,193* | *2,034,808* | *39,913* | *69,453* | *2,953,205* |

**Notes**

[1]  Board Committees: "ARC" Audit and Risk Committee; "CC" Compensation Committee; "GNC" Governance and Nomination Committee; "IC" Innovation Committee.

[2]  These amounts represent the values of tax and, if applicable, social security due upon the allocation of shares, which were delivered in cash to the accounts. They were then deducted and paid to the applicable authorities. Further, the amounts include the residual amount of cash resulting from rounding down the number of shares to the next whole share.

[3]  The amounts in USD represent the converted value in CHF based on the Alcon shares granted on March 11, 2020 at the closing price of CHF 50.82 per share on the date of grant and on September 11, 2020, at the closing price of CHF 51.10 on September 10, 2020. The shares granted are listed at the SIX Swiss Exchange.

[4]  The total number of shares reported were delivered to each Board member in (i) the second installment of the fee in shares in March 2020 (term April 9, 2019 - 2020 AGM), and (ii) the first installment of the fee in shares (term 2020 AGM - 2021 AGM) . The second and final installment in shares for the services from the 2020 AGM to the 2021 AGM will be delivered in March 2021.

[5]  Includes (i) an amount of USD 19,176 for mandatory employer contributions paid by Alcon to governmental social security systems, which provides the relevant members of the Board with a right to the maximum future insured government pension benefit (this amount is a part out of total mandatory employer contributions of USD 87,533 to the governmental social security systems) and (ii) USD 54,809 paid to Dr. Cummings (or his related entities) for consulting services, including assistance with clinical trials that Dr. Cummings, as an ophthalmologist, provided to Alcon (these services were unrelated to Dr. Cummings' board service).

[6]  All amounts include the payments made and the shares delivered in March 2020 as installment of the fee for the term of office April 9, 2019 - 2020 AGM.

[7]  The payments in cash were made in Swiss Francs (CHF). For consistency they are reported in USD as all compensation in this 2020 Compensation Report. The amounts in CHF were converted to USD at the exchange rate of 1.0 CHF : 1.06526 USD. All amounts are before deductions of social security contributions and income tax paid by the Board members.

## Board Compensation FY 2019

The following Exhibit 31 sets out the total compensation received by non-executive members of the Board during 2019. The compensation disclosed in this Exhibit was received for their service on the Board from Spin-off April 9, 2019 to December 31, 2019 including a one time fee paid in March 2019 for activities prior to the Spin-off date.

The fees payable in March 2020 as shown in this Exhibit 32 are included in the total compensation 2020 disclosed in Exhibit 31. The CEO of Alcon, David J. Endicott, is not included in this Exhibit as he was not compensated for his Board membership. His compensation was disclosed as CEO and member of the ECA in the 2019 Compensation Report (see Exhibit 18).

### Exhibit 31

| Board members, functions[9] | Payment in cash[1,2] | Payment in shares[3] | Number of shares[4] | Other payments[5] | Total fees 2019 | Fee paid in March 2020[6] | Total fees for term[7] |
|---|---|---|---|---|---|---|---|
| **F. Michael Ball** Board Chair | 418,206 | 179,166 | 3,000 | — | **597,372** | 358,423 | 955,795 |
| **Lynn D. Bleil** Member ARC and IC | 83,685 | 73,518 | 1,231 | — | **157,203** | 114,444 | 271,647 |
| **Arthur B. Cummings** Member IC | 112,486 | 39,058 | 654 | 89,243 | **240,787** | 84,890 | 325,677 |
| **Thomas H. Glanzmann** Chair IC, member CGNC | 16,474 | 131,926 | 2,209 | 4,399 | **152,799** | 138,339 | 291,138 |
| **D. Keith Grossman** Vice Chair, member CGNC, IC | 137,711 | 54,706 | 916 | — | **192,417** | 109,413 | 301,830 |
| **Scott H. Maw** Chair ARC | 44,058 | 101,826 | 1,705 | — | **145,884** | 135,824 | 281,708 |
| **Karen J. May** Chair CGNC, member ARC | 45,930 | 107,500 | 1,800 | — | **153,430** | 143,369 | 296,799 |
| **Ines Pöschel** Member CGNC | 77,980 | 67,904 | 1,137 | 4,399 | **150,283** | 90,549 | 240,832 |
| **Dieter P. Spälti** Member ARC | 17,195 | 111,084 | 1,860 | 4,399 | **132,678** | 118,217 | 250,895 |
| **Total fees paid in 2019 in USD** | **953,725** | **866,688** | **14,512** | **102,440** | **1,922,853** | **1,293,468** | **3,216,321** |
| *Total fees paid in 2019 in CHF[8]* | *947,943* | *861,433* | *14,512* | *101,819* | *1,911,195* | *1,285,626* | *3,196,820* |

**Notes**

1   The totals include the USD 10,061 (CHF 10,000) on-boarding fee paid in March 2019.

2   Includes the fees paid in cash or the value of tax and, if applicable, social security withheld upon the allocation of shares to be paid in cash to the applicable authorities.

3   The amounts in USD represent the converted value in CHF based on the Alcon shares granted on September 11, 2019 at the closing price of CHF 59.36 per share on the date of grant.

4   The number of shares reported were delivered to each Board member in September 2019. The second and final installment in shares for the services from the Spin-off date April 9, 2019 to the 2020 AGM will be delivered in March 2020.

5   Includes the amount of USD 17,596 for mandatory employer contributions, of a total of USD 47,826 paid by Alcon to the social security systems) and USD 84,844 paid to Dr. Cummings (or his related entities) for consulting services.

6   Fees payable in March 2020, the final installment of the total fees payable for service from the Spin-off to the 2020 AGM.

7   Total fees that will be paid for the Board members' term of office from the Spin-off to the 2020 AGM.

8   The payments in cash were made in Swiss Francs (CHF), for consistency they are reported in USD. The amounts were converted at the rate of 1.0 CHF : 1.0061 USD.

9   Board Committees: "ARC" Audit and Risk Committee; "CGNC" Compensation, Governance and Nomination Committee; "IC" Innovation Committee.

For further details to the compensation payments in the FY 2019, please refer to the 2019 Compensation Report.

# Share Ownership of the Members of the Board of Directors

The number of Alcon shares held by members of the Board and "persons closely linked" to them as of December 31, 2020 are set out in the Exhibit below. As of this same date, no Board member, either individually or together with "persons closely linked", owned 1% or more of the outstanding shares of Alcon. The CEO of Alcon and Board member, David J. Endicott, is not included in this Exhibit as his share ownership is disclosed in Exhibit 26.

The number of shares held as of December 31, 2019 is shown for comparison.

**Exhibit 32**

| Board member | 2020<br>Total shares | 2019<br>Total shares |
|---|---|---|
| F. Michael Ball | 23,678 | 13,202 |
| D. Keith Grossman | 4,480 | 916 |
| Lynn D. Bleil | 4,577 | 1,231 |
| Arthur B. Cummings | 2,309 | 787 |
| Thomas H. Glanzmann | 7,812 | 2,473 |
| Scott H. Maw | 5,678 | 1,705 |
| Karen J. May | 15,994 | 1,800 |
| Ines Pöschel | 4,847 | 1,679 |
| Dieter P. Spälti | 13,191 | 8,860 |
| Total | 82,566 | 32,653 |

# Additional Disclosures

## Loans to Board Members

Alcon's Articles of Incorporation and corporate policies do not permit loans to current or former members of the Board or to persons closely linked to them. No loans were granted in 2020, and none were outstanding as of December 31, 2020.

## Other Payments to Board Members

No payments (or waivers of claims) other than those set out in Exhibit 30 (including the related notes) under section "Board compensation FY 2020" were made to current Board members or to persons closely linked to them.

## Persons Closely Linked

Persons closely linked to members of the Board are (i) their spouse, (ii) their children below age 18, (iii) any legal entities that they own or otherwise control, and (iv) any legal or natural person who is acting as their fiduciary or agent.

## Payments to Former Board Members

None.

110

**A120**

# Outlook for 2021

## Compensation Philosophy and Principles

The Company will continue to adopt a compensation philosophy which:

- Ensures a broadly competitive level of remuneration appropriate to each executives' scale of responsibility and individual performance;
- Attracts, retains and motivates a world-class executive team to drive performance;
- Supports long-term value creation for shareholders;
- Considers the geographic and industry-specific nature of our talent pool and the medical device industry;
- Aligns the compensation program for the senior executives with the broader management and employee population; and
- Fully embraces Swiss governance expectations and follows principles of simplicity and transparency.

**Exhibit 33**

| Pay for performance | • Programs are designed to compensate short-term performance and long-term success<br>• Rewards are achieved if financial and non-financial performance metrics are met |
|---|---|
| Alignment with shareholders | • A significant part of compensation is delivered in Alcon equity<br>• Executives are expected to hold a meaningful level of Alcon shares |
| Market competitiveness | • Overall compensation is competitive with other companies in the medical device and other industries in which Alcon competes for talent<br>• Total opportunity is targeted at market median |
| Motivation and retention | • Compensation is designed to attract, retain and motivate executives to achieve Company objectives<br>• Compensation is reviewed periodically to ensure competitiveness and alignment to key strategic objectives |

## ECA Compensation

The CC is committed to a pay-for-performance framework to align Company and executive performance with shareholder interests. Following a thorough review of Alcon's compensation structures during 2020, we have made refinements to our overall compensation structures to better reflect Alcon's status as an independent, stand-alone company.

Headquartered in Switzerland, Alcon operates on a truly global basis. Our main business competitors are found in both Europe and North America, which is where we compete for talent. Consequently, our executive compensation framework has been benchmarked against a carefully selected peer group, consisting of European and North American companies with a blend of similar size, industry and geographic characteristics to Alcon. The inclusion of European and North American companies reflects our global footprint, business mix and source for management talent. Based on the Company's business strategy, compensation philosophy and the analysis of peer group compensation practices, below are the key features of ECA compensation for 2021:

- Same overall structure of ECA compensation as compared to 2020 (base pay, STI, LTI and benefits);
- Broadly no significant change to the ECA members' compensation levels;
- Continuation of robust share ownership requirements; and
- No material changes to benefits provisions.

111

**A121**

# Board Compensation

The Board compensation framework will remain unchanged for the upcoming term of office from the 2021 AGM to the 2022 AGM, including:

- The overall framework of Board compensation from the 2020 AGM to the 2021 AGM will be carried forward to the term from the 2021 AGM to 2022 AGM;
- The Board Chair fee and Board member fees will remain unchanged; and
- The payment of fifty percent in shares (mandatory) and a voluntary election of a higher percentage in shares will continue.

In 2020, the CC commissioned a comprehensive study of benchmarking the compensation of the Board members, including the Board Chair, against the other companies in the Swiss Market Index SMI. As a Swiss based company, governed by Swiss law, the study compared the compensation of Alcon's Board against the Board compensation of other SMI companies. In addition, the CC sought advice regarding compensation practices prepared by its external advisors.

The results of the study indicated that certain areas of Board compensation were below the median compensation levels of the SMI companies. However, due to the magnitude of COVID-19 impact on the Company's financial results, the Board made the decision to not propose any changes to shareholders at the 2021 AGM for the term 2021 AGM - 2022 AGM. The CC and the Board will reconsider possible increases to Board compensation in 2022 for future terms.

# Shareholder Vote at the 2021 AGM

In accordance with Article 29 of the Articles of Incorporation (http://investor.alcon.com/governance//default.aspx), the Board will ask shareholders at the 2021 AGM meeting to cast a binding vote on:

- The aggregate amount of compensation payable to non-executive members of the Board for their term of office from the 2021 AGM to the 2022 AGM; and
- The aggregate amount of compensation payable to ECA members in the financial year 2022.

In addition, the Board will ask shareholders to cast an advisory vote on the 2020 Compensation Report.

The procedures of voting on the compensation of ECA members and the Board are defined in our Articles of Incorporation. Our Articles allow for an additional amount of compensation to be used when promoting or adding new members to the ECA.

The Exhibit below depicts the voting at the 2021 AGM and the respective period of the compensation affected by the vote.

**Exhibit 34**

A122

(This page has been left blank intentionally.)

113

## 6.C.        BOARD PRACTICE

# Corporate Governance

## Group Structure and Shareholders

### Operational Group Structure

The Company, with its registered office at Rue Louis-d'Affry 6, 1701 Fribourg, Switzerland, is a corporation organized under Swiss law and is the ultimate parent company of Alcon. As of December 31, 2020, the market capitalization of the Company was $32.279 billion (CHF 28.785 billion).

Alcon is the global leader in eye care with $6.8 billion in net sales during the year ended December 31, 2020. We research, develop, manufacture, distribute and sell a full suite of eye care products within two key businesses: Surgical and Vision Care. Our Surgical business is focused on ophthalmic products for cataract surgery, vitreoretinal surgery, refractive laser surgery and glaucoma surgery. Our Vision Care business is comprised of various contact lenses and a comprehensive portfolio of ocular health products, including devices and over-the-counter products for dry eye, contact lens care and ocular allergies, as well as ocular vitamins and redness relievers. Further information is available under "Item 4. Information on the Company".

### Listed and Non-listed Companies Belonging to the Alcon Group

The registered shares of the Company are listed on the SIX Swiss Exchange (Valor 43249246 / ISIN code CH0432492467) and the New York Stock Exchange (CUSIP code H01301128). The Company owns directly or indirectly all consolidated entities of Alcon, none of which has its shares otherwise listed.

The following table lists the most significant subsidiaries of the Company, including those entities with total assets or net sales to third parties in excess of 5% of the Company's consolidated total assets or net sales to third parties, as applicable, at December 31, 2020. The referenced share capital may not reflect the taxable share capital and does not include any paid in surplus. Further information regarding the Company's subsidiaries is disclosed in Note 28 of the Consolidated Financial Statements. The combination of the Company's subsidiaries disclosed in the table below and in Note 28 of the Consolidated Financial Statements does not cover all subsidiaries of the Company.

| Country of Organization/ Entity Name | Equity Interest | Principal Place of Business | Share Capital |
|---|---|---|---|
| **China** | | | |
| Alcon (China) Ophthalmic Product Co., Ltd. | 100% | Beijing | USD 60,000,000 |
| **Japan** | | | |
| Alcon Japan Ltd. | 100% | Tokyo | JPY 500,000,000 |
| **Switzerland** | | | |
| Alcon Pharmaceuticals Ltd. | 100% | Fribourg | CHF 200,000 |
| **United States** | | | |
| Alcon Finance Corporation | 100% | Fort Worth, TX | USD 1 |
| Alcon Laboratories, Inc. | 100% | Fort Worth, TX | USD 1 |
| Alcon Research, LLC | 100% | Fort Worth, TX | USD 1,000 |
| Alcon Vision, LLC | 100% | Fort Worth, TX | USD 1,000 |

114

**A124**

## Significant Shareholders

According to the Alcon share register, the following nominee shareholders held more than 3% of the share capital of Alcon Inc. as of December 31, 2020:

| Holder | Number of Shares | Percentage |
|---|---|---|
| Chase Nominee Ltd., London (UK) | 45,288,915 | 9.06% |
| Cede & Co (DTC nominee), New York, NY (USA) | 112,244,037 | 22.46% |
| Nortrust Nominees Limited, London (UK) | 20,031,841 | 4.01% |

In addition, according solely to disclosure of shareholdings notifications filed with Alcon and the SIX Swiss Exchange ("SIX Threshold Notifications") pursuant to the obligations set forth in the Swiss Federal Act on Financial Market Infrastructure and Market Conduct in Securities and Derivatives Trading ("FMIA") and the rules and regulations promulgated thereunder, there is one shareholder that held shares representing at least 3% of the Company's total share capital as of December 31, 2020, but was not registered with the Alcon share register. This shareholder is identified in the table below.

The information required to be included in the SIX Threshold Notifications regarding this shareholder varies from the information required to be included in beneficial ownership statements filed with the SEC ("SEC Notification").

Interested persons can access the relevant SIX Threshold Notifications online at the SIX Swiss Exchange: https://www.six-exchange-regulation.com/en/home/publications/significant-shareholders.html.

The below table shows the information available to the Company, based on both notification regimes, with respect to shareholders reported to have significant positions in Alcon's share capital as of December 31, 2020:

| Holder | Number of shares and voting rights as per SIX Threshold Notification | Percentage as per SIX Threshold Notification[1] | Number of shares beneficially owned as per SEC Notification[2] | Percentage as per SEC Notification |
|---|---|---|---|---|
| BlackRock, Inc. c/o BlackRock Investment Management (UK) Limited 12 Throgmorton Ave, London, EC2N 2DL, UK | 24,679,231[3] | 5.06 % | N/A | N/A |

[1]  Percentages indicated in this column have been established based on the share capital of the Company registered with the commercial register of the Canton of Fribourg on the date on which the respective disclosure obligation pursuant to the FMIA was triggered. Furthermore, according to the FMIA, this shareholder is required to notify Alcon and the SIX Swiss Exchange only at the time it reaches, exceeds or falls below any of the thresholds set forth in the FMIA; therefore, its shareholding as of December 31, 2020 may differ from the figures indicated as per the contents of the relevant SIX Threshold Notification.

[2]  In general, under SEC rules, "beneficial ownership", for the purposes of this column, refers to shares that an entity had the power to vote or the power to dispose of and shares that such entity or individual had the right to acquire within 60 days after December 31, 2020.

[3]  Based solely on a SIX Threshold Notification dated November 9, 2019. This figure does not include its derivative position.

## Cross-Shareholdings

Neither the Company nor any of its consolidated entities has any shareholdings exceeding 5% of the holdings of capital or voting rights in any entity that also has shareholdings exceeding 5% of the holdings of the capital or voting rights in the Company or any of its consolidated entities.

A125

# Capital Structure

## Share Capital

As of December 31, 2020, the share capital of Alcon Inc. was CHF 19,988,000, fully paid-in and divided into 499,700,000 registered shares, each with a nominal value of CHF 0.04.

## Authorized and Conditional Share Capital

On January 29, 2019, the Company's annual general meeting approved the creation of an authorized share capital. According to this shareholder resolution, the Board was authorized, at any time until January 29, 2021, to increase the Company's share capital by a maximum of CHF 977,400 through the issue of up to 24,435,000 fully paid up new shares of CHF 0.04 nominal value each for the purpose of any share-based incentive or other participation plans, schemes or arrangements for directors, associates or advisors of the Company or its consolidated subsidiaries ("Employees Participation Plans"). Additional terms and conditions of this authorized share capital are set forth in Article 4a of the Articles of Incorporation (http://investor.alcon.com/governance/default.aspx).

The Board resolved on November 19, 2019 to increase the share capital by CHF 120,000 through the issuance of 3,000,000 new registered shares under the authorized share capital in order to comply with Alcon's obligations under the relevant Employees Participation Plans.

On November 10, 2020, the Board resolved to further increase the share capital by CHF 320,000 through the issuance of 8,000,000 new registered shares under the remaining authority available under the authorized share capital, i.e. 21,435,000 shares, in order comply with Alcon's obligations under the relevant Employees Participation Plans.

As of December 31, 2020, the Board remained authorized, at any time until January 29, 2021, to further increase the Company's share capital by a maximum of CHF 537,400 through the issue of up to 13,435,000 fully paid up new shares of CHF 0.04 nominal value each for the purpose of any Employees Participation Plans.

The Company did not have any conditional share capital available on December 31, 2020.

## Changes in Capital

The Company was formed on September 21, 2018 with a share capital of CHF 100,000 divided into 2,500,000 registered shares with a nominal value of CHF 0.04 each. In view of the contemplated Spin-off from the Novartis group, the Company's share capital was increased on January 29, 2019 to CHF 19,548,000 divided into 488,700,000 registered shares with a par value of CHF 0.04 each. Following the two successive increases through the authorized share capital, as described above under *"Authorized and Conditional Share Capital"*, the share capital of the Company was, as of December 31, 2020, CHF 19,988,000 divided into 499,700,000 registered shares.

No other historical data is available regarding changes in capital during the last three financial years.

## Shares, Participation Certificates and Profit-sharing Certificates

The Company has a single class of shares, being registered shares in the form of uncertificated securities (in the sense of the Swiss Code of Obligations). A portion of these uncertificated shares is issued as intermediated securities (*titres intermédiés*) within the meaning of the Swiss Federal Intermediated Securities Act via the settlement system operated by SIX SIS, with the remaining shares directly held through Computershare Trust Company, N.A. in the US (including shares held through Computershare Trust Company, N.A. via DTC). All Alcon shares have equal voting rights and carry equal entitlements to dividends. No participation certificates (*bons de participations*) or profit-sharing certificates (*bons de jouissance*) have been issued.

Based solely upon shares registered in the Alcon share registry, as of December 31, 2020, approximately 15.16% of the Company's total share capital was held in Switzerland by 82,783 registered shareholders.

## Limitations on Transferability and Nominees Registrations

The Articles of Incorporation of the Company do not provide for any limitation on transferability of shares or nominees registration.

116

**A126**

## Convertible Bonds and Options

As of December 31, 2020, Alcon did not have any convertible bonds, warrants, options or other securities granting rights to Alcon shares.

# Board of Directors

## Composition

The Board consists of eight to 13 members according to the Articles of Incorporation. As of December 31, 2020, the size of the Board was 10 members and the Board was comprised of the following members:



### F. Michael Ball, Chairman

A seasoned healthcare executive with nearly four decades of experience with global healthcare companies, including nearly a decade as the CEO of medical device and pharmaceutical companies, F. Michael Ball brings extensive executive leadership experience as well as in-depth industry and Alcon-specific knowledge to the Board. He previously held the position of Chief Executive Officer of the Alcon Division and served as a member of the Novartis Executive Committee from February 1, 2016 until June 30, 2018. He previously served as Chief Executive Officer of Hospira, Inc. from 2011 to 2015. Prior to that, Mr. Ball held a number of senior leadership positions at Allergan, Inc., including President from 2006 to 2011. Before joining Allergan, Inc. in 1995, he held roles of increasing responsibility in marketing and sales at Syntex Corporation and Eli Lilly & Co. Mr. Ball served on the board of directors of several organizations, including Kythera Biopharmaceuticals Inc., Hospira, Inc., IntraLase Corp., AdvaMed and sTec, Inc. He began his career in the healthcare industry in 1981.

He holds a Bachelor of Science and a Master of Business Administration from Queen's University in Canada.

Key Competencies: Global Business Operations, Healthcare Industry and Marketing

Age: **65**

Citizenship:
**Canada and United States**

Year of initial
appointment:
**2019**

Expiration of current
term of office:
**2021**



### Lynn D. Bleil

An experienced healthcare industry consultant with nearly three decades of experience as a Senior Partner at McKinsey & Company combined with her valuable experience as a director of publicly-held healthcare and life sciences companies, Lynn D. Bleil brings to the Board extensive US and Swiss experience, strategy and leadership. Ms. Bleil has been a member of the boards of directors of Stericycle, Inc. since 2015 (where she chairs the Nominating & Governance Committee), Sonova Holding AG since 2016 and Amicus Therapeutics, Inc. since 2018. She is a former member of the board of directors of DST Systems Inc. and Auspex Pharmaceuticals, Inc. (until their sale to SS&C Technologies Holdings, Inc. and Teva Pharmaceutical Industries, Ltd., respectively). From 1985 through 2013, Ms. Bleil was a Senior Partner at McKinsey & Company.

Ms. Bleil holds a Bachelor of Science in Chemical Engineering from Princeton University and a Master of Business Administration from the Stanford Graduate School of Business, both in the United States.

Key Competencies: Financial, Healthcare Industry and Regulatory/Public Policy

Age: **57**

Citizenship:
**United States**

Year of initial
appointment:
**2019**

Expiration of current
term of office:
**2021**



Age: **58**

Citizenship:
**Ireland and South Africa**

Year of initial
appointment:
**2019**

Expiration of current
term of office:
**2021**

### Arthur Cummings, M.D.

As a native of South Africa with a large ophthalmology practice in Ireland whose opinion is frequently sought by innovators in ophthalmology, Arthur Cummings, M.D. brings to the Board an international perspective of a physician entrepreneur and practical first-hand knowledge of the innovation that ophthalmologists seek. Dr. Cummings has been Consultant Ophthalmologist at Beacon Hospital, since 2007, and Owner and Medical Director at Wellington Eye Clinic, since 1998, both in Dublin, Ireland. Also, he has been Owner of Arthur Cummings Eye Clinic Ltd. since 2014.

Dr. Cummings holds a Bachelor of Science in Medicine and Surgery (MB. ChB.) and a Master of Medicine in Ophthalmology (M. Med) from the University of Pretoria, South Africa. Dr. Cummings is a Fellow of the College of Surgeons in South Africa (FCS SA) in Ophthalmology and a Fellow of the Royal College of Surgeons of Edinburgh (FRCSEd) in Ophthalmology.

Key Competencies: Healthcare Industry, Marketing and Technology



Age: **55**

Citizenship:
**United States**

Year of initial
appointment:
**2019**

Expiration of current
term of office:
**2021**

### David J. Endicott

A lifelong healthcare executive with leadership experience at global pharmaceutical and medical device companies, David J. Endicott is the Chief Executive Officer of Alcon and brings to the Board an in-depth knowledge of Alcon as well as the healthcare industry. He joined the Alcon Division, when still operating under the Novartis group, in July 2016 as President, Commercial and Innovation, and Chief Operating Officer. Prior to joining the Alcon Division in 2016, Mr. Endicott was President of Hospira Infusion Systems, a Pfizer company. Before joining Hospira, Mr. Endicott served as an officer and executive committee member of Allergan, Inc. where he spent more than 25 years of his career in leadership roles across Europe, Asia and Latin America, as well as the U.S. Mr. Endicott served on the board of directors of Zeltiq, Inc. and Orexigen Therapeutics, Inc. He currently serves on the board of AdvaMed.

He holds an undergraduate degree in Chemistry from Whitman College and a Master's degree in Business Administration from the University of Southern California, both in the United States.

Key Competencies: Global Business Operations, Healthcare Industry and Marketing



Age: **62**

Citizenship:
**Switzerland**

Year of initial
appointment:
**2019**

Expiration of current
term of office:
**2021**

### Thomas Glanzmann

Thomas Glanzmann, a venture capital investor with Medtech Ventures Partners where he evaluates and invests in medical device companies, brings those strategic insights and financial and risk management experience to the Board, as well as his decades long experience in the healthcare industry. Thomas Glanzmann is the Founder and has been a Partner at Medtech Ventures Partners since 2017. He has been a member of the board of directors of Grifols S.A. since 2006, including serving as Vice Chairman since 2017 and the President of its Sustainability Committee. He was President and Chief Executive Officer of Gambro AB from 2006 to 2011 and Chief Executive Officer and Managing Director of HemoCue AB from 2005 to 2006. Mr. Glanzmann was Senior Advisor to the Executive Chairman and Acting Managing Director of the World Economic Forum from 2004 to 2005. From 1988 to 2004, Mr. Glanzmann worked in various positions at Baxter International Inc., including President of Baxter Bioscience, Chief Executive Officer of Immuno International Co., Ltd. and President of Europe Biotech Group. In 2004, he was a Senior Vice President and Corporate Officer of Baxter AG.

He holds a Bachelor of Science in Political Science from Dartmouth College in the United States, a Master of Business Administration from the IMD Business School in Switzerland and a Board of Directors Certification from the UCLA Anderson School of Management in the United States.

Key Competencies: Global Business Management, Healthcare Industry and Technology



Age: 60

Citizenship:
**United States**

Year of initial
appointment:
**2019**

Expiration of current
term of office:
**2021**

### D. Keith Grossman

D. Keith Grossman, with more than 30 years of experience with medical devices and supplies, including as Chief Executive Officer of publicly held healthcare companies, brings to the Board his executive and board leadership experience as well as operational and strategic planning expertise in the healthcare industry. He has been the Chairman, Chief Executive Officer and President of Nevro, Inc. since March 2019. He has also been Chairman of the board of directors of Outset Medical, Inc. since 2014. He was President and Chief Executive Officer of Thoratec Corporation from 1996 to 2006 and from 2014 to 2015 and was a member of the board of directors from 1996 to 2015. Mr. Grossman was Chief Executive Officer and a member of the board of directors at Conceptus, Inc. from 2011 to 2013. He was Managing Director and Senior Advisor at TPG Capital, L.P. from 2007 to 2011. Mr. Grossman also served as a member of the board of directors of ViewRay, Inc. from 2018 to 2021, Zeltiq, Inc., as Lead Director, from 2013 to 2017, Intuitive Surgical, Inc. from 2004 to 2010 and Kyphon Inc. in 2007 and served on a number of private boards of directors.

Mr. Grossman holds a Bachelor of Science in Animal Sciences from The Ohio State University and Master of Business Administration in Finance from Pepperdine Graziadio Business School at Pepperdine University, both in the United States.

Key Competencies: Healthcare Industry, International Supply Chain and Technology

119

A129



### Scott Maw

An experienced financial executive with over two decades of experience at global companies, including Chief Financial Officer of Starbucks Corporation, Scott Maw contributes to the Board his extensive understanding of complex financial analysis and reporting and internal controls over financial reporting of a global company. He has been a member of the board of directors of Avista Corporation since 2016, Chipotle Mexican Grill Inc. since 2019, where he is Chair of the Audit Committee, and Root, Inc. since 2020. Mr. Maw is also member of the board of trustees of Gonzaga University. Previously, he was Executive Vice President and Chief Financial Officer at Starbucks Corporation from 2014 until the end of 2018, Senior Vice President in Corporate Finance from 2012 to 2013 and Senior Vice President and Global Controller from 2011 to 2012. From 2010 to 2011, he was Senior Vice President and Chief Financial Officer of SeaBright Holdings, Inc. From 2008 to 2010, he was Senior Vice President and Chief Financial Officer of the Consumer Bank at JP Morgan Chase and Company. Prior to this, Mr. Maw held leadership positions in finance at Washington Mutual, Inc. from 2003 to 2008 and GE Capital from 1994 to 2003.

Mr. Maw holds a Bachelor of Business Administration in Accounting from Gonzaga University in the United States.

Key Competencies: Financial, Global Business Operations and Consumer Industry

Age: **53**

Citizenship:
**United States**

Year of initial appointment:
**2019**

Expiration of current term of office:
**2021**



### Karen May

Karen May, who possesses a unique combination of having been both a financial executive and a human resource executive of global companies, brings to the Board extensive operational, financial and human capital strategy experience. Ms. May has been a member of the board of directors of Ace Hardware Corporation, where she is Chair of the Audit Committee, since 2017. Previously, Ms. May was on the board of directors of MB Financial, Inc., where she served as Chair of the Compensation Committee until 2019. From 2012 to 2018, she was Executive Vice President and Chief Human Resources Officer at Mondelez International, Inc. (name changed from Kraft Foods, Inc. after the spin-off of select Kraft North American businesses in 2012). From 2005 to 2012, Ms. May was the Executive Vice President and Chief Human Resources Officer of Kraft Foods, Inc. Between 1990 and 2005, she held various positions in Human Resources and Finance at Baxter International Inc., including Corporate Vice President and Chief Human Resources Officer, Vice President, International Finance, and Vice President, Division Controller. Prior to Baxter International Inc., Ms. May was a Certified Public Accountant in the audit practice of Price Waterhouse.

Ms. May holds a Bachelor of Science in Accounting from the University of Illinois in the United States.

Key Competencies: Financial, Consumer Industry and Human Capital Management

Age: **62**

Citizenship:
**United States**

Year of initial appointment:
**2019**

Expiration of current term of office:
**2021**

A130



Age: **52**

Citizenship:
**Switzerland**

Year of initial
appointment:
**2019**

Expiration of current
term of office:
**2021**

### Ines Pöschel

Ines Pöschel brings to the Board not only her deep experience as a Swiss lawyer, particularly in corporate governance, capital markets and mergers and acquisitions, but her extensive leadership roles in public policy with her appointments on government and public commissions. Ms. Pöschel has been a Partner at Kellerhals Carrard Zurich KIG since 2007. She has been a member of the board of directors of Implenia AG since 2016 and Graubündner Kantonalbank since 2018 and serves on the board of directors of several non-listed Swiss companies. Ms. Pöschel is also a member of the Swiss Federal expert commission for commercial register. From 2002 to 2007, Ms. Pöschel was a Senior Associate at Bär & Karrer AG. She was a Senior Manager at Andersen Legal LLC from 1999 to 2002.

Ms. Pöschel has a Master in Law from the University of Zurich in Switzerland, and passed the Swiss Bar Exam in 1996.

Key Competencies: Government Relations, Legal/Governance and Regulatory/Public Policy



Age: **60**

Citizenship:
**Switzerland**

Year of initial
appointment:
**2019**

Expiration of current
term of office:
**2021**

### Dieter Spälti, Ph.D.

As an executive of Spectrum Value Management Ltd., the family office of an iconic industrial Swiss family, Dr. Spälti has overseen all of its investments for nearly two decades, which allows Dr. Spälti to bring to the Board significant financial and operational experience in addition to his previous consulting experience with numerous industrial, financial and technology firms in Europe, the US and Southeast Asia. Dr. Spälti has been Chief Executive Officer and a member of the board of directors at Spectrum Value Management Ltd., Switzerland since 2006 and Managing Partner from 2002 to 2006. He has been a member of the board of directors at LafargeHolcim Ltd. since 2003. Dr. Spälti served, or continues to serve, on the board of directors of various non-listed Swiss and international companies, including several that are controlled by the same beneficial owner. Dr. Spälti was a Partner at McKinsey & Company from 1993 to 2001.

He holds a Ph.D. in Law from the University of Zurich, Switzerland.

Key Competencies: Financial, Legal/Governance and Technology

121

**A131**

## Independence and Executive Function

The independence of Board members is a key element of Alcon's corporate governance framework. Therefore, Alcon has developed a strong set of independence criteria for its board members based on international best practice standards, including the Swiss Code of Best Practices for Corporate Governance and the NYSE standards, which can be found in the Alcon Board Regulations, available under the investor relations portion of the Alcon website (https://investor.alcon.com/governance/governance/default.aspx).

The Board assesses the independence of its Board members on a regular basis, at least annually. As of December 31, 2020, all Board members qualified as independent, except for F. Michael Ball, David J. Endicott and Dr. Arthur Cummings.

Other than (i) F. Michael Ball, who previously served as Chief Executive Officer of the Alcon Division of Novartis and as a member of the Novartis Executive Committee from February 1, 2016 until June 30, 2018 and (ii) David J. Endicott, who currently serves as Alcon's Chief Executive Officer, no Board member was a member of the management of the Company or any other Alcon consolidated subsidiary in the last three financial years up to December 31, 2020.

Other than Dr. Arthur Cummings, who, in his capacity as an ophthalmologist, has provided certain consulting services, including assistance with various clinical trials, to Alcon, no Board member has a significant business relationship with the Company or with any other Alcon consolidated subsidiary.

David J. Endicott is an executive member of the Board by reason of his function as Chief Executive Officer of Alcon. All other members of the Board are non-executive directors since none of them carries out operational management tasks within Alcon.

As of December 31, 2020, none of the Board members held any official government functions or political posts.

## Limitations of Number of Mandates

No member of the Board may hold more than 10 additional mandates in other companies, of which no more than four shall be in other listed companies. Chairs of the board of directors of other listed companies count as two mandates. Mandates in different legal entities which are under joint control are deemed one mandate. Further details can be found in Article 34 of the Articles of Incorporation, available under https://investor.alcon.com/governance/governance/default.aspx.

## Elections and Terms of Office

The Board members, the Chair of the Board and the members of the Compensation Committee shall be elected individually by the General Meeting of Shareholders for a term of office lasting until completion of the next Annual General Meeting of Shareholders.

There is no mandatory term limit for Board members.

The rules in the Articles of Incorporation reflect the statutory legal provisions regarding the appointment of the Chairman, the members of the Board, the members of the Compensation Committee and the independent proxy.

## Internal Organizational Structure

### General Principles and Areas of Responsibilities

The Board constitutes itself in compliance with legal requirements and taking into consideration the resolutions of the General Meeting of Shareholders. It shall elect one or two Vice-Chairs. It shall appoint a secretary, who need not be a member of the Board.

The Board is the ultimate governance body of the Company, under the leadership of the Chair. F. Michael Ball has been the Chair of the Board since the Spin-off from Novartis. In this role, Mr. Ball leads the Board to represent the interests of all stakeholders. The Vice Chair has been held by D. Keith Grossman, also acting in this role as the Senior Independent Director. The duties of Mr. Ball and Mr. Grossman in their respective functions are laid out in Articles 20 and 21, respectively, of the Alcon Board Regulations (https://investor.alcon.com/governance/governance/default.aspx).

122

A132

The Board is responsible for the duties assigned to it by the Articles of Incorporation and the Alcon Board Regulations, which include the overall direction and supervision of management. It holds the ultimate decision-making authority for Alcon, with the exception of any decisions reserved to the shareholders. In performing its tasks, the Board follows the highest standards of ethics, integrity and governance. It undertakes annually a self-assessment process to evaluate its performance, the performance of its committees and the individual performance of its members.

Within the limits of the law and the Articles of Incorporation, the Alcon Board has delegated certain of its duties to the Executive Committee and the Board's Committees.

## Delegation to the Executive Committee

The Alcon Board has delegated to the Executive Committee the management of the business in accordance with the terms set forth in the Alcon Board Regulations. Such delegation has been formalized in Article 12 of the Alcon Board Regulations and further regulated in a set of internal regulations. Under the lead of the Chief Executive Officer, the Executive Committee is responsible for the management of the business and functions as a coordination committee, independent of any legal entity of the Alcon Group. A non-exhaustive list of the duties assigned to the Executive Committee can be found in Article 23 of the Alcon Board Regulations (https://investor.alcon.com/governance/governance/default.aspx).

## Delegation to the Board's Committees

The Board's Committees enable the Alcon Board to work in an efficient and effective manner, ensuring a thorough review and discussion of matters, while giving the Alcon Board more time for deliberation and decision-making. For this purpose, the Alcon Board has delegated certain of its duties to each of its four permanent committees, i.e. the Audit and Risk Committee, the Compensation Committee, the Governance and Nomination Committee and the Innovation Committee. Details of the duties, responsibilities and decision-making powers of each committee can be found in the respective committee's charter, contained in the Alcon Board Regulations, available under https://investor.alcon.com/governance/governance/default.aspx.

In 2020, the composition of the respective Board's Committees was as follows[1]:

| Name | Audit and Risk Committee | Compensation Committee | Governance and Nomination Committee | Innovation Committee |
|---|---|---|---|---|
| F. Michael Ball | | | Member | |
| Lynn D. Bleil | Member | | | Member |
| Arthur Cummings | | | | Member |
| David J. Endicott | | | | |
| Thomas Glanzmann | | Member | Member | Chair |
| D. Keith Grossman | | Member | Chair | Member |
| Scott Maw | Chair | | | |
| Karen May | Member | Chair | | |
| Ines Pöschel | | Member | Member | |
| Dieter Spälti | Member | | | |

[1] Effective May 6, 2020, the Compensation, Governance and Nomination Committee ("CGNC") split into two distinct committees, a Compensation Committee ("CC") and a Governance and Nomination Committee ("GNC") to enable the two committees to better focus on their respective key responsibilities.

123

**A133**

## Audit and Risk Committee

The Audit and Risk Committee consisted of four members in 2020, all of whom were determined by the Board to be independent and in possession of the financial literacy and accounting or related financial management expertise, as defined in the NYSE standards. The Audit and Risk Committee meets and consults regularly with the management, the Alcon Internal Audit function, the independent external auditors and external consultants. The Audit and Risk Committee regularly reports to the full Board on its decisions and deliberations.

The primary responsibilities of this committee include:

- supervising external auditors and selecting and nominating external auditors for election at the Annual General Meeting of shareholders;

- overseeing internal auditors;

- overseeing accounting policies, financial controls and compliance with accounting and internal control standards;

- approving quarterly financial statements and financial results releases;

- overseeing internal control and compliance processes and procedures;

- overseeing compliance with laws and external and internal regulations;

- ensuring that Alcon has implemented and maintained an appropriate and effective risk management system and process;

- ensuring that all necessary steps are taken to foster a culture of risk-adjusted decision-making without constraining reasonable risk-taking and innovation;

- approving guidelines and reviewing policies and processes; and

- reviewing with management, internal auditors and external auditors the identification, prioritization and management of risks; the accountabilities and roles of the functions involved in risk management; the risk portfolio; and the related actions implemented by management.

## Compensation Committee

The Compensation Committee consisted of four members in 2020, all of whom were determined by the Board to be independent. The Compensation Committee meets and consults regularly with management and external consultants. The Compensation Committee regularly reports to the full Board on its decisions and deliberations.

The primary responsibilities of this committee include:

- developing a compensation philosophy in line with the principles set forth in the Articles of Incorporation and submit to the Alcon Board;

- providing oversight for Alcon's human capital strategy, including talent management, CEO and ECA succession planning, diversity and inclusion initiatives and pay equity measures;

- designing, reviewing and recommending to the Alcon Board compensation policies and programs;

- reviewing and approving a peer group of companies for executive compensation comparisons;

- advising the Alcon Board on the compensation of Directors and the Chief Executive Officer of Alcon;

- determining the compensation of ECA members;

- supporting the Alcon Board in preparing the proposals to the General Meeting of Shareholders regarding the compensation of the members of the Alcon Board and ECA;

- preparing the annual compensation report and submitting it to the Alcon Board for approval;

- establishing executive and director stock ownership guidelines and stock trading policies and monitoring compliance with such policies; and

- overseeing communication and engagement on executive compensation matters with shareholders and their advisors.

### Governance and Nomination Committee

The Governance and Nomination Committee consisted of four members in 2020. The Governance and Nomination Committee meets and consults regularly with management and external consultants. The Governance and Nomination Committee regularly reports to the full Board on its decisions and deliberations.

The primary responsibilities of this committee include:

- designing, reviewing and recommending corporate governance principles to the Alcon Board;

- overseeing Alcon's strategy and reputation regarding ESG matters and annually approve Alcon's Corporate Responsibility Report;

- establishing criteria and identifying candidates for election as Directors;

- assessing existing Directors and recommending to the Alcon Board whether they should stand for re-election;

- developing and reviewing an onboarding program for new Directors and an ongoing education plan for existing Directors;

- reviewing periodically the Articles of Incorporation with a view to reinforcing shareholder rights;

- reviewing periodically the composition and size of the Alcon Board and its committees;

- direct periodic assessments of the Board, directors and committees;

- reviewing annually the independence status of each Director; and

- reviewing directorships and agreements of Directors for conflicts of interest and dealing with conflicts of interest.

The ESG topic is considered of key importance within the Alcon governance framework. Under supervision and guidance of the Governance and Nomination Committee, a dedicated Executive Steering Committee has been created to implement Alcon's ESG strategy and conduct day-to-day activities. This Executive Steering Committee consists of senior representatives of Alcon key functions, as listed in the following chart:



125

A135

Innovation Committee

The Innovation Committee consisted of four members in 2020. The Innovation Committee meets and consults regularly with management. The Innovation Committee regularly reports to the full Board on its decisions and deliberations.

The primary responsibilities of this committee include:

- providing counsel to the Alcon Board and management in the area of technology, application of technology and new business models;

- reviewing and making recommendations to the Board on internal pipeline and external investments (e.g. potential acquisitions, equity investments, alliances and collaborations) relative to Alcon's business portfolio, forecasted capital and operating capacity during the strategic and operating reviews;

- reviewing, evaluating and advising the Board on the strategic direction and competitiveness of the innovation pipeline through the evaluation of key innovation metrics;

- reviewing and recommending for approval any innovation goals/targets that may be incorporated into Alcon's incentive compensation plans;

- assisting the Board with oversight, risk management and evaluation of management's criteria for selecting major new R&D and BD&L projects, assessing progress against major milestones, budget execution and post-launch revenue impact;

- reviewing, discussing and informing the Board of significant emerging science, technology, programs, issues or trends relevant to Alcon; and

- reviewing such other matters in relation to Alcon research and development, technology and innovation programs as the committee may, in its own discretion, deem desirable in connection with its responsibilities.

## Frequency, Duration and Attendance of the Meetings of the Board of Directors and its Committees

The Board and its Committees are convened as often as the conduct of the business may require.

In 2020, the Board and its Committees met as follows:

| | Board of Directors | Audit and Risk Committee | Compensation Committee | Governance and Nomination Committee[3] | Innovation Committee |
|---|---|---|---|---|---|
| Number of meetings[1] | 8 | 11 | 8 | 4 | 3 |
| Approximate average duration[2] | 5 hrs 10 min | 1 hrs 40 min | 1 h 50 min | 1 h 15 min | 2 hrs 10 min |
| Overall attendance | 100% | 100% | 100% | 100% | 100% |

126

**A136**

During 2020, each Board member attended all of the meetings of the Board and each Committee on which he or she serves, as represented below:

| Meeting attendance | Board of Directors | Audit and Risk Committee | Compensation Committee | Governance and Nomination Committee | Innovation Committee |
|---|---|---|---|---|---|
| | Number of Meetings 8 | Number of Meetings 11 | Number of Meetings 8 | Number of Meetings 4 | Number of Meetings 3 |
| F. Michael Ball | 8 | | | 4 | |
| Lynn D. Bleil | 8 | 11 | | | 3 |
| Arthur Cummings | 8 | | | | 3 |
| David J. Endicott | 8 | | | | |
| Thomas Glanzmann | 8 | | 8 | 4 | 3 |
| D. Keith Grossman | 8 | | 8 | 4 | 3 |
| Scott Maw | 8 | 11 | | | |
| Karen May | 8 | 11 | 8 | | |
| Ines Pöschel | 8 | | 8 | 4 | |
| Dieter Spälti | 8 | 11 | | | |

1   The number of meetings includes physical meetings as well as meetings held through videoconference or conference call.

2   The approximate average duration does not include dinners, lunches and breaks.

3   Until May 6, 2020, the Governance and Nomination Committee was combined with the Compensation Committee as the Compensation, Governance and Nomination Committee ("CGNC"). The three CGNC meetings occurring prior to May 6 are included in the Compensation Committee totals. Prior to the split of the committees, governance and nomination matters were addressed in the CGNC meetings.

## Board Evaluation and Education

The Governance and Nomination Committee and the Chair of the Board coordinate an annual self-evaluation of the Board and its Committees, which included individual interviews with the Board Chair and the completion of a confidential survey by Board members. The Chair summarizes for the Board the results of the evaluation, and any findings are appropriately addressed. For example, in 2020, the committee structure was reviewed and the Board decided to create the Governance and Nomination Committee as a separate committee to better focus on ESG matters. In addition, each Committee conducts its own self-evaluation annually.

The Alcon Board recognizes the value of independent development and learning by its members, and in 2020, it established a Director Education Program for its members. This program provides for internal and external speakers on trending topics, experiential learning of Alcon and its industry through site tours and product demonstrations and, at each Board member's option, externally provided coursework. The intent of the Director Education Program is to ensure Alcon Board members are well-versed in matters related to Alcon, its business and the rapidly changing corporate governance environment.

127

**A137**

## Information and Control System of the Board vis-à-vis the Management

The Alcon Board ensures that it receives through several channels sufficient information from the Executive Committee to perform its supervisory duties and to make the decisions that are reserved to it by law, i.e. its non-delegable decisions.

### Information to the Board of Directors

The Alcon Board Regulations confer to the members of the Alcon Board the right to have full and unrestricted access to management and employees of the Company and its subsidiaries in the execution of their duties. Also, the Chief Executive Officer regularly informs the Alcon Board on business developments, including significant transactions and risk issues. The Alcon Board and its Committees meet as often as required with the Chief Executive Officer and members of the Executive Committee or other members of the senior management. Further, the Alcon Board may invite, in accordance with the Alcon Board Regulations, external advisors to attend board or committee meetings in order to obtain a third party independent perspective on certain topics. Information is further communicated to the Alcon Board through regular reports (please refer to the section below "*Alcon Management Information System*").

### Alcon Management Information System

The Alcon Board receives monthly reports on the financial performance of the Company, including the performance of the Surgical and Vision Care franchises. On a quarterly basis, prior to the release of each quarter's results, the Board receives the consolidated financial statement information and an outlook of the full-year results in accordance with IFRS and "core" results together with related commentary.

On an annual basis, the Board receives and approves the financial targets for the following year. Mid-year, the Board met for a strategic review of the business and approved the strategic plan for the next five years.

Additionally, throughout the year, the Board directly or through its Committees also received reports on, among other things:

- the enterprise risk management program and risk assessment reports;
- the compliance program;
- the internal audit function;
- manufacturing and technical operations;
- research & development and product pipeline;
- commercial strategies and product launches;
- legal matters;
- competitive developments; and
- industry trends.

In matters of significance, the Board receives direct, immediate information.

### Internal Audit

The purpose of the internal audit function is to review Alcon's financial, operational, IT and compliance activities to review compliance with laws, regulations and internal policies. It also supports Alcon's efforts to maintain accurate and timely financial reporting while seeking to add value by suggesting improvements to Alcon's operations and to assist Alcon in achieving its strategic and financial objectives. Internal audit is led by the Chief Audit Executive ("CAE") who functionally reports to the Audit and Risk Committee. The CAE is responsible for the development, review and modification of Alcon's internal audit policies and procedures. The CAE shall ensure effectiveness and efficiency of the internal control framework with existing policies and regulations and proposes remediation actions where deficiencies were identified. The CAE periodically submits to the Audit and Risk Committee reports on the activities of the internal audit function. In 2020, internal audit was involved in a total of 37 audit engagements. The results and remediation status of these audit engagements are reported to the Audit and Risk Committee on a periodic basis.

A138

## Internal Control System

Alcon's internal control system is designed to provide reasonable assurance to the Board and management regarding the reliability of financial reporting and accounting policies and the preparation and the presentation of the Company's financial statements. In 2020, Alcon fully implemented an internal control system that has been fully tested for effectiveness. The Audit and Risk Committee has ultimate responsibility to oversee the adequacy and effectiveness of internal control over financial reporting.

## Risk Management

The Audit and Risk Committee has the responsibility to ensure the implementation of an appropriate and effective risk management system and process and to foster a culture of risk-adjusted decision-making without constraining reasonable risk taking and innovation. It approves guidelines and review policies and processes. In addition, the Audit and Risk Committee reviews with management, internal auditors and external auditors, the identification, prioritization and management of the risks, the accountabilities and roles of the functions involved with risk management, the risk portfolio and the related actions implemented by management. The Audit and Risk Committee informs the Executive Committee and the Board on a periodic basis on the risk management system and on the most significant risks and how these are managed. The CAE supports the Audit and Risk Committee and perform appropriate reviews of Alcon's risk management strategy.

Alcon's key risk management tool is the Enterprise Risk Management ("ERM") program, the purpose of which is to help execute on Alcon's strategy within the boundaries of regulations and improve the probability for achieving Alcon's strategic and financial objectives. Alcon's vision is to design a sustainable and appropriately scaled ERM program to proactively manage existing and emerging threats and opportunities to the business. The ERM program aims in particular to provide the business with the following: (i) operation discipline and rigor to enable business continuity, creation and preservation of value, (ii) forums for frequent risk discussions and escalation of relevant items with leadership, and (iii) guidance, techniques and support to identify, assess (e.g. likelihood and impact), manage, monitor and report on major risks, including proper mitigation if necessary.

## Compliance Function

As part of its global control system, Alcon has also established a comprehensive global integrity and compliance program, under the supervision of the Audit and Risk Committee. The program is led by the Global Head, Integrity and Compliance under the functional leadership of Alcon's General Counsel and is intended to help prevent, detect and mitigate compliance risk across the organization. The program is built on a culture and expectation of compliance at all levels. The fundamental elements of the program include dedicated resources to address compliance globally, formal compliance governance, a global intake process to receive questions and concerns (including through the Alcon's Ethics Helpline), written standards, communications, training, multiple levels of risk-based auditing and monitoring, review of alleged misconduct and corrective/disciplinary actions for violations. The Audit and Risk Committee of the Board receives periodic updates on the performance of the Integrity and Compliance program and compliance related matters. The program also includes compliance committees, which have been established at the corporate, regional and country-levels and include participation by the Executive Committee and other senior leadership to provide strategic direction and oversight relating to the management of compliance risks for Alcon. Policies are reviewed and updated on a regular basis to address changes in laws and regulations and to strengthen compliance.

# Executive Committee

## Composition of the Executive Committee

As of December 31, 2020, the Executive Committee of Alcon was composed of the following members:



### David J. Endicott, Chief Executive Officer

Please refer to the biography set forth under "Board of Directors."

Age: **55**

Citizenship:
**United States**



### Tim C. Stonesifer, Chief Financial Officer

Tim Stonesifer has been the Chief Financial Officer since April 2019. Prior to joining Alcon, he had served as Executive Vice President and Chief Financial Officer at Hewlett Packard Enterprise from November 2015 through September 2018. Prior to that role, Mr. Stonesifer acted as Senior Vice President and Chief Financial Officer, Enterprise Group at HP Co. since 2014. Before joining HP Co., he served as Chief Financial Officer of General Motors' International Operations from 2011 to 2014. Previously, he served as Chief Financial Officer of Alegco Scotsman, a storage company, from 2010 to May 2011; Chief Financial Officer of Sabic Innovative Plastics (formerly GE Plastics) from 2007 to 2010; and various other positions at General Electric since joining the company in 1989.

Mr. Stonesifer holds a Bachelor of Arts in Economics from the University of Michigan in the United States.

Age: **53**

Citizenship:
**United States**



### Laurent Attias, Head Corporate Development, Strategy, Business Development and Licensing (BD&L) and Mergers and Acquisitions (M&A)

Laurent Attias is Head of Corporate Development, Strategy, BD&L and M&A where he leads the development of long-term strategic plans for the Surgical and Vision Care franchises of Alcon and is responsible for the Alcon's BD&L, M&A, partnerships and alliance activities, a role which he has held since 2012. Since 1994 when Mr. Attias joined Alcon, he has had various roles with increasing responsibility beginning with positions in Alcon's Sales and Marketing functions and then holding the positions of Vice President, Refractive Sales and Marketing from 2002 to 2007; Vice President/General Manager of Alcon Canada from 2007 to 2009; Vice President, Central & Eastern Europe, Italy and Greece from 2009 to 2010; and President, Europe, Middle East and Africa ("EMEA") from 2010 to 2012.

Mr. Attias holds both a Bachelor of Business Administration in Marketing and a Master of Business Administration from Texas Christian University in the United States.

Age: **53**

Citizenship:
**France and United States**

A140



Age: **50**

Citizenship:
**United Kingdom**

### Ian Bell, President International

Ian Bell has been the President-International, overseeing the Europe, Russia, Middle East and Africa, Asia Pacific, Japan and Latin America and Caribbean markets, since January 2019. He joined Alcon in March 2016 as President of EMEA. Prior to joining Alcon, Mr. Bell served as Corporate Vice President and President of the EMEA region for Hospira since 2014. Mr. Bell was Corporate Vice President and President of Allergan, Inc.'s Asia Pacific region, based in Singapore, from 2008 to 2014. Mr. Bell joined Allergan in 2005 as Vice President and Managing Director of its neurosciences division for the EMEA region. He began his career at GlaxoSmithKline, where he held roles of increasing responsibility and scope in sales, marketing and strategy for more than 10 years.

Mr. Bell was awarded the degree of Bachelor of Arts with honors in Economics from the University of York in the United Kingdom.



Age: **53**

Citizenship:
**Mexico and United States**

### Leon Sergio Duplan Fraustro, President North America

Sergio Duplan has served as President-North America, overseeing the United States and Canada markets since 2015. Mr. Duplan joined Alcon in 2012 and served as Alcon's President of Latin America and Canada for Alcon for three years. Mr. Duplan began his career with Novartis in 2004, as Vice President of Sales in General Medicines, in Mexico then served as Head of Marketing and Sales for Latin America, General Medicines, Pharma from 2006 to 2008 and then Country Pharma Organization Head and Country President of Novartis Mexico from 2008 to 2012. Prior to joining Novartis, Mr. Duplan held several positions of increasing responsibility in Sales, Finance and Country Management at Procter & Gamble and Eli Lilly & Co. He is also currently a board member of The Alcon Foundation.

Mr. Duplan holds a Bachelor degree in Industrial Engineering from Universidad Iberoamericana in Mexico and a Master of Business Administration from The Wharton School at the University of Pennsylvania in the United States.



Age: **54**

Citizenship:
**United States**

### Michael Onuscheck, President Global Businesses and Innovation

Michael Onuscheck has been the President-Global Businesses and Innovation since November 2018 where he is responsible for driving the innovation pipeline for Alcon. Mr. Onuscheck joined Alcon in 2015 as Alcon's President and General Manager of the Global Surgical franchise from Boston Scientific, where he had spent 10 years in leadership positions of increasing responsibility, including overseeing the company's business operations in Europe and Russia from 2011 to 2015 and serving as President for its Neuromodulation division from 2008 to 2011. Prior to joining Boston Scientific, Mr. Onuscheck held a variety of management positions at Medtronic in spinal reconstructive surgery and stereotactic image guided surgery and various sales and marketing positions for Pfizer.

Mr. Onuscheck earned his degree in Business Administration and Psychology from Washington and Jefferson College in the United States.

A141



**Age: 56**

Citizenship:
**United States**

### Rajkumar Narayanan, Operational Strategy and Chief Transformation Officer

Mr. Narayanan has been the Senior Vice President Operational Strategy and Chief Transformation Officer since April 2019 and is responsible for leading the development and implementation of Alcon's transformation program. He joined Alcon in June 2017 as President Asia Pacific Region from Allergan, Inc., where he worked for 22 years in roles of increasing responsibility, including Senior Vice President Asia Pacific Region from 2014 to 2017; Vice President and Managing Director of the Medical Aesthetic Franchise for Europe Africa and Middle East from 2011 to 2014; and Vice-President, Greater China & Japan from 2008 to 2011. Prior to those roles, Mr. Narayanan was a part of Allergan's Finance function in a number of Country, Region and Corporate Finance roles. Mr. Narayanan started his career in finance with Hindustan Unilever India in 1987.

Mr. Narayanan holds a Bachelor of Science degree in Accounting and Finance from Mumbai University. He is also Chartered Accountant and Cost and Works Accountant in India.

## Role of the Executive Committee

The members of the Executive Committee are appointed by the Alcon Board. In accordance with the Articles of Incorporation and the Alcon Board Regulations, the Alcon Board delegated the responsibility for the management of the business to the Executive Committee, under the lead of the Chief Executive Officer.

The Executive Committee shall in particular (i) develop strategies and policies and implement those upon approval by the Alcon Board, (ii) coordinate and monitor the group's functions to achieve the business targets, (iii) ensure the efficient operation of the group, (iv) manage the proper provision and use of capacity and financial and other resources within the group and (v) ensure the development and succession of the senior management.

Alcon has not entered into any management agreements with any third parties pursuant to which Alcon would delegate any business management responsibilities to any such third parties.

As of December 31, 2020, none of the members of the Executive Committee held any official functions or political posts.

## Limitations of Number of Mandates

No member of the Executive Committee may hold more than 6 additional mandates in other companies, of which no more than 2 additional mandates shall be in other listed companies. Each of these mandates shall be subject to approval by the Board. Members of the Executive Committee are not allowed to hold chairs of the board of directors of other listed companies. Further details can be found in Article 34 of the Articles of Incorporation, available under https://investor.alcon.com/governance/governance/default.aspx.

## Compensation, Shareholdings and Loans

Please refer to "Item 6.B - Compensation".

# Shareholders' Participations Rights

## Voting-right Restrictions and Representation

Alcon has not imposed any restriction regarding share ownership or voting rights. Nominees shareholdings are not subject to any limitations. The right to vote at Alcon general meetings may only be exercised by a shareholder, usufructuary or nominee who is duly registered in Alcon share register on the record date for the applicable general meeting. Shareholders can be represented at general meetings by the independent proxy or by a third person authorized by written proxy who does not need to be a shareholder. As required by law, shareholders will also be given the opportunity to issue their voting instructions to the independent proxy electronically through an online voting platform.

Each Alcon share has the right to one vote. Shares held by the Company or any of its consolidated subsidiaries are not entitled to vote. Votes are taken either by a show of hands or by electronic voting, unless the General Meeting of Shareholders resolves to have a ballot or where a ballot is ordered by the chairman of the meeting.

## Statutory Quorums

Unless otherwise required by law, the general meeting passes resolutions and elections with the absolute majority of the votes duly represented.

According to Article 704 of the Swiss Code of Obligation, the following shareholders' resolutions require the approval of at least two thirds of the votes represented at a General Meeting of Shareholders: (1) an alteration of Alcon's corporate purpose; (2) the creation of shares with increased voting powers; (3) an implementation of restrictions on the transfer of registered shares and the removal of such restrictions; (4) an authorized or conditional increase of the share capital; (5) an increase of the share capital by conversion of equity, by contribution in kind, or for the purpose of an acquisition of property and the grant of special rights; (6) a restriction or an exclusion of shareholders' pre-emptive rights; (7) a change of Alcon's registered office; (8) Alcon's dissolution; or (9) any amendment to the Articles of Incorporation which would create or eliminate a supermajority requirement.

Swiss law further provides for a qualified majority for certain special resolutions, such as in case of merger or demerger.

## Convocation of General Meetings

The Annual General Meeting shall be held within six months after the close of the financial year of the Company. Extraordinary General Meetings may be convened upon request of the Alcon Board, the auditors or one or more shareholders representing in aggregate not less than 10% of the Company's share capital. At least 20 days before the general meeting, the invitation including the agenda is published in the Swiss Gazette of Commerce and mailed to the registered shareholders.

## Agenda

One or more Alcon shareholders whose combined shareholdings represent an aggregate nominal value of at least CHF 1 million may demand that an item be included in the agenda of a General Meeting of Shareholders. Such a demand must be made in writing at the latest 45 days before the meeting and shall specify the items and the proposals of such a shareholder.

## Registration in the Share Register

The share register of the Company is a non-public register, subject to confidentiality and privacy and data protections imposed on Alcon to protect registered shareholders. Alcon shares can be voted only if their relevant holder is registered in the Alcon share register by the record date determined by the Alcon Board. The Articles of Incorporation do not provide for any specific rule regarding the closure of the share register.

# Changes of Control and Defense Measures

## Duty to Make an Offer

Under the Swiss Financial Market Infrastructure Act, shareholders and groups of shareholders acting in concert who acquire more than 33.3% of Alcon shares would be under an obligation to make an offer to acquire all remaining Alcon shares. Alcon has neither opted out from the mandatory takeover offer obligation nor opted to increase the threshold for mandatory takeover offers in the Articles of Incorporation.

## Clauses on Change of Control

In accordance with the rules of the Ordinance against Excessive Compensation in Listed Companies, Alcon does not provide severance payments upon a change of control or "golden parachute" provisions in its agreements with its Directors, Executive Committee members or other members of senior management. Alcon's Long Term Incentive Plan and Deferred Bonus Stock Plan, each applicable to all employee participants including Executive Committee members, provide for double trigger accelerated vesting of outstanding stock awards in the event a participant leaves the company for "good

133

**A143**

reason" or Alcon terminates the employee without "cause," as such terms are defined in the plans, within two years following a change of control. If such a double trigger event occurs, the participant's outstanding unvested awards would vest in full. In the case of Performance Share Units, awards less than 50% vested would vest at target and awards more than 50% vested would vest in accordance with Alcon's actual performance, as determined by the Compensation Committee.

# Auditors

## Duration of the Mandate and Terms of Office of the Auditors

PricewaterhouseCoopers SA, Switzerland ("PwC Switzerland"), is the statutory auditor of the Company since 2019 and shall conduct the audit activities required by Swiss law and the related SIX regulations. It was re-elected on May 6, 2020 for a term of one year until the 2021 Company's Annual General Meeting. Mike Foley has been the auditor in charge of the statutory audit since 2019. Alcon has a policy to rotate the lead audit partner of the statutory auditor at least every five years.

Separately, on May 5, 2020, the Company appointed PricewaterhouseCoopers LLP, United States ("PwC US"), for a term of one year, as its independent registered accounting firm to conduct the audit activities required by US law and the related NYSE regulations. The appointment of PwC US does not require approval of the Company's shareholders.

## Auditing Fees and Additional Fees

The following table sets forth the amount of audit fees, audit-related fees, tax fees and all other fees billed or expected to be billed in aggregate by PwC Switzerland, PwC US and any other member firm of PricewaterhouseCoopers International Limited that rendered audit and related services to any member of Alcon, for the fiscal years ended December 31, 2020 and December 31, 2019:

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Audit fees | 10.3 | 11.7 |
| Audit related fees | 0.2 | 0.2 |
| Tax fees | 0.1 | — |
| All other fees | — | — |
| **Total** | **10.6** | **11.9** |

*Audit fees* include fees billed for professional services rendered for audits of our annual consolidated and standalone financial statements, reviews of consolidated quarterly financial information and statutory audits of the Company (including in particular the Compensation Report) and our subsidiaries.

*Audit-related fees* include fees billed for assurance and related services such as due diligence, accounting consultations and audits in connection with mergers and acquisitions, employee benefit plan audits, internal control reviews and consultations concerning financial accounting and reporting standards.

*Tax fees* include fees billed for professional services for tax compliance, tax advice and tax planning.

*All other fees* include fees billed for products and services other than as reported above.

## Control Measures over the Activities of the Auditors

The Alcon Board has delegated to the Audit and Risk Committee ("ARC") the oversight of the activities of the external auditors. The ARC evaluates on an annual basis the qualifications and performance of our auditors and will determine whether PwC Switzerland should be proposed to the general meeting to stand for re-election. The criteria applicable of the performance assessment of our auditors include professional competence, sufficiency of resources to complete the audit mandate, independence and objectivity, capability to provide effective and pragmatic recommendations and coordination with the ARC and other functions of the Alcon group, including internal audit.

Upon recommendation of the ARC, the Alcon Board proposed that the shareholders accept the audited consolidated financial statements of the Alcon group and the financial statements of the Company.

The ARC is further responsible for the compensation of our auditors and pre-approve all auditing services, internal control-related services and non-audit services permitted under applicable statutory law, regulations and listing requirements.

In 2020, our auditors participated in five meetings of the ARC in order to discuss auditing matters and present the 2020 audit strategy and audit results. Our auditors provide at least once a year to the ARC a report regarding (i) the external auditor's internal quality-control procedures, (ii) any material issues raised by quality-control reviews or any inquiry or investigation by governmental or professional authorities, (iii) any step taken to deal with such issues and (iv) all relationships between the external auditor and the Alcon group.

## Information Policy

Alcon is committed to pursuing an open and transparent communication with shareholders, suppliers, customers and other stakeholders. It publishes information in a professional manner in accordance with best practices and legal requirements.

### Investor Relations

Effective communication with shareholders is an important part of Alcon's governance framework. The Chairman and the CEO, supported by the Investor Relations team, are responsible for actively engaging with shareholders and keeping them informed about Alcon's business, governance, strategy and performance, in accordance with applicable laws and regulations. The Company believes good engagement and dialogue with the financial community is critical in securing support and confidence in management's leadership and Board's governance of Alcon. The Investor Relations team regularly organizes opportunities to learn about the Company through in-person and virtual meetings and product showcases throughout the year, subject to its quiet period policy.

### Communications

Financial information is published in the form of annual and quarterly financial results, in accordance with internationally recognized accounting standards. Related material, including annual reports, Form 20-Fs, quarterly results releases, presentations and conference call webcasts are available on the Alcon website. From time to time, Alcon issues press releases regarding business developments. Investors may subscribe to receive via email distributions providing news and notification about Alcon. The dissemination of material information about business developments is made in accordance with the rules of the SIX and the NYSE.

Information contained in reports and releases may only be deemed accurate in any material respect at the time of the publication. Past releases are not updated to reflect subsequent events.

Alcon's website provides regular information and updates about the Company at *www.alcon.com*. Detailed information regarding certain topics may be found as follows:

| Topic | Website |
| --- | --- |
| Investor relations | https://investor.alcon.com |
| Media releases | https://www.alcon.com/about-us#media-releases |
| Leadership | https://www.alcon.com/about-us#leadership |
| Governance | https://investor.alcon.com/governance/governance/default.aspx |
| Financials | https://investor.alcon.com/financials/quarterly-results/default.aspx |

### Corporate Responsibility Report

Alcon publishes an annual Corporate Responsibility Report, which describes Alcon's corporate responsibility strategy and highlights Alcon's approach to ESG matters, available at https://www.alcon.com/about-us/corporate-social-responsibility.

A145

# Differences in Corporate Governance Standards

According to the NYSE listing standards on corporate governance, listed foreign private issuers are required to disclose any significant ways in which their corporate governance practices differ from those governance practices that must be followed by NYSE-listed US domestic companies. We briefly summarize those differences in the following paragraphs.

## Responsibility of the Audit Committee with regard to Independent Auditors

Our Audit and Risk Committee is responsible for the compensation, retention and oversight of our independent statutory auditors. It assesses the performance and qualification of our statutory auditors and submits its proposal for appointment, reappointment or removal of our statutory auditors to the full Board. As required by the Swiss Code of Obligations, our Board then submits its proposal to the shareholders for their vote at the Annual General Meeting (AGM). In contrast, under NYSE listing standards, the audit committee for US domestic companies is responsible for the appointment of the independent auditors.

## Supervision of the Internal Audit Function

The CFO and the Audit and Risk Committee share the supervisory responsibility with respect to the internal audit function. In contrast, under NYSE standards, only the audit committee supervises the internal audit function.

## Responsibility of the Compensation Committee for Performance Evaluations of Senior Management

In line with Swiss law, our Compensation Committee, together with the Board, proposes for shareholder approval at the AGM the maximum aggregate amount of compensation for the Board and the maximum aggregate amount of fixed and variable compensation for the Executive Committee of Alcon. Our shareholders elect each of the members of the Compensation Committee at the Annual General Meeting. In contrast, under NYSE standards, it is the responsibility of the compensation committee to evaluate senior management performance and to determine and approve, as a committee or together with the other independent directors, the compensation for senior officers and the board. US domestic companies listed on NYSE are only required to provide shareholders a periodic advisory non-binding vote on a company's executive compensation practices.

## Shareholders' Votes on Equity Compensation Plans

Swiss law authorizes the Board to approve equity-based compensation plans. Shareholder approval is only mandatory if equity-based compensation plans require an increase in capital. No shareholder approval is required if shares for issuance under such plans are purchased by the issuer in the open market. In contrast, the NYSE standards require shareholder approval for the establishment of and material revisions to all equity compensation plans.

## 6.D.  EMPLOYEES

The table below sets forth the breakdown of the total year-end number of our full-time equivalent employees by main category of activity for the past three years.

| | For the year ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018**[1] |
| Production & Supply | 12,237 | 11,026 | 10,655 |
| Marketing & Sales | 7,450 | 7,301 | 7,162 |
| General & Administration | 2,087 | 2,120 | 1,133 |
| Research & Development | 1,881 | 1,695 | 1,431 |
| **Total full-time equivalent employees** | **23,655** | **22,142** | **20,381** |

(1)   Alcon historically received certain services from NBS, the shared service organization of Novartis. The corresponding full time equivalents providing such services were part of NBS and therefore not included in the table above for 2018.

Unions or works councils represent a significant number of our associates. We have not experienced any material work stoppages in recent years, and we consider our employee relations to be good.

## 6.E.  SHARE OWNERSHIP

The information set forth under "Item 6.B. Compensation" is incorporated by reference. Also, refer to Note 24 to the Consolidated Financial Statements for a discussion of our equity-based compensation programs.

137

**A147**

# ITEM 7.   MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS

## 7.A.        MAJOR SHAREHOLDERS

The information set forth under "Item 6. Directors, Senior Management and Employees—6.C. Board Practices—Corporate Governance" is incorporated by reference.

## 7.B.        RELATED PARTY TRANSACTIONS

Dr. Arthur Cummings, an Alcon director, in his capacity as an ophthalmologist, provides certain consulting services including assistance with various clinical trials to Alcon. In 2020 and 2019, Alcon paid to Dr. Cummings (or his related entities) approximately $54,809 and $84,844, respectively.

## 7.C.        INTERESTS OF EXPERTS AND COUNSEL

Not Applicable.

# ITEM 8.    FINANCIAL INFORMATION

## 8.A.         CONSOLIDATED STATEMENTS AND OTHER FINANCIAL INFORMATION

Please refer to the financial statements beginning on page F-1 of this Annual Report.

## Legal Proceedings

From time to time, we may become involved in litigation or may receive inquiries from regulatory authorities, including antitrust and competition authorities in various jurisdictions relating to matters arising from the ordinary course of business. In addition, we are from time to time and may in the future be subject to audit or investigation by tax authorities in the ordinary course of business in the various jurisdictions in which we operate. Our management believes that, except as described below, there are currently no claims or actions pending against us, the ultimate disposition of which could have a material adverse effect on our results of operations, financial condition or cash flows. In addition, under the Separation and Distribution Agreement we entered into with Novartis, we and Novartis have agreed, subject to certain conditions and except to the extent otherwise described below with respect to any matter, to indemnify the other party and its directors, officers, employees and other representatives against any pending or future liabilities or claims that constitute either a Novartis liability, in the case of Novartis, or an Alcon liability, in the case of Alcon, under the terms of the Separation and Distribution Agreement, based on whether such claim or liability relates to the Novartis business and products or our business and products. For more information, see "Item 10. Additional Information—10.C. Material Contracts—Our Agreements with Novartis".

### Contact lenses class actions

Since the first quarter of 2015, more than 50 class action complaints have been filed in several courts across the US naming as defendants contact lens manufacturers, including Alcon, and alleging violations of federal antitrust law, as well as the antitrust, consumer protection and unfair competition laws of various states, in connection with the implementation of unilateral price policies by the defendants in the sale of contact lenses. The cases have been consolidated in the Middle District of Florida by the Judicial Panel on Multidistrict Litigation and the claims are being vigorously contested.

### JJSVI patent dispute

On June 23, 2020, Johnson & Johnson Surgical Vision, Inc. ("JJSVI"), acting through its subsidiaries, filed a patent infringement action in the US District Court in Delaware alleging that the manufacture, use, sale, offer for sale and/or importation of Alcon's *LenSx* Laser System willfully infringes, directly and/or indirectly, one or more claims of 12 US patents. JJSVI subsequently amended its complaint to include copyright infringement claims relating to source code used in the *LenSx* Laser System as well as additional claims of patent infringement. Also on June 23, 2020, JJSVI filed a claim in Mannheim, Germany, alleging that Alcon directly infringes one European patent through its manufacture and sale of *LenSx*. In these cases, JJSVI seeks monetary and injunctive relief. In addition, JJSVI filed a motion on February 4, 2021 asking the district court in Delaware to issue a preliminary injunction prohibiting Alcon from offering, selling, distributing, installing, or exporting *LenSx* systems that contain the allegedly infringing source code or offering to sell, selling, distributing, or exporting such source code with the purpose or intent of it being loaded onto *LenSx* systems. Alcon intends to defend the cases vigorously and has asserted various patent infringement claims against JJSVI in Europe and the United States.

### Hoya patent dispute

On December 11, 2020, Hoya Corporation and one of its affiliates filed suit against Alcon in the US District Court for the Northern District of Texas alleging that Alcon's *UltraSert* Pre-Loaded Delivery System infringes six of Hoya's US patents. Alcon intends to defend the case vigorously.

## Dividend Policy

Alcon expects that it will recommend to shareholders the payment of a regular annual cash dividend based on the prior year's core net income; however, the declaration, timing and amount, including potential increases, of any dividends will be subject to the approval of our shareholders at a General Meeting. The determination of the Board as to whether to recommend a dividend and the approval of any such proposed dividend by our shareholders will depend upon many factors, including our financial condition, earnings, corporate strategy, capital requirements of our operating subsidiaries, covenants, legal requirements and other factors deemed relevant by the Board and shareholders. In 2020, Alcon's Board had initially proposed a dividend of CHF 0.19 per share for 2019; however, in April 2020, in light of the then current market conditions and economic uncertainties linked to COVID-19 and as part of Alcon's overall efforts to maintain financial flexibility and implement cash preservation measures, the Board determined that it was in the best interest of Alcon's stakeholders to delay the initiation of a dividend proposal until 2021. For additional information, see "Item 3. Key Information—3.D. Risk Factors—Risks related to the Ownership of our Shares—We may not pay or declare dividends".

For information about deduction of the withholding tax or other duties from dividend payments, see "Item 10. Additional Information—10.E. Taxation—Swiss Taxation—Swiss Residents—Withholding Tax on Dividends" and "Item 10. Additional Information—10.E. Taxation—US Federal Income Taxation—Distributions on the Shares".

## Past Dividends

Since the formation of Alcon, which became effective as of the date of the registration of Alcon in the Swiss Register of Commerce on September 21, 2018, Alcon has not paid any dividends.

## 8.B.    SIGNIFICANT CHANGES

A discussion of significant changes in our business can be found under "Item 4. Information on the Company —4.A. History and Development of the Company", "Item 4. Information on the Company — 4.B. Business Overview" and "Item 5. Operating and Financial Review and Prospects — 5.A. Operating Results".

# ITEM 9.   THE OFFER AND LISTING

## 9.A.   OFFER AND LISTING DETAILS

Alcon Inc. shares are listed on the SIX and the NYSE as global registered shares under the trading ticker "ALC". As such, they can be traded and transferred across applicable borders, without the need for conversion, with identical shares traded on different stock exchanges in different currencies. During 2020, the average daily trading volume of Alcon Inc. shares was approximately 1.9 million shares on the SIX and approximately 1.2 million shares on the NYSE.

As of the date of this Annual Report, our shares are included in a number of indices, including the "Swiss Market Index", or SMI, the principal Swiss index published by the SIX. This index contains 20 of the largest and most liquid stocks based on market capitalization and the most active stocks listed on the SIX. The SMI indicates trends in the Swiss stock market as a whole and is one of the most widely followed stock price indices in Switzerland.

## 9.B.   PLAN OF DISTRIBUTION

Not applicable.

## 9.C.   MARKETS

See "Item 9.A. Offer and listing Details."

## 9.D.   SELLING SHAREHOLDERS

Not applicable.

## 9.E.   DILUTION

Not applicable.

## 9.F.   EXPENSES OF THE ISSUE

Not applicable.

# ITEM 10.   ADDITIONAL INFORMATION

## 10.A.   SHARE CAPITAL

Not Applicable.

## 10.B.   MEMORANDUM AND ARTICLES OF ASSOCIATION

We incorporate by reference into this Annual Report the description of our Articles of Incorporation and our Regulations of the Board contained in our Registration Statement on Form 20-F, as amended, initially filed with the SEC on November 13, 2018 (File No. 001-31269).

## 10.C.   MATERIAL CONTRACTS

### Our Agreements with Novartis

Following the separation and the Spin-off, we and Novartis operate separately, each as an independent public company. Prior to the completion of the Spin-off, we entered into a Separation and Distribution Agreement and several other agreements with Novartis to effect the separation and provide a framework for our relationship with Novartis after the Spin-off. These agreements govern the relationships between Novartis and are attributable to periods prior to, at and after the separation. In addition to the Separation and Distribution Agreement (which contains many of the key provisions related to our separation from Novartis and the distribution of the Alcon shares to holders of Novartis shares and ADRs), these agreements include:

- tax matters agreement;
- employee matters agreement;
- manufacturing and supply agreements;
- transitional services agreement; and
- certain IP arrangements.

The material agreements described below have been previously filed as exhibits to our filings with the SEC and the summaries below set forth the terms of the agreements that we believe are material. These summaries are qualified in their entireties by reference to the full text of the applicable agreements, which are incorporated by reference into this Form 20-F.

In addition, we entered into other agreements with Novartis prior to the completion of the Spin-off that are not material to our business. These agreements include agreements relating to information sharing and access rights, data transfer, confidentiality and systems access, transfer of marketing authorizations, certain manufacturing quality control and pharmacovigilance matters, certain leases to Novartis and certain transitional distribution and other services matters, including shared premises services, as well as a third party claims and investigations management agreement.

### Separation and Distribution Agreement

The Separation and Distribution Agreement sets forth our agreements with Novartis regarding the principal actions taken in connection with the separation and the Spin-off.

#### Transfer of Assets and Assumption of Liabilities

The Separation and Distribution Agreement identified the assets to be transferred, liabilities to be assumed and contracts to be assigned to each of Novartis and Alcon as part of the internal transactions effected prior to the distribution, the purpose of which was to ensure that, at the time of the distribution, each of Alcon and Novartis held the assets required to operate their respective businesses and retained or assumed (as applicable) liabilities, including pending and future claims, which relate to such business (whether arising prior to, at or after the date of execution of the Separation and Distribution Agreement), subject to certain limited exceptions set out under the heading "Asia/Russia Investigation" below.

### The Distribution

The Separation and Distribution Agreement governed the rights and obligations of the parties with respect to the distribution.

### Intercompany Arrangements

All agreements, arrangements, commitments and understandings, including most intercompany accounts payable or accounts receivable, between us, on the one hand, and Novartis, on the other hand, terminated effective as of completion of the separation, except specified agreements and arrangements that survived completion of the separation that were either transactional in nature or at arms' length terms.

### Representations and Warranties

We and Novartis each provided customary warranties as to our respective capacity to enter into the Separation and Distribution Agreement. Except as expressly set forth in the Separation and Distribution Agreement or any ancillary agreement, neither we nor Novartis made any representation or warranty as to the assets, business or liabilities transferred or assumed as part of the separation, or as to the legal sufficiency of any assignment, document or instrument delivered to convey title to any asset or thing of value transferred in connection with the separation. Except as expressly set forth in the Separation and Distribution Agreement and certain other ancillary agreements, all assets were transferred on an "as is", "where is" basis.

### Indemnification

We and Novartis each agreed to indemnify the other and each of the other's directors, officers, managers, members, agents and employees against certain liabilities incurred in connection with the Spin-off and our and Novartis respective businesses. The amount of either Novartis or our indemnification obligations will be reduced by any insurance proceeds the party being indemnified receives.

### Asia/Russia Investigation

Novartis indemnified Alcon in respect of defined direct monetary liabilities relating to the current scope of the ongoing investigation by the DoJ and the SEC relating to certain business practices in Asia and Russia and related accounting treatment. See the section entitled "Asia Investigation" in the Separation and Distribution Agreement attached as Exhibit 4.1 to this Form 20-F.

### Release of Claims

We and Novartis each agreed to release the other and its affiliates, successors and assigns, and all persons that, prior to completion of the Spin-off, were the other's shareholders, directors, officers, managers, members, agents or employees, and their respective heirs, executors, administrators, successors and assigns, from any claims against any of them that arise out of or relate to our respective businesses. These releases are subject to limited exceptions set forth in the Separation and Distribution Agreement (including in respect of fraud and criminal conduct).

### Term / Termination

Neither we nor Novartis may rescind the Separation and Distribution Agreement in any circumstances whatsoever following the completion of the distribution.

### Switch Rights

Novartis granted us the right, from the date of separation, to switch certain specified olopatadine products from prescription products to over-the-counter products and to develop, manufacture and commercialize such products as over-the-counter products going forward. This right is exercisable on notice and, for jurisdictions outside US, subject to Novartis consent. We have provided notice to Novartis to exercise our right to develop, manufacture and commercialize certain of those products in the US. The FDA approved *PATADAY* Twice Daily Relief (0.1%), *PATADAY* Once Daily Relief (0.2%) and *PATADAY* Once Daily Extra Strength (0.7%) in 2020. The *PATADAY* brand contains olopatadine, the number one doctor prescribed active ingredient for eye allergy relief.

## Brazil and Belgian Sites

Novartis and we each granted each other a right of last look in respect of any third party disposal of our portion of the Puurs site and Novartis granted us a right of last look in respect of any third party disposal by Novartis of its portion of the Brazilian manufacturing facility. In 2020, we agreed to waive our right of last look with respect to Novartis's Brazilian manufacturing facility.

## Other Matters Governed by the Separation and Distribution Agreement

Other matters governed by the Separation and Distribution Agreement include, without limitation, insurance arrangements, confidentiality, mutual assistance and information sharing after completion of the distribution, treatment and replacement of credit support and transfer of and post-separation access to certain books and records.

# Tax Matters Agreement

We entered into a Tax Matters Agreement with Novartis prior to completion of the Spin-off. The Tax Matters Agreement imposed certain restrictions on us (including restrictions on share issuances, business combinations, sales of assets and similar transactions) designed to preserve the tax-neutral nature of the Spin-off for Swiss tax and US federal income tax purposes. Nonetheless, we are able to engage in an otherwise restricted action if we obtain appropriate advice from counsel or a ruling from a competent taxing authority. However, our indemnification obligation to Novartis, as discussed below, is still applicable in circumstances in which we are permitted to engage in an otherwise restricted action.

The Tax Matters Agreement provides that we will indemnify Novartis if our breach of a representation or covenant that serves as the basis for the Tax Opinion or the Tax Rulings or our taking, or failure to take, certain actions results in the failure of the Spin-off or certain internal restructuring steps to qualify for tax-neutral treatment under Swiss tax or US federal income tax laws, as applicable. The Tax Matters Agreement also provides that we will generally indemnify Novartis for any taxes of Novartis and its subsidiaries to the extent such taxes are attributable to the Alcon Division, and Novartis will generally indemnify us for any of our or our subsidiaries' taxes to the extent such taxes are attributable to the Novartis retained businesses, in each case whether accruing before, on or after the date of the Spin-off.

# Employee Matters Agreement

We entered into an Employee Matters Agreement with Novartis prior to completion of the Spin-off. The Employee Matters Agreement sets forth our agreements with Novartis regarding the identification of the employees transferred to and retained by each of Novartis and Alcon as part of the operational separation prior to the Spin-off, as well as the allocation of liabilities and responsibilities with respect to certain employee matters.

## Allocation of Employment Liabilities

Subject to certain exceptions, the general principle for the allocation of employment and service-related liabilities is that (i) Alcon assumes all such liabilities relating to Alcon employees and former employees of the Novartis Group who worked wholly or substantially in the Alcon Division as of the date immediately prior to the termination of their employment ("former Alcon employees") and (ii) Novartis retains all such liabilities relating to all other current and former employees of the Novartis Group (including employees who are identified as Alcon employees, but did not in fact transfer to Alcon), in each case, regardless of when such liabilities arise.

## Terms and Conditions of Alcon Employees

Until January 1, 2021, Alcon was to provide each current Alcon employee with the same basic salary and contractual benefits that are substantially comparable, taken as a whole, to the contractual benefits received prior to the date of his or her transfer to Alcon (excluding share-based incentive schemes and long-term incentive plans). If the employment of any Alcon employee is terminated by reason of redundancy within 24 months following the date of his or her transfer, Alcon will provide severance benefits that are no less favorable than those that would have been provided prior to the date of his or her transfer.

## Employee Benefit and Cash Bonus Plans

Alcon employees were generally, as of the date of the Spin-off, eligible to participate in Alcon employee benefit plans and cash bonus plans that are the same as, or comparable to, those that apply to them prior to the date of the Spin-off.

## Share-Based Incentive Schemes

Awards granted under share-based incentive schemes were treated as follows:

- Holders of unvested awards in the form of restricted Novartis shares received the dividend in-kind resulting from the Spin-off.

144

**A154**

- Holders of unvested RSUs and PSUs did not receive the dividend in-kind resulting from the Spin-off, and such awards were treated as described in the section entitled "Item 6. Directors, Senior Management and Employees—6.B. Compensation—Section 3—ECA Compensation 2019—Section 3.6—Alcon Equity Restoration Plan".

In addition, Alcon was required to establish, and employees were eligible to participate in, new Alcon equity plans in relation to Alcon shares following the Spin-off.

## Restrictions on Post-Spin-off Employee Employment and Engagement

- Subject to certain exceptions, Novartis agreed that each member of the Novartis Group will not, for a period of two years following the Spin-off, directly or indirectly: (i) solicit or induce certain senior Alcon employees to become employed or engaged by any member of the Novartis Group; or (ii) knowingly induce or encourage such employees to no longer be employed or engaged by Alcon.

- Subject to certain exceptions, Novartis agreed that it would not, and would undertake to procure that each member of the Novartis Group would not, for a period of two years following the Spin-off, employ or engage certain senior Alcon employees.

## Long-Term Employee Benefits

As of the date of the Spin-off, Alcon generally assumed sponsorship of and responsibility for any standalone long-term employee benefit arrangements relating to Alcon employees and former Alcon employees. Further, subject to certain exceptions, the accrued (past service) liabilities relating to the Alcon employees and former Alcon employees under Novartis Group-wide plans providing retirement, disability or death, old-age part-time retirements or jubilee benefits, transferred to Alcon. In the UK, Novartis paid to Alcon a sum equal to the liabilities and expenses incurred, sustained or paid by Alcon, after the date of the Spin-off, arising pursuant to section 75 of the UK Pensions Act 1995 in respect of Alcon or of any Alcon subsidiary's cessation of participation in the Novartis UK Pension Scheme.

## Manufacturing and Supply Agreements

We entered into manufacturing and supply agreements with Novartis prior to the completion of the Spin-off. The manufacturing and supply agreements set forth our agreements with Novartis pursuant to which we and Novartis each manufacture, label, package and supply products for the other and conduct relevant quality control, assurance and testing activities for the other in relation to the manufacture and supply of applicable products (the "Forward and Reverse MSAs"). The terms of the manufacturing and supply agreements, including terms relating to pricing, were determined at arm's length and are based on the prevailing cost of manufacturing with mutually agreed mark-ups and adjustment mechanisms.

The terms of the Forward and Reverse MSAs are equivalent, except where specific provision is required to address a manufacturing site or product specific issue. The Forward and Reverse MSAs each include a transfer plan specifically addressing the relocation and transfer of certain products between the parties and manufacturing sites, key milestones in relation to product technical transfer and the anticipated date of expiration of the relevant Forward and Reverse MSA for those products, as required to achieve separation of the relevant Novartis and Alcon Division following the distribution. The Forward and Reverse MSAs additionally contain customary provisions for the transfer of manufacturing technology and processes to the other party (or other manufacturers where applicable) for all products for the benefit of the relevant purchasing party. For products not included in the transfer plan the Forward and Reverse MSAs have an initial term of three years, with automatic renewal subject to rights of termination on three years' notice from the relevant purchaser party and five years' notice from the relevant supplier party. The Forward and Reverse MSAs contain customary fault based termination triggers (such as an insolvency related event or a material breach (which if curable is uncured)) and customary liability provisions.

The Forward and Reverse MSAs also contain certain capacity reservation and minimum volume off-take obligations on each party that reflect the movement of products in the transfer plan and the agreed use of existing capacities at the related sites. Failure to meet volume forecasts and minimum off-take obligations will result in price adjustment and take or pay obligations in respect of certain products.

The manufacturing and supply obligations will generally be performed under the Forward and Reverse MSAs on the basis of total product cost plus a margin with certain adjustments where volume, inflation and materials cost criteria are met. Certain products are to be supplied from Novartis to Alcon through toll manufacturing.

## Transitional Services Agreement

We entered into a Transitional Services Agreement with Novartis prior to completion of the Spin-off pursuant to which we and Novartis, to the extent that shared business functions have not been separated prior to the Spin-off, each provide to the other various services and support on an interim transitional basis until such time as we (or Novartis in the case of

145

**A155**

services we will provide to Novartis) have developed the capability to provide the relevant services and support ourselves or have appointed a third party provider to provide those services and support.

The Transitional Services Agreement sets forth the agreement with Novartis regarding the provision of these transitional services and support. The Transitional Services Agreement is two-way and reciprocal. Services and support are provided on substantially the same basis as prior to the Spin-off. The charges for the services are on a costs-plus basis (with a mark-up to reflect the management and administrative cost of providing the services). The services generally commenced on the date of the Spin-off and are intended to terminate within 24 months of the date of the Spin-off. The recipient of the services will generally have the ability to: (i) extend the term that a service is provided for, subject to a maximum aggregate service term of 24 months; and (ii) terminate a service early in whole or, with the service provider's agreement, in part, in each case subject to a specified notice period. Each party has standard termination rights for unremedied material breach or insolvency.

Subject to standard limitations and exceptions, the liability of each of Alcon and Novartis as service provider under the Transitional Services Agreement is capped, for all claims in each 12 month period of the agreement, at the level of service charges payable to the service provider in that 12 month period.

The services and support provided by Novartis to us includes: information technology, human resources, real estate and facilities, non-strategic corporate services and financial reporting and accounting services. The services to be provided by us to Novartis include information technology and real estate and facilities support.

## IP Arrangements

### Assignment of Alcon Intellectual Property Rights

We entered into assignment agreements with Novartis prior to, or with effect from, completion of the Spin-off, under which:

- Novartis transferred to us: (i) all intellectual property rights owned by the Novartis Group and used exclusively within the Alcon Division; and (ii) certain intellectual property rights owned by the Novartis Group used within both the Alcon Division and the other businesses of Novartis including, but not limited to, the Alcon brand; and

- We transferred to Novartis: (i) all intellectual property rights owned by Alcon and used exclusively within the Novartis businesses; and (ii) certain intellectual property rights owned by the Alcon group used within both the Alcon Division and the other businesses of Novartis.

### Perpetual Shared Intellectual Property Rights License Agreements

In connection with any intellectual property rights owned by Alcon or Novartis and which are used by both Alcon and Novartis in our respective businesses following the completion of the Spin-off, we entered into reciprocal licenses with Novartis under which we and Novartis were each granted the right to continue to use those shared intellectual property rights in connection with our respective businesses. The intellectual property rights covered by these licenses will include trademarks, patents, know-how and other forms of intellectual property rights. The licenses are on a perpetual, worldwide and royalty-free basis. The licenses contain standard termination rights for material breach or insolvency.

### Transitional Trademark License Agreements

We agreed with Novartis that we will each phase out our respective use of a limited number of corporate and product marks which are owned by the other party following completion of the Spin-off. We entered into reciprocal transitional trademark license agreements with Novartis under which each party grants the other a royalty-free, worldwide non-exclusive license to use certain corporate and product trademarks following the Spin-off on substantially the same basis as currently used. Each license permits the licensee to continue using the licensed trademarks for a transitional period to provide the licensee with sufficient time to rebrand or phase out its use of the licensed trademarks, subject in most cases to a longstop date of three years. The licenses contain standard termination rights for material breach or insolvency.

### Trademark Co-Existence Agreement

In addition, we entered into a perpetual co-existence agreement with Novartis regulating our respective use of the Alcon CIBA VISION and Novartis CIBA brands with the objective of mitigating any potential customer confusion in connection with our respective use of those brands and addressing certain related trademark formalities, including in connection with the registration of new trade mark applications.

146

## 2019 Bond Offering

On September 23, 2019, Alcon Finance Corporation (the "Issuer"), an indirect, wholly owned subsidiary of Alcon, completed an offering of $500,000,000 aggregate principal amount of its 2026 Notes, $1,000,000,000 aggregate principal amount of its 2029 Notes and $500,000,000 aggregate principal amount its 2049 Notes (collectively, the "Initial Notes"). The Initial Notes were issued under an Indenture, dated September 23, 2019 (the "Indenture"), by and among the Issuer, Alcon Inc. and Citibank, N.A., as trustee (the "Trustee"). The Initial Notes are senior unsecured obligations of the Issuer and are fully and unconditionally guaranteed on a senior basis by Alcon.

Interest is payable on the Initial Notes on March 23 and September 23 of each year, beginning on March 23, 2020. The 2026 Notes will mature on September 23, 2026, the 2029 Notes will mature on September 23, 2029 and the 2049 Notes will mature on September 23, 2049.

The Issuer may redeem the 2026 Notes prior to July 23, 2026 (the date that is two months prior to their maturity date), the 2029 Notes prior to June 23, 2029 (the date that is three months prior to their maturity date) or the 2049 Notes prior to March 23, 2049 (the date that is six months prior to their maturity date) at a redemption price equal to 100% of the principal amount of the applicable series of Initial Notes plus a "make-whole premium" and accrued and unpaid interest, if any, up to, but excluding, the redemption date. The Issuer may also redeem the 2026 Notes on or after the date that is two months prior to their maturity date, the 2029 Notes on or after the date that is three months prior to their maturity date or the 2049 Notes on or after the date that is six months prior to their maturity date at a redemption price equal to 100% of their principal amount plus accrued and unpaid interest, if any, to, but excluding, the redemption date.

In addition, the Issuer may redeem any series of the Initial Notes at its option, in whole, but not in part, for cash, at any time prior to their respective maturities at a price equal to 100% of the outstanding principal amount of such Initial Notes, plus accrued and unpaid interest, to, but excluding, the redemption date, if certain tax events occur that would obligate the Issuer to pay additional amounts as described in the Indenture.

Subject to certain limitations, in the event of a change of control triggering event, the Issuer will be required to make an offer to purchase each series of the Initial Notes at a price equal to 101% of the principal amount of the Initial Notes, plus accrued and unpaid interest, if any, to, but excluding, the date of repurchase.

The Indenture also contains certain limitations on the Issuer's ability to incur liens, as well as customary events of default.

## 2020 Bond Offering

On May 27, 2020, the Issuer completed an offering of an additional $750,000,000 aggregate principal amount of its 2030 Notes. The 2030 Notes were issued under the same Indenture as the Initial Notes. The 2030 Notes are senior unsecured obligations of the Issuer and are fully and unconditionally guaranteed on a senior basis by Alcon.

Interest is payable on the 2030 Notes on May 27 and November 27 of each year, beginning on November 27, 2020. The 2030 Notes will mature on May 27, 2030.

The Issuer may redeem the 2030 Notes prior to February 27, 2030 (the date that is three months prior to their maturity date) at a redemption price equal to 100% of the principal amount of the 2030 Notes plus a "make-whole premium" and accrued and unpaid interest, if any, up to, but excluding, the redemption date. The Issuer may also redeem the 2030 Notes on or after the date that is three months prior to their maturity date at a redemption price equal to 100% of their principal amount plus accrued and unpaid interest, if any, to, but excluding, the redemption date.

In addition, the Issuer may redeem the 2030 Notes at its option, in whole, but not in part, for cash, at any time prior to their respective maturities at a price equal to 100% of the outstanding principal amount of such 2030 Notes, plus accrued and unpaid interest, to, but excluding, the redemption date, if certain tax events occur that would obligate the Issuer to pay additional amounts as described in the Indenture.

Subject to certain limitations, in the event of a change of control triggering event, the Issuer will be required to make an offer to purchase the 2030 Notes at a price equal to 101% of the principal amount of the 2030 Notes, plus accrued and unpaid interest, if any, to, but excluding, the date of repurchase.

The Indenture also contains certain limitations on the Issuer's ability to incur liens, as well as customary events of default.

## Bridge Loan, Term Loan and Revolving Credit Facilities

In connection with the Spin-off, we entered into a $1.5 billion unsecured 364-day bridge loan facility with two extension options, each for a period of 180 days (the "Bridge Facility"), a $0.5 billion unsecured three-year term loan facility ("Facility A"), a $0.8 billion unsecured five-year term loan facility ("Facility B"), a $0.4 billion (or the equivalent in EUR) unsecured

five-year term loan facility ("Facility C") and a $1.0 billion unsecured five-year committed multicurrency revolving credit facility (the "Revolving Facility" and, together with the Bridge Facility, Facility A, Facility B and Facility C, the "Facilities" and the related agreement, the "Group Facilities Agreement"). In February 2021, the Revolving Facility term was extended to March 2026.

We and certain of our subsidiaries are borrowers under the Facilities. We guarantee the borrowings of such subsidiaries under the Facilities. In addition, the Revolving Facility includes a mechanism through which certain of our subsidiaries, as approved by the lenders, can accede as a borrower.

Prior to the Spin-off, we borrowed an aggregate of approximately $3.2 billion under the Facilities and paid to Novartis approximately $3.0 billion of the net proceeds of the Bridge Facility, Facility A, Facility B and Facility C, including in satisfaction of certain intercompany indebtedness owed by Alcon and its subsidiaries to Novartis and its affiliates. We retained the remaining net proceeds of such Facilities for general corporate and working capital purposes. In September 2019, we used the proceeds of our Initial Notes Offering to pay off in full the Bridge Facility and Facility A. The Bridge Facility and Facility A are no longer available to us for borrowings.

We are permitted to voluntarily prepay loans under the Facilities, in whole or in part, without penalty or premium subject to certain minimum prepayment amounts and the payment of accrued interest on the amount prepaid and customary breakage costs.

The terms of the Facilities include certain events of default and covenants customary for investment grade credit facilities, including restrictive covenants that limit, among other things, the grant or incurrence of security interests over any of our assets, the incurrence of certain indebtedness and entry into certain fundamental change transactions. The Facilities do not contain any financial covenants.

The Facilities bear interest at a rate equal to the interest rate benchmark (EURIBOR in the case of loans denominated in EUR, USD LIBOR in the case of loans denominated in USD and CHF LIBOR in the case of loans denominated in CHF), plus an applicable margin.

As of December 31, 2020, $1.2 billion of borrowings was outstanding under the Facilities. Such indebtedness requires us to dedicate a portion of our future cash flows to payments on our debt, reducing our ability to use our cash flows to pay dividends, fund capital expenditures, BD&L or other strategic transactions, working capital and other general operational requirements.

## 10.D.    EXCHANGE CONTROLS

There are no Swiss governmental laws, decrees or regulations that restrict, in a manner material to Alcon, the export or import of capital, including any foreign exchange controls, or that generally affect the remittance of dividends or other payments to non-residents or non-citizens of Switzerland who hold Alcon shares.

# 10.E.       TAXATION

The taxation discussion set forth below is intended only as a descriptive summary and does not purport to be a complete analysis or listing of all potential tax effects relevant to the ownership or disposition of our shares. The statements of US and Swiss tax laws set forth below are based on the laws and regulations in force as of the date of this Annual Report, including the current Convention Between the United States and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income, entered into force on December 19, 1997 (the "Treaty"), and the US Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations, rulings, judicial decisions and administrative pronouncements, and may be subject to any changes in US and Swiss law and in any double taxation convention or treaty between the United States and Switzerland occurring after that date, which changes may have retroactive effect.

## Swiss Taxation

*The following is a general summary of certain tax consequences relating to owning and disposing of Alcon shares based on the Swiss tax laws and regulations and regulatory practices in force on the date of this Annual Report. Tax consequences are subject to changes in applicable law (or subject to changes in interpretation), including changes that could have a retroactive effect.*

*This is not a complete summary of the potential Swiss tax effects relevant to the Alcon shares nor does the summary take into account or discuss the tax laws of any jurisdiction other than Switzerland. For example, this summary does not address estate, gift, inheritance, capital or wealth taxes. It also does not take into account investors' individual circumstances. This summary does not purport to be a legal opinion or to address all tax aspects that may be relevant to any particular investor.*

**YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR WITH RESPECT TO ACQUIRING, OWNING AND DISPOSING OF ALCON SHARES.**

### Swiss Residents

#### Withholding Tax on Dividends

Dividends that we pay and any similar cash or in-kind distributions we may make to a holder of our shares (including distributions of liquidation proceeds in excess of the nominal value, stock dividends and, under certain circumstances, proceeds from repurchases of shares by us in excess of the nominal value) are generally subject to a Swiss federal withholding tax (the "Withholding Tax") at a current rate of 35%. Under certain circumstances distributions out of capital contribution reserves made by shareholders after December 31, 1996 are exempt from the Withholding Tax. We are required to withhold this Withholding Tax from the gross distribution and to pay the Withholding Tax to the Swiss Federal Tax Administration. The Withholding Tax is refundable in full to Swiss residents who are the beneficial owners of the taxable distribution at the time it is resolved and duly report the gross distribution received on their personal tax return or in their financial statements for tax purposes, as the case may be.

The Swiss corporate tax reform, which entered into force on January 1, 2020, requires that Swiss listed companies must make distributions as dividends subject to Withholding Tax to the extent distributions are made out of capital contribution reserves, which, as described above, are not subject to Withholding Tax.

#### Swiss Issuance Stamp Duty

Switzerland levies a one-time Issuance Stamp Duty (*Emissionsabgabe*) on the issuance of corporate equity capital by Swiss companies. A 1% Swiss Issuance Stamp Duty applies to capital contributions received for the issuance of corporate shares, non-voting shares, participation rights, as well as informal capital contributions in cash or in kind for no consideration.

#### Swiss Transfer Stamp Duty upon Transfer of Securities

The sale of our shares, whether by Swiss residents or Non-resident Holders, may be subject to federal securities Transfer Stamp Duty (*Umsatzabgabe*) of 0.15%, calculated on the gross sale proceeds, if the sale occurs through or with a Swiss bank or other Swiss securities dealer (*Effektenhändler*), as defined in the Swiss Federal Stamp Duty Act. The Transfer Stamp Duty has to be paid by the securities dealer and may be charged to the parties in a taxable transaction who are not securities dealers. In addition to this Transfer Stamp Duty, the sale of shares by or through a member of the SIX may be subject to a minor stock exchange levy.

#### Income Tax on Dividends

A Swiss Holder who holds Alcon shares as private assets ("Swiss Resident Private Shareholder") is required to report the receipt of dividends and similar distributions (including stock dividends and liquidation surplus) in its individual income tax

149

A159

returns and is subject to Swiss federal, cantonal and communal income tax on any net taxable income for the relevant tax period.

A Swiss Holder who is Swiss resident for tax purposes, a non-Swiss individual who is subject to Swiss income tax for reasons other than residency and a legal entity tax resident in Switzerland, in each case that holds Alcon shares as business assets, and a non-Swiss tax resident legal entity that holds Alcon shares as part of a Swiss permanent establishment or fixed place of business (each, a "Swiss Resident Commercial Shareholder") is required to recognize dividends and similar distributions (including stock dividends and liquidation surplus) on Alcon shares in its income statement for the relevant taxation period and is subject to Swiss federal, cantonal and communal individual or corporate income tax, as the case may be, on any net taxable earnings for such taxation period. The same tax treatment also applies to a Swiss Holder who, for income tax purposes, is classified as a "professional securities dealer" for reasons of, *inter alia,* frequent dealing, or leveraged investments, in shares and other securities. Swiss Resident Commercial Shareholders who are corporate taxpayers may be eligible for a participation deduction (*Beteiligungsabzug*) in respect of dividends if the Alcon shares held by them as part of a Swiss business have an aggregate market value of at least CHF 1 million.

## Taxes upon Disposition of Alcon Shares

Capital gains realized on the sale or other disposal of Alcon shares held by a Swiss Resident Private Shareholder are generally not subject to any federal, cantonal or communal income taxation. However, gain realized upon a repurchase of shares by us may be characterized as taxable dividend income if certain conditions are met. Capital gains realized on shares held by a Swiss Resident Commercial Shareholder are, in general, included in the taxable income of such person.

# Residents of Other Countries

Recipients of dividends and similar distributions on our shares who are neither residents of Switzerland for tax purposes nor holding shares as part of a business conducted through a permanent establishment situated in Switzerland ("Non-resident Holders") are not subject to Swiss income taxes in respect of such distributions. Moreover, gain realized by such recipients upon the disposal of our shares is not subject to Swiss income tax.

Non-resident Holders of our shares are, however, subject to the Withholding Tax on dividends and similar distributions mentioned above and under certain circumstances to the Transfer Stamp Duty described above. Such Non-resident Holders may be entitled to a partial refund of the Withholding Tax if the country in which they reside has entered into a bilateral treaty for the avoidance of double taxation with Switzerland. Non-resident Holders should be aware that the procedures for claiming treaty refunds (and the time frame required for obtaining a refund) may differ from country to country. Non-resident Holders should consult their own tax advisors regarding the receipt, ownership, purchase, sale or other dispositions of our shares and the procedures for claiming a refund of the Withholding Tax.

A Non-resident Holder of our shares will not be liable for any Swiss taxes other than the Withholding Tax described above and, if the transfer occurs through or with a Swiss bank or other Swiss securities dealer, the Transfer Stamp Duty described above. If, however, the shares of Non-resident Holders can be attributed to a permanent establishment or a fixed place of business maintained by such person within Switzerland during the relevant tax year, the shares may be subject to Swiss income taxes in respect of income and gains realized on the shares and such person may qualify for a full refund of the Withholding Tax based on Swiss tax law.

# Residents of the United States

Non-resident Holders who are residents of the United States for purposes of the Treaty are eligible for a reduced rate of tax on dividends equal to 15% of the dividend, provided that such holders qualify for benefits under the Treaty and do not conduct business through a permanent establishment or fixed base in Switzerland to which our shares are attributable. Such holders should consult their own tax advisors regarding their eligibility to claim the reduced rate and the procedures for claiming a refund of the amount of the Withholding Tax in excess of the 15% Treaty rate.

# International Automatic Exchange of Information in Tax Matters

On November 19, 2014, Switzerland signed the Multilateral Competent Authority Agreement, which is based on article 6 of the OECD/Council of Europe administrative assistance convention and is intended to ensure the uniform implementation of automatic exchange of information (the "AEOI"). The Federal Act on the International Automatic Exchange of Information in Tax Matters (the "AEOI Act") entered into force on January 1, 2017. The AEOI Act is the legal basis for the implementation of the AEOI standard in Switzerland.

The AEOI is being introduced in Switzerland through bilateral agreements or multilateral agreements. The agreements have been, and will be, concluded on the basis of guaranteed reciprocity, compliance with the principle of specialty (i.e. the

information exchanged may only be used to assess and levy taxes (and for criminal tax proceedings)) and adequate data protection. The United States is not a treaty state.

Based on such multilateral agreements and bilateral agreements and the implementing laws of Switzerland, Switzerland has begun to collect data in respect of financial assets (including shares) held in, and income derived thereon and credited to, accounts or deposits with a paying agent in Switzerland for the benefit of individuals resident in a EU member state or in a treaty state from, depending on the effective date of the respective agreement, 2017 or 2018, as the case may be, and will begin to exchange such data in 2018 or 2019, as the case may be.

# US Federal Income Taxation

*The following discussion is a summary of the US federal income tax considerations generally applicable to the ownership and disposition of our shares. This summary is based on the Code, its legislative history, US Treasury Regulations, administrative guidance, published court decisions and the Treaty, all in effect as of the date hereof, and any of which may be repealed, revoked, or modified (possibly with retroactive effect) so as to result in US federal income tax consequences different from those discussed below. This summary is applicable to US Holders (as defined below) who are residents of the United States for purposes of the Treaty and who qualify for the full benefits of the Treaty. It applies only to US Holders that hold our shares as capital assets (generally, property held for investment purposes) and is of a general nature. This summary should not be construed to constitute legal or tax advice to any particular US Holder.*

*This summary does not apply to or address US Holders subject to special rules, including, without limitation, brokers, dealers in securities or currencies, traders in securities that elect to use a mark-to-market method of accounting for securities holdings, tax-exempt entities (including private foundations), insurance companies, banks, thrifts and other financial institutions, persons liable for alternative minimum tax, persons that hold an interest in an entity that holds our shares, persons that will own, or will have owned, directly, indirectly or constructively 10% or more (by vote or value) of our stock, persons that hold our shares as part of a straddle, hedge, conversion, constructive sale or other integrated transaction for US federal income tax purposes or persons whose functional currency is not the US dollar.*

*This summary does not purport to be a complete analysis of all of the potential US federal income tax considerations that may be relevant to US Holders in light of their particular circumstances. Further, it does not address any aspect of foreign, state, local or estate or gift taxation or the 3.8% surtax imposed on certain net investment income. **Each US Holder is urged to consult its tax advisor regarding the application of US federal taxation to its particular circumstances and the, state, local, non-US and other tax considerations of the ownership and disposition of our shares**.*

## General

For purposes of this discussion, a "US Holder" is a beneficial owner of our shares that is, for US federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity treated as a corporation for US federal income tax purposes) created in or organized under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is includable in gross income for US federal income tax purposes regardless of its source; or

- a trust (A) the administration of which is subject to the primary supervision of a US court and which has one or more US persons who have the authority to control all substantial decisions of the trust or (B) that has otherwise validly elected to be treated as a US person under the Code.

If a partnership (or other entity treated as a partnership for US federal income tax purposes) is a beneficial owner of our shares, the tax treatment of a partner in the partnership that will generally depend upon the status of the partner and the activities of the partnership. Partnerships holding our shares and partners in such partnerships are urged to consult their tax advisors as to the particular US federal income tax consequences of an investment in our shares.

## Distributions on the Shares

Subject to the passive foreign investment company ("PFIC") rules discussed below, the gross amount of any distribution received by a US Holder with respect to our shares (including any amounts withheld to pay Swiss withholding taxes) will be included in the gross income of the US Holder as a dividend to the extent attributable to the Company's current or accumulated earnings and profits, as determined under US federal income tax principles. The Company may not calculate its earnings and profits under US federal income tax rules. Accordingly, US Holders should expect that a distribution generally will be treated as a dividend for US federal income tax purposes. Unless the Company is treated as a PFIC for the

151

A161

taxable year in which it pays a distribution or in the preceding taxable year (see "Passive foreign investment company rules" below), the Company believes that it may qualify as a "qualified foreign corporation," in which case distributions treated as dividends and received by non-corporate US Holders may be eligible for a preferential tax rate. Distributions on our shares generally will not be eligible for the dividends received deduction available to US Holders that are corporations.

The amount of any dividend paid in Swiss francs (including any amounts withheld to pay Swiss withholding taxes) will be included in the gross income of a US Holder in an amount equal to the US dollar value of the Swiss francs calculated by reference to the exchange rate in effect on the date the dividend is actually or constructively received by the US Holder, regardless of whether the Swiss francs are converted into US dollars on such date. A US Holder will have a tax basis in the Swiss francs equal to their US dollar value on the date of receipt. If the Swiss francs received are converted into US dollars on the date of receipt, the US Holder generally should not be required to recognize foreign currency gain or loss in respect of the distribution. If the Swiss francs received are not converted into US dollars on the date of receipt, a US Holder may recognize foreign currency gain or loss on a subsequent conversion or other disposition of the Swiss francs. Such gain or loss generally will be treated as US source ordinary income or loss.

A US Holder may be entitled to deduct or credit Swiss withholding tax imposed on dividends paid to a US Holder, subject to applicable limitations in the Code. The rules governing the foreign tax credit are complex. US Holders are urged to consult their own tax advisors regarding the availability of the foreign tax credit under their particular circumstances.

## Sale, Exchange or Other Taxable Disposition of Our Shares

Subject to the PFIC rules discussed below, a US Holder generally will recognize a capital gain or loss on the sale, exchange or other taxable disposition of our shares in an amount equal to the difference between the amount realized for the shares and the US Holder's adjusted tax basis in the shares. Any capital gain or loss will be long-term capital gain or loss if the ordinary shares have been held for more than one year. Individuals and other non-corporate US Holders who have long-term capital gains will generally be eligible for reduced tax rates. The deductibility of capital losses is subject to limitations. Any capital gain or loss recognized by a US Holder generally will be treated as US source gain or loss for US foreign tax credit purposes.

## Passive Foreign Investment Company Rules

A foreign corporation will be considered a PFIC for any taxable year in which (i) 75% or more of its gross income is "passive income" or (ii) 50% or more of the average quarterly value of its assets produce (or are held for the production of) "passive income." For this purpose, "passive income" generally includes interest, dividends, rents, royalties and certain gains. We currently do not believe that we were a PFIC in the taxable year ending December 31, 2020, nor do we anticipate that we will be a PFIC in future taxable years. However, the determination of PFIC status is based on an annual determination that cannot be made until the close of the taxable year, involves extensive factual investigation, including ascertaining the fair market value of all of our assets on a quarterly basis and the character of each item of income that we earn, and is subject to uncertainty in several respects. Accordingly, we cannot assure you that we will not be treated as a PFIC for the taxable year ending December 31, 2020, or any future taxable year, or that the IRS will not take a contrary position.

# 10.F.    DIVIDENDS AND PAYING AGENTS

Not applicable.

# 10.G.    STATEMENTS BY EXPERTS

Not applicable.

# 10.H.    DOCUMENTS ON DISPLAY

We maintain a website at the following address: *www.alcon.com*. The information on our website is not incorporated by reference in this Annual Report. We make available on or through our website certain reports and amendments to those reports that we file with or furnish to the SEC in accordance with the Exchange Act. We make this information available on our website free of charge as soon as reasonably practicable after we electronically file the information with, or furnish it to, the SEC.

You may read and copy any reports or other information that we file through the Electronic Data Gathering, Analysis and Retrieval (EDGAR) system through the SEC's website on the Internet at *www.sec.gov*.

We also make certain other documents available to the public (such as our Board committee charters, press releases and investor presentations) on our website (*www.alcon.com*).

Any statement in this Annual Report about any of our contracts or other documents is not necessarily complete. If the contract or document is filed as an exhibit to this Annual Report, the contract or document is deemed to modify the description contained in this Annual Report. You must review the exhibits themselves for a complete description of the contract or document.

Unless stated otherwise in this Annual Report, none of these documents form part of this Annual Report.

## 10.I.      SUBSIDIARY INFORMATION

Not applicable.

# ITEM 11.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The major financing risks faced by Alcon are managed by the Alcon treasury function. For information about the effects of currency and interest rate fluctuations and how we manage currency and interest risk, see "Item 5. Operating and Financial Review and Prospects—5.A. Operating Results" and "—5.B. Liquidity and Capital Resources". Please also see the information set forth under Note 18 to the Consolidated Financial Statements and related notes included elsewhere in this Annual Report.

# ITEM 12.   DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES

## 12.A.      DEBT SECURITIES

Not applicable.

## 12.B.      WARRANTS AND RIGHTS

Not applicable.

## 12.C.      OTHER SECURITIES

Not applicable.

## 12.D.      AMERICAN DEPOSITARY SHARES

Not applicable.

154

**A164**

# PART II

# ITEM 13.   DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES

None.

# ITEM 14.   MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS

None.

# ITEM 15.   CONTROLS AND PROCEDURES

## Disclosure Controls and Procedures

As of December 31, 2020, the end of the period covered by this Annual Report, our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act). Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that as of December 31, 2020, the end of the period covered by this Annual Report, we maintained effective disclosure controls and procedures.

## Management's Annual Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Our management, including our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of internal control over financial reporting using the criteria set forth in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the results of this evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2020.

Our independent registered public accounting firm, PricewaterhouseCoopers LLP, audited the effectiveness of our internal control over financial reporting. PricewaterhouseCoopers LLP's attestation report on our internal control over financial reporting as of December 31, 2020 is included in Item 18 of this Annual Report.

## Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that occurred during the fiscal year ended December 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

# ITEM 16A.   AUDIT COMMITTEE AND FINANCIAL EXPERT

Our Board has determined that Lynn D. Bleil, Scott Maw, Karen May and Dieter Spälti, each of whom serves on our Audit and Risk Committee ("ARC"), are independent for purposes of serving on the audit committee under Rule 10A-3 and the listing standards promulgated by the New York Stock Exchange and are audit committee financial experts.

# ITEM 16B. CODE OF ETHICS

Our Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer are bound to adhere to our Code of Business Conduct, which applies to all of our associates and members of our Board. Our Code of Business Conduct is available on our website at *www.alcon.com/about-us/responsible-business-practice*.

# ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information set forth under "Item 6. Directors, Senior Management and Employees—6.C. Board Practices—Corporate Governance—Auditors—Auditing Fees and Additional Fees" is incorporated by reference.

## Policy on Audit and Risk Committee Pre-Approval of Services of Principal Accountant

The Audit and Risk Committee has established a written policy to pre-approve, on an annual basis, all anticipated audit and non-audit services provided by our independent auditors ("Pre-Approval Policy"). These services may include audit services, audit-related services, tax services and other services. Pre-approval is generally provided for up to 12 months from the date of pre-approval, and any pre-approval is detailed as to the particular service or category of services and is generally subject to a specific budget.

The Pre-Approval Policy provides that the independent auditors may not perform any services for Alcon unless the independent auditors are engaged pursuant to the Pre-Approval Policy. In addition, the Pre-Approval Policy prohibits the Audit and Risk Committee from pre-approving certain non-audit services that are prohibited from being performed by the independent auditors by applicable securities laws. Management is required to periodically report to the Audit and Risk Committee regarding the extent of services provided by the independent auditors. In 2020, all audit-related, tax and other services provided by PwC were pre-approved.

In connection with its review and evaluation of non-audit services, the Audit and Risk Committee is required to and does consider and conclude that the provision of the non-audit services is compatible with maintaining the independence of the independent auditor.

# ITEM 16D.   EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES

Not applicable.

A169

# ITEM 16E.   PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS

The following table sets forth purchases of our Ordinary Shares by us and our affiliated purchasers during the fiscal year ended December 31, 2020:

| Period | Total Number of Shares Purchased | Average Price Paid per Share (USD) | Total Number of Shares Purchased as part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares that may yet be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| January 1-31 | — | — | — | — |
| February 1-28 | — | — | — | — |
| March 1-31 | 40,000 | 46.67 | — | — |
| April 1-30 | — | — | — | — |
| May 1-31 | — | — | — | — |
| June 1-30 | — | — | — | — |
| July 1-31 | — | — | — | — |
| August 1-31 | — | — | — | — |
| September 1-30 | 10,000 | 55.99 | — | — |
| October 1-31 | — | — | — | — |
| November 1-30 | — | — | — | — |
| December 1-31 | — | — | — | — |
| **Total** | 50,000 | 48.53 | — | — |

# ITEM 16F.   CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT

Not applicable.

# ITEM 16G.   CORPORATE GOVERNANCE

The information set forth under "Item 6. Directors, Senior Management and Employees—6.C. Board Practices—Corporate Governance—Differences from Corporate Governance Standards Relevant to US-listed Companies" is incorporated by reference.

# ITEM 16H.   MINE SAFETY DISCLOSURE

Not applicable.

162

# PART III

## ITEM 17.   FINANCIAL STATEMENTS

See response to "Item 18. Financial Statements."

## ITEM 18.   FINANCIAL STATEMENTS

Please refer to the financial statements beginning on page F-1 of this Annual Report.

# ITEM 19.   EXHIBITS

| Exhibit Number | Description |
|---|---|
| 1.1 | Articles of Incorporation of Alcon Inc., as amended December 1, 2020 (English Translation) |
| 1.2 | Regulations of the Board of Directors of Alcon Inc., as amended May 6, 2020 (English Translation) |
| 2.1 | Description of rights of each class of securities registered under Section 12 of the Securities Exchange Act of 1934 |
| 2.2 | The total amount of long-term debt securities authorized under any instrument does not exceed 10% of the total assets of Alcon and its subsidiaries on a consolidated basis. We hereby agree to furnish to the SEC, upon its request, a copy of any instrument defining the rights of holders of long-term debt of Alcon or of its subsidiaries for which consolidated or unconsolidated financial statements are required to be filed. |
| 4.1 | Separation and Distribution Agreement by and between Novartis AG and Alcon Inc. - incorporated by reference to Exhibit 99.1 to the Current Report on Form 6-K (File No. 001-31269) filed with the Securities and Exchange Commission on April 9, 2019 |
| 4.2 | Tax Matters Agreement by and between Novartis AG and Alcon Inc. - incorporated by reference to Exhibit 99.2 to the Current Report on Form 6-K (File No. 001-31269) filed with the Securities and Exchange Commission on April 9, 2019 |
| 4.3 | Employee Matters Agreement by and between Novartis AG and Alcon Inc. - incorporated by reference to Exhibit 99.3 to the Current Report on Form 6-K (File No. 001-31269) filed with the Securities and Exchange Commission on April 9, 2019 |
| 4.4 | Forward Manufacturing and Supply Agreement by and between Novartis Pharma AG and Alcon Inc. - incorporated by reference to Exhibit 99.4 to the Current Report on Form 6-K (File No. 001-31269) filed with the Securities and Exchange Commission on April 9, 2019 |
| 4.5 | Reverse Manufacturing and Supply Agreement by and between Novartis Pharma AG and Alcon Inc. - incorporated by reference to Exhibit 99.5 to the Current Report on Form 6-K (File No. 001-31269) filed with the Securities and Exchange Commission on April 9, 2019 |
| 4.6 | Transitional Services Agreement by and between Novartis AG and Alcon Inc. - incorporated by reference to Exhibit 99.6 to the Current Report on Form 6-K (File No. 001-31269) filed with the Securities and Exchange Commission on April 9, 2019 |
| 4.7 | Patent and Know-How License Agreement by Novartis AG for the benefit of Alcon Inc. - incorporated by reference to Exhibit 99.7 to the Current Report on Form 6-K (File No. 001-31269) filed with the Securities and Exchange Commission on April 9, 2019 |
| 4.8 | Patent and Know-How License Agreement by Alcon Inc. for the benefit of Novartis AG - incorporated by reference to Exhibit 99.8 to the Current Report on Form 6-K (File No. 001-31269) filed with the Securities and Exchange Commission on April 9, 2019 |
| 4.9 | Brand License Agreement by Novartis AG for the benefit of Alcon Inc. - incorporated by reference to Exhibit 99.9 to the Current Report on Form 6-K (File No. 001-31269) filed with the Securities and Exchange Commission on April 9, 2019 |
| 4.10 | Brand License Agreement by Alcon Inc. for the benefit of Novartis AG - incorporated by reference to Exhibit 99.10 to the Current Report on Form 6-K (File No. 001-31269) filed with the Securities and Exchange Commission on April 9, 2019 |
| 4.11 | Facilities Agreement by and among Alcon Inc., as borrower, Bank of America Merrill Lynch International Designated Activity Company, BNP Paribas Fortis SA/NV, Citigroup Global Markets Limited, Morgan Stanley Bank International Limited and UBS AG, London Branch, as joint lead arrangers and joint bookrunners, and Citibank Europe PLC, UK Branch, as agent, dated as of March 6, 2019 - incorporated by reference to Exhibit 4.11 to the Registration Statement on Form 20-F (File No. 001-31269) filed with the Securities and Exchange Commission on March 13, 2019 |
| 4.12 | Alcon Inc. Long Term Incentive Plan, as amended - incorporated by reference to Exhibit 4.12 to the Annual Report on Form 20-F (File No. 001-31269) filed with the Securities and Exchange Commission on February 25, 2020 |

| | |
|---|---|
| 4.13 | Alcon Inc. Deferred Bonus Stock Plan, as amended - incorporated by reference to Exhibit 4.13 to the Annual Report on Form 20-F (File No. 001-31269) filed with the Securities and Exchange Commission on February 25, 2020 |
| 4.14 | Alcon Swiss Employee Share Ownership Plan - incorporated by reference to Exhibit 99.3 to the Registration Statement on Form S-8 (File No. 333-230794) filed with the Securities and Exchange Commission on April 10, 2019 |
| 4.15 | Alcon Laboratories Ireland Share Participation Scheme - incorporated by reference to Exhibit 99.4 to the Registration Statement on Form S-8 (File No. 333-230794) filed with the Securities and Exchange Commission on April 10, 2019 |
| 4.16 | Alcon Inc. UK Share Incentive Plan, as amended |
| 8.1 | For a list of all principal subsidiaries of Alcon Inc., see "Item 18. Financial Statements-Note 28. Alcon subsidiaries". |
| 12.1 | Certification of David J. Endicott, Chief Executive Officer of Alcon Inc., Pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934 |
| 12.2 | Certification of Timothy C. Stonesifer, Chief Financial Officer of Alcon Inc., Pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934 |
| 13.1 | Certification of David J. Endicott, Chief Executive Officer of Alcon Inc., Pursuant to 18 U.S.C Section 1350 |
| 13.2 | Certification of Timothy C. Stonesifer, Chief Financial Officer of Alcon Inc., Pursuant to 18 U.S.C Section 1350 |
| 15.1 | Consent of PricewaterhouseCoopers LLP |
| 15.2 | Consent of PricewaterhouseCoopers SA |
| 101.SCH | Inline XBRL Taxonomy Extension Schema |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation |
| 101.DEF | Inline XBRL Taxonomy Extension Definition |
| 101.LAB | Inline XBRL Taxonomy Extension Label |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

A175

# Signatures

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this registration statement on its behalf.

Alcon Inc.

By:     /s/ David J. Endicott

Name:        David J. Endicott

Title:        Authorized Representative

By:     /s/ Timothy C. Stonesifer

Name:        Timothy C. Stonesifer

Title:        Authorized Representative

Date: February 23, 2021

166

**A176**

# CONSOLIDATED FINANCIAL STATEMENTS OF ALCON INC.

**Audited Consolidated Financial Statements**

| | |
|---|---|
| Consolidated Income Statement | F-2 |
| Consolidated Statement of Comprehensive Loss | F-3 |
| Consolidated Balance Sheet | F-4 |
| Consolidated Statement of Changes in Equity | F-5 |
| Consolidated Statement of Cash Flows | F-6 |
| Notes to Consolidated Financial Statements | F-7 |
| Report of Independent Registered Public Accounting Firm | F-72 |
| Report of Predecessor Independent Registered Public Accounting Firm | F-75 |

F-1

A177

**CONSOLIDATED FINANCIAL STATEMENTS OF ALCON INC.**

## Consolidated income statement

### (For the years ended December 31, 2020, 2019 and 2018)

| ($ millions except (loss) per share) | Note | 2020 | 2019 | 2018 |
|---|---|---|---|---|
| **Net sales to third parties** | 5 | **6,763** | **7,362** | **7,149** |
| Sales to former parent | 25 | — | — | 4 |
| Other revenues | 5 | 70 | 146 | — |
| **Net sales and other revenues** | | **6,833** | **7,508** | **7,153** |
| Cost of net sales | | (3,830) | (3,719) | (3,961) |
| Cost of other revenues | | (63) | (127) | — |
| **Gross profit** | | **2,940** | **3,662** | **3,192** |
| Selling, general & administration | | (2,694) | (2,847) | (2,801) |
| Research & development | | (673) | (656) | (587) |
| Other income | | 235 | 55 | 47 |
| Other expense | | (290) | (401) | (99) |
| **Operating (loss)** | | **(482)** | **(187)** | **(248)** |
| Interest expense | 6 | (124) | (113) | (24) |
| Other financial income & expense | 6 | (29) | (32) | (28) |
| **(Loss) before taxes** | | **(635)** | **(332)** | **(300)** |
| Taxes | 7 | 104 | (324) | 73 |
| **Net (loss)** | | **(531)** | **(656)** | **(227)** |
| | | | | |
| (Loss) per share ($) | | | | |
| Basic | 8 | (1.09) | (1.34) | (0.46) |
| Diluted | 8 | (1.09) | (1.34) | (0.46) |
| | | | | |
| Weighted average number of shares outstanding (millions)[1] | | | | |
| Basic | 8 | 489.0 | 488.2 | 488.2 |
| Diluted | 8 | 489.0 | 488.2 | 488.2 |

(1)   For periods prior to the Spin-off, the denominator for basic and diluted (loss) per share was calculated using 488.2 million shares of common stock distributed in the Spin-off.

The accompanying Notes form an integral part of the Consolidated Financial Statements.

**A178**

**CONSOLIDATED FINANCIAL STATEMENTS OF ALCON INC. (Continued)**

## Consolidated statement of comprehensive loss

### (For the years ended December 31, 2020, 2019 and 2018)

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| **Net (loss)** | **(531)** | **(656)** | **(227)** |
| *Other comprehensive income to be eventually recycled into the consolidated income statement:* | | | |
| Currency translation effects | 19 | (4) | (58) |
| **Total of items to eventually recycle** | **19** | **(4)** | **(58)** |
| *Other comprehensive income never to be recycled into the consolidated income statement:* | | | |
| Actuarial (losses)/gains from defined benefit plans, net of taxes[1] | (14) | (55) | 8 |
| Fair value adjustments on equity securities, net of taxes[2] | (7) | (2) | (23) |
| **Total of items never to be recycled** | **(21)** | **(57)** | **(15)** |
| **Total comprehensive (loss)** | **(533)** | **(717)** | **(300)** |

(1)  Amounts are net of tax benefits of $13 million and $11 million in 2020 and 2019, respectively, and net of tax expense of $2 million in 2018.

(2)  Amounts are net of tax benefits of $3 million and $5 million in 2020 and 2019, respectively. No taxes were recorded in 2018.

The accompanying Notes form an integral part of the Consolidated Financial Statements.

**CONSOLIDATED FINANCIAL STATEMENTS OF ALCON INC. (Continued)**

# Consolidated balance sheet

## (At December 31, 2020 and 2019)

| ($ millions) | Note | 2020 | 2019 |
|---|---|---|---|
| **Assets** | | | |
| **Non-current assets** | | | |
| Property, plant & equipment | 9 | 3,425 | 3,113 |
| Right-of-use assets | 16 | 358 | 324 |
| Goodwill | 10 | 8,905 | 8,905 |
| Intangible assets other than goodwill | 10 | 9,097 | 10,231 |
| Deferred tax assets | 11 | 399 | 354 |
| Financial assets | 12 | 218 | 307 |
| Other non-current assets | 12 | 211 | 185 |
| **Total non-current assets** | | **22,613** | **23,419** |
| **Current assets** | | | |
| Inventories | 13 | 1,644 | 1,505 |
| Trade receivables | 14 | 1,361 | 1,390 |
| Income tax receivables | | 21 | 17 |
| Cash and cash equivalents | 18 | 1,557 | 822 |
| Other current assets | 15 | 404 | 502 |
| **Total current assets** | | **4,987** | **4,236** |
| **Total assets** | | **27,600** | **27,655** |
| | | | |
| **Equity and liabilities** | | | |
| **Equity** | | | |
| Share capital | 8.1 | 20 | 20 |
| Reserves | | 18,802 | 19,283 |
| **Total equity** | | **18,822** | **19,303** |
| **Liabilities** | | | |
| **Non-current liabilities** | | | |
| Financial debts | 17 | 3,949 | 3,218 |
| Lease liabilities | 16 | 315 | 280 |
| Deferred tax liabilities | 11 | 1,196 | 1,386 |
| Provisions & other non-current liabilities | 19 | 1,060 | 1,168 |
| **Total non-current liabilities** | | **6,520** | **6,052** |
| **Current liabilities** | | | |
| Trade payables | | 876 | 833 |
| Financial debts | 17 | 169 | 261 |
| Lease liabilities | 16 | 70 | 61 |
| Current income tax liabilities | | 149 | 107 |
| Provisions & other current liabilities | 20 | 994 | 1,038 |
| **Total current liabilities** | | **2,258** | **2,300** |
| **Total liabilities** | | **8,778** | **8,352** |
| **Total equity and liabilities** | | **27,600** | **27,655** |

The accompanying Notes form an integral part of the Consolidated Financial Statements.

**CONSOLIDATED FINANCIAL STATEMENTS OF ALCON INC. (Continued)**

## Consolidated statement of changes in equity

### (For the years ended December 31, 2020, 2019 and 2018)

| ($ millions) | Share capital | Other reserves | Former parent net investment[1] | Fair value adjustments on marketable securities | Fair value adjustments on equity securities | Actuarial (losses)/gains from defined benefit plans | Cumulative currency translation effects | Total value adjustments[2] | Equity[1] |
|---|---|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2017, as previously reported | — | — | 22,942 | 25 | — | (25) | 87 | 87 | 23,029 |
| Impact of change in accounting policies[3] | | | 25 | (25) | — | — | — | (25) | — |
| Restated balance as of January 1, 2018 | — | — | 22,967 | — | — | (25) | 87 | 62 | 23,029 |
| Net (loss) | | | (227) | | | | | — | (227) |
| Other comprehensive (loss) | | | | — | (23) | 8 | (58) | (73) | (73) |
| Total comprehensive (loss) | — | — | (227) | — | (23) | 8 | (58) | (73) | (300) |
| Movements of financing provided to former parent, net | | | (119) | | | | | — | (119) |
| Other transactions with former parent | | | 27 | | | | | — | 27 |
| Other movements[4] | | | 2 | | | | | — | 2 |
| Total other movements | — | — | (90) | — | — | — | — | — | (90) |
| Balance as of December 31, 2018 | — | — | 22,650 | — | (23) | (17) | 29 | (11) | 22,639 |
| Net (loss) | | (547) | (109) | | | | | — | (656) |
| Other comprehensive (loss) | | | | — | (2) | (55) | (4) | (61) | (61) |
| Total comprehensive (loss) | — | (547) | (109) | — | (2) | (55) | (4) | (61) | (717) |
| Movements of financing provided to former parent, net | | | (2,658) | | | | | — | (2,658) |
| Other transactions with former parent | | | (46) | | | | | — | (46) |
| Reclassification of deferred equity-compensation | | | (7) | | | | | — | (7) |
| Distribution by former parent of share capital | 20 | 19,812 | (19,832) | | | | | — | — |
| Equity-based compensation | | 87 | — | | | | | — | 87 |
| Other movements[4] | | 3 | 2 | | | | | — | 5 |
| Total other movements | 20 | 19,902 | (22,541) | — | — | — | — | — | (2,619) |
| Balance as of December 31, 2019 | 20 | 19,355 | — | — | (25) | (72) | 25 | (72) | 19,303 |
| Net (loss) | | (531) | — | | | | | — | (531) |
| Other comprehensive (loss) | | | | — | (7) | (14) | 19 | (2) | (2) |
| Total comprehensive (loss) | — | (531) | — | — | (7) | (14) | 19 | (2) | (533) |
| Equity-based compensation | | 70 | — | | | | | — | 70 |
| Other movements[4] | | 5 | — | | | (23) | | (23) | (18) |
| Total other movements | — | 75 | — | — | — | (23) | — | (23) | 52 |
| Balance as of December 31, 2020 | 20 | 18,899 | — | — | (32) | (109) | 44 | (97) | 18,822 |

(1)   For periods prior to the Spin-off "Former parent net investment" and "Equity" were presented as "Retained earnings" and "Invested capital", respectively, and were renamed upon the execution of the Spin-off.

(2)   "Total value adjustments" are presented net of the corresponding tax effects.

(3)   The impact of change in accounting policies includes $25 million relating to IFRS 9 implementation and nil relating to IFRS 15 implementation.

(4)   Activity includes hyperinflationary accounting (see Note 3 to the Consolidated Financial Statements) and an adjustment to actuarial (losses) for other post-employment benefit obligation assumption changes directly related to the Spin-off on April 9, 2019 but which was not recorded at that time.

The accompanying Notes form an integral part of the Consolidated Financial Statements.

F-5

A181

**CONSOLIDATED FINANCIAL STATEMENTS OF ALCON INC. (Continued)**

# Consolidated statement of cash flows

## (For the years ended December 31, 2020, 2019 and 2018)

| ($ millions) | Note | 2020 | 2019 | 2018 |
|---|---|---|---|---|
| **Net (loss)** | | **(531)** | **(656)** | **(227)** |
| *Adjustments to reconcile net (loss) to net cash flows from operating activities* | | | | |
| Depreciation, amortization, impairments and fair value adjustments | 21.1 | 1,626 | 1,456 | 1,622 |
| Equity-based compensation expense | | 105 | 83 | — |
| Non-cash change in provisions and other non-current liabilities | | (106) | (4) | (10) |
| Losses on disposal and other adjustments on property, plant & equipment and other non-current assets, net | | 42 | 5 | 4 |
| Interest expense | | 124 | 113 | 24 |
| Other financial income & expense | | 29 | 32 | 28 |
| Taxes | | (104) | 324 | (73) |
| Interest received | | 5 | 7 | 1 |
| Interest paid | | (105) | (67) | (10) |
| Other financial payments | | (5) | (18) | (29) |
| Taxes paid | | (97) | (224) | (203) |
| **Net cash flows before working capital changes and net payments out of provisions and other non-current liabilities** | | **983** | **1,051** | **1,127** |
| Net payments out of provisions and other cash movements in non-current liabilities | | (115) | (83) | (67) |
| Change in net current assets and other operating cash flow items | 21.2 | (45) | (48) | 80 |
| **Net cash flows from operating activities** | | **823** | **920** | **1,140** |
| Purchase of property, plant & equipment | | (479) | (553) | (524) |
| Proceeds from sale of property, plant & equipment | | 6 | — | — |
| Purchase of intangible assets | | (88) | (123) | (188) |
| Purchase of financial assets | | (11) | (59) | (57) |
| Proceeds from sales of financial assets | | — | 8 | 7 |
| Purchase of other non-current assets | | — | (1) | — |
| Acquisitions of businesses, net | 21.3 | — | (283) | (239) |
| **Net cash flows used in investing activities** | | **(572)** | **(1,011)** | **(1,001)** |
| Movements of financing provided to former parent, net | | — | (2,658) | (119) |
| Proceeds from non-current financial debts, net of issuance costs | 21.4 | 744 | 3,724 | — |
| Proceeds from Bridge Facility, net of issuance costs | 21.4 | — | 1,495 | — |
| Repayment of non-current financial debts | 21.4 | — | (509) | — |
| Repayment of Bridge Facility | 21.4 | — | (1,500) | — |
| Change in current financial debts | 21.4 | (139) | 202 | (6) |
| Lease payments | 21.4 | (69) | (52) | — |
| Change in other financial receivables from former parent | 21.4 | — | 39 | 26 |
| Change in other financial liabilities to former parent | 21.4 | — | (67) | 21 |
| Other financing cash flows | | (70) | (15) | — |
| **Net cash flows from/(used in) financing activities** | | **466** | **659** | **(78)** |
| Effect of exchange rate changes on cash and cash equivalents | | 18 | 27 | (6) |
| **Net change in cash and cash equivalents** | | **735** | **595** | **55** |
| Cash and cash equivalents at January 1 | | 822 | 227 | 172 |
| **Cash and cash equivalents at December 31** | | **1,557** | **822** | **227** |

The accompanying Notes form an integral part of the Consolidated Financial Statements.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS OF ALCON INC.

## 1.  Description of business

Alcon Inc. (the "Company") and the subsidiaries it controls (collectively "Alcon") is a leading eye care company. Alcon is a multinational company specializing in the research, development, manufacturing and marketing of a broad range of eye care products within two businesses: Surgical and Vision Care. Alcon is a stock corporation organized under the laws of Switzerland, domiciled in Fribourg, Switzerland, with global headquarters located in Geneva, Switzerland.

On February 28, 2019, Novartis AG ("Novartis" or "Former Parent") shareholders at their Annual General Meeting approved the proposed 100% spin-off of Alcon through the distribution of a dividend-in-kind of new Alcon shares to Novartis shareholders and Novartis ADR holders (the "Spin-off"), subject to completion of certain conditions precedent to the distribution. Amendment No. 6 to the Company's Registration Statement on Form 20-F filed with the Securities and Exchange Commission ("SEC") on March 22, 2019, ("2018 Form 20-F"), was declared effective by the SEC on that same day. On April 9, 2019, Novartis completed the Spin-off, which resulted in the Company becoming an independent, publicly-traded company. Each Novartis shareholder of record as of April 8, 2019 and each holder of Novartis' ADR of record as of April 1, 2019 received one share of Alcon common stock for every five shares of Novartis common stock or Novartis ADR held. The shares of the Company are listed on the SIX Swiss Stock Exchange ("SIX") and on the New York Stock Exchange ("NYSE") under the symbol "ALC".

The Consolidated Financial Statements of Alcon are comprised of Consolidated Balance Sheet as of December 31, 2020 and 2019 and the Consolidated Income Statement, Consolidated Statement of Comprehensive Loss, Consolidated Statement of Changes in Equity and Consolidated Statement of Cash Flows for each of the years ended December 31, 2020, 2019 and 2018.

The country of operation and percentage ownership of the legal entities with "Total assets" or "Net sales to third parties" in excess of $5 million included in the Consolidated Financial Statements are disclosed in Note 28.

## 2.  Basis of preparation

The accompanying Consolidated Financial Statements present our historical financial position, results of operations, comprehensive loss, and cash flows in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB"), including the basis of preparation as described in this Note and with the accounting policies as described in Note 3 to these Consolidated Financial Statements.

The preparation of Consolidated Financial Statements requires management to make certain estimates and assumptions, either at the balance sheet date or during the year that affect the reported amounts of assets and liabilities as well as revenues and expenses. Actual outcomes and results could differ from those estimates and assumptions.

### Relationship with Former Parent and affiliates prior to Spin-off

The financial statements for periods prior to the Spin-off were prepared on a combined basis because the business of Alcon did not form a separate legal group until the Spin-off occurred. The information in the financial statements for periods prior to the Spin-off was derived from Novartis' Consolidated Financial Statements and accounting records, which were prepared in accordance with IFRS. Through the date of the Spin-off, all revenues and expenses as well as assets and liabilities directly associated with Alcon have been included in the financial statements. For periods prior to the Spin-off, the financial statements also include allocations of certain expenses for services provided by Novartis to Alcon and allocations of related assets, liabilities, and the Former Parent's invested capital, as applicable. The allocations were determined on a reasonable basis; however, the amounts are not necessarily representative of the amounts that would have been reflected in the financial statements had Alcon been an entity that operated independently of Novartis during the applicable periods.

IFRS does not provide principles for the preparation of combined financial statements for carve-out financial statements, and accordingly in preparing the financial statements for periods prior to the Spin-off certain accounting and allocation conventions commonly used in practice for the preparation of carve-out financial statements were applied. The assets and liabilities included in the balance sheet prior to Spin-off were measured at the carrying amounts recorded in Novartis Group Consolidated Financial Statements.

The financial statements for periods prior to the Spin-off include all Alcon subsidiaries and all Alcon business operated within Novartis Group subsidiaries over which Alcon has control, by applying the principles of IFRS 10, *Consolidated*

*Financial Statements*. Alcon controls an entity when it is exposed to, or has rights to, variable returns from its involvement with the entity and has the ability to affect those returns through its power over the entity.

The financial statements for the periods prior to the Spin-off include the assets and liabilities within Novartis subsidiaries that were attributable to the Alcon business and excluded the assets and liabilities within Alcon subsidiaries not attributable to the Alcon business.

In addition, the financial statements include, for the periods prior to the Spin-off, the assets, liabilities and results of operations of the ophthalmic over-the-counter products and a small portfolio of surgical diagnostics products that in connection with a Novartis Group business reorganization, effective as of January 1, 2018, were transferred to Alcon from the Innovative Medicines Division of Novartis.

Certain Novartis manufacturing sites performed production services for both the Alcon and Innovative Medicines Divisions of Novartis Group ("multi-divisional manufacturing sites"). The financial statements, for periods prior to the Spin-off include the carrying value of the manufacturing sites where the majority of the production is attributable to Alcon and where such sites were transferred to Alcon in connection with the Spin-off. The inventory, sales and production costs of these multi-divisional manufacturing sites that were attributable to the products of the Alcon and Innovative Medicines Divisions of Novartis Group were accounted for and reported separately by the Alcon and Innovative Medicines Divisions of Novartis Group within Novartis Group accounting systems. The supply chains of the Alcon and Innovative Medicines Divisions of Novartis Group each managed separately the distribution of their respective products produced in these multi-divisional manufacturing sites. As a result, there was no requirement for inter-divisional trading arrangements between the Alcon and Innovative Medicines Divisions of Novartis Group for the products produced in these multi-divisional manufacturing sites. Manufacturing costs attributable to the Alcon business' products produced in these multi-divisional manufacturing sites were recognized in the financial statements for periods prior to the Spin-off at cost of production.

For periods prior to the Spin-off, the financial statements include the attribution of certain assets and liabilities that were historically held at the Novartis corporate level that were specifically identifiable or attributable to Alcon on a standalone basis and were recognized on the pre-Spin-off balance sheet through retained earnings in invested capital. The most significant of which were defined benefit plans, current and deferred income taxes, financial debts, financial investments and the Alcon brand name. The Alcon brand name was used to market the products of Alcon and the products within Novartis Innovative Medicines Divisions' ophthalmology pharmaceutical business. The Novartis Group transferred the full rights to the Alcon brand name to Alcon in connection with the Spin-off. As a result, the carrying value of the Alcon brand name was fully attributed to Alcon in the financial statements.

The income and expenses related to the hedging transactions prior to the Spin-off were allocated to Alcon based on the estimated currency exposure of Alcon and are recorded to Other financial income & expense in the income statement and recognized directly through retained earnings in Invested capital (renamed upon execution of the Spin-off).

The majority of Alcon's subsidiaries were party to Novartis cash pooling arrangements with several financial institutions to maximize the availability of cash for general operating and investing purposes. Under these cash pooling arrangements, cash balances were swept by Novartis regularly from Alcon's bank accounts. The net position with the Novartis cash pooling accounts at the end of each reporting period prior to the Spin-off were reflected in the balance sheet in Other financial receivables from former parent or Other financial liabilities to former parent.

Financing transactions between Novartis and Alcon, except for receivables and payables against the Novartis cash pool described above, were excluded from the financial statements in the periods prior to the Spin-off, as none of the financing transactions were specifically related to the operation of Alcon's business. The exclusion of these financing transactions was recognized through retained earnings in Invested capital.

Dividend and other equity transactions between Alcon and Novartis were recognized directly to retained earnings in Invested capital.

Novartis third-party debt and the related interest expense were not allocated to Alcon when Alcon's subsidiaries were not the legal obligor of the debt and when Novartis borrowings were not directly attributable to Alcon's business. The financial statements for periods prior to the Spin-off include third-party debt and the related interest expense when Alcon's subsidiaries were the legal obligor of the debt and when the borrowings were directly attributable to Alcon's business.

Both before and after the Spin-off, Alcon's associates participate in defined benefit pension and other postretirement plans sponsored by Novartis; in some countries these are single employer plans dedicated to the Alcon business associates and in other countries these are plans where associates of Alcon and associates of the Novartis Group are participants. The net defined benefit and other postretirement plan liabilities and pension costs attributable to Alcon are included in the Consolidated Financial Statements for periods prior to and after the Spin-off, to the extent that the corresponding pension obligations and plan assets under those plans transferred to Alcon at the time of Spin-off or will

subsequently transfer pursuant to the Employee Matters Agreement entered into with Novartis. Refer to Note 23 to these Consolidated Financial Statements for additional disclosure on post-employment benefits for associates.

Income taxes attributable to the Alcon business in the financial statements were determined using the separate return approach, under which current and deferred income taxes are calculated as if a separate tax return had been prepared in each tax jurisdiction. In various tax jurisdictions, Alcon and Novartis businesses operated within the same legal entity and certain Alcon subsidiaries were part of a Novartis tax group. This required an assumption that the subsidiaries and operations of Alcon in those tax jurisdictions operated on a standalone basis and constitute separate taxable entities. Actual outcomes and results could differ from these separate tax return estimates, including those estimates and assumptions related to realization of tax benefits within these Novartis tax groups. Refer to Note 7 and Note 11 to these Consolidated Financial Statements for additional disclosures on income taxes.

Alcon's Invested capital in the financial statements for the periods prior to Spin-off represents the excess of total assets over total liabilities and, in addition to the items described above, was impacted by the following:

- Currency translation adjustments of the Novartis Group multi-divisional subsidiaries were allocated between Alcon and the Novartis retained businesses by applying allocation keys based on net assets of each respective business.

- Other transactions with Novartis Group as shown on the Consolidated Statement of Changes in Equity represents the movements in Invested capital resulting from the preparation of the financial statements in accordance with the basis of preparation described in this Note.

- Movements of financing provided to Novartis Group as shown on the Consolidated Statement of Changes in Equity and on the Consolidated Statement of Cash Flows primarily represent the net contributions from Alcon to Novartis Group.

For the periods prior to the Spin-off, the financial statements include charges and allocation of expenses related to certain Novartis business support functions and Novartis corporate general and administration functions. Alcon considers the charges and allocation methodology and results to be reasonable. However, the charges and allocations may not be indicative of the actual expense that would have been incurred had Alcon operated as an independent, publicly traded company for the periods prior to the Spin-off. The following is a brief description of the nature of these charges and allocations:

- Alcon received services from Novartis Business Services ("NBS"), the shared service organization of Novartis Group, across the following service domains: human resources operations, real estate and facility services, including site security and executive protection, procurement, information technology, commercial and medical support services and financial reporting and accounting operations. The financial statements include the appropriate costs related to the services rendered, without profit margin, in accordance with the historical arrangements that existed between Novartis and the Alcon business prior to the Spin-off. Refer to Note 25 to these Consolidated Financial Statements for additional disclosures.

- Certain Novartis corporate general and administrative functions costs, in the areas of corporate governance, including board of directors, corporate responsibility and other corporate functions, such as tax, corporate governance and listed company compliance, investor relations, internal audit, treasury, communications functions and the net interest on the net defined benefit liability were not charged or allocated to the Alcon business in the past. The financial statements include a reasonable allocation of these Novartis corporate general and administrative functions costs and net interest on the net defined benefit liability, based on reasonable assumptions and estimates. The corporate general and administrative function costs allocations were based on the direct and indirect costs incurred to provide the respective services. When specific identification was not practicable, a proportional cost allocation method was used, primarily based on sales, or headcount. Management believes that the allocations reasonably approximate the corporate general and administrative functions costs Alcon may have incurred had it operated as a standalone company. However, the allocations may not be indicative of the actual expense that would have been incurred had Alcon operated on a standalone basis prior to the Spin-off. Refer to Note 25 to these Consolidated Financial Statements for additional disclosures.

Management believes that all allocations were performed on a reasonable basis and reflect the services received by Alcon, the costs incurred on behalf of Alcon and the assets and liabilities of Alcon. Although the financial statements for the periods prior to the Spin-off reflect management's best estimate of all historical costs related to Alcon, this may not necessarily reflect what the results of operations, financial position, or cash flows would have been had Alcon been a separate entity prior to the Spin-off.

Agreements entered into between Alcon and Novartis in connection with the Spin-off govern the relationship between the parties following the Spin-off and provide for the allocation of various assets, liabilities, rights and obligations. These agreements also include arrangements for transition services to be provided on a temporary basis between the parties.

F-9

**A185**

Following the Spin-off, the Consolidated Financial Statements include the accounts of Alcon and no longer include any allocations from Novartis.

# 3.    Selected accounting policies

## Principles of consolidation

The Consolidated Financial Statements include the accounts of the Company and its wholly owned subsidiaries. In the event that the Company has an interest in another entity that is not wholly owned, the assets, liabilities, results of operations and cash flows of such entity are included in the Company's Consolidated Financial Statements, if the Company is exposed or has rights to variable returns from its involvement with the entity and has the ability to affect those returns through its power over the entity. The Consolidated Financial Statements of the Company are prepared in accordance with IFRS as issued by the IASB. They are prepared in accordance with the historical cost convention except for items that are required to be accounted for at fair value. All intercompany transactions and accounts within Alcon were eliminated.

The Company's financial year-end is December 31, which is also the annual closing date of the individual entities' financial statements incorporated into the Consolidated Financial Statements.

## Impact of the coronavirus ("COVID-19") pandemic

In March 2020, the World Health Organization declared the outbreak of COVID-19 a pandemic. The COVID-19 pandemic has negatively impacted the global economy, disrupted global supply chains and created significant volatility and disruption of financial markets, resulting in widespread shelter-in-place orders, business shut-downs and the deferral of non-urgent surgeries. This has had, and may continue to have, an adverse effect on our net sales, operating results and cash flow. The extent to which the COVID-19 pandemic and the related economic impact may continue to affect our financial condition or results of operations is uncertain.

We have analyzed the impact of the COVID-19 pandemic on our financial statements for the twelve months ended December 31, 2020. We have assessed various accounting estimates and other matters, including those that require consideration of forecasted financial information, in the context of the unknown future impacts of COVID-19 using information reasonably available to us at this time. The accounting estimates and other matters assessed include, but were not limited to, provisions for expected credit losses, recoverability of goodwill and other intangible assets, financial instruments, inventory provisions, associate benefits, income taxes and revenue recognition. Based on our assessment performed, the resulting provisions recorded were not material to our Consolidated Financial Statements for the twelve months ended December 31, 2020. However, the inherent uncertainties of COVID-19 including the duration, scope, and severity of the pandemic may result in actual outcomes that differ materially from our current assumptions and estimates.

## Foreign currencies

The Consolidated Financial Statements are presented in US dollars ("USD"). The functional currency of individual entities incorporated into the Consolidated Financial Statements are generally the local currency of the respective entity. The functional currency used for the reporting of certain Swiss entities is USD instead of their respective local currencies. This reflects the fact that the cash flows and transactions of these entities are primarily denominated in these currencies.

For entities not operating in hyperinflationary economies, the entities results, financial position and cash flows that do not have USD as their functional currency are translated into USD using the following exchange rates:

- Income, expense and cash flows using for each month the average exchange rate with the USD values for each month being aggregated during the year.

- Balance sheet using year-end exchange rates.

- Resulting exchange rate differences are recognized in other comprehensive income.

The hyperinflationary economies in which Alcon operates are Argentina and Venezuela. Venezuela was hyperinflationary for all years presented, and Argentina became hyperinflationary effective July 1, 2018, requiring retroactive implementation of hyperinflation accounting as of January 1, 2018.

F-10

A186

The impact of the restatement of the non-monetary assets and liabilities with the general price index at the beginning of the period is recorded in "Other Reserves" in equity. The subsequent gains or losses resulting from the restatement of non-monetary assets are recorded in "Other financial income & expense" in the consolidated income statement.

## Acquisition of assets

Acquired assets are initially recognized on the balance sheet at cost if they meet the criteria for capitalization. The capitalized cost of the asset includes the purchase price and any directly attributable costs for bringing the asset into the condition to operate as intended. Expected costs for obligations to dismantle and remove property, plant and equipment when it is no longer used are included in their cost.

## Property, plant and equipment

Property, plant and equipment are depreciated on a straight-line basis over their estimated useful lives. Freehold land is not depreciated. The related depreciation expense is included in the costs of the functions using the asset or "Cost of net sales" in the consolidated income statement.

Property, plant and equipment are assessed for impairment whenever there is an indication that the balance sheet carrying amount may not be recoverable using cash flow projections for the useful life.

The following table shows the respective useful lives for property, plant and equipment:

|  | Useful life |
|---|---|
| Buildings and improvements | 10 to 40 years |
| Machinery and other equipment |  |
| Machinery and equipment | 5 to 20 years |
| Furniture and vehicles | 5 to 10 years |
| Computer hardware | 3 to 7 years |

## Business combinations

From January 1, 2020, with the adoption of Amendments to IFRS 3, *Business Combinations*, Alcon's accounting policy for business combinations is as follows:

The acquisition method of accounting is used to account for all business combinations, regardless of whether equity instruments or other assets are acquired. The consideration transferred for the acquisition of a subsidiary may include:

- fair values of the assets transferred;

- liabilities incurred to the former owners of the acquired business;

- equity interests issued by the Company;

- fair value of an asset or liability resulting from a contingent consideration arrangement; and

- fair value of any pre-existing equity interest in the subsidiary.

Identifiable assets acquired and liabilities assumed in a business combination are measured initially at their fair values at the acquisition date. The excess of the consideration transferred over the fair value of the net identifiable assets acquired is recorded as goodwill, or directly in the income statement if it is a bargain purchase. Alcon primarily uses net present value techniques, utilizing post-tax cash flows and discount rates in calculating the fair value of identifiable assets acquired when allocating the purchase consideration paid for the acquisition. The estimates used in calculating fair values involve significant judgment by management and include assumptions with measurement uncertainty such as, the amount and timing of projected cash flows, long-term sales forecasts, the timing and probability of regulatory and commercial success, and the discount rate.

Acquisition related costs are expensed as incurred.

Alcon may elect on a transaction-by-transaction basis to apply the optional concentration test to assess whether a transaction qualifies as a business. Under the test, when substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or a group of similar identifiable assets, Alcon will account for the transaction as an asset purchase and not a business combination.

If the concentration test is not met, or Alcon elects not to apply this optional test, Alcon will perform an assessment focusing on the existence of inputs and processes that have the ability to create outputs to determine whether the transaction is an asset purchase or a business combination.

Prior to the adoption of Amendments to IFRS 3 on January 1, 2020, Alcon's accounting policy for business combinations was as follows:

The acquisition method of accounting is used to account for all business combinations, regardless of whether equity instruments or other assets are acquired. The consideration transferred for the acquisition of a subsidiary may include:

- fair values of the assets transferred;

- liabilities incurred to the former owners of the acquired business;

- equity interests issued by the Company;

- fair value of an asset or liability resulting from a contingent consideration arrangement; and

- fair value of any pre-existing equity interest in the subsidiary.

Identifiable assets acquired and liabilities assumed in a business combination are measured initially at their fair values at the acquisition date. The excess of the consideration transferred over the fair value of the net identifiable assets acquired is recorded as goodwill, or directly in the income statement if it is a bargain purchase. Alcon primarily uses net present value techniques, utilizing post-tax cash flows and discount rates in calculating the fair value of net identifiable assets acquired when allocating the purchase consideration paid for the acquisition. The estimates used in calculating fair values involve significant judgment by management and include assumptions with measurement uncertainty such as, the amount and timing of projected cash flows, long-term sales forecasts, the timing and probability of regulatory and commercial success, and the discount rate.

Acquisition related costs are expensed as incurred.

## Goodwill and intangible assets

The annual impairment testing date is Alcon's financial year-end, December 31.

### Goodwill

Goodwill arises in a business combination and is the excess of the consideration transferred to acquire a business over the underlying fair value of the net identified assets acquired. It is allocated to groups of cash generating units ("CGUs") which are usually represented by the reportable segments, which are the same as Alcon's operating segments. Goodwill is tested for impairment annually at the level of these groups of CGUs, and any impairment charges are recorded under "Other expense" in the consolidated income statement.

### Intangible assets available for use

Alcon has the following classes of available-for-use intangible assets: Currently marketed products, Marketing know-how, Technologies, Other intangible assets (including computer software) and the Alcon brand name.

Currently marketed products represent the composite value of acquired intellectual property, patents, and distribution rights and product trade names.

Marketing know-how represents the value attributable to the expertise acquired for marketing and distributing Alcon surgical products.

Technologies represent identified and separable acquired know-how used in the research, development and production processes.

Significant investments in internally developed and acquired software are capitalized and included in the "Other" category and amortized once available for use.

The Alcon brand name is shown separately as it is the only Alcon intangible asset that is available for use with an indefinite useful life. Alcon considers it appropriate that the brand name has an indefinite life since the branded products have a history of strong revenue and cash flow performance, and Alcon has the intent and ability to support the brand with spending to maintain its value for the foreseeable future.

Except for the Alcon brand name, intangible assets available for use are amortized over their estimated useful lives on a straight-line basis and evaluated for potential impairment whenever facts and circumstances indicate that their carrying value may not be recoverable. The Alcon brand name is not amortized, but evaluated for potential impairment annually.

F-12

A188

The following table shows the respective useful lives for available-for-use intangible assets and the location in the consolidated income statement in which the respective amortization and any potential impairment charge is recognized:

| | Useful life | Income statement location for amortization and impairment charges |
|---|---|---|
| Currently marketed products | 5 to 20 years | "Cost of net sales" |
| Marketing know-how | 25 years | "Cost of net sales" |
| Technologies | 10 to 20 years | "Cost of net sales" or "Research and Development" |
| Other (including software) | 3 to 10 years | In the respective functional expense |
| Alcon brand name | Not amortized, indefinite useful life | "Other expense" |

From July 1, 2019, the useful life of Alcon's new SAP ERP software was extended from 7 years to 10 years on a prospective basis based on Alcon's multi-year transformation program which centers on one ERP platform across the organization. This change in estimate resulted in a $5 million reduction in amortization expense during the six months ended December 31, 2019 and a $10 million reduction in amortization expense for the twelve months ended December 31, 2020. This change in estimate will reduce amortization expense up to $10 million per year during the remaining useful life of the SAP ERP software assets placed in service at the time of the change.

The corresponding "Intangible assets available for use" portion of the accounting policy was updated in 2019 to reflect that the useful life for Other intangible assets (including software) was extended from 3 to 7 years to 3 to 10 years.

## Acquired In-Process Research & Development ("IPR&D")

Acquired research and development intangible assets, which are still under development and have accordingly not yet obtained marketing approval, are recognized as IPR&D.

IPR&D is not amortized, but evaluated for potential impairment on an annual basis or when facts and circumstances warrant. IPR&D is considered impaired when its balance sheet carrying amount exceeds its estimated recoverable amount, which is defined as the higher of its fair value less costs of disposal ("FVLCOD") and its value in use ("VIU"). Usually, Alcon applies the FVLCOD method for its impairment assessments. Under this approach when evaluating IPR&D for potential impairment, FVLCOD is estimated using net present value techniques utilizing post-tax cash flows and discount rates as there are no direct or indirect observable prices in active markets for identical or similar assets. The estimates used in calculating the net present values involve significant judgment by management and include assumptions with measurement uncertainty such as, the amount and timing of projected cash flows, long-term sales forecasts, discount rate, and the timing and probability of regulatory and commercial success. In the limited cases where the VIU method would be applied, net present value techniques would be applied using pre-tax cash flows and discount rates.

Any impairment charge is recorded in the consolidated income statement under "Research & development".

Once a project included in IPR&D has been successfully developed it is transferred to the "Currently marketed products" category.

## Impairment of goodwill, Alcon brand name and definite lived intangible assets

A CGU to which goodwill has been allocated (reportable segments) is considered impaired when its carrying amount, including the goodwill, exceeds its recoverable amount, which is defined as the higher of its FVLCOD and its VIU. If the recoverable amount of the reportable segment is less than its carrying amount, an impairment loss shall be recognized. The impairment loss shall be allocated to reduce the carrying amount of any goodwill allocated to the reportable segment first, with any remaining impairment loss allocated to other assets of the reportable segment on a pro-rata basis of their carrying amount.

An intangible asset other than goodwill is considered impaired when its balance sheet carrying amount exceeds its estimated recoverable amount, which is defined as the higher of its FVLCOD and its VIU. If the recoverable amount of an asset is less than its carrying amount, the carrying amount of the asset shall be reduced to its recoverable amount. That reduction is an impairment loss. Usually, Alcon applies the FVLCOD method for its impairment assessment. In most cases no direct or indirect observable market prices for identical or similar assets are available to measure the fair value less costs of disposal. Therefore, an estimate of FVLCOD is based on net present value techniques utilizing post-tax cash flows and discount rates. In the limited cases where the VIU method would be applied, net present value techniques would be applied using pre-tax cash flows and discount rates.

FVLCOD reflects estimates of assumptions that market participants would be expected to use when pricing the asset or CGUs, and for this purpose management considers the range of economic conditions that are expected to exist over the remaining useful life of the asset.

The estimates used in calculating the net present values involve significant judgment by management and include assumptions with measurement uncertainty, such as the following:

- Amount and timing of projected cash flows;
- Long-term sales forecasts for periods of up to 25 years including sales growth rates;
- Royalty rate for the Alcon brand name;
- Terminal growth rate; and
- Discount rate.

Other assumptions used in the net present values calculation include:

- Future tax rate;
- Actions of competitors (launch of competing products, marketing initiatives, etc.); and
- Outcome of R&D activities and forecast of related costs (future product developments).

Generally, for intangible assets with a definite useful life Alcon uses cash flow projections for the whole useful life of these assets. For goodwill and the Alcon brand name, Alcon generally utilizes cash flow projections for a five-year period based on management forecasts, with a terminal value based on cash flow projections considering the long-term expected inflation rates and impact of demographic trends of the population to which Alcon products are prescribed, for later periods. Probability-weighted scenarios are typically used.

Discount rates used consider Alcon estimated weighted average cost of capital adjusted for specific country and currency risks associated with cash flow projections to approximate the weighted average cost of capital of a comparable market participant. Actual cash flows and values could vary significantly from forecasted future cash flows and related values derived using discounting techniques.

## Cash and cash equivalents

Cash and cash equivalents includes cash on hand, deposits held at call with financial institutions, and other short-term and highly liquid investments with original or weighted-average maturities of three months or less which are readily convertible to known amounts of cash and which are subject to an insignificant risk of changes in value. Bank overdrafts are usually presented within current financial debts on the consolidated balance sheet except in cases where a right of offset has been agreed with a bank which then allows for presentation on a net basis.

## Financial assets

Non-current financial assets such as loans and long-term receivables from customers, primarily related to surgical equipment sales arrangements, advances and other deposits, are carried at amortized cost, which reflects the time value of money, less any allowances for uncollectable amounts.

Alcon assesses on a forward-looking basis the expected credit losses associated with its non-current financial assets valued at amortized cost.

For loans, advances and other deposits valued at amortized cost, impairments, which are based on their expected credit losses, and exchange rate losses are included in "Other expense" in the consolidated income statement and exchange rate gains and interest income, using the effective interest rate method, are included in "Other income" in the consolidated income statement.

For long-term receivables from customers, provisions for uncollectable amounts, which are based on their expected credit losses, are recorded as marketing and selling costs recognized in the consolidated income statement within "Selling, general & administration" expenses.

Fund investments are valued at fair value through profit and loss ("FVPL"). Unrealized gains and losses, including exchange gains and losses, are recognized in the consolidated income statement in "Other income" for gains and "Other expense" for losses.

Equity securities and convertible notes receivable held as strategic investments are generally designated at the date of acquisition as financial assets valued at fair value through other comprehensive income with no subsequent recycling through profit and loss. Unrealized gains and losses, including exchange gains and losses, are recorded as a fair value

adjustment in the consolidated statement of comprehensive income. They are reclassified to "Other Reserves" when the equity security is sold. If these equity securities and convertible notes receivable are not designated at the date of acquisition as financial assets valued at fair value through other comprehensive income, they are valued at FVPL, as described above for fund investments. Changes in fair value of options to acquire development stage companies are charged to research and development expense.

Derivative financial instruments are initially recognized in the consolidated balance sheet at fair value and are remeasured to their current fair value at the end of each subsequent reporting period. The valuation of forward exchange rate contracts and foreign exchange swaps are based on the discounted cash flow model, using interest curves and spot rates at the reporting date as observable inputs. Unsettled forward contracts and swaps are measured at fair value at quarter-end with changes in fair value recorded to the consolidated income statement as unrealized gains or losses in "Other financial income & expense". Settled forward contracts and swaps are measured at maturity date at fair value with corresponding realized gains or losses recognized in the consolidated income statement in "Other financial income & expense". No hedge accounting is applied for these arrangements.

## Inventories

Inventory is valued at acquisition or production cost determined on a first-in, first-out basis. This value is used for the "Cost of net sales" and "Cost of other revenues" in the consolidated income statement. Unsalable inventory is fully written off in the consolidated income statement under "Cost of net sales" and "Cost of other revenues".

## Trade receivables

Trade receivables are initially recognized at their invoiced amounts, including any related sales taxes less adjustments for estimated revenue deductions such as chargebacks and cash discounts.

Provisions for expected credit losses are established using an expected credit loss model ("ECL"). The provisions are based on a forward-looking ECL, which includes possible default events on the trade receivables over the entire holding period of the trade receivable. These provisions represent the difference between the trade receivable's carrying amount and the estimated net collectible amount. Charges for doubtful trade receivables are recorded as marketing and selling costs recognized in the consolidated income statement within "Selling, general & administration" expenses.

## Leases

Effective January 1, 2019, Alcon adopted IFRS 16, *Leases*. As lessee, Alcon assesses whether a contract contains a lease at inception of a contract based on whether the contract conveys the right to control the use of an identified asset for a period of time in exchange for consideration. Alcon recognizes a right-of-use asset and a corresponding lease liability for all arrangements in which it is a lessee, except for leases with a term of twelve months or less (short-term leases) and low value leases for which Alcon has elected the recognition exemptions allowed under IFRS 16.

### Right-of-use assets

Right-of-use assets are initially recognized at cost, which is comprised of the amount of the initial measurement of the corresponding lease liabilities, adjusted for any lease payments made at or prior to the commencement date of the lease, lease incentives received and initial direct costs incurred, as well as any expected costs for obligations to dismantle and remove right-of-use assets when they are no longer used.

Right-of-use assets are depreciated on a straight-line basis over the shorter of the useful life of the right-of-use asset or the end of the lease term.

Right-of-use assets are assessed for impairment whenever there is an indication that the balance sheet carrying amount may not be recoverable using cash flow projections for the useful life.

### Lease liabilities

Lease liabilities are accounted for at amortized cost and are initially measured at the present value of future lease payments and are classified as current or non-current based on the due dates of the underlying principal payments. In determining the lease term, Alcon evaluates the renewal options and termination options reasonably certain to be exercised. Lease payments are discounted using the interest rate implicit in the lease or, if not readily determinable, the incremental borrowing rate Alcon would be expected to pay within the respective markets, on a borrowing with a similar term and security. Interest in the period is recorded within "Interest expense" in Alcon's consolidated income statement.

Lease liabilities are remeasured for changes in estimated lease term, future lease payments arising from a change in an index or rate, amounts expected to be payable under a residual value guarantee, or in assessment of whether Alcon will exercise a purchase, extension or termination option. Changes to initial lease contract terms are assessed to determine

their impact on the scope of lease, and any modifications increasing the scope of the lease are treated as new contracts under the initial measurement principles, while modifications that do not increase or that decrease the scope of the lease result in an adjustment to the right-of-use asset which is remeasured as of the date of the modification.

Principal payments made on lease liabilities and any initial direct costs paid are classified as financing cash outflows, while interest payments are classified as operating cash outflows.

Payments associated with short-term leases and leases of low-value assets are recognized on a straight-line basis as an expense in the consolidated income statement and are classified as cash flows from operating activities. Short-term leases are leases with a lease term of twelve months in duration or less.

## Legal liabilities

Alcon is subject to contingencies arising in the ordinary course of business such as patent litigation and other product-related litigation, commercial litigation, and governmental investigations and proceedings. Provisions are recorded where a reliable estimate can be made of the probable outcome of legal or other disputes against the subsidiary.

## Contingent consideration

In a business combination, it is necessary to recognize contingent future payments to previous owners representing contractually defined potential amounts as a liability. Usually for Alcon, these are linked to development or commercial milestones related to certain assets and are recognized as a financial liability at their fair value, which is then re-measured at each subsequent reporting date.

For the determination of the fair value of a contingent consideration various unobservable inputs are used. A change in these inputs might result in a significantly higher or lower fair value measurement. The inputs used are, among others, the timing and probability of regulatory and commercial success, sales forecast and assumptions regarding the discount rate, timing and different scenarios of triggering events. The significance and usage of these inputs to each contingent consideration may vary due to differences in the timing and triggering events for payments or in the nature of the asset related to the contingent consideration. These estimations typically depend on factors such as technical milestones or market performance and are adjusted for the probability of their likelihood of payment, and if material, appropriately discounted to reflect the impact of time.

Changes in the fair value of contingent consideration liabilities in subsequent periods are recognized in the consolidated income statement in "Cost of net sales" for currently marketed products and in "Research & development" for IPR&D.

The effect of unwinding the discount over time is recognized in "Interest expense" in the consolidated income statement.

## Defined benefit pension plans and other post-employment benefits

The liability or asset recognized in the balance sheet in respect of defined benefit pension plans and other post-employment benefits is the present value of the defined benefit obligation at the end of the reporting period less the fair value of plan assets. The defined benefit obligation is calculated annually by independent actuaries using the projected unit credit method.

The present value of the defined benefit obligation is determined by discounting the estimated future cash outflows using interest rates of high-quality corporate bonds that are denominated in the currency in which the benefits will be paid, and that have approximating to the terms of the related obligation. In countries where there is no sufficient market for such bonds, the market rates on government bonds are used.

The current service cost for such post-employment benefit plans is included in the personnel expenses of the various functions where the associates are employed. The net interest on the net defined benefit liability is recognized as "Other expense" or "Other income". The net interest cost is calculated by applying the discount rate to the net balance of the defined benefit obligation and the fair value of plan assets. Past service cost is recognized as "Other expense" or "Other income" in the consolidated income statement for the change in the present value of a defined benefit obligation for employee service in prior periods resulting from a plan amendment or a curtailment.

Remeasurement gains and losses arising from experience adjustments and changes in actuarial assumptions are recognized in the period in which they occur, directly in other comprehensive income/(loss).

## Defined contribution plans

For defined contribution plans, Alcon contributes to publicly or privately administered plans. Alcon has no further payment obligations once the contributions have been paid. The contributions are included in the personnel expenses of the various functions where the associates are employed.

## Financial debts

Financial debts are initially recognized at fair value, net of transaction costs incurred. Financial debts are subsequently measured at amortized cost. Any difference between the proceeds (net of transaction costs and discounts) and the redemption amount is recognized in the consolidated income statement over the period of the financial debts using the effective interest method. Fees paid on the establishment of credit facilities are recognized as transaction costs of the financial debt to the extent that it is probable that some or all of the facility will be drawn down. In this case, the fee is deferred until the draw down occurs. To the extent that there is no evidence that it is probable that some or all of the facility will be drawn down, the fee is capitalized as a prepayment for liquidity services and amortized over the period of the facility to which it relates, and is recognized in "Other financial income & expense" in the consolidated income statement.

Financial debts are derecognized from the balance sheet when the obligation specified in the contract is discharged, cancelled or expired. The difference between the carrying amount of a financial debt that has been extinguished and the consideration paid, including any non-cash assets transferred or liabilities assumed, is recognized in "Other financial income & expense" in the consolidated income statement.

Interest paid on financial debts is classified as operating activities in the consolidated statement of cash flows. Financial debts are classified as current liabilities unless Alcon has an unconditional right and intent to defer the settlement of the liability for at least twelve months after the reporting period.

## Revenue

### Net sales to third parties

Revenue on the sale of Alcon products and services, which is recorded as "Net sales to third parties" in the consolidated income statement, is recognized when a contractual promise to a customer (performance obligation) has been fulfilled by transferring control over the promised goods and services to the customer, substantially all of which is at the point in time of shipment to or receipt of the products by the customer or when the services are performed. If contracts contain customer acceptance provisions, revenue would be recognized upon the satisfaction of acceptance criteria. The amount of revenue to be recognized is based on the consideration Alcon expects to receive in exchange for its goods and services. If a contract contains more than one performance obligation, the consideration is allocated based on the relative standalone selling price of each performance obligation.

Surgical equipment may be sold together with other products and services under a single contract and may be structured as an outright cash sale, an installment sale, or lease. Surgical equipment installment sales and leases have a fixed payment amount which the customer may pay either in fixed intervals or as the customer purchases consumables and/or implantables. Revenues are recognized upon satisfaction of each of the performance obligations in the contract and the consideration is allocated based on the relative standalone selling price of each performance obligation.

- Surgical equipment revenue from outright cash sales and installment sales arrangements is recognized at the point in time when control is transferred to the customer. Current portion of long-term receivables from customers and long-term receivables from customers for installment sales arrangements are recorded in "Other current assets" (see "Current portion of long-term receivables from customers" in Note 15 of these Consolidated Financial Statements) and "Financial assets" (see "Long-term receivables from customers" in Note 12 of these Consolidated Financial Statements), respectively. Financing income for installment sales arrangements longer than twelve months is recognized over the term of the arrangement in "Other Income". Alcon applies the practical expedient under IFRS 15 to installment sales arrangements that are twelve months or less in duration.

- In addition to cash and installment sales, revenue is recognized under finance and operating lease arrangements. Leases in which Alcon transfers substantially all the risks and rewards incidental to ownership to the customer are treated as finance lease arrangements. Revenue from finance lease arrangements is recognized at amounts equal to the fair value of the equipment, which approximates the present value of the minimum lease payments under the arrangements. As interest rates embedded in lease arrangements are approximately market rates, revenue under finance lease arrangements is comparable to revenue for outright sales. Finance income for arrangements longer than twelve months is deferred and subsequently recognized based on a pattern that approximates the use of the effective interest method and recorded in "Other income". Operating lease revenue for equipment rentals is recognized on a straight-line basis over the lease term in "Net sales to third parties".

The consideration Alcon receives in exchange for its goods or services may be fixed or variable. Variable consideration is only recognized when it is highly probable that a significant reversal of cumulative sales will not occur. The most common elements of variable consideration are listed below:

<div align="center">F-17</div>

<div align="right">A193</div>

- Rebates and discounts granted to government agencies, wholesalers, retail pharmacies and other customers are provisioned and recorded as a deduction from revenue at the time the related revenues are recorded or when the incentives are offered. They are calculated on the basis of historical experience and the specific terms in the individual agreements.

- Cash discounts are offered to customers to encourage prompt payment and are provisioned and recorded as revenue deductions at the time the related sales are recorded.

- Sales returns provisions are recognized and recorded as revenue deductions when there is historical experience of Alcon agreeing to customer returns and Alcon can reasonably estimate expected future returns. In doing so, the estimated rate of return is applied, determined based on historical experience of customer returns and considering any other relevant factors. This is applied to the amounts invoiced, also considering the amount of returned products to be destroyed versus products that can be placed back in inventory for resale. Where shipments are made on a re-sale or return basis, without sufficient historical experience for estimating sales returns, revenue is only recorded when there is evidence of consumption or when the right of return has expired.

Provisions for revenue deductions are adjusted to actual amounts as rebates, discounts and returns are processed. The provision represents estimates of the related obligations, requiring the use of judgment when estimating the effect of these sales deductions.

Other revenues

"Other revenues" include revenue from contract manufacturing services provided to the Former Parent which are recognized over time as the service obligations are completed and third party royalty income. Associated costs for contract manufacturing services are recognized in "Cost of other revenues".

## Research & development

Internal research & development ("R&D") costs are fully charged to "Research & development" in the consolidated income statement in the period in which they are incurred. Alcon considers that regulatory and other uncertainties inherent in the development of new products preclude the capitalization of internal development expenses as an intangible asset until marketing approval from a regulatory authority is obtained in a major market such as the United States, the European Union, Switzerland, China or Japan.

Payments made to third parties to in-license or acquire intellectual property rights and products, including initial upfront and subsequent milestone payments, are capitalized as intangible assets. If additional payments are made to the originator company to continue to perform R&D activities, an evaluation is made as to the nature of the payments. Such additional payments will be expensed if they are deemed to be compensation for subcontracted R&D services not resulting in an additional transfer of intellectual property rights to Alcon. Such additional payments will be capitalized if they are deemed to be compensation for the transfer to Alcon of additional intellectual property developed at the risk of the originator company. Subsequent internal R&D costs in relation to IPR&D and other assets are expensed until such time that technical feasibility can be proven, as demonstrated by the receipt of marketing approval for the related product from a regulatory authority in a major market.

## Equity-based compensation

Each of the periods presented include expense related to incentive compensation provided to eligible Alcon associates in the form of equity-settled or equity-based awards including restricted stock units ("RSUs") and performance stock units ("PSUs").

Alcon expenses the fair values of RSUs and PSUs granted to associates as compensation over the related vesting periods within the various functions where the associates are employed. The fair values of the awards are determined on their grant dates and are adjusted to account for the specific provisions of each of the corresponding grant agreements.

Alcon RSUs do not entitle the recipients to dividends. As such, the fair value upon grant is therefore based on the Alcon share price at the grant date adjusted for potential future dividends to be paid within the holding period. The fair value of these grants, after making adjustments for assumptions related to their forfeiture during the vesting period, is expensed on a straight-line basis over the respective vesting period.

PSUs are subject to certain performance criteria being achieved during the vesting period and require plan participants to provide services during the vesting period. PSUs granted under Alcon's plans are subject to performance criteria based on internal performance metrics. The expense is determined taking into account assumptions concerning performance during the period relative to targets and expected forfeitures due to plan participants not meeting their service conditions. These assumptions are periodically adjusted. Any change in estimates for past services is recorded immediately as an expense or income in the consolidated income statement and amounts for future periods are expensed over the

remaining vesting period. As a result, at the end of the vesting period, the total charge during the whole vesting period represents the amount that will finally vest. The number of equity instruments that finally vest is determined at the vesting date.

If a plan participant leaves Alcon for reasons other than retirement, disability or death, then unvested restricted shares, RSUs and PSUs are forfeited, unless determined otherwise by the provision of the plan rules or by the Compensation Committee of the Alcon Board of Directors, for example, in connection with a reorganization.

## Restructuring charges

Restructuring provisions are recognized for the direct expenditures arising from the restructuring, where the plans are sufficiently detailed and where appropriate communication to those affected has been made.

Charges to increase restructuring provisions are included in "Other expense" in the consolidated income statement. Corresponding releases are recorded in "Other income" in the consolidated income statement.

## Taxes

Taxes on income are expensed in the same periods as the revenues and expenses to which they relate and include any interest and penalties incurred during the period. Deferred taxes are determined using the comprehensive liability method and are calculated on the temporary differences that arise between the tax base of an asset or liability and its carrying value in the balance sheet prepared for purposes of these Consolidated Financial Statements, except for those temporary differences related to investments in subsidiaries where the timing of their reversal can be controlled and it is probable that the difference will not reverse in the foreseeable future. Since the retained earnings are reinvested, withholding or other taxes on eventual distribution of a subsidiary's retained earnings are only taken into account when a dividend has been planned.

The estimated amounts for current and deferred tax assets or liabilities, including any amounts related to any uncertain tax positions, are based on currently known facts and circumstances. Tax returns are based on an interpretation of tax laws and regulations and reflect estimates based on these judgments and interpretations. The tax returns are subject to examination by the competent taxing authorities which may result in an assessment being made requiring payments of additional tax, interest or penalties. Inherent uncertainties exist in the estimates of the tax positions.

## Earnings/(loss) per share

Basic earnings (loss) per share is based on the weighted average number of common shares outstanding. Diluted earnings (loss) per share is based on the weighted average number of common shares outstanding and all dilutive potential common shares outstanding.

## Impact of adopting amended standards in 2020

Effective January 1, 2020, Alcon adopted Amendments to IFRS 3, *Business Combinations*, for transactions occurring on or after January 1, 2020. The amendments clarify the definition of a business, with the objective of assisting entities to determine whether a transaction should be accounted for as a business combination or an asset acquisition. The amendments define a business as an integrated set of activities and assets that is capable of being conducted and managed for the purpose of providing goods or services to customers, generating investment income (such as dividends or interest) or generating other income from ordinary activities.

One of the key changes is the introduction of an optional concentration test that permits a simplified assessment of whether an acquired set of activities and assets is not a business. The introduction of the optional concentration test is a fundamental change in the determination of a business combination, applied on a transaction-by-transaction basis. Specifically, when substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or a group of similar assets, the set is not a business.

If the initial concentration test is not met, or Alcon elects not to apply the concentration test, an assessment focusing on the existence of inputs and processes that have the ability to create outputs is required. The changes to the definition of a business will likely result in Alcon accounting for more acquisitions as asset acquisitions.

The adoption of this amended standard on January 1, 2020 did not have a significant impact on our Consolidated Financial Statements.

## New standards and interpretations not yet adopted

There are no IFRS standards or interpretations not yet effective that would be expected to have a material impact on Alcon.

# 4. Significant transactions

## Significant transactions in 2020

### Series 2030 notes issuance

On May 27, 2020, Alcon, through its wholly owned subsidiary Alcon Finance Corporation ("AFC"), completed an offering of $750 million of non-current financial debt consisting of 2.600% senior notes due 2030. The senior notes are described in Note 17 of these Consolidated Financial Statements.

## Significant transactions in 2019

### Refinancing of Bridge Facility and Facility A financial debts

On September 23, 2019, Alcon, through its wholly owned subsidiary AFC, refinanced $2 billion of the bridge and term loans, which had been issued in April 2019, with $500 million of 2.750% senior notes due 2026, $1 billion of 3.000% senior notes due 2029, and $500 million of 3.800% senior notes due 2049. The bridge and term loans, notes, and refinancing are described in Note 17 of these Consolidated Financial Statements.

### Completion of Spin-off from Novartis through a dividend in kind distribution to Novartis shareholders

The Spin-off was executed on April 9, 2019 as described in Note 1 of these Consolidated Financial Statements. The below transactions occurred in April 2019, immediately preceding the Spin-off.

On April 2, 2019, Alcon borrowed $3.2 billion against the bridge and other term loans which were executed on March 6, 2019 and are described in Note 17 of these Consolidated Financial Statements. These borrowings increased Alcon's third party financial debts to $3.5 billion at the date of Spin-off. Through a series of intercompany transactions, Alcon then paid approximately $3.1 billion in cash to Novartis and its affiliates prior to the Spin-off, decreasing Alcon's net assets to approximately $20.0 billion at the date of Spin-off.

### Surgical - Acquisition of PowerVision, Inc.

On March 13, 2019, Alcon acquired 100% of the outstanding shares and equity of PowerVision, Inc. ("PowerVision"), a privately-held, US-based company focused on developing accommodative, implantable intraocular lenses. This technology allows the intraocular lens to respond to natural muscular movements in the eye to alter shape and focus. The PowerVision acquisition was executed as part of Alcon's commitment to innovation in advanced technology intraocular lenses ("AT-IOLs").

The fair value of the total purchase consideration was $424 million. This amount consisted of an initial cash payment of $289 million and the fair value of the probability weighted contingent consideration of $135 million due to PowerVision shareholders, which they are eligible to receive upon the achievement of specified regulatory and commercialization milestones. The purchase price allocation resulted in net identifiable assets of $418 million, which consisted of in-process research & development intangible assets of $505 million, a net deferred tax liability of $93 million, and other net assets of $6 million. Goodwill of $6 million was also recognized which is attributable to the assembled workforce. Cash paid for the acquisition, net of cash acquired, was $283 million. The 2019 results of operations following the date of acquisition and transaction costs for the acquisition were not material.

## Significant transactions in 2018

### Surgical - Acquisition of TrueVision Systems, Inc.

On December 19, 2018, Alcon acquired 100% of the outstanding shares and equity of TrueVision Systems, Inc. ("TrueVision"), a privately held US-based company. TrueVision developed the 3D scope technology currently used in the commercially marketed Alcon product *NGENUITY*. This technology allows retina surgery specialists to have a 3D visualization of the back of the eye with greater depth and detail than traditional microscopes.

The fair value of the total purchase consideration was $146 million. This amount consists of an initial cash payment of $110 million and the fair value of the probability weighted contingent consideration of $36 million due to TrueVision shareholders, which they are eligible to receive upon the achievement of specified development and commercialization milestones. The purchase price allocation resulted in net identifiable assets of $144 million, which consisted of intangible assets of $172 million, net deferred tax liability of $29 million and other net assets of $1 million. Goodwill of $2 million was

also recognized which is attributable to the assembled workforce. The 2018 results of operations following the date of acquisition were not material.

Vision Care - Acquisition of Tear Film Innovations, Inc.

On December 17, 2018, Alcon acquired 100% of the outstanding shares and equity of Tear Film Innovations, Inc. ("Tear Film"), a privately held US-based company. Tear Film is the manufacturer of the *iLux* device, an innovative therapeutic device used to treat Meibomian Gland Dysfunction, a leading cause of dry eye.

The fair value of the total purchase consideration was $145 million. This amount consists of an initial cash payment of $79 million and the fair value of the probability weighted contingent consideration of $66 million due to Tear Film previous owners, which they are eligible to receive upon the achievement of specified development and commercialization milestones. The purchase price allocation resulted in net identifiable assets of $143 million, which consisted of intangible assets of $174 million, net deferred tax liability of $37 million, cash of $5 million and other net assets of $1 million. Goodwill of $2 million was also recognized which is attributable to the assembled workforce. The 2018 results of operations following the date of acquisition were not material.


# 5.   Segment information

The segment information disclosed in these Consolidated Financial Statements reflects historical results consistent with the identifiable reportable segments of Alcon and financial information that the Chief Operating Decision Maker ("CODM") reviews to evaluate segmental performance and allocate resources among the segments. The CODM is the Executive Committee of Alcon.

The businesses of Alcon are divided operationally on a worldwide basis into two identified reportable segments, Surgical and Vision Care. Alcon's reportable segments are the same as its operating segments as Alcon does not aggregate any operating segments in arriving at its reportable segments. As indicated below, certain income and expenses are not allocated to segments.

Reportable segments are presented in a manner consistent with the internal reporting to the CODM. The reportable segments are managed separately due to their distinct needs and activities for research, development, manufacturing, distribution, and commercial execution.

The Executive Committee of Alcon is responsible for allocating resources and assessing the performance of the reportable segments.

In Surgical, Alcon researches, develops, manufactures, distributes and sells ophthalmic products for cataract surgery, vitreoretinal surgery, refractive laser surgery and glaucoma surgery. The surgical portfolio also includes implantables, consumables and surgical equipment required for these procedures and supports the end-to-end procedure needs of the ophthalmic surgeon.

In Vision Care, Alcon researches, develops, manufactures, distributes and sells daily disposable, reusable, and color-enhancing contact lenses and a comprehensive portfolio of ocular health products, including products for dry eye, contact lens care and ocular allergies, as well as ocular vitamins and redness relievers.

Alcon also provides services, training, education and technical support for both the Surgical and Vision Care businesses.

The basis of preparation described in Note 2, and the selected accounting policies mentioned in Note 3 of these Consolidated Financial Statements are used in the reporting of segment results.

The Executive Committee of Alcon evaluates segmental performance and allocates resources among the segments primarily based on net sales and segment contribution.

Net identifiable assets are not assigned to the segments in the internal reporting to the CODM, and are not considered in evaluating the performance of the business segments by the Executive Committee of Alcon.

Segment contribution excludes amortization and impairment charges for acquired product rights or other intangibles, general and administrative expenses for corporate activities, spin readiness and separation costs, transformation costs, fair value adjustments of contingent consideration liabilities, past service costs primarily for post-employment benefit plan amendments, and certain other income and expense items.

A197

General & administration (corporate) includes the costs of the Alcon corporate headquarters, including all related corporate function costs. For a portion of the historical comparative periods only, the related corporate function costs were allocated to Alcon from its Former Parent.

Other income and expense items excluded from segment contribution include fair value adjustments of financial assets in the form of options to acquire a company carried at FVPL, net gains and losses on fund investments and equity securities valued at FVPL, restructuring costs, legal settlements, integration related expenses and other income and expense items not attributed to a specific segment.

Certain income and expense items, primarily related to fair value adjustments of contingent consideration liabilities and option rights and integration related expenses, previously included in segment contribution in the prior year periods have been reclassified to conform with reporting of segment contribution to the CODM in the current period. The reclassifications resulted in an increase in Surgical and Vision Care segment contribution of $34 million and $17 million, respectively, in the year ended December 31, 2019 and an increase in Surgical and Vision Care segment contribution of $33 million and $6 million, respectively, in t   he year ended December 31, 2018.

## Segmentation - Consolidated income statement

| ($ millions) | Surgical | | Vision Care | | Company | |
|---|---|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 |
| **Net sales to third parties** | **3,710** | **4,174** | **3,053** | **3,188** | **6,763** | **7,362** |
| Other revenues | — | — | 70 | 146 | 70 | 146 |
| **Net sales and other revenue** | **3,710** | **4,174** | **3,123** | **3,334** | **6,833** | **7,508** |
| **Segment contribution** | **672** | **957** | **419** | **580** | **1,091** | **1,537** |
| Amortization of intangible assets | | | | | (1,078) | (1,084) |
| Impairment charges on intangible assets | | | | | (167) | — |
| General & administration (corporate) | | | | | (232) | (216) |
| Separation costs | | | | | (217) | (237) |
| Spin readiness costs | | | | | — | (72) |
| Transformation costs | | | | | (49) | (52) |
| Fair value adjustments of contingent consideration liabilities | | | | | 63 | 75 |
| Past service costs for post-employment benefit plan amendments | | | | | 154 | (2) |
| Other | | | | | (47) | (136) |
| **Operating (loss)** | | | | | **(482)** | **(187)** |
| Interest expense | | | | | (124) | (113) |
| Other financial income & expense | | | | | (29) | (32) |
| **(Loss) before taxes** | | | | | **(635)** | **(332)** |

Included in segment contribution are:

| ($ millions) | Surgical | | Vision Care | | Not allocated | | Total | |
|---|---|---|---|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 |
| Depreciation of property, plant & equipment | (122) | (112) | (171) | (155) | — | — | (293) | (267) |
| Depreciation of right-of-use assets | (47) | (42) | (32) | (24) | — | — | (79) | (66) |
| Impairment charges on property, plant & equipment, net | (6) | (3) | — | (5) | — | — | (6) | (8) |
| Equity-based compensation | (55) | (55) | (45) | (44) | (13) | (15) | (113) | (114) |

F-22

A198

| ($ millions) | Surgical | | Vision Care | | Company | |
|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 | 2019 | 2018 |
| **Net sales to third parties** | **4,174** | **3,999** | **3,188** | **3,150** | **7,362** | **7,149** |
| Sales to former parent | — | 2 | — | 2 | — | 4 |
| Other revenues | — | — | 146 | — | 146 | — |
| **Net sales and other revenues** | **4,174** | **4,001** | **3,334** | **3,152** | **7,508** | **7,153** |
| **Segment contribution** | **957** | **846** | **580** | **600** | **1,537** | **1,446** |
| Amortization of intangible assets | | | | | (1,084) | (1,019) |
| Impairment charges on intangible assets | | | | | — | (378) |
| General & administration (corporate) | | | | | (216) | (206) |
| Separation costs | | | | | (237) | — |
| Spin readiness costs | | | | | (72) | (32) |
| Transformation costs | | | | | (52) | — |
| Fair value adjustments of contingent consideration liabilities | | | | | 75 | 62 |
| Past service costs for post-employment benefit plan amendments | | | | | (2) | (1) |
| Other | | | | | (136) | (120) |
| **Operating (loss)** | | | | | **(187)** | **(248)** |
| Interest expense | | | | | (113) | (24) |
| Other financial income & expense | | | | | (32) | (28) |
| **(Loss) before taxes** | | | | | **(332)** | **(300)** |

Included in segment contribution are:

| ($ millions) | Surgical | | Vision Care | | Not allocated | | Company | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 | 2019 | 2018 | 2019 | 2018 |
| Depreciation of property, plant & equipment | (112) | (114) | (155) | (125) | — | — | (267) | (239) |
| Depreciation of right-of-use assets | (42) | — | (24) | — | — | — | (66) | — |
| Impairment charges on property, plant & equipment, net | (3) | (1) | (5) | (1) | — | — | (8) | (2) |
| Equity-based compensation[1] | (55) | (45) | (44) | (36) | (15) | (12) | (114) | (93) |

(1)   Equity-based compensation not allocated to segments in 2018 reflects an estimate of the allocation for corporate functions in the historical period based on 2019 actual percentages.

F-23

A199

## Net sales by segment

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| **Surgical** | | | |
| Implantables | 1,126 | 1,210 | 1,136 |
| Consumables | 1,952 | 2,304 | 2,227 |
| Equipment/other | 632 | 660 | 636 |
| **Total Surgical** | **3,710** | **4,174** | **3,999** |
| **Vision Care** | | | |
| Contact lenses | 1,838 | 1,969 | 1,928 |
| Ocular health | 1,215 | 1,219 | 1,222 |
| **Total Vision Care** | **3,053** | **3,188** | **3,150** |
| **Net sales to third parties** | **6,763** | **7,362** | **7,149** |

## Geographical information

The following table shows the United States, International and countries that accounted for more than 5% of at least one of the respective Alcon totals, for net sales for the years ended December 31, 2020, 2019 and 2018, and for selected non-current assets at December 31, 2020 and 2019:

| ($ millions unless indicated otherwise)[1] | Net sales[2] | | | | | | Total of selected non-current assets[3] | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2020 | | 2019 | | 2018 | | 2020 | | 2019 | |
| **Country** | | | | | | | | | | |
| United States | 2,975 | 44 % | 3,055 | 41 % | 2,942 | 41 % | 10,309 | 47 % | 10,559 | 47 % |
| International | 3,788 | 56 % | 4,307 | 59 % | 4,207 | 59 % | 11,476 | 53 % | 12,014 | 53 % |
| *thereof:* | | | | | | | | | | |
| Switzerland (country of domicile) | 55 | 1 % | 56 | 1 % | 57 | 1 % | 9,737 | 45 % | 10,486 | 46 % |
| Japan | 650 | 10 % | 656 | 9 % | 593 | 8 % | 63 | — % | 66 | — % |
| China | 383 | 6 % | 377 | 5 % | 341 | 5 % | 16 | — % | 18 | — % |
| Other | 2,700 | 40 % | 3,218 | 44 % | 3,216 | 45 % | 1,660 | 8 % | 1,444 | 6 % |
| **Company total** | **6,763** | **100 %** | **7,362** | **100 %** | **7,149** | **100 %** | **21,785** | **100 %** | **22,573** | **100 %** |

(1)   International percentages may not sum due to rounding

(2)   Net sales from operations by location of third-party customer.

(3)   Includes property, plant & equipment, right-of-use assets, goodwill and other intangible assets.

No customer accounted for 10% or more of Alcon's net sales.

F-24

A200

## 6.   Interest expense and other financial income & expense

### Interest expense

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| Interest expense on financial debts | (94) | (81) | (10) |
| Interest expense from discounting long-term liabilities | (17) | (21) | (9) |
| Interest expense on lease liabilities[1] | (13) | (11) | (5) |
| **Total interest expense** | **(124)** | **(113)** | **(24)** |

(1)   For the year ended December 31, 2018, interest expense on finance leases was included in "Interest expense on lease liabilities".

### Other financial income & expense

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| Interest income | 6 | 8 | 2 |
| Loss on extinguishment of financial debt | — | (4) | — |
| Other financial expense | (9) | (18) | (3) |
| Monetary loss from hyperinflation accounting | (4) | (2) | (1) |
| Currency result, net | (22) | (16) | (26) |
| **Total other financial income & expense** | **(29)** | **(32)** | **(28)** |

## 7.   Taxes

### (Loss) before taxes

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| Switzerland | (585) | (274) | (227) |
| Foreign | (50) | (58) | (73) |
| **Total (loss) before taxes** | **(635)** | **(332)** | **(300)** |

### Current and deferred income tax (expense)/income

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| Switzerland | (14) | (34) | (77) |
| Foreign | (105) | (168) | (157) |
| **Current income tax expense** | **(119)** | **(202)** | **(234)** |
| Switzerland | 96 | (246) | 78 |
| Foreign | 127 | 124 | 229 |
| **Deferred tax income/(expense)** | **223** | **(122)** | **307** |
| **Total income tax income/(expense)** | **104** | **(324)** | **73** |

F-25

A201

## Analysis of tax rate

Alcon's overall applicable tax rate can change each year since it is calculated as the weighted average tax rate based on pre-tax (loss)/income of each subsidiary. The main elements contributing to the difference between Alcon's overall applicable tax rate and the effective tax rate are summarized in the below table.

| ($ millions unless indicated otherwise) | 2020 | % | 2019 | % | 2018 | % |
|---|---|---|---|---|---|---|
| Applicable tax rate | 98 | 15.4 % | 39 | 11.7 % | 82 | 27.3 % |
| Effect of disallowed expenditures | (20) | (3.1)% | (23) | (6.9)% | (26) | (8.7)% |
| Effect of equity-based compensation | (5) | (0.8)% | (1) | (0.3)% | (2) | (0.7)% |
| Effect of income taxed at reduced rates | 4 | 0.6 % | 2 | 0.6 % | 2 | 0.7 % |
| Effect of tax credits and allowances | 9 | 1.4 % | 7 | 2.1 % | 13 | 4.3 % |
| Effect of adjustments to contingent consideration and other liabilities | 17 | 2.7 % | 11 | 3.3 % | 11 | 3.7 % |
| Effect of option payments | (6) | (0.9)% | (12) | (3.6)% | (17) | (5.7)% |
| Effect of tax rate changes[1] | 10 | 1.6 % | (342) | (103.0)% | (14) | (4.7)% |
| Effect of changes in uncertain tax positions | (8) | (1.3)% | 10 | 3.0 % | (33) | (11.0)% |
| Effect of other items | (10) | (1.6)% | (2) | (0.6)% | (4) | (1.2)% |
| Effect of prior year items[2] | 15 | 2.4 % | (13) | (3.9)% | 61 | 20.3 % |
| **Effective tax rate** | **104** | **16.4 %** | **(324)** | **(97.6)%** | **73** | **24.3 %** |

(1)   Effect of tax rate changes in 2019 relates primarily to the adoption of the Swiss Tax Reform which resulted in a non-cash increase in tax expense of $304 million for the re-measurement of the Swiss deferred tax balances and a $31 million re-measurement of US deferred tax balances as a result of rate changes in the US following legal entity reorganizations executed related to the Spin-off.

(2)   In 2020 and 2019, the prior year items relate to changes in certain estimates which resulted in a $15 million tax benefit and $13 million tax expense, respectively. In 2018, the prior year items relate to an out of period income tax benefit of $61 million which Alcon concluded was not material to the current period or the prior periods to which they relate.

Alcon has a substantial business presence in many countries and is therefore subject to different income and expense items that are non-taxable (permanent differences) or are taxed at different rates in those tax jurisdictions. This results in a difference between Alcon's applicable tax rate and effective tax rate as shown in the table above.

The applicable tax rate in 2020, 2019 and 2018 was impacted by pre-tax losses in certain tax jurisdictions. The fluctuation in taxes and effective tax rates, excluding Swiss tax reform, is primarily due to the geographical pre-tax income and loss mix across certain tax jurisdictions relative to Alcon's consolidated (loss) before taxes, changes in uncertain tax positions and certain non-recurring items.

# 8. Share capital and earnings/(loss) per share

## 8.1   Share capital

The share capital of the Company as of December 31, 2020 is CHF 20 million, which is comprised of 499.7 million common shares, nominal value of CHF 0.04 per share.

On November 10, 2020 and November 19, 2019, the Company's Board of Directors approved increases of CHF 320,000 and CHF 120,000, respectively, out of the Company's authorized share capital through the issuance of 8.0 million and 3.0 million additional registered shares, respectively, nominal value CHF 0.04 per share, to fulfill the future vesting of existing and future equity-based awards. These additional shares were issued as treasury shares as part of the Company's authorized share capital according to the authority granted by the shareholders at the Company's Annual General Meeting held on January 29, 2019 and reflected in the Company's Articles of Incorporation as amended. While the transactions increased the number of shares available for issuance under the Company's equity-based compensation plans, there was no immediate impact on the number of shares outstanding or earnings per share calculations at the time of the transactions. The number of shares outstanding and earnings per share calculations will be impacted as shares are delivered to plan participants over the course of the next several years.

During the year ended December 31, 2020, 0.9 million shares were delivered for awards vesting under the Company's equity incentive programs. At December 31, 2020, the Company had 489.2 million outstanding common shares and 10.5 million shares held in the Company's treasury share accounts. All of the Company's 10.5 million shares held in treasury may only be used to fulfill the future vesting of existing and future equity-based awards.

On April 9, 2019, the date of the Spin-off, 488.2 million shares of the Company's common stock were distributed to Novartis shareholders and Novartis ADR holders. The shares were distributed from the Company's existing share capital of 488.7 million shares. Subsequent to the Spin-off, 0.1 million shares were delivered for awards vesting under the Company's equity incentive programs during the year ended December 31, 2019. At December 31, 2019, the Company had 488.3 million outstanding common shares and 3.4 million shares held in the Company's treasury share accounts.

No dividends were declared or paid from April 9, 2019 through December 31, 2020.

## 8.2   Earnings/(loss) per share

Basic earnings/(loss) per share is computed by dividing net (loss)/income for the period by the weighted average number of common shares outstanding during the period. For the years ended December 31, 2020 and 2019, the weighted average number of shares outstanding was 489.0 million and 488.2 million shares, respectively. For periods prior to the Spin-off, the denominator for basic loss per share uses the number of shares distributed on the date of the Spin-off.

The only potentially dilutive securities are the outstanding unvested equity-based awards under the Company's equity-based incentive plans, as described in Note 24 to these Consolidated Financial Statements. Except when the effect would be anti-dilutive, the calculation of diluted earnings per common share includes the weighted average net impact of unvested equity-based awards. For the years ended December 31, 2020 and 2019, 2.8 million and 1.9 million unvested equity-based awards, respectively, have been excluded from the calculation of diluted loss per share as their effect would be anti-dilutive. For periods prior to the Spin-off, the denominator for diluted loss per share uses the number of shares distributed on the date of the Spin-off.

The average market value of the Company's shares for the purposes of calculating the potentially dilutive effects of unvested equity-based awards was based on quoted market prices for the period that the unvested awards were outstanding.

F-27

## 9.   Property, plant & equipment

The following table summarizes the movements of property, plant & equipment in 2020:

| ($ millions) | Land | Buildings & improvements | Construction in progress | Machinery & other equipment | Total |
|---|---|---|---|---|---|
| **Cost** | | | | | |
| **January 1, 2020** | **33** | **1,628** | **755** | **2,906** | **5,322** |
| Additions[1] | 2 | 7 | 479 | 74 | 562 |
| Disposals and derecognitions[2] | — | (7) | (10) | (105) | (122) |
| Reclassifications for assets placed in service | — | 215 | (705) | 490 | — |
| Other reclassifications | — | 11 | — | (11) | — |
| Currency translation effects | — | 30 | 54 | 71 | 155 |
| **December 31, 2020** | **35** | **1,884** | **573** | **3,425** | **5,917** |
| **Accumulated depreciation** | | | | | |
| **January 1, 2020** | **—** | **(618)** | **(8)** | **(1,583)** | **(2,209)** |
| Depreciation charge | — | (80) | — | (213) | (293) |
| Impairment charge | — | — | — | (6) | (6) |
| Disposals and derecognitions[2] | — | 4 | — | 70 | 74 |
| Other reclassifications | — | (7) | — | 7 | — |
| Currency translation effects | — | (15) | — | (43) | (58) |
| **December 31, 2020** | **—** | **(716)** | **(8)** | **(1,768)** | **(2,492)** |
| **Net book value at December 31, 2020** | **35** | **1,168** | **565** | **1,657** | **3,425** |

(1)   Includes $83 million in non-cash additions.

(2)   Derecognition of assets that are no longer used and are not considered to have a significant disposal value or other alternative use.

As of December 31, 2020, commitments for purchases of property, plant & equipment were $136 million. There were no capitalized borrowing costs.

A204

The following table summarizes the movements of property, plant and equipment in 2019:

| ($ millions) | Land | Buildings & improvements | Construction in progress | Machinery & other equipment | Total |
|---|---|---|---|---|---|
| **Cost** | | | | | |
| **January 1, 2019** | **60** | **1,527** | **657** | **2,646** | **4,890** |
| Additions[1] | — | 11 | 514 | 82 | 607 |
| Impact of business combinations | — | — | — | 1 | 1 |
| Disposals and derecognitions[2] | — | (17) | (1) | (161) | (179) |
| Transfers with former parent | — | 4 | 2 | 29 | 35 |
| Reclassifications for assets placed in service | — | 104 | (417) | 313 | — |
| Other reclassifications | (27) | — | — | — | (27) |
| Currency translation effects | — | (1) | — | (4) | (5) |
| **December 31, 2019** | **33** | **1,628** | **755** | **2,906** | **5,322** |
| | | | | | |
| **Accumulated depreciation** | | | | | |
| **January 1, 2019** | **(7)** | **(558)** | **(7)** | **(1,518)** | **(2,090)** |
| Depreciation charge | — | (73) | — | (194) | (267) |
| Impairment charge | — | — | (1) | (7) | (8) |
| Disposals and derecognitions[2] | — | 14 | — | 151 | 165 |
| Transfers with former parent | — | (2) | — | (15) | (17) |
| Other reclassifications | 7 | — | — | — | 7 |
| Currency translation effects | — | 1 | — | — | 1 |
| **December 31, 2019** | **—** | **(618)** | **(8)** | **(1,583)** | **(2,209)** |
| **Net book value at December 31, 2019** | **33** | **1,010** | **747** | **1,323** | **3,113** |

(1)   Includes $56 million in non-cash additions.

(2)   Derecognition of assets that are no longer used and are not considered to have a significant disposal value or other alternative use.

As of December 31, 2019, commitments for purchases of property, plant & equipment were $212 million. There were no capitalized borrowing costs.

F-29

A205

## 10. Goodwill and other intangible assets

The following table summarizes the movements of goodwill and other intangible assets in 2020:

| ($ millions) | Goodwill | Alcon brand name | Acquired research & development | Technologies | Currently marketed products | Marketing know-how | Other intangible assets (including software) | Total |
|---|---|---|---|---|---|---|---|---|
| **Cost** | | | | | | | | |
| **January 1, 2020** | **8,905** | **2,980** | **728** | **5,369** | **4,440** | **5,960** | **611** | **20,088** |
| Additions | — | — | 2 | — | — | — | 118 | 120 |
| Disposals and derecognitions[1] | — | — | (3) | — | — | — | (173) | (176) |
| **December 31, 2020** | **8,905** | **2,980** | **727** | **5,369** | **4,440** | **5,960** | **556** | **20,032** |
| | | | | | | | | |
| **Accumulated amortization** | | | | | | | | |
| **January 1, 2020** | **—** | **—** | **(3)** | **(4,692)** | **(2,842)** | **(2,146)** | **(174)** | **(9,857)** |
| Amortization charge | — | — | — | (507) | (249) | (238) | (84) | (1,078) |
| Disposals and derecognitions[1] | — | — | 3 | — | — | — | 164 | 167 |
| Impairment charges | — | — | — | — | (106) | — | (61) | (167) |
| **December 31, 2020** | **—** | **—** | **—** | **(5,199)** | **(3,197)** | **(2,384)** | **(155)** | **(10,935)** |
| **Net book value at December 31, 2020** | **8,905** | **2,980** | **727** | **170** | **1,243** | **3,576** | **401** | **9,097** |

(1)    Derecognitions of assets that are no longer used or being developed and are not considered to have a significant disposal value or other alternative use.

The following table summarizes the allocation of the net book values of goodwill and other intangible assets by reportable segment at December 31, 2020:

| ($ millions) | Goodwill | Alcon brand name | Acquired research & development | Technologies | Currently marketed products | Marketing know-how | Other intangible assets (including software) | Total |
|---|---|---|---|---|---|---|---|---|
| Surgical | 4,544 | — | 723 | 170 | 247 | 3,576 | 237 | 4,953 |
| Vision Care | 4,361 | — | 4 | — | 996 | — | 164 | 1,164 |
| Not allocated to segments | — | 2,980 | — | — | — | — | — | 2,980 |
| **Net book value at December 31, 2020** | **8,905** | **2,980** | **727** | **170** | **1,243** | **3,576** | **401** | **9,097** |

The Surgical and Vision Care reportable segments' cash generating units, to which goodwill is allocated are comprised of a group of smaller cash generating units. The valuation method of the recoverable amount of the cash generating units, to which goodwill is allocated, is based on the fair value less costs of disposal.

The Alcon brand name is an intangible asset with an indefinite life. The intangible asset is not allocated to the reportable segments as it is used to market the Alcon-branded products of both the Surgical and Vision Care businesses. Net sales of these products together are the grouping of cash generating units, which is used to determine the recoverable amount. The valuation method is based on the fair value less costs of disposal.

F-30

A206

The following assumptions were used in the calculations for the recoverable amounts of goodwill and the Alcon brand name at December 31, 2020 and 2019:

| (As a percentage) | Surgical | Vision Care |
|---|---|---|
| Terminal growth rate | 3.0 | 3.0 |
| Discount rate (post-tax) | 7.5 | 7.0 |

The Surgical and Vision Care reportable segments' terminal growth rate assumption of 3.0% takes into consideration how the industry is expected to grow, analysis of industry expert reports, and expected relevant changes in demographics for various markets. The discount rates for both Surgical and Vision Care reportable segments consider Alcon's weighted average cost of capital, adjusted to approximate the weighted average cost of capital of comparable market participants. Both the terminal growth rate and the discount rate are consistent with external sources of information.

The fair value less costs of disposal, for all groupings of cash generating units containing goodwill or indefinite life intangible assets, is reviewed for the impact of reasonably possible changes in key assumptions. In particular Alcon considered an increase in the discount rate, a decrease in the terminal growth rate and certain negative impacts on the forecasted cash flows. These reasonably possible changes in key assumptions did not indicate an impairment.

Refer to "Impairment of goodwill, Alcon brand name and definite lived intangible assets" in Note 3 in these Consolidated Financial Statements for additional disclosures on how Alcon performs goodwill and intangible asset impairment testing.

The following table summarizes the movements of goodwill and other intangible assets in 2019:

| ($ millions) | Goodwill | Intangible assets other than goodwill | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | | Alcon brand name | Acquired research & development | Technologies | Currently marketed products | Marketing know-how | Other intangible assets (including software) | |
| **Cost** | | | | | | | | |
| **January 1, 2019** | 8,899 | 2,980 | 249 | 5,369 | 4,440 | 5,960 | 494 | 19,492 |
| Impact of business combinations | 6 | — | 505 | — | — | — | — | 505 |
| Additions | — | — | 7 | — | — | — | 125 | 132 |
| Reclassifications | — | — | (33) | — | — | — | 33 | — |
| Disposals and derecognitions[1] | — | — | — | — | — | — | (41) | (41) |
| **December 31, 2019** | 8,905 | 2,980 | 728 | 5,369 | 4,440 | 5,960 | 611 | 20,088 |
| **Accumulated amortization** | | | | | | | | |
| **January 1, 2019** | — | — | (3) | (4,184) | (2,592) | (1,906) | (128) | (8,813) |
| Amortization charge | — | — | — | (508) | (250) | (240) | (86) | (1,084) |
| Disposals and derecognitions[1] | — | — | — | — | — | — | 40 | 40 |
| **December 31, 2019** | — | — | (3) | (4,692) | (2,842) | (2,146) | (174) | (9,857) |
| **Net book value at December 31, 2019** | 8,905 | 2,980 | 725 | 677 | 1,598 | 3,814 | 437 | 10,231 |

(1)   Derecognitions of assets that are no longer used or being developed and are not considered to have a significant disposal value or other alternative use.

The following table summarizes the allocation of the net book values of goodwill and other intangible assets by reportable segment at December 31, 2019:

| ($ millions) | Goodwill | Alcon brand name | Acquired research & development | Technologies | Currently marketed products | Marketing know-how | Other intangible assets (including software) | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Intangible assets other than goodwill | | | | |
| Surgical | 4,544 | — | 721 | 677 | 374 | 3,814 | 184 | 5,770 |
| Vision Care | 4,361 | — | 4 | — | 1,224 | — | 253 | 1,481 |
| Not allocated to segments | — | 2,980 | — | — | — | — | — | 2,980 |
| **Net book value at December 31, 2019** | **8,905** | **2,980** | **725** | **677** | **1,598** | **3,814** | **437** | **10,231** |

## Intangible asset impairment charges

The following table shows the intangible asset impairment charges in 2020, 2019 and 2018:

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| Surgical | (66) | — | (378) |
| Vision Care | (101) | — | — |
| **Total** | **(167)** | **—** | **(378)** |

For the year ended December 31, 2020, impairments amounted to $167 million. An impairment of $61 million was recognized in the third quarter of 2020, primarily to fully impair a CGU within the Vision Care reportable segment upon termination of the associated licensing agreement. The impairment was recognized in Research & development in the consolidated income statement. The remaining amount relates to additional impairments of $106 million, which was recognized in Cost of net sales in the consolidated income statement in 2020. Of that amount, an impairment of $41 million was recorded for a currently marketed product CGU within the Vision Care reportable segment due to lower expected sales. The CGU was reduced to its recoverable amount of $88 million at the time of impairment in the second quarter of 2020. An additional $65 million relates to impairments of a currently marketed product CGU in the Surgical reportable segment recognized in the first and fourth quarters of 2020 due to lower expected sales. This CGU was also reduced to its recoverable amount of $65 million at the time of impairment at December 31, 2020.

The recoverable amount of each CGU was determined based on the FVLCOD method. FVLCOD was estimated using net present value techniques utilizing post-tax cash flows and discount rates as there are no direct or indirect observable prices in active markets for identical or similar assets. The estimates used in calculating the net present value involve significant judgment by management and include assumptions with measurement uncertainty. The estimates used are considered to be consistent with market participant assumptions and include cash flow projections for a five-year period based on management forecasts, sales forecasts beyond the five-year period extrapolated using long-term expected inflation rates, discount rate, and future tax rate. Since the cash flow projections are a significant unobservable input, the fair value of the CGUs were classified as Level 3 in the fair value hierarchy. Actual cash flows and values could vary significantly from forecasted future cash flows and related values derived using net present value techniques.

There were no intangible asset impairment charges during the year ended December 31, 2019. For the year ended December 31, 2018, there was a full impairment of $337 million related to the write-down of *CyPass* within the Surgical reportable segment due to a voluntary market withdrawal, and an impairment of $39 million related to the write-down of the Optonol technologies also within the Surgical reportable segment.

## 11. Deferred tax assets and liabilities

| ($ millions) | Property, plant & equipment | Intangible assets | Pensions and other benefit obligations of associates | Inventories | Tax loss carry-forwards | Other assets, provision and accruals | Total |
|---|---|---|---|---|---|---|---|
| Gross deferred tax assets at December 31, 2019 | 13 | 6 | 151 | 371 | 110 | 281 | 932 |
| Gross deferred tax liabilities at December 31, 2019 | (172) | (1,713) | (10) | (23) | — | (46) | (1,964) |
| Net deferred tax balance at December 31, 2019 | (159) | (1,707) | 141 | 348 | 110 | 235 | (1,032) |
| At December 31, 2019 | (159) | (1,707) | 141 | 348 | 110 | 235 | (1,032) |
| (Charged)/credited to income | (32) | 193 | (33) | 10 | 59 | 26 | 223 |
| Credited/(charged) to equity | — | — | 7 | — | 5 | (16) | (4) |
| Credited to other comprehensive income | — | — | 13 | — | — | 3 | 16 |
| Net deferred tax balance at December 31, 2020 | (191) | (1,514) | 128 | 358 | 174 | 248 | (797) |
| Gross deferred tax assets at December 31, 2020 | 24 | 5 | 128 | 381 | 174 | 314 | 1,026 |
| Gross deferred tax liabilities at December 31, 2020 | (215) | (1,519) | — | (23) | — | (66) | (1,823) |
| Net deferred tax balance at December 31, 2020 | (191) | (1,514) | 128 | 358 | 174 | 248 | (797) |

The below table presents the Net deferred tax balance as of December 31, 2020 after offsetting $627 million of deferred tax assets and liabilities within the same tax jurisdiction.

| ($ millions) | At December 31, 2020 |
|---|---|
| Deferred tax assets | 399 |
| Deferred tax liabilities | (1,196) |
| Net deferred tax balance | (797) |

F-33

A209

| ($ millions) | Property, plant & equipment | Intangible assets | Pensions and other benefit obligations of associates | Inventories | Tax loss carry-forwards | Other assets, provision and accruals | Total |
|---|---|---|---|---|---|---|---|
| Gross deferred tax assets at December 31, 2018 | 12 | — | 125 | 262 | 39 | 235 | 673 |
| Gross deferred tax liabilities at December 31, 2018 | (94) | (1,403) | (2) | (14) | — | (18) | (1,531) |
| Net deferred tax balance at December 31, 2018 | (82) | (1,403) | 123 | 248 | 39 | 217 | (858) |
| At December 31, 2018 | (82) | (1,403) | 123 | 248 | 39 | 217 | (858) |
| (Charged)/credited to income | (71) | (194) | 18 | 111 | 50 | (36) | (122) |
| Credited to equity | — | — | — | — | — | 25 | 25 |
| Credited to other comprehensive income | — | — | 11 | — | — | 5 | 16 |
| Impact of business combinations | — | (121) | — | — | 28 | — | (93) |
| Other movements | (6) | 11 | (11) | (11) | (7) | 24 | — |
| Net deferred tax balance at December 31, 2019 | (159) | (1,707) | 141 | 348 | 110 | 235 | (1,032) |
| Gross deferred tax assets at December 31, 2019 | 13 | 6 | 151 | 371 | 110 | 281 | 932 |
| Gross deferred tax liabilities at December 31, 2019 | (172) | (1,713) | (10) | (23) | — | (46) | (1,964) |
| Net deferred tax balance at December 31, 2019 | (159) | (1,707) | 141 | 348 | 110 | 235 | (1,032) |

The below table presents the Net deferred tax balance as of December 31, 2019 after offsetting $578 million of deferred tax assets and liabilities within the same tax jurisdiction.

| ($ millions) | At December 31, 2019 |
|---|---|
| Deferred tax assets | 354 |
| Deferred tax liabilities | (1,386) |
| Net deferred tax balance | (1,032) |

The below table presents deferred tax assets and deferred tax liabilities expected to have an impact on current taxes payable after more than twelve months.

| ($ billions) | At December 31, 2020 | At December 31, 2019 |
|---|---|---|
| Deferred tax assets | 0.6 | 0.6 |
| Deferred tax liabilities | 1.8 | 1.8 |

For foreign unremitted earnings retained by consolidated entities for reinvestment, which amounted to $7 billion as of December 31, 2020, no provision is made for income taxes that would be payable upon the distribution of these earnings. If these earnings were remitted, an income tax charge could result based on the tax statutes currently in effect.

IFRS exceptions to recognizing taxable temporary differences include an exception to recognizing a deferred tax liability arising on the initial recognition of goodwill from acquisitions. As such, we have not provided a deferred tax for goodwill from acquisitions which amounted to $9 billion as of December 31, 2020 and 2019.

The gross value of tax loss carryforwards capitalized as deferred tax assets amount to $921 million (2019: $521 million), of which $5 million will expire in five years. Of the remaining $916 million, approximately $559 million have an indefinite carryforward period, and approximately $357 million have a carryforward period that ranges from six to 20 years. All tax loss carryforwards have been capitalized as deferred tax assets in 2020 as it is probable that sufficient taxable income will be available for the foreseeable future.

No tax losses carried forward have expired in 2020, 2019 or 2018.

## Swiss tax reform

On June 30, 2019, Swiss voters approved the Swiss Tax Reform and Old Age Insurance financing bill ("Swiss tax reform"). As a result, the corporate income tax rate applicable to Alcon's Swiss profits as of January 1, 2020 increased from approximately 9.4% in 2019 to approximately 14.2% beginning in 2020. This change resulted in a non-cash increase in tax expense of $304 million related to the re-measurement of Swiss deferred tax assets and liabilities in 2019.

# 12. Financial and other non-current assets

The below tables provide details related to Financial assets and Other non-current assets as of December 31, 2020 and 2019.

## Financial assets

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Long-term financial investments measured at FVOCI | 28 | 31 |
| Long-term financial investments measured at FVPL | 12 | 28 |
| Long-term receivables from customers | 117 | 136 |
| Minimum lease payments from finance lease agreements | 39 | 78 |
| Long-term loans, advances, and security deposits | 22 | 34 |
| **Total financial assets** | **218** | **307** |

### Minimum lease payments from finance lease agreements

The following table shows the receivables of the gross investments in finance leases and the net present value of the minimum lease payments, as well as unearned finance income, related to surgical equipment lease arrangements. The finance income is recorded in "Other income".

| ($ millions) | 2020 | | | | | 2019 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total future payments | Unearned interest income | Present value | Provision | Net book value | Total future payments | Unearned interest income | Present value | Provision | Net book value |
| Not later than one year[1] | 33 | (3) | 30 | (1) | 29 | 51 | (4) | 47 | (1) | 46 |
| Between one and five years | 55 | (3) | 52 | (18) | 34 | 94 | (5) | 89 | (23) | 66 |
| Later than five years | 32 | — | 32 | (27) | 5 | 46 | (1) | 45 | (33) | 12 |
| **Total** | **120** | **(6)** | **114** | **(46)** | **68** | **191** | **(10)** | **181** | **(57)** | **124** |

(1) The current portion of the minimum lease payments is recorded in trade receivables or other current assets (to the extent not yet invoiced).

## Other non-current assets

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Deferred compensation plans | 137 | 122 |
| Prepaid post-employment benefit plans | 24 | 13 |
| Other non-current assets | 50 | 50 |
| **Total other non-current assets** | **211** | **185** |

## 13. Inventories

The amount of inventory recognized as an expense in "Cost of net sales" in the consolidated income statement during 2020 amounted to $2.1 billion (2019: $2.2 billion, 2018: $2.2 billion). The amount of inventory recognized as an expense in "Cost of other revenues" in the consolidated income statement during 2020 amounted to $63 million (2019: $127 million, 2018: $0 million).

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Raw material, consumables | 278 | 286 |
| Work in progress | 136 | 101 |
| Finished products | 1,230 | 1,118 |
| **Total inventories** | **1,644** | **1,505** |

Alcon recognized inventory provisions and write-downs amounting to $304 million in 2020 (2019: $181 million, 2018: $170 million) and reversed inventory provisions amounting to $91 million (2019: $65 million, 2018: $56 million). Inventory provisions mainly relate to the adjustment of inventory balances to their net realizable value based on the forecasted sales. Reversals are made when the products become saleable.

## 14. Trade receivables

Trade receivable balances include sales to wholesalers, retailers, doctor groups, private health systems, government agencies, pharmacy benefit managers and government-supported healthcare systems. The following tables provide details related to Trade receivables as of December 31, 2020 and 2019, including trade receivables that are not overdue as specified in the payment terms and conditions established with Alcon's customers, as well as an analysis of overdue amounts, expected credit loss rates and related provisions for doubtful trade receivables:

| ($ millions) | 2020 | | | |
|---|---|---|---|---|
| | Gross trade receivables | Provision | Trade receivables, net | Expected credit loss rates |
| Not overdue | 1,137 | (2) | 1,135 | 0.2 % |
| Past due for not more than one month | 109 | (1) | 108 | 0.9 % |
| Past due for more than one month but less than three months | 67 | (2) | 65 | 3.0 % |
| Past due for more than three months but less than six months | 36 | (2) | 34 | 5.6 % |
| Past due for more than six months but less than one year | 31 | (18) | 13 | 58.1 % |
| Past due for more than one year | 49 | (43) | 6 | 87.8 % |
| **Total** | **1,429** | **(68)** | **1,361** | |

| ($ millions) | 2019 | | | |
|---|---|---|---|---|
| | Gross trade receivables | Provision | Trade receivables, net | Expected credit loss rates |
| Not overdue | 1,135 | (1) | 1,134 | 0.1 % |
| Past due for not more than one month | 118 | (1) | 117 | 0.8 % |
| Past due for more than one month but less than three months | 81 | (1) | 80 | 1.2 % |
| Past due for more than three months but less than six months | 47 | (2) | 45 | 4.3 % |
| Past due for more than six months but less than one year | 21 | (12) | 9 | 57.1 % |
| Past due for more than one year | 36 | (31) | 5 | 86.1 % |
| **Total** | **1,438** | **(48)** | **1,390** | |

The following table summarizes the movement in the provision for doubtful trade receivables:

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| **January 1** | **(48)** | **(54)** | **(77)** |
| Transfers with former parent | — | — | 4 |
| Provisions for doubtful trade receivables charged to the consolidated income statement | (48) | (17) | (17) |
| Utilization of provisions for doubtful trade receivables | 15 | 7 | 16 |
| Reversal of provisions for doubtful trade receivables | 14 | 15 | 16 |
| Currency translation effects | (1) | 1 | 4 |
| **December 31** | **(68)** | **(48)** | **(54)** |

The majority of the outstanding trade receivables from Greece, Italy, Portugal, Spain, Brazil, Russia, Turkey, Saudi Arabia, and Argentina (the closely monitored countries) are due directly from local governments or from government-funded entities except for Russia, Brazil, and Turkey. We evaluate trade receivables in these countries for potential collection risk. Should there be a substantial deterioration in our economic exposure with respect to those countries, we may increase our level of provisions by updating our expected loss provision or may change the terms of trade on which we operate.

The following table shows the gross trade receivables balance from these closely monitored countries as of December 31, 2020 and 2019, the amounts that are past due for more than one year and the related amount of the provisions for doubtful trade receivables that have been recorded:

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Total balance of gross trade receivables from closely monitored countries | 211 | 209 |
| Past due for more than one year | 14 | 10 |
| Provisions for doubtful trade receivables | (15) | (13) |

Trade receivables include amounts denominated in the following major currencies:

| ($ millions) | 2020 | 2019 |
|---|---|---|
| US dollar (USD) | 477 | 463 |
| Euro (EUR) | 214 | 243 |
| Japanese yen (JPY) | 168 | 168 |
| Chinese yuan (CNY) | 121 | 102 |
| Indian rupee (INR) | 30 | 33 |
| Canadian dollar (CAD) | 32 | 30 |
| Australian dollar (AUD) | 29 | 29 |
| British pound (GBP) | 21 | 24 |
| Russian ruble (RUB) | 28 | 34 |
| South Korean won (KRW) | 31 | 29 |
| Other currencies | 210 | 235 |
| **Total trade receivables, net** | **1,361** | **1,390** |

F-37

A213

## 15. Other current assets

The following table provides details related to Other current assets as of December 31, 2020 and 2019:

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Current portion of long-term financial investments measured at FVPL | 12 | 33 |
| Current portion of long-term receivables from customers | 107 | 122 |
| Current portion of minimum lease payments from finance lease agreements | 29 | 46 |
| Prepaid expenses | 93 | 89 |
| Other receivables, security deposits and current assets | 88 | 147 |
| Derivative financial instruments | 3 | 1 |
| VAT receivable | 72 | 64 |
| **Total other current assets** | **404** | **502** |

## 16. Right-of-use assets and Lease liabilities

### Right-of-use assets

Right-of-use assets as of December 31, 2020 and 2019 were comprised of the following:

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Land | 20 | 20 |
| Buildings | 310 | 277 |
| Machinery & equipment and other assets | 28 | 27 |
| **Total right-of-use assets** | **358** | **324** |

Depreciation charges of $79 million and $66 million for the years ended December 31, 2020 and 2019, respectively, are shown in the table below by underlying class of asset:

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Land | 1 | 1 |
| Buildings | 59 | 47 |
| Machinery & equipment and other assets | 19 | 18 |
| **Total** | **79** | **66** |

Additions to right-of-use assets amounted to $107 million and $116 million for the years ended December 31, 2020 and 2019, respectively.

### Lease liabilities

Lease liabilities totaled $385 million as of December 31, 2020, including $70 million in current lease liabilities and $315 million in non-current lease liabilities. The contractual maturities of the undiscounted lease liabilities as of December 31, 2020 and December 31, 2019, are as follows:

| ($ millions) | Lease liabilities undiscounted | |
|---|---|---|
| | 2020 | 2019 |
| Not later than one year | 82 | 73 |
| Between one and five years | 203 | 176 |
| Later than five years | 203 | 200 |
| **Total lease liabilities undiscounted** | **488** | **449** |

F-38

| ($ millions) | Lease liabilities | |
|---|---|---|
| | 2020 | 2019 |
| Not later than one year | 70 | 61 |
| Between one and five years | 168 | 140 |
| Later than five years | 147 | 140 |
| **Total lease liabilities** | **385** | **341** |

## Additional disclosures

The following table provides additional disclosures related to right-of-use assets and lease liabilities:

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Interest expense on lease liabilities | 13 | 11 |
| Expense on short-term, low value and variable leases | 4 | 3 |
| Total cash outflows for leases | 85 | 59 |
| *Thereof:* | | |
| *Lease liability payments[1]* | *69* | *52* |
| *Interest payments[2]* | *12* | *5* |
| *Short-term and low value lease payments[2]* | *4* | *2* |

(1)    Reported as cash outflows from financing activities net of lease incentives received

(2)    Included within total net cash flows from operating activities

F-39

A215

## 17. Non-current and current financial debts

The below table summarizes non-current and current Financial debts outstanding as of December 31, 2020 and 2019.

| ($ millions) | 2020 | 2019 |
|---|---|---|
| **Non-current financial debts** | | |
| Facility B | 794 | 793 |
| Facility C | 429 | 391 |
| Local facilities (Japan) | — | 55 |
| Series 2026 notes | 496 | 495 |
| Series 2029 notes | 992 | 991 |
| Series 2030 notes | 744 | — |
| Series 2049 notes | 494 | 493 |
| Revolving facility | — | — |
| **Total non-current financial debts** | **3,949** | **3,218** |
| | | |
| **Current financial debts** | | |
| Local facilities: | | |
| Japan | 101 | 115 |
| All others | 49 | 101 |
| Other short-term financial debts | 12 | 29 |
| Derivatives | 7 | 16 |
| **Total current financial debts** | **169** | **261** |
| **Total financial debts** | **4,118** | **3,479** |

Interest expense recognized for Financial debts, excluding lease liabilities, was $94 million, $81 million and $10 million for the years ended December 31, 2020, 2019 and 2018, respectively. The weighted average interest rate on Financial debts was 2.3% in 2020 and 2.9% in 2019.

### Bridge Loan, Term Loan, and Revolving Credit Facilities

On March 6, 2019, Alcon entered into a $1.5 billion unsecured 364-day bridge loan facility with two extension options, each for a period of 180 days (the "Bridge Facility"), a $0.5 billion unsecured three-year term loan facility ("Facility A"), a $0.8 billion unsecured five-year term loan facility ("Facility B"), a $0.4 billion (or the equivalent in EUR) unsecured five-year term loan facility ("Facility C") and a $1.0 billion unsecured five-year committed multicurrency revolving credit facility (the "Revolving Facility" and, together with the Bridge Facility, Facility A, Facility B and Facility C, the "Facilities"). On April 2, 2019, Alcon borrowed $3.2 billion against the bridge and other term loans. In January 2020, the $1.0 billion Revolving Facility was extended to March 2025. The Revolving Facility remained undrawn as of December 31, 2020.

The Facilities bear interest rates equal to the interest rate benchmark (prevailing Euro Interbank Offered Rate ("EURIBOR") in the case of loans denominated in EUR, USD prevailing London Interbank Offered Rate ("LIBOR") in the case of loans denominated in USD and CHF LIBOR in the case of loans denominated in CHF), plus an applicable margin.

Alcon and certain of its subsidiaries are the borrowers under the Facilities and Alcon guarantees the borrowings of such subsidiaries under the Facilities. In addition, the Revolving Facility includes a mechanism through which certain subsidiaries, as approved by the lenders, can accede as a borrower.

Alcon is permitted to voluntarily prepay loans under the Facilities, in whole or in part, without penalty or premium subject to certain minimum prepayment amounts and the payment of accrued interest on the amount prepaid and customary breakage costs. The Bridge Facility had a mandatory prepayment provision, pursuant to which Alcon would have to apply proceeds from relevant debt capital markets transactions in prepayment under the Bridge Facility.

The terms of the Facilities include certain events of default and covenants customary for investment grade credit facilities, including restrictive covenants that will limit, among other things, the grant or incurrence of security interests over any of Alcon's assets, the incurrence of certain indebtedness and entry into certain fundamental change transactions. The Facilities do not contain any financial covenants.

## Refinancing of Bridge Facility and Facility A

On September 23, 2019, AFC issued Senior Notes ("Notes") with maturity dates in 2026, 2029, and 2049, which are guaranteed by the Company. The Notes are unsecured senior obligations of AFC issued in a private placement. The total principal amount of the Notes is $2.0 billion. The Notes were issued at a discount totaling $7 million, which was recorded as a reduction to the carrying value of the Notes and will be amortized to Interest expense over the term of the Notes. AFC incurred $15 million of debt issuance costs, which were recorded as a reduction to the carrying value of the Notes and will be amortized to Other financial income & expense over the term of the Notes.

The Notes consist of the following:

- Series 2026 Notes - $0.5 billion due in 2026 issued at 99.5%, 2.750% interest is payable twice per year in March and September, beginning in March 2020.

- Series 2029 Notes - $1.0 billion due in 2029 issued at 99.6%, 3.000% interest is payable twice per year in March and September, beginning March 2020.

- Series 2049 Notes - $0.5 billion due in 2049 issued at 99.8%, 3.800% interest is payable twice per year in March and September, beginning March 2020.

The funds borrowed through the issuance of the Notes were used to repay the $1.5 billion Bridge Facility and $0.5 billion Facility A. The transaction was accounted for as an extinguishment of a liability. Alcon recognized a loss of $4 million associated with the write-off of unamortized deferred financing costs due to extinguishment of the original financing. This loss on extinguishment was recognized in Other financial income & expense.

## Series 2030 notes issuance

On May 27, 2020, AFC issued senior notes due in 2030 ("Series 2030 Notes"), which are guaranteed by the Company. The Series 2030 Notes are unsecured senior obligations of AFC issued in a private placement and rank equally in right of payment with the Series 2026, Series 2029, and Series 2049 notes. The total principal amount of the Senior 2030 Notes is $750 million. The Senior 2030 Notes were issued at 99.843% with 2.600% interest payable twice per year in May and November, beginning in November 2020. The Series 2030 Notes were issued at a discount totaling $1 million, which was recorded as a reduction to the carrying value of the Series 2030 notes and will be amortized to Interest expense over the term of the Series 2030 Notes. AFC incurred $5 million of debt issuance costs, which were recorded as a reduction to the carrying value of the Series 2030 Notes and will be amortized to Other financial income & expense over the term of the Series 2030 Notes.

## Local Bilateral Facilities

In February 2019, Alcon entered into a number of local bilateral facilities in different countries, with the largest share of borrowings in Japan. As of December 31, 2020, a total of $150 million was drawn, including $101 million on two lines in Japan and are classified as current with a maturity date of one year or less. There was $115 million undrawn on the facilities in Japan as of December 31, 2020.

## Maturity of contractual undiscounted cash flows and interest payment commitments

The following table provides details on the maturity of the contractual undiscounted cash flows for Alcon's borrowings as of December 31, 2020 and 2019:

| ($ millions) | 2020 | | | 2019 | | |
|---|---|---|---|---|---|---|
| | Nominal amount - Current and non-current financial debt | Derivatives | Total | Nominal amount - Current and non-current financial debt | Derivatives | Total |
| Not later than one year | 162 | 7 | 169 | 245 | 16 | 261 |
| Between one and five years | 1,231 | — | 1,231 | 1,247 | — | 1,247 |
| Later than five years | 2,750 | — | 2,750 | 2,000 | — | 2,000 |
| Total cash flows | 4,143 | 7 | 4,150 | 3,492 | 16 | 3,508 |
| Unamortized debt discount and issuance costs | (32) | — | (32) | (29) | — | (29) |
| Total carrying value | 4,111 | 7 | 4,118 | 3,463 | 16 | 3,479 |

The following table provides details on the maturity of the future contractual interest payments commitments as of December 31, 2020 and 2019:

| ($ millions) | 2020 | 2019 |
|---|---|---|
| Not later than one year | 96 | 94 |
| Between one and five years | 357 | 336 |
| Later than five years | 687 | 653 |
| Total cash flows | 1,140 | 1,083 |

F-42

A218

## 18. Financial instruments - additional disclosures

The below table provides detail related to financial instruments as of December 31, 2020 and 2019.

| ($ millions) | Note | 2020 | 2019 |
|---|---|---|---|
| **Cash and cash equivalents** | | | |
| Cash in current accounts | | 262 | 392 |
| Cash held in time deposits and money market funds | | 1,295 | 430 |
| **Total Cash and cash equivalents** | | **1,557** | **822** |
| **Financial assets - measured at fair value through other comprehensive income ("FVOCI")** | | | |
| Long-term financial investments | 12 | 28 | 31 |
| **Total financial assets - measured at FVOCI** | | **28** | **31** |
| **Financial assets - measured at amortized costs**[1] | | | |
| Trade receivables | 14 | 1,361 | 1,390 |
| Income tax receivables | | 21 | 17 |
| Other current assets (excluding prepaid expenses and other current assets measured at FVPL) | 15 | 296 | 379 |
| Long-term receivables from customers | 12 | 117 | 136 |
| Non-current minimum lease payments from finance lease agreements | 12 | 39 | 78 |
| Long-term loans, advances, and security deposits | 12 | 22 | 34 |
| **Total financial assets - measured at amortized costs** | | **1,856** | **2,034** |
| **Financial assets - measured at fair value through profit and loss ("FVPL")** | | | |
| Deferred compensation assets | 12 | 137 | 122 |
| Current portion of long-term financial investments | 15 | 12 | 33 |
| Derivative financial instruments | 15 | 3 | 1 |
| Long-term financial investments | 12 | 12 | 28 |
| **Total financial assets - measured at FVPL** | | **164** | **184** |
| **Total financial assets** | | **3,605** | **3,071** |
| **Financial liabilities - measured at amortized cost or cost**[1] | | | |
| *Current financial liabilities* | | | |
| Financial debts | 17 | 162 | 245 |
| Lease liabilities | 16 | 70 | 61 |
| Trade payables | | 876 | 833 |
| **Total current financial liabilities - measured at amortized cost or cost** | | **1,108** | **1,139** |
| *Non-current financial liabilities* | | | |
| Financial debts | 17 | 3,949 | 3,218 |
| Lease liabilities | 16 | 315 | 280 |
| **Total non-current financial liabilities - measured at amortized cost or cost** | | **4,264** | **3,498** |
| **Total financial liabilities - measured at amortized cost or cost** | | **5,372** | **4,637** |
| **Financial liabilities - measured at FVPL** | | | |
| Contingent consideration liabilities | 19/20 | 157 | 243 |
| Derivative financial instruments | 17 | 7 | 16 |
| **Total financial liabilities - measured at FVPL** | | **164** | **259** |
| **Total financial liabilities** | | **5,536** | **4,896** |
| **Net financial assets and financial liabilities** | | **(1,931)** | **(1,825)** |

(1)   The carrying amount is a reasonable approximation of fair value, with the exception of the Series 2026, 2029, 2030 and 2049 notes recorded in Non-current financial debts with a fair value of $3,036 million and carrying value of $2,726 million as of December 31, 2020 and a fair value of $2,049 million and carrying value of $1,979 million as of December 31, 2019. The fair value of notes was determined using level 2 inputs. The notes were valued using a quoted market price for such notes, which have low trading volumes.

## Fair value by hierarchy

As required by IFRS, financial assets and liabilities recorded at fair value in the Consolidated Financial Statements are categorized based upon the level of judgment associated with the inputs used to measure their fair value. There are three hierarchical levels, based on an increasing amount of judgment associated with the inputs to derive fair value for these financial assets and liabilities, which are as follows:

Financial assets and liabilities carried at Level 1 fair value hierarchy are listed in active markets.

Financial assets and liabilities carried at Level 2 fair value hierarchy are valued using corroborated market data.

Level 1 financial assets include money market funds and deferred compensation assets. There were no financial liabilities carried at Level 1 fair value, and Level 2 financial assets and liabilities include derivative financial instruments.

Investments in money market funds are classified within Level 1 of the fair value hierarchy because they are valued using quoted market prices. The investments are classified as Cash & cash equivalents within our Consolidated Balance Sheet.

Deferred compensation investments for certain employee benefit plans are held in a rabbi trust and dedicated to pay the benefits under the associated plans but are not considered plan assets as the assets remain available to creditors of Alcon in certain events, including bankruptcy. Rabbi trust assets primarily consist of investments in mutual funds. These assets are classified within Level 1 of the fair value hierarchy because they are valued using quoted market prices.

Level 3 inputs are unobservable for the financial asset or liability. The financial assets and liabilities generally included in Level 3 fair value hierarchy are equity securities and convertible notes receivable of private companies measured at FVOCI, and fund investments, options to acquire private companies, and contingent consideration liabilities measured at FVPL.

The following tables summarize financial assets and liabilities measured at fair value on a recurring basis or at amortized cost or cost as of December 31, 2020 and 2019.

| ($ millions) | Level 1 | Level 2 | Level 3 | Valued at amortized cost or cost | Total |
|---|---|---|---|---|---|
| | | | December 31, 2020 | | |
| **Non-current financial assets** | | | | | |
| Long-term financial investments measured at FVOCI | — | — | 28 | — | 28 |
| Long-term financial investments measured at FVPL | — | — | 12 | — | 12 |
| Long-term receivables from customers | — | — | — | 117 | 117 |
| Deferred compensation assets[1] | 137 | — | — | — | 137 |
| Non-current minimum lease payments from finance lease agreements | — | — | — | 39 | 39 |
| Long-term loans, advances, and security deposits | — | — | — | 22 | 22 |
| **Total non-current financial assets** | **137** | **—** | **40** | **178** | **355** |
| **Current financial assets** | | | | | |
| Money market funds | 625 | — | — | — | 625 |
| Current portion of long-term financial investments measured at FVPL[2] | — | — | 12 | — | 12 |
| Current portion of long-term receivables from customers[2] | — | — | — | 107 | 107 |
| Current portion of minimum lease payments from finance lease agreements[2] | — | — | — | 29 | 29 |
| Other receivables, security deposits and current assets[2] | — | — | — | 88 | 88 |
| VAT receivables[2] | — | — | — | 72 | 72 |
| Derivative financial instruments[2] | — | 3 | — | — | 3 |
| **Total current financial assets** | **625** | **3** | **12** | **296** | **936** |
| **Total financial assets at fair value and amortized cost or cost** | **762** | **3** | **52** | **474** | **1,291** |
| **Financial liabilities** | | | | | |
| Contingent consideration liabilities | — | — | (157) | — | (157) |
| Non-current financial debt | — | — | — | (3,949) | (3,949) |
| Current financial debt | — | — | — | (162) | (162) |
| Derivative financial instruments | — | (7) | — | — | (7) |
| **Total financial liabilities at fair value and amortized cost** | **—** | **(7)** | **(157)** | **(4,111)** | **(4,275)** |

(1)  Recorded in Other non-current assets.

(2)  Recorded in Other current assets.

F-45

A221

| ($ millions) | Level 1 | Level 2 | Level 3 | Valued at amortized cost or cost | Total |
|---|---|---|---|---|---|
| | | | December 31, 2019 | | |
| **Non-current financial assets** | | | | | |
| Long-term financial investments measured at FVOCI | — | — | 31 | — | 31 |
| Long-term financial investments measured at FVPL | — | — | 28 | — | 28 |
| Long-term receivables from customers | — | — | — | 136 | 136 |
| Deferred compensation assets[1] | 122 | — | — | — | 122 |
| Non-current minimum lease payments from finance lease agreements | — | — | — | 78 | 78 |
| Long-term loans, advances, and security deposits | — | — | — | 34 | 34 |
| **Total non-current financial assets** | **122** | **—** | **59** | **248** | **429** |
| **Current financial assets** | | | | | |
| Money market funds | 120 | — | — | — | 120 |
| Current portion of long-term financial investments measured at FVPL[2] | — | — | 33 | — | 33 |
| Current portion of long-term receivables from customers[2] | — | — | — | 122 | 122 |
| Current portion of minimum lease payments from finance lease agreements[2] | — | — | — | 46 | 46 |
| Other receivables, security deposits and current assets[2] | — | — | — | 147 | 147 |
| VAT receivables[2] | — | — | — | 64 | 64 |
| Derivative financial instruments[2] | — | 1 | — | — | 1 |
| **Total current financial assets** | **120** | **1** | **33** | **379** | **533** |
| **Total financial assets at fair value and amortized cost or cost** | **242** | **1** | **92** | **627** | **962** |
| **Financial liabilities** | | | | | |
| Contingent consideration liabilities | — | — | (243) | — | (243) |
| Non-current financial debt | — | — | — | (3,218) | (3,218) |
| Current financial debt | — | — | — | (245) | (245) |
| Derivative financial instruments | — | (16) | — | — | (16) |
| **Total financial liabilities at fair value and amortized cost** | **—** | **(16)** | **(243)** | **(3,463)** | **(3,722)** |

(1)   Recorded in Other non-current assets.

(2)   Recorded in Other current assets.

There were no transfers of financial instruments between levels in the fair value hierarchy during the years ended December 31, 2020 and 2019.

## Level 3 financial instruments measured at fair value on a recurring basis

Financial assets

| ($ millions) | Long-term financial investments measured at FVOCI | | Financial investments measured at FVPL | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| **Balance as of January 1** | 31 | 19 | 61 | 98 |
| Additions | 7 | 17 | 2 | 34 |
| Sales | — | — | — | (7) |
| (Losses) recognized in consolidated statement of comprehensive loss | (10) | (7) | — | — |
| Unrealized gains/(losses) in consolidated income statement | — | — | (5) | (3) |
| Amortization | — | — | (34) | (61) |
| Reclassification | — | 2 | — | — |
| **Balance as of December 31** | 28 | 31 | 24 | 61 |

If the pricing parameters for the Level 3 input were to change for Long-term financial investments measured at FVOCI and Financial investments measured at FVPL by 10% positively or negatively, this would change the amount recorded in the 2020 Consolidated Statement of Comprehensive Loss by $4 million.

Financial liabilities

| ($ millions) | Contingent consideration liabilities | |
|---|---|---|
| | 2020 | 2019 |
| **Balance as of January 1** | (243) | (162) |
| Additions | — | (135) |
| Accretion for passage of time | (17) | (21) |
| Adjustments for changes in assumptions | 63 | 75 |
| Payments | 40 | — |
| **Balance as of December 31** | (157) | (243) |

Changes in contingent consideration liabilities in the current year include adjustments for changes in assumptions $63 million primarily related to revised expectations for achievement of development and commercial milestones and timing of settlement for milestones, and payments of $40 million related to achievement of development milestones. As of December 31, 2020, the probability of success for various development and commercial milestones ranges from 55% to 100% and the maximum remaining potential payments related to contingent consideration from business combinations is $470 million, plus other amounts calculated as a percentage of commercial sales in cases where there is not a specified maximum contractual payment amount. The estimation of probability typically depends on factors such as technical milestones or market performance and is adjusted for the probability of payment. If material, probable payments are appropriately discounted to reflect the impact of time.

Changes in contingent consideration liabilities in the prior year included additions of $135 million related to the acquisition of PowerVision in March 2019 as described in Note 4 of these Consolidated Financial Statements. The prior year also included changes in assumptions of $75 million primarily related to revised expectations for achievement of commercial milestones and changes in assumptions related to the expected timing of settlement for development milestones. As of December 31, 2019, the probability of success for various development and commercial milestones ranged from 70% to 100% and the maximum remaining potential payments related to contingent consideration from business combinations was $510 million, plus other amounts calculated as a percentage of commercial sales in cases where there is not a specified maximum contractual payment amount.

Contingent consideration liabilities are reported in "Provisions & other non-current liabilities" and "Provisions & other current liabilities" based on the projected timing of settlement which is estimated to range from 2021 through 2032 for contingent consideration obligations as of December 31, 2020.

F-47

A223

For the determination of the fair value of a contingent consideration various unobservable inputs are used. A change in these inputs might result in a significantly higher or lower fair value measurement. The inputs used are, among others, the probability of success, sales forecast and assumptions regarding the discount rate, timing and different scenarios of triggering events. The significance and usage of these inputs to each contingent consideration may vary due to differences in the timing and triggering events for payments or in the nature of the asset related to the contingent consideration.

As the most significant Level 3 input, if the probability of success were to change by 10% positively or negatively, this would change the amounts recorded for contingent consideration payables in the 2020 Consolidated Income Statement by $23 million and $24 million respectively.

## Derivatives

As of December 31, 2020, the net value of unsettled positions for derivative forward contracts and swaps was $4 million, including $3 million of unrealized gains in Other current assets and $7 million of unrealized losses in Current financial debts. As of December 31, 2019, the net value of unsettled positions for derivative forward contracts and swaps was $15 million, including $1 million of unrealized gains in Other current assets and $16 million of unrealized losses in Current financial debts. There are master agreements with several banking counterparties for derivatives financial instruments, however, there were no derivative financial instruments meeting the offsetting criteria under IFRS as of December 31, 2020 or December 31, 2019.

## Nature and extent of risks arising from financial instruments

COVID-19 has resulted in updates to our assessment of the nature and extent of certain risks arising from financial instruments, as outlined below.

### Market risk

Alcon is exposed to market risk, primarily related to foreign currency exchange rates, interest rates and the market value of the investments of liquid funds. Alcon actively monitors and seeks to reduce, where it deems it appropriate to do so, fluctuations in these exposures. It is Alcon policy and practice to enter into a variety of derivative financial instruments to manage the volatility of these exposures and to enhance the yield on the investment of liquid funds. Alcon does not enter into any financial transactions containing a risk that cannot be quantified at the time the transaction is concluded. In addition, Alcon does not sell short assets it does not have, or does not know it will have, in the future. Alcon only sells existing assets or enters into transactions and future transactions (in the case of anticipatory hedges) that it confidently expects it will have in the future, based on past experience. In the case of liquid funds, Alcon writes call options on assets it has, or writes put options on positions it wants to acquire and has the liquidity to acquire. Alcon expects that any loss in value for these instruments generally would be offset by increases in the value of the underlying transactions.

### Foreign currency exchange rate risk

Alcon uses the US Dollar as its reporting currency and is therefore exposed to foreign currency exchange movements, primarily in Euros, Japanese Yen, Chinese Renminbi, Swiss Francs, and emerging market currencies. Fluctuations in the exchange rate between the US Dollar and other currencies can have a significant effect on both the Alcon's results of operations, including reported sales and earnings, as well as on the reported value of our assets, liabilities and cash flows. This, in turn, may significantly affect the comparability of period-to-period results of operations.

Alcon manages its global currency exposure by engaging in hedging transactions where management deems appropriate (forward contracts and swaps). Specifically, Alcon enters into various contracts that reflect the changes in the value of foreign currency exchange rates to preserve the value of assets.

### Interest rate risk

Alcon's exposure to cash flow interest rate risks arises mainly from non-current financial debts at variable rates. Alcon may enter into interest rate swap agreements, in which it exchanges periodic payments based on a notional amount and agreed-upon fixed and variable rate interests. If the interest rates had been higher / lower by 1%, the loss before taxes would have been higher / lower by $14 million from the impacts of interest expense based on the change in the interest rate.

F-48

## Commodity price risk

Alcon has only a very limited exposure to price risk related to anticipated purchases of certain commodities used as raw materials by Alcon's businesses. A change in those prices may alter the gross margin of a specific business, but generally by not more than 10% of the margin and thus below Alcon's risk management tolerance levels. Accordingly, Alcon does not enter into significant forward and option contracts to manage fluctuations in prices of anticipated purchases.

## Credit risk

Credit risks arise from the possibility that customers may not be able to settle their obligations as agreed. To manage this risk, Alcon periodically assesses credit risk, assigns individual credit limits, and takes actions to mitigate credit risk where appropriate.

With the continued adverse economic conditions in relation to the COVID-19 pandemic, there is an increased credit risk due to an increase in expected credit losses. Provisions for expected credit losses have been reflected in the Consolidated Financial Statements as of December 31, 2020. Alcon will continue to assess forward-looking estimates of potential increased default rates and potential increase in lifetime expected credit losses. For further information, refer to Note 14 of these Consolidated Financial Statements.

No customer accounted for 10% or more of Alcon's net sales in 2020, 2019, or 2018.

## Liquidity risk

Liquidity risk is defined as the risk that Alcon may not be able to settle or meet its obligations on time or at a reasonable price. Alcon Treasury is responsible for liquidity, funding and settlement management. In addition, liquidity and funding risks, and related processes and policies, are overseen by management. Alcon manages its liquidity risk on a consolidated basis according to business needs, tax, capital or regulatory considerations, if applicable, through numerous sources of financing in order to maintain flexibility. Management monitors Alcon's net debt or liquidity position through rolling forecasts on the basis of expected cash flows.

Since March 2020, Alcon has experienced delayed collections from customers. While collections improved in the second half of the year, with the continued adverse economic conditions in relation to the COVID-19 pandemic, there is an increased liquidity risk due to further potential delays or reductions in collections from our customers or increased difficulties in accessing the capital or debt markets. In response to the increased liquidity risk, on May 27, 2020, AFC completed an offering of $750 million of 2.600% senior notes due in 2030, increasing Alcon's overall liquidity. In addition, Alcon's revolving credit facility with total availability of $1.0 billion remained undrawn as of December 31, 2020 with no current limitations on borrowing, and management has not identified any changes in Alcon's ability to access the capital or debt markets.

For further information on maturity of the contractual undiscounted cash flows for Alcon's borrowings and interest on borrowing, refer to Note 17 of these Consolidated Financial Statements.

# 19. Provisions and other non-current liabilities

The below table provides details related to Provisions and other non-current liabilities as of December 31, 2020, and 2019.

| ($ millions) | Note | 2020 | 2019 |
|---|---|---|---|
| Accrued liability for employee benefits: | | | |
| Defined benefit pension plans | 23 | 339 | 291 |
| Other long-term employee benefits and deferred compensation | | 152 | 140 |
| Other post-employment benefits | 23 | 332 | 423 |
| Provisions for litigation and other legal matters | | — | — |
| Contingent consideration | 18 | 142 | 208 |
| Other non-current liabilities | | 95 | 106 |
| **Total provisions and other non-current liabilities** | | **1,060** | **1,168** |

Alcon believes that its total provisions are adequate based upon currently available information; however, given the inherent difficulties in estimating liabilities in this area, Alcon may incur additional costs beyond the amounts provided. Management believes that such additional amounts, if any, would not be material to Alcon's financial condition but could be material to the results of operations or cash flows in a given period.

## Provisions for litigation and other legal matters

Alcon has established provisions for certain litigation and other legal matters, where a potential cash outflow is probable and a reliable estimate can be made of the amount of the outflow. These provisions represent the current best estimate of the total financial effect for these matters. Potential cash outflows reflected in a provision may be fully or partially off-set by insurance in certain circumstances.

Alcon has not established provisions for potential damage awards for certain additional legal claims if Alcon currently believes that a payment is either not probable or cannot be reliably estimated. A number of other legal matters are in such early stages or the issues presented are such that Alcon has not made any provisions since it cannot currently estimate either a potential outcome or the amount of any potential losses. For these reasons, among others, Alcon generally is unable to make a reliable estimate of possible loss with respect to such cases. It is therefore not practicable to provide information about the potential financial impact of those cases.

There might also be cases for which Alcon was able to make a reliable estimate of the possible loss or the range of possible loss, but Alcon believes that publication of such information on a case-by-case basis would prejudice Alcon's position in ongoing legal proceedings or in any related settlement discussions. Accordingly, in such cases, information would be disclosed with respect to the nature of the contingency, but no disclosure is provided as to an estimate of the possible loss or range of possible loss.

Note 26 contains additional information on contingencies.

## Summary of significant legal proceedings

Under the Separation and Distribution Agreement Alcon entered into with Novartis in connection with the separation and the Spin-off, Alcon and Novartis agreed, subject to certain conditions and except to the extent otherwise described below with respect to any matter, to indemnify the other party and its directors, officers, associates and other representatives against any pending or future liabilities or claims that constitute either a Novartis Group liability, in the case of Novartis, or an Alcon liability, in the case of Alcon, under the terms of the Separation and Distribution Agreement, based on whether such claim or liability relates to the Novartis business and products or Alcon's respective business and products.

A number of Alcon companies are, and will likely continue to be, subject to various legal proceedings and investigations that arise from time to time, including proceedings regarding product liability, sales and marketing practices, commercial disputes, employment, and wrongful discharge, antitrust, securities, health and safety, environmental, tax, international trade, privacy, and intellectual property matters. As a result, Alcon may become subject to substantial liabilities that may not be covered by insurance and could affect our business, financial position and reputation. While Alcon does not believe that any of these legal proceedings will have a material adverse effect on its financial position, litigation is inherently unpredictable and large judgments sometimes occur. As a consequence, Alcon may in the future incur judgments or enter into settlements of claims that could have a material adverse effect on its results of operations or cash flow. The following is a summary as of February 23, 2021 of significant legal proceedings of the Alcon business to which Alcon or any of its subsidiaries are a party.

### Asia / Russia investigation

In 2017 and 2018, Alcon and Novartis Group companies, as well as certain present and former executives and associates of Alcon and Novartis, received document requests and subpoenas from the US Department of Justice ("DoJ") and the SEC requesting information concerning Alcon accounting, internal controls and business practices in Asia and Russia, including revenue recognition for surgical equipment and related products and services and relationships with third party distributors, both before and after Alcon became part of the Novartis Group.  The Investigations by the DoJ and the SEC have concluded. On June 25, 2020, Alcon entered into a three-year Deferred Prosecution Agreement with the DoJ regarding a charge that Alcon Pte Ltd. conspired to falsify financial books and records in violation of the US Foreign Corrupt Practices Act. The charge relates to payments made by a former distributor to health care providers in Vietnam between 2007 and 2014. Alcon agreed to pay the DoJ a penalty of $8.925 million, for which Novartis has indemnified Alcon under the Separation and Distribution Agreement.

### Contact lenses class actions

Since the first quarter of 2015, more than 50 class action complaints have been filed in several courts across the US naming as defendants contact lens manufacturers, including Alcon, and alleging violations of federal antitrust law, as well as the antitrust, consumer protection and unfair competition laws of various states, in connection with the implementation of unilateral price policies by the defendants in the sale of contact lenses. The cases have been consolidated in the Middle District of Florida by the Judicial Panel on Multidistrict Litigation and the claims are being vigorously contested.

### TCPA matter

In April 2016, a putative class action lawsuit was filed in Illinois federal court alleging that the defendants, Alcon and Novartis Pharmaceuticals Corporation, sent unsolicited facsimiles in violation of the Telephone Consumer Protection Act, and seeking to certify a representative putative nationwide class of affected consumers. The parties have settled the matter on terms that will dispose of all claims and will require no payments by Alcon.

### JJSVI patent dispute

On June 23, 2020, Johnson & Johnson Surgical Vision, Inc. ("JJSVI"), acting through its subsidiaries, filed a patent infringement action in the US District Court in Delaware alleging that the manufacture, use, sale, offer for sale, and/or importation of Alcon's *LenSx* Laser System willfully infringes, directly and/or indirectly, one or more claims of 12 US patents. JJSVI subsequently amended its complaint to include copyright infringement claims relating to source code used in the *LenSx* Laser System as well as additional claims of patent infringement. Also on June 23, 2020, JJSVI filed a claim in Mannheim, Germany, alleging that Alcon directly infringes one European patent through its manufacture and sale of *LenSx*. In these cases, JJSVI seeks monetary and injunctive relief. In addition, JJSVI filed a motion on February 4, 2021 asking the district court in Delaware to issue a preliminary injunction prohibiting Alcon from offering, selling, distributing, installing, or exporting LenSx systems that contain the allegedly infringing source code or offering to sell, selling, distributing, or exporting such source code with the purpose or intent of it being loaded onto *LenSx* systems. Alcon intends to defend the cases vigorously and has asserted various patent infringement claims against JJSVI in Europe and the United States.

### Hoya patent dispute

On December 11, 2020, Hoya Corporation and one of its affiliates filed suit against Alcon in the US District Court for the Northern District of Texas alleging that Alcon's *UltraSert* Pre-Loaded Delivery System infringes six of Hoya's US patents. Alcon intends to defend the case vigorously.

### Litigation and other legal matters provision movements

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| **January 1** | — | 42 | 49 |
| Additions to provisions | 9 | — | 1 |
| Cash payments | (9) | (40) | (1) |
| Releases of provisions | — | (2) | (7) |
| **December 31** | — | — | 42 |
| Less current portion | — | — | (42) |
| **Non-current provisions for litigation and other legal matters at December 31** | — | — | — |

Alcon believes that its total provisions for litigation and other legal matters are adequate based upon currently available information. However, given the inherent difficulties in estimating liabilities, there can be no assurance that additional liabilities and costs will not be incurred beyond the amounts provided.

A227

## 20. Provisions and other current liabilities

The following table provides details related to Provisions and other current liabilities as of December 31, 2020 and 2019:

| ($ millions) | Note | 2020 | 2019 |
|---|---|---|---|
| Taxes other than income taxes | | 110 | 81 |
| Restructuring provisions | | 10 | 28 |
| Accrued expenses for goods and services received but not invoiced | | 61 | 79 |
| Accruals for royalties | | 11 | 10 |
| Accruals for deductions from revenue | | 217 | 212 |
| Accruals for compensation and benefits including social security | | 352 | 382 |
| Deferred income | | 110 | 97 |
| Provisions for litigation and other legal matters | 19 | — | — |
| Accrued share-based payments | | 9 | 10 |
| Accrued interest on financial debts | | 19 | 19 |
| Contingent consideration | 18 | 15 | 35 |
| Other payables | | 80 | 85 |
| **Total provisions and other current liabilities** | | **994** | **1,038** |

Provisions and accruals are based upon management's best estimate and adjusted for actual experience. Such adjustments to the historic estimates have not been material.

### Accruals for deductions from revenue

The following table shows the movement of accruals for deductions from revenue:

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| **January 1** | **212** | **194** | **213** |
| Additions | 540 | 662 | 603 |
| Payments/utilizations | (537) | (646) | (613) |
| Changes in offset against gross trade receivables | (2) | 1 | 2 |
| Currency translation effects | 4 | 1 | (11) |
| **December 31** | **217** | **212** | **194** |

## Restructuring provisions

The following table shows the movement of restructuring provisions:

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| **January 1** | **28** | **8** | **3** |
| Additions | 22 | 32 | 13 |
| Cash payments | (40) | (10) | (7) |
| Releases | — | (2) | (2) |
| Currency translation effects | — | — | 1 |
| **December 31** | **10** | **28** | **8** |

In 2020 and 2019, additions to restructuring provisions of $22 million and $32 million, respectively, were related to the multi-year transformation program announced by Alcon on November 19, 2019. The additions to restructuring provisions in 2020 and 2019 were primarily related to accrued severance for the associates whose positions will be eliminated.

In 2018, additions to restructuring provisions of $13 million were related to initiatives aimed at improving the efficiency and agility of Alcon's operating model.

## 21. Consolidated statements of cash flows - additional details

The Consolidated Statement of Cash Flows was prepared in accordance with IAS 7, *Statement of Cash Flows*. The below tables provide additional detail supporting select line items in the Consolidated Statement of Cash Flows.

### 21.1 Depreciation, amortization, impairments and fair value adjustments

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| Property, plant & equipment | 299 | 275 | 241 |
| Right-of-use assets | 79 | 66 | — |
| Intangible assets | 1,245 | 1,084 | 1,397 |
| Financial assets | 5 | 31 | (16) |
| Other non-current assets | (2) | — | — |
| **Total** | **1,626** | **1,456** | **1,622** |

### 21.2 Change in net current assets and other operating cash flow items

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| (Increase) in inventories | (159) | (108) | (150) |
| Decrease/(increase) in trade receivables | 43 | (115) | 53 |
| (Decrease)/increase in trade payables | (21) | 84 | 44 |
| Net change in other current assets | 127 | (26) | 83 |
| Net change in other current liabilities | (35) | 117 | 50 |
| **Total** | **(45)** | **(48)** | **80** |

## 21.3 Acquisitions of businesses, net

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| **Net assets recognized as a result of business combinations** | — | (418) | (286) |
| Payables contingent consideration | — | 135 | 102 |
| Other payments | — | — | (55) |
| **Cash flows** | — | (283) | (239) |

Notes 4 and 22 to these Consolidated Financial Statements provide further information regarding acquisitions of businesses. All acquisitions were for cash.

## 21.4 Reconciliation of assets and liabilities arising from financing activities

| ($ millions) | Financial Liabilities | | | |
|---|---|---|---|---|
| | Non-current financial debts | Current financial debts | Non-current lease liabilities | Current lease liabilities |
| **January 1, 2020** | **3,218** | **261** | **280** | **61** |
| Proceeds from non-current financial debts, net of issuance costs | 744 | — | | |
| New leases | | | 96 | 11 |
| Change in current financial debts | — | (139) | | |
| Amortization of discounts on financial debts | 1 | — | | |
| Payments of lease liabilities, net | | | — | (69) |
| Interest payments for amounts included in lease liabilities classified as cash flows from operating activities | | | — | (12) |
| Changes in fair values and other non-cash changes, net | 4 | (9) | (2) | 8 |
| Currency translation effects | 37 | 1 | 10 | 2 |
| Reclassification from non-current to current | (55) | 55 | (69) | 69 |
| **December 31, 2020** | **3,949** | **169** | **315** | **70** |

| ($ millions) | Financial Assets | Financial Liabilities | | | | |
|---|---|---|---|---|---|---|
| | Other financial receivables from former parent | Non-current financial debts | Current financial debts | Other financial liabilities to former parent | Non-current lease liabilities | Current lease liabilities |
| **January 1, 2019** | **(39)** | **—** | **47** | **67** | **89** | **—** |
| Proceeds from non-current financial debts, net of issuance costs | | 3,724 | | | | |
| Repayment of non-current financial debts | | (509) | | | | |
| Proceeds from Bridge Facility, net of issuance costs | | | 1,495 | | | |
| Repayment of Bridge Facility | | | (1,500) | | | |
| Change in current financial debts | | | 202 | | | |
| Impact of adoption of IFRS 16 Leases and new leases | | | | | 248 | 54 |
| Payments of lease liabilities, net | | | | | — | (52) |
| Interest payments for amounts included in lease liabilities classified as cash flows from operating activities | | | | | — | (5) |
| Changes in fair values and other non-cash changes, net | | 2 | 20 | | (2) | 8 |
| Change in other financial receivables from former parent | 39 | | | | | |
| Change in other financial liabilities to former parent | | | | (67) | | |
| Currency translation effects | | 1 | (3) | | 1 | — |
| Reclassifications from non-current to current | | | | | (56) | 56 |
| **December 31, 2019** | **—** | **3,218** | **261** | **—** | **280** | **61** |

F-55

# 22. Acquisitions of businesses

## Fair value of assets and liabilities arising from acquisitions

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| Property, plant & equipment | — | 1 | 1 |
| Currently marketed products | — | — | 346 |
| Acquired research & development | — | 505 | — |
| Deferred tax assets | — | 28 | 12 |
| Inventories | — | — | 3 |
| Trade receivables and other current assets | — | — | 2 |
| Cash and cash equivalents | — | 6 | 5 |
| Deferred tax liabilities | — | (121) | (78) |
| Trade payables and other liabilities | — | (1) | (4) |
| **Net identifiable assets acquired** | **—** | **418** | **287** |
| Acquired liquidity | — | (6) | (5) |
| Goodwill | — | 6 | 4 |
| **Net assets recognized as a result of business combinations** | **—** | **418** | **286** |

Note 4 of these Consolidated Financial Statements details significant acquisitions of businesses, which were PowerVision in 2019 and TrueVision and Tear Film in 2018. No goodwill from 2019 or 2018 acquisitions is tax-deductible.

# 23. Post-employment benefits for associates

## Defined benefit plans

In addition to the legally required social security schemes, Alcon has sponsored numerous independent pension and other post-employment benefit plans and participates in certain plans of Novartis pending completion of their separation. In most cases, these plans are externally funded in entities that are legally separate from Alcon. For certain subsidiaries, however, no independent plan assets exist for the pension and other post-employment benefit obligations of associates. In these cases the related unfunded liability is included in the Consolidated Balance Sheet. The value of the post-employment benefits promised under the pension and other post-employment benefit plans is represented by the defined benefit obligation ("DBO"), which is measured based on the projected unit credit method ("PUC"). Independent actuaries reappraise the DBOs of all major pension and other post-employment benefit plans annually. Plan assets are recognized at fair value.

The major plans are based in Switzerland, the United States, Germany, and the United Kingdom. As of December 31, 2020, these plans represent 86% of Alcon's total DBO and, other than described below for the finalization of the Swiss plan separation, are independently sponsored by Alcon. Details of the plans in those significant countries are provided below.

The pension plans in Switzerland represent the most significant portion of Alcon's total pension DBO and the largest component of Alcon's total plan assets. The principal plan in Switzerland is funded. Following the Spin-off, all Alcon Swiss associates continued to participate in Novartis pension funds for a temporary period. For the Swiss pension plan, active insured members' benefits are partially linked to the contributions paid into the plan. Certain features of Swiss pension plans required by law preclude the plans from being categorized as defined contribution plans. These factors include a minimum interest guarantee on retirement savings accounts, a pre-determined factor for converting the accumulated savings account balance into a pension and embedded death and disability benefits. All benefits granted under a Swiss-based principal pension plan are vested, and Swiss legislation prescribes that the employer has to contribute a fixed percentage of an associate's pay to an external pension fund. Additional employer contributions may be required whenever the plan's statutory funding ratio falls below a certain level. The associate also contributes to the plan.

F-56

A232

As of December 31, 2020 the Swiss pension plan was managed by a separate legal entity governed by a board of trustees, that, for the pension plan, consisted of representatives nominated by Alcon's Former Parent and the active insured associates. The board of trustees was responsible for the plan design and asset investment strategy. Effective February 1, 2021, Alcon's Swiss pension obligation was set-up under an Alcon-sponsored arrangement with Copré La Collective de Prévoyance ("Copre"). Also effective February 1, 2021, Alcon has its own pension committee, consisting of representatives nominated by Alcon and the active insured associates. Associates' vested account balances are expected to transfer to Copré before March 31, 2021. As a collective foundation, Copré is governed by its own board of trustees which is responsible for the foundation regulations and asset investment strategy for multiple entities participating in the collective foundation. The pension committee is responsible for the plan design of Alcon's plan. During the third quarter of 2020, the selection of Copré resulted in a plan amendment with past service costs of $12 million recognized in Other expense and a corresponding increase in the DBO.

The United States pension plans represent the second largest component of Alcon's total pension DBO and the third largest component of Alcon's total plan assets. The principal plan (Qualified Plan) is funded, whereas the plans providing additional benefits for executives (Defined Benefit Restoration Plan and Grandfathered Supplemental Executive Plan) are unfunded. Benefits in the Qualified Plan and Restoration Plan are frozen for all participants. Employer contributions are required for the Qualified Plan whenever the statutory funding ratio falls below a certain level. Furthermore, associates in the United States are covered under other post-employment benefit plans (US OPEB plans) which represent 99% of the total DBO for other post-employment benefit plans. These benefits in the US primarily consist of post-employment healthcare which has been closed to new members since 2015. Effective January 1, 2021, the Alcon sponsored group health plan for current and future eligible retired participants age 65 and over was changed to a private Medicare marketplace while providing an annual notional contribution to a Health Reimbursement Account for each covered member and spouse. The impact of the plan amendment in the fourth quarter of 2020 was a benefit of $164 million recognized in Other income and a corresponding decrease in the DBO in Provisions and other non-current liabilities. There is no statutory funding requirement for the US OPEB plans. The Qualified Pension plan and US OPEB plans were separated from Novartis plans subsequent to the Spin-off and were independently sponsored by Alcon as of December 31, 2020. The Defined Benefit Restoration Plan and Grandfathered Supplemental Executive Plan were already independently sponsored by Alcon.

The major pension arrangements in Germany are governed by the Occupational Pensions Act ("BetrAVG") and represent the third largest component of Alcon's total pension DBO and the fifth largest component of Alcon's total plan assets. The plans are partly funded by a Contractual Trust arrangement or direct insurances. The employer is responsible for contributing the premiums to the insurances and paying certain benefits when they fall due. All plans are closed for new entrants and the benefits are fully vested for all participants. For some participants the benefits are based on final salary and length of employment, and for others the benefit is earned each year based on the current salary in the year of service. Associates do not contribute towards the cost of the benefits.

The pension plans in the United Kingdom represent the fourth largest component of Alcon's total pension DBO and the second largest component of Alcon's total plan assets. The Alcon United Kingdom Pension Scheme is governed and administered by a board of trustees in accordance with its Trust Deed. United Kingdom legislation requires that pension schemes are funded prudently (i.e., to a level in excess of the "best estimate" expected cost of providing benefits). Funding is assessed on a triennial basis using (prudent) assumptions agreed by the board of trustees and Alcon. The board of trustees is responsible for jointly agreeing with Alcon the level of contributions needed to eliminate any shortfall over a reasonable period of time, typically not exceeding 10 years. Under the governing documentation, if a surplus remains once liabilities have been settled it would be refunded to Alcon.

One of Alcon's pension plans has a surplus that is not recognized, on the basis that future economic benefits are not available to the entity in the form of a reduction in future contributions or a cash refund.

The following tables summarize the funded and unfunded DBO for pension and other post-employment benefit plans of Alcon associates at December 31, 2020 and 2019:

| ($ millions) | Pension plans | | Other post-employment benefit plans | |
|---|---|---|---|---|
| | **2020** | **2019** | **2020** | **2019** |
| **Benefit obligation at January 1** | **723** | **662** | **423** | **385** |
| Current service cost | 31 | 22 | 14 | 8 |
| Interest cost | 12 | 13 | 15 | 15 |
| Past service costs and settlements | 9 | 2 | (165) | — |
| Administrative expenses | 1 | 1 | — | — |
| Remeasurement losses arising from changes in financial assumptions | 38 | 71 | 92 | 52 |
| Remeasurement losses/(gains) arising from changes in demographic assumptions | 2 | 6 | (4) | (1) |
| Remeasurement (gains) arising from experience-related changes | (13) | (5) | (27) | (20) |
| Currency translation effects | 44 | 1 | — | — |
| Benefit payments | (36) | (15) | (25) | (16) |
| Contributions of associates | 6 | 5 | 9 | — |
| Effect of acquisitions, divestments or transfers | — | (40) | — | — |
| **Benefit obligation at December 31** | **817** | **723** | **332** | **423** |
| **Fair value of plan assets at January 1** | **451** | **424** | **—** | **40** |
| Interest income | 7 | 8 | — | 1 |
| Return on plan assets excluding interest income | 32 | 36 | — | 3 |
| Currency translation effects | 24 | 7 | — | — |
| Employer contributions | 25 | 21 | 16 | (28) |
| Contributions of associates | 6 | 5 | 9 | — |
| Settlements | (2) | — | — | — |
| Benefit payments | (36) | (15) | (25) | (16) |
| Effect of acquisitions, divestments or transfers | 12 | (35) | — | — |
| **Fair value of plan assets at December 31** | **519** | **451** | **—** | **—** |
| **Funded status** | **(298)** | **(272)** | **(332)** | **(423)** |
| **Limitation on recognition of fund surplus at January 1** | **(6)** | **(4)** | | |
| Change in limitation on recognition of fund surplus (including exchange rate differences) | (11) | (2) | | |
| **Limitation on recognition of fund surplus at December 31** | **(17)** | **(6)** | | |
| **Net liability in the balance sheet at December 31** | **(315)** | **(278)** | **(332)** | **(423)** |

The reconciliation of the net liability from January 1 to December 31 is as follows:

| ($ millions) | Pension plans | | Other post-employment benefit plans | |
| --- | --- | --- | --- | --- |
| | **2020** | **2019** | **2020** | **2019** |
| **Net liability at January 1** | **(278)** | **(242)** | **(423)** | **(345)** |
| Current service cost | (31) | (22) | (14) | (8) |
| Net interest expense | (5) | (5) | (15) | (14) |
| Administrative expenses | (1) | (1) | — | — |
| Past service costs and settlements | (11) | (2) | 165 | — |
| Remeasurements | 5 | (36) | (61) | (28) |
| Currency translation effects | (20) | 6 | — | — |
| Employer contributions | 25 | 21 | 16 | (28) |
| Effect of acquisitions, divestments or transfers | 12 | 5 | — | — |
| Change in limitation on recognition of fund surplus | (11) | (2) | — | — |
| **Net liability at December 31** | **(315)** | **(278)** | **(332)** | **(423)** |
| | | | | |
| **Amounts recognized in the balance sheet** | | | | |
| Prepaid benefit cost | 24 | 13 | — | — |
| Accrued benefit liability | (339) | (291) | (332) | (423) |

The following tables provide detail of the DBO for pension plans by geography and type of member and of plan assets based on the geographical locations in which they are held:

| ($ millions) | 2020 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Switzerland | United States | Germany | United Kingdom | Rest of the world | Total |
| **By type of member** | | | | | | |
| Active | (251) | (53) | (76) | — | (125) | (505) |
| Deferred pensioners | (12) | (50) | (32) | (62) | (17) | (173) |
| Pensioners | (26) | (35) | (26) | (42) | (10) | (139) |
| **Benefit obligation at December 31** | **(289)** | **(138)** | **(134)** | **(104)** | **(152)** | **(817)** |
| *Thereof: unfunded plans* | *51* | *30* | *—* | *—* | *31* | *112* |
| *Thereof: unfunded portion of funded plans* | *84* | *14* | *115* | *—* | *14* | *227* |
| *Prepaid benefit costs and limitation on recognition of fund surplus* | *—* | *—* | *—* | *(23)* | *(18)* | *(41)* |
| **Fair value of plan assets at December 31** | 154 | 94 | 19 | 127 | 125 | 519 |
| **Funded status** | **(135)** | **(44)** | **(115)** | **23** | **(27)** | **(298)** |

| ($ millions) | Switzerland | United States | Germany | United Kingdom | Rest of the world | Total |
|---|---|---|---|---|---|---|
| **2019** | | | | | | |
| **By type of member** | | | | | | |
| Active | (216) | (40) | (61) | — | (123) | (440) |
| Deferred pensioners | (12) | (46) | (27) | (54) | (12) | (151) |
| Pensioners | (16) | (41) | (21) | (44) | (10) | (132) |
| **Benefit obligation at December 31** | **(244)** | **(127)** | **(109)** | **(98)** | **(145)** | **(723)** |
| *Thereof: unfunded plans* | *47* | *29* | *—* | *—* | *23* | *99* |
| *Thereof: unfunded portion of funded plans* | *65* | *18* | *92* | *—* | *17* | *192* |
| *Prepaid benefit costs and limitation on recognition of fund surplus* | *—* | *—* | *—* | *(11)* | *(8)* | *(19)* |
| **Fair value of plan assets at December 31** | **132** | **80** | **17** | **109** | **113** | **451** |
| **Funded status** | **(112)** | **(47)** | **(92)** | **11** | **(32)** | **(272)** |

The following table shows the principal weighted average actuarial assumptions used for calculating defined benefit plans and other post-employment benefits of Alcon associates:

| | Pension plans | | Other post-employment benefit plans | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Discount rate | 1.2 % | 1.7 % | 2.3 % | 3.3 % |
| Expected rate of pension increase | 1.1 % | 1.2 % | | |
| Expected rate of salary increase | 2.4 % | 3.3 % | | |
| Interest on savings account | 1.0 % | 1.0 % | | |
| Current average life expectancy for a 65-year-old male (in years) | 20 | 21 | 20 | 21 |
| Current average life expectancy for a 65-year-old female (in years) | 23 | 24 | 22 | 23 |

The following table shows additional details related to the weighted average discount rates for the principal plan for each significant country:

| | Pension plans | | Other post-employment benefit plans | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Switzerland | 0.1 % | 0.3 % | | |
| United States | 2.4 % | 3.1 % | 2.3 % | 3.3 % |
| Germany | 0.8 % | 1.1 % | | |
| United Kingdom | 1.3 % | 2.0 % | | |

Changes in the aforementioned actuarial assumptions can result in significant volatility in the accounting for pension plans in the Consolidated Financial Statements. This can result in substantial changes in Alcon's other comprehensive income, non-current liabilities and prepaid pension assets.

The DBO is significantly impacted by assumptions related to the rate used to discount the actuarially determined post-employment benefit liability. This rate is based on yields of high-quality corporate bonds in the country of the plan. Decreasing corporate bond yields decrease the discount rate, resulting in an increase in the DBO and decrease in the funded status.

The impact of decreasing interest rates on a plan's assets is more difficult to predict. A significant part of the plan assets is invested in bonds. Bond values usually rise when interest rates decrease and may therefore partially compensate for the decrease in the funded status. Furthermore, pension assets also include significant holdings of equity instruments. Share

A236

prices tend to rise when interest rates decrease and therefore often counteract the negative impact of the rising DBO on the funded status (although the correlation of interest rates with equities is not as strong as with bonds, especially in the short term).

The assumption for the expected rate for pension increases significantly affects the DBO of most plans in Switzerland, Germany and the United Kingdom. Such pension increases also decrease the funded status, although there is no strong correlation between the value of the plan assets and pension/inflation increases.

Assumptions regarding life expectancy significantly impact the DBO. An increase in longevity increases the DBO. There is no offsetting impact from the plan assets, as no longevity bonds or swaps are held by the pension funds. Generational mortality tables are used where this data is available.

The following table shows the sensitivity of the defined benefit pension and other post-employment benefit obligations to the principal actuarial assumptions as of December 31, 2020:

| ($ millions) | Change in 2020 year-end |
|---|---|
| 25 basis point increase in discount rate | (42) |
| 25 basis point decrease in discount rate | 46 |
| 1 year increase in life expectancy | 31 |
| 25 basis point increase in rate of pension increase | 15 |
| 25 basis point decrease in rate of pension increase[1] | (7) |
| 25 basis point increase of interest on savings account | 4 |
| 25 basis point decrease of interest on savings account | (3) |
| 25 basis point increase in rate of salary increase | 6 |
| 25 basis point decrease in rate of salary increase | (4) |

(1)   Decrease in rate of pension increase is limited to zero.

The above sensitivity analyses are based on a change in an assumption while holding all other assumptions constant. In practice, this is unlikely to occur, and changes of the assumptions may be correlated. When calculating the sensitivity of the DBO to significant actuarial assumptions the same method (present value of the defined benefit obligation calculated with the PUC method at the end of the reporting period) has been applied as when calculating the net liability recognized in the Consolidated Balance Sheet.

The healthcare cost trend rate assumptions used for other post-employment benefits are as follows:

| | 2020 | 2019 | 2018 |
|---|---|---|---|
| Healthcare cost trend rate assumed for next year | 6.2 % | 6.5 % | 7.0 % |
| Rate to which the cost trend rate is assumed to decline | 4.5 % | 4.5 % | 4.5 % |
| Year that the rate reaches the ultimate trend rate | 2028 | 2028 | 2028 |

F-61

A237

The following table shows the weighted average plan asset allocation of funded defined benefit pension plans at December 31, 2020, and 2019:

| (as a percentage) | Pension plans | | | |
| --- | --- | --- | --- | --- |
| | Long-term target minimum | Long-term target maximum | 2020 | 2019 |
| Equity securities | 15 | 40 | 31 | 32 |
| Debt securities | 20 | 60 | 46 | 42 |
| Real estate | 5 | 20 | 7 | 7 |
| Alternative investments | 0 | 20 | 10 | 15 |
| Cash and other investments | 0 | 15 | 6 | 4 |
| **Total** | | | **100** | **100** |

Cash and most of the equity and debt securities have a quoted market price in an active market. Real estate and alternative investments, which include hedge fund and private equity investments, usually do not have a quoted market price.

The strategic allocation of assets of the different pension plans is determined with the objective of achieving an investment return that, together with employer contributions and contributions of associates, is sufficient to maintain reasonable control over the various funding risks of the plans. Based upon the market and economic environments, actual asset allocations may temporarily be permitted to deviate from policy targets.

The weighted average duration of the DBO is 15.5 and 15.6 years as of December 31, 2020 and 2019, respectively.

Alcon's ordinary contribution to the various pension plans is based on the rules of each plan. Additional contributions are made whenever required by statute or law (i.e., usually when statutory funding levels fall below predetermined thresholds).

The following table summarizes expected future cash flows for pension and other post-employment benefit plans as of December 31, 2020:

| ($ millions) | Pension plans | Other post-employment benefit plans |
| --- | --- | --- |
| **Expected employer contributions to funded plans** | | |
| 2021 (estimated) | 11 | — |
| **Expected future benefit payments** | | |
| 2021 | 44 | 19 |
| 2022 | 26 | 21 |
| 2023 | 28 | 22 |
| 2024 | 32 | 23 |
| 2025 | 32 | 23 |
| 2026-2030 | 185 | 110 |

## Defined contribution plans

In many subsidiaries, associates are covered by defined contribution plans. Contributions charged to the 2020 Consolidated Income Statement for the defined contribution plans were $136 million (2019: $128 million; 2018: $105 million).

## 24. Equity-based compensation

For the year ended December 31, 2020, Alcon recorded equity-based compensation expense of $113 million (2019: $114 million, 2018: $93 million).

Liabilities from cash-settled equity-based compensation plans were $9 million as of December 31, 2020 (2019: $10 million).

F-62

A238

On April 9, 2019, Alcon adopted various equity-based incentive plans, under which Alcon may grant awards in the form of restricted stock units ("RSUs"), performance-based restricted stock units ("PSUs"), restricted stock awards ("RSAs"), or any other form of award at the discretion of the Board. Certain associates in select countries may also participate in share ownership savings plans.

Prior to the Spin-off, Alcon associates participated in Novartis equity-based participation plans, which included stock options, RSUs, PSUs, RSAs and certain share ownership savings plans. Such awards were settled in shares or options of the Former Parent. For periods prior to the Spin-off, the Consolidated Income Statement reflects the compensation expense for the Novartis's equity-based incentive plans in which Alcon associates participated.

## Replacement awards

Concurrent with the Spin-off, certain outstanding Novartis awards granted to Alcon associates under Novartis' equity-based incentive plans vested in Novartis equity on a pro rata basis, in proportion to the amount of the vesting period completed. The remaining unvested Novartis awards were replaced and restored with Alcon awards as governed by the Alcon equity restoration plan with terms and vesting schedules substantially similar to the replaced Novartis awards.

The pro rata vesting of Novartis awards and replacement of forfeited unvested Novartis awards with Alcon awards represents a modification under IFRS 2, *Share-based Payment*. Alcon measured the fair value of the awards immediately prior to and subsequent to the modification and concluded that no incremental fair value was provided to associates. Accordingly, Alcon continues to recognize as an expense the amount of unrecognized compensation cost of the original awards over the remaining vesting periods. Alcon issued 4.2 million unvested equity-based awards in connection with the modification at the time of the the Spin-off.

The replacement awards consist primarily of RSUs and PSUs, and vest over a period consistent with the original vesting schedule of the awards which they replaced. In addition to the replacement awards, Alcon has granted additional equity-based awards under the newly-established Alcon incentive plans which were also granted in the form of RSUs and PSUs that will settle in Alcon Inc. shares upon vesting.

## Summary of unvested share movements

The below table summarizes unvested share movements for all Alcon equity-based incentive plans through December 31, 2020 and 2019:

| | 2020 | | | 2019 | | |
|---|---|---|---|---|---|---|
| | Number of shares in thousands | Weighted average fair value at grant date in $ | Fair value at grant date in $ millions | Number of shares in thousands | Weighted average fair value at grant date in $ | Fair value at grant date in $ millions |
| **Unvested shares at January 1/Replacement awards issued at Spin-off**[1] | **4,742** | **51.20** | **243** | **4,222** | **n/a** | **212** |
| Granted | | | | | | |
|   Restricted awards | 1,668 | 60.19 | 100 | 625 | 56.10 | 35 |
|   Performance awards | 457 | 62.03 | 28 | 117 | 58.00 | 7 |
| Vested[1] | (1,149) | n/a | (58) | (108) | n/a | (5) |
| Forfeited[1] | (301) | n/a | (16) | (114) | n/a | (6) |
| **Unvested shares at December 31** | **5,417** | **54.90** | **297** | **4,742** | **51.20** | **243** |

(1)   Fair value of replacement awards granted at Spin-off and associated subsequent vesting and forfeitures based on estimated fair value per share at the time of Spin-off.

The remaining weighted-average vesting period of unvested equity-based awards as of December 31, 2020 was 1.3 years.

F-63

A239

## Alcon equity-based incentive plans

The below table summarizes the number of shares authorized under the plans as of December 31, 2020:

| (thousands) | Authorized shares |
|---|---|
| Long-term Incentive Plan | 20,000 |
| Deferred Bonus Stock Plan | 1,500 |
| Swiss Employee Share Ownership Plan | 475 |
| Other share savings plans | 275 |
| **Total** | **22,250** |

### Long-Term Incentive Plan ("LTIP") - Restricted Stock Units and Restricted Stock Awards

Under Alcon's LTIP, certain eligible executives and management personnel may receive grants of RSUs and RSAs (together "Restricted awards"). The awards generally vest on the third anniversary of the award and are generally forfeited if the employment relationship with Alcon terminates prior to vesting. Recipients of RSU awards do not have any shareholder rights, such as voting or dividend rights, until the shares are delivered. Alcon associates receiving grants of RSAs are entitled to the dividends that may be declared and paid over the vesting period only if the associates vest in such award.

For the periods prior to the Spin-off, Alcon associates participated in the Former Parent's "Select" plan. The Company's LTIP plan is substantially similar to and replaced the Former Parent plan.

### LTIP - Performance Stock Units

The Alcon CEO and Alcon Top Leaders ("ATLs") participate in Alcon's long-term performance program. PSUs granted under the LTIP each convert to one unrestricted Alcon Inc. share at vesting, subject to the achievement of performance measures.

PSUs awarded to plan participants are granted at target incentive ranges from 30% to 430% of base compensation and vest over a three-year period. The payout between 0% and 200% of target is dependent upon four equally weighted performance metrics which are determined at the onset of the performance period by the Alcon Inc. Board of Directors. The metrics include cumulative annual growth rate of Net sales, Core EPS, market share, and innovation. The Alcon Inc. Board of Directors and the Compensation Committee assess the performance against the defined measures and approve the final payout. PSUs granted under the performance plan do not carry voting rights, but do carry dividend equivalents that are paid in Alcon Inc. shares at vesting, provided participants remain associates of Alcon.

For the periods prior to the Spin-off, Alcon associates participated in the Former Parent's Long-Term Performance Plan ("LTPP") and Long-Term Relative Performance Plan ("LTRPP"), which were substantially similar to Alcon's LTIP performance program.

### Deferred Bonus Stock Plan ("DBSP")

Beginning in 2020, the annual incentives for the Alcon CEO and ATLs no longer include deferrals of compensation in the form of equity-based awards subject to the provisions of the DBSP. Prior to 2020, the Alcon CEO's annual incentive was paid 50% in cash in the year following the performance period, and 50% in Alcon Inc. RSUs or RSAs. In prior years ATLs received 70% of their annual incentive in cash and 30% in Alcon Inc. RSUs or RSAs. The RSUs and RSAs are granted in first quarter of the year following the performance period, which are deferred and restricted for three years. Each RSU is converted into one Alcon Inc. share at the vesting date. RSUs granted under the DBSP do not carry any dividend, dividend equivalent or voting rights. Executives in certain countries may elect to also receive some or all of their cash incentive in shares or share units that are not subject to vesting conditions.

The Alcon DBSP is substantially similar to and replaces the Annual Incentive plan, which existed in the periods prior to the Spin-off.

## Swiss Employee Share Ownership Plan and other share savings plans

Alcon associates in certain countries are encouraged to invest in share savings plans. Under the share savings plans, participants may elect to receive some or all of their wages or annual incentives in Alcon Inc. shares in lieu of cash. Subject to plan rules and limitations, as a reward for their participation in the share savings plans, at no additional cost to the participant, Alcon may fully or partially match their investments in shares after a holding period of three or five years.

Prior to the Spin-off, Alcon associates participated in the Former Parent's share savings plans, which were substantially similar to and replaced by Alcon's share savings plans.

# 25. Related parties transactions

## Executive officers

The following table summarizes compensation information for key management personnel (7 members for all years presented):

| ($ millions) | 2020 | 2019 | 2018 |
|---|---|---|---|
| Cash and other compensation | 12.8 | 12.5 | 10.3 |
| Post-employment benefits | 1.1 | 0.9 | 0.8 |
| Equity-based compensation | 9.2 | 10.7 | 11.3 |
| **Total** | **23.1** | **24.1** | **22.4** |

## Transactions with members of the Board of Directors

Dr. Arthur Cummings, an Alcon Board Director, in his capacity as an ophthalmologist, provides certain consulting services, including assistance with various clinical trials to Alcon. In 2020 and 2019, Alcon paid to Dr. Cummings (or his related entities) approximately $54,809 and $84,844, respectively.

## Transactions with Novartis (up to April 9, 2019)

Prior to the Spin-off, the Alcon business was a segment of Novartis such that transactions with Novartis were considered related party transactions. In connection with the Spin-off, Alcon entered into a separation and distribution agreement as well as various other agreements governing relationships with Novartis going forward, including manufacturing and supply, transitional services, tax matters, employee matters, and patent and know-how license and brand license agreements. Information included in this Note with respect to Novartis is strictly limited to related party transactions with Novartis prior to the Spin-off on April 9, 2019.

Transactions from trading activities related to products and services invoiced between other Novartis Group companies and Alcon's business, have been retained in the historical Consolidated Financial Statements. The ultimate controlling parent of both, the other Novartis Group companies and Alcon's business, was Novartis AG until the Spin-off.

The following table summarizes amounts for the years ended December 31, 2019 and 2018:

| ($ millions) | 2019 [(1)] | 2018 |
|---|---|---|
| Sales to former parent | — | 4 |
| Contract manufacturing revenues from former parent | 47 | — |
| Purchases from former parent | 19 | 4 |

(1)   Activity presented strictly relates to the period during which Novartis was a related party (up to April 9, 2019).

## Sales to and purchases from Former Parent

Beginning in 2019, product sales to Novartis are recorded in Other revenues in line with Alcon's contract manufacturing arrangement executed with Novartis. Other revenues in 2019 prior to the Spin-off were $47 million. Purchases of products from Novartis under the contract manufacturing arrangement totaled $19 million in 2019 prior to the Spin-off.

**Other financial receivables and payables related to Former Parent**

Prior to the Spin-off, the majority of Alcon's subsidiaries were party to Novartis cash pooling arrangements with several financial institutions to maximize the availability of cash for general operating and investing purposes. Under these cash pooling arrangements, cash balances were swept by Novartis regularly from Alcon's bank accounts, and the net position with the Novartis cash pooling accounts at the end of each reporting period was reflected in the Consolidated Balance Sheet in Other financial receivables from former parent or Other financial liabilities to former parent. These cash pooling arrangements were eliminated during the three months ended March 31, 2019 in anticipation of the Spin-off and replaced with third party financing arrangements as needed.

**Novartis Business Services ("NBS") charges, corporate overhead and other allocations from Former Parent**

Prior to January 1, 2019, Novartis Group provided Alcon certain services from NBS, the shared service organization of Novartis Group, across the following service domains: human resources operations, real estate and facility services, including site security and executive protection, procurement, information technology, commercial and medical support services and financial reporting and accounting operations. The Consolidated Financial Statements include the appropriate costs related to the services rendered, without profit margin, in accordance with the historical arrangements that existed between the Alcon business and NBS.

Further, certain general and administrative costs of Novartis Group were not charged or allocated to the Alcon business in the past. For the purpose of the 2018 financial statements, such costs were allocated based on reasonable assumptions and estimates, based on the direct and indirect costs incurred to provide the respective service. When specific identification was not practicable, a proportional cost method was used, primarily based on sales or headcount.

These NBS charges, corporate overhead and other allocations amounted to $553 million in 2018.

During 2018, Alcon formed its own business and corporate support functions, including its own service organization, such that certain activities and associates were transferred from Novartis to Alcon, operationally effective January 1, 2019. Services provided by Novartis Group to Alcon in 2019 prior to the Spin-off totaled $40 million and primarily related to human resources operations, real estate and facility services, and information technology.

Management believes that the net charges and methods used for allocations to Alcon were performed on a reasonable basis and reflect the services received by Alcon and the cost incurred on behalf of Alcon. Although the Consolidated Financial Statements reflect management's best estimate of all historical costs related to Alcon, this may however not necessarily reflect what the results of operations, financial position, or cash flows would have been had Alcon been a separate entity, nor the future results of Alcon as it exists following completion of the separation on April 9, 2019.

## 26. Commitments and contingencies

### Commitments

#### Research & development

Alcon has entered into long-term research agreements with various institutions which provide for potential milestone payments and other payments by Alcon that may be capitalized. As of December 31, 2020, the commitments to make payments under those agreements, and their estimated timing, were as follows:

| ($ millions) | 2020 |
|---|---|
| 2021 | 26 |
| 2022 | 5 |
| 2023 | 1 |
| 2024 | 1 |
| 2025 | — |
| Thereafter | 47 |
| **Total** | **80** |

#### Other

Alcon entered into various purchase commitments for services and materials as well as for equipment in the ordinary course of business. These commitments are generally entered into at current market prices and reflect normal business operations. For disclosure of Property, plant and equipment purchase commitments, see Note 9.

### Contingencies

The Alcon companies have to observe the laws, government orders and regulations of the country in which they operate.

A number of Alcon companies are, and will likely continue to be, subject to various legal proceedings and investigations that arise from time to time, including proceedings regarding product liability, sales and marketing practices, commercial disputes, employment, and wrongful discharge, antitrust, securities, health and safety, environmental, tax, international trade, privacy, and intellectual property matters. As a result, Alcon may become subject to substantial liabilities that may not be covered by insurance and could affect our business, financial position and reputation. While Alcon does not believe that any of these legal proceedings will have a material adverse effect on its financial position, litigation is inherently unpredictable and large judgments sometimes occur. As a consequence, Alcon may in the future incur judgments or enter into settlements of claims that could have a material adverse effect on its results of operations or cash flow.

Governments and regulatory authorities around the world have been stepping up their compliance and law enforcement activities in recent years in key areas, including marketing practices, pricing, corruption, trade restrictions, embargo legislation, insider trading, antitrust, cyber security and data privacy. Further, when one government or regulatory authority undertakes an investigation, it is not uncommon for other governments or regulators to undertake investigations regarding the same or similar matters. Responding to such investigations is costly and requires an increasing amount of management's time and attention. In addition, such investigations may affect Alcon's reputation, create a risk of potential exclusion from government reimbursement programs in the United States and other countries, and may lead to (or arise from) litigation. These factors have contributed to decisions by Alcon and other companies in the medical device and healthcare industry, when deemed in their interest, to enter into settlement agreements with governmental authorities around the world prior to any formal decision by the authorities or a court. Those government settlements have involved and may continue to involve, in current government investigations and proceedings, large cash payments, sometimes in the hundreds of millions of dollars or more, including the potential repayment of amounts allegedly obtained improperly and other penalties, including treble damages. In addition, settlements of government healthcare fraud cases often require companies to enter into corporate integrity agreements, which are intended to regulate company behavior for a period of years. Also, matters underlying governmental investigations and settlements may be the subject of separate private litigation.

While provisions have been made for probable losses, which management deems to be reasonable or appropriate, there are uncertainties connected with these estimates. Note 19 contains additional information on these matters.

Alcon is involved in legal proceedings concerning intellectual property rights. The inherent unpredictability of such proceedings means that there can be no assurances as to their ultimate outcome. A negative result in any such

proceeding could potentially adversely affect the ability of certain Alcon companies to sell their products, or require the payment of substantial damages or royalties.

Alcon's potential for environmental remediation liability is assessed based on a risk assessment and investigation of the various sites identified by Alcon as at risk for environmental remediation exposure. Alcon's future remediation expenses are affected by a number of uncertainties. These uncertainties include, but are not limited to, the method and extent of remediation, the percentage of material attributable to Alcon at the remediation sites relative to that attributable to other parties, and the financial capabilities of the other potentially responsible parties.

Alcon has no significant environmental liabilities as at December 31, 2020 and 2019 and has incurred no significant remediation costs for the years ended December 31, 2020, 2019 and 2018.

## 27. Subsequent events

Subsequent to December 31, 2020, the Revolving Facility was extended to March 2026. The Revolving Facility remained undrawn as of February 23, 2021.

On February 23, 2021, the Alcon Board of Directors approved the proposal to submit the 2020 financial statements of Alcon Inc. and these Consolidated Financial Statements for approval at the Annual General Meeting on April 28, 2021. Additionally on February 23, 2021, the Board proposed a dividend of CHF 0.10 per share to be approved at the same Annual General Meeting. If approved by the shareholders, the total dividend payments would amount to a maximum of approximately $56 million using the CHF/USD exchange rate as of February 19, 2021.

The Board of Directors has evaluated subsequent events as they relate to Alcon for potential recognition or disclosures from January 1, 2021 to the date of the approval of these Consolidated Financial Statements and has determined there are no additional subsequent events to be reported in these Consolidated Financial Statements.

## 28. Alcon subsidiaries

The following table lists the subsidiaries of Alcon Inc. with Total assets or Net sales to third parties in excess of $5 million included in the Consolidated Financial Statements at and for the year ended December 31, 2020, respectively. The equity interest percentage shown in the table represents Alcon's share in voting rights in those entities. Unless otherwise stated, each entity has share capital consisting of equity held directly by the Company or another of its consolidated subsidiaries.

| Country of organization/Entity name | Place of business | Equity interest |
|---|---|---|
| **Argentina** | | |
| Alcon Laboratorios Argentina S.A. | Buenos Aires | 100 % |
| **Australia** | | |
| Alcon Laboratories (Australia) Pty Ltd | Frenchs Forest, NSW | 100 % |
| **Austria** | | |
| Alcon Ophthalmika GmbH | Wein | 100 % |
| **Belgium** | | |
| Alcon Laboratories Belgium BVBA | Puurs | 100 % |
| N.V. Alcon S.A. | Vilvoorde | 100 % |
| **Brazil** | | |
| Alcon Brasil Cuidados com a Saúde Ltda. | São Paulo | 100 % |
| **Canada** | | |
| Alcon Canada Inc. | Mississauga, Ontario | 100 % |
| **Chile** | | |
| Alcon Laboratorios Chile Ltd. | Santiago de Chile | 100 % |
| **China** | | |
| Alcon (China) Ophthalmic Product Co., Ltd. | Beijing | 100 % |
| Alcon Hong Kong Limited | Hong Kong | 100 % |
| **Colombia** | | |
| Laboratorios Alcon de Colombia S.A. | Santafé de Bogotá | 100 % |
| **Czech Republic** | | |
| Alcon Pharmaceuticals (Czech Republic) s.r.o. | Prague | 100 % |
| **Denmark** | | |
| Alcon Nordic A/S | Copenhagen | 100 % |
| **Ecuador** | | |
| AlconLab Ecuador S.A. | Quito | 100 % |
| **France** | | |
| Laboratoires Alcon S.A.S. | Rueil-Malmaison | 100 % |
| **Germany** | | |
| Alcon Deutschland GmbH | Freiburg im Breisgau | 100 % |
| CIBA Vision GmbH | Grosswallstadt | 100 % |
| WaveLight GmbH | Erlangen | 100 % |
| **Greece** | | |
| Alcon Laboratories Hellas- Single Member Commercial and Industrial S.A.C.I. | Maroussi, Athens | 100 % |
| **Hungary** | | |
| Alcon Hungary Pharmaceuticals Trading Limited Liability Company | Budapest | 100 % |
| **India** | | |
| Alcon Laboratories (India) Private Limited | Bangalore | 100 % |
| **Indonesia** | | |
| PT. CIBA Vision Batam | Batam | 100 % |
| **Ireland** | | |
| Alcon Laboratories Ireland Limited | Cork City | 100 % |
| **Israel** | | |
| Optonol Ltd. | Neve-Ilan | 100 % |
| **Italy** | | |
| Alcon Italia S.p.A. | Milano | 100 % |
| **Japan** | | |
| Alcon Japan Ltd. | Tokyo | 100 % |

| Country of organization/Entity name | Place of business | Equity interest |
|---|---|---|
| **Malaysia** | | |
| Alcon Laboratories (Malaysia) Sdn. Bhd. | Petaling Jaya | 100 % |
| CIBA Vision Johor Sdn. Bhd. | Kuala Lumpur | 100 % |
| **Mexico** | | |
| Alcon Laboratorios, S.A. de C.V. | Ciudad de Mexico | 100 % |
| **Netherlands** | | |
| Alcon Nederland B.V. | Arnhem | 100 % |
| **New Zealand** | | |
| Alcon Laboratories (New Zealand) Ltd. | Auckland | 100 % |
| **Panama** | | |
| Alcon Centroamerica S.A. | Panama City | 100 % |
| **Peru** | | |
| Alcon Pharmaceutical del Peru S.A. | Lima | 100 % |
| **Philippines** | | |
| Alcon Laboratories (Philippines), Inc. | Manila | 100 % |
| **Poland** | | |
| Alcon Polska Sp. z o.o. | Warszawa | 100 % |
| **Portugal** | | |
| Alcon Portugal-Produtos e Equipamentos Oftalmológicos Lda. | Porto Salvo | 100 % |
| **Puerto Rico** | | |
| Alcon (Puerto Rico), Inc. | Cataño, PR | 100 % |
| **Romania** | | |
| Alcon Romania S.R.L. | Bucharest | 100 % |
| **Russian Federation** | | |
| Alcon Farmacevtika LLC | Moscow | 100 % |
| **Singapore** | | |
| Alcon Pte Ltd | Singapore | 100 % |
| Alcon Singapore Manufacturing Pte Ltd | Singapore | 100 % |
| CIBA Vision Asian Manufacturing and Logistics Pte Ltd. | Singapore | 100 % |
| **South Africa** | | |
| Alcon Laboratories (South Africa) (Pty) Ltd. | Midrand | 100 % |
| **South Korea** | | |
| Alcon Korea Ltd. | Seoul | 100 % |
| **Spain** | | |
| Alcon Healthcare S.A. | Barcelona | 100 % |
| **Switzerland** | | |
| Alcon Grieshaber AG | Schaffhausen | 100 % |
| Alcon Management SA | Vernier | 100 % |
| Alcon Pharmaceuticals Ltd. | Fribourg | 100 % |
| Alcon Services AG | Fribourg | 100 % |
| Alcon Switzerland SA | Zug | 100 % |
| **Thailand** | | |
| Alcon Laboratories (Thailand) Limited | Bangkok | 100 % |
| **Turkey** | | |
| Alcon Laboratuvarlari Ticaret A.S. | Istanbul | 100 % |
| **Ukraine** | | |
| Alcon Ukraine LLC | Kiev | 100 % |
| **United Kingdom** | | |
| Alcon Eye Care UK Limited | Frimley/Camberley | 100 % |
| **United States of America** | | |
| Alcon Finance Corporation | Fort Worth, TX | 100 % |
| Alcon Laboratories, Inc. | Fort Worth, TX | 100 % |
| Alcon RefractiveHorizons, LLC | Fort Worth, TX | 100 % |
| Alcon Research, LLC | Fort Worth, TX | 100 % |

| Country of organization/Entity name | Place of business | Equity interest |
|---|---|---|
| Alcon Vision, LLC | Fort Worth, TX | 100 % |
| CIBA Vision, LLC | Fort Worth, TX | 100 % |
| WaveLight, Inc. | Fort Worth, TX | 100 % |
| ClarVista Medical, Inc. | Fort Worth, TX | 100 % |
| PowerVision, Inc. | Fort Worth, TX | 100 % |
| Tear Film Innovations, Inc. | Fort Worth, TX | 100 % |
| TrueVision Systems, Inc. | Fort Worth, TX | 100 % |
| Alcon LenSx, Inc. | Fort Worth, TX | 100 % |

During the year ended December 31, 2020, the below principal Novartis legal entity contained assets, liabilities and results of operations attributable to the Alcon business with Total assets or Net sales to third parties in excess of $5 million included in the Consolidated Financial Statements.

**Mexico**

Novartis Farmacéutica, S.A. de C.V.

F-71

A247

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of Alcon Inc.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Alcon Inc. and its subsidiaries (the "Company") as of December 31, 2020 and 2019, and the related consolidated statements of income, comprehensive loss, changes in equity and cash flows for each of the two years in the period ended December 31, 2020, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2020 in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

We also have audited the effects of disclosing earnings/(loss) per share information, as described in Note 8.2. In our opinion, such disclosures are appropriate and have been properly applied. We were not engaged to audit, review, or apply any procedures to the 2018 financial statements of the Company other than with respect to the earnings/(loss) per share disclosures and, accordingly, we do not express an opinion or any other form of assurance on the 2018 financial statements taken as a whole.

*Change in Accounting Principle*

As discussed in Note 3 to the consolidated financial statements, the Company changed the manner in which it accounts for leases in 2019.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Annual Report on Internal Control Over Financial Reporting appearing under Item 15. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

*Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Goodwill and Alcon Brand Name Impairment Assessments*

As described in Notes 3 and 10 to the consolidated financial statements, as of December 31, 2020 the Company had $8.9 billion of goodwill, as well as a $3.0 billion indefinite life intangible asset related to the Alcon brand name. An impairment assessment on goodwill and indefinite life intangible assets, which is performed over the groupings of cash generating units containing goodwill or the Alcon brand name, is performed at least annually. A cash generating unit to which goodwill has been allocated is considered impaired when its carrying amount, including the goodwill, exceeds its recoverable amount, which is defined as the higher of its fair value less costs of disposal and its value in use. An intangible asset other than goodwill is considered impaired when its balance sheet carrying amount exceeds its estimated recoverable amount, which is defined as the higher of its fair value less costs of disposal and its value in use. Usually, management applies the fair value less costs of disposal method for its impairment assessment. In most cases, no direct or indirect observable market prices for identical or similar assets are available to measure the fair value less costs of disposal. Therefore, an estimate of fair value less costs of disposal is based on net present value techniques utilizing post-tax cash flows and discount rates. The estimates used by management in calculating the net present values involve significant judgment by management and include assumptions with measurement uncertainty, such as the amount and timing of projected cash flows, long-term sales forecasts, terminal growth rate, discount rate, and additionally for the Alcon brand name, royalty rate.

The principal considerations for our determination that performing procedures relating to the goodwill and Alcon brand name impairment assessments is a critical audit matter are the significant judgment by management when determining the fair value less costs of disposal, which in turn led to a high degree of auditor judgment, subjectivity and effort in performing procedures and evaluating for (i) goodwill, management's significant assumptions related to long-term sales forecasts and discount rate, and (ii) the Alcon brand name, management's significant assumptions related to long-term sales forecasts, discount rate and royalty rate. In addition, the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's goodwill and the Alcon brand name impairment assessments, including controls over the determination of the fair value less costs of disposal. These procedures also included, among others, testing management's process for developing the fair value less costs of disposal estimates; evaluating the appropriateness of the fair value estimates; testing the completeness, accuracy, and relevance of underlying data used; and evaluating the significant assumptions used by management related to long-term sales forecasts, discount rates and royalty rate. Evaluating management's assumptions related to long-term sales forecasts involved evaluating whether the assumptions used by management were reasonable considering (i) the current and past performance of the business, (ii) the consistency with external market and industry data, and (iii) whether these assumptions were consistent with evidence

<div align="center">F-73</div>

<div align="right">**A249**</div>

obtained in other areas of the audit. Professionals with specialized skill and knowledge were used to assist in the evaluation of management's estimate of fair value less costs of disposal method and the discount rate and royalty rate significant assumptions.

*In-Process Research and Development and Definite Lived Intangible Asset Assessments*

As described in Notes 3 and 10 to the consolidated financial statements, as of December 31, 2020 the Company had $727 million of in-process research and development (IPR&D) intangible assets and $5,390 million of definite lived intangible assets. An impairment assessment on individual IPR&D assets is performed at least annually or when facts and circumstances warrant. Individual definite lived intangible assets are evaluated for potential impairment whenever facts and circumstances indicate that their carrying value may not be recoverable. An intangible asset is considered impaired when its carrying amount exceeds its estimated recoverable amount, which is defined as the higher of its fair value less costs of disposal and its value in use. Usually, management applies the fair value less costs of disposal method for its impairment assessment. In most cases, no direct or indirect observable market prices for identical or similar assets are available to measure the fair value less costs of disposal. Therefore, an estimate of fair value less costs of disposal is based on net present value techniques utilizing post-tax cash flows and discount rates. The estimates used by management in calculating the net present values involve significant judgment by management and include assumptions with measurement uncertainty, such as the amount and timing of projected cash flows, long-term sales forecasts, and discount rates, and additionally for IPR&D intangible assets, the timing and probability of success.

The principal considerations for our determination that performing procedures relating to the IPR&D and definite lived intangible asset impairment assessments is a critical audit matter are the significant judgment by management when determining the fair value less costs of disposal, which in turn led to a high degree of auditor judgment, subjectivity and effort in performing procedures and evaluating for (i) IPR&D intangible assets, management's significant assumptions related to long-term sales forecasts, discount rate, and probability of success, and (ii) definite lived intangible assets, management's significant assumptions related to long-term sales forecasts and discount rate. In addition, the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's IPR&D and definite lived intangible asset impairment assessments, including controls over the determination of the fair value less costs of disposal. These procedures also included, among others, testing management's process for developing the fair value less costs of disposal estimates; evaluating the appropriateness of the fair value estimates; testing the completeness, accuracy, and relevance of underlying data used; and evaluating the significant assumptions used by management related to long-term sales forecasts, discount rates and probability of success. Evaluating management's assumptions related to long-term sales forecasts and probability of success involved evaluating whether the assumptions used by management were reasonable considering (i) the current and past performance of the business, and (ii) whether these assumptions were consistent with evidence obtained in other areas of the audit. Evaluating management's assumption related to long-term sales forecasts also involved ensuring consistency with external market and industry data. Professionals with specialized skill and knowledge were used to assist in the evaluation of management's estimate of fair value less costs of disposal method and the discount rate significant assumptions.


/s/ PricewaterhouseCoopers LLP


Fort Worth, Texas
February 23, 2021


We have served as the Company's auditor since 2019.

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of Alcon Inc.

### *Opinion on the Financial Statements*

We have audited the income statement, statement of comprehensive loss, statement of changes in equity, and statement of cash flows of Alcon Inc. (formerly known as the Novartis AG Alcon business) (the "Company"), for the year ended December 31, 2018 including the related notes (collectively referred to as the "financial statements") before the effects of disclosing earnings/(loss) per share information discussed in Note 8.2. In our opinion, the financial statements, before the effects of disclosing earnings/(loss) per share information discussed in Note 8.2, present fairly, in all material respects, the results of operations and cash flows of the Company for the year ended December 31, 2018 in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board (the 2018 financial statements before the effects of disclosing earnings/(loss) per share information discussed in Note 8.2 are not presented herein).

We were not engaged to audit, review, or apply any procedures to the earnings/(loss) per share information described in Note 8.2 and accordingly, we do not express an opinion or any other form of assurance about whether such disclosures are appropriate and have been properly applied. Those disclosures were audited by other auditors.

### *Basis for Opinion*

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements, before the effects of disclosing earnings/(loss) per share information described above, based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of these financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers SA

Geneva, Switzerland
February 28, 2019

We served as the Company's auditor from 2017 to 2019.

F-75

**A251**

Articles of Incorporation of Alcon Inc.

December 1, 2020

| Section 1 | Corporate Name, Registered Office, Purpose and Duration | 2 |
|---|---|---|
| Section 2 | Share Capital | 3 |
| Section 3 | Corporate Bodies | 5 |
|  | A. General Meeting of Shareholders | 5 |
|  | B. Board of Directors | 10 |
|  | C. Auditors | 15 |
| Section 4 | Compensation of the Board of Directors and the Executive Committee | 15 |
| Section 5 | Annual Financial Statements, Consolidated Financial Statements and Profit Allocation | 21 |
| Section 6 | Publications and Place of Jurisdiction | 21 |
| Section 7 | Language | 21 |

## Section 1 — Corporate Name, Registered Office, Purpose and Duration

### Article 1

Corporate name,
Registered
office

Under the Corporate name

Alcon AG
Alcon SA
Alcon Inc.

there exists a company limited by shares with its registered office in Fribourg.

### Article 2

Purpose

1  The purpose of the Company is to acquire, hold, manage, sell direct and indirect participations in enterprises of any kind, in particular in the area of health care, medical devices, biology, chemistry, physics, information technology and related areas in Switzerland and abroad.

2  The Company may establish enterprises of any kind in Switzerland and abroad, hold equity interest in these enterprises, and conduct their management. The Company may acquire, mortgage, operate or sell real estate and intellectual property rights in Switzerland or abroad. The Company may provide loans, guarantees and other kinds of financing and security for Group companies as well as borrow and invest money on the money and capital markets.

3  The Company may engage in all other types of activities or transactions and may take all measures that appear appropriate to promote the purpose of the Company or that are related to the same.

4  In pursuing its purpose, the Company strives to create sustainable value.

A254

### Article 3

Duration    The duration of the Company is unlimited.

## Section 2      Share Capital

### Article 4

Ordinary share capital    1
The share capital of the Company is CHF 19,988,000, fully paid-in and divided into 499,700,000 registered shares. Each share has a nominal value of CHF 0.04.

2    Upon resolution of the General Meeting of Shareholders registered shares may be converted into bearer shares and reversed bearer shares may be converted into registered shares.

### Article 4a

Authorized share capital    1
for employee participation
plans
The Board of Directors is authorized, at any time until 29 January 2021, to increase the Company's share capital by a maximum of CHF 537,400 through the issue of up to 13,435,000 fully paid up new shares of CHF 0.04 nominal value each for the purpose of any share-based incentive or other participation plans, schemes or arrangements for directors, employees or advisors of the Company or its consolidated subsidiaries ("Employee Participation Plans"). Share capital increases representing one or several portions of this maximum are permitted.

2    The Board of Directors shall determine the amount of share capital to be issued, the form of payment required for subscription, the date of issue, and the commencement of dividend entitlement.

**A255**

3  Existing shareholders' subscription rights shall be excluded and the Board of Directors is authorized to allocate the shares as it deems appropriate (including to any group company or third party involved in the administration of any Employee Participation Plan) to fulfil or cover existing or future obligations to deliver shares under any Employee Participation Plan.

### Article 5

Shareholders register

The Company shall maintain a shareholders register showing the last names, first names, domicile (in the case of legal entities the registered office) and address of the holders or usufructuaries of registered shares.

### Article 6

Form of shares

1  Subject to paragraph 3 of this Article, the registered shares of the Company are issued as uncertificated securities (in terms of the Swiss Code of Obligations). The Company may cause all or a part of such uncertificated securities to be entered into a main register of a custodian as an underlying security for book entry securities (in terms of the Book Entry Securities Act).

2  Provided that the shareholder is registered in the shareholders register, the shareholder may request from the Company a statement of his or her registered shares at any time.

3  The shareholder has no right to the printing and delivery of certificates. The Company may, however, in its sole discretion, transform the underlying securities for book entry securities into another form or withdraw such securities from the custodian system at any time; in particular, the Company may print and deliver certificates (individual share certificates, certificates or global certificates) for shares and deregister uncertificated securities entered into the main register of a custodian.

4  A disposition of shares in the form of uncertificated securities which are not entered into the main register of a custodian shall be effected by way of a written declaration of assignment and requires, as a condition for validity, to be notified to the Company. In contrast, a disposition of shares which exist in the form of book entry securities based on uncertificated securities entered into the main register of a custodian shall solely be effected by entries in securities accounts in accordance with applicable law, without prerequisite to be notified to the Company; a disposition of such shares by way of assignment without corresponding entry in a securities account is excluded.

5  The Company may prescribe the use of forms for purposes of notification in accordance with paragraph 4 of this Article.

### Article 7

Exercise of rights

1  The shares are not divisible. The Company accepts only one representative per share.

2  The right to vote and the rights associated therewith may only be exercised vis-à-vis the Company by a shareholder, usufructuary or nominee who is registered in the share register in respect of the shares concerned.

## Section 3

### Corporate Bodies

### A. General Meeting of Shareholders

#### Article 8

Competence

The General Meeting of Shareholders is the supreme body of the Company.

#### Article 9

General Meetings

a. Annual General Meeting

The Annual General Meeting of Shareholders shall be held each year within six months after the close of the financial year of the Company; at the latest twenty days before the meeting the annual report and the reports of the auditors shall be made available for inspection by the Shareholders at the registered office of the Company. Notification thereof may be made by way of a publication in the publication organs set forth in Article 38 of these Articles of Incorporation.

## Article 10

b. Extraordinary General Meetings of Shareholders

1 Extraordinary General Meetings of Shareholders shall take place upon request of the Board of Directors or the Auditors.

2 Furthermore, Extraordinary General Meetings of Shareholders shall be convened upon resolution of a General Meeting of Shareholders or if it is required by one or more shareholders who are representing in the aggregate not less than one tenth of the share capital and submit a petition signed by such shareholder or shareholders specifying the items for the agenda and the proposals.

## Article 11

Convening of General Meetings of Shareholders

1 General Meetings of Shareholders shall be convened by the Board of Directors at the latest twenty days before the date of the meeting. The meeting shall be convened by way of a notice appearing once in the official publication organs of the Company. Registered shareholders may also be informed by mail.

2 The notice of a meeting shall state the items on the agenda and the proposals of the Board of Directors and as the case may be of the shareholders who demanded that a General Meeting of Shareholders be convened and, in case of elections, the names of the nominated candidates.

### Article 12

Agenda

1   One or more shareholders whose combined shareholdings represent an aggregate nominal value of at least CHF 1 million may demand that an item be included in the agenda of a General Meeting of Shareholders. Such a demand must be made in writing at the latest forty-five days before the meeting and shall specify the items and the proposals of such a shareholder.

2   No resolution shall be passed at a General Meeting of Shareholders on matters for which no proper notice was given. This provision shall not apply to proposals to convene an Extraordinary General Meeting of Shareholders or to initiate a special audit.

### Article 13

Presiding officer, Minutes, Vote counters

1   The General Meeting of Shareholders shall take place in Switzerland, unless the Board of Directors decides otherwise. The General Meeting shall be presided by the chair of the Board of Directors, in his absence, by the vice-chair or another member of the Board of Directors chosen by the Board of Directors.

2   The chairperson of the meeting shall appoint a secretary and the vote counters. The minutes shall be signed by the chairperson of the meeting and the secretary.

### Article 14

Proxies

1   The Board of Directors may issue regulations regarding the participation and the representation at the General Meeting of Shareholders and may allow electronic proxies without qualified signatures.

2   A shareholder may be represented at a General Meeting of Shareholders by means of a written proxy by a third person who does not need to be a shareholder.

A260

3   The General Meeting of Shareholders shall elect the Independent Proxy for a term of office lasting until completion of the next Annual General Meeting of Shareholders. Re-election is possible.

4   If the Company does not have an Independent Proxy, the Board of Directors shall appoint the Independent Proxy for the next General Meeting of Shareholders.

### Article 15

Voting rights

Each share entitles to one vote.

### Article 16

Resolutions, Elections

1   Unless the law requires otherwise, the General Meeting passes resolutions and elections with the absolute majority of the votes validly represented.

2   Resolutions and elections shall be taken either on a show of hands or by electronic voting, unless the General Meeting decides for, or the presiding officer orders, a secret ballot.

3   The presiding officer may at any time order to repeat an election or resolution taken on a show of hands with a secret ballot, if he doubts the results of the vote. In this case, the preceding election or resolution taken on a show of hands is deemed not to have taken place.

4   If no election has taken place at the first ballot and if there is more than one candidate, the presiding officer shall order a second ballot in which the relative majority shall be decisive.

A261

## Article 17

Powers of the General
Meeting of Shareholders

The following powers shall be vested exclusively in the General Meeting of Shareholders:

a)  To adopt and amend the Articles of Incorporation;

b)  To elect and remove the members of the Board of Directors, the Chair of the Board of Directors, the members of the compensation committee, the Independent Proxy and the Auditors;

c)  To approve the management report and the consolidated financial statements;

d)  To approve the financial statements and to decide on the appropriation of available earnings shown on the balance sheet, in particular with regard to dividends;

e)  To approve the aggregate amounts of compensation of the Board of Directors and the Executive Committee in accordance with Article 29 of these Articles of Incorporation;

f)  To grant discharge to the members of the Board of Directors and to the members of the Executive Committee;

g)  To decide on matters that are reserved by law or by the Articles of Incorporation to the General Meeting of Shareholders.

### Article 18

Special
quorum

The approval of at least two-thirds of the votes represented is required for resolutions of the General Meeting of Shareholders on:

a)  An alteration of the purpose of the Company;

b)  The creation of shares with increased voting powers;

c)  An implementation of restrictions on the transfer of registered shares and the removal of such restrictions;

d)  An authorized or conditional increase of the share capital;

e)  An increase of the share capital out of equity, by contribution in kind or for the purpose of an acquisition of property and the grant of special rights;

f)  A restriction or suspension of rights of option to subscribe;

g)  A change of location of the registered office of the Company;

h)  The dissolution of the Company.


## B. Board of Directors

### Article 19

Number of
Directors

The Board of Directors shall consist of a minimum of 8 and a maximum of 13 members.

## Article 20

Term of office

1 The members of the Board of Directors and the Chair of the Board of Directors shall be elected individually by the General Meeting of Shareholders for a term of office lasting until completion of the next Annual General Meeting of Shareholders.

2 Members whose term of office has ended may be immediately re-elected.

## Article 21

Organization

1 The Board of Directors constitutes itself in compliance with legal requirements and taking into consideration the resolutions of the General Meeting of Shareholders. It shall elect one or two Vice Chairs. It shall appoint a secretary, who need not be a member of the Board of Directors.

2 If the office of the Chair of the Board of Directors is vacant, the Board of Directors shall appoint a new Chair from amongst its members for the remaining term of office.

## Article 22

Convening of meetings

The Chair shall convene meetings of the Board of Directors if and when the need arises or if a member so requires in writing.

## Article 23

Resolutions

1 The organization of the meetings, including the presence quorum and the passing of resolutions, shall be set out in the organizational regulations.

2 In the event of a tie vote, the Chair is not entitled to a tie-breaking vote.

A264

## Article 24

Powers of the Board of Directors

1

The Board of Directors has in particular the following non-delegable and inalienable duties:

a) The ultimate direction of the Company's business and issuing of the necessary directives;

b) The determination of the organization of the Company;

c) The determination of the principles of accounting, financial controlling and financial planning;

d) The appointment and removal of the persons entrusted with the management and representation of the Company (including the CEO and the other members of the Executive Committee);

e) The ultimate supervision of the persons entrusted with the management of the Company, specifically in view of their compliance with the law, Articles of Incorporation, regulations and directives;

f) The preparation of the annual report and the compensation report in accordance with the provisions of the law and the Articles of Incorporation;

g) The preparations for the General Meeting of Shareholders and carrying out of the resolutions of the General Meeting of Shareholders;

h) The notification to the court in the event of over-indebtedness; and

i) The adoption of resolutions concerning increases in share capital to the extent that such power is vested in the Board of Directors (Article 651 paragraph 4 of the Swiss Code of Obligations), as well as resolutions concerning the confirmation of capital increases and respective amendments to the Articles of Incorporation.

2   In addition, the Board of Directors can pass resolutions with respect to all matters which are not reserved to the authority of the General Meeting of Shareholders by law or by these Articles of Incorporation.

### Article 25

Delegation of powers

The Board of Directors may, within the limits of the law and the Articles of Incorporation, delegate the management of the Company in whole or in part to one or several of its members (including to ad hoc or permanent committees of the Board of Directors) or to third persons (Executive Committee).

### Article 26

Signature power

The Board of Directors shall designate those of its members as well as those third persons who shall have legal signatory power for the Company, and shall further determine the manner in which such persons may sign on behalf of the Company.

### Article 27

Organization and powers of the Compensation Committee

1   The compensation committee shall consist of a minimum of 3 members of the Board of Directors.

2   The members of the compensation committee shall be elected individually by the General Meeting of Shareholders for a term of office lasting until completion of the next Annual General Meeting of Shareholders. Members of the compensation committee whose term of office has expired shall be immediately eligible for re-election.

A266

3   If there are vacancies on the compensation committee, the Board of Directors shall appoint substitutes for the remaining term of office.

4   The Board of Directors shall elect a chair of the compensation committee. The Board of Directors shall, within the limits of the law and the Articles of Incorporation, define the organization of the compensation committee in regulations.

5
    The compensation committee has the following powers:

    a) Develop a compensation strategy in line with the principles described in the Articles of Incorporation and submit it for approval to the Board of Directors;

    b) Propose to the Board of Directors the principles and structure of the compensation plans;

    c) Support the Board of Directors in preparing the proposals to the General Meeting of Shareholders regarding the compensation of the members of the Board of Directors and the Executive Committee;

    d) Submit the compensation report to the Board of Directors for approval;

    e) Inform the Board of Directors about policies, programs and key decisions as well as comparisons of compensation levels at key competitors;

    f) Regularly report to the Board of Directors on the decisions and deliberations of the compensation committee;

    g) Assume other responsibilities assigned to it by law, the Articles of Incorporation or by the Board of Directors. In particular, the Board of Directors may, in its discretion, assign responsibilities regarding nomination and governance to the compensation committee.

6   The Board of Directors issues regulations to determine for which positions of the Board of Directors and of the Executive Committee the compensation committee shall submit proposals regarding compensation, and for which positions it shall determine the compensation in accordance with the Articles of Incorporation.

## C. Auditors

### Article 28

Term, Powers and Duties

The Auditors, who shall be elected by the General Meeting of Shareholders each year, shall have the powers and duties vested in them by law.

## Section 4

## Compensation of the Board of Directors and the Executive Committee

### Article 29

Approval of compensation by the General Meeting of Shareholders

1   The General Meeting of Shareholders shall approve annually and separately the proposals of the Board of Directors in relation to the maximum aggregate amount of:

a) Compensation of the Board of Directors for the period until the next Annual General Meeting of Shareholders; and

b) Compensation of the Executive Committee for the following financial year.

The Board of Directors may submit for approval by the General Meeting of Shareholders additional proposals relating to the same or different periods.

**A268**

2      If the General Meeting of Shareholders rejects the proposal of the Board of Directors for the total compensation of the Board of Directors and/or the Executive Committee, the decision on how to proceed shall reside with the Board of Directors. The options for the Board of Directors shall be to submit a new compensation proposal to the same General Meeting, to convene an Extraordinary General Meeting for that purpose, or to determine the compensation for the corresponding period on an interim basis, subject to approval at the next Annual General Meeting of Shareholders.

3      Notwithstanding the preceding paragraphs, the Company or companies controlled by it may pay out compensation prior to approval by the General Meeting of Shareholders subject to subsequent approval by a General Meeting of Shareholders.

4      The Board of Directors shall submit the compensation report to an advisory vote of the General Meeting of Shareholders.

## Article 30

Additional amount

If the maximum aggregate amount of compensation already approved by the General Meeting of Shareholders is not sufficient to also cover the compensation of one or more members who become members of or are promoted within the Executive Committee during a compensation period for which the General Meeting of Shareholders has already approved the compensation of the Executive Committee, the Company or companies controlled by it shall be authorized to pay or grant to such member(s) an additional amount during the compensation period(s) already approved. The total additional amount for each relevant compensation period for which approval by the General Meeting of Shareholders has already been obtained shall not exceed (in full and not pro rata temporis) 40% of the aggregate amount of compensation of the Executive Committee last approved by the General Meeting of Shareholders per compensation period.

## Article 31

General compensation principles

1   Compensation of the non-executive members of the Board of Directors comprises fixed compensation elements only. In particular, non-executive members of the Board of Directors shall receive no company contributions to any pension plan, no performance-related elements and no financial instruments (e.g. options).

A270

## Article 32

Variable compensation

1 The variable compensation of the members of the Executive Committee in a certain year shall consist of compensation elements from short- and long-term compensation plans (as defined in this Article).

2 The short-term compensation plans are based on performance metrics that take into account the performance of the Alcon Group and/or parts thereof, and/or individual targets. Achievements are generally measured based on the one-year period to which the short-term compensation relates. The short-term compensation pay-outs shall be subject to caps that may be expressed as predetermined multipliers of the respective target levels and may be deferred subject to vesting periods and conditions.

3 The long-term compensation plans are based on i) performance metrics that take into account strategic objectives of the Alcon Group (such as financial, innovation, shareholder return and/or other metrics), and/or ii) the share price that determines the value of the award at expiry of the vesting period. Achievements and share price are generally measured based on a period of not less than three years. The long-term compensation pay-outs shall be subject to caps that may be expressed as predetermined multipliers of the respective target levels.

4 The Board of Directors or, to the extent delegated to it, the compensation committee determines performance metrics, target levels, and their achievement.

A271

5    The Board of Directors or, to the extent delegated to it, the compensation committee determines grant, vesting, blocking, exercise and forfeiture conditions of the compensation; they may provide for continuation, acceleration or removal of exercise and vesting conditions or provide other conditions for the grant, acquisition or forfeiture of rights as the consequence of certain predefined events such as death, disability, retirement or termination of an employment or mandate agreement.

## Article 33

Agreements with Members of the Board of Directors and of the Executive Committee

1    The Company or companies controlled by it may enter into agreements with members of the Board of Directors relating to their compensation for a fixed term of up to one year. The Company or companies controlled by it may enter into contracts of employment with members of the Executive Committee for a fixed term not exceeding one year or for an indefinite period of time with a notice period not exceeding 12 months.

2    Contracts of employment with members of the Executive Committee may contain a prohibition of competition for the time after the end of employment for a duration of up to one year. The annual consideration for such prohibition shall not exceed the total annual compensation (i.e. base salary and annual incentive) last paid to such member of the Executive Committee.

## Article 34

Mandates outside of the Alcon Group

1    No member of the Board of Directors may hold more than 10 additional mandates in other companies, of which no more than 4 additional mandates shall be in other listed companies. Chairs of the board of directors of other listed companies count as two mandates.

A272

2      No member of the Executive Committee may hold more than 6 additional mandates in other companies, of which no more than 2 additional mandates shall be in other listed companies. Each of these mandates shall be subject to approval by the Board of Directors. Members of the Executive Committee are not allowed to hold chairs of the board of directors of other listed companies.

3      The following mandates are not subject to these limitations:

a)  Mandates in companies which are controlled by the Company;

b)  Mandates which a member of the Board of Directors or of the Executive Committee holds at the request of the Company or companies controlled by it. No member of the Board of Directors or of the Executive Committee shall hold more than 5 such mandates; and

c)  Mandates in associations, charitable organizations, foundations, trusts and employee welfare foundations. No member of the Board of Directors or of the Executive Committee shall hold more than 10 such mandates.

4      Mandates shall mean mandates in the supreme governing body of a legal entity which is required to be registered in the commercial register or a comparable foreign register. Mandates in different legal entities which are under joint control are deemed one mandate.

5      The Board of Directors may issue regulations that may determine additional restrictions, taking into account the position of the respective member.

### Article 35

Loans

No loans or credits shall be granted to the members of the Board of Directors or the Executive Committee.

A273

## Section 5     Annual Financial Statements, Consolidated Financial Statements and Profit Allocation

### Article 36

Financial year

The Board of Directors shall prepare for each financial year as of 31 December an annual report consisting of financial statements with a management report and the consolidated financial statements.

### Article 37

Allocation of profit shown on the balance sheet, reserves

1   The allocation of the profit shown on the balance sheet shall be determined by the General Meeting of Shareholders subject to the legal provisions. The Board of Directors shall submit to the General Meeting of Shareholders its proposals.

2   In addition to statutory reserves additional reserves may be accrued.

3   Dividends which have not been claimed within five years after the due date fall back to the Company.

## Section 6     Publications and Place of Jurisdiction

### Article 38

Publications

Shareholder communications of the Company shall be made in the Swiss Official Gazette of Commerce. The Board of Directors may designate additional publication organs.

### Article 39

Place of jurisdiction

The place of jurisdiction for any disputes arising from or in connection with the shareholdership in the Company shall be at the registered office of the Company.

**A274**

## Section 7

## Language
### Article 40

Prevailing
version

A French and an English version exist of these Articles of Incorporation. In case of any discrepancies, the French version shall prevail.

Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

(Règlement d'organisation d'Alcon Inc.)

**Alcon Inc.**
1701 Fribourg, Switzerland

**Table of Contents**

| | | |
|---|---|---|
| Introduction | Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon | 3 |
| Section 1 | General Provisions | 4 |
| Section 2 | Board of Directors | 7 |
| Section 3 | Committees of the Board | 10 |
| Section 4 | Chair and Vice Chairs | 11 |
| Section 5 | Executive Committee and Chief Executive Officer | 11 |
| Section 6 | Internal Audit | 14 |
| Section 7 | Effectiveness, Amendments | 14 |

Based on Article 25 of the articles of incorporation of Alcon Inc. (the "Articles of Incorporation"), the Board of Directors (the "Board") promulgates the following regulations (the "Regulations").

These Regulations govern the duties, powers and responsibilities of the following executive bodies and persons of Alcon Inc. (the "Company"):

– Board
– Committees of the Board
– Chair of the Board (the "Chair")
– Vice Chairs of the Board (the "Vice Chairs")
– Chief Executive Officer (the "CEO")
– Executive Committee, and
– Internal Audit

All references to functions in these Regulations shall apply to both male and female persons.

## Section 1            General Provisions

**Duty of Care and Loyalty**

### Article 1
Each member of the Board, or the Executive Committee is under the duty to safeguard and further the interests of the Company and its shareholders.

**Conflict of Interests**

### Article 2
No member of the Board, the Committees of the Board or the Executive Committee shall participate in the deliberations and resolutions on matters which affect, or reasonably might affect, the interests of that member or of a person close to that member.

**Confidentiality**

### Article 3
Each member of the Board, the Committees of the Board, or the Executive Committee shall at all times keep strictly confidential
all information – except information which is already in the public domain – relating to the Company and its affiliated companies (the "Group") which the member has learned during the exercise of his duties. This obligation and duty shall continue even after the term of office of the member has expired.

**No Representation of Members**

### Article 4
A member of the Board, the Committees of the Board, or the Executive Committee who is not able to participate in a meeting of the executive body may not be represented by another member of the body or any other person.

**Quorum, Majority Requirements**

### Article 5
Unless stated otherwise in these Regulations, the presence in person or by telephone or video conference of a majority of the members is required for any meeting of the Board, the Committees of the Board or the Executive Committee. If the chairperson does not participate, the members shall nominate a chairperson *ad hoc* who shall be the deputy chairperson.

Resolutions of the Board, the Committees of the Board, or the Executive Committee require the affirmative majority of the votes cast.

In the event of a tie on any issue, (i) in a Committee of the Board, the full Board shall decide the issue, and (ii) in the Executive Committee, the CEO shall decide the issue.

The CEO has the power to overrule any resolution taken by the Executive Committee.

No quorum is required for meetings at which the sole order of business is to deliberate and approve resolutions providing for the confirmation of capital increases or the amendment of the Articles of Incorporation in connection with an increase in the share capital.

The adoption of resolutions on items not on the agenda requires the affirmative vote of at least two thirds of the members of the Board or the Committees of the Board, present at a meeting.

**A279**

| | |
|---|---|
| Meetings and Resolutions | **Article 6**<br><br>Meetings of the Board, the Committees of the Board and the Executive Committee may be held in any location determined by the chairperson of the respective body.<br><br>Resolutions may be passed in writing (including by electronic communication or facsimile). A proposal for a circular resolution must be communicated to all members, giving a deadline for responding, and is approved if: (i) more than two-thirds of all members cast a vote or give written notice that they abstain; (ii) an absolute majority of all members casting a vote approve the proposed resolution; and (iii) no member requests a meeting in relation to the subject matter of the proposed resolution within one full business day of receiving notice of the proposal. |
| Secretary, Minutes | **Article 7**<br><br>The Board, the Committees of the Board and the Executive Committee shall each appoint a secretary, who need not be a member of the body.<br><br>The secretary of each body shall keep the minutes of meetings, which shall contain all resolutions adopted at the meeting. |
| Participation of Non-Members | **Article 8**<br><br>Persons who are not members of the Board, the Committees of the Board, or the Executive Committee may participate in meetings of such bodies if their expertise is required and if they have been invited by the chairperson of the body. Such persons shall not vote in any resolutions. |
| Business and Legal Separateness | **Article 9**<br><br>The Company is a holding company which directly or indirectly owns a global group of subsidiaries that conduct business operations (the "Business"). To ensure proper functioning of the Business in the interests of the Company and its shareholders and to comply with various requirements imposed by relevant laws and regulatory authorities, the Board shall supervise and, where necessary and appropriate, coordinate the Business by providing overall guidance and support.<br><br>Each company in the Group ("Group Company") shall be legally separate from all other Group Companies and shall manage its business independently. No Group Company shall operate the business of another Group Company nor shall any Group Company act as agent of any other Group Company. |

Other Offices or Investments

Article 10

Any member of the Board and any member of the Executive Committee shall obtain the written consent of the Chair, and the Chair himself/herself, as applicable, shall obtain the written consent of the chair of the Governance and Nomination Committee, prior to:

a) accepting (i) any board memberships of listed companies and, in the case of members of the Executive Committee, of any listed and non-listed companies, or (ii) any major external appointments. If a Board Member has been qualified by the Board as independent or non-executive, the agreement of the Chair, or the Chair of the, Governance and Nomination Committee respectively, should also be sought before accepting additional commitments that might conflict with that qualification; or

b) accepting any board membership or other role with, or making or holding a significant investment in, a company or other entity which is or is about to be in competition with the Group, except for investments in a collective investment scheme, where the assets of such scheme include a multitude of assets and are invested at the discretion of a third party.

In addition, any member of the Board and any member of the Executive Committee shall inform the Chair, or the Chair of the Governance and Nomination Committee, respectively, before accepting any other membership of a board of directors or other significant commitments involving affiliation with other businesses or governmental units. Changes to such board memberships or significant commitments shall be reported as well.

In any case, each member of the Board and each member of the Executive Committee shall comply with the maximum number of offices permitted by the Articles of Incorporation.

**A281**

**Section 2**

Duties of the
Board

**Board of Directors**

**Article 11**

The Board is the ultimate executive body of the Company. It shall resolve all Business matters that are not reserved to the authority of the General Meeting of Shareholders or to other executive bodies of the Company by law, the Articles of Incorporation, or these Regulations.

In particular, the Board shall have the following duties:

a) The ultimate direction of the Business, including, without limitation, the taking of the resolutions and the giving of necessary instructions or overall guidance and support regarding the following matters:

- The strategy upon recommendation of the Executive Committee
- Entry into new areas of activity and withdrawal from existing areas of the Business; acquisitions and divestments of companies, participations in companies or businesses, or incorporations or liquidations of companies or businesses, if such matters are of fundamental significance to the Business
- The opening and closing down of sites of fundamental significance to the Business
- The initiation and settlement of legal proceedings of fundamental significance to the Business
- The setting of financial targets and financial means to reach such targets
- The promulgation of corporate policies, in particular on financial matters, investments, personnel matters, cybersecurity, leadership, compensation, compliance with laws, corporate citizenship, communication and safety and environmental protection and supervising management's compliance therewith
- The adoption from time to time of further regulations and instructions regarding the organization of the Business and the duties and responsibilities of the executive bodies.

b) The determination of the organization of the Company and the Group.

c) The manner of governance of the Company, including the adoption from time to time of principles of corporate governance that are in the best interests of the Company and its shareholders.

d) The structuring of the accounting system, financial controls and financial planning.

e) The preparation of the annual report of the Company and of the Group, and of the compensation report.

f) The appointment, removal, determination of duties and responsibilities, and succession plans of the following persons:

A282

      –   The members of the Committees of the Board (subject to the powers of the General Meeting to appoint and remove the members of the Compensation Committee)
      –   One or two Chairs
      –   The CEO, and
      –   The members of the Executive Committee

g)   The designation of those persons who shall have signatory power for the Company and the manner in which such persons may sign on behalf of the Company.

h)   The ultimate supervision of the persons entrusted with the management of the Business, specifically in view of their compliance with laws, the Articles of Incorporation, these Regulations and other applicable regulations, directives and instructions.

i)   The preparations for the General Meeting of Shareholders and carrying out the resolutions of the General Meeting, including the preparation of the proposals to the General Meeting related to the compensation of the Board of Directors and of the Executive Committee and to the Compensation Report, as per the Articles of Incorporation.

j)   Notification of the court if liabilities exceed assets.

k)   The adoption of resolutions concerning an increase of the share capital to the extent that such power is vested in the Board (Article 651 paragraph 4 of the Swiss Code of Obligations), as well as resolutions concerning confirmation of capital increases and related amendments to the Articles of Incorporation.

l)   The determination of (i) the compensation strategy and of the principles, policies, structure and design of compensation plans for the Executive Committee, (ii) the long-term incentive/equity plans, (iii) the compensation of the members of the Board and of the CEO, and of the terms of employment of the CEO, (iv) the group financial, strategic and operational targets and the evaluation of target achievement, and the approval of the Compensation Report.

m)   The determination of the maximum aggregate amount or maximum partial amounts of compensation, in the event the General Meeting of Shareholders has not approved a proposal of the Board of Directors, as per the Articles of Incorporation.

n)   The determination of (i) whether or not a Board member is independent, based on a proposal by the Governance and Nomination Committee, and (ii) whether or not the members of the Audit and Risk Committee meet the financial literacy and expertise standards, both as stipulated by applicable law, regulation and listing requirements.

o)   The examination of the expert qualifications of specially qualified auditors.

p)   The determination and promotion of a culture that seeks to safeguard and strengthen the Group's reputation for responsible and sustainable conduct including (i) overseeing the Company's strategy and governance on corporate responsibility and key related issues that may affect the Company's, and (ii) reviewing emerging trends with regard to corporate responsibility as well as providing advice to the management thereabout.

q) The approval of other business, if such business exceeds the authority delegated from time to time by the Board to the Committees of the Board or to the Executive Committee.

**Delegation of Management**

**Article 12**

Where not stipulated as a Board responsibility in law, the Articles of Incorporation or these Regulations, the Board delegates to the Executive Committee the management of the Business pursuant and subject to these Regulations.

**Meetings, Agenda**

**Article 13**

The Board shall meet at the invitation of the Chair as often as may be required.

Invitations for meetings of the Board shall contain the agenda for the meeting and shall be issued at least five business days in advance, except for urgent matters.

Also, any member of the Board may request a meeting for a specific purpose or the inclusion of a certain item on the agenda. Such requests must be submitted to the Chair in writing at least two days prior to the meeting, except for urgent matters.

The Chair shall take the chair at the meetings of the Board.

The independent members of the Board shall meet in separate sessions, as necessary.

**Right to Request Information**

**Article 14**

The members of the Board have full and unrestricted access to management and employees of the Company and the affiliated companies in the execution of their duties. This includes the right to request information and inspection pursuant to Article 715a of the Swiss Code of Obligations.

**Authority to Retain Independent Advisors**

**Article 15**

The Board shall have the authority to retain independent advisors for any matters within the scope of its responsibilities. The Board shall obtain appropriate funding, as determined by the Board, for payment of compensation to any outside advisors engaged by the Board.

**Authorized Signatories**

**Article 16**

The Board appoints those of its members who shall be authorized to sign documents on behalf of the Company.

**Resignation of Board members**

**Article 17**

A member of the Board shall inform the Chair upon a material change of his or her business or professional affiliations or responsibilities and offer his/her resignation, as appropriate.

**Evaluation of Board performance**

**Article 18**

The Board conducts a periodic evaluation of the performance of the Board and of the Chair.

A284

**Section 3**

Committees of the Board

**Committees of the Board**

Article 19

The Board shall form the following permanent Committees:

- – Compensation Committee
- – Governance and Nomination Committee
- – Audit and Risk Committee, and
- – Innovation Committee

The composition and duties of these Committees shall be as set forth in the applicable Committee charters in compliance with legal requirements. The Committee charters are attached to these Regulations and incorporated herein by reference.

| | |
|---|---|
| **Section 4** | **Chair and Vice Chairs** |

Chair

**Article 20**

In addition to other duties described in these Regulations and the Articles of Incorporation, the Chair, elected by the General

Meeting of Shareholders, has the following duties:

a) Provides leadership to the Board in its governance role, coordinating the tasks within the Board and, in particular, calls Board meetings and sets their agenda.

b) Coordinates, together with the Chairpersons of the Committees, the work of all Committees. The Chair may attend the Committee meetings in consultation with the relevant Committee Chairperson.

c) Establishes and keeps a close working relationship with the CEO, providing advice and support while respecting the fact that the day-to-day management responsibility is delegated to the Executive Committee led by the CEO.

d) Promotes effective relationships and communication between the Board and the CEO and the Executive Committee.

e) Takes the lead in crisis situations.

f) Together with the CEO, ensures effective communication with shareholders, other stakeholders and the general public. The Chair is the primary representative of the Board and, together with the CEO, represents Alcon to the media. Other Board members may only discuss Alcon matters with the media with the prior approval of the Chair; and

g) Works closely with the CEO in evaluating members of the Executive Committee and in establishing succession plans for key management positions.

Vice Chair

**Article 21**

In case and as long as the Chair is incapacitated, the Vice Chair (or one of them if two have been appointed), shall be tasked by the Board to lead the Board.

If and as long as the Chair is not independent, the Vice Chair (or one of them if two have been appointed) (in this capacity acting also as "Senior Independent Director"), shall be tasked by the Board with the following duties:

a) Chairs the sessions of the independent members of the Board, as required; and

b) Leads the independent members of the Board in case of a crisis or matter requiring their separate consideration or decision. Every independent Board member may request separate me

| | |
|---|---|
| **Section 5** | **Executive Committee** |

Members of
Executive Committee

**Article 22**

The Executive Committee is headed by the CEO. It shall consist of such members as may be appointed or removed by the Board from time to time.

Duties of Executive
Committee

Article 23

The Executive Committee under the leadership of the CEO is responsible for the management of the Business and functions as a coordination committee, independent of any legal entity of the Group.

In particular, and without limitation, the Executive Committee shall have the following duties:

a)  Prepare corporate policies, strategies and strategic plans for the attention of and approval by the Board or its Committees.

b)  Implement the strategies, policies, and matters agreed upon by the Board or its Committees.

c)  Regularly assess the achievement of the targets for the Business.

d)  Submit the following to the Board or to one of its Committees for approval or advice in accordance with such regulations and standards as are promulgated by the Board from time to time:

    –  Appointments to and removals of associates with material impact on the Business
    –  Capital investments, financial measures, and the acquisition or divestiture of companies, participations and businesses of fundamental significance in accordance with such regulations and standards as are promulgated by the Board from time to time
    –  Significant agreements with third parties and engagement in new business activities
    –  The revenue, financial, and investment budgets of the Business, including any addenda thereto

e)  Implement the matters approved by the Board.

f)  Prepare and submit quarterly and annual financial reports for the attention and approval of the Board or its Committees, and keep the Board informed of all matters of fundamental significance to the Business.

g)  Implement modifications to the organization of the Business to ensure efficient operation of the Business and achievement of optimized consolidated results.

h)  Promote an active internal and external communications policy.

i)  Ensure that management capacity, financial and other resources are provided and used efficiently.

j)  Deal with such other matters as are delegated by the Board to the Executive Committee from time to time.

CEO

**Article 24**

In addition to other duties that may be assigned by the Board, the CEO, supported by the Executive Committee, has the following duties:

a)  Has a leading role in preparing corporate policies, strategies and strategic plans according to Article 24 above.

b)  Has overall responsibility for the management and performance of the Business.

c)  Is the primary contact person for the Board and is responsible for the reporting to the Board.

d)  Leads the Executive Committee.

e)  Builds and maintains an effective executive team and proposes adequate succession planning. He submits proposals for the appointment of members of the Executive Committee to the Governance and Nomination Committee.

f)  Appoints and promotes senior management subject to such standards as shall be adopted by the Board from time to time.

g)  May adopt further policies regarding the organization of the Executive Committee in accordance with the Articles of Incorporation and these Regulations.

h)  Represents Alcon, in coordination with the Chairman, with major customers, financial analysts, investors and the media.

Sub-committees of the Executive Committee

**Article 25**

The Executive Committee may delegate duties as stipulated in Article 23 above to other executives and committees. The CEO shall ensure proper reporting to the Executive Committee or the Board as the case may be.

A288

**Section 6**                    **Internal Audit**

Duties of Internal Audit         **Article 26**

The Group's internal audit, led by the Head of Internal Audit, shall:

a)   Carry out operational and system audits, assisting the organizational units in the accomplishment of objectives by providing an independent approach to the evaluation, improvement, and effectiveness of their risk management and internal control framework. All organizational units of the Group are subject to audit.

b)   Prepare reports regarding the audits it has performed, and report to the CEO and to the Audit and Risk Committee material irregularities, whether actual or suspected, without delay.

c)   Perform such other functions and audits as assigned to it by the Board, the Audit and Risk Committee or the CEO from time to time.

**Section 7**                    **Effectiveness, Amendments**

Effectiveness Amendments         **Article 27**

These Regulations shall come into effect on May 6, 2020 and replace the former regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

These Regulations may only be amended or replaced by the Board.

Mike Ball        Royce Bedward
Chairman        General Counsel and Corporate Secretary

# DESCRIPTION OF SECURITIES
# REGISTERED UNDER SECTION 12 OF THE EXCHANGE ACT

As of December 31, 2020 Alcon Inc. ("Alcon," "we," "us," and "our") had the following securities registered pursuant to Section 12(b) of the Exchange Act:

## A.    OFFER AND LISTING DETAILS

Alcon is a stock corporation (société anonyme) organized under the laws of Switzerland in accordance with article 620 et seq. of the Swiss Code of Obligations ("Swiss CO") and registered with the Swiss Register of Commerce under registration number CHE-234.781.164. Alcon is registered in the Swiss Register of Commerce under each of Alcon AG, Alcon SA and Alcon Inc., all of which are stated in Alcon's Articles of Incorporation (our "Articles") as our corporate name. Alcon was formed for an unlimited duration, effective as of the date of the registration of Alcon in the Swiss Register of Commerce on September 21, 2018. As a result of Novartis' Spin-off of Alcon and its consolidated subsidiaries on April 9, 2019, Alcon became an independent, standalone corporation. Alcon Inc. shares are listed on the SIX Swiss Exchange ("SIX") and the New York Stock Exchange ("NYSE") as global registered shares under the trading ticker "ALC". As such, they can be traded and transferred across applicable borders, without the need for conversion, with identical shares traded on different stock exchanges in different currencies.

As of December 31, 2020, the share capital of Alcon Inc. was CHF 19,988,000, fully paid-in and divided into 499,700,000 registered shares, each with a nominal value of CHF 0.04.
The Company has a single class of shares, being registered shares in the form of uncertificated securities (in the sense of the Swiss Code of Obligations). A portion of these uncertificated shares is issued as intermediated securities (titres intermédiés) within the meaning of the Swiss Federal Intermediated Securities Act via the settlement system operated by SIX SIS, with the remaining shares directly held through Computershare Trust Company, N.A. in the U.S. All Alcon shares have equal voting rights and carry equal entitlements to dividends.
No participation certificates (bons de participations) or profit-sharing certificates (bons de jouissance) have been issued.

The shares have the rights, preferences and restrictions described below in "Memorandum and Articles of Incorporation."

## B.    MEMORANDUM AND ARTICLES OF INCORPORATION

*The following is a summary of certain provisions of our Articles, our Regulations of the Board of Directors ("Board Regulations") and of Swiss law, particularly, the Swiss CO. This is not a summary of all the significant provisions of the Articles, the Board Regulations or Swiss law and does not purport to be complete. This description is qualified in its entirety by reference to the Articles and the Board Regulations, for which English translations are filed as exhibits to this Form 20-F, and to Swiss law.*

### Shareholder Rights

Because Alcon has only one class of registered shares, the following information applies to all shareholders.

*Dividend Rights*

The Swiss CO requires that, among other things, at least 5% of our annual profit be retained as general reserves, so long as these reserves amount to less than 20% of our registered share capital. Swiss law and the Articles permit us to accrue additional reserves.

Under the Swiss CO, we may only pay dividends out of balance sheet profits, out of reserves created for this purpose or out of free reserves. In any event, under the Swiss CO, while the Board may propose that a dividend be paid, we may only pay dividends upon shareholders' approval at a General Meeting of Shareholders. To the extent approved, dividends are usually due and payable shortly after the shareholders have passed a resolution approving the payment. Dividends which have not been claimed within five years after the due date revert to us, and are allocated to our general reserves.

A290

*Voting Rights*

Each share is entitled to one vote at a General Meeting of Shareholders. Voting rights may only be exercised for shares registered on the Alcon share register on the record date for the applicable General Meeting of Shareholders. In order to do so, the shareholder must file a share registration form with us, setting forth the shareholder's name, address and domicile (or, in the case of a legal entity, its registered office). If the shareholder has not timely filed the form, then the shareholder may not vote at, or participate in, General Meetings of Shareholders. Shareholders should contact their bank or broker if they wish to register their Alcon shares. Acquirers of Alcon shares that are registered on the Alcon U.S. share register maintained by Alcon's U.S. share registrar, Computershare Trust Company, N.A., should file a registration form with Computershare Trust Company, N.A.

Except as noted in the paragraph immediately below, shareholders' resolutions require the approval of a majority of the votes present at a General Meeting of Shareholders. As a result, abstentions have the effect of votes against such resolutions. Some examples of shareholders' resolutions requiring a vote by such "absolute majority of the votes" are (1) amendments to the Articles; (2) elections of Directors, the Chairman of the Board, the compensation committee members, the independent proxy and the statutory auditors; (3) approval of the management report and the financial statements (consolidated and stand-alone); (4) setting the annual dividend, if any; (5) approval of the aggregate amounts of compensation of the Directors and the members of the ECA; (6) decisions to discharge Directors and management from liability for matters disclosed to the General Meeting of Shareholders; and (7) the ordering of an independent investigation into specific matters proposed to the General Meeting of Shareholders. As a matter of Swiss law, certain other matters also require a supermajority, including certain mergers, scissions and transformations under the Swiss Merger Act.

According to the Articles and Swiss law, the following types of shareholders' resolutions require the approval of a "supermajority" of at least two thirds of the votes present at a General Meeting of Shareholders: (1) an alteration of our corporate purpose; (2) the creation of shares with increased voting powers; (3) an implementation of restrictions on the transfer of registered shares and the removal of such restrictions; (4) the creation of an authorized or conditional share capital; (5) an increase of the share capital by conversion of equity, by contribution in kind, or for the purpose of an acquisition of property or the grant of special rights; (6) a restriction or an exclusion of shareholders' pre-emptive rights; (7) a change of our registered office; (8) our dissolution; or (9) any amendment to the Articles which would create or eliminate a supermajority requirement.

Our shareholders are required to annually elect all of the members of the Board, as well as the Chair of the Board, the members of the compensation committee and the independent proxy. The Articles do not provide for cumulative voting of shares.

At General Meetings of Shareholders, shareholders can be represented by the independent proxy or by a third person authorized by written proxy who does not need to be a shareholder. Votes are taken either by a show of hands or by electronic voting, unless the General Meeting of Shareholders resolves to have a ballot or where a ballot is ordered by the chair of the meeting. In light of the COVID 19 pandemic, the Swiss government has permitted Alcon to request shareholders exercise their rights exclusively (i) in writing or online, or (2) through the independent proxy. This measure is valid until December 31, 2021.

*Rights to Share in the Company's Profits*

Shareholders have the right to allocate the profit shown on our balance sheet and to distribute dividends by vote taken at the General Meeting of Shareholders, subject to the legal requirements described above.

*Rights to Share in any Surplus in the Event of Liquidation*

Under the Swiss CO, any surplus arising out of a liquidation of Alcon (i.e., after the settlement of all claims of all creditors) would be distributed to the shareholders in proportion to the paid in nominal value of their shares.

*Redemption Provisions*

The Swiss CO limits a corporation's ability to hold or repurchase its own shares. We and our subsidiaries may only repurchase shares if we have freely disposable equity available in the amount necessary for this purpose. The aggregate nominal value of all Alcon shares held by us and our subsidiaries may not exceed 10% of our registered share capital. However, it is accepted that a corporation may repurchase its own shares beyond the statutory limit of 10%, if the repurchased shares are clearly earmarked for cancellation and such repurchase has been approved by our shareholders. In addition, we are required to recognize a negative position for our

own shares acquired by Alcon or, if our subsidiaries acquire our shares, create a special reserve on our balance sheet in each case in the amount of the purchase price of the acquired shares. Repurchased shares held by us or our subsidiaries do not carry any rights to vote at a General Meeting of Shareholders but are entitled to the economic benefits generally connected with the shares.

Under the Swiss CO, we may not cancel treasury shares without the approval of a capital reduction by our shareholders.

## Changes to Shareholder Rights

Under the Swiss CO, we may not issue new shares without the prior approval of a capital increase by our shareholders, subject to the existing authorized share capital of Alcon pursuant to the Articles. If a capital increase is approved, then our shareholders would generally have certain pre-emptive rights to obtain newly issued shares in an amount proportional to the nominal value of the shares they already hold. These pre-emptive rights could be excluded in certain limited circumstances with the approval of a resolution adopted at a General Meeting of Shareholders by a supermajority of two thirds of the votes present. In addition, we may not create shares with increased voting powers or place restrictions on the transfer of registered shares without the approval of a resolution adopted at a General Meeting of Shareholders by a supermajority of votes.

## Limitations

There are no limitations under the Swiss CO or our Articles on the right of non-Swiss residents or nationals to own or vote shares.

## Change in Control

The Articles and the Board Regulations contain no provision that would have an effect of delaying, deferring or preventing a change in control of Alcon and that would operate only with respect to a merger, acquisition or corporate restructuring involving us or any of our subsidiaries.

According to the Swiss Merger Act, shareholders may pass a resolution to merge with another corporation at any time. Such a resolution would require the consent of at least two thirds of all votes present at the necessary General Meeting of Shareholders.

Under the Swiss Financial Market Infrastructure Act, shareholders and groups of shareholders acting in concert who acquire more than 33 1/3% of our shares would be under an obligation to make an offer to acquire all remaining Alcon shares. Alcon has neither opted out from the mandatory takeover offer obligation nor opted to increase the threshold for mandatory takeover offers in the Articles.

## Disclosure of Shareholdings

Under the Swiss Financial Market Infrastructure Act, persons who directly, indirectly or in concert with other parties acquire or dispose of our shares or purchase or sale rights relating to our shares are required to notify us and the SIX of the level of their holdings whenever such holdings reach, exceed, or fall below certain thresholds— 3%, 5%, 10%, 15%, 20%, 25%, 33 1/3%, 50% and 66 2/3%— of the voting rights represented by our share capital (whether exercisable or not). This also applies to anyone who has discretionary power to exercise voting rights associated with our shares. Following receipt of such notification we are required to inform the public by publishing the information via the electronic publication platform operated by the SIX.

An additional disclosure obligation exists under the Swiss CO which requires us to disclose, once a year in the notes to the financial statements published in our annual report, the identity of all of our shareholders (or related groups of shareholders) that hold a participation exceeding 5% of all voting rights.

## Changes in Capital

The requirements of the Articles regarding changes in capital are not more stringent than the requirements of Swiss law.

**DATED**                **17/08/2020**

(1)      ALCON INC.

(2)      SOLIUM TRUSTEE (UK) LIMITED (REGISTERED NUMBER 09154605)

**TRUST DEED AND RULES**
**OF**
**THE ALCON INC. UK SHARE INCENTIVE PLAN**

Adopted by the Board of Directors of the Company on 9th April 2019

Registered with HM Revenue & Customs with scheme reference number XG1100000162916

Table of Contents

1.    DEFINITIONS                                                                                              1

2.    TRUSTS OF THE PLAN                                                                          1

3.    NOTICES TO PARTICIPANTS                                                             2

4.    INVESTMENT                                                                                         3

5.    BORROWING                                                                                          3

6.    RECEIPT OF MONEY OR MONEY'S WORTH WITH RESPECT TO PLAN SHARES      3

7.    APPLICATION OF THE PLAN TO GROUP COMPANIES                          3

8.    RETENTION OF SHARES SUBJECT TO HOLDING PERIOD                      4

9.    VOTING RIGHTS & DIRECTIONS                                                          4

10.    TRUSTEE'S POWERS OF DELEGATION                                              4

11.    ADMINISTRATION                                                                                5

12.    TRUSTEE'S INDEMNITIES & CHARGES                                            6

13.    APPOINTMENT, REMOVAL & RETIREMENT OF TRUSTEE                     8

14.    RESIDENCE OF THE TRUST                                                                9

15.    AMENDMENTS TO THE PLAN                                                             9

16.    TERMINATION OF THE PLAN                                                             10

17.    Data processing                                                                                   10

18.    GOVERNING LAW                                                                                11

19.    CONSTRUCTION OF THIS DEED                                                       11

Schedule 1 THE RULES OF THE ALCON INC. UK SHARE INCENTIVE PLAN    12

APPENDIX 1                                                                                                41

APPENDIX 2                                                                                                44

-i-

**THIS DEED** is made the 18th day of August 2020

**BETWEEN**:

(1)      **ALCON INC.** of Chemin de Blandonnet 8, 1214 Vernier, Geneva V8 0000 (the "**Company**"); and

(2)      **SOLIUM TRUSTEE (UK) LIMITED** (registered number 09154605) whose registered office is at New Penderel House, 4th Floor, 283-288 High
          Holborn, London, WC1V 7HP (the "**Original Trustee**").

**WHEREAS**

(A)      The Company wishes to establish an employee share plan to be known as the Alcon Inc. UK Share Incentive Plan which is intended to be a
          Schedule 2 SIP (as defined below) and constitute an Employees' Share Scheme.

(B)      The Original Trustee has agreed to be the first Trustee of the Plan.


**NOW THIS DEED WITNESSES** as follows:

**1.        DEFINITIONS**

a.      **Definitions:** The words and expressions used in this Deed which have capital letters shall have the meanings set out in Part One of the Schedule.

b.      **Interpretation:** The provisions of Part One of the Schedule shall apply equally to this Deed.

**2.        TRUSTS OF THE PLAN**

a.      **Payments by Participating Companies:** The Company will pay, or require that any Participating Company will pay, to the Trustee the amounts
         necessary to enable the Trustee to acquire Shares for, and/or to be Appropriated to, Qualifying Employees in accordance with the Plan, together
         with any other amounts required to cover any liabilities incurred by the Trustee under the Plan. The Company can require any Participating
         Company to reimburse the Company for any amounts it bears under this Clause 2.1 directly or indirectly in respect of such Participating Company's
         officers or employees.

b.      **Application of Payments:** Unless otherwise stated, the Trustee will apply all monies received by it in accordance with the Plan and hold any Shares
         acquired and all other trust property deriving from them on the trusts declared in this Deed. In the case of any monies received for the acquisition of
         Free Shares or Matching Shares, the Trustee will acquire and Appropriate these Shares in accordance with the Plan. In the case of any monies
         received for the acquisition of Partnership Shares or Dividend Shares, the Trustee will acquire these Shares in accordance with the Plan.

c.      **Rights attaching to unappropriated Shares:** If the Trustee becomes entitled in respect of any Shares not held on behalf of a Participant to any rights
         to be allotted, or to subscribe for,

A295

further securities (other than an issue on capitalisation of shares of the same class as specific Shares which the Trustee is about to Appropriate, in which case such issued shares shall be retained by the Trustee as Shares to be Appropriated among the Participants on the relevant Appropriation Date), the Trustee may take up those rights or sell them for the best consideration in money reasonably obtainable at the time or sell sufficient of them nil paid to enable the Trustee to subscribe in full for the balance of any unsold rights or allow those rights to lapse.

d.   **Trusts of unappropriated Shares:** The Trustee shall hold any unappropriated Shares or unutilised cash balances and any income arising from them UPON TRUST to apply the same in or towards the future purchase of Shares for the purposes of the Plan and/or its expenses in administering the Plan. The Trustee shall notify the Company from time to time of the amounts and/or number of Shares so held by it and its / their application.

## 3.   NOTICES TO PARTICIPANTS

a.   **Notice of Appropriation of Free Shares or Matching Shares:** As soon as practicable after the Trustee has Appropriated Free Shares or Matching Shares, it shall notify each Qualifying Employee of the number and description of the Shares Appropriated to him, the Initial Market Value of those Shares and the Holding Period applicable to them and if the Shares are subject to any Relevant Restriction, details of the Relevant Restriction.

b.   **Notice of acquisition of Partnership Shares:** As soon as practicable after the Trustee has acquired any Partnership Shares on behalf of a Qualifying Employee, it shall notify the Qualifying Employee of the number and description of the Shares acquired, the amount of Partnership Share Money applied in acquiring them, their Market Value on the Acquisition Date and if the Shares are subject to any Relevant Restriction, details of the Relevant Restriction.

c.   **Notice of acquisition of Dividend Shares:** As soon as practicable after the Trustee has acquired Dividend Shares on behalf of a Participant it shall notify the Participant of the number and description of the Shares acquired, their Market Value on the Acquisition Date, the Holding Period applicable to them, and if appropriate, the amount of any cash dividend carried forward under Rule 2.3 of Part Five of the Schedule.

d.   **Notice of Participant's tax liability:** Where a Participant becomes liable to income tax under ITEPA or Chapter 3 or 4 of Part 4 ITTOIA due to his participation in the Plan, the Trustee shall notify the Participant accordingly and inform him of any facts relevant to determining the amount of that liability.

e.   **Notice of receipt of foreign cash dividends:** As soon as practicable after the Trustee has received any foreign cash dividend in respect of any Plan Shares held on behalf of a Participant, the Trustee shall notify the Participant of the amount of foreign tax (if any) deducted from that dividend before it was paid.

## 4.   INVESTMENT

a.   **Trustee's power of investment:** The Trustee may invest any monies from time to time held by it and not immediately required as if it were the absolute beneficial owner of those monies.

b.   **No duty to invest:** The Trustee shall be under no duty to invest property held on trust under this Deed beyond the extent described in paragraph 49 of Schedule 2.

**5.    BORROWING**

The Trustee may borrow money for the purposes of the Plan on such terms as it thinks fit.

**6.    RECEIPT OF MONEY OR MONEY'S WORTH WITH RESPECT TO PLAN SHARES**

a.   **Obligation to pay over:** Subject to Clause 6.2, the Trustee shall, as soon as practicable following its receipt of any money or money's worth in respect of any Plan Shares, arrange for that money or money's worth to be paid to Participants in accordance with their respective entitlements.

b.   Exceptions from obligation: Clause 6.1 shall:

(i)      not apply to money's worth consisting of New Shares;

(ii)     be subject to the operation of Part Five of the Schedule (Reinvestment of Cash Dividends); and

(iii)    be subject to Clause 11 and the Trustee's PAYE Obligations (including its obligations under paragraph 79 of Schedule 2 and sections 509 to 514 of ITEPA).

**7.    APPLICATION OF THE PLAN TO GROUP COMPANIES**

a.   **Extension of the Plan to Subsidiaries and/or Jointly Owned Companies:** The Plan may, with the consent of the Company, be extended to any Subsidiary or any Jointly Owned Company by the execution of a Deed of Adherence under which that company agrees to be bound by this Deed and the Plan.

b.   **Disapplication of the Plan to Participating Companies:** The Plan shall cease to apply to any company, other than the Company, at any time when:

(i)      that company ceases to be a Subsidiary or a Jointly Owned Company; or

(ii)     a notice is served by the Company upon the Trustee that the Plan shall not apply to that company,

provided that the rights of Participants employed by that company to Plan Shares Appropriated to them or acquired on their behalf while that company was a Participating Company shall not be affected.

c.   **Information from Participating Companies:** A Participating Company (or a former Participating Company, if appropriate) shall provide the Trustee with all information required from it for the operation of the Plan in such form as the Trustee shall reasonably require.

**8.    RETENTION OF SHARES SUBJECT TO HOLDING PERIOD**

a.   **No disposal:** Subject to Clause 8.2, the Trustee shall not dispose of any of a Participant's Plan Shares that are subject to a Holding Period other than at the written direction of the

Participant given under the terms of the Participation Contract or (in the case of Matching Shares and where applicable Dividend Shares) the Partnership Share Agreement.

b.   **Permitted disposals during Holding Period:** Clause 8.1 shall:

   (i)      not apply if at the time of the disposal the Participant has ceased to be in Employment or employed by an Associated Company;

   (ii)     be subject to a direction of that Participant given in accordance with Rule 10 of Part Two of the Schedule; and

   (iii)    be subject to Clause 11.3 of the Deed.

## 9.      VOTING RIGHTS & DIRECTIONS

a.   **Exercise of voting rights:** All voting rights attaching to the Plan Shares shall be deemed to have been waived and shall not be capable of exercise whilst those Plan Shares are registered in the name of the Trustee. Upon withdrawal of the Plan Shares from the Plan and registration of the Plan Shares in the Participant's name, they shall carry the same voting rights as all other shares of the same class.

b.   **Voting rights and dividends attached to unappropriated or unallocated Shares:** The Trustee:

   (i)      shall be obliged to waive all voting rights; and

   (ii)     shall be obliged to waive any dividend due or to become due at any time or times in the future.

c.   **Giving of directions:** Subject to Clause 8 and Clause 11.3, the Trustee shall dispose of a Participant's Plan Shares and deal with any right conferred in respect of a Participant's Plan Shares to be allotted other shares, securities or rights of any description, only pursuant to a direction given by or on behalf of the Participant.

## 10.     TRUSTEE'S POWERS OF DELEGATION

a.   **Trustee's power to employ agents:** The Trustee may, in the performance of its duties under the Plan, employ and pay any appropriate person, appoint any person as its agent to transact all or any business, and act on the advice or opinion of any professional or business person, and shall not be responsible for anything done or omitted or suffered in good faith in reliance on such advice or opinion.

b.   **Delegation of Trustee's powers:** With the exception of the duties and obligations specifically imposed on it by Schedule 2, the Trustee may, to the extent permitted by law, delegate any of its powers and duties under the Plan to any person or company, but shall notify the Company in advance should it decide so to do.

c.   **Nominee shareholder:** The Trustee may allow any Shares to be registered in the name of an appointed nominee or custodian.

d.   **Revocation of delegation:** The Trustee may at any time, and shall if directed to by the Company, revoke any delegation or arrangement made under this Clause and/or require any trust property held by another person to be returned to the Trustee.

e.   **Execution of documents:** The Trustee may execute and may authorise any of its directors, officers or employees to execute on its behalf any documents in such manner as may be appropriate.

11.   **ADMINISTRATION**

a.   **Meetings and regulations:** Subject to the terms of this Deed, the Trustee may convene meetings and make such regulations as it considers appropriate for the administration of the Plan.

b.   **Duty to keep accounts and records:** The Trustee shall maintain the accounts and records necessary for it to fulfil its own PAYE Obligations and other obligations under the Plan and the PAYE Obligations of an Employer Company under the Plan.

c.   **Trustee's power to dispose of shares to meet its PAYE Obligations:** The Trustee shall, where a PAYE Obligation is imposed on it under Schedule 2 (including an obligation under paragraph 79 of Schedule 2 and sections 509 to 514 of ITEPA) or an obligation to account for employee's NICs, PAYE or employees national insurance (a "**Tax Obligation**") is imposed on it as a result of a Participant's Plan Shares ceasing to be subject to the Plan (including due to the operation of this Clause), have the power to meet that PAYE Obligation or employee's NICs by:

   (i)      disposing of any of that Participant's Plan Shares; or

   (ii)     the relevant Participant paying to it a sum equal to the amount required to discharge that PAYE Obligation and employee's NICs.

   The Trustee may dispose of a Participant's Plan Shares under Clause 11.3(a) by itself acquiring some or all of those Shares for the purposes of the Plan.

d.   **Trustee to pay Employer Company:** If as a result of a Participant's Plan Shares ceasing to be subject to the Plan a Participant is chargeable to income tax under sections 500 to 508 of ITEPA and an obligation to make a PAYE Deduction or to account for employee's NICs arises in respect of that charge the Trustee shall, subject to Clauses 11.6 and 11.7, pay to the Employer Company a sum sufficient to enable it to discharge that obligation.

e.   **Payment to Employer Company of Capital Receipts:** If the Trustee receives a sum of money which constitutes (or forms part of) a Capital Receipt in respect of which a Participant is chargeable to income tax in accordance with sections 500 to 508 of ITEPA when it is received by the Participant, the Trustee shall subject to Clause 11.7 pay to the Employer Company out of that sum of money an amount equal to that on which income tax is payable.

f.   **Payment by Participant to Employer Company:** Clause 11.4 shall not apply if the relevant Participant is required to pay to his Employer Company a sum that is sufficient to enable it to discharge the obligation.

A299

g.   **No Employer Company:** In any case under Clause 11.4 or Clause 11.5, as appropriate, where:

   (i)   there is no Employer Company; or

   (ii)  HMRC have directed under sections 511(2) or 514(2) of ITEPA, as appropriate, that it is impracticable for the Employer Company concerned to make a PAYE Deduction,

   Clause 11.4 or Clause 11.5 as appropriate, shall not apply and the Trustee shall make a PAYE Deduction in respect of an amount equal to that on which income tax is payable, as if the Participant were a former employee of the Trustee.

## 12.   TRUSTEE'S INDEMNITIES & CHARGES

a.   **Trustee's indemnity:**

   (i)   The Participating Companies agree to jointly and severally keep the Trustee, and the directors, officers and employees of a corporate trustee, fully indemnified against any liability arising out of or in connection with the Plan. However, no Trustee will be indemnified or exonerated in respect of any fraud, negligence or wilful default on its, its agent's, or any of their officer's or employee's parts. The Trustee shall also have the benefit of any indemnities conferred upon trustees by general law and the Trustee Act 2000.

   (ii)  No Trustee shall be personally liable for any breach of trust (other than through fraud, wilful wrongdoing or negligence) over and above to the extent to which the Trustee, or the officers and employees of a corporate trustee, are indemnified by the Participating Companies in accordance with clause 12.1(a).

b.   **Accounting for benefits received by the Trustee:** Neither the Trustee nor any of its officers or employees shall be liable to account to Participants for any benefit received under the Plan. No Trustee or officer or employee of the Trustee shall be liable to account to other Participants for any profit derived by him as a Participant.

c.   **Trustee's remuneration:** Any person acting as a Trustee in the course of any profession or business carried on by him may charge and be paid such reasonable charges for acting as shall from time to time be agreed between him and the Company. The Company will act in accordance with any terms and conditions in force from time to time as agreed with a corporate trustee.

d.   **Permitted dealings of Trustee:** Any Trustee (and any director or officer of a body corporate or a trust corporation acting as a Trustee) shall not, on its own account:

   (i)   be precluded from acquiring, holding or dealing with any debentures, debenture stock, shares or securities whatsoever of the Company, any Subsidiary or Jointly Owned Company or any other company in the shares of which the Company, any Subsidiary or any Jointly Owned Company may be interested;

   (ii)  be precluded from entering into any contract or other transaction with the Company, any Subsidiary or any Jointly Owned Company or any other company, or from being interested in any such contract or transaction; or

**A300**

(iii)    be in any way liable to account to the Company or any Subsidiary or any Jointly Owned Company or any Participant for any amount obtained by it from such acquisition, holding, dealing, contract or transaction, whether or not in connection with its duties under this Deed.

e.    **Reliance on information provided:**

(i)    The trustee shall be entitled to rely without further inquiry on:

(1)    all information supplied to it by any Participating Company with regard to its duties as Trustee and in particular, but without prejudice to the generality of the foregoing, any notice given by a Participating Company to the Trustee in respect of the eligibility of any person to become or remain a Participant in the Plan shall be conclusive; and

(2)    any direction, notice or document purporting to be given or executed by or with the authority of any Participating Company or by any Participant.

(ii)    Except as otherwise provided, the Trustee may in its discretion agree with the Board, the Company or any of the Participating Companies on matters relating to the operation and administration of the trust of the Plan as they may consider advisable in the interests of the trust of the Plan and so that no person claiming an interests under this Plan shall be entitled to question the legality or correctness of any arrangement or agreement made between the Board, the Company or any of the Participating Companies and the Trustee in relation to such operation or administration.

f.    **Exclusion of liability:** The Trustee shall not be liable or responsible for any loss, liability or increased liability of a Participant arising out of the failure of the Participant to give a direction to the Trustee or to give a direction within a particular time or, if the Participant has directed the Trustee to use its discretion, arising out of the bona fide exercise by the Trustee of that discretion.

g.    **Insurance:** The Trustee may insure against any loss caused by it or by any of its employees, officers, agents or delegates under the Plan. It may also insure itself and any of these persons against liability for breach of trust not involving wilful wrongdoing or fraud of the Trustee or the person concerned. Except in the case of a paid Trustee, the insurance premiums may be paid from the Plan assets.

**13.    APPOINTMENT, REMOVAL & RETIREMENT OF TRUSTEE**

a.    **Number of Trustees:** Unless the Trustee is a corporate Trustee there must be two or more Trustees.

b.    **Appointment and removal of Trustees:** The Company may at any time by writing:

(i)    appoint a new (or additional) Trustee, including a corporate Trustee (to the exclusion of the Trustee's statutory power of appointment); and

**A301**

(ii)      remove a Trustee from office by three months' written notice to the Trustee (but not so as to leave in office fewer than two Trustees or a corporate Trustee), without assigning any reason for its removal.

c.    **Appointment and removal on cessation of Company's existence:** The powers of appointment and removal shall be vested in the Trustee in the event that the Company ceases to exist otherwise than in consequence of a Company Reconstruction (as defined in Rule 10 of Part Two of the Schedule) or takeover (as envisaged in Rule 11.1 of Part Two of the Schedule) when the successor company (or, if more than one, such successor company as the Company shall nominate) shall have such powers.

d.    **Retirement of Trustee:** A Trustee may retire by giving to the Company written notice which shall take effect at the end of three months (or another period agreed with the Company) from the date of that notice, provided that this retirement shall not take effect unless immediately after retirement there will be at least two Trustees or a corporate Trustee in office (whether by virtue of an appointment taking effect upon such retirement or otherwise). If it is necessary to ensure compliance with Clause 13.1, the Company will procure a replacement Trustee or Trustees to replace the retiring Trustee at the end of the notice period. The retiring Trustee shall not be responsible for any costs caused by its retirement but shall do all things necessary to give proper effect to its retirement.

e.    **Transfer of trust property:** Promptly on removal or retirement, a Trustee shall transfer all trust property held by it to the continuing Trustee and deliver all documents in its possession relating to the Plan as the Company may direct.

f.    **Participants as Trustee:** A person shall not be disqualified from acting as a Trustee or an officer or employee of a Trustee of the Plan because he is or was an officer or employee of a Participating Company or is or was a Participant.

## 14.    RESIDENCE OF THE TRUST

For so long as the Plan is a Schedule 2 SIP all Trustees shall be resident in the United Kingdom for tax purposes.

## 15.    AMENDMENTS TO THE PLAN

a.    **Company's power to amend:** Subject to the rest of this Clause 15, the Board may amend the Plan in any manner as it thinks fit by supplemental deed (with any amendment being binding on the Trustee, all Participating Companies and Participants) but so that no purported amendment shall be effective:

(i)      whilst the Plan remains a Schedule 2 SIP, if such amendment is to a "key feature" (as defined in paragraph 81(B)(8) of Schedule 2) and as a result of the amendment, the Plan would no longer be a Schedule 2 SIP; or

(ii)      where it would cause the Plan to cease to be an Employees' Share Scheme; or

(iii)      where it would materially adversely affect the rights of a Participant in respect of his Plan Shares unless it is made with his written consent or by a resolution passed as if all the Plan Shares held by the Trustee constituted a separate class of share capital

**A302**

and the provisions of the Articles of Association of the Company and the Companies Act 1985 or Companies Act 2006 relating to class meetings (with, in each case, the necessary amendments) applied to that class; or

(iv)       where it would offend the rule against perpetuities.

b.     **Shareholder approval**: To the extent required by (i) applicable law, (ii) regulation, (iii) the requirements of any stock exchange upon which the Shares are traded or (iv) the guidance or code of any investor body to which the Board has decided to adhere, no amendment to the advantage of Participants or Eligible Employees can be made to the provisions in the Plan (including this Deed) relating to:

(i)       who can be a Participant or Eligible Employee; or

(ii)      the number of Shares which the Trustee can subscribe for under the Plan; or

(iii)     the basis for determining a Participant's entitlement to and the terms of the Shares and any adjustment in the event of a Variation,

without the approval by ordinary resolution of the Company in general meeting, except minor amendments to benefit the administration of the Plan, to take account of a change in legislation or to obtain or maintain favourable tax, exchange control or regulatory treatment for Participants or Eligible Employees or any Participating Company.

c.     **Consent by Trustee:** Any amendment to the Plan (including this Deed) shall require the consent of the Trustee, such consent not to be unreasonably withheld or delayed.

d.     **Additional parts:** The Company can adopt additional parts of the Plan applicable in any jurisdiction under which participation may be subject to additional and/or modified terms and conditions, having regard to any securities, exchange control or taxation laws, which apply to a Participant, the Company, any Participating Company or any Associated Company. Any additional parts must conform to the basic principles of the Plan and must not enlarge to the benefit of Participants any limits in the Plan. Any such additional part shall not form part of the Plan for the purposes of Schedule 2.

e.     **Consents:** No amendments to the Plan (including this Deed) shall require the consent of any Participating Company or any third party except as expressly provided in this Clause.

## 16.    TERMINATION OF THE PLAN

a.     **Decision not to operate:** The Company may resolve not to operate the Plan at any time. Any decision not to operate the Plan will not affect the subsisting rights of Participants, save as to the extent that no further deductions from Salary pursuant to any Partnership Share Agreement will be made unless an Accumulation Period is in progress.

b.     **Decision to terminate the Plan:** The Board or the Company may resolve to terminate the Plan at any time. Where the Plan is to be terminated, the Company will issue a Plan Termination Notice and provide a copy of the notice, without delay, to:

(i)

the Trustee; and

    (ii)        each individual who is either a Participant or has entered into a Partnership Share Agreement which was in force immediately before the notice was issued.

The Company shall execute a Plan Termination Notice in the event of its insolvency.

c.    **Perpetuity period:** No acquisition of Shares may be made under the Plan later than eighty years after the date of this Deed or the earlier termination of the Plan by the Company. The perpetuity period applicable to this Deed shall be eighty (80) years.

d.    **Return of surplus assets:** On termination of the Plan for whatever reason, the Trustee shall sell all unappropriated or unallocated Shares and account for and pay the proceeds together with any other surplus assets or monies held by it to the Participating Companies, so far as practicable in proportion to the total amounts provided by each of them (directly or indirectly) to the Trustee or, as may otherwise, in the opinion of the Trustee, be appropriate.

**17.**    **Data processing**

For the purposes of administering the Plan, the Company, the Trustee, any Participating Company and any Associated Company will collect and process information relating to each Participant in accordance with the privacy notice currently available on the Company's intranet.

**18.**    **GOVERNING LAW**

This Deed shall be governed by and construed in accordance with the laws of England.

**19.**    **CONSTRUCTION OF THIS DEED**

The Schedule shall be treated as part of this Deed.

**IN WITNESS** of which this Deed has been executed and delivered as a deed by the parties on the date which first appears in page 1.

**A304**

**Schedule 1.**

**THE RULES OF**
**THE ALCON INC. UK SHARE INCENTIVE PLAN**
**Part a.**

**Definitions and Interpretation**
The words and expressions used in the Plan which have capital letters have the meanings set out below.

**"Accumulation Period"** in respect of Partnership Shares, the period during which a Qualifying Employee's Partnership Share Money is accumulated before it is used to acquire Partnership Shares or is repaid to that employee;

**"Acquisition Date"** in respect of Partnership Shares the date determined under Rule 3.1 or Rule 4.3 of Part Four of the Schedule as appropriate; and in respect of Dividend Shares, the date determined under Rule 2.1 of Part Five of the Schedule;

**"Announcement Date"** any date on which the Company makes an announcement of its final or interim results for any financial year or other period for which the Company makes up its Accounts;

**"Appropriation"** the vesting in a Qualifying Employee of a beneficial interest in Free Shares or Matching Shares (and references to Appropriate or Appropriated shall be read accordingly);

**"Appropriation Date"**   a date on which Free Shares or Matching Shares are Appropriated to a Qualifying Employee;

**"Appropriation Year"**   a Tax Year during which an Appropriation of Shares is or is intended to be made;

**"Associated Company"** the meaning given in section 94 of Schedule 2;

**"Board"** the board of directors of the Company or a duly authorised committee of the board of directors, in either case constituted in accordance with the Articles of Association and which for the avoidance of doubt may include the Remuneration Committee of the Company;

**"Capital Receipt"** the meaning given in section 502 of ITEPA;

**"Company"** Alcon Inc. which for the purposes of the Plan may act through the Board or through a duly authorised committee thereof;

**"Connected Company"** means:

(i)        the Company;

(ii)       a company which Controls or is Controlled by the Company or is Controlled by a company which also Controls the Company; and

**A305**

(iii)     a company which is a Member of a Consortium owning the Company or which is owned in part by the Company as a Member of a Consortium;

**"Control"** unless otherwise indicated, control within the meaning given in section 995 of the Income Tax Act 2007 (reference to Controls or Controlled shall be read accordingly);

**"Conversion Rate** on any given day, the average currency conversion rate quoted by Bloomberg or such other currency conversion quotation source used by the Company as the price for US dollars purchased with Sterling;

**"CTA 2010"** the Corporation Tax Act 2010;

**"Dealing Day"** any day on which the NYSE is open for business;

**"This Deed"** this trust deed as amended from time to time;

**"Deed of Adherence"** a deed substantially in the form set out in Part Six of the Schedule;

**"Dividend Shares"** Shares acquired on behalf of a Participant under Part Five of the Schedule;

**"Eligible Employee"** an individual who on the Relevant Date:

     a.     is in Employment; and

     b.     is a UK resident taxpayer within the meaning in paragraph 8(2) of Schedule 2; and

     c.     has been in Employment for such Qualifying Period (if any) as the Company may determine; and

     d.     an individual who on the Relevant Date is in Employment and nominated by the Company as an Eligible Employee (or is a member of a category of employees which is nominated by the Company as Eligible Employees) subject to being in Employment for such Qualifying Period (if any) as the Company may determine,

unless in either case, the individual is ineligible to participate in the Plan by virtue of Rule 3 of Part Two of the Schedule;

**"Employees' Share Scheme"** the meaning given in section 1166 of the Companies Act 2006;

**"Employer Company"** the company (if any) of which a Participant is an employee when, as appropriate, either (a) his Plan Shares cease to be subject to the Plan; or (b) the Trustee receives a sum of money which constitutes (or forms part of) a Capital Receipt in respect of his Plan Shares and to which the PAYE Regulations apply at that time;

**"Employment"** employment with a Participating Company;

**"Free Shares"** Shares Appropriated to a Qualifying Employee under Part Three of the Schedule;

**"HMRC"** Her Majesty's Revenue & Customs

**"Holding Period"** with respect to:

      a.    an Appropriation of Free Shares or Matching Shares, the period specified by the Company for that Appropriation during which those Shares will be held by the Trustee, which must be not less than three years nor more than five years from the Appropriation Date (or such other period(s) as may be permitted under paragraph 36(2) of Schedule 2 from time to time); and

      b.    Dividend Shares, the period of three years from their Acquisition Date (or such other period as may be permitted under paragraph 67 of Schedule 2 from time to time);

**"Initial Market Value"** in relation to any Appropriation of Shares their Market Value on the Appropriation Date (or if that day is not a Dealing Day, then the immediately preceding Dealing Day); provided that the Market Value of any Shares which are restricted shares (within the meaning of paragraph 35(4) of Schedule 2 is determined as if they were not;

**"IPO Date"** the date on which the Shares are admitted to trading on the NYSE;

**"ITA"** the Income Tax Act 2007;

**"ITEPA"** the Income Tax (Earnings and Pensions) Act 2003;

**"ITTOIA"** the Income Tax (Trading and Other Income) Act 2005;

**"Jointly Owned Company"**

      c.    any company of which 50 per cent of its issued share capital is owned by the Company and/or any Subsidiary of the Company and 50 per cent of its issued share capital is owned by another person; and

      d.    any company under the Control of any such jointly owned company;

**"Market Value"** means in relation to a Share on any day:

      a.    if and so long as the Shares are listed on the NYSE:

            i.    the middle market quotation of a Share on that day; or

            ii.    the average of the middle market quotations on the NYSE of a Share for the three immediately preceding Dealing Days; or

           iii.    The price obtained in the market at the time of purchase

      b.    subject to (i) above, the market value of a Share determined in accordance with Part VIII of the Taxation of Chargeable Gains Act 1992 and agreed in advance with HMRC Shares and Assets Valuation;

If Shares are subject to a Relevant Restriction, Market Value shall be determined as if the Shares were not subject to a Relevant Restriction;

A307

**"Matching Shares"** Shares Appropriated under Part Four of the Schedule and which remain subject to the Plan;

**"Member of a Consortium"** the meaning given in paragraph 99(3) of Schedule 2;

**"NICs"** national insurance contributions;

**"NYSE"** The New York Stock Exchange or any successor body carrying on the business of The New York Stock Exchange;

**"Participant"** any individual for whom the Trustee holds Plan Shares;

**"Participating Company"**

      a.     the Company;

      b.     any Subsidiary which, with the approval of the Board, participates in the Plan; and

      c.     any company which is a Jointly Owned Company and which, with the approval of the Board, participates in the Plan;

**"Participation Contract"** an agreement between the Company and an Eligible Employee relating to participation in awards of Free Shares made pursuant to the Plan which complies with Rule 2 of Part Two of the Schedule;

**"Partnership Shares"** Shares acquired by the Trustee under Part Four of the Schedule on behalf of a Qualifying Employee and which remain subject to the Plan;

**"Partnership Share Agreement"** an agreement between the Company and an Eligible Employee relating to the acquisition of Partnership Shares pursuant to the Plan which complies with Rule 2 of Part Two of the Schedule and Rule 1, 4 and 7 of Part Four of the Schedule;

**"Partnership Share Money"** money deducted from a Qualifying Employee's Salary under a Partnership Share Agreement;

**"PAYE Deduction"** a deduction required by PAYE Regulations;

**"PAYE Obligations"** obligations of any persons to account for income tax pursuant to Part 11 ITEPA or pursuant to PAYE Regulations;

**"PAYE Regulations"** the meaning given in section 684(8) of ITEPA;

**"Performance Unit"** any individual, team, divisional or corporate unit the Company may determine with respect to an Appropriation to be made under Rule 1 of Part Three of the Schedule;

**"Permitted Cessation"** ceasing to be in Employment or in employment with an Associated Company because of:

      a.     injury or disability;

b.      redundancy;

c.      a transfer to which the Transfer of Undertakings (Protection of Employment) Regulations 2006 apply;

d.      a change of Control or other circumstances ending the Associated Company status of the company by which he is employed;

e.      retirement by agreement with their employer; or

f.      death;

**"Plan"** the Alcon Inc. UK Share Incentive Plan established by the Deed and the Schedule (as amended from time to time);

**"Plan Shares"** Free Shares, Matching Shares, Dividend Shares, Partnership Shares and/or, where appropriate, New Shares which are held by the Trustee on behalf of the Participants to whom they have been Appropriated or on whose behalf they have been acquired;

**"Plan Termination Notice"** a notice terminating the Plan as referred to in paragraph 89 of Schedule 2;

**"Qualifying Corporate Bond"** the meaning given in section 117 of the Taxation of the Chargeable Gains Act 1992;

**"Qualifying Employee"** an Eligible Employee who has entered into a Participation Contract or Partnership Share Agreement, as appropriate;

**"Qualifying Period"**

a.      in the case of an award of Free Shares, a period of 18 months (or any different period specified by paragraph 16(2) of Schedule 2) ending with the date on which the award is made or such shorter period (if any) as the Board may determine in relation to the award;

b.      in the case of an award of Partnership Shares and Matching Shares where there is an Accumulation Period, a period of six months (or any different period specified by paragraph 16(4) and (6) of Schedule 2) ending with the start of the Accumulation Period or such shorter period (if any) as the Board may determine in relation to the award; and

c.      in the case of an award of Partnership Shares and Matching Shares where there is no Accumulation Period, a period of 18 months (or any different period specified by paragraph 16(3) and (5) of Schedule 2) ending with the deduction of Partnership Share Money relating to the award or such shorter period (if any) as the Board may determine in relation to the award;

**"Redundancy"** the meaning given in the Employment Rights Act 1996;

**"Relevant Date"**

      a.      in relation to an award of Free Shares and Matching Shares, the Appropriation Date; and

      b.      in relation to an offer of Partnership Shares, the day Partnership Share Money relating to those Partnership Shares is deducted, or when there is an Accumulation Period, the day of the first deduction of the Partnership Share Money relating to those Partnership Shares;

**"Relevant Restriction"** any provision included in any contract, agreement, arrangement or condition to which any of sections 423(2), 423(3) and 423(4) of ITEPA would apply if references in those sections to employment-related securities were references to Shares;

**"Restricted Performance Measures"**   performance measures as defined in Rule 3.3 of Part Three of the Schedule;

**"Salary"** the meaning given in paragraph 43(4) of Schedule 2;

**"Schedule"** the schedule to the Deed;

**"Schedule 2"** Schedule 2 to ITEPA;

**"Schedule 2 SIP"** a share plan that meets the requirements of Schedule 2;

**"Share"** a share in the capital of the Company which satisfies the conditions specified in paragraphs 25 to 33 (inclusive) of Schedule 2 or, where the context permits in the event of a Company Reconstruction, such New Shares as forms part of any New Holding as those terms are defined in Rule 9 of Part Two of the Schedule;

**"Subsidiary"** any company which in relation to the Company is a company as defined by section 1159 of the Companies Act 2006 and which is under the Control of the Company;

**"Tax Year"** the meaning given in section 4(2) ITA 2007;

**"Trustee"** the Original Trustee referred to in the Deed or such other person or persons resident in the United Kingdom who is or are the trustee or trustees from time to time of the Plan;

**"Unrestricted Performance Measures"** performance measures as defined in Rule 3.4 of Part Three of the Schedule; and

**"Variation"** in relation to the equity share capital of the Company:

      a.      a capitalisation issue, an offer or invitation made by way of rights, a subdivision, a consolidation or reduction; or

      b.      any other variation in respect of which HMRC may from time to time allow an adjustment of a Participant's entitlement to Shares.

Words and expressions not otherwise defined have the same meanings as they have in the ITEPA.

---

**A310**

References to a Participant ceasing to be in Employment or employed by an Associated Company shall not apply until the Participant has ceased employment with all Participating Companies and Associated Companies.

In this Plan:

1.    the headings are for the sake of convenience and should be ignored when construing it;

2.    references to any statutory provisions are to those provisions as amended, extended or re-enacted from time to time and include any subordinate legislation made under them;

3.    unless the context requires otherwise, words in the singular include the plural and vice versa and words imputing either gender include both genders;

4.    references to rules shall be to rules contained in the same part of the Schedule unless otherwise stated.

**Part b.**

**Provisions affecting Plan Shares**

**OPERATION OF THE PLAN/PARTICIPATION ON THE SAME TERMS**

1.    **Board's discretion**: The Plan shall be operated at the discretion of the Board. The offer of Shares shall not create any expectation or right to a further offer of Shares.

2.    **Participation on the same terms**: Subject to Rules 3.3 and 3.4 of Part Three of the Schedule, every Eligible Employee must be invited to participate in the Plan in respect of any Appropriation of Shares or acquisition of Shares on their behalf on the same terms, and those who participate must do so on the same terms.

3.    **Permitted factors**: The fact that participation pursuant to Part Three of the Schedule in the Plan may be by reference to an Eligible Employee's remuneration, length of service or hours worked shall not infringe Rule 1.2 unless, where more than one of these three factors is used, paragraph 9(4) of Schedule 2 is not complied with.

**PARTICIPATION CONTRACT**

1.    **Holding period**: A Participation Contract (and a Partnership Share Agreement which provides for the Appropriation of Matching Shares) shall allow for the Holding Period applicable to the Free Shares (or Matching Shares) to which it relates to be specified and shall, subject to its provisions, bind the Eligible Employee in contract with the Company:

   i.     to permit any Plan Shares which are subject to a Holding Period and Appropriated to him or acquired on his behalf to remain in the hands of the Trustee throughout the Holding Period applicable to them; and

   ii.    not to assign, charge or otherwise dispose of his beneficial interest in any of those Plan Shares during their Holding Period.

2.   **Forfeiture:** The Participation Contract shall, if appropriate, state in respect of the Appropriation of Free Shares (or in the case of a Partnership Share Agreement, the Matching Shares) to which it relates the extent (if any) to which those Shares will be forfeited if, other than in the event of Permitted Cessation:

   iii.   the Participant ceases to be in Employment or employed by an Associated Company; or

   iv.   the Participant withdraws the Shares from the Plan; or

   v.   in the case of Matching Shares only, if the Participant withdraws the Partnership Shares in respect of which those Matching Shares were Appropriated to him,

   before the expiry of the period from the Appropriation Date of the relevant Shares specified under the Participation Contract or Partnership Agreement (as the case may be). If any Free Shares or Matching Shares are forfeited, a Participant shall cease to be beneficially entitled to those Shares.

### INELIGIBILITY DUE TO PARTICIPATION IN OTHER SHARE SCHEMES

1.   **Free Shares, Partnership Shares or Matching Shares:** An individual shall not be eligible to participate in an award of Free Shares, Partnership Shares or Matching Shares in any Tax Year in which he has participated (or is in the same Tax year to participate) in any other plan established by the Company or a Connected Company which is a Schedule 2 SIP.

2.   **Deemed Participation:** For the purposes of Rule 3.1 an individual shall be treated as having participated in an award of Free Shares under a Schedule 2 SIP if he would have received Free Shares under that plan but for his failure to meet a performance target.

3.   **Successive participation:** If an individual participates in an award in a Tax Year in which he has already participated in an award of shares under one or more Schedule 2 SIPs then the limits specified in Rule 2 of Part 3 of the Schedule, Rule 1.2 of Part 4 of the Schedule and Rule 2.1 of Part 5 of the Schedule apply as if the Plan and the other plan or plans were a single plan as required by paragraph 18A of Schedule 2.

### CONTRIBUTIONS TO TRUSTEE

Any contributions to be made to the Trustee to enable an acquisition of Shares to be made by the Trustee for Appropriation on any Appropriation Date shall be made within a sufficient time to allow for that Appropriation.

### ACQUISITION OF SHARES FOR THE PLAN/LIMIT ON NUMBER OF SHARES WHICH CAN BE ISSUED

1.   **Acquisition of Shares**: The Trustee, upon the direction of the Company, shall acquire Shares to be Appropriated as Free Shares or Matching Shares or which are to be acquired as Partnership Shares or Dividend Shares either by subscription from the Company or by purchase.

2.   **Adjustment to Shares to be taken into account**: Where Shares issued in connection with the Plan or any other Employees' Share Scheme of the Company are to be taken into account

A312

for the purposes of any of the limits in this Rule 5 and a Variation has taken place between the date of issue of those Shares and the date on which the limit is to be calculated, the number of Shares which will be taken into account for the purposes of the limit will be adjusted in such manner as the Board considers appropriate to take account of the Variation.

**APPROPRIATION AND OFFERS OF PARTNERSHIP SHARES / FREE SHARES**

1.  **Timing of Appropriations and Offers**: Except in the case of the first Appropriation of Free Shares and offer of Partnership Shares under the Plan following the IPO Date, any Appropriation of Free Shares and/or offer of Partnership Shares shall be made within six weeks after any relevant Announcement Date or within six weeks of any date on which the Board determines that there are exceptional circumstances which justify an Appropriation of Free Shares and/or offer of Partnership Shares, provided that where Partnership Shares are offered by way of regular deductions from a Participant's Salary, an offer of Partnership Shares can be made at any time, subject to any relevant code issued by the NYSE, as amended from time to time.

2.  **Rights attaching to Plan Shares**: Where the Trustee Appropriates or acquires Plan Shares a proportion of which rank for any dividend or other distribution or other rights attaching to Shares by reference to a record date preceding the relevant Appropriation Date or Acquisition Date and a proportion of which do not, then the Shares to be Appropriated or allocated to each Qualifying Employee shall, as far as practicable, be in the same proportions.

**RIGHTS ISSUES**

1.  **Instructions to Trustee**: Whenever any rights arise in respect of Plan Shares to be allotted, on payment, any shares, securities or rights of any description in the same company, each Participant shall be notified by the Trustee of the rights relating to his Plan Shares. Each Participant may direct the Trustee and the Trustee shall then be permitted to do one or more of the following:

    vi.     subject to the provision by the Participant of any necessary funds, to take up or sell all or any of the rights or allow them to lapse; and/or

    vii.    sell rights nil paid to the extent necessary to enable the Trustee to subscribe in full for the balance of any unsold rights.

    The Participant's instructions may be of particular or of general application and relate to Plan Shares Appropriated or acquired on his behalf before and after the date of the rights issue.

2.  **Period for giving instructions**: The Trustee shall act upon any such instruction received by it before the expiry of the period allowed for the exercise of any such rights. If any Participant has not by such time given instructions to the Trustee with regard to those rights and, if appropriate, provided any funds necessary for the purpose, the Trustee shall take no action. The Trustee shall deal with any Capital Receipt received in consequence of the non-exercise or sale of any rights in accordance with Clause 11.5 of the Deed.

3.  **New Shares**: Any shares, securities or rights taken up by the Trustee on behalf of any Participant under Rule 7.1(b) shall, subject to Rule 12 and provided that the right so to take up shares, securities or other rights was conferred in respect of all the ordinary shares in the

Company, form part of the Participant's Plan Shares and shall be deemed to have been Appropriated to or acquired on behalf of the Participant in the same way and at the same time as the Participant's Plan Shares in respect of which they are allotted.

4.   **Trustee's indemnity**: Nothing in this Rule shall require the Trustee to act in any manner which would involve it in any liability unless indemnified to its satisfaction by the Participant against such liability.

### CAPITALISATION ISSUES

Where any Shares are allotted by way of capitalisation to the Trustee in respect of any Participant's Plan Shares, those Shares shall, subject to Rule 12, form part of that Participant's Plan Shares and be deemed to have been Appropriated to, or acquired on behalf of the Participant in the same way and at the same time as the Participant's Plan Shares in respect of which they are allotted.

### COMPANY RECONSTRUCTION

1.   **Company reconstruction**: This Rule applies if there occurs in relation to any of a Participant's Plan Shares (the "Original Shares") a transaction:

viii.   which results in a new holding (the "New Holding") being equated with the Original Shares for the purposes of capital gains tax; or

ix.   that would have that result but for the fact that what would be the new holding would consist of or include a Qualifying Corporate Bond.

Such a transaction shall be referred to in this Rule as a Company Reconstruction.

2.   **Excluded Shares**: If, as part of a Company Reconstruction, any:

x.   redeemable shares or securities issued as mentioned in section 1000(1) CTA 2010;

xi.   share capital issued in circumstances such that section 1022 CTA 2010; or

xii.   share capital to which section 410 ITTOIA applies that is issued in a case where subsection (2) or (3) of that section applies,

is/are issued (and in respect of which a charge to income tax arises) those shares shall not form part of the New Holding for the purposes of this Rule.

3.   **New Shares**: In this Rule "New Shares" means, subject to Rule 9.2, shares comprised in the New Holding which were issued in respect of, or otherwise represent, the Original Shares.

4.   **Effect on Original Shares**: For the purposes of the Plan:

xiii.   a Company Reconstruction shall be treated as not involving a disposal of the Original Shares;

xiv.    the date on which any New Shares are to be treated as having been Appropriated to or acquired on behalf of a Participant shall be that on which his Original Shares were so Appropriated or acquired;

xv.    the conditions in Part 4 (types of shares that may be used) of Schedule 2 shall be treated as fulfilled with respect to any New Shares if they were (or were treated as) fulfilled with respect to the Original Shares; and

xvi.    the provisions of sections 489 to 514 of ITEPA, sections 392 and 405 to 408 and section 770 of ITTOIA, sections 488 to 490 ITA and Part 1 of Schedule 7D to the Taxation of Chargeable Gains Act 1992 shall apply in relation to the New Shares as they would have applied to the Original Shares.

5.    **References to Plan Shares**: Following a Company Reconstruction references to a Participant's Plan Shares shall be construed, subject to the above provisions, as being or, as the case may be, as including, references to any New Shares.

6.    **References to the Company**: Following a Company Reconstruction references to the Company in this Schedule shall, unless the context otherwise requires, be construed as referring to the successor company.

**EVENTS DURING HOLDING PERIOD**

1.    **Takeover**: A Participant may during the Holding Period of any of his Plan Shares direct the Trustee to:

xvii.    accept an offer for those Plan Shares ("the Original Shares") if such acceptance will result in a new holding being equated with the Original Shares for the purposes of capital gains tax; or

xviii.    accept an offer of a Qualifying Corporate Bond (whether alone or with other assets or cash or both) for those Plan Shares if the offer forms part of a general offer as mentioned in Rule 10.1(c) below; or

xix.    accept an offer of cash, with or without other assets, for those Plan Shares if the offer forms part of a general offer which is made to holders of shares of the same class as his shares in the Company and which is made in the first instance on a condition such that if it is satisfied the person making the offer will have control of the Company, within the meaning of sections 450 and 451 CTA 2010; or

xx.    agree to a transaction affecting those Plan Shares or those of them which are of a particular class, if the transaction would be entered into pursuant to a compromise, arrangement or scheme applicable to or affecting:

c.    all the ordinary share capital of the Company or, as the case may be, all the shares of the class in question; or

d.    all the shares, or all the shares of the class in question, which are held by a class of shareholders identified otherwise than by reference to their employment or their participation in an employee share ownership plan which is a Schedule 2 SIP.

**A315**

2.   **Compulsory acquisition**: In the case of a takeover offer (as defined in section 974 of the Companies Act 2006) there arises a right under section 983 of that Act to require the offeror to acquire the Participant's Free Shares, Matching Shares and Dividend Shares or such of them as are of a particular class, the Participant may direct the Trustee to exercise that right.

### SHARES IN LIEU OF CASH DIVIDENDS

1.   **Instructions to Trustee**: Subject to Part Five of the Schedule (Reinvestment of Cash Dividends), this Rule applies where the holders of any class of shares of which some are Plan Shares are offered the right to elect to receive Shares, credited as fully paid in whole or in part, instead of a cash dividend. Within 5 Dealing Days, or any other period the Trustee may decide, before the closing of the offer, the Participant may:

   xxi.      instruct the Trustee to elect to receive Shares; or

   xxii.     instruct the Trustee to elect to receive cash.

   As regards a Scrip Offer the Participant's election may be of particular or of general application and relate to Plan Shares appropriated before and after the date of the relevant dividend. In the absence of any instruction from the Participant, the Participant shall be deemed to have elected for cash.

2.   **Vesting of Shares**: Any Shares taken up by the Trustee on behalf of any Participant under this Rule shall not form part of the Participant's Plan Shares to which they relate and shall belong to the Participant. The Trustee shall, subject to Clause 11 of the Deed and its PAYE obligations or its obligations under paragraph 79 of Schedule 2 or sections 509 to 514 of ITEPA take all reasonable steps to procure that the Participant (or his nominee) receives the Shares as soon as practicable.

3.   **Cash dividends**: Any cash dividend paid in respect of a Participant's Plan Shares shall, subject to Part Five of the Schedule (Reinvestment of Cash Dividends), be paid to the Participant by, or on behalf of, the Trustee in accordance with Clause 6 of the Deed.

### FRACTIONAL ENTITLEMENTS

1.   **Proportionate allocation**: Where the Trustee receives additional rights or securities in respect of Plan Shares under a capitalisation or rights issue or similar offer or invitation, the Trustee shall allocate those rights or securities amongst the Participants concerned on a proportionate basis. If that allocation gives rise to a fraction of a security or of a transferable unit of a security (in this Rule "unit"), the Trustee shall round the allocation down to the next whole unit and aggregate the fractions not allocated. The Trustee shall use its best endeavours to sell any rights or units which are not allocated and distribute the net proceeds of sale (after deducting from them any expenses of sale and any taxation which may be payable in respect of them) proportionately among the Participants whose allocation was rounded down, but so that any sum of less than £3 otherwise distributable to a particular Participant may be retained by the Trustee and used for the purposes of the Plan.

2.   **Allocation by reference to time of Appropriation**: In any circumstances in which the Trustee receives New Shares which form part of a Participant's Plan Shares, the Trustee shall allocate the New Shares to the Participant by reference to the relative times of Appropriation

**A316**

or acquisition of his Plan Shares to which they relate. If that allocation gives rise to a fraction of a New Share, the Trustee shall, subject to ITEPA, round the allocation up or down to the next whole unit as it, in its discretion, thinks fit.

**TRANSFER OF PLAN SHARES**

Subject to Clause 11.3 of the Deed, the Trustee shall as soon as practicable after it is required to under the Plan, either transfer the legal title to any Plan Shares it holds on behalf of that Participant into the name of the relevant Participant (or his nominee).

**STAMP DUTY**

1.      Subject to Rule 14.1(b) any stamp duty or other expenses involved in any transfer of Shares by the Trustee shall be payable:

xxiii.      In the case of a transfer into the name of the Participant concerned, by the Trustee (and reimbursed by the Company);

xxiv.      in any other case, by the transferee concerned; and

xxv.      any broker's fees or dealing costs arising on the sale of a Participant's Plan Shares shall be paid by the Participant concerned.

**NOTICES**

1.      **Instructions to Trustee**: Any instruction given to the Trustee by or on behalf of a Participant or any person in whom the beneficial interest in his Plan Shares is for the time being vested under the Plan may be given in writing or electronically and, unless given electronically, signed by the relevant person.

2.      **Notices**: Any notice or other communication under or in connection with the Plan may be given in such form as the Board considers to be appropriate which may include communication by email (in the case of an individual to his last known email address) or by intranet or by personal delivery or by sending the same by post. If the notice is sent by post it shall be deemed to have been duly given on the day following the date the notice is posted or if sent by electronic mail or by other electronic means on the day following the date of transmission except that in the case of a notice or communication given by an Eligible Employee, Qualifying Employee or Participant, it shall be effective only upon receipt by the Company (or Subsidiary) or Trustee, as the case may be.

**DISPUTES**

The decision of the Board on any dispute or question affecting any Eligible Employee, Qualifying Employee, Participating Company or Participant under the Plan shall be final and conclusive.

**TERMS OF EMPLOYMENT**

1.      **Rights of Participants and Eligible Employees**: Participation in the Plan is not pensionable. Nothing in the Plan nor in any instrument executed under it will confer upon any person any right to continue in Employment, or will affect the right of any Participating Company to

terminate the Employment of any person without liability at any time with or without cause, or will impose upon any Participating Company or the Trustee or the Board or their respective agents and employees any liability whatsoever (whether in contract, tort, or otherwise howsoever) in connection with:

xxvi.     the loss of a Participant's benefits or rights under the Plan;

xxvii.    the failure or refusal of any person to exercise any discretion under the Plan; and/or

xxviii.   a Participant ceasing to be a person who has the status or relationship of an employee or executive director with the Company or any other Participating Company or Associated Company for any reason as a result of the termination of his Employment.

2.    **Waiver of any rights**: Any person whose employment with a Participating Company or an Associated Company ceases for any reason as a result of dismissal (lawfully or otherwise) shall not be entitled and shall be deemed irrevocably to have waived any entitlement by way of damages for dismissal or by way of compensation for loss of office or otherwise to any sum, damages, Shares or other benefits to compensate that person for the loss of any rights, benefits or expectations under the Plan or any instrument executed under it.

3.    **The Benefit of Rule 17.1 and Rule 17.2**: The benefit of Rule 17.1 and Rule 17.2 is given for the Company and/or the Trustee, as appropriate, for itself and as trustee and agent of the Company (if the benefit is given for the Trustee), and of all the Company's Subsidiaries or any of its Associated Companies and the Company and/or the Trustee, as appropriate, will hold the benefit of Rule 17.1 and Rule 17.2 on trust and as agent for each of them and the Company and/or the Trustee may, at their respective discretion, assign the benefit of this Rule 17.3 to any of them.

4.    **No obligations to make contributions**: Nothing in the Plan shall be construed as imposing on a Participating Company a contractual obligation as between that Participating Company and any Qualifying Employee or Participant to contribute or to continue to contribute to the Plan.

**TERMINATION OF THE PLAN**

1.    **The effect of issuing a Plan termination notice**: If the Company issues a Plan Termination Notice in accordance with Clause 16.2 of the Deed then:

xxix.     no further Shares may be Appropriated under the Plan;

xxx.      the Trustee must, subject to Rule 18.2, remove a Participant's Plan Shares from the Plan as soon as practicable after the end of (i) the period of three months beginning with the date on which a copy of the Plan Termination Notice is provided in accordance with Clause 16.2 of the Deed; or (ii) if later, the first date on which that Participant's Plan Shares may be removed from the Plan without giving rise to a charge to income tax under sections 501 to 507 of ITEPA on that Participant; and

xxxi.     the Trustee must as soon as practicable pay to Participants any money held on their behalf, including any Partnership Share Money and any amount of cash dividend held

for acquiring Dividend Shares on their behalf that has not yet been reinvested (subject to deduction of income tax under PAYE and NICs as appropriate.)

2.  **Participant's consent to early release**: The Trustee may, with the Participant's consent, remove a Participant's Plan Shares at a date earlier than that given under Rule 18.1(b). For this purpose, any consent given by a Participant before he receives a copy of the Plan Termination Notice shall be disregarded.

3.  **How the Trustee removes Plan Shares from the Plan**: The Trustee removes a Participant's Plan Shares from the Plan by:

xxxii.      transferring them to that Participant or to another person at his direction; or

xxxiii.     disposing of them and accounting (or holding themselves ready to account) for the proceeds to that Participant or to another person at his direction.

If the Participant has died, references to this Rule to the Participant shall be read as references to his personal representatives.

**Part c.**

**Free Shares**

**INVITATION TO PARTICIPATE**

If the Board resolves that an Appropriation of Free Shares shall be made, it shall invite all Eligible Employees who are not at that time a party to a Participation Contract, to participate by issuing to them a Participation Contract. To consent to the Appropriation of Free Shares an Eligible Employee must return the Participation Contract duly completed by the date specified in it. An Eligible Employee who does not return a Participation Contract by the specified date shall be deemed to have declined to participate in the Plan at that time. The Board shall specify the Holding Period for the Free Shares to be Appropriated on an Appropriation Date. The Holding Period of any Free Shares already Appropriated under the Plan cannot be increased.

**MAXIMUM VALUE OF FREE SHARES APPROPRIATED**

The maximum aggregate Initial Market Value of the Free Shares Appropriated to a Qualifying Employee in an Appropriation Year shall not exceed the maximum amount permitted by paragraph 35 of Schedule 2 from time to time (currently £3,600). For the purposes of applying this limit, the Initial Market Value of the Free Shares shall be converted into US dollars by applying the Conversion Rate at the relevant Appropriation Date.

**PERFORMANCE MEASURES AND TARGETS**

1. **Appropriation may be subject to performance measures**: An Appropriation of Free Shares may be made subject to performance measures and targets as provided for under this Rule 3.

2. **Requirements as to performance measures**: If any Appropriation of Free Shares under

   the Plan is to be made subject to performance measures they must be:

   xxxiv.    provided for all persons who are Eligible Employees in respect of that Appropriation;

   xxxv.    based on business results or other objective criteria;

   xxxvi.    fair and objective measures of the performance of the Performance Units to which they apply;

   xxxvii.    set for Performance Units where no employee can be a member of more than one Performance Unit; and

   xxxviii.    be either Restricted Performance Measures or Unrestricted Performance Measures.

3. **Restricted Performance Measures**: If the Board decides to Appropriate Free Shares by reference to Restricted Performance Measures then at least 20 per cent. of the Free Shares to be Appropriated must be Appropriated without reference to performance measures and shall be Appropriated on the same terms as required by Rule 1 of Part Two of the Schedule. The remaining Free Shares shall be Appropriated subject to performance measures but so that, in respect of that Appropriation, the highest Appropriation made to a Qualifying

A320

Employee by reference to performance shall be no more than four times the highest Appropriation to a Qualifying Employee without reference to performance. The Free Shares awarded by reference to performance need not be allocated on the same terms as required by Rule 1 of Part Two of the Schedule.

4.      **Unrestricted Performance Measures**: If the Board decides to Appropriate Free Shares by reference to Unrestricted Performance Measures some or all of the Free Shares shall be Appropriated by reference to performance measures but so that:

xxxix.      Appropriations of Free Shares to Qualifying Employees who are members of the same Performance Unit shall be made on the same terms as required by Rule 1 of Part Two of the Schedule;

xl.      Free Shares Appropriated for each Performance Unit shall be treated as separate Appropriations; and

xli.      in the opinion of the Board, the performance measures for each Performance Unit can be reasonably viewed as comparable; and

xlii.      such performance measures are consistent targets (as defined for the purposes of paragraph 42(3) of Schedule 2).

5.      **Company's obligation to notify**: If an Appropriation of Free Shares under the Plan is to be made subject to performance measures and targets the Company must, as soon as reasonably practicable, notify:

xliii.      each Eligible Employee participating of the performance measures and targets which will be used to determine the number or value, as appropriate, of Free Shares Appropriated to him; and

xliv.      Eligible Employees in general terms of the performance measures and targets which will be used to determine the number or value, as appropriate, of Free Shares to be Appropriated to each Eligible Employee participating in that Appropriation.

6.      **Confidential Information:** In fulfilling its obligation under Rule 3.5(b) above the Company shall not be obliged to disclose any information which the Board reasonably considers would prejudice commercial confidentiality.

### BASIS OF APPROPRIATION

1.      **Free Shares – no performance measures**: Free Shares to be Appropriated to Qualifying Employees pursuant to Rule 1 shall be Appropriated on a basis determined by the Board but so that such basis complies with Rule 1 of Part Two of the Schedule.

2.      **Free Shares – performance measures**: The Board shall determine in respect of any Appropriation of Free Shares to be made subject to performance measures (i) what the Performance Units are to be for that Appropriation; (ii) what performance measures and

targets are to be used; and (iii) whether the performance measures are Restricted Performance Measures or Unrestricted Performance Measures.

**a.**

**Partnership Shares and Matching Shares**

**INVITATIONS**

1.   **Invitations to Eligible Employees**: If the Board decides to give Eligible Employees the opportunity to acquire Partnership Shares, each Eligible Employee will be sent a Partnership Share Agreement under which, if entered into:

   i.   the Eligible Employee would authorise the Company to deduct part of his Salary for the acquisition of Partnership Shares; and

   ii.   the Company would agree to arrange for Partnership Shares to be acquired on behalf of the Eligible Employee in accordance with the Plan.

   To participate in the opportunity to acquire Partnership Shares an Eligible Employee must return the Partnership Share Agreement duly completed by the date specified in it. Any Eligible Employee who does not return a Partnership Share Agreement by the specified date shall be deemed to have declined to participate in the opportunity to acquire Partnership Shares at that time.

2.   **Maximum deductions from Salary**: The Partnership Share Agreement must stipulate the maximum amount of Partnership Share Money (or percentage of Salary) that may be deducted from an Eligible Employee's Salary and the intervals at which such deductions are to be made, but so that the maximum amount cannot exceed the amount permitted by paragraph 46 of Schedule 2 from time to time (currently £1,800) and cannot, in any event, exceed ten per cent. of the Eligible Employee's Salary.

3.   **Percentage of Salary**: For the purposes of Rule 1.2 above, ten per cent. of Salary shall mean:

   iii.   if the Partnership Share Agreement does not provide for an Accumulation Period, ten per cent. of the Salary payment from which the deduction is made; and

   iv.   if the Partnership Share Agreement provides for an Accumulation Period, ten per cent. of the Salary payments over the Accumulation Period.

4.   **Minimum deductions from Salary**: The Partnership Share Agreement in respect of any invitation shall also stipulate that the monthly amount (irrespective of the interval for deductions) to be deducted from a Participant's Salary in pursuance of that Agreement must not be less than a specified minimum amount which must not be greater than £10 (or any other amount specified by paragraph 47(2) of Schedule 2).

5.   **Prescribed notice**: The Partnership Share Agreement must contain a notice in a prescribed form in compliance with paragraph 48 of Schedule 2.

   **PARTNERSHIP SHARE MONEY**

1.   **Payment to Trustee**: Any Partnership Share Money shall be paid to the Trustee as soon as practicable following its deduction from a Qualifying Employee's Salary and shall be held by the Trustee on his behalf pending its application in accordance with Rule 3.1 or 4.3 of this Part Four, as appropriate, in an account (interest-bearing or otherwise) with:

    v.     a person falling within section 991(2)(b) ITA (certain institutions permitted to accept deposits);

    vi.    a building society; or

    vii.   a relevant European institution within section 991(2)(c) ITA.

    If the Partnership Share Money held on behalf of a Qualifying Employee is held in an interest-bearing account, the Trustee shall account for the interest to that Qualifying Employee. The Trustee is, however, not obliged to keep monies in an interest bearing account.

2.   **Repayment if the Plan ceases to be a Schedule 2 SIP**: If the Plan ceases to be a Schedule 2 SIP by virtue of paragraph 81H or 81I of Schedule 2 and the period for an appeal has expired or an appeal has been unsuccessful or withdrawn, any Partnership Share Money held by the Trustee on behalf of a Participant must be paid to that Participant as soon as practicable after the expiry of such period or on the date the appeal is adjudged unsuccessful or withdrawn (as applicable).

### NO ACCUMULATION PERIOD

1.   **Acquisition of Shares**: Any Partnership Share Money deducted from a Participant's Salary under a Partnership Share Agreement with no Accumulation Period will be applied by the Trustee in acquiring Partnership Shares on a date (the "Acquisition Date") set by the Trustee which is within 30 days after the deduction is made. The number of Shares acquired on behalf of a Participant shall be determined by reference to the Market Value (converted into a pounds Sterling equivalent by application of the Conversion Rate) of the Shares on that Acquisition Date.

2.   **Surplus Partnership Share Money**: Any surplus Partnership Share Money remaining after the acquisition of Partnership Shares by the Trustee on behalf of a Participant may, with the agreement of the Participant (which may be provided for in the Partnership Share Agreement), be carried forward and added to the amount of the next deduction of Salary. In any other case it must be paid over to the Participant in pounds Sterling (subject to deduction of income tax under PAYE and NICs, as appropriate) as soon as practicable.

### ACCUMULATION PERIOD

1.   **Accumulation Period**: If the Board decides to offer an Accumulation Period in respect of an invitation to acquire Partnership Shares, the Partnership Share Agreement must specify:

    viii.   the length of the Accumulation Period (which cannot exceed twelve months or, if different, any period specified from time to time in paragraph 51 (1) of Schedule 2);

    ix.     the date of the start of the Accumulation Period (which may not be later than the date on which the first deduction of Salary is made under that Agreement); and

A324

x.  the date of the end of the Accumulation Period and whether the Accumulation Period will come to an end on the occurrence of (a) specified event(s).

2.  **Transaction resulting in a new holding**: If, during an Accumulation Period, a transaction occurs in relation to any Partnership Shares ("the original holding") to be acquired under a Partnership Share Agreement which results in a new holding of shares being equated with the original holding for the purposes of capital gains tax and the Participant so consents, the Partnership Share Agreement shall have effect after the time of that transaction as if it were an agreement for the purchase of shares comprised in the new holding.

3.  **Acquisition of Shares**: Subject to Rule 4.5, the Partnership Share Money deducted in respect of a Participant during an Accumulation Period must be applied by the Trustee in acquiring Partnership Shares on behalf of that Participant on a date (the "Acquisition Date") set by the Trustee which is within 30 days after the end of that Accumulation Period. The number of Shares acquired on behalf of a Participant will be determined in accordance with any of the following methods:

xi.  by reference to the lower of:

a.  the Market Value of the Shares at the beginning of the Accumulation Period; and

b.  the Market Value of the Shares on the Acquisition Date;

xii.  by reference to the Market Value of the Shares on the first day of the Accumulation Period; or

xiii.  by reference to the Market Value of the Shares on the Acquisition Date,

in each case having been converted into a pounds Sterling equivalent by application of the Conversion Rate.

4.  **Surplus Partnership Share Money**: Any surplus Partnership Share Money remaining

after the acquisition of Partnership Shares by the Trustee may, with the agreement of the Participant (which may be provided for in the Partnership Share Agreement), be carried forward to the next Accumulation Period. In any other case it must be paid over to the Participant in pounds Sterling (subject to deduction of income tax under PAYE and NICs, as appropriate) as soon as practicable.

5.  **Repayment of Partnership Share Money**: In any case where Partnership Share Money has been deducted in an Accumulation Period and either:

xiv.  the Participant ceases to be in Employment or employed by an Associated Company during that Accumulation Period; or

xv.  the Accumulation Period comes to an end on the occurrence of an event specified in the Partnership Share Agreement,

the Partnership Share Money deducted in that Accumulation Period must be paid over to the Participant in pounds Sterling (subject to deduction of income tax under PAYE and NICs, as appropriate) as soon as practicable.

**STOPPING, RE-STARTING AND VARYING DEDUCTIONS**

1.      **Stopping deductions**: A Participant may at any time after entering into a Partnership Share Agreement give notice to the Company to stop deductions from his Salary in pursuance of that Partnership Share Agreement.

2.      **Re-starting deductions**: A Participant who has stopped deductions from his Salary in pursuance of a Partnership Share Agreement may subsequently give notice to the Company to re-start deductions from his Salary in pursuance of that Partnership Share Agreement. However:

   xvi.       any deductions that have been missed may not be made up; and

   xvii.      where the deductions are made during an Accumulation Period the Partnership Share Agreement may prevent a Participation from re-starting deductions more than once in that Accumulation Period.

3.      Termination of Partnership Share Agreement: Notwithstanding any other provision of the Plan, a Partnership Share Agreement will terminate:

   xviii.     at any time by the Participant giving notice to the Company;

   xix.       if the Participant ceases to be in employment or employed by an Associated Company, or where a Partnership Share Agreement terminates (whether pursuant to this Rule or otherwise), no further deductions shall be made from his Salary and any Partnership Share Money held on his behalf shall be paid over to him (subject to deduction of income tax under PAYE and NICs, as appropriate) as soon as practicable;

   xx.        if the Company gives notice to all Participants holding subsisting Partnership Share Agreements that no further deductions of Salary will be made under those Partnership Share Agreements which do not provide for an Accumulation Period.

4.      **Varying Deductions** : Without prejudice to the rights of a Participant pursuant to Rules 5.1, 5.2 and 5.3, a Participant may only vary the level of deductions from his Salary pursuant to his Partnership Share Agreement with the agreement of the Company.

5.      **Effect of notice under Rules 5.1, 5.2 and 5.3**:

   Unless a later date is specified in any notice given under:

   xxi.       Rules 5.1, and 5.3(a) above, the Company must give effect to such a notice within 30 days of receiving it; or

   xxii.      Rule 5.2 above, the Company must re-start deductions under the Partnership Share Agreement no later than the date of the first deduction due under the Partnership Share Agreement more than 30 days after receipt of the notice.

**WITHDRAWAL OF PARTNERSHIP SHARES**

   A Participant may withdraw his Partnership Shares from the Plan at any time.

**NUMBER OF PARTNERSHIP SHARES THAT CAN BE ACQUIRED**

1.  **Limit specified at time of invitation**: The Company may specify at the time of making an invitation under Rule 1 the maximum number of Partnership Shares that can be acquired on behalf of Eligible Employees in respect of that invitation. The Partnership Share Agreement shall contain an undertaking by the Company to notify each Qualifying Employee of any limit on the number of shares to be acquired:

    xxiii.    if there is no Accumulation Period, before the deduction of any Partnership Share Money under the Partnership Share Agreement; or

    xxiv.    if there is an Accumulation Period, before the beginning of the Accumulation Period under the Partnership Share Agreement.

2.  **Scaling down**: If the Company receives applications for Partnership Shares in excess of the maximum number of Partnership Shares specified in respect of that invitation under Rule 7.1 then the following steps shall be taken in sequence until the excess number is eliminated:

    xxv.    the excess of the monthly deduction chosen by each Qualifying Employee over the amount stipulated under Rule 1.4 shall be reduced pro rata;

    xxvi.    all monthly deductions shall be reduced to the amount stipulated under Rule 1.4; and

    xxvii.    Partnership Share Agreements shall be selected by lot, each based on a monthly deduction of the amount stipulated under Rule 1.4.

3.  **Modification/Withdrawal and Notification**: If Rule 7.2 applies each Partnership Share Agreement shall be deemed to have been modified or withdrawn in accordance with Rule 7.2 and each Qualifying Employee shall be notified of the change to his Partnership Share Agreement

    **MATCHING SHARES**

1.  **Matching Shares**: The Board may decide to offer Matching Shares in conjunction with an invitation to acquire Partnership Shares. The Partnership Share Agreement under which Matching Shares are offered must state the extent (if any) to which the Matching Shares Appropriated to a Participant in respect of the associated Partnership Shares will be forfeited if the Participant, other than in the event of a Permitted Cessation:

    xxviii.    ceases to be in Employment or employed by an Associated Company other than on a Permitted Cessation; or

    xxix.    withdraws the Matching Shares from the Plan; or

    xxx.    withdraws the associated Partnership Shares from the Plan,

    in each case within such period stated in the Partnership Share Agreement (not to exceed three years) after the relevant Shares were Appropriated to him or acquired on his behalf, as appropriate.

2.      **Terms of Matching Shares**: Matching Shares shall:

    xxxi.      be Shares of the same class and carrying the same rights as the Partnership Shares to which they relate;

    xxxii.      be Appropriated on the same day as the Partnership Shares to which they relate are acquired on behalf of the Participant; and

    xxxiii.      in respect of any Appropriation, be Appropriated to all Participants on exactly the same basis.

3.      **Ratio of Matching Shares**: The Partnership Share Agreement under which Matching Shares are offered must specify the ratio of Matching Shares to Partnership Shares for the time being offered by the Company and the circumstances and manner in which the ratios may be changed by the Company. The ratio must not exceed 2:1 (or such other ratio permitted by paragraph 60 (2) of Schedule 2 from time to time). The Participant must be informed by the Company if the ratio offered by the Company changes before Partnership Shares are acquired on his behalf under the relevant Partnership Share Agreement.

4.      **Holding Period and Trustee authorisation**: The provisions of Rules 2.1, 7 and 10 of Part Two of the Schedule and Clause 11.3 of the Deed shall apply with the necessary amendments in respect of Matching Shares offered under this Part Four of the Schedule.

**a.**

**Reinvestment of Cash Dividends**

**PERMITTED REINVESTMENT**

1. **Mandatory or Voluntary Reinvestment**: At the time of operating Part Three or Part Four of the Schedule, the Board may in its discretion direct that some or all of cash dividends paid in respect of any Plan Shares Appropriated or acquired on behalf of a Participant as a consequence of that operation must either:

    i.   be applied in acquiring Dividend Shares on behalf of the Participant; or

    ii.  be applied in acquiring Dividend Shares only on behalf of Participants who elect to reinvest those dividends.

    If the Board decides to impose or allow such a facility under the Plan, the provisions of this Part Five of the Schedule shall apply.

    The Board may at any time revoke or amend any direction for reinvestment of cash dividends made pursuant to this Rule 1.

    In any direction is given or amended under this Rule 1, the Board shall set out the amount of cash dividends to be applied by the Trustee in accordance with this Rule 1 or how that amount is to be determined.

2. **Dividend Shares/Holding Period**: Dividend Shares shall be shares of the same class and carrying the same rights as the Shares to which the cash dividend relates and may not be subject to forfeiture. Dividend Shares shall be acquired on behalf of a Participant subject to a Free Share or/and Partnership Share Agreement which, subject to its provisions, binds the Participant to permit the Dividend Shares acquired on his behalf to remain in the hands of the Trustee throughout the Holding Period applicable to them and not to assign, charge or otherwise dispose of his beneficial interest in any of those Dividend Shares during their Holding Period. The Holding Period for Dividend Shares shall be three years from their Acquisition Date (or such other period as may be permitted under paragraph 67 of Schedule 2 from time to time).

**ACQUISITION OF DIVIDEND SHARES**

1. **Time of acquisition**: Subject to Rule 2.3, the Trustee must apply a cash dividend paid in respect of Plan Shares that is to be reinvested in acquiring Dividend Shares on a date (the "Acquisition Date") set by the Trustee which is a date within 30 days of the date on which the cash dividend is received by it. The Trustee must, in exercising its powers in relation to the acquisition of Dividend Shares, treat Participants fairly and equally and may, for these purposes, use any unappropriated Shares that it holds.

2. **Number of Dividend Shares acquired**: The number of Dividend Shares acquired on behalf of a Participant shall be determined by the Market Value of those Shares on their Acquisition Date.

**A329**

3.      **Carry forward of uninvested amounts**: Any amount of a cash dividend available for reinvestment that is not reinvested because it is insufficient to acquire a Dividend Share on behalf of a Participant may be retained by the Trustee (in pounds Sterling) and carried forward and added to the amount of the next cash dividend to be reinvested for that Participant. However, any such amount retained by the Trustee must be paid over to the Participant (in Sterling) as soon as practicable:

iii.        if the Participant ceases to be in Employment or employed by an Associated Company prior to its reinvestment; or

iv.         if a Plan Termination Notice is issued prior to its reinvestment.

For the purposes of this Rule an amount of cash dividend carried forward from an earlier cash dividend shall be treated as reinvested before an amount derived from a later cash dividend.

a.

**Deed of Adherence**

**THIS DEED** is made the 18th day of August 2020

**BETWEEN**:

(1)     **ALCON INC.** (the "Company");

(2)     **SOLIUM TRUSTEE (UK) LIMITED** (the "**Trustee**"); and

(3)     **ALCON EYE CARE UK LIMITED** (the "**Adhering Company**").

and is supplemental to the Trust Deed and Rules (the "**Trust Deed**") of the Alcon Inc. UK Share Incentive Plan (the "**Plan**") executed by the Company and the Trustee on 18 August 2020.

**WHEREAS**:

(A)     The Adhering Company was incorporated on the 16th day of June 20 1964 and on the 12th day of September 2018 became a Subsidiary under the Control of the Company;

(B)     The Adhering Company wishes to become a Participating Company under, and to invite its Eligible Employees to participate in, the Plan.

**NOW THIS DEED WITNESSES** as follows:

Terms and expressions used in this deed of adherence shall, unless the context otherwise requires, have the same meaning as in the Trust Deed.

The Adhering Company agrees to become a Participating Company and to be bound by the terms of the Trust Deed.

**IN WITNESS** of which this Deed of Adherence has been delivered as a deed on the date written above.

**EXECUTED AS A DEED** by     )

**ALCON INC.** acting by:   )

/s/ Carla Rupp

Sr. Director, Global Rewards Operations

**EXECUTED AS A DEED** by **SOLIUM TRUSTEE (UK) LIMITED**   )

**A331**

acting by:                    )

/s/ Iain Wilson

Director / Secretary

**EXECUTED AS A DEED** by **SOLIUM TRUSTEE (UK) LIMITED**    )

acting by:                    )

/s/ June Davenport

Director / Secretary

**APPENDIX 1**

**Alcon Inc. UK Share Incentive Plan (the "Plan"): Free Share Agreement**

PLEASE USE BLOCK CAPITALS AND READ THE WHOLE OF THE AGREEMENT BEFORE SIGNING BELOW

This agreement is between the above named parties.

**Participant (the "Participant")**
Name:
Home Address:
<u>Payroll Number:</u>
**Company (the "Company")**
Name: Alcon Inc.
Registered Address: Chemin de Blandonnet 8, 1214 Vernier, Geneva V8 0000
**This agreement sets out the terms on which the Participant agrees to take part under the terms of the Plan and is subject to the rules of the Plan.**
**The definitions in the Plan Rules apply to this agreement:**

**PARTICIPANT**

I agree to accept the Free Shares in the Company awarded to me under the Plan.

I agree to leave the Free Shares in the hands of the Trustees, and not to assign, charge or otherwise dispose of my beneficial interest in the shares for the whole of the Holding Period of [insert number of years being not less than 3 and not more than 5].

I agree that the dividends paid on my shares will be used by the Trustees to buy more shares in the Company for me according to the rules of the Plan.

I agree to leave the Dividend Shares in the hands of the Trustees, and not to assign, charge or otherwise dispose of my beneficial interest in the shares for the whole of the Holding Period of 3 years.

I have read this agreement and agree to be bound by it and by the rules of the Plan.

The Company agrees to arrange for shares in the Company to be awarded and bought for me, according to the rules of the Plan.

Rule 6 of Part 2 of the Plan shall apply to any award of Free Shares. The number of Free Shares to be awarded by reference to performance shall be determined using the methods specified in Rule 3.2, 3.3 or 3.4 of Part 3 of the Plan.

For the purposes of administering the Plan, the Company, any Participating Company and any Associated Company will collect and process information relating to each Participant in accordance with the privacy notice currently available on the Company's intranet.

**Signature:**                    **Date:**

**Rights and Obligations**

I agree that taking part in the Plan does not affect my rights, entitlements and obligations under my contract of employment, and does not give me any rights or additional rights to compensation or damages if my employment ceases.

I may ask the Trustees for my Free Shares and Dividend Shares at any time after the end of the Holding Period, but I may have to pay income tax and National Insurance Contributions when they are taken out of the Plan.

I agree to allow the Trustees to sell some or all of my shares to pay any income tax and National Insurance Contributions in respect of my shares ceasing to be subject to the Plan, unless I provide them in advance with sufficient funds to pay these amounts.

If there is a rights issue, I agree to allow the Trustees to sell some of the rights attached to my shares in the Plan, to exercise the rights attached to other shares held by me in the Plan.

I can at any time withdraw from this agreement, by writing to my employer.

I agree that withdrawal from this agreement will not affect the terms on which I agreed to accept any shares that have already been awarded to or bought for me under the terms of the Plan.

I understand that my obligations during the Holding Period will end:

1.    if I cease to be in Relevant Employment, and this may lead to forfeiture of the Free Shares;

2.    if the Company terminates the Plan in accordance with Clause 16 of the Deed and I have consented to the transfer of the Shares to me.

I understand that my obligations under the Holding Period are subject to:

1.    the right of the Trustee to sell my shares to meet PAYE and NIC obligations;

2.    the Trustees accepting at my direction an offer for my shares in accordance with the Plan.

Unless the board of directors of the Company or a duly constituted committee of it (the **"Board"**) determines otherwise I will lose my Free Shares if I cease to be in Relevant Employment within [insert time not exceeding 3 years] from the date of the Award, **unless the employment ceased for one of the following reasons:**[3]

**A334**

1.      death or incapacity due to ill health or accident (such incapacity reasonably being expected to be permanent);

2.      retirement on terms agreed with the Board;

3.      redundancy; or

4.      wrongful dismissal.

**Dividend Reinvestment**

All cash dividend will be used to buy more shares (Dividend Shares) for me.

Any amount not used to buy shares shall be carried forward and added to the next cash dividend to be reinvested.

**A335**

**APPENDIX 2**

**The Alcon Inc. UK Share Incentive Plan (the "Plan"): Partnership Share Agreement**

**This agreement is between:**

| Participant (the "Participant") | Alcon Inc. (the "Company") | SOLIUM TRUSTEES (UK) LIMITED |
|---|---|---|
| Name:<br><br>Home Address:<br><br><br><br>Payroll Number: | Address: Chemin de Blandonnet 8, 1214 Vernier, Geneva V8 0000 | New Penderel House, 4th Floor, 283-288 High Holborn, London, WC1V 7HP |

**This agreement sets out the terms on which the Participant agrees to buy shares under the terms of the Plan and is subject to the rules of the Plan. The definitions in the Plan Rules apply to this agreement.**

**NOTICE TO PARTICIPANT ABOUT POSSIBLE EFFECT ON BENEFITS**

Deductions from your pay to buy partnership shares under this agreement may affect your entitlement to or the level of, some contributory social security benefits, statutory maternity pay and statutory sick pay.

They may also have a similar effect in respect of some contributory social security benefits paid to your spouse or civil partner.

With this agreement you should have been given information on the effect of deductions from your pay to buy partnership shares on entitlement to social security benefits, statutory sick pay and statutory maternity pay. The effect is particularly significant if your earnings are brought below the lower earnings limit

for National Insurance purposes, and is explained in the information: it is therefore important that you read it. If you have not been given a copy, ask your employer for it. Otherwise a copy may be obtained from any office of HM Revenue & Customs, Department of Social Security, or, in Northern Ireland, the Department for Social Development. You should take the information you have been given into account in deciding whether to buy partnership shares.

**PARTICIPANT**

I agree to allow my employer to deduct the following amount per [insert period, e.g. month] from my Salary:

 £

*(insert amount between £10 and £150 (per month) and not more than 10% of your salary).*

I agree that these deductions will be used to buy Partnership Shares in the Company for me. I agree that the Trustee will accumulate my deductions from [Company to specify beginning and end of Accumulation Period if there is one] and buy Partnership Shares in the Company for me after the end of the Accumulation Period.

I agree to accept Matching Shares in the Company awarded to me under the Plan and leave them in the hands of the Trustee, and not to assign, charge or otherwise dispose of my beneficial interest in the shares for the whole of the Holding Period of 3 years.

I agree that all dividends paid on my shares will be used by the Trustee to buy more shares in the Company for me according to the rules of the Plan. I agree to accept the Dividend Shares bought for me and leave them in the hands of the Trustee, and not to assign, charge or otherwise dispose of my beneficial interest in the shares for the whole for the whole of the Holding Period of 3 years.

I understand that shares may fall in value as well as rise.

I have read this agreement and agree to be bound by it and by the rules of the Plan.

For the purposes of administering the Plan, the Company, the Trustee, any Participating Company and any Associated Company will collect and process information relating to each Participant in accordance with the privacy notice currently available on the Company's intranet.

**COMPANY**

A337

The Company agrees to arrange for shares in the Company to be bought for me, according to the rules of the Plan.

The Company agrees to provide 1 Matching Share for every 2 Partnership Shares.

The Company undertakes to notify me of any restriction on the number of Partnership Shares available in the (or each) Award.

**TRUSTEE**

The Trustee agrees to keep my Salary deductions in a ring fenced trust bank account until they are used to buy shares in the Company for me.

**Signature:   Date: _____**

PLEASE USE BLOCK CAPITALS AND READ THE WHOLE OF THE AGREEMENT BEFORE SIGNING

**A338**

**Rights and Obligations**

I agree that taking part in the Plan does not affect my rights, entitlements and obligations under my contract of employment, and does not give me any rights or additional rights to compensation or damages if my employment ceases.

I may stop the deductions at any time, or begin them again, by writing to my employer, but I may not make up any amounts missed when deductions were stopped.

I agree that the deductions from my salary, or the number of shares that I receive may be scaled down if the limit on the number of shares set by the Company for this award is exceeded.

I may ask the Trustee for my Partnership Shares at any time, but I may have to pay income tax and National Insurance Contributions when they are taken out of the Plan.

I agree to allow the Trustees to sell some or all of my shares to pay any income tax and National Insurance Contributions in respect of my shares ceasing to be subject to the Plan, unless I provide them in advance with sufficient funds to pay these amounts.

I agree that any deductions not used to buy shares will at the discretion of the Trustees be repaid to me after the deduction of any necessary income tax or National Insurance Contributions, or will be carried forward and added to the next deduction or Accumulation Period.

If there is a rights issue, I agree to allow the Trustee to sell some of the rights attached to my shares in the Plan, in order to fund the exercise of the rights attached to other shares held by me in the Plan.

I can at any time withdraw from this agreement by writing to my employer. Any unused deductions will be returned to me after the deduction of any necessary income tax or National Insurance Contributions.

I agree that withdrawal from this agreement will not affect the terms on which I agreed to buy shares already held for me under the Plan.

**Accumulation Period**

The Accumulation Period shall come to an end when *[specify nature of event(s)],* but this agreement shall continue until terminated by any party giving notice to the others.

**A339**

I may only restart deductions once in any Accumulation Period.

**Matching Shares**

The ratio of Matching Shares to Partnership Shares is 1:2 and may be varied by the Company. The circumstances and manner in which the ratio may be varied are *[company to specify details here]*.

If the ratio varies, the Company will notify me before the Partnership Shares are bought for me.

I will lose my Matching Shares if:

I cease to be in Employment, or

I withdraw the Partnership Shares in respect of which the Matching Shares were awarded

*(either or both of these options may be specified)* within 3 years from the date of the Award, unless the employment ceases for one of the following reasons:

i.        death or incapacity due to ill health or accident (such incapacity reasonably being expected to be permanent);

ii.       retirement on terms agreed with the Board;

iii.      redundancy; or

iv.      wrongful dismissal.

**Partnership Share Money held by Trustee**

The Trustee is under no obligation to keep the deductions in an interest-bearing account, but if they do, they will pay the interest to me.

**Dividend Reinvestment**

Cash dividends will be used to buy more shares (Dividend Shares) for me.

A340

**Holding Period: Dividend and Matching Shares**

I understand that my obligations during the Holding Period will end:

a.      if I cease to be in Employment, and this may lead to forfeiture of the Matching Shares;

b.      if the Company terminates the Plan and I have consented to the transfer of the Shares to me.

I understand that my obligations under the Holding Period are subject to:

a.      the right of the Trustees to sell my shares to meet PAYE obligations;

b.      the Trustees accepting at my direction an offer for my shares in accordance with the Plan.

Exhibit 12.1

**Certification of CEO Pursuant to Securities Exchange Act**
**Rule 13a-14(a)/15d-14(a) as Adopted Pursuant to**
**Section 302 of the Sarbanes-Oxley Act of 2002**

I, David J. Endicott, certify that:

1. I have reviewed this annual report on Form 20-F of Alcon Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: February 23, 2021    /s/ David J. Endicott

David J. Endicott
Chief Executive Officer

Exhibit 12.2

**Certification of CFO Pursuant to Securities Exchange Act
Rule 13a-14(a)/15d-14(a) as Adopted Pursuant to
Section 302 of the Sarbanes-Oxley Act of 2002**

I, Timothy C. Stonesifer, certify that:

1. I have reviewed this annual report on Form 20-F of Alcon Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;
4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:
    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c. Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d. Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and
5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):
    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and
    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: February 23, 2021     /s/ Timothy C. Stonesifer
Timothy C. Stonesifer
Chief Financial Officer

**Exhibit 13.1**

**Certification of CEO Pursuant to 18 U.S.C. Section 1350**

Pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned certifies that:

(1)     this annual report for Alcon Inc. (the "Company") on Form 20-F for the period ended December 31, 2020, as filed with the Securities and Exchange Commission on the date hereof (this "Report"), fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods covered therein.

/s/ David J. Endicott
David J. Endicott
Chief Executive Officer

February 23, 2021

**A344**

**Exhibit 13.2**

**Certification of CFO Pursuant to 18 U.S.C. Section 1350**

Pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned certifies that:

(1)   this annual report for Alcon Inc. (the "Company") on Form 20-F for the period ended December 31, 2020, as filed with the Securities and Exchange Commission on the date hereof (this "Report"), fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods covered therein.

/s/ Timothy C. Stonesifer
Timothy C. Stonesifer
Chief Financial Officer

February 23, 2021

**A345**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 (No. 333-230794) of Alcon Inc. of our report dated February 23, 2021 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 20-F.

/s/PricewaterhouseCoopers LLP

Fort Worth, Texas
February 23, 2021

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 (No. 333-230794) of Alcon Inc. of our report dated February 28, 2019 relating to the financial statements, which appears in this Form 20-F.

/s/ PricewaterhouseCoopers SA
Geneva, Switzerland
February 23, 2021

1

**A347**

# EXHIBIT 2




US


EXPERIENCE ALCON


SHOP


.COM


MENU

# COMPLETE CONFIDENCE: THE ACRYSOF® ADVANTAGE



IOLs

| Surgical Equipment | Procedural Eye Drops | IOLs | Disposables |



**ACRYSOF® IQ PANOPTIX®
TRIFOCAL IOL**

20/20 Near, Intermediate and
Distance Vision is Now
Possible*,†,1



**ACRYSOF® IQ RESTOR®
MULTIFOCAL IOL**

More Options to Broaden your
Patients' Outlook



**ACRYSOF® IQ TORIC IOL**

Managing Astigmatism with the
Unrivaled Stability2-4 of
AcrySof® IQ Toric IOL



**ACRYSOF® IQ MONOFOCAL IOL**

Offer Clarity, Stability and Quality
to Cataract Patients Who Value



**ULTRASERT® PRE-LOADED
DELIVERY SYSTEM**

A Pristine Untouched Optic5



**ACRYSOF® IOL VISION
SIMULATORS**

Invite Your Patients to See the
AcrySof® Difference

OCULAR
HEALTH

CONTACT
LENSES &
SOLUTIONS

REFRACTIVE
TECHNOLOGY

CATARACT
SURGERY

VITREORETINAL
SURGERY

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 355 of 635   PageID 726

*Based on mean value of binocular defocus curve at near, intermediate and distance at 6 months (n=127).

†Snellen VA was converted from logMAR VA. A Snellen notation of 20/20$^{-2}$ or better indicates a logMAR VA of 0.04 or better, which means 3 or more of the 5 ETDRS chart letters in the line were identified correctly.

**Click here for Important Product Information on these products**

SOLUTIONS FOR EVERY SET OF EYES

My Alcon     Professional     Cataracts IOL Options

Ocular Health

Contact Lenses & Solutions

Refractive Technology

Cataract Surgery

Vitreoretinal Surgery

Contact Us

Legal Information

Privacy Policy

Alcon.com

About Cookies

© 2020 Alcon Inc. 4/20 US-ACI-2000007

OCULAR        CONTACT        REFRACTIVE        CATARACT        VITREORETINAL
HEALTH        LENSES &       TECHNOLOGY        SURGERY         SURGERY
              SOLUTIONS

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 356 of 635   PageID 727

**_Alcon Statement on COVID-19_**

**_AcrySof® IQ PanOptix® Family of Trifocal IOLs Important Product Information_**

**_CAUTION:_** _Federal (USA) restricts this device to the sale by or on the order of a physician._ **INDICATIONS:** _The AcrySof® IQ PanOptix® Trifocal IOLs include AcrySof® IQ PanOptix® and AcrySof® IQ PanOptix® Toric IOLs and are indicated for primary implantation in the capsular bag in the posterior chamber of the eye for the visual correction of aphakia in adult patients, with less than 1 diopter of pre-existing corneal astigmatism, in whom a cataractous lens has been removed. The lens mitigates the effects of presbyopia by providing improved intermediate and near visual acuity, while maintaining comparable distance visual acuity with a reduced need foreyeglasses, compared to a monofocal IOL. In addition, the AcrySof® IQ PanOptix® Toric Trifocal IOL is indicated for the reduction of residual refractive astigmatism._ **WARNINGS/PRECAUTIONS**_: Careful preoperative evaluation and sound clinical judgment should be used by the surgeon to decide the risk/benefit ratio before implanting a lens in a patient with any of the conditions described in the Directions for Use labeling. Physicians should target emmetropia and ensure that IOL centration is achieved. For the AcrySof® IQ PanOptix® Toric Trifocal IOL, the lens should not be implanted if the posterior capsule is ruptured, if the zonules are damaged or if a primary posterior capsulotomy is planned. Rotation can reduce astigmatic correction. If necessary, lens repositioning should occur as early as possible prior to lens encapsulation. Some visual effects may be expected due to the superposition of focused and unfocused multiple images. These may include some perceptions of halos or starbursts, as well as other visual symptoms. As with other multifocal IOLs, there is a possibility that visual symptoms may be significant enough that the patient will request explant of the multifocal IOL. A reduction in contrast sensitivity as compared to a monofocal IOL may be experienced by some patients and may be more prevalent in low lighting conditions. Therefore, patients implanted with multifocal IOLs should exercise caution when driving at night or in poor visibility conditions. Patients should be advised that unexpected outcomes could lead to continued spectacle dependence or the need for secondary surgical intervention (E.g., intraocular lens replacement or repositioning). As with other multifocal IOLs, patients may need glasses when reading small print or looking at small objects. Posterior capsule opacification (PCO) may significantly affect the vision of patients with multifocal IOLs sooner in its progression than patients with monofocal IOLs. Prior to surgery, physicians should provide prospective patients with a copy of the Patient Information Brochure, available from Alcon, informing them of possible risks and benefits associated with the AcrySof® IQ PanOptix® Trifocal IOLs. ATTENTION: Reference the Directions for Use labeling for each IOL for a complete listing of indications, warnings and precautions._

**_AcrySof® Family of Single-Piece IOLs Important Product Information_** _(AcrySof® UV, AcrySof® IQ, AcrySof® IQ Toric, AcrySof® IQ ReSTOR®, AcrySof® IQ ReSTOR® Toric, AcrySof® IQ PanOptix® and AcrySof® IQ PanOptix® Toric IOLs)_ **CAUTION:** _Federal law restricts these devices to sale by or on the order of a physician._ **INDICATION:** _The family of AcrySof® single-piece intraocular lenses (IOLs) includes AcrySof® UV-absorbing IOLs ("AcrySof® UV"), AcrySof® IQ, AcrySof® IQ Toric, AcrySof® IQ ReSTOR®, AcrySof® IQ ReSTOR® Toric, AcrySof® IQ PanOptix® and AcrySof® IQ PanOptix® Toric IOLs. Each of these IOLs is indicated for visual correction of aphakia in adult patients following cataract surgery. In addition, the AcrySof Toric IOLs are indicated to correct pre-existing corneal astigmatism at the time of cataract surgery. The AcrySof IQ ReSTOR IOLs are for cataract patients with or without presbyopia, who desire increased spectacle independence with a multifocal vision. The AcrySof® IQ PanOptix® lens mitigates the effects of presbyopia by providing improved intermediate and near visual acuity, while maintaining comparable distance visual acuity with a reduced need for eyeglasses, compared to a monofocal IOL. All of these IOLs are intended for placement in the capsular bag._ **WARNINGS/PRECAUTIONS:** _General cautions for all AcrySof® and AcrySof® UV IOLs: Careful preoperative evaluation and sound clinical judgment should be used by the surgeon to decide the risk/benefit ratio before implanting any IOL in a patient with any of the_ [...] _should be used prior to lens_ [...]_t emmetropia, and ensure that_ [...]_TOR® and AcrySof® IQ PanOptix®_

OCULAR          CONTACT          REFRACTIVE          CATARACT          VITREORETINAL
HEALTH          LENSES &          TECHNOLOGY          SURGERY          SURGERY
                SOLUTIONS

A-351

IOLs: Some patients may experience visual disturbances and/or discomfort due to multifocality, especially under dim light conditions. These may include some perceptions of halos or starbursts, as well as other visual symptoms. Therefore, patients implanted with multifocal IOLs should exercise caution when driving at night or in poor visibility conditions. A reduction in contrast sensitivity may occur in low light conditions. Spectacle independence rates vary with all multifocal IOLs; as such, some patients may need glasses when reading small print or looking at small objects. Patients should be advised that unexpected outcomes could lead to continued spectacle dependence or the need for secondary surgical intervention (e.g., intraocular lens replacement or repositioning). Posterior capsule opacification (PCO), may significantly affect the vision of patients with multifocal IOLs sooner in its progression than patients with monofocal IOLs.  Additional Cautions associated with AcrySof® IQ Toric, AcrySof® UV Toric ReSTOR® Toric, and AcrySof® IQ PanOptix® Toric IOLs: Optical theory suggests that, high astigmatic patients (i.e. > 2.5 D) may experience spatial distortions. Possible toric IOL related factors may include residual cylindrical error or axis misalignments. Toric IOLs should not be implanted if the posterior capsule is ruptured, if the zonules are damaged, or if a primary posterior capsulotomy is planned. Rotation can reduce astigmatic correction; if necessary lens repositioning should occur as early as possible prior to lens encapsulation. Prior to surgery, physicians should provide prospective patients with a copy of the appropriate Patient Information Brochure available from Alcon informing them of possible risks and benefits associated with the AcrySof® IQ Toric, AcrySof® IQ ReSTOR®, AcrySof® IQ ReSTOR® Toric, and AcrySof® IQ PanOptix® Trifocal IOLs. **ATTENTION:** Refer to the Directions for Use labeling for the specific IOL for a complete list of indications, warnings and precautions.

**IMPORTANT PRODUCT INFORMATION**

UltraSert® Pre-loaded IOL Delivery Systemwith the AcrySof® IQ aspheric IOL **CAUTION:** Federal (USA) law restricts this device to sale by or on the order of a physician. **INDICATIONS:** The AcrySof® IQ aspheric intraocular lens ("AcrySof IQ") is intended for the replacement of the human lens to achieve visual correction of aphakia in adult patients following cataract surgery. This lens is intended for placement in the capsular bag. **WARNING/PRECAUTION:** Use the UltraSert® Pre-loaded Delivery System ("UltraSert") at temperatures between 18° C (64° F) and 23°C (73° F). Use only Alcon viscoelastic qualified for this device. Do not use the UltraSert if the nozzle appears damaged or deformed. Follow the Directions for Use for correct order and sequence of steps to avoid damage to the IOL or the UltraSert. Careful preoperative evaluation and sound clinical judgment should be used by the surgeon to decide the risk/benefit ratio before implanting a lens in a patient with any of the conditions described in the Directions for Use. Caution should be used prior to lens encapsulation to avoid lens decentrations or dislocations. Studies have shown that color vision discrimination is not adversely affected in individuals with the AcrySof® Natural IOL and normal color vision. The effect on vision of the AcrySof® Natural IOL in subjects with hereditary color vision defects and acquired color vision defects secondary to ocular disease (e.g., glaucoma, diabetic retinopathy, chronic uveitis, and other retinal or optic nerve diseases) has not been studied. Do not resterilize; do not store over 45° C. **ATTENTION:** Reference the Directions for Use for Model AU00T0 for a complete listing of indications, warnings and precautions.

**References**

1. AcrySof® IQ PanOptix® Directions for Use.

2. WirtitschMG, et al. Effect of haptic design on change in axial lens position after cataract surgery. J Cataract Refract Surg. 2004;30(1):45-51.

3. Visser N, Bauer NJ, Nuijts RM. Toric intraocular lenses: historical overview, patient selection, IOL calculation, surgical techniques, clinical outcomes, and complications. J Cataract Refract Surg. 2013;39(4):624-637.

OCULAR HEALTH    CONTACT LENSES & SOLUTIONS    REFRACTIVE TECHNOLOGY    CATARACT SURGERY    VITREORETINAL SURGERY

A352

*endophthalmitis: injectable intraocular lenses may reduce the incidence of postoperative endophthalmitis. Br J Ophthalmol. 2015;99(10):1377-1380*

OCULAR
HEALTH

CONTACT
LENSES &
SOLUTIONS

REFRACTIVE
TECHNOLOGY

CATARACT
SURGERY

VITREORETINAL
SURGERY

# EXHIBIT 3

**SURGICAL**
FOR U.S. PROFESSIONALS

| Cataract Equipment | Cataract IOLs | Cataract Disposables | Refractive Technology | Surgical Glaucoma | Vitreoretinal Surgery | Education & Resources |



UltraSert™
PRE-LOADED DELIVERY SYSTEM

The latest advancement in pre-loaded IOL delivery is here

## Simple Device Prep

Mastering device prep with the UltraSert™ Pre-loaded Delivery System takes very few cases. For greater efficiency in the OR, the system is ready for implantation in just three simple steps.

### Step 1: Inject OVD



Insert cannula of approved ophthalmic viscosurgical device (OVD)* perpendicular to the device through the OVD port on the blue lens stop.

Inject approximately 0.2 mL of OVD until it reaches the "fill-to" line on the nozzle tip.

### Step 2: Remove lens stop and plunger lock

 

Pull the blue lens stop forward slightly, and lift up and away from device to remove. Remove the plunger lock by pulling it straight up.

### Step 3: Advance & inspect



Advance the blue plunger until the leading edge of the IOL optic is even with the line on the nozzle. Inspect to ensure the blue plunger tip is touching the trailing edge of the IOL optic and the trailing haptic is folded.

Now the device is ready for delivery, which should take place within three minutes of advancement.

*Consult your Alcon sales representative for a list of approved OVDs.



© 2016 Novartis    1/16    US-ACR-15-E-0508d



Copyright © 2021 Alcon

Alcon  | Legal  | Privacy Policy  | California Resident? Do Not Sell My Personal Information  | About Cookies

**Other Alcon websites:**

**For Patients**

**For Professionals**

**More Websites**

Alcon          Legal          Privacy Policy

# EXHIBIT 4

# Contact Us

Alcon welcomes your questions and comments. Please select a topic from the list below. If none of the links relate to your question, please select general inquiry below or call one of the telephone numbers found on this page.

## Contact Alcon

**A358**

Alcon Management S. A.
Chemin de Blandonnet 8
1214 Vernier-Geneva
Switzerland

6201 South Freeway
Fort Worth, TX 76134-2001
United States

Looking for media or investor information?

**GENERAL INQUIRY**

**QUALITY CONCERN OR ADVERSE EVENT**

# Customer service

For non-US Customer Service contact the local country office.

**U.S. Surgical**

T 1 800 TO ALCON

1 800 862 5266

**Hours:**

Monday-Friday

A359

7 am – 6 pm
(Central U.S. Time)

**U.S. Vision Care**
OTC/Contact Lens
T 1 800 241 5999

**Hours:**
Monday-Friday
7:30 am – 6 pm
(Central U.S. Time)

**U. S. Customer Care**
T 1 800 757 9195

**Hours:**
Monday-Friday
8 am – 5 pm
(Central U.S. Time)

# Alcon Medical Information

For information about Alcon products or medical data

**Telephone:**
U.S. 800 757 9785

For non-US information contact the local country office.

# Alcon Medical Safety

To report product complaints or adverse events from the US please call 1 800 757 9780.

To report product complaints or adverse events from the outside the US please contact the local country office.

Looking for information on the CyPass® Micro-Stent Market Withdrawal?

# EXHIBIT 5

# Executive Committee

| Governance | Board of Directors | Executive Committee | Leadership Team | Committee Composition | ESG |
|---|---|---|---|---|---|

Home / Governance / Executive Committee

## David Endicott  Chief Executive Officer



David J. Endicott is the CEO of Alcon, a member of its Board of Directors, and leads the Alcon Executive Committee. He joined Alcon in July of 2016 as Chief Operating Officer. Prior to Alcon, Mr. Endicott was President of Hospira Infusion Systems, a Pfizer company. During his tenure there, he led Hospira's medical device business through a turnaround, carve-out, and

eventual sale. Critical to the turnaround, he advanced the company's product pipeline, returned its products to market from quality disruptions and accelerated global growth. Before joining Hospira, David served as an officer and executive committee member of Allergan where he spent more than 25 years of his career in leadership roles across Europe, Asia, Latin America and the US. He accelerated Allergan's international growth and successfully built new markets focused on medical specialties in the areas of ophthalmology, plastic surgery, dermatology and aesthetic medicine. He currently serves on the Board of Directors of AdvaMed, and has previously served on the Boards of Zeltiq (NASDAQ: ZLTQ), and Orexigen (NASDAQ: OREX).

David holds an undergraduate degree in Chemistry from Whitman College, an MBA from the University of Southern California, and is a graduate of the Advanced Management Program at the Harvard Business School.

## Laurent Attias SVP, Head Global Corp Dev Strategy, BD&L, and M&A

Laurent Attias is Senior Vice President, Corporate Development Strategy at Alcon.



During his more than 20 years at Alcon, Mr. Attias progressed through the Sales and Marketing organizations by defining key strategic directions for Surgical and Pharmaceutical flagship brands. Starting in 2002, Mr. Attias held the position of Vice President, Refractive Sales and Marketing, where he helped define Alcon's participation in the Laser Refractive market. Mr. Attias moved to Europe in 2009 to assume the role of Vice President, Central & Eastern Europe, Italy and Greece. In 2010, Mr. Attias was promoted to President, Europe, Middle East & Africa (EURMEA). Previously, Mr. Attias served as Vice President/General Manager of Alcon Canada, an international relocation role he assumed in 2007.

Mr. Attias holds both a Bachelor of Business Administration in Marketing and an MBA from Texas Christian University in Fort Worth.

## Ian Bell President, International



Ian Bell is President, International at Alcon. Prior to this role, Mr. Bell was the Region President, Europe, Middle East and Africa since 2016. Mr. Bell brings more than 20 years of experience in the medical device and

pharmaceutical industry. He joined Alcon from Hospira Inc. where he served as Corporate Vice President and President of the EMEA region. Prior to his work at Hospira Inc., Mr. Bell was Corporate Vice President and President of Allergan's Asia Pacific region, based in Singapore from 2008 to 2014. Mr. Bell joined Allergan in 2005 as Vice President and Managing Director of its neurosciences division for Europe, Middle East and Africa. Mr. Bell began his career at GlaxoSmithKline where he held roles of increasing responsibility in sales, marketing and strategy for more than 10 years.

Mr. Bell was awarded the degree of Bachelor of Arts with honors in Economics from the University of York in the United Kingdom.

## Sergio Duplan President, North America



Sergio Duplan is President for the United States and Canada at Alcon. He leads the Surgical and Vision Care business units. Mr. Duplan began his career with Novartis in 2004 as Vice President of Pharma Sales in Mexico and was soon promoted to Head of Pharma Marketing and Sales for Latin America. In 2008, he became CPO Head and Country President of Novartis Mexico. Prior to his current role, Mr.

Duplan was President for Latin America and Canada at Alcon for three years. He was appointed to his current role in August 2015. Prior to joining Novartis, Mr. Duplan held several positions of increasing responsibility in Sales, Finance and Country Management at Procter & Gamble and Eli Lilly and Company.

Mr. Duplan holds a Bachelor's in Industrial Engineering from Universidad Iberoamericana, in Mexico City, Mexico and an MBA from The Wharton School at the University of Pennsylvania, in the United States.

## Rajkumar Narayanan SVP, Operational Strategy & Chief Transformation Officer



Rajkumar Narayanan is the Senior Vice President, Operational Strategy & Chief Transformation Officer at Alcon. Mr. Narayanan has over 30 years of experience in the medical device, pharmaceutical and consumer sectors. Prior to joining Alcon, he was Senior Vice President and Region President of Allergan, Asia Pacific. He had an over 20-year history with Allergan as Vice President, Medical Aesthetics for Allergan Europe, Africa and the Middle East. Prior to this he was Vice President, Allergan Greater China and Japan. Mr.

Narayanan worked for Unilever in India before joining Allergan in 1995.

He has a Bachelor of Finance and Economics degree from Bombay University in India.

---

## Michael Onuscheck President, Global Business and Innovation



Michael Onuscheck is President, Global Business & Innovation at Alcon. Previously, Mr. Onuscheck led Alcon's Surgical business as President & General Manager. Mr. Onuscheck joined Alcon in February 2015 from Boston Scientific. Mr. Onuscheck held the position of President of Boston Scientific EMEA. He previously served as Senior Vice President and President of Boston Scientific's Neuromodulation Division. Prior to the Boston Scientific acquisition of Advanced Bionics (BSC Neuromodulation), Mr. Onuscheck held a variety of marketing and sales management positions at Medtronic Sofamor. He also held various sales and management positions for Pfizer.

Mr. Onuscheck earned his degree in Business Administration and Psychology from Washington and Jefferson College in Washington, Pennsylvania.

# Tim Stonesifer SVP, Chief Financial Officer



Tim Stonesifer is Senior Vice President and Chief Financial Officer for Alcon. Prior to joining Alcon, Mr. Stonesifer was Executive Vice President and Chief Financial Officer for Hewlett Packard Enterprise. Prior to HP's separation into two companies—Hewlett Packard Enterprise and HP Inc.—Mr. Stonesifer served as Chief Financial Officer for HP's Enterprise Group. Previously, Mr. Stonesifer spent three years with General Motors where he served as the Chief Financial Officer of International Operation. He also spent a year as the Chief Financial Officer for Algeco Scottsman. Before his career at General Motors, Mr. Stonesifer worked at General Electric for 18 years. Mr. Stonesifer's last position at General Electric was as Chief Financial Officer of the company's Plastics business. While at General Electric, he also held other Finance leadership roles in Insurance, Equipment Leasing, Structured Finance, and Corporate Audit. Mr. Stonesifer started his career in the Financial Management Program at General Electric.

Mr. Stonesifer holds a Bachelor of Arts in Economics from the University of Michigan.

# Contact Alcon Investor Relations

+41 589 112 110

+1 817 615 2789

investor.relations@alcon.com

# Computershare

Switzerland: +41 62 205 77 00

U.S. Toll Free: +1 800 736 3001

International: +1 781 575 3100

# Quick Links

SEC FILINGS

INVESTOR FAQS

INFORMATION REQUEST FORM

SPIN OFF

# Investor Email Alerts

| email@example.com | SIGN UP |
|---|---|

News                    Events & Presentations

Quarterly Reports       Annual Reports

SEC Filings                End of Day Stock Quote

Consensus Estimates    ESG

UNSUBSCRIBE

# EXHIBIT 6

# Leadership Team

| Governance | Board of Directors | Executive Committee | Leadership Team | Committee Composition | ESG |

Home / Governance / Leadership Team

## David J. Endicott **Chief Executive Officer**



David J. Endicott is the CEO of Alcon, a member of its Board of Directors, and leads the Alcon Executive Committee. He joined Alcon in July of 2016 as Chief Operating Officer. Prior to Alcon, Mr. Endicott was President of Hospira Infusion Systems, a Pfizer company. During his tenure there, he led Hospira's medical device business through a turnaround, carve-out, and

eventual sale. Critical to the turnaround, he advanced the company's product pipeline, returned its products to market from quality disruptions and accelerated global growth. Before joining Hospira, David served as an officer and executive committee member of Allergan where he spent more than 25 years of his career in leadership roles across Europe, Asia, Latin America and the US. He accelerated Allergan's international growth and successfully built new markets focused on medical specialties in the areas of ophthalmology, plastic surgery, dermatology and aesthetic medicine. He currently serves on the Board of Directors of AdvaMed, and has previously served on the Boards of Zeltiq (NASDAQ: ZLTQ), and Orexigen (NASDAQ: OREX).

David holds an undergraduate degree in Chemistry from Whitman College, an MBA from the University of Southern California, and is a graduate of the Advanced Management Program at the Harvard Business School.

## Laurent Attias SVP, Head Global Corp Dev Strategy, BD&L, and M&A

Laurent Attias is Senior Vice President, Corporate Development Strategy at Alcon.



During his more than 20 years at Alcon, Mr. Attias progressed through the Sales and Marketing organizations by defining key strategic directions for Surgical and Pharmaceutical flagship brands. Starting in 2002, Mr. Attias held the position of Vice President, Refractive Sales and Marketing, where he helped define Alcon's participation in the Laser Refractive market. Mr. Attias moved to Europe in 2009 to assume the role of Vice President, Central & Eastern Europe, Italy and Greece. In 2010, Mr. Attias was promoted to President, Europe, Middle East & Africa (EURMEA). Previously, Mr. Attias served as Vice President/General Manager of Alcon Canada, an international relocation role he assumed in 2007.

Mr. Attias holds both a Bachelor of Business Administration in Marketing and an MBA from Texas Christian University in Fort Worth.

## Heather Attra SVP, Head Global Quality



Heather Attra is Senior Vice President, Head Global Quality for Alcon. Ms. Attra joined Novartis in 2010 as the Ciba Vision Head of Quality for the Americas. She later served as Ciba Vision's Vice President of Compliance and

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 381 of 635   PageID 752

Alcon's Vice President of Quality for both the Vision Care and Surgical franchises. Most recently, Ms. Attra held the position of Global Head of Manufacturing and Technical Operations for Alcon's Vision Care franchise. Prior to joining Alcon, Ms. Attra has held a variety of quality management positions of increasing responsibility at Catalent Pharma Solutions.

Ms. Attra holds a Bachelor of Science degree in Biomedical Science from Texas A&M in College Station, Texas.

## Jeannette Bankes President & GM, Global Surgical Franchise



Jeannette Bankes is President & General Manager, Global Surgical Franchise for Alcon. Prior to joining Alcon, Ms. Bankes was General Manager, Urology & Pelvic Health for Boston Scientific, where she was responsible for the entire scope of the global business including commercial sales, marketing, R&D, regulatory, operations, manufacturing, supply chain, quality, clinical research, and new business development. During her 15-year tenure at Boston Scientific, Ms. Bankes served as Vice President of Clinical & Regulatory Affairs,

**A376**

Director of Scientific Communications, and Director of Medical Affairs. Ms. Bankes began her career with Merck & Co., where she held diverse roles of increasing responsibility in sales, marketing, clinical and biological manufacturing.

Ms. Bankes holds a Bachelor of Science in Biochemistry & Medical Technology from Kutztown University.

## Royce Bedward SVP, General Counsel & Corporate Secretary



Royce Bedward is Senior Vice President, General Counsel and Corporate Secretary for Alcon. Mr. Bedward joined Alcon in 2016 from Hospira, where he played a key role in the company's turnaround, overseeing M&A, securities, litigation, regulatory and compliance matters. He joined Hospira in 2004 as Vice President of Litigation and Human Resources and led its spin-off from Abbott Laboratories.

Mr. Bedward holds a Bachelor's degree in Business Administration from Saint Norbert College, De Pere, Wisconsin, and a Juris Doctor degree from the University of Illinois College of Law, Champaign, Illinois.

# Ian Bell **President, International**



Ian Bell is President, International at Alcon. Prior to this role, Mr. Bell was the Region President, Europe, Middle East and Africa since 2016. Mr. Bell brings more than 20 years of experience in the medical device and pharmaceutical industry. He joined Alcon from Hospira Inc. where he served as Corporate Vice President and President of the EMEA region. Prior to his work at Hospira Inc., Mr. Bell was Corporate Vice President and President of Allergan's Asia Pacific region, based in Singapore from 2008 to 2014. Mr. Bell joined Allergan in 2005 as Vice President and Managing Director of its neurosciences division for Europe, Middle East and Africa. Mr. Bell began his career at GlaxoSmithKline where he held roles of increasing responsibility in sales, marketing and strategy for more than 10 years.

Mr. Bell was awarded the degree of Bachelor of Arts with honors in Economics from the University of York in the United Kingdom.

# Sergio Duplan **President, North America**

Sergio Duplan is President for the United States

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 384 of 635   PageID 755



and Canada at Alcon. He leads the Surgical and Vision Care business units. Mr. Duplan began his career with Novartis in 2004 as Vice President of Pharma Sales in Mexico and was soon promoted to Head of Pharma Marketing and Sales for Latin America. In 2008, he became CPO Head and Country President of Novartis Mexico. Prior to his current role, Mr. Duplan was President for Latin America and Canada at Alcon for three years. He was appointed to his current role in August 2015. Prior to joining Novartis, Mr. Duplan held several positions of increasing responsibility in Sales, Finance and Country Management at Procter & Gamble and Eli Lilly and Company.

Mr. Duplan holds a Bachelor's in Industrial Engineering from Universidad Iberoamericana, in Mexico City, Mexico and an MBA from The Wharton School at the University of Pennsylvania, in the United States.

## Karen King SVP, Investor Relations & Communications



Karen King is Senior Vice President, Head Global Investor Relations & Communications for Alcon. Prior to joining Alcon, Ms. King was Vice President, Investor Relations and Corporate Communications for LivaNova, a global medical

technology company. Previously, Ms. King served as Corporate Vice President, Investor Relations at Hospira, and Vice President Investor Relations at Career Education Corporation.

Ms. King holds a Bachelor of Science degree in Finance from the Indiana University, and completed the Post Baccalaureate Life Sciences program at Loyola University.

## Franck Leveiller **SVP, Head Global R&D**



Franck Leveiller is Head, Global R&D for Alcon. Mr. Leveiller joined Alcon in June 2011 as VP and Head of R&D Vision Care, and in June 2015 assumed the role of Head, R&D Surgical Franchise at Alcon. Before joining Alcon, Mr. Leveiller was the Global Head of R&D at Ciba Vision, after two years with Novartis Pharmaceuticals as Global Head Technical R&D, Project Management. Prior to Novartis, he held R&D positions with pharmaceutical companies, such as AstraZeneca, Aventis and Rhône-Poulenc Rorer.

Franck has a Ph.D. in Physical Chemistry from the Weizmann Institute of Science, Israel, where

he was awarded the John F. Kennedy Memorial prize for outstanding Ph.D. research work.

---

# Sue-Jean Lin SVP, Chief Information Officer



Sue-Jean Lin is Senior Vice President & Chief Information Officer for Alcon. Ms. Lin joined Alcon in August of 2018. Prior to her current role, Ms. Lin was Senior Vice President and Chief Information Officer for Hill-Rom, a global medical technology company. Prior to joining Hill-Rom in 2016, she was the Senior Vice President and Chief Information Officer for Allergan. Previously, Ms. Lin was the Vice President of Finance & Regional Controller for Allergan for its Europe, Middle East, and Africa and Asia Pacific. In 2015, she also served as Interim Executive for Presbyterian Healthcare Services in the capacity of Senior Vice President and Chief Information Officer.

Ms. Lin holds both a Bachelor's degree in Accounting and a Master's degree in Business Administration from the University of Nevada, Reno. She also completed the Executive Leadership Program from the University of Southern California, Marshall School of Business, and holds a Cybersecurity Oversight

Case 3:20-cv-03629-M    Document 23    Filed 03/12/21    Page 387 of 635    PageID 758

certificate from Software Engineering Institute of
Carnegie Mellon University.

## Kim Martin SVP, Chief Human Resources Officer



Kim Martin is the Senior Vice President and
Chief Human Resources Officer for Alcon. Prior
to joining Alcon, Ms. Martin was Chief Human
Resources Officer for Worldpay, a $4 billion
global payment processing and technology
provider. She has also served as an executive
human resources leader at Zimmer Holdings
Inc., as well as more than 11 years in
progressive human resources and talent
acquisition positions at General Electric
Healthcare.

Ms. Martin attended the University of Illinois,
Champaign-Urbana, where she received her
Bachelor of Arts in Speech Communications
and her Masters in Labor and Industrial
Relations.

## Ed McGough SVP, Head Global Manufacturing & Technical Operations

Ed McGough is Alcon's Senior Vice President of
Global MTO. Mr. McGough joined Alcon in April

A382



1991 as a Manager of Quality Assurance and Regulatory. Following this role, he held various positions at Alcon, including Director of Quality Assurance and Director of Operations. Mr. McGough has also served as Vice President and General Manager of Fort Worth and Houston manufacturing. Following this role, he served as Vice President, Manufacturing, Pharmaceutical Operations. Prior to joining Alcon, Mr. McGough served in various quality engineering/management roles with Baxter Healthcare Corporation.

Mr. McGough earned a Bachelor of Science in Industrial Engineering from Louisiana Tech University in 1983. He is also a 1999 graduate of the Stanford Executive Program.

## Rajkumar Narayanan SVP, Operational Strategy & Chief Transformation Officer



Rajkumar Narayanan is the Senior Vice President, Operational Strategy & Chief Transformation Officer at Alcon. Mr. Narayanan has over 30 years of experience in the medical device, pharmaceutical and consumer sectors. Prior to joining Alcon, he was Senior Vice President and Region President of Allergan, Asia Pacific. He had an over 20-year history

with Allergan as Vice President, Medical Aesthetics for Allergan Europe, Africa and the Middle East. Prior to this he was Vice President, Allergan Greater China and Japan. Mr. Narayanan worked for Unilever in India before joining Allergan in 1995.

He has a Bachelor of Finance and Economics degree from Bombay University in India.

## Michael Onuscheck **President, Global Business & Innovation**



Michael Onuscheck is President, Global Business & Innovation at Alcon. Previously, Mr. Onuscheck led Alcon's Surgical business as President & General Manager. Mr. Onuscheck joined Alcon in February 2015 from Boston Scientific. Mr. Onuscheck held the position of President of Boston Scientific EMEA. He previously served as Senior Vice President and President of Boston Scientific's Neuromodulation Division. Prior to the Boston Scientific's acquisition of Advanced Bionics (BSC Neuromodulation), Mr. Onuscheck held a variety of marketing and sales management positions at Medtronic Sofamor. He also held various sales and management positions for Pfizer.

Mr. Onuscheck earned his degree in Business Administration and Psychology from Washington and Jefferson College in Washington, Pennsylvania.

---

# Andy Pawson   President & GM, Global Vision Care Franchise



Andy Pawson is President & General Manager, Global Vision Care Franchise. Mr. Pawson joined Alcon in January 2018. Prior to joining Alcon, Mr. Pawson was Chief Marketing Officer & Vice President, Global Marketing & Sales, for Kimberly-Clark's Professional Division. Before moving to the United States, Mr. Pawson was Vice President, Marketing, Brands and Innovation, for Kimberly-Clark's European Consumer division. During his 25 years at Kimberly-Clark, he progressed his career in several senior roles across Marketing, Strategy, Regional General Management, Sales and Manufacturing. Mr. Pawson began his career with Unilever Frozen Foods, as an operations manager.

Mr. Pawson holds a Bachelor of Science in Mechanical Engineering from University College London in the United Kingdom.

# Tim Stonesifer SVP, Chief Financial Officer



Tim Stonesifer is Senior Vice President and Chief Financial Officer for Alcon. Prior to joining Alcon, Mr. Stonesifer was Executive Vice President and Chief Financial Officer for Hewlett Packard Enterprise. Prior to HP's separation into two companies—Hewlett Packard Enterprise and HP Inc.—Mr. Stonesifer served as Chief Financial Officer for HP's Enterprise Group. Previously, Mr. Stonesifer spent three years with General Motors where he served as the Chief Financial Officer of International Operation. He also spent a year as the Chief Financial Officer for Algeco Scottsman. Before his career at General Motors, Mr. Stonesifer worked at General Electric for 18 years. Mr. Stonesifer's last position at General Electric was as Chief Financial Officer of the company's Plastics business. While at General Electric, he also held other Finance leadership roles in Insurance, Equipment Leasing, Structured Finance, and Corporate Audit. Mr. Stonesifer started his career in the Financial Management Program at General Electric.

Mr. Stonesifer holds a Bachelor of Arts in Economics from the University of Michigan.

# Contact Alcon Investor Relations

+41 589 112 110

+1 817 615 2789

investor.relations@alcon.com

# Computershare

Switzerland: +41 62 205 77 00

U.S. Toll Free: +1 800 736 3001

International: +1 781 575 3100

# Quick Links

SEC FILINGS

INVESTOR FAQS

INFORMATION REQUEST FORM

SPIN OFF

# Investor Email Alerts

email@example.com            SIGN UP

News                  Events & Presentations

Quarterly Reports        Annual Reports

SEC Filings               End of Day Stock Quote

Consensus Estimates     ESG

UNSUBSCRIBE

# EXHIBIT 7



Follow     ···

# David Endicott

## Chief Executive Officer at Alcon

Dallas-Fort Worth Metroplex   500+ connections

Contact info



Alcon

Whitman College

## About

David is the Chief Executive Officer of Alcon, the largest eye care device company in the world with complementary businesses is surgical and vision care. David joined Alcon in 2016 as Chief Operating Officer, and in 2018 he was named Chief Executive Officer of Alcon, a Novartis Division. Today, under David's leadership more than 20,000 associates work in locations around the globe to help people in over 120 countries see brilliantly.

## Activity

2,474 followers

 **Congratulations on this well-deserved honor Sue Jean Lin!**

David commented

**See all activity**

## Experience

 **Alcon**
4 yrs 9 mos

     Chief Executive Officer

Full-time
Jul 2018 – Present2 yrs 9 mos
Fort Worth, Texas, United States

**Chief Operating Officer**
Jul 2016 – Jun 20182 yrs
Dallas/Fort Worth Area



# President, Hospira Infusion Systems - A Pfizer Company

Pfizer
Mar 2014 – Jun 20162 yrs 4 mos
Greater Chicago Area



**Allergan**
27 yrs

**President Allergan Medical and President Asia and Latin America**
2010 – 20133 yrs
Irvine, CA

**President, Europe, Africa & Middle East**
2005 – 20105 yrs
Marlow, United Kingdom

Show 3 more roles ⌄

# Education



## Whitman College
Bachelor of Arts (BA)Chemistry



## University of Southern California
Master of Business Administration (MBA)



## Harvard Business School
Advanced Management Program

# Skills & endorsements

## Pharmaceutical Industry55

Christopher Ballesteros and 54 connections have given endorsements for this skill

## Strategic Planning 48

Endorsed by Ryan Abbate, who is highly skilled at this

 Endorsed by 4 of David's colleagues at Alcon

## Product Launch 37

 Endorsed by Tom Albright and 6 others who are highly skilled at this

 Endorsed by 2 of David's colleagues at Alcon

Show more ⌄

---

# Recommendations

**Received (0)**        **Given (1)**

 **Kym Damasco**
I am a polished "Miracle Worker and Mind Reader" with 20+ years' supporting c-level executives.

May 23, 2018, David managed Kym directly

Kym was indeed a mind reader. Working with her from in and out of the office she kept things running smoothly in choppy waters. Great personality with a positive outlook and energy. D

---

# Accomplishments

2  **Organizations**                                                    ⌄

Zeltiq, Inc. (NASDQ: ZLTQ)  Orexigen Therapeutics, Inc. (NASDQ: OREX)

---

# Interests

 **Pfizer**
3,974,963 followers

 **Alcon**
401,283 followers

Real Endpoints                                              Harvard Business School


2,024 followers


1,461,678 followers


Whitman College
13,913 followers

Hospira
111,030 followers

See all

**A393**

# EXHIBIT 8



🔒 Message ⋯

# Sergio Duplan

## Region President Alcon North America

Fort Worth, Texas, United States

500+ connections  Contact info

 **Alcon**

 **The Wharton School**

## Activity

3,567 followers

@Alcon great news for cataract patients in the United States! #Vivity #Alcon #cataracts #cataractsurgery #presbyopia

Sergio shared this

66 Reactions  1 Comment

**See all activity**

## Experience



### President Alcon North America

Alcon

Aug 2015 – Present5 yrs 8 mos

Dallas/Fort Worth Area

### Area President Latin America and Caribbean

Alcon Laboratories, Inc.

2012 – Present9 yrs



**Novartis Pharmaceutical**
15 yrs

**Country President**
2008 – Present13 yrs

**Country President Mexico**
2008 – Present13 yrs

Show 2 more roles ⌄

# Education



## The Wharton School
MBA
1994 – 1996

# Skills & endorsements

## Strategic Planning20

 Endorsed by Armando J., who is highly skilled at this

 Endorsed by 3 of Sergio's colleagues at Alcon

## Cross-functional Team Leadership20

 Endorsed by Armando J. and 1 other who is highly skilled at this

 Endorsed by 5 of Sergio's colleagues at Alcon

## Pharmaceutical Industry16

Christopher Ballesteros and 15 connections have given endorsements for this skill

Show more ⌄

# Recommendations

Received (0)      Given (5)

**Ivan Morales**      Creative innovator with a strong performance orientation.

A396

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 402 of 635   PageID 773



**Utrilla**

Director at spAce
iLab

January 19, 2021,
Sergio and Ivan were
students together

Highlearning agility. Good communicator."

**Jorge Herrera
Verduzco**

Access &
Government
Affairs Director
en Ultragenyx
Pharmaceutical
Inc.

October 15, 2018,
Sergio was senior to
Jorge but didn't
manage directly

Jorge es un líder con mucha experiencia en manejo de gente
yequipos. Tiene un sólido conocimiento en manejo de fuerzas
deventa y en asuntos de acceso de medicamentos en gobierno
yplanes privados. Buen pensamiento estratégico y habilidades
decomunicación.

Show more ⌄

# EXHIBIT 9



🔒 Message    •••

# Michael Onuscheck

President, Global Business and Innovation at Alcon

Fort Worth, Texas, United States

500+ connections   Contact info

 **Alcon**

**Washington and Jefferson College**

## About

Global Business leader with a demonstrated record of creating value in the medical device industry. Skilled at building diverse teams that drive innovation, commercial execution and talent leadership. Willing to take calculated risks

andstretch assignments knowing failure is a part of winning.

## Activity

1,456 followers

 Cathleen, thanks for all you do to support and ally for women!

Michael commented

 Todd, this is a exciting for you, your team and all the patients that could benefit....

Michael commented

See all activity

## Experience

A399


**Alcon**
6 yrs 2 mos

**President, Global Business and Innovation**
Nov 2018 – Present2 yrs 5 mos
Dallas/Fort Worth Area

**President and General Manager Surgical**
Sep 2017 – Nov 20181 yr 3 mos
Dallas/Fort Worth Area

**Global Franchise Head Surgical**
Feb 2015 – Aug 20172 yrs 7 mos
Dallas/Fort Worth Area


**Boston Scientific**
10 yrs 4 mos

**Senior Vice President and President EMEA**
Sep 2011 – Jan 20153 yrs 5 mos
Paris Area, France

**Senior Vice President and President, Neuromodulation**
Jan 2008 – Sep 20113 yrs 9 mos
Valencia, California

• Senior Vice President reporting directly to the CEO with responsibility to provide direction and insight into BSC critical business and functional decisions.
• Direct P&L responsibility for the Neuromodulation Division ...see more

Show 1 more role ⌄

## Multiple
**Advanced Bionics**
Dec 2001 – Oct 20042 yrs 11 mos
Valencia, California

• Responsible for the Sales, Clinical Services, Customer Service, Field Clinical Engineering, Operating Room Support, and Consumer Outreach Function of the Company (Bionic Ear Association) for the Auditory Division. ...see more

# Education


## Washington and Jefferson College
Bachelor of Arts (B.A.)Business Administration and Management, General
1985 – 1989

Activities and Societies: Commencement Speaker, 1988 International Scholarship Award Winner, Big Brother of Southwestern PA, 1986-1989, 4 year letter winner track, MVP 87, 88, Resident Assistant 1986-1988, 3 year letter winner football, President of Fellowship of Christian Athletes - 1988, Peer Counselor 1987-1989, Peters Township High School Track Coach 1985-1989

# Volunteer experience

### Board

Michael Hoefflin Foundation
Feb 2010 – Aug 2011 1 yr 7 mos
Children



### Board Member

United Way of Tarrant County
May 2015 – Present 5 yrs 11 mos
Children

### General Member Board

Eucomed
Oct 2013 – Jan 2015 1 yr 4 mos
Health

Show 3 more experiences ⌄

# Skills & endorsements

## Medical Devices 40


Endorsed by Hank Kucheman and 13 others who are highly skilled at this


Endorsed by 5 of Michael's colleagues at Alcon

## Cross-functional Team Leadership 25


Endorsed by Hank Kucheman and 4 others who are highly skilled at this


Endorsed by 4 of Michael's colleagues at Alcon

## Strategy 23


Endorsed by Brit Gould and 1 other who is highly skilled at this


Endorsed by 3 of Michael's colleagues at Alcon

Show more ⌄

# Recommendations

Received (0)        Given (1)

 **Géraldine Varoqui**

Vice President Digital Strategy & Commercial Excellence at Terumo Europe

March 19, 2017, Michael managed Géraldine directly

Geraldine, is a world-class partner. As we turned around the EMEA BSC organization, she was not only a communications parther but an integral part of the team that designed the changemanagement plan. She is professional, hardworking and extremely versatile. One of the best communications s... See more

## Interests

 **Neuromodulation Marketing**
1,170 members

 **TearClear**
990 followers

 **World Economic Forum**
3,259,472 followers

 **Himalayan Cataract Project**
636 followers

 **Ophthalmology Industry Group**
5,777 members

 **Alcon**
401,283 followers

**See all**

# EXHIBIT 10



🔒 Message     • • •

# Heather Attra

## Senior Vice President, Global Head of Quality

Dallas-Fort Worth Metroplex   335 connections

Contact info



**Alcon**

**Texas A and M University**

## Activity

348 followers

Posts Heather created, shared, or commented on in the last 90 days are displayed here.

See all activity

## Experience



**Alcon**
9 yrs 7 mos

**Senior Vice President, Global Head of Quality**
Oct 2018 – Present2 yrs 6 mos
Dallas/Fort Worth Area

**Vice President, Global Head Manufacturing & Technical Operations, Vision Care**
Sep 2016 – Oct 20182 yrs 2 mos
Dallas/Fort Worth Area

**Vice President Global Quality Operations**
Sep 2011 – Sep 20165 yrs 1 mo

## Global Head of Compliance
### Ciba Vision, a Novartis Company
Jun 2010 – Sep 20111 yr 4 mos

### Catalent Pharma Solutions
4 yrs 5 mos

**Senior Director Quality**
Feb 2009 – May 20101 yr 4 mos

**Senior Director, Site Head of Quality**
Jan 2008 – Feb 20091 yr 2 mos

Show 1 more role ⌄

### ADViSYS, Inc.
3 yrs 11 mos

**Director of Quality**
Aug 2003 – Jan 20062 yrs 6 mos

**Manager Quality Control**
Mar 2002 – Aug 20031 yr 6 mos

## QC/QA Specialist
### Valentis, Inc. (formerly GeneMedicine, Inc.)
1997 – 20025 yrs

# Education

## Texas A and M University
Bachelor of Science (B.Sc.)Biological and Biomedical Sciences

# Skills & endorsements

## GMP18

Endorsed by Robert Coleman and 5 others who are highly skilled at this

Endorsed by 4 of Heather's colleagues at Alcon

**A405**

# FDA 18

Terri Sogard, ASQ CQA and 17 connections have given endorsements for this skill

# CAPA 11

Tom Hunter and 10 connections have given endorsements for this skill

Show more ⌄

---

## Accomplishments

### 1 Publication ⌄

A Novel RNA Quantitation Method Using Hydrophobic Interaction Chromatography-HPLC

---

## Interests

 Quality System Excellence:FDA-QbD Solut
604 members

 Quality & Regulatory Network
135,168 members

 Professionals in the Pharmaceutical and B
204,751 members

 TED Conferences
19,872,836 followers

 International Quality Assurance (QA) Grou
35,644 members

Quality Assurance, GMP and ICH Guidelin
75,901 members

See all

# EXHIBIT 11

🔒 **Message**     • • •

 **Alcon**

# Jeannette Bankes

## President & GM Global Surgical Franchise

Dallas-Fort Worth Metroplex   500+ connections

Contact info

---

## Activity

3,187 followers

 **Great article Sophie!**

Jeannette commented

 **Congratulations Sue-Jean**

Jeannette commented

 **Opportunity to join a phenomenal Vision Care team #leadingbrilliantly**

Jeannette shared this

17 Reactions   1 Comment

 **Radical Inclusion Workshop with Global Surgical Franchise at Alcon Nichelle...**

Jeannette shared this

194 Reactions   8 Comments

**See all activity**

---

## Experience

 **President & GM Global Surgical Franchise**

Alcon

Mar 2019 – Present 2 yrs 1 mo

Fort Worth, Texas

 **Executive Board Member**

The Medical Alley Association

Aug 2018 – Mar 2019 8 mos

Minnesota

 **Boston Scientific**

14 yrs 9 mos

General Manager Men's, Women's Health & Gynsurg Businesses

Mar 2018 – Mar 20191 yr 1 mo
Minnetonka, Minnesota

○ **General Manager- Men's Health**
Aug 2016 – Mar 20192 yrs 8 mos
Minnetonka, Minnesota

General Manager for the Men's Health Business in the
Urology & Pelvic Health Division at Boston Scientific

Show 1 more role ⌄

# Skills & endorsements

## Medical Devices 75

Endorsed by Evan Brasington and 20 others
who are highly skilled at this

 Endorsed by 4 of Jeannette's colleagues at
Alcon

## Clinical Research 45

 Endorsed by Jonathan Berry MD, FACP,
FACC, FAHA, FSVMB, FSCAI and 2 others who are
highly skilled at this

 Endorsed by 26 of Jeannette's colleagues at
Boston Scientific

## Product Launch 28

 Endorsed by Howard Rosen and 1 other
who is highly skilled at this

 Endorsed by 15 of Jeannette's colleagues at
Boston Scientific

Show more ⌄

# Interests

 **Alcon**
401,283 followers

 **Boston Consulting Group (BCG)**
2,660,511 followers

**Accountable Care Organization (ACO) Grc**
48 members

 **Medical Device Opportunity**
235,998 members

 **The Medical Alley Association**
5,380 followers

 **Medical Device Networkers -Now Active c**
111,534 members

Case 3:20-cv-03629-M    Document 23    Filed 03/12/21    Page 415 of 635    PageID 786

See all

**A410**

# EXHIBIT 12



🔒 Message     · · ·

# Royce Bedward

Senior Vice President, General Counsel & Secretary at Alcon

Fort Worth, Texas, United States  443 connections

Contact info

 **Alcon**

 **University of Illinois College o...**

## About

Mr. Bedward is a General Counsel and business executive with experience in the healthcare, pharmaceutical, and medical device fields, with deep expertise in M&A, securities, litigation, regulatory & compliance matters.

... see more

## Activity
447 followers

 Well, they have the right person in the CLO seat! All the best, Mike!

Royce commented

**See all activity**

## Experience

 **SVP, General Counsel & Corporate Secretary**

Alcon
Apr 2016 – Present5 yrs
Dallas/Fort Worth Area

Direct worldwide legal and compliance operations for $7B medical device company. Successfully led spin-off from Novartis in 2019. Devise business strategies and manage operations as a member of Alcon's Executive Leadership Team. Key advisor and Secretary to the Alcon Board of Directors.



**Hospira**
4 yrs

**Senior Vice President/Corporate Vice President, General Counsel & Secretary**
Feb 2013 – Sep 20152 yrs 8 mos
Lake Forest, IL

Enabled Hospira to maintain a record of no significant government fines/penalties and successfully launch highly profitable first to market generic products. Oversaw global litigation, intellectual property and labor and employment…see more

**Vice President, Deputy General Counsel & Secretary**
2011 – Feb 20132 yrs
Lake Forest, IL

Drove critical aspects of spin-off from Abbott Laboratories, including negotiation of separation and distribution agreement and key aspects of risk-allocation between the companies; responsible for global litigation, labor and

## Vice President & Associate General Counsel

Hospira, Inc.
2008 – 20113 yrs
Lake Forest, IL



## Vice President, Legal

Hospira
2004 – 20084 yrs
Lake Forest, IL



## Senior Counsel, Litigation

Abbott
2002 – 20042 yrs
Abbott Park, IL

Oversaw highest profile litigation matters facing the
Company, including defense of key drug patent portfolios,
class action litigation, and mass tort product liability actions
(\$10 million litigation budget) ...see more

Show 2 more experiences ⌄

## Education



### University of Illinois College of Law

Doctor of Law (J.D.)Magna Cum Laude
1988 – 1991

Activities and Societies: Lead Articles Editor, University of Illinois Law Review Order of the Coif



### St. Norbert College

Bachelor of Business Administration (B.B.A.)Business Administration/Finance & American
PoliticsMagna Cum Laude
1984 – 1988

Activities and Societies: Graduate of the Honors Program

## Skills & endorsements

### Litigation15

Endorsed by Carey B. and 2 others who are
highly skilled at this

 Endorsed by 8 of Royce's colleagues at
Hospira

### Corporate Governance11

 Endorsed by 7 of Royce's colleagues at Hospira

### Intellectual Property9

 Endorsed by 4 of Royce's colleagues at Hospira

Show more ⌄

# EXHIBIT 13

🔒 Message     •••

 Alcon

 Weizmann
Institute of...

# Franck Leveiller

Senior Vice President, Head Global Research and Development at Alcon

Dallas, Texas, United States   500+ connections

Contact info

---

## Activity

2,153 followers

 **Congratulations Melissa**

Franck commented

**See all activity**

---

## Experience

 **Alcon**

10 yrs

**Senior Vice President, Head Global Research and Development**
Jul 2016 – Present4 yrs 9 mos

Member of Alcon Executive Leadership Team (responsible for the company strategy and operations).
Leading a global R&D organization responsible for developing (either internally or by partnering with external innovation entities worldwide) new ophthalmic medical device products that drive business growth as well as increasing the revenue from existing products.
Breadth of technologies developed include implantable…see more

**VP, Head, R&D Surgical Franchise**
Jun 2015 – Feb 20171 yr 9 mos

My responsibilities cover R&D for Cataract (including IntraOcular Lenses, IOLs), Vitreoretinal, Glaucoma and Refractive Surgery. I am also leading and overseeing Alcon's strategic partnership with Google[x] to develop the smart

**VP, Head R&D Vision Care Alcon**
Apr 2011 – Jun 2015 4 yrs 3 mos
Fort Worth, Texas



## VP, Global Head R&D

CIBA Vision

Jun 2009 – Apr 2011 1 yr 11 mos
Duluth, Georgia



## Global Head Technical R&D, Project Management

Novartis

Jan 2007 – May 2009 2 yrs 5 mos
Basel, Switzerland



**AstraZeneca**
5 yrs 4 mos

**Director, Product Development**
Nov 2005 – Dec 2006 1 yr 2 mos

**Director, Preformulation and Biopharmaceutics**
Sep 2001 – Nov 2005 4 yrs 3 mos

## Head, Material and Drug Delivery Design

Aventis Pharma

Jun 2000 – Sep 2001 1 yr 4 mos
Paris, France

Show 1 more experience ⌄

# Education



## Weizmann Institute of Science

PhD Physical Chemistry, Physics
1986 – 1992

## Ecole Nationale Superieure de Chimie Industrielle de Lyon (ENSCIL)

Engineer Degree

# Skills & endorsements

### R&D 77

Endorsed by Archana Rao PhD and 1 other who is highly skilled at this

 Endorsed by 3 of Franck's colleagues at Alcon

### Medical Devices 57

 Endorsed by Dwight Akerman, OD, MBA and 5 others who are highly skilled at this

 Endorsed by 24 of Franck's colleagues at Alcon

### Product Development 50

Endorsed by Burton Tripathi and 3 others who are highly skilled at this

 Endorsed by 17 of Franck's colleagues at Alcon

Show more ⌄

# Interests

 Medical Device Networkers -Now Active ⟨
111,534 members

 Forbes
15,930,357 followers

 Novartis Alumni
20,128 members

 The Wall Street Journal
8,591,491 followers

 Alcon
401,283 followers

 ⚕ MedicalDevicesGroup.net ⚕
359,988 members

See all

# EXHIBIT 14



Connect        ···

 Alcon

# Sue Jean Lin

## Senior Vice President & Chief Information Officer at Alcon

Fort Worth, Texas, United States

500+ connections  Contact info

## About

My name is Sue Jean Lin. I am an accomplished global business leader across a diverse set of corporate functions including information technology, finance, cyber security, risk management, and digital transformation. I possess deep strategic and operational leadership experience and have demonstrated ability to drive higher business performance. My career in the life sciences industry spans over 30 years where I have driven enterprise growth and business turnarounds. I am a trusted advisor to Fortune 500 C-suites and board members.

I am passionate about making a difference to customers. By focusing on "what's making the business and customer successful", I have led the development of strategy, technology implementation, and digital transformation that delivered growth and sustained changes for global pharmaceutical and medical device companies. I am a globalist, lived and worked in multiple continents.

While my broad business experience is what mostly helped me to succeed, listening to the business, customers and end users has created greater access to intelligence and execution wisdom. My peers describe me as collaborative and outcome-driven colleague. My team sees me as a visionary, inspiring and supportive leader.

## Activity

### 1,521 followers

 What a wonderful dialogue to be remembered! Thank you.

Sue Jean commented

This recognition is about the high-performing teams with a vibrant and...

Sue Jean commented

**A421**

 Congrats to this year's nominees, each of finalists and winners!

Sue Jean commented

Thank you for your partnership, Steve.

Sue Jean replied to a comment

**See all activity**

# Experience



### Senior Vice President & Chief Information Officer
Alcon
Aug 2018 – Present2 yrs 8 mos
Dallas/Fort Worth Area

Alcon was a $7B business carve-out from Novartis and went public in April 2019. Reporting to CEO and as a member of the executive leadership, I have the full accountability and lead IT and business teams to:
• Transition carved-out enterprise assets from Novartis, consistently meeting and accelerating against the project plan
• Stand up new capabilities, global technological        ...see more

### Senior Vice President, Chief Information Officer
Hill-Rom
Jan 2016 – Aug 20182 yrs 8 mos
Greater Chicago Area

Reporting to CEO and working with the executive leadership team, during my tenure Hill-Rom doubled its market capitalization through new products and digital solutions, including the integration of nurse calls system with EHR and ...see more

### Interim Chief Information Officer
Presbyterian Healthcare Services
Nov 2015 – Jan 20163 mos
Albuquerque, New Mexico Area



**Allergan**
26 yrs

  Senior Vice President, Chief Information Officer

Irvine, California

As a global CIO, my priorities are to fulfill the promise of technology, drive innovation to accelerate enterprise growth and provide leadership to the business and I.T.

...see more

○ **VP of Finance, Information Services, Supply Chain and EMEA Regional Controller**
2004 – 20073 yrs
U.K.

During my 7 years of expatriate assignment in the UK, I was responsible for Europe, Africa, Middle East, and Asia regions. This role was heavily commercial-focused with full P&L responsibilities to grow sales and expand margins. I also...see more

Show 5 more roles ⌄

 **Financial Systems Specialist**

Northrop Grumman Corporation

1986 – 19893 yrs
Southern California

Show 1 more experience ⌄

# Education

 **University of Nevada, Reno**

Bachelor's DegreeAccounting & Information Systems

**University of Nevada, Reno**

Master Degree (MBA)Business Administration

# Licenses & certifications

 **NACD Cyber Certificate (CERT Certificate in Cyber-security Oversight)**

NACD (National Association of Corporate Directors)
Issued Mar 2018No Expiration Date

 **Directors' College 2015 Executive Education Program**

Stanford University
Issued Jun 2015No Expiration Date



### The Executive Leadership Program

University of Southern California
Issued 2008No Expiration Date

Show more ⌄

## Volunteer experience



### Board of Directors

WISE & Healthy Aging
2014 – Feb 2016 2 yrs
Social Services



### Executive Advisory Services

WITI (Women in Technology International)
2014 – Jan 2016 2 yrs



### Catalyst Women On Board

Catalyst Inc.
Mar 2018 – Present 3 yrs 1 mo

## Skills & endorsements

### Cross-functional Team Leadership$^{66}$

 Endorsed by Edward Ryan, MBA and 10 others who are highly skilled at this

 Endorsed by 2 of Sue Jean's colleagues at Alcon

### Strategy$^{63}$

 Endorsed by Jack C Crawford and 4 others who are highly skilled at this

 Endorsed by 3 of Sue Jean's colleagues at Hillrom

### Process Improvement$^{45}$

 Endorsed by 3 of Sue Jean's colleagues at Hillrom

Show more ⌄

## Recommendations

A424

Received (6)     Given (2)

## Lourdes Gipson, MBA★

Executive Director | DallasCIO & BayAreaCIO at Inspire CIO Leadership Network (InspireCIO)

December 1, 2020, Lourdes worked with Sue Jean but at different companies

Sue-Jean has been recognized as a Super Global Finalist for the 2021 Dallas CIO of the Year® ORBIE® Awards for her outstandingleadership, management effectiveness, and business value createdthrough technology innovation as Senior Vice President & ChiefInformation Officer at Alcon. Sue-Jean is additionally r... See more

## Glenda Newell

Executive Director at Hill-Rom

October 9, 2018, Glenda reported directly to Sue Jean

As Sue-Jean's direct report at Hill-Rom I had the pleasure ofworking with her on a variety of projects and business initiatives. Sue- Jean is not only a thought leader but also a great mentorand coach. She motivated the organization to think outside of thebox and always seek to achieve those goals which wou... See more

Show more ⌄

# Accomplishments

## 4 Honors & Awards       ⌄

Ascend/Deloitte Inspirational Leadership Award  CIO100 Award  UCLA Anderson IS Associates Exectuive Leadership Award  Premier 100 IT Leader

## 2 Languages       ⌄

Chinese  English

## 1 Organization       ⌄

NACD National Association of Corporate Directors

# Interests

 **Allergan**
604,787 followers

 **Hillrom**
73,378 followers

 **Chief Financial Officer (CFO) Network | #1**
419,105 members

 **Alcon**
401,283 followers

 **Bonnie Gwin**
## Vice Chairman and Co-Managir
52,458 followers

 **University of Southern California - Marsha**
76,409 followers

**See all**

# EXHIBIT 15

3/11/2021

Kim Martin | LinkedIn

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 433 of 635   PageID 804



🔒 Message     ⋯

 **Alcon**

**University of
Illinois Urbana-...**

# Kim Martin

## Chief Human Resources Officer at Alcon, Inc.

Fort Worth, Texas, United States

500+ connections  Contact info

## About

Experienced global human resources executive with expertise in culture transformation, compensation and benefits, and mergers and acquisitions across healthcare, industrial, financial services and technology industries.

Deliver innovative and elegant solutions for company and customer challenges. Adept in compensation committe

... see more

## Activity

944 followers

Posts Kim created, shared, or commented on in the last 90 days are displayed here.

**See all activity**

## Experience

 **Chief Human Resources Officer**

Alcon

https://www.linkedin.com/in/dkhmartin01/

1/4

A428

Apr 2020 – Present1 yr
Fort Worth, Texas, United States



## Chief Human Resources Officer

Worldpay

Jan 2015 – Dec 20195 yrs

Chief Human Resources Officer leading a global human
resources and corporate communications organization
responsible for strategic talent management, workforce
optimization and planning, culture and engagement shaping, ...see more



## Vice President, Human Resources Americas & Corporate funtions

Zimmer Biomet

Jul 2010 – Jan 20154 yrs 7 mos

Vice President of Human Resources for the Americas region,
supporting the Reconstructive, Spine, Trauma, Surgical, and
Dental business units, Americas sales and corporate
functions including; finance, infrastructure technology, ...see more



**GE Healthcare**
11 yrs

**Global HR Executive, Monitoring Solutions & Diagnostic Cardiology**
Nov 2009 – Jul 20109 mos

Global human resource executive supporting the general
manager of a $1+ billion global profit and loss business. Led
a global human resources team across EMEA, Asia, and the
Americas regions.        ...see more

**Global HR Leader**
1999 – Nov 200910 yrs

Lead Global Talent Acquisition for GE Healthcare.

# Education



## University of Illinois Urbana-Champaign

MALabor & Industrial Relations
1996 – 1998



## Northwestern University - Kellogg School of

**Management**

CertificateWomen's Director Development Program
2018 – 2018



## University of Illinois Urbana-Champaign

1992 – 1996

## Skills & endorsements

### Executive Compensation[1]

Dennis Cultice has given an endorsement for this skill

### Global Human Resources Management[1]

Dennis Cultice has given an endorsement for this skill

### HR Strategy

Show more ⌄

## Recommendations

Received (0)      Given (1)

### Cinia Rodriguez

HR & Safety Manager at NPS Corporation

October 5, 2012, Kim was senior to Cinia but didn't manage directly

Cinia is a service focused individual who works well withemployees at all levels.

## Interests

Linked:HR (#1 Human Resources Group)

Worldpay
144,829 followers



**Executive Suite**
374,412 members

**GE Healthcare**
1,553,674 followers

**University of Illinois Urbana-Champaign**
449,127 followers

**Vantiv**
29,530 followers

See all

# EXHIBIT 16



🔒 Message     • • •

 Alcon

 Louisiana Tech University

# Ed McGough

Sr. VP, Mfg. and Technical Operations at Alcon

Fort Worth, Texas, United States

500+ connections   Contact info

## Activity

568 followers

Posts Ed created, shared, or commented on in the last 90 days are displayed here.

**See all activity**

## Experience



**Sr. VP, Mfg. and Technical Operations**

Alcon

**Senior VP, Mfg. and Technical Operations**

Alcon Laboratories, Inc.

Jan 2008 – Present13 yrs 3 mos
Fort Worth, Texas

**Sr. V.P. of Manufacturing & Technical Operations**

Alcon Labs, Inc.
1991 – Present30 yrs

### Quality Assurance
Baxter
1983 – 19918 yrs

## Education



### Louisiana Tech University



### Louisiana State University Health Sciences Center

## Skills & endorsements

### Pharmaceutical Industry58

Jim Jogerst and 57 connections have given endorsements for this skill

### Quality Assurance47


Endorsed by Kevin Cook and 5 others who are highly skilled at this




### Medical Devices38

Endorsed by MK Raheja and 2 others who are highly skilled at this




Show more

## Interests



TechExecs Network
4,659 members



Alcon
401,283 followers

OpsMedics
OpsMedics
61 followers


Louisiana Tech University
56,819 followers



**Louisiana State University Health Sciences**
7,511 followers

**Sapphire3D, Inc.**
81 followers

# EXHIBIT 17



🔒 Message          • • •

# Andrew Pawson

 **Alcon**

**UCL**

## President & GM Global Vision Care Franchise

Fort Worth, Texas, United States

500+ connections  Contact info

---

## Highlights

### Reach out to Andrew for...

Probono consulting and volunteering, Joining a nonprofit board.

Message

---

## About

Honored to be the President & General Manager of Global Vision Care with the worlds leading eye care company. Incorporated in 1947, now reestablished as an independent entity with over 20,000 associates globally, serving patients in over 140 countries - Alcon is re-imagining Eyecare by being at the forefront of Innovation and partnering with eyecare professionals and organizations around the world to help people 'See Brilliantly'.

---

## Featured



Alcon Official Site: Developing Innovative Eye Care Treatments | Alcon.com

Alcon.com

Our mission is to provide innovative vision products that

enhance quality of life by helping people see better. From vision
research to eye health, learn more at Alcon.com.

## Activity

**2,590 followers**

 Dreadfully sad news and my heartfelt
condolences to family and loved ones....

Andrew commented

 So proud of our super talented women
leaders in our exec team at Alcon - it's a...

Andrew shared this

19 Reactions 1 Comment

 Awesome - congratulations Michel.
Thrilled for you! Welcome to the world ...

Andrew commented

 This is a terrific opportunity for a Sales
professional to join the Worlds biggest...

Andrew shared this

16 Reactions

**See all activity**

## Experience



### President & GM Global Vision Care Franchise, Alcon

Alcon Full-time

Jan 2018 – Present3 yrs 3 mos

Forth Worth Texas

Leading the Vision Care Global Franchise driving,Strategy,
Brands & Innovation in the worlds leading independent eye
care company to help people all over the world to 'See
Brilliantly' everyday.

 Alcon Official
🔗 Site:...



### V/P Global Marketing & Sales

Kimberly-Clark Professional

Jun 2014 – Jan 20183 yrs 8 mos

Head of Global Marketing & Sales for Kimberly-Clark
Professional responsible for divisional CMO leadership of

Marketing capability globally and leading Global Key
...see more



**Kimberly-Clark Corporation**
9 yrs 10 mos

**V/P Consumer Brands & Innovation**
Jan 2013 – Jun 2014   1 yr 6 mos
Reigate

Reporting to the President of Kimberly-Clark Europe,
responsible for the Brand Innovation & Strategic
Development for the European Consumer Business with
functional accountability for Regional Marketing, R&E, ...see more

**Director of Strategy**
Mar 2012 – Jan 2013   11 mos
Reigate, Surrey

Leading the strategic review of the European consumer
business. Development & execution of five year strategic
plans leading to major European business restructuring.


Show 4 more roles ⌄

# Education

UCL
**UCL**
BSC (Hons) Mechanical Engineering
1984 – 1987

Bachelor of Science Degree in Mechanical Engineering

# Licenses & certifications

**Member - Chartered Institute of Mechanical Engineers**

# Skills & endorsements

**Consumer Products** 82

 Endorsed by Nathan Hanson and 5 others who are highly skilled at this

 Endorsed by 7 of Andrew's colleagues at Kimberly-Clark Professional

## FMCG 57

Tommaso Trigona and 56 connections have given endorsements for this skill

## Strategy 52

 Endorsed by Vinay Dhamija and 5 others who are highly skilled at this

 Endorsed by 9 of Andrew's colleagues at Kimberly-Clark Professional

Show more ⌄

# Recommendations

**Received (0)**     **Given (1)**

 **David Bass**
Category and Marketing Director at Kerry Foods

February 9, 2013, David worked with Andrew in the same group

I have worked with David for many years and believe him to be a great innovator and brand champion. He has a passion for innovation, for Insight lead brand development and has many years of strategic development of leading brands such as Huggies, Kotex, and Kleenex. He is a change agent and… See more

**A441**

# EXHIBIT 18



Message  · · ·

 Alcon

 Harvard Law School

# Christopher Cook 🔗

## Global Head of Litigation and Government Investigations at Alcon

Fort Worth, Texas, United States

500+ connections · Contact info

## About

Christopher Cook is an accomplished lawyer and executive with decades of experience advising corporations, their leaders, and their Boards. He brings a unique blend of perspectives and knowledge to his corporate roles.

... see more

## Activity

### 1,561 followers

Posts Christopher created, shared, or commented on in the last 90 days are displayed here.

**See all activity**

## Experience

 **Global Head of Litigation and Government**

## Investigations

Alcon

Nov 2017 – Present 3 yrs 5 mos
Dallas/Fort Worth Area

Lead and manage litigation and government investigations for the global leader in eye care, comprising over $7 billion of medical device and consumer product sales in 75 countries worldwide.



## Vice President, Walmart Stores, Inc. and General Counsel, Walmart Central America

Walmart

Feb 2014 – Oct 2016 2 yrs 9 mos
San Jose, Costa Rica

Led all aspects of the legal function for the largest retailer in Central America with US $4.7 billion in annual sales, 700 stores and more than 33,0000 employees located in Costa Rica, Nicaragua, Guatemala, El Salvador and Honduras.



## Partner

Jones Day

May 1997 – Feb 2014 16 yrs 10 mos
Washington, D.C. and Chicago, Illinois

Defended public companies and other clients in civil litigation and criminal investigations, with an emphasis on complex international matters. Conducted internal investigations and responded to inquiries from the     ...see more



## Assistant U.S. Attorney

U.S. Department of Justice

1992 – 1997 5 yrs
Chicago, Illinois

Prosecuted federal criminal cases in Chicago, Illinois. Tried eleven jury trials and handled twenty-two appeals involving the entire spectrum of criminal statutes, including fraud, RICO, drug trafficking and violent crime.



## Associate

King and Spalding

1989 – 1992 3 yrs
Atlanta, Georgia

Represented clients in civil litigation and internal investigations, including inquiries following the Exxon Valdez grounding and the Dow Corning silicon breast implant recall.

## Education



### Harvard Law School
J.D.
1986 – 1989

Graduated magna cum laude.



### Emory University
B.A.English
1982 – 1986

---

## Skills & endorsements

### Litigation⁴⁷

 Endorsed by James A. Shapiro and 13 others who are highly skilled at this

 Endorsed by 3 of Christopher's colleagues at Walmart

### White Collar Criminal Defense³³

Endorsed by Scott Mendeloff and 2 others who are highly skilled at this

 Endorsed by 11 of Christopher's colleagues at Jones Day

### Commercial Litigation³⁰

Endorsed by Anand S. Pathak, who is highly skilled at this

Endorsed by 2 of Christopher's colleagues at Walmart

Show more ⌄

---

## Recommendations

**Received (0)**     **Given (6)**

### Sophia
Sophia is an extraordinarily talented translator. I have worked

### Bensofia Gurgi

Translator & Simultaneous Interpreter

March 6, 2020, Christopher worked with Sophia in different groups

withher in a wide range of contexts, from sitting next to me in abusiness meeting, to hiring her for court proceedings, to watchingher work in a large group meeting. Her accuracy, speed and clarityare as good as any translator I have ever used. She is s... See more

---



### Maria Augusta Fernández Siu

Senior Legal and Management Consultant

January 21, 2020, Christopher managed Maria Augusta directly

Augusta is smart, diligent, ethical, and intellectually agile. I couldnot ask for more in a country lawyer, particularly when facing thehigh degree of legal uncertainty present in Central America. Plus,Augusta is as impressive personally as she is professionally, whichmakes working with her a delight.

Show more ⌄

# EXHIBIT 19



🔒 Message   · · ·

# Brent Chism

Global Brand Director at Alcon

Dallas-Fort Worth Metroplex  500+ connections

Contact info

 **Alcon**

 **University of Notre Dame -...**

## About

I'm a passionate Brand Marketing leader with experience across Fortune 500 companies. People are my focus. I have a history of strong results working on brands that range from Infant to Icon. Challenges motivate me. I love making a difference.

## Activity

**1,723 followers**

 **So kind of you to say Linda Cronin. I always gain so much from conversation...**
Brent replied to a comment

 **Very cool!**
Brent commented

 **So awesome Jaxie! Congratulations to you and the team.**
Brent commented

 **Let me know if I have any connections in my network that could help Henry!**
Brent replied to a comment

**See all activity**

A448

# Experience



## Global Brand Director

Alcon Full-time

Aug 2020 – Present8 mos

Dallas-Fort Worth Metroplex



## Independent Consultant

Self Employed Freelance

Jan 2020 – Aug 20208 mos

Marketing consulting projects for the beverage industry including research, packaging, branding and strategy development.



## Vice President Marketing

Dunn's River Brands

Jan 2019 – Jan 20201 yr 1 mo

Frisco, Texas



## Senior Director Of Marketing

Keurig Dr Pepper Inc.

2017 – 20192 yrs

Plano, Texas



**Dr Pepper Snapple Group**

5 yrs 11 mos

  •  **Marketing & Content Director - Teas and Juice Drinks**
Feb 2015 – Feb 20172 yrs 1 mo
Plano, Texas

  •  **Marketing Director - Dr Pepper, Crush & Schweppes**
Jun 2013 – Feb 20151 yr 9 mos
Plano, Texas

Show 1 more role ⌄

Show 4 more experiences ⌄

# Education



## University of Notre Dame - Mendoza College of Business

MBAMarketing

A449

1998 – 2000



## Harding University

B.A.Accounting
1994 – 1998

Activities and Societies:  President of Fraternity, Graduated Summa Cum Laude, Awarded Business
Law Student of the Year

## Licenses & certifications



### Fundamentals of Digital Marketing

Google Digital Garage
Issued Jun 2020No Expiration Date
Credential ID UJQ A4G CDB

**See credential**

## Skills & endorsements

### Marketing[76]

 Endorsed by  Charley Mays and 6 others
who are highly skilled at this

 Endorsed by  10 of Brent's colleagues at
Keurig Dr Pepper Inc.

### Marketing Strategy[69]

 Endorsed by  Eric Blackwood and 11 others
who are highly skilled at this

 Endorsed by  11 of Brent's colleagues at
Keurig Dr Pepper Inc.

### Shopper Marketing[47]

 Endorsed by  Richard Moulton and 10
others who are highly skilled at this

Endorsed by  3 of Brent's colleagues at
Keurig Dr Pepper Inc.

Show more ⌄

## Recommendations

Received (17)    Given (13)

**Stuart (Tex)**    I have worked for a number of global CPG conglomerates as wellas
mid-cap and start up opportunities and thus interfaced



**Daley**

COO/EVP - Operations|Supply Chain|Finance|Sales|R&D|Eng|Quality|Procurement - (Beverages|Food|Dietary Supplements)

September 3, 2019, Brent worked with Stuart (Tex) in the same group

withnumerous marketing professionals and executives, and by farBrent is the most talented marketing person I have ever workedwith. He is extremely well rounded, has solid business ... See more

---



**Sherrell Primo**

Field Marketing Manager at Nestlé

August 23, 2019, Sherrell reported directly to Brent

Brent is by far one of the most inspirational, intelligent andcompassionate leaders, I have had to the pleasure to work with.He stands out from the crowd with an incredible amount of hustleand heart. Always looking beyond what's immediately at hand,Brent is an energetic and warmhearted leader who is a... See more

---

Show more ⌄

# EXHIBIT 20



🔒 Message     •••

# Curt Metzler

Head, Global Transportation Alcon

Fort Worth, Texas, United States  406 connections

Contact info



**Alcon, a Novartis company**

---

## Activity

407 followers

Posts Curt created, shared, or commented on in the last 90 days are displayed here.

See all activity

---

## Experience



### Head,Global Transportation

Alcon, a Novartis company

May 2015 – Present5 yrs 11 mos

### Global Transportation Manager

Alcon

Jan 2013 – Jun 20152 yrs 6 mos



### Global Logistics Analyst

Alcon Laboratories, Inc.

**A453**

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 459 of 635   PageID 830

Jan 2005 – Jan 2013 8 yrs 1 mo

## Interests



**Expeditors**
197,978 followers



**Alcon**
401,283 followers

**GT Nexus**
14,819 followers

A454

# EXHIBIT 21



🔒 Message     •••

 Alcon

 Texas Christian University

# Juli Zoota

## Global Head, Strategic Pricing, Alcon

Fort Worth, Texas, United States

500+ connections   Contact info

## About

Analytic & strategic professional with proven track record of driving growth across a wide range of verticals including Pharmaceuticals, Medical Device, Healthcare Providers, CPG, Brick-&-Mortar and Online Retail, Restaurants, and Professional Services.

## Activity

1,341 followers

 **Fantastic workshop!**

Juli commented

**See all activity**

## Experience

 **Alcon**
10 yrs 7 mos

**Global Head, Strategic Pricing**
Dec 2014 – Present6 yrs 4 mos

A456

Dallas/Fort Worth Area

Built comprehensive Strategic Pricing function within Global
Market Access team, including implementation of Tools &
Processes to improve sales process & execution, and Pricing
Analytics to identify opportunities

Developed business case for and lead successful
development, deployment and organizational change
management efforts for Salesforce.com CPQ Global    ...see more

**Director, Global Marketing Science, Surgical Franchises**
Apr 2013 – Dec 20141 yr 9 mos

Lead a team of insights, analytics and CI professionals to
provide comprehensive market insights, implications and
recommendations to the business - informing Global
Marketing campaign development, BD&L forecasting, ...see more

**Associate Director, Global Marketing Science, Pharmaceutical Division**
May 2011 – Apr 20132 yrs

Contributed forward-looking analysis, combining a
comprehensive primary market research program with robust
forecasting methods to identify profitable Global product
opportunities to satisfy unmet medical needs.

**Global Market Research Manager**
Sep 2010 – May 20119 mos

Focus on strategic portfolio building by identifying unmet
need and forecasting market performance for Retina
Pharmaceuticals.



## Director of Research & Modeling, Market Planning

Experian Marketing Services
Nov 2005 – Sep 20104 yrs 11 mos

Strategic planning, direct marketing and forecasting to grow
a diverse set of client businesses spanning multi-channel
Retail, Online, Restaurants, Professional Services, and
Healthcare.

## Owner

DataFocus, Inc.
Dec 2004 – Mar 2008 3 yrs 4 mos
Advanced analytics service provider to small businesses

### Director of Research

Tangram Corporation
Jan 1999 – May 2002 3 yrs 5 mos

Predictive Analytics, Forecasting and retail/restaurant
location planning within a comprehensive GIS software
product

## Education



### Texas Christian University

Doctor of Philosophy (Ph.D.)Experimental Psychology
1996 – 2000

Emphasis in Social Psychology, Attitudes & Attitude Change,
Intrinsic Motivation & Quantitative Methods



### The University of Memphis

BAPsychology
1992 – 1996

## Licenses & certifications



### Certified Pricing Professional (CPP)

Professional Pricing Society
Issued Mar 2019No Expiration Date

## Skills & endorsements

### Market Research57

Endorsed by  Kendall Gay, PRC and 6 others
who are highly skilled at this

 Endorsed by  25 of Juli's colleagues at Alcon

### Strategy39

 Endorsed by  Raj Kumar and 5 others who

 Endorsed by  18 of Juli's colleagues at Alcon

are highly skilled at this

## Analytics 32

 Endorsed by Matt McLelland and 2 others who are highly skilled at this

 Endorsed by 17 of Juli's colleagues at Alcon

Show more ⌄

# Recommendations

**Received (4)**   **Given (8)**

 **Doug Scott**

Chief Operating Officer - SAP Services, Regulated Industries at SAP

February 15, 2009, Juli worked with Doug in the same group

I thoroughly enjoyed working alongside Juli. She was outstanding in supporting our retail/restaurant clients. Her extensive knowledge of their business combined with the technical modeling/analytics expertise gave her tremendous credibility with executives. In addition, she had a way of creating relat... See more

 **Ted Frumkin**

President/CEO at TBF Strategic Realty Advisors, Inc.

February 2, 2009, Ted was a client of Juli's

I have had the pleasure of working with Juli twice. Once when she was Director of Research at Tangram and most recently with her at Experian. Juli is always customer/client focused and wants to make sure that the product she is producing for you will assist you in making the right real estate decisions. She is very d... See more

Show more ⌄

# EXHIBIT 22

Case 3:20-cv-03629-M Document 23 Filed 03/12/21 Page 467 of 635 PageID 838



🔒 Message   ⋯

# Jay Stark

## Global Head, Surgical Visualization at Alcon

Fort Worth, Texas, United States

500+ connections  Contact info



Alcon

Pepperdine
University, The...

---

## About

Specialties: Global Product Launches, Commercial Operations, Integration Management, Marketing and Sales Leadership, Strategic Planning, Cross Functional Leadership, Change Management, Product Management, Organizational Development and Training,

Medical Device Marketing, Pharmaceutical Marketing, Portfolio and Innovation Strategy

---

## Activity

2,647 followers

Posts Jay created, shared, or commented on in the last 90 days are displayed here.

**See all activity**

---

## Experience



**Alcon**
7 yrs 10 mos

● **Global Head, Surgical Visualization**
Jan 2019 – Present·2 yrs 3 mos
Fort Worth, Texas

---

- **Global Franchise Director, Surgical Glaucoma**
  Jun 2016 – Jan 20192 yrs 8 mos
  Fort Worth, Texas

- **Global Product Director, Surgical Retina**
  Jan 2015 – Jun 20161 yr 6 mos
  Dallas/Fort Worth Area

- **Nordic Business Unit Head, Surgical**
  Jun 2013 – Dec 20141 yr 7 mos
  Copenhagen Area, Denmark

  Head of Surgical Business Unit for Alcon Nordic. Responsible
  for Marketing, Sales and Tech Service leadership for Alcon
  Surgical Portfolio for Denmark, Norway, Finland, Sweden and
  Iceland. Brand areas included sales of Surgical Equipment...see more



**Alcon**
3 yrs

- **Director, Global Marketing Development**
  2011 – 20132 yrs

  • Led Alcon's Global Marketing Development Organization to
  enhance leadership, talent and innovation skills within the
  worldwide marketing organization
  • Developed and championed Alcon's global marketing...see more

- **Global Marketing Manager, Advanced Technology Intraocular Lenses**
  2010 – 20111 yr
  Fort Worth, TX

  Global brand management for the AcrySof IQ ReSTOR
  Intraocular Lens and international commercialization/launch
  of the Acrysof IQ ReSTOR TORIC Intraocular Lens

  ...see more



**Alcon**
6 yrs

- **Global Sr. Product Manager, Vitreoretinal Marketing**
  2007 – 20092 yrs
  Fort Worth, TX

  Global launch/commercialization and brand management for
  the PUREPOINT Ophthalmic Laser (532 nm), laser delivery
  devices and fiberoptic illumination devices.

  ...see more



**US Sr. Product Manager, Allergy**
2003 – 2007 4 yrs
Fort Worth, TX

US Eye Care (Ophthalmology & Optometry) Brand Management for PATANOL Ophthalmic Solution and launch/commercialization of PATADAY Ophthalmic Solution.

...see more



Show 1 more role ⌄

**Pharmacia Corporation**
6 yrs

**Hospital Account Manager**
2001 – 2003 2 yrs

• Managed highest volume physician and institutional accounts in Southern CA
• Conducted business analysis with market trends and developed, implemented and assessed sales action plans

...see more

**Glaucoma Sales Specialist**
1997 – 2001 4 yrs

Managed Greater Los Angeles Territory for the promotion of Xalatan Ophthalmic Solution, an agent indicated for the treatment of Glaucoma.

...see more



## Public Information Coordinator
American Academy of Ophthalmology
1994 – 1997 3 yrs
San Francisco Bay Area

• Managed all public and patient information product lines
• Worked with vendors, AAO committees and marketing staff to develop products from concept to completion
• Developed and programmed patient information features

...see more

# Education

## Pepperdine University, The George L. Graziadio School of Business and Management
MBA

2000 – 2002



# The Johns Hopkins University
Bachelor's degree
1989 – 1993

# Gilman School
1980 – 1989

## Skills & endorsements

### Ophthalmology 99+

Endorsed by David Boyer, MD and 9 others who are highly skilled at this

 Endorsed by 83 of Jay's colleagues at Alcon

### Pharmaceutical Sales 99+

 Endorsed by Steve Gill and 3 others who are highly skilled at this

 Endorsed by 63 of Jay's colleagues at Alcon

### Medical Devices 99+

Endorsed by Dean Burns and 19 others who are highly skilled at this

 Endorsed by 68 of Jay's colleagues at Alcon

Show more ⌄

# EXHIBIT 23



🔒 Message     • • •

# Carla Mack, OD, MBA

Global Head, Professional Affairs

Fort Worth, Texas, United States

500+ connections   Contact info

 **Alcon**

 **The Ohio State University - The...**

## About

Results-oriented executive with over twenty years of all-encompassing experience in eye health; Driven by a passion for patient outcomes, innovative treatment options, high performing teams and developing talent.

Global leadership in the strategic development, execution and bridging of medical, professional and commercial strategies. Recognized ability to lead in matrix organizations, build strong internal and external relationships with key stakeholders and identify and inspire the right teams for desired results.

Solid competencies with international experience in medical device, medical affairs, professional marketing, professional and medical communications, professional affairs, KOL strategy and engagement, academic affairs, practice management, organizational structure, ophthalmology/optometry and direct patient care.

## Featured

⟨     ⟩

#AACE #makinganimpact



Proud employee of Alcon, a company committed to science-based innovation!...



Dry eye symptom relief study p

#dryeyedisease #seebrilliantly .



A468


© 2021 Alcon, Inc. 1/21 2101816E3A
BLACK HISTORY MONTH '20

Alcon

Symptom Relief Following a Si
Propylene Glycol-Hydroxyprop
dovepress.com • 3 min read

## Activity
### 4,106 followers


**Coming in April! A new global consensus report: Contact Lens Evidence-based...**

Carla shared this
8 Reactions


**Carolina Kunnen and David Borja making it happen! #seebrilliantly...**

Carla shared this
6 Reactions


**Shane- this is great work you are doing!**

Carla commented


**Joe Barr, OD, MS, FAAO writes about the scientific, clinical and regulatory matter...**

Carla shared this
16 Reactions

**See all activity**

## Experience


**Alcon**
7 yrs 3 mos

**Global Head, Professional Affairs**
Jul 2019 – Present1 yr 9 mos
Dallas/Fort Worth Area

**Head of Professional Strategy and Development**
Nov 2018 – Jun 20198 mos

**Senior Director, Professional Strategy**
Jul 2017 – Oct 20181 yr 4 mos
Columbus, Ohio Area

**Director, Professional and Clinical support**
Jan 2014 – Jun 20173 yrs 6 mos
Columbus, Ohio Area


**Bausch + Lomb**
5 yrs 2 mos

**Global Director Professional Marketing- Vision Care**
Jan 2012 – Oct 20131 yr 10 mos

**Global Director Medical Affairs- Vision Care**
Sep 2008 – Dec 2011 3 yrs 4 mos

 Show 1 more role ⌄

**Wolters Kluwer Health**
2 yrs

**Chief Editor, Contact Lens Spectrum and Chief Editor Contact Lenses Today**
Jul 2007 – Nov 2008 1 yr 5 mos

**Clinical Columns Editor- Contact Lens Spectrum**
2006 – 2008 2 yrs

 # Associate Professor of Clinical Optometry and Director Clinic Services
The Ohio State University
Dec 1996 – Sep 2008 11 yrs 10 mos

# Education

 ### The Ohio State University - The Max M. Fisher College of Business
M.B.A.
2006 – 2008

 ### The Ohio State University College of Optometry
The OSU College of Optometry and Veteran's Affairs Medical Center Hospital-Based Residency
1995 – 1996

Certificate of Residency in Ocular Disease awarded by the Veteran's Health Services and Research Administration 1996

### The Ohio State University College of Optometry
O.D.
1991 – 1995

Activities and Societies: Class President

Show 1 more education ⌄

# Skills & endorsements

## Medical Devices 99+

Endorsed by **Mo Merchea, OD PhD MBA** and 18 others who are highly skilled at this

 Endorsed by 21 of Carla's colleagues at Alcon

## Clinical Research 99+

 Endorsed by **Mark Bullimore** and 23 others who are highly skilled at this

 Endorsed by 11 of Carla's colleagues at Alcon

## Ophthalmology 99

 Endorsed by **Michael DePaolis, OD, FAAO** and 4 others who are highly skilled at this

 Endorsed by 14 of Carla's colleagues at Alcon

Show more ⌄

# Recommendations

**Received (6)**      **Given (5)**

 **Alexis Spilman Vogt, PhD**
Endowed Chair & Professor of Optics at Monroe Community College

October 7, 2013, Carla was senior to Alexis but didn't manage directly

As colleagues at Bausch + Lomb I always enjoyed working with Carla. She uniquely couples her depth of expertise with a high level of creativity to provide organizational vision and strategic leadership. She is always cognizant of the "big picture" and brings focus and direction to project teams. In additio... See more

 **Marjorie Rah**
Bausch + Lomb

October 2, 2013, Marjorie reported directly to Carla

I was hired by Carla at Bausch + Lomb in 2010 as a manager of global medical affairs focusing on publication strategy and implementation. I had the pleasure of working for and with her for just over three years. As a supervisor, she was exemplary. She allowed the perfect amount of oversight while at the s... See more

Show more ⌄

# EXHIBIT 24

# FDA U.S. FOOD & DRUG ADMINISTRATION

FDA Home[3] | Medical Devices[4] | Databases[5]

## Class 2 Device Recall Acrysof.IQ IOL w/UltraSert, System

510(k)[7] | DeNovo[8] | Registration & Listing[9] | Adverse Events[10] | Recalls[11] | PMA[12] | HDE[13] | Classification[14] | Standards[15]
CFR Title 21[16] | Radiation-Emitting Products[17] | X-Ray Assembler[18] | Medsun Reports[19] | CLIA[20] | TPLC[21]

New Search                                                       Back to Search Results

**Class 2 Device Recall Acrysof.IQ IOL w/UltraSert, System**

See Related Information[22]

| | |
|---|---|
| **Date Initiated by Firm** | April 17, 2020 |
| **Create Date** | June 05, 2020 |
| **Recall Status[1]** | Terminated[3] on February 05, 2021 |
| **Recall Number** | Z-2287-2020 |
| **Recall Event ID** | 85563[23] |
| **PMA Number** | P930014S084[24] |
| **Product Classification** | intraocular lens[25] - **Product Code** HQL[26] |
| **Product** | Acrysof, IQ IOL w/UltraSert System, AcrySof IQ ASPHERIC IOL, 20.5 D, SP ACRYLIC FOLDABLE LENS, w/UltraSert DELIVERY SYSTEM, UV w/BLUE LIGHT FILTER. 13.0mm. LENGTH, 6.0mm ANTERIOR ASYMMETRIC BICONVEX OPTIC, PLANAR HAPTICS. |
| **Code Information** | Lot number 12726594; Model Number: AU00T0V205; UDI # 038065GMN000065H7; 0380652394772(17)220630(21)12726594000(30)1 |
| **Recalling Firm/ Manufacturer** | Alcon Research LLC Aspex Facility 6201 South Fwy Fort Worth TX 76134-2099 |
| **For Additional Information Contact** | Heather Attra 817-293-0450 |
| **Manufacturer Reason** | Incorrect IOL diopter |

**FDA Determined Cause** [2]　　Process control

**Action**　　On 04/17/2020, the firm sent an "Urgent: Voluntary Medical Device Removal' letter to customers via overnight mail that the firm became aware that there was a potential problem relating to the IOL of wrong sized diopter, in a pre-loaded delivery system. Should a patient be implanted with an IOL having incorrect optical power, a refractive error would result. Patients with a refractive error may experience symptoms from mild blurred vision to decreased vision, which may require additional interventions such as spectacles or surgical intervention to correct.

The firm is instructing customers to: (i) Return any unused product of specified lot number (ii) The firm's Customer Service will contact customers to arrange for the return and replacement of affected Pre-loaded delivery system (iii) Fill out "Response Form" (iv) Return the "Response form" via fax or email to the firm, provided of contact information: Fax No.: 817-302-4337; E-mail: Market.Actions@alcon.com

Additionally, the firm is asking customers to: Reach out to firm's Sales Representative for any questions.

**Quantity in Commerce**　　84 units

**Distribution**　　US Nationwide distribution including in the states of TX, PA, CT, IA, MI, NE.

**Total Product Life Cycle**　　TPLC Device Report[27]

---

[1] A record in this database is created when a firm initiates a correction or removal action. The record is updated if the FDA identifies a violation and classifies the action as a recall, and it is updated for a final time when the recall is terminated. Learn more about medical device recalls[28].

[2] Per FDA policy, recall cause determinations are subject to modification up to the point of termination of the recall.

[3] For details about termination of a recall see Code of Federal Regulations (CFR) Title 21 §7.55[29].

**PMA Database**　　PMAs with Product Code = HQL and Original Applicant = ALCON LABORATORIES, INC.[30]

---

Links on this page:

　　1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. https://www.fda.gov/

4. http://www.fda.gov/MedicalDevices/default.htm

5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm

6. /scripts/cdrh/devicesatfda/index.cfm

7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm

8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm

9. /scripts/cdrh/cfdocs/cfRL/rl.cfm

10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm

11. /scripts/cdrh/cfdocs/cfRES/res.cfm

12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm

13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm

14. /scripts/cdrh/cfdocs/cfPCD/classification.cfm

15. /scripts/cdrh/cfdocs/cfStandards/search.cfm

16. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm

17. /scripts/cdrh/cfdocs/cfPCD_RH/classification.cfm

18. /scripts/cdrh/cfdocs/cfAssem/assembler.cfm

19. /scripts/cdrh/cfdocs/Medsun/searchReportText.cfm

20. /scripts/cdrh/cfdocs/cfClia/Search.cfm

21. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm

22. http://www.fda.gov/safety/recalls/enforcementreports/default.htm

23. /scripts/cdrh/cfdocs/cfRES/res.cfm?start_search=1&event_id=85563

24. /scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P930014S084

25. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=HQL

26. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=HQL

27. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm?id=HQL

28. http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm329946.htm

29. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm?fr=7.55

30. /scripts/cdrh/cfdocs/cfPMA/pma.cfm?start_search=1&productcode=HQL&applicant=ALCON%20LABORATORIES%2C%20INC%2E

Page Last Updated: 03/10/2021

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

Accessibility Contact FDA Careers FDA Basics FOIA No FEAR Act Nondiscrimination Website Policies / Privacy

FDA

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 482 of 635   PageID 853

For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency
Preparedness International Programs News & Events Training and Continuing Education
Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

3/11/2021 Class 2 Device Recall Acrysof.IQ IOL w/UltraSert, System



U.S. Department of **Health & Human Services**

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. http://www.fda.gov/MedicalDevices/default.htm
5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm
6. /scripts/cdrh/devicesatfda/index.cfm
7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm
8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm
9. /scripts/cdrh/cfdocs/cfRL/rl.cfm
10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm
11. /scripts/cdrh/cfdocs/cfRES/res.cfm
12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm
13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm
14. /scripts/cdrh/cfdocs/cfPCD/classification.cfm
15. /scripts/cdrh/cfdocs/cfStandards/search.cfm
16. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm
17. /scripts/cdrh/cfdocs/cfPCD_RH/classification.cfm
18. /scripts/cdrh/cfdocs/cfAssem/assembler.cfm
19. /scripts/cdrh/cfdocs/Medsun/searchReportText.cfm
20. /scripts/cdrh/cfdocs/cfClia/Search.cfm
21. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm
22. http://www.fda.gov/safety/recalls/enforcementreports/default.htm
23. /scripts/cdrh/cfdocs/cfRES/res.cfm?start_search=1&event_id=85563
24. /scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P930014S084
25. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=HQL
26. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=HQL
27. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm?id=HQL
28. http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm329946.htm
29. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm?fr=7.55
30. /scripts/cdrh/cfdocs/cfPMA/pma.cfm?
    start_search=1&productcode=HQL&applicant=ALCON%20LABORATORIES%2C%20INC%2E

# EXHIBIT 25

S-8 1 a19-7923_1s8.htm S-8

As filed with the Securities and Exchange Commission on April 10, 2019

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM S-8
## REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

# ALCON INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Switzerland** | **N/A** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**Rue Louis-d'Affry 6**
**1701 Fribourg, Switzerland**
(Address of principal executive offices)

**Alcon Inc. Long Term Incentive Plan**
**Alcon Inc. Deferred Bonus Stock Plan**
**Alcon Swiss Employee Share Ownership Plan**
**Alcon Laboratories Ireland Share Participation Scheme**
**Alcon Inc. UK Share Incentive Plan**
(Full title of the plans)

**Royce R. Bedward**
**Chemin de Blandonnet 8**
**1214 Vernier**
**Geneva, Switzerland**
**Tel: +1 (817) 293-0450**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Copy to:**
**Laura Becking**
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019-6142
(212) 506-5000

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer ☐ |
| Non-accelerated filer ☒ | | Smaller reporting company ☐ |
| | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

### CALCULATION OF REGISTRATION FEE

| Title of securities to be registered | Amount to be registered (1) | Proposed maximum offering price per share (2) | Proposed maximum aggregate offering price (2) | Amount of registration fee (2) |
|---|---|---|---|---|
| Ordinary shares, nominal value of CHF 0.04 each, issuable under the Alcon Inc. Long Term Incentive Plan | 20,000,000 | $ 58.20 | $ 1,164,000,000.00 | $ 141,076.80 |

(the "LTIP")

| | | | | | | |
|---|---|---|---|---|---|---|
| Ordinary shares, nominal value of CHF 0.04 each, issuable under the Alcon Inc. Deferred Bonus Stock Plan (the "DBSP") | 1,500,000 | $ | 58.20 | $ | 87,300,000.00 | $ | 10,580.76 |
| Ordinary shares, nominal value of CHF 0.04 each, issuable under the Alcon Swiss Employee Share Ownership Plan (the "Swiss Plan") | 475,000 | $ | 58.20 | $ | 27,645,000.00 | $ | 3,350.57 |
| Ordinary shares, nominal value of CHF 0.04 each, issuable under the Alcon Laboratories Ireland Share Participation Scheme (the "Irish Plan") | 200,000 | $ | 58.20 | $ | 11,640,000.00 | $ | 1,410.77 |
| Ordinary shares, nominal value of CHF 0.04 each, issuable under the Alcon Inc. UK Share Incentive Plan (the "U.K. Plan") | 75,000 | $ | 58.20 | $ | 4,365,000.00 | $ | 529.04 |
| Total | 22,250,000 | | | $ | 1,294,950,000.00 | $ | 156,947.94 |

(1)     Pursuant to Rule 416(a) under the Securities Act of 1933, as amended (the "Securities Act"), this registration statement on Form S-8 ("Registration Statement") covers an indeterminate number of additional ordinary shares ("Ordinary Shares") of Alcon Inc. (the "Registrant") that may become issuable under the LTIP, DBSP, Swiss Plan, Irish Plan and U.K. Plan (together, the "Plans") because of any future stock split, stock dividend, recapitalization or similar adjustment of the Ordinary Shares.

(2)     Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(c) and Rule 457(h) of the Securities Act. The proposed maximum offering price per share is estimated to be $58.20, based on the average of the high sales price ($58.73) and the low sales price ($57.67) for the Ordinary Shares as reported on the New York Stock Exchange on April 9, 2019.

## PART I

### INFORMATION REQUIRED IN THE SECTION 10(a) PROSPECTUS

The information required by Item 1 and Item 2 of Part I of Form S-8 is omitted from this filing in accordance with Rule 428 under the Securities Act and the introductory note to Part I of Form S-8. The documents containing the information specified in Part I will be delivered to the participants in the Plans as required by Rule 428(b)(1).

## PART II

### INFORMATION REQUIRED IN THE REGISTRATION STATEMENT

### Item 3.  INCORPORATION OF DOCUMENTS BY REFERENCE

The following documents filed by the Registrant with the Securities and Exchange Commission (the "Commission") are hereby incorporated by reference in this Registration Statement:

(a)      The Registrant's registration statement on Form 20-F (Commission File No. 001-31269) initially filed on November 13, 2018 under the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), relating to the Ordinary Shares, as amended by Amendment No. 1 on December 27, 2018, Amendment No. 2 on January 18, 2019, Amendment No. 3 on February 7, 2019, Amendment No. 4 on February 28, 2019, Amendment No. 5 on March 13, 2019 and Amendment No. 6 on March 22, 2019 (as amended, the "Form 20-F"); and

(b)      The description of the Ordinary Shares contained in the Form 20-F.

All documents subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, prior to the filing of a post-effective amendment, which indicates that all securities offered hereby have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference in this Registration Statement and to be part hereof from the date of filing such documents. For purposes of this Registration Statement, any statement contained in a document incorporated or deemed to be incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Registration Statement to the extent that a statement contained herein or in any other subsequently filed document, which also is or is deemed to be incorporated herein by reference modifies or supersedes such statement.

### Item 4.  DESCRIPTION OF SECURITIES

Not applicable.

### Item 5.  INTERESTS OF NAMED EXPERTS AND COUNSEL

Not applicable.

### Item 6.  INDEMNIFICATION OF DIRECTORS AND OFFICERS

Under Swiss law, directors and senior officers acting in violation of their statutory duties, whether dealing with bona fide third parties or performing any other acts on behalf of the corporation, may become liable to the corporation; its shareholders; and in bankruptcy, its creditors, for damages. The directors' liability is joint and several but only to the extent the damage is attributable to each director based on willful or negligent violation of duty. If the board of directors lawfully delegated the power to carry out day-to-day management to a different corporate body, such as the executive board, the board of directors is not vicariously liable for the acts of the members of the executive board. Instead, the directors can be held liable for their failure to properly select, instruct or supervise the executive board members. If directors and officers enter into a transaction on behalf of the corporation with bona fide third parties in violation of their statutory duties, the transaction is nevertheless valid as long as it is not excluded by the corporation's business purpose.

2

Under Swiss law, a corporation may indemnify a director or officer of the corporation against losses and expenses (unless arising from his or her gross negligence or willful misconduct), including attorney fees, judgments, fines and settlement amounts actually and reasonably incurred in a civil or criminal action, suit or proceeding by reason of having been the representative of or serving at the request of the corporation.

Registrant's articles of incorporation do not contain provisions regarding the indemnification of directors and officers but according to general principles of Swiss employment law, an employer may, under certain circumstances, be required to indemnify an employee against losses and expenses incurred by him or her in the execution of his or her duties under the employment agreement, unless the losses and expenses arise from the employee's gross negligence or willful misconduct.

Registrant currently maintains directors' and officers' insurance for its directors and officers as well as officers and directors of certain of its subsidiaries.

## Item 7. EXEMPTION FROM REGISTRATION CLAIMED

Not Applicable.

## Item 8. EXHIBITS

| Exhibit Number | Description of Document |
|---|---|
| 5.1+ | Opinion of Counsel regarding legality of the Ordinary Shares being registered |
| 23.1+ | Consent of Independent Registered Public Accounting Firm |
| 23.2 | Consent of Counsel (included in opinion filed as Exhibit 5.1) |
| 24.1+ | Power of Attorney (see signature page) |
| 99.1+ | Alcon Inc. Long Term Incentive Plan and Forms of Agreement Thereunder |
| 99.2+ | Alcon Inc. Deferred Bonus Stock Plan |
| 99.3+ | Alcon Swiss Employee Share Ownership Plan and Forms of Agreement Thereunder |
| 99.4+ | Alcon Laboratories Ireland Share Participation Scheme and Forms of Agreement Thereunder |
| 99.5+ | Alcon Inc. UK Share Incentive Plan and Forms of Agreement Thereunder |

+   Filed herewith.

## Item 9. UNDERTAKINGS

(a) The undersigned Registrant hereby undertakes:

(1) to file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement:

(i) to include any prospectus required by Section 10(a)(3) of the Securities Act;

(ii) to reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement (notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20 percent change in the maximum

aggregate offering price set forth in the "Calculation of Registration Fee" table in this Registration Statement); and

(iii)  to include any material information with respect to the plan of distribution not previously disclosed in the Registration Statement or any material change to such information in the Registration Statement;

provided, however, that paragraphs (a)(1)(i) and (a)(1)(ii) do not apply if the information to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the Registrant pursuant to Section 13 or Section 15(d) of the Exchange Act that are incorporated by reference in the registration statement;

(2)  that, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof; and

(3)  to remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b)  The undersigned Registrant hereby undertakes that, for purposes of determining any liability under the Securities Act, each filing of the Registrant's Annual Report pursuant to Section 13(a) or Section 15(d) of the Exchange Act (and, where applicable, each filing of an employee benefit plan's Annual Report pursuant to Section 15(d) of the Exchange Act) that is incorporated by reference in the Registration Statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(c)  Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

<div align="center">4</div>

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-8 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Geneva, Switzerland, on April 10, 2019.

ALCON INC.

By:   /s/ David J. Endicott
     Name: David J. Endicott
     Title:   Chief Executive Officer

By:   /s/ Timothy C. Stonesifer
     Name: Timothy C. Stonesifer
     Title:   Chief Financial Officer

5

# POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints David J. Endicott, Timothy C. Stonesifer and Royce R. Bedward, and each of them (with full power to each of them to act alone), his or her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this Registration Statement and to file the same with all exhibits thereto and other documents in connection therewith with the Securities and Exchange Commission granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities indicated on April 10, 2019.

| SIGNATURE | TITLE |
|---|---|
| /s/ David J. Endicott<br>David J. Endicott | Chief Executive Officer<br>(principal executive officer) |
| /s/ Timothy C. Stonesifer<br>Timothy C. Stonesifer | Chief Financial Officer<br>(principal financial officer) |
| /s/ Margaret Buckley<br>Margaret Buckley | Chief Accounting Officer<br>(principal accounting officer) |
| /s/ F. Michael Ball<br>F. Michael Ball | Chairman of the Board of Directors |
| /s/ Lynn D. Bleil<br>Lynn D. Bleil | Director |
| /s/ Arthur Cummings, M.D.<br>Arthur Cummings, M.D. | Director |
| /s/ Thomas Glanzmann<br>Thomas Glanzmann | Director |
| /s/ D. Keith Grossman<br>D. Keith Grossman | Director |
| /s/ Scott Maw<br>Scott Maw | Director |
| /s/ Karen May<br>Karen May | Director |
| /s/ Ines Pöschel<br>Ines Pöschel | Director |
| /s/ Dieter Spälti, Ph.D.<br>Dieter Spälti, Ph.D. | Director |

6

**AUTHORIZED REPRESENTATIVE**

Pursuant to the Securities Act of 1933, as amended, the undersigned, the duly authorized representative in the United States of the Registrant has signed this Registration Statement or amendment thereto in the City of Fort Worth, State of Texas, on April 10, 2019.

<div align="right">

/s/ Royce R. Bedward
_____
Royce R. Bedward

</div>

7

# EXHIBIT 26

# Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

## (Règlement d'organisation d'Alcon Inc.)

**Alcon Inc.**
1701 Fribourg, Switzerland

**Alcon**

A488

2    Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 494 of 635   PageID 865

# Table of Contents

**Introduction**      Regulations of the Board of Directors, its Committees
and the Executive Committee of Alcon Inc.                          3

**Section 1**        General Provisions                                          4

**Section 2**        Board of Directors                                          7

**Section 3**        Committees of the Board                                    10

**Section 4**        Chair and Vice Chairs                                       11

**Section 5**        Executive Committee and Chief Executive Officer             12

**Section 6**        Internal Audit                                             14

**Section 7**        Effectiveness, Amendments                                  14


**Charter**          The Compensation Committee of Alcon Inc.                    15

**Charter**          The Governance and Nomination Committee of Alcon Inc.       18

**Charter**          The Audit and Risk Committee of Alcon Inc.                  21

**Charter**          The Innovation Committee of Alcon Inc.                      26

**Appendix**         Independence Criteria for the Board of Directors
and its Committees                                         28

**Alcon**

A489

Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Based on Article 25 of the articles of incorporation of Alcon Inc. (the "Articles of Incorporation"), the Board of Directors (the "Board") promulgates the following regulations (the "Regulations").

These Regulations govern the duties, powers and responsibilities of the following executive bodies and persons of Alcon Inc. (the "Company"):

– Board
– Committees of the Board
– Chair of the Board (the "Chair")
– Vice Chairs of the Board (the "Vice Chairs")
– Chief Executive Officer (the "CEO")
– Executive Committee , and
– Internal Audit

All references to functions in these Regulations shall apply to both male and female persons.

Alcon

A490

4   Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

| Section 1 | General Provisions |
|---|---|

**Duty of Care and Loyalty**

**Article 1**

Each member of the Board, or the Executive Committee is under the duty to safeguard and further the interests of the Company and its shareholders.

**Conflict of Interests**

**Article 2**

No member of the Board, the Committees of the Board or the Executive Committee shall participate in the deliberations and resolutions on matters which affect, or reasonably might affect, the interests of that member or of a person close to that member.

**Confidentiality**

**Article 3**

Each member of the Board, the Committees of the Board, or the Executive Committee shall at all times keep strictly confidential all information – except information which is already in the public domain – relating to the Company and its affiliated companies (the "Group") which the member has learned during the exercise of his duties. This obligation and duty shall continue even after the term of office of the member has expired.

Business documents of the Company and the Group shall be returned by members of the Board, the Committees of the Board, or the Executive Committee at the latest on expiry of their term of office.

**No Representation of Members**

**Article 4**

A member of the Board, the Committees of the Board, or the Executive Committee who is not able to participate in a meeting of the executive body may not be represented by another member of the body or any other person.

**Quorum, Majority Requirements**

**Article 5**

Unless stated otherwise in these Regulations, the presence in person or by telephone or video conference of a majority of the members is required for any meeting of the Board, the Committees of the Board or the Executive Committee. If the chairperson does not participate, the members shall nominate a chairperson *ad hoc* who shall be the deputy chairperson.

Resolutions of the Board, the Committees of the Board, or the Executive Committee require the affirmative majority of the votes cast.

In the event of a tie on any issue, (i) in a Committee of the Board, the full Board shall decide the issue, and (ii) in the Executive Committee, the CEO shall decide the issue.

The CEO has the power to overrule any resolution taken by the Executive Committee.

**Alcon**

A491

**5** Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 497 of 635   PageID 868

No quorum is required for meetings at which the sole order of business is to deliberate and approve resolutions providing for the confirmation of capital increases or the amendment of the Articles of Incorporation in connection with an increase in the share capital.

The adoption of resolutions on items not on the agenda requires the affirmative vote of at least two thirds of the members of the Board or the Committees of the Board, present at a meeting.

Meetings and Resolutions

**Article 6**

Meetings of the Board, the Committees of the Board and the Executive Committee may be held in any location determined by the chairperson of the respective body.

Resolutions may be passed in writing (including by electronic communication or facsimile). A proposal for a circular resolution must be communicated to all members, giving a deadline for responding, and is approved if: (i) more than two-thirds of all members cast a vote or give written notice that they abstain; (ii) an absolute majority of all members casting a vote approve the proposed resolution; and (iii) no member requests a meeting in relation to the subject matter of the proposed resolution within one full business day of receiving notice of the proposal.

Secretary, Minutes

**Article 7**

The Board, the Committees of the Board and the Executive Committee shall each appoint a secretary, who need not be a member of the body.

The secretary of each body shall keep the minutes of meetings, which shall contain all resolutions adopted at the meeting.

Participation of Non-Members

**Article 8**

Persons who are not members of the Board, the Committees of the Board, or the Executive Committee may participate in meetings of such bodies if their expertise is required and if they have been invited by the chairperson of the body. Such persons shall not vote in any resolutions.

**Alcon**

6    Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 498 of 635   PageID 869

Business and
Legal Separateness

## Article 9

The Company is a holding company which directly or indirectly owns a global group of subsidiaries that conduct business operations (the "Business"). To ensure proper functioning of the Business in the interests of the Company and its shareholders and to comply with various requirements imposed by relevant laws and regulatory authorities, the Board shall supervise and, where necessary and appropriate, coordinate the Business by providing overall guidance and support.

Each company in the Group ("Group Company") shall be legally separate from all other Group Companies and shall manage its business independently. No Group Company shall operate the business of another Group Company nor shall any Group Company act as agent of any other Group Company.

Other Offices or
Investments

## Article 10

Any member of the Board and any member of the Executive Committee shall obtain the written consent of the Chair, and the Chair himself/herself, as applicable, shall obtain the written consent of the chair of the Governance and Nomination Committee, prior to:

a)    accepting (i) any board memberships of listed companies and, in the case of members of the Executive Committee, of any listed and non-listed companies, or (ii) any major external appointments. If a Board Member has been qualified by the Board as independent or non-executive, the agreement of the Chair, or the Chair of the Governance and Nomination Committee respectively, should also be sought before accepting additional commitments that might conflict with that qualification; or

b)    accepting any board membership or other role with, or making or holding a significant investment in, a company or other entity which is or is about to be in competition with the Group, except for investments in a collective investment scheme, where the assets of such scheme include a multitude of assets and are invested at the discretion of a third party

In addition, any member of the Board and any member of the Executive Committee shall inform the Chair, or the Chair of the Governance and Nomination Committee, respectively, before accepting any other membership of a board of directors or other significant commitments involving affiliation with other businesses or governmental units. Changes to such board memberships or significant commitments shall be reported as well.

In any case, each member of the Board and each member of the Executive Committee shall comply with the maximum number of offices permitted by the Articles of Incorporation.

**Alcon**

A493

7   Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 499 of 635   PageID 870

| Section 2 | **Board of Directors** |
|---|---|
| Duties of the Board | **Article 11** |

The Board is the ultimate executive body of the Company. It shall resolve all Business matters that are not reserved to the authority of the General Meeting of Shareholders or to other executive bodies of the Company by law, the Articles of Incorporation, or these Regulations.

In particular, the Board shall have the following duties:

a)  The ultimate direction of the Business, including, without litation, the taking of resolutions and the giving of necessary instructions or overall guidance and support regarding the following matters:

– The strategy upon recommendation of the Executive Committee
– Entry into new areas of activity and withdrawal from existing areas of the Business; acquisitions and divestments of companies, participations in companies or businesses, or incorporations or liquidations of companies or businesses, if such matters are of fundamental significance to the Business
– The opening and closing down of sites of fundamental significance to the Business
– The initiation and settlement of legal proceedings of fundamental significance to the Business
– The setting of financial targets and financial means to reach such targets
– The promulgation of corporate policies, in particular on financial matters, investments, personnel matters, cybersecurity, leadership, compensation, compliance with laws, corporate citizenship, communication and safety and environmental protection and supervising management's compliance therewith
– The adoption from time to time of further regulations and instructions regarding the organization of the Business and the duties and responsibilities of the executive bodies.

b)  The determination of the organization of the Company and the Group.

c)  The manner of governance of the Company, including the adoption from time to time of principles of corporate governance that are in the best interests of the Company and its shareholders.

d)  The structuring of the accounting system, financial controls and financial planning.

**Alcon**

A494

e)   The preparation of the annual report of the Company and of the Group, and of the compensation report.

f)   The appointment, removal, determination of duties and responsibilites, and succession plans of the following persons:

–   The members of the Committees of the Board (subject to the powers of the General Meeting to appoint and remove the members Compensation Committee)
–   One or two Chairs
–   The CEO, and
–   The members of the Executive Committee.

g)   The designation of those persons who shall have signatory power for the Company and the manner in which such persons may sign on behalf of the Company.

h)   The ultimate supervision of the persons entrusted with the management of the Business, specifically in view of their compliance with laws, the Articles of Incorporation, these Regulations and other applicable regulations, directives and instructions.

i)   The preparations for the General Meeting of Shareholders and carrying out the resolutions of the General Meeting, including the preparation of the proposals to the General Meeting related to the compensation of the Board of Directors and of the Executive Committee and to the Compensation Report, as per the Articles of Incorporation.

j)   Notification of the court if liabilities exceed assets.

k)   The adoption of resolutions concerning an increase of the share capital to the extent that such power is vested in the Board (Article 651 paragraph 4 of the Swiss Code of Obligations), as well as resolutions concerning confirmation of capital increases and related amendments to the Articles of Incorporation.

l)   The determination of (i) the compensation strategy and of the principles, policies, structure and design of compensation plans for the Executive Committee, (ii) the long-term incentive/equity plans, (iii) the compensation of the members of the Board and of the CEO, and of the terms of employment of the CEO, (iv) the group financial, strategic and operational targets and the evaluation of target achievement, and the approval of the Compensation Report.

**Alcon**

A495

9   Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

m) The determination of the maximum aggregate amount or maximum partial amounts of compensation, in the event the General Meeting of Shareholders has not approved a proposal of the Board of Directors, as per the Articles of Incorporation.

n) The determination of (i) whether or not a Board member is independent, based on a proposal by the Governance and Nomination Committee, and (ii) whether or not the members of the Audit and Risk Committee meet the financial literacy and expertise standards, both as stipulated by applicable law, regulation and listing requirements.

o) The examination of the expert qualifications of specially qualified auditors.

p) The determination and promotion of a culture that seeks to safeguard and strengthen the Group's reputation for responsible and sustainable conduct including (i) overseeing the Company's strategy and governance on corporate responsibility and key related issues that may affect the Company's, and (ii) reviewing emerging trends with regard to corporate responsibility as well as providing advice to the management thereabout.

q) The approval of other business, if such business exceeds the authority delegated from time to time by the Board to the Committees of the Board or to the Executive Committee.

**Delegation of Management**

**Article 12**

Where not stipulated as a Board responsibility in law, the Articles of Incorporation or these Regulations, the Board delegates to the Executive Committee the management of the Business pursuant and subject to these Regulations.

**Meetings, Agenda**

**Article 13**

The Board shall meet at the invitation of the Chair as often as may be required.

Invitations for meetings of the Board shall contain the agenda for the meeting and shall be issued at least five business days in advance, except for urgent matters.

Also, any member of the Board may request a meeting for a specific purpose or the inclusion of a certain item on the agenda. Such requests must be submitted to the Chair in writing at least two days prior to the meeting, except for urgent matters.

The Chair shall take the chair at the meetings of the Board.

The independent members of the Board shall meet in separate sessions, as necessary.

**Alcon**

A496

**10**  Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M    Document 23    Filed 03/12/21    Page 502 of 635    PageID 873

Right to Request
Information

**Article 14**

The members of the Board have full and unrestricted access to management and employees of the Company and the affiliated companies in the execution of their duties. This includes the right to request information and inspection pursuant to Article 715a of the Swiss Code of Obligations.

Authority to
Retain
Independent
Advisors

**Article 15**

The Board shall have the authority to retain independent advisors for any matters within the scope of its responsibilities. The Board shall obtain appropriate funding, as determined by the Board, for payment of compensation to any outside advisors engaged by the Board.

Authorized
Signatories

**Article 16**

The Board appoints those of its members who shall be authorized to sign documents on behalf of the Company.

Resignation of
Board
members

**Article 17**

A member of the Board shall inform the Chair upon a material change of his or her business or professional affiliations or responsibilities and offer his/her resignation, as appropriate.

Evaluation of
Board
performance

**Article 18**

The Board conducts a periodic evaluation of the performance of the Board and of the Chair.

**Section 3**

**Committees of the Board**

Committees of
the Board

**Article 19**

The Board shall form the following permanent Committees:

– Compensation Committee
– Governance and Nomination Committee
– Audit and Risk Committee, and
– Innovation Committee

The composition and duties of these Committees shall be as set forth in the applicable Committee charters in compliance with legal requirements. The Committee charters are attached to these Regulations and incorporated herein by reference.

**Alcon**

A497

**Section 4**  **Chair and Vice Chairs**

Chair

**Article 20**

In addition to other duties described in these Regulations and the Articles of Incorporation, the Chair, elected by the General Meeting of Shareholders, has the following duties:

a)  Provides leadership to the Board in its governance role, coordinating the tasks within the Board and, in particular, calls Board meetings and sets their agenda;

b)  Coordinates, together with the Chairpersons of the Committees, the work of all Committees. The Chair may attend the Committee meetings in consultation with the relevant Committee Chairperson;

c)  Establishes and keeps a close working relationship with the CEO, providing advice and support while respecting the fact that the day-to-day management responsibility is delegated to the Executive Committee led by the CEO;

d)  Promotes effective relationships and communication between the Board and the CEO and the Executive Committee;

e)  Takes the lead in crisis situations;

f)  Together with the CEO, ensures effective communication with shareholders, other stakeholders and the general public.  The Chair is the primary representative of the Board and, together with the CEO, represents Alcon to the media.  Other Board members may only discuss Alcon matters with the media with the prior approval of the Chair; and

g)  Works closely with the CEO in evaluating members of the Executive Committee and in establishing succession plans for key management positions.

Vice Chair

**Article 21**

In case and as long as the Chair is incapacitated, the Vice Chair (or one of them if two have been appointed), shall be tasked by the Board to lead the Board.

If and as long as the Chair is not independent, the Vice Chair (or one of them if two have been appointed) (in this capacity acting also as "Senior Independent Director"), shall be tasked by the Board with the following duties:

a)  Chairs the sessions of the independent members of the Board, as required; and

b)  Leads the independent members of the Board in case of a crisis or matter requiring their separate consideration or decision. Every independent Board member may request separate meetings of the independent members if the need arises.

**Alcon**

A498

**Section 5**

Members of
Executive
Committee

Duties of
Executive
Committee

### Executive Committee

#### Article 22
The Executive Committee is headed by the CEO. It shall consist of such members as may be appointed or removed by the Board from time to time.

#### Article 23
The Executive Committee under the leadership of the CEO is responsible for the management of the Business and functions as a coordination committee, independent of any legal entity of the Group.

In particular, and without limitation, the Executive Committee shall have the following duties:

a) Prepare corporate policies, strategies and strategic plans for the attention of and approval by the Board or its Committees.

b) Implement the strategies, policies, and matters agreed upon by the Board or its Committees.

c) Regularly assess the achievement of the targets for the Business.

d) Submit the following to the Board or to one of its Committees for approval or advice in accordance with such regulations and standards as are promulgated by the Board from time to time:

  – Appointments to and removals of associates with material impact on the Business
  – Capital investments, financial measures, and the acquisition or divestiture of companies, participations and businesses of fundamental significance in accordance with such regulations and standards as are promulgated by the Board from time to time
  – Significant agreements with third parties and engagement in new business activities
  – The revenue, financial, and investment budgets of the Business, including any addenda thereto

e) Implement the matters approved by the Board.

f) Prepare and submit quarterly and annual financial reports for the attention and approval of the Board or its Committees, and keep the Board informed of all matters of fundamental significance to the Business.

g) Implement modifications to the organization of the Business to ensure efficient operation of the Business and achievement of optimized consolidated results.

h) Promote an active internal and external communications policy.

**Alcon**

A499

13  Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 505 of 635   PageID 876

i) Ensure that management capacity, financial and other resources are provided and used efficiently.

j) Deal with such other matters as are delegated by the Board to the Executive Committee from time to time.

CEO

### Article 24

In addition to other duties that may be assigned by the Board, the CEO, supported by the Executive Committee, has the following duties:

a) Has a leading role in preparing corporate policies, strategies and strategic plans according to Article 24 above.

b) Has overall responsibility for the management and performance of the Business.

c) Is the primary contact person for the Board and is responsible for the reporting to the Board.

d) Leads the Executive Committee.

e) Builds and maintains an effective executive team and proposes adequate succession planning. He submits proposals for the appointment of members of the Executive Committee to the Compensation, Governance and Nomination Committee.

f) Appoints and promotes senior management subject to such standards as shall be adopted by the Board from time to time.

g) May adopt further policies regarding the organization of the Executive Committee in accordance with the Articles of Incorporation and these Regulations.

h) Represents Alcon, in coordination with the Chairman, with major customers, financial analysts, investors and the media.

Sub-committees of the Executive Committee

### Article 25

The Executive Committee may delegate duties as stipulated in Article 23 above to other executives and committees. The CEO shall ensure proper reporting to the Executive Committee or the Board as the case may be.

**Alcon**

A500

| | |
|---|---|
| **Section 6** | **Internal Audit** |

Duties of Internal Audit

### Article 26

The Group's internal audit, led by the Head of Internal Audit, shall:

a) Carry out operational and system audits, assisting the organizational units in the accomplishment of objectives by providing an independent approach to the evaluation, improvement, and effectiveness of their risk management and internal control framework. All organizational units of the Group are subject to audit.

b) Prepare reports regarding the audits it has performed, and report to the CEO and to the Audit and Risk Committee material irregularities, whether actual or suspected, without delay.

c) Perform such other functions and audits as assigned to it by the Board, the Audit and Risk Committee or the CEO from time to time.

| | |
|---|---|
| **Section 7** | **Effectiveness, Amendments** |

Effectiveness Amendments

### Article 27

These Regulations shall come into effect on May 6, 2020 and replace the former regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

These Regulations may only be amended or replaced by the Board.

Mike Ball
Chairman

Royce Bedward
General Counsel and
Corporate Secretary

**Alcon**

**A501**

15    Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 507 of 635   PageID 878

**Charter**                    **The Compensation Committee of Alcon Inc.**

<span style="color:teal">Mission Statement</span>

The Compensation Committee (the "CC") assists the Board with compensation and human capital strategies, the design of the compensation plans, the compensation of the members of the Board and of the CEO, talent succession and the Compensation Report, and determines the compensation of the other members of the Executive Committee.

Pay for performance is one of the guiding principles of the compensation strategy of Alcon Inc. and its affiliates (the "Group").

The Group aims to reward those associates who achieve competitive business results and exemplify the Group values and behaviors. The compensation strategy strives to strengthen the performance-oriented culture and to reinforce entrepreneurial behavior resulting in contributions that motivated and dedicated associates make to sustain superior business results whilst holding executives accountable for behavior that displays innovation, quality, performance, collaboration, courage and integrity.

<span style="color:teal">Organization</span>

The CC shall consist of a minimum of three and a maximum of five members of the Board. The Board shall elect a Chair of the CC.  The members of the CC shall be elected individually by the General Meeting of Shareholders for a term of office until completion of the next Ordinary General Meeting of Shareholders. Members of the CC whose term of office has expired shall be immediately eligible for re-election. If there are vacancies on the CC, the Board shall appoint substitutes from amongst its members for the remaining term of office.

The members of the CC shall be independent in accordance with the independence criteria set forth in the Appendix.

The CC will meet no fewer than four times a year. Special meetings may be convened as required.

The CC shall report regularly to the Board on CC policies, programs, deliberations, decisions, determinations, approvals, findings and other matters the CC deems appropriate or the Board requests.

The CC may invite to its meetings other Board members, members of the management and such other persons the CC deems appropriate in order to carry out its responsibilities.  No executive may be present during the decision on his or her own pay.

The CC shall have the authority to retain an independent compensation consultant and to approve the consultant's fees and other retention terms. The CC shall also have authority to obtain advice and assistance from internal or external legal, accounting or other advisors. In retaining services of consultants or advisors, the CC takes due care to consider the independence of any such consultant or advisor from the management of Alcon.

The CC shall obtain appropriate funding, as determined by the CC, to support its activities, including for payment of the independent compensation consultant and advisors.

**Alcon**

## Roles and Responsibilities

The CC shall have the following responsibilities:

1. Develop a compensation philosophy in line with the principles described in the Articles of Incorporation and submit to the Board of approval.

2. Provide oversight for the human capital strategy of the Company, including talent management, succession planning for the CEO and other members of the ECA, the Company's diversity and inclusion initiatives and equal pay measures and results.

3. Develop the principles and design of compensation plans, long-term incentive/equity plans, and unique pension arrangements and benefits, if any, for the Executive Committee and submit to the Board for approval.

4. Periodically review and approve a peer group(s) of companies for executive compensation comparisons.

5. Develop the terms of, and administer, the Group's long-term incentive/equity compensation plans, including the weightings, payout curves and caps for the chosen performance measures.

6. Determine the critical performance measures (financial, strategic and operational) that inform how well the Group is performing in relation to the business strategy for incorporation into the incentive plans.

7. Periodically assess the effectiveness of the executive short- term and long-term incentive plans in relation to market practices and the Group's strategic objectives, values and pay-for-performance principles.

8. Support the Board of Directors in preparing the proposals to the General Meeting of Shareholders regarding the compensation of the members of the Board of Directors and the Executive Committee.

9. Prepare the Compensation Report and submit to the Board for approval.

10. Propose to the Board the contractual terms (if any) and compensation of the members of the Board (incl. the Chair of the Board) and the CEO.

11. Annually assess the level of Board compensation against the peer group and other relevant companies and submit to the Board its recommendations for the compensation of Board members and the compensation and terms of employment of the Chair of the Board.

12. Approve, upon proposal by the CEO, the terms of employment, compensation, promotion or termination of the other members of the Executive Committee (except for the CEO).

13. Work together with other Board Committees as appropriate to ensure that executive compensation, including applicable incentive targets, is correctly aligned to business performance and is not structured in a way that could lead to inappropriate or excessive risk taking.

**Alcon**

A503

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 509 of 635   PageID 880

17   Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

14. At the start of each performance period, review, after Board approval, the Group financial, strategic, operational and individual targets for Executive Committee members. Incorporate these targets into the short-term and long-term incentive/equity compensation plans.

15. At the start of each performance period, approve the target total direct compensation levels and the mix of compensation (fixed/variable, short/long-term, individual/Group, and cash/equity) for Executive Committee members, and recommend the CEO's target total direct compensation level and mix of compensation to the Board for approval, in each case taking into consideration pay and conditions for the wider population of Group associates.

16. At the end of each performance period, taking into consideration the Board's evaluation of Group performance against targets established at the beginning of the performance cycle, approve performance results under the incentive plans, evaluate individual performance, approve the amount of compensation earned by Executive Committee members and recommend the amount of compensation earned by the CEO to the Board for approval taking into account the overall performance of the business and, if appropriate, making adjustments to the formulaic outcome of any incentive plans, within the plan Rules.

17. Consider and decide whether there is a need for malus and/or clawback provisions to be exercised and, if so, the extent and form of the malus and/or clawback.

18. Establish executive and director stock ownership guidelines and stock trading policies, and monitor compliance with such policies.

19. As directed by the Chair of the Board, oversee communications and engagement on executive compensation matters with shareholders and their advisors, including shareholder voting on Board and Executive Committee compensation, and assess the voting results on executive compensation matters of the most recent General Meeting of Shareholders.

20. Annually assess the engagement and performance of compensation consultants or other outside advisors engaged by the CC and their independence in relation to any potential conflicts of interest.

21. Keep abreast of regulatory and best practice requirements regarding Board, Executive Committee and other senior executive compensation.

22. Keep abreast of market trends and consideration of external factors that may influence pay in terms of design, structure, quantum, disclosure, etc.

23. Review and assess the adequacy of this charter annually and submit proposed changes to the Board for approval.

24. Conduct an annual self-evaluation of the CC performance.

25. Assume other responsibilities assigned to it by law, the Articles of Incorporation and by the Board.

Effective: [May 6, 2020]

**Alcon**

A504

**18** Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 510 of 635   PageID 881

**Charter**

## The Governance and Nomination Committee of Alcon Inc.

### Mission Statement

The Governance and Nomination Committee (the "GNC") supports the Board of Directors of Alcon Inc. (the "Board") in fulfilling its responsibilities with respect to the governance of Alcon Inc. (the "Company"), the identification of individuals who are qualified to become (or be re-elected as) Board members and the public responsibilities of the Company.

### Organization

The GNC shall consist of a minimum of three members of the Board. The Board will designate one member of the GNC as its chairperson. The majority of members of the GNC shall be independent in accordance with the independence criteria set forth in the Appendix.

The GNC will meet no fewer than three times a year. Special meetings may be convened as required.

The GNC shall report regularly to the Board on its decisions, determinations, approvals, findings and other matters the GNC deems appropriate or the Board requests.

The GNC may invite to its meetings other Board members, members of the management and such other persons the GNC deems appropriate in order to carry out its responsibilities. In the event the Chair of the Board is not a member of the GNC, the Chair of the Board shall be a permanent guest of the Committee.  The GNC shall exclude from its meetings anyone with a personal interest in the matters to be discussed.

The GNC shall have the authority to retain an independent consultant and to approve the consultant's fees and other retention terms. The GNC shall also have authority to obtain advice and assistance from internal or external legal, accounting or other advisors. In retaining services of consultants or advisors, the GNC takes due care to consider the independence of any such consultant or advisor from the management of Alcon.

The GNC shall obtain appropriate funding, as determined by the GNC, to support its activities, including for payment of the independent compensation consultant and advisors.

### Roles and Responsibilities

The GNC shall have the following responsibilities:

*In General*

1. With the Chair of the Board, review periodically the Articles of Incorporation and the Regulations and recommend to the Board changes thereto in respect of good corporate governance and fostering shareholders' rights.

2. Oversee the Company's global strategy and reputation regarding corporate governance, environmental stewardship, sustainability and corporate social responsibility ("ESG matters") and stay abreast of developing trends in ESG matters.

3. Annually approve the Company's reporting on ESG matters.

**Alcon**

A505

4.  With the Chair of the Board, oversee the Company's communications and engagement on ESG matters with shareholders and their advisors and assess the feedback received as a result of such communications and engagement.

5.  With the Chair of the Board, recommend such other actions not set out below regarding the governance of the Company that are in the best interests of the Company and its shareholders, as the GNC shall deem appropriate.

*Board Composition*

6.  Review the composition and size of the Board in order to ensure the Board has the proper expertise and consists of persons with sufficiently diverse backgrounds.

7.  Determine the criteria for selection of the Chair of the Board, Board members and Board Committee members. The GNC considers factors such as (i) personality, skills and knowledge, (ii) diversity of viewpoints, professional backgrounds and expertise, (iii) business and other experience relevant to the business of the Company, (iv) the ability and willingness to commit adequate time and effort to Board and Committee responsibilities, (v) the extent to which personality, background, expertise, knowledge and experience will interact with other Board members to build an effective and complementary Board, and (vi) whether existing board memberships or other positions held by a candidate could lead to a conflict of interest.

8.  With the participation of the Chair of the Board, actively seek, interview and screen individuals qualified to become Board members for recommendation to the Board.

9.  Assess and recommend to the Board as to whether members of the Board should stand for re-election.

10. In case a Board member tenders his/her resignation, review the appropriateness of continued service on the Board of such member.

11. With the Chair of the Board and the Board Secretary, develop and periodically review an orientation program for new Board members and an ongoing education program for existing Board members.

*Board Committees*

12. With the Chair of the Board, periodically review the Regulations and the charters of the Board Committees and make recommendations to the Board for the creation of additional Board Committees or a change in mandate or dissolution of Board Committees.

13. With the Chair of the Board, periodically review the composition of the Board Committees. When doing so, the GNC takes into account whether a member of a Board Committee is suitable for the tasks of his respective Board Committee.

14. With the Chair of the Board, periodically review the chairs of the respective Board Committee.

15. Ensure that each Committee conducts the required number of meetings and makes sufficient reports to the Board on its activities and findings.

**Alcon**

**Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 512 of 635   PageID 883**

20      Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

16. Periodically review the number, structure and effectiveness of the Board Committees and recommend changes, if any, to the full board.

*Conflicts, Other Directorships and Board Members Independence*

17. Review directorships and consulting agreements of Board members for conflicts of interest.

18. With the Chair of the Board, review actual and potential conflicts of interest a Board member may have and propose to the Board how the conflict should be handled. Ensure the Board member having an actual or potential conflict of interest appropriately conducts himself/herself in matters before the Board as it pertains to such a conflict.

19. Annually submit to the Board a proposal concerning the determination of the independent status of the Board members and the corresponding disclosure.

*Other*

20. Review and reassess the adequacy of this charter annually and submit proposed changes to the Board for approval.

21. Conduct an annual self-evaluation of the GNC performance.

22. Determine appropriate means for evaluating the Board, Directors and Committee performance and direct periodic assessments.

23. Assume other responsibilities assigned to it by law, the Articles of Incorporation and by the Board.

Effective: [May 6, 2020]

**Alcon**

A507

**Charter**

## The Audit and Risk Committee of Alcon Inc.

### Mission Statement

The Audit and Risk Committee (the "ARC") will assist the Board of Directors of Alcon Inc. (the "Board") in (A) monitoring (1) the integrity of the financial statements of Alcon Inc. (the "Company") and its affiliated companies (the "Group"), (2) the external auditor's qualifications and independence, (3) the performance of the Group's internal audit function and external auditors, and (4) the compliance by the Group with legal and regulatory requirements, and (B) ensuring that risks are properly assessed and professionally managed by (1) overseeing the Alcon risk management system and processes and (2) reviewing the Alcon risk portfolio and related actions implemented by the management.

### Organization

The ARC shall consist of a minimum of three members of the Board. The Board will designate one member of the ARC as its chairperson.

The members of the ARC shall be independent in accordance with the independence criteria set forth in the Appendix.

Each member of the ARC must be financially literate; as such, qualification is interpreted by the Board in its business judgment. At least one member shall be an "audit committee financial expert." Such member has (1) an understanding of generally accepted accounting principles and financial statements, (2) the ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves, (3) experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the Group's financial statements, or experience actively supervising one or more persons engaged in such activities, (4) an understanding of internal control over financial reporting, and (5) an understanding of audit committee functions. To qualify, an individual must have gained the foregoing attributes through any of the following means:

- Education and experience 1) in a position as a principal financial or accounting officer, controller, public accountant, or auditor, or 2) in a position involving similar functions;
- Experience in actively supervising a principal financial or accounting officer, controller, public accountant, or auditor (or an individual performing similar functions);
- Experience in overseeing or assessing companies or public accountants in the preparation, auditing, or evaluation of financial statements; or
- Other relevant experience.

The ARC shall meet no less than four times a year. The ARC shall meet periodically in separate executive sessions with management, the internal auditors and, but not less frequently than quarterly, the external auditor, and have such other direct and independent interaction with such persons from time to time as the members of the ARC deem appropriate.

**Alcon**

A508

22    Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M    Document 23    Filed 03/12/21    Page 514 of 635    PageID 885

The ARC may invite to its meetings Company management, internal auditors, external auditors, and such other persons as the ARC deems appropriate in order to carry out its responsibilities. The ARC shall exclude from its meetings anyone with a personal interest in the matters to be discussed.

The ARC shall regularly report to the Board on decisions and deliberations of the ARC.

The ARC shall have the authority to retain independent counsel and other advisors, and to conduct or authorize investigations into any matters within the scope of its responsibilities.

The Company shall provide for appropriate funding, as determined by the ARC, for payment of compensation to the external auditors and any outside advisors engaged by the ARC.

## Roles and Responsibilities

The ARC has the following roles and responsibilities:

*Regarding External Auditors*

1.  Evaluate the qualifications, performance and independence of the external auditors, including considering whether the auditor's quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the auditor's independence, taking into account the opinions of management and internal auditors.

2.  Ensure rotation of the lead group audit partner(s) and quality review partner(s) of the external auditors at least every five years. Consider whether, in order to ensure continuing auditor independence, it is appropriate to adopt a policy of rotating the external auditing firm on a regular basis. Set policies for the Company's hiring of employees or former employees of the external auditors.

3.  On behalf of the Board, which has fully delegated this task to the ARC, (1) select and nominate the external auditors for election by the meeting of the shareholders (pursuant to mandatory Swiss company law), and (2) be directly responsible for the supervision and compensation of the external auditors (including the resolution of any disagreement between management and the external auditors regarding financial reporting). The external auditors shall report directly to the ARC.

4.  On behalf of the Board, which has fully delegated this task to the ARC, pre-approve all auditing services, internal control-related services and non-audit services permitted under applicable statutory law, regulations and listing requirements to be performed for the Group by its external auditor. The ARC shall establish and maintain the necessary approval procedures.

5.  Obtain and review a report from the external auditors at least annually regarding (1) the external auditors' internal quality- control procedures, (2) any material issues raised by the most recent quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, (3) any steps taken to deal with any such issues, and (4) all relationships between the external auditors and the Group.

**Alcon**

A509

6.  Discuss with the external auditors the results of their audits, any unusual items or disclosures contained in the audits and the matters required by, PCAOB and International Standards on Auditing, including the following:
    –  The initial selection of and changes in significant accounting policies
    –  The methods used to account for significant or unusual transactions and the effects of significant accounting policies in controversial or emerging areas
    –  The process utilized by management to formulate significant accounting estimates and the basis for the auditors' conclusions regarding the reasonableness of these estimates
    –  Audit findings and recommendations, including audit adjustments that either individually or in the aggregate have a significant effect on the audit
    –  The auditors' responsibility for other information presented with the audited financial statements, such as a management report on financial status
    –  Any disagreements with management, whether or not satisfactorily resolved, concerning matters that individually or in the aggregate may be significant to the Company's or the Group's financial status or the auditors' report
    –  Significant matters that were the subject of consultations with other accountants
    –  Significant issues discussed with management with regard to the initial or recurring retention of the auditor and
    –  Any serious difficulties encountered in dealing with management during the performance of the audit

*Regarding Internal Auditors*

7.  Review periodically, together with the CEO, the adequacy of the organizational structure, budget and appointment and replacement of the senior internal auditing executives.

8.  Review the significant reports to management prepared by the internal audit department and management's responses.

9.  Discuss with the external auditor and management the internal audit department's responsibilities, staffing and any recommended changes in the planned scope of the internal audit.

*Regarding Financial Reporting*

10. Review and discuss with management and the external auditors the Company's and Group's quarterly and annual financial statements (including the sections on Operating and Financial Review and Prospects) to consider significant financial reporting issues and judgments made in connection with the preparation of the Company's and Group's financial statements, including any significant changes in the Company's or Group's selection or application of accounting principles.

11. On behalf of the Board, which has fully delegated this task to the ARC, review and approve the Company's and Group's quarterly financial statements for the first three quarters of each calendar year and the corresponding financial results releases, including financial information and earnings guidance provided to analysts and rating agencies. The Board remains responsible for the approval of the annual financial statements of the Company and the Group annual financial guidance and of the corresponding financial results releases.

**Alcon**

A510

24 Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 516 of 635   PageID 887

12. Maintain oversight of the adequacy and effectiveness of internal control over financial reporting.

*Regarding Compliance with Laws*

13. Review major issues regarding the status of the Company's compliance with laws and regulations, as well as major legislative and regulatory developments that may have significant impact on the Company.

14. Review the processes and procedures for management's monitoring of compliance with local laws. To this end, the ARC will obtain and review reports submitted at least annually by those persons the ARC has designated as responsible for compliance with laws.

*Regarding Compliance with Policies*

15. Review compliance by management of the Company with those Company policies designated by the Board from time to time, including policies on ethical business standards. To this end, the ARC will obtain and review reports submitted at least annually by each of those persons the ARC has designated as responsible for implementation of and compliance with such policies and give guidance and direction on how the policies are to be administered.

*Regarding Risk Management*

16. Ensure that Alcon has implemented an appropriate and effective risk management system and process.

17. Ensure that all necessary steps are taken to foster a culture of risk-adjusted decision-making without constraining reasonable risk taking and innovation.

18. Approve guidelines and review policies and processes.

19. Review with management, internal auditors and external auditors, the identification, prioritization and management of the risks, the accountabilities and roles of the functions involved with risk management, the risk portfolio and the related actions implemented by management.

20. Inform the Executive Committee and the Board on a periodic basis on the risk management system and on the most significant risks and how these are managed.

21. Review such other matters in relation to Alcon' risk management as the ARC may, in its own discretion, deem desirable in connection with its responsibilities described above.

22. Keep itself up to date on risk management best practices.

*Other*

23. Review the financial literacy of each ARC member to determine whether he or she meets the applicable legal standards and propose to the Board the appropriate determination and its disclosure.

**Alcon**

A511

25    Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 517 of 635   PageID 888

24. Establish procedures for (a) the receipt, retention and treatment of complaints received by the Group regarding accounting, internal accounting controls or auditing matters, and (b) the confidential, anonymous submission by employees of the Group of concerns regarding questionable accounting or auditing matters.

25. Review disclosures made by the CEO and chief financial officer regarding compliance with their certification obligations, including the Company's disclosure controls and procedures and internal controls for financial reporting and evaluations thereof.

26. Review such other matters in relation to the Group's accounting, auditing, financial reporting and compliance with law and policies as the ARC may, in its own discretion, deem desirable in connection with the review functions described above.

27. Annually review and reassess the adequacy of this charter and submit proposed changes to the Board for approval.

28. Conduct periodic self-evaluations of the ARC's performance.

## Limitation of ARC's Role

While the ARC has the responsibilities and powers set forth in this charter, it is not the duty of the ARC to plan or conduct audits or to determine that the Company's financial statements and disclosures are complete and accurate and are in accordance with applicable rules and regulations. These are the responsibilities of management and the external auditor. Also, the design of the risk management system and the risk management process (including the identification, prioritization and management of the risks) lies within the responsibility of the management.

Effective: [April 2, 2019]

**Alcon**

26    Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M    Document 23    Filed 03/12/21    Page 518 of 635    PageID 889

**Charter**

**The Innovation Committee of Alcon Inc.**

**Mission Statement**

The Innovation Committee is appointed by and acts on behalf of the Board of Directors of Alcon Inc.  The purpose of the Committee is to assist the Board in its oversight of matters relating to Alcon's strategic direction and investments in research and development and emerging technologies.  The Committee: (i) oversees the research and development strategy, (ii) evaluates and challenges the effectiveness and competitiveness of the research and development function, (iii) reviews and discusses emerging scientific trends and activities critical to the success of research and development and (iv) reviews the innovation pipeline, including internal and external investments in innovation.

**Organization**

The Innovation Committee shall consist of a minimum of three members of the Board of Directors of Alcon Inc. (the "Board"). The Board will designate one member of the Innovation Committee as the chairperson.

The Innovation Committee shall meet no less than three times per year and have direct and independent interaction with such persons from time to time, as the members of the Innovation Committee deem appropriate.

The Innovation Committee may invite to its meetings members of the management and such other persons, as the Innovation Committee deems appropriate in order to carry out its responsibilities. The Innovation Committee shall exclude from its meetings anyone with a personal interest in the matters to be discussed.  The Chair of the Board and Alcon CEO shall be permanent invitees.

The Innovation Committee shall regularly report to the Board on the activities of the Innovation Committee.

The Innovation Committee shall have the authority to retain independent advisors for any matters within the scope of its responsibilities. The Innovation Committee shall obtain appropriate funding, as determined by the Innovation Committee for payment of compensation to any outside advisors engaged by the Innovation Committee.

**Alcon**

### Roles and Responsibilities

The Innovation Committee has the following roles and responsibilities:

1. Provide counsel to the Board and the management team in the area of technology, application of technology and new business models.

2. Review and make recommendations to the Board on internal pipeline and external investments (e.g. potential acquisitions, equity investments, alliances, and collaborations) relative to Alcon's business portfolio, forecasted capital and operating capacity during the strategic and operating reviews.

3. Review, evaluate and advise the Board on the strategic direction and competitiveness of the innovation pipeline through the evaluation of key innovation metrics.

4. Review and recommend for approval any innovation goals/targets that may be incorporated into Alcon's incentive compensation plans.

5. Assist the Board with oversight, risk management and evaluation of management's criteria for selecting major new R&D and BD&L projects, assessing progress against major milestones, budget execution, and post-launch revenue impact.

6. Review, discuss and inform the Board of significant emerging science, technology, programs, issues or trends relevant to Alcon.

7. Review such other matters in relation to Alcon's research and development, technology and innovation programs as the Committee may, in its own discretion, deem desirable in connection with its responsibilities.

8. Annually review and reassess the adequacy of this charter and submit proposed changes to the Board for approval.

9. Conduct periodic self-evaluations of the Innovation Committee's performance.

Effective: December 8, 2020

**Alcon**

Case 3:20-cv-03629-M   Document 23   Filed 03/12/21   Page 520 of 635   PageID 891

**28** Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

**Appendix**

**Independence Criteria for the Board of Directors and its Committees**

*Independence of the members of the Board of Directors*

The Governance and Nomination Committee ("GNC") annually submits to the full Board of Directors of Alcon Inc. (the "Board") a proposal concerning the determination of the independent status of the Board members ("Director"). For purposes of such assessment, the GNC considers all relevant facts and circumstances of which it is aware. The majority of Directors shall meet the independence criteria set forth below. Any member of the Audit and Risk Committee ("ARC Director"), or the Compensation Committee ("CC Director"), and a majority of the members of the Governance and Nomination Committee ("GNC Director") shall also meet the relevant additional independence criteria as further described below.

In order to be considered independent, a Director shall not have any material relationship with Alcon Inc. and any of its subsidiaries ("Alcon") other than his/her service as a director.

As applicable in this Appendix, "affiliate" means a Director that directly or indirectly through one or more intermediaries, controls, is controlled or is under common control with Alcon.

I.  Material Relationships

1.   *A Director will not be considered independent if*

    &ndash;  The Director has received, during any twelve-month period within the last three years, direct compensation (other than for former service as an interim Chairman or CEO or other executive officer) of more than USD 120000 (other than dividends or Board/Board Committee fees and retirement or deferred compensation for prior service, provided such compensation is not contingent on continued service) from Alcon

    &ndash;  A Family Member[1] has received, during any twelve-month period within the last three years, direct compensation of more than USD 120 000 (other than compensation received for service as an employee other than an executive officer) from Alcon

    &ndash;  The Director is, or has been within the last three years, an employee of Alcon (other than for former service as an interim Chairman or CEO or other executive officer)

    &ndash;  A Family Member is, or has been within the last three years, an executive officer of Alcon

    &ndash;  The Director is a current partner or employee of the auditor of Alcon ("Auditor")

---

[1]  Family Member includes a person's spouse, parents, children, siblings, mother-, father-, brothers-, sisters-, sons- and daughters-in-law and anyone (other than domestic employees) who shares such person's home.

**Alcon**

A515

**29** Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

**Case 3:20-cv-03629-M Document 23 Filed 03/12/21 Page 521 of 635 PageID 892**

- A Family Member is a partner of the Auditor or is an employee of the Auditor and works on Alcon' audit
- The Director or a Family Member is a former partner or employee of the Auditor who personally worked on Alcon' audit during the last three years
- The Director or a Family Member is, or has been within the last three years, employed as an executive officer of an enterprise while any of Alcon' present executive officers serves or has served on that enterprise's compensation committee
- An enterprise has made payments to or received payments from Alcon for goods, property or services in an amount that exceeds, in any of the last three fiscal years, the greater of USD 1 million or 2% of the enterprise's consolidated gross revenues, and
- The Director is an employee of that enterprise or
- A Family Member is an executive officer in that enterprise

2. *In addition to the independence criteria set under 1. above, an ARC Director may not be considered independent if*

- The ARC Director, or his/her spouse, minor child, minor stepchild, or child or stepchild sharing the home of the ARC Director, accepts any salary or consulting, advisory or other compensatory fee (other than Board/Board Committee compensation or fixed amounts under a retirement plan, including deferred compensation, for prior service provided such compensation is not contingent on continued service) from Alcon[2], or
- The ARC Director is an affiliate of Alcon

If an ARC Director simultaneously serves on the audit committees of more than three public companies other than Alcon, then the GNC must determine that such simultaneous service would not impair the ability of such Director to effectively serve on the ARC.

3. *In addition to the independence criteria set under 1. above, in determining the independence of any CC Director, the Board shall*

- consider all factors specifically relevant to determining whether a Director has a relationship to Alcon which is material to that Director's ability to serve in the CC, including but not limited to:

(i) the source of compensation of such Director, including any consulting, advisory or other compensatory fee paid by Alcon to such Director, and
(ii) whether such Director may be an affiliate of Alcon.

---

[2] This criteria also applies if the ARC Director accepts any such fee indirectly through an entity in which the ARC Director is a partner, member, officer occupying a comparable position as an executive officer or similar position and which provides accounting, consulting, legal, investment banking or financial advisory services to Alcon.

**Alcon**

A516

**30** Regulations of the Board of Directors, its Committees and the Executive Committee of Alcon Inc.

Case 3:20-cv-03629-M    Document 23    Filed 03/12/21    Page 522 of 635    PageID 893

## II.  Immaterial Relationships

Unless the GNC concludes in its assessment to the contrary, a relationship is presumed not to impair the independence of a Director if

- A Family Member is an employee but not an executive officer of Alcon, unless the Family Member is an ARC Director's spouse, minor child, minor stepchild or child or stepchild sharing the ARC Director's home
- The Director or a Family Member holds less than 10% interest in any legal entity that has a relationship with Alcon
- The Director or a Family Member is a board member of a legal entity and that legal entity has made payments to or received payments from Alcon for goods, property or services in an amount that did not exceed, in any of the last three fiscal years, the greater of USD 1 million or 2% of the legal entity's consolidated gross revenues
- The Director or a Family Member is a board member or executive officer of a non-profit organization and Alcon' contributions to such organization did not exceed, in any of the last three fiscal years, the greater of USD 1 million or 2% of the organization's consolidated gross revenues
- A legal entity in which the Director or a Family Member is director, executive officer or employee has been indebted to Alcon in connection with a transaction in the ordinary course of business or in an amount that did not exceed USD 100 000 during the last fiscal year
- The Director or a Family Member serves on the board of another enterprise at which an executive officer or another board member of Alcon also serves as board member

The enumeration of relationships mentioned in this Section II is merely exemplary. The fact that a particular relationship is not listed does not mean that the relationship affects the independence of a Director.

Effective: [May 6, 2020]

**Alcon**

# EXHIBIT 27

I hereby certify that this paper (along with any paper referred to as being attached or enclosed) is being transmitted today via the Office electronic filing system (EFS-Web) in accordance with 37 CFR §1.6 (a)(4).

**P A T E N T**

Date: <u>XXX</u>        Signature: <u>/</u>
                        Printed Name:

Docket No. PAT056534-US-NP

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent Application of: Van Noy et al. | Conf. No.:  8814 |
| Serial No.:  15/049,315 | Art Unit:    3731 |
| Filing Date:  February 22, 2016 | Examiner:  Majid Jamialahmadi |
| Title:  Intraocular Lens Injector | |

Mail Stop RCE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia  22313-1450

### RESPONSE TO FINAL OFFICE ACTION OF SEPTEMBER 7, 2018

This is in reply to the Final Office Action dated September 7, 2018, for which a reply is due on December 7, 2018.  Accordingly, this reply is timely filed.  Reconsideration and allowance of the pending claims, as amended, in light of the remarks presented herein is respectfully requested.  Please amend the above-identified application as follows:

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this paper.

The **Remarks** begin on page 6 of this paper.

Application No.:  15/049,315                                      Docket No.:  PAT056534-US-NP

## REMARKS

Claims 1, 4-11, and 13-22 are pending in the present application.  By this amendment, claims 1, 4, and 5 have been amended and claims 11 and 13-22 are cancelled without prejudice or disclaimer.  No new matter has been added.  Accordingly, claims 1 and 4-10 are currently under consideration.  Assignee respectfully submits that these claims are patentable and in condition for allowance.

## CLAIM REJECTIONS under 35 U.S.C. § 102 and 35 U.S.C. § 103

Claims 11 and 13 are rejected under 35 U.S.C. 102 as being anticipated by US Patent Publication No. 2010/0217273 to Someya (hereinafter referred to as "Someya") and claims 21-22 are rejected under 35 U.S.C. 102 as being anticipated by US Patent Publication No. 2011/0288557 to Kudo (hereinafter referred to as "Kudo").  Claims 11, 13, and 21-22 are cancelled herein, thereby rendering the rejections moot.

Claim 1 is rejected under 35 U.S.C. 103 as being unpatentable over US Patent Publication No. 2007/0270945 to Kobayashi (hereinafter referred to as "Kobayashi").  The Applicant respectfully disagrees that Kobayashi renders claim 1 obvious; however, in an effort towards compact prosecution, the Applicant amends claim 1 to distinguish more clearly Kobayashi.  More specifically, the Applicant amends claim 1 to recite "a plunger tip that slides through the delivery passage of the injector body and into the nozzle of the injector body, wherein the bend in the plunger rod causes the plunger tip to interface with the bottom surface of the interior wall when the plunger tip is slid into the delivery passage of the injector body, wherein the plunger tip includes a first protrusion on a top of the plunger tip, a second protrusion on a bottom of the plunger tip, and a groove between the first protrusion and the second protrusion, and wherein the downward bend in the plunger rod causes the second protrusion to engage a haptic feature of the IOL when the plunger is advanced through the delivery passage, and wherein the groove of the plunger tip engages an optic of the IOL when the plunger is advanced through the delivery passage, and wherein the variation in height of the delivery passage causes the IOL to fold as the plunger is advanced through the delivery passage."  Kobayashi does not teach or suggest the above limitation, nor does the Examiner suggest that he does.

Application No.:  15/049,315                    Docket No.:  PAT056534-US-NP

## CONCLUSION

Assignee submits that each of the pending claims are allowable in light of the responses made herein.   Accordingly, Assignee requests reconsideration of the rejections levied and ultimately allowance of the pending claims.

\* \* \* \* \* \*

The undersigned representative requests any extension of time that may be deemed necessary to further the prosecution of this application.

The undersigned representative authorizes the Commissioner to charge any additional fees under 37 C.F.R. 1.16 or 1.17 that may be required, or credit any overpayment, to Deposit Account No. **010682**, referencing **Attorney Docket No. PAT056534-US-NP.**

In order to facilitate the resolution of any issues or questions presented by this paper, the Examiner may directly contact the undersigned by phone to further the discussion.

Respectfully Submitted

/Joseph Weatherbee/

Joseph Weatherbee

Attorney for Applicant

**Address for Correspondence:**

Joseph Weatherbee
Alcon Research, Ltd.
IP Legal (TB4-8)
6201 South Freeway
Fort Worth, Texas 76134-2099
(415)307-4837

8

A521

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/049,315 | 02/22/2016 | STEPHEN J. VAN NOY | PAT056534-US-NP | 8814 |

26356          7590          09/07/2018

ALCON
IP LEGAL
6201 SOUTH FREEWAY
FORT WORTH, TX 76134

| EXAMINER |
|---|
| JAMIALAHMADI, MAJID |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3731 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/07/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patent.docketing@alcon.com

| Office Action Summary | Application No. 15/049,315 | Applicant(s) VAN NOY ET AL. | | |
|---|---|---|---|---|
| | Examiner MAJID JAMIALAHMADI | Art Unit 3731 | AIA (First Inventor to File) Status Yes | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE **3** MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☒ Responsive to communication(s) filed on *5/1/2018*.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☒ This action is **FINAL**.    2b) ☐ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5) ☒ Claim(s) *1,4-11 and 13-22* is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) *1,4-11 and 13-22* is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All   b) ☐ Some**   c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .

4) ☐ Other: _____.

Application/Control Number: 15/049,315                                          Page 2
Art Unit: 3731

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### *Response to Amendment*

This office action is in response to the amendments filed on 5/1/2018. Claim 1, 11, 13-14 and 21 are amended. Claims 2-3 and 12 are canceled. Claims 1, 4-11 and 13-22 are pending and addressed below.

### Response to Arguments

Applicant's arguments, filed on 5/1/2018, with respect to claims 11 and 21 have been considered but are moot because the arguments do not apply to any of the new interpretations of the prior art of record and new reference being used in the current rejection. Applicant's arguments are only directed to the amended claims, therefore the arguments are addressed in the body of the rejection below.

Applicant arguments regarding claim 1 filed on 5/1/2018 have been fully considered but they are not persuasive.

Regarding arguments on page 9, applicant states, "*Particularly, the Application explicitly discloses that the flanged surface may be a spherical in nature "in order to conform to the eye 151 when the nozzle is fully inserted thereinto." Application at [0047], Therefore, not only does the Application disclose a specific reason as to why the*

A524

Application/Control Number: 15/049,315                                     Page 5
Art Unit: 3731

distal end of the injector body; and a plunger (**8**) slideable in the bore (**Figure 2**), the plunger comprising a distal end portion comprising: a first longitudinal axis extending centrally along the distal end portion (**see annotated figure above**) and a plunger tip (**Figure 12A**) that includes a first groove and a second groove nested within the first groove (**see annotated figure above**), the second groove formed in the first groove and laterally offset from the first longitudinal axis (**see annotated figure above**).

Regarding claim 13, a portion of the first groove adjacent to the second groove is configured to capture a trailing haptic of an intraocular lens disposed in the injector body, and wherein the second groove is adapted to capture a proximal end of an optic of the intraocular lens [**Since Someya discloses all of the structural elements in the same arrangement as claimed including a plunger tip having a first groove and a second groove, then it is fully configured in doing this**].

**Claims 21-22 are rejected under 35 U.S.C. 102(a)(1) as being anticipated by Kudo (US Pub No. 2011/0288557).**



Application/Control Number: 15/049,315                                    Page 7
Art Unit: 3731

Regarding claim 21, Kudo discloses (**Figures 1-6B**) an injector body (**2**) comprising: a bore defined by an interior wall; a nozzle (**11**) formed at a distal end of the injector body; and a plunger (**3**) slideable in the bore (**Figure 1**), the plunger comprising a first side (**top side**) (**see annotated figure above**); a second side (**bottom side**) disposed opposite of the first side; a longitudinal axis disposed between the first side and the second side [**Longitudinal axis can run right below the first protrusion 18 which will be between the first side (top) and the second side (bottom)**]; and a plunger tip (**Figure 3**) comprising: a first protrusion (**18**) extending distally from the first side of the plunger at an oblique angle in a direction away from the longitudinal axis (**see annotated figure above**); and a hinge (**see annotated figure above**) disposed at a proximal end of the first protrusion, the first protrusion pivotable about the hinge (**Paragraph 0056**) (**Figures 4A-6B**).

Regarding claim 22, further comprising a first groove (**see annotated figure above**) disposed adjacent to second protrusion (**see annotated figure above**) and adapted to receive an optic of an intraocular lens [**Since Kudo discloses all of the structural elements in the same arrangement as claimed, then it is fully adapted in doing this**].

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102 of this title, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole

# IN THE UNITED STATES PATENT
## AND TRADEMARK OFFICE

First Named Inventor:  Van Noy        Art Unit    :    3731

Serial No.   :    15/049,315        Examiner    :    Jamialahmadi, Majid

Filed       :    February 22, 2016        Conf. No. :    8814

Title        :    INTRAOCULAR LENS INJECTOR

Attorney Docket No. PAT056534-US-NP

Mail Stop **Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

REPLY TO ACTION OF FEBRUARY 2, 2018

Application No.: 15/049,315
Filed: February 22, 2016
Attorney Docket No. PAT056534-US-NP

## REMARKS

The Office Action mailed February 2, 2018 ("Office Action") has been received and its contents noted carefully. Claims 1-22 are pending. Claim 1 is amended to incorporate the features of Claims 2 and 3. Thus, amended Claim 1 corresponds to Claim 3 rewritten into independent form. Claims 2-3 and 12 are canceled without prejudice or disclaimer. Claims 11, 13-14, and 21 are also amended. Support for the amendments is at least provided in paragraphs [0062]-[0063] and [0077]-[0079] and Figures 10 and 28-30 of the Application as originally filed. Applicant respectfully submits no new matter is added. Applicant respectfully requests reconsideration of the Application.

### *Claim Rejections – 35 U.S.C. §§ 102 and 103*

Claims 1-2 are rejected under 35 U.S.C. § 102(a)(1) as allegedly being anticipated by U.S. Patent Application Publication No. 2007/0270945 to Kobayashi et al. ("*Kobayashi*").

Claims 11-14 are rejected under 35 U.S.C. § 102(a)(1) as allegedly being anticipated by U.S. Patent No. 5,873,879 to Figueroa et al. ("*Figueroa*").

Claims 21-22 are rejected under 35 U.S.C. § 102(a)(1) as allegedly being anticipated by U.S. Patent Application Publication No. 2011/0288557 to Kudo et al. ("*Kudo*").

Claim 3 is rejected under 35 U.S.C. § 103 as allegedly being unpatentable over *Kobayashi*.

Claims 4-5 are rejected under 35 U.S.C. § 103 as allegedly being unpatentable over *Kobayashi* in view of U.S. Patent Application Publication No. 2015/0066043 to Nallakrishnan ("*Nallakrishnan*").

Claims 6-7 and 10 are rejected under 35 U.S.C. § 103 as allegedly being unpatentable over *Kobayashi* in view of U.S. Patent Application Publication No. 2009/0036898 to Ichinohe et al. ("*Ichinohe*").

Claim 8 is rejected under 35 U.S.C. § 103 as allegedly being unpatentable over *Kobayashi* in view of *Ichinohe* and further in view of U.S. Patent Application Publication No. 2005/0149057 to Rathert ("*Rathert*").

Claim 9 is rejected under 35 U.S.C. § 103 as allegedly being unpatentable over

Application No.: 15/049,315
Filed: February 22, 2016
Attorney Docket No. PAT056534-US-NP

*Kobayashi* in view of *Rathert*.

Claims 15-17 are rejected under 35 U.S.C. § 103 as allegedly being unpatentable over U.S. Patent No. 5,873,879 to Figueroa et al. ("*Figueroa*") in view of *Kobayashi*.

Claims 18-19 are rejected under 35 U.S.C. § 103 as allegedly being unpatentable over *Figueroa* in view of *Nallakrishnan*.

Claim 20 is rejected under 35 U.S.C. § 103 as allegedly being unpatentable over *Figueroa* in view of *Ichinohe*.

Applicant respectfully traverses the rejections and all assertions therein.

As indicated above, amended Claim 1 corresponds to Claim 3 rewritten into independent form.  Amended Claim 1 recites an intraocular lens injector including, *inter alia*, "an insertion depth guard disposed at a distal end of the injector body, the insertion depth guard comprising a flanged surface" and "wherein the flanged surface is a curved surface, and wherein the curved surface is a spherical surface."  The Office Action contends that:

> It would have been an obvious matter of design choice to have the curved surface of the insertion depth guard to be a spherical surface, since such a modification would have involved a mere change in the shape of a component.  A change in shape is generally recognized as being within the level of ordinary skill in the art.  In re Dailey, 149 USPQ 47 (CCPA 1966).

Office Action at page 8, lines 3-7.  Applicant respectfully disagrees and submits that the basis of the rejection is improper for the following reasons.

The Office Action has attempted to substitute a per-se rule for the fact-specific analysis required to support a rejection under 35 U.S.C. § 103.  Such an attempt is legal error.  "The use of per se rules, while undoubtedly less laborious than a searching comparison of the claimed invention — including all its limitations — with the teachings of the prior art, flouts section 103 and the fundamental case law applying it."  *See In re Ochiai*, 71 F.3d 1565, 1572 (Fed. Cir. 1995).  "But reliance on per se rules of obviousness is **legally incorrect** and **must cease**.  Any such administrative convenience is simply inconsistent with section 103 . . . ."  *Id.* (emphasis added).

Here, the Office Action has failed to provide any analysis of the underlying facts of *In re Dailey* in relation to the underlying facts of the present Application to determine if *In re Dailey* is even applicable.  Unlike in *Dailey*, the spherical surface recited in Claim

8

Application No.: 15/049,315
Filed: February 22, 2016
Attorney Docket No. PAT056534-US-NP

1 is significant and is not arbitrarily chosen. Particularly, the Application explicitly discloses that the flanged surface may be a spherical in nature "in order to conform to the eye 151 when the nozzle is fully inserted thereinto." Application at ¶ [0047]. Therefore, not only does the Application disclose a specific reason as to why the flanged surface may be spherical in nature, obviating the assertion that the surface shape is merely one of design choice, it has not been shown that *Kobayashi* or any of the other cited art references disclose or suggest such features. A combination of references must teach or suggest every feature of a claim in order to render the claim obvious. *See In re Royka*, 490 F.2d 981 (CCPA 1974). Because it has not been shown that *Kobayashi*, either alone or in combination with any of the other cited references, teaches or suggests each and every feature recited in Claim 1, Applicant respectfully submits that the basis of the rejection is improper and that Claim 1 is in condition for allowance.

As amended, Claim 11 recites an intraocular lens injector including, *inter alia*, "a plunger slideable in the bore, the plunger comprising: a distal end portion comprising: a first longitudinal axis extending centrally along the distal end portion; and a plunger tip that includes a first groove and a second groove nested within the first groove, the second groove formed in the first groove and laterally offset from the first longitudinal axis." Figure 16 of *Figueroa* discloses that the slot 132 is centered between walls 137a and 137b and, therefore, not offset from a longitudinal axis extending centrally along a distal end portion of the slender rod 122. It has not been shown that any of the other cited art references overcomes this deficiency. Therefore, for at least this reason, Applicant respectfully submits that Claim 11 is in condition for allowance.

Regarding Claim 21, amended Claim 21 recites an intraocular lens injector including, *inter alia*, "a plunger slideable in the bore, the plunger comprising: a first side; a second side disposed opposite the first side; a longitudinal axis disposed between the first side and the second side; and a plunger tip comprising: a first protrusion extending distally from the first side of the plunger at an oblique angle in a direction away from the longitudinal axis; and a hinge disposed at a proximal end of the first protrusion, the first protrusion pivotable about the hinge." It has not been shown that *Kudo* discloses or suggests such features. It has not been shown that any of the other cited art references

9

Application No.: 15/049,315
Filed: February 22, 2016
Attorney Docket No. PAT056534-US-NP

overcomes the deficiencies of *Kudo*.   Therefore, for at least these reasons, Applicant respectfully submits that Claim 21 is in condition for allowance.

Claims 4-10 depend from Claim 1; Claims 13-20 depend from Claim 11; and Claim 22 depends from Claim 21.  Applicant respectfully submits that Claims 4-10, 13-20, and 22 are allowable for at least the same reasons Claims 1, 11, and 21 are allowable as well as for the additional subject matter recited respectively therein.  Applicant respectfully requests withdrawal of the rejections.

A532

Application No.: 15/049,315
Filed: February 22, 2016
Attorney Docket No. PAT056534-US-NP

<u>CONCLUSION</u>

It is believed that all of the pending claims have been addressed.  Further, any circumstance in which the Applicant has (a) addressed certain comments of the Examiner does not mean that the Applicant concedes other comments of the Examiner, (b) made arguments for the patentability of some claims does not mean that there are not other good reasons for patentability of those claims and other claims, or (c) amended or canceled a claim does not mean that the Applicant concedes any of the Examiner's positions with respect to that claim or other claims.

In view of the above, and for other reasons clearly apparent, Applicant respectfully submits that the Application is in condition for allowance and requests such a Notice.

If any extension of time is required to enter this response, Applicant hereby petitions for any such extension of time.  The Commissioner is hereby authorized to charge any fees or costs associated with this response and to credit any excess payments to Deposit Account No. 010682.

Respectfully submitted,

May 1, 2018
Date

/Darien Reddick/
Darien Reddick
Reg. No. 57,956
Attorney for Applicant

**Address for Correspondence:**

Darien Reddick
Alcon Research, Ltd.
IP Legal (TB4-8)
6201 South Freeway
Fort Worth, Texas 76134-2099
(817) 615-5342
Patent.docketing@alcon.com

A533

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/049,315 | 02/22/2016 | STEPHEN J. VAN NOY | PAT056534-US-NP | 8814 |

26356        7590        02/02/2018
ALCON
IP LEGAL
6201 SOUTH FREEWAY
FORT WORTH, TX 76134

| EXAMINER |
|---|
| JAMIALAHMADI, MAJID |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3731 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/02/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patent.docketing@alcon.com

PTOL-90A (Rev. 04/07)

| Office Action Summary | Application No. 15/049,315 | Applicant(s) VAN NOY ET AL. | |
|---|---|---|---|
| | Examiner MAJID JAMIALAHMADI | Art Unit 3731 | AIA (First Inventor to File) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☒ Responsive to communication(s) filed on *2/22/2016*.
 ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL**. 2b) ☒ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5) ☒ Claim(s) *1-22* is/are pending in the application.
 5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) *1-22* is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.
* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10) ☐ The specification is objected to by the Examiner.
11) ☒ The drawing(s) filed on *2/22/2016* is/are: a)☒ accepted or b)☐ objected to by the Examiner.
 Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
 Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
 **Certified copies:**
 a)☐ All b)☐ Some** c)☐ None of the:
  1. ☐ Certified copies of the priority documents have been received.
  2. ☐ Certified copies of the priority documents have been received in Application No. _____.
  3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
4) ☐ Other: _____.

Application/Control Number: 15/049,315                                      Page 2
Art Unit: 3731

## DETAILED ACTION

The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.


## Claim Interpretation

The following is a quotation of 35 U.S.C. 112(f):
(f) Element in Claim for a Combination. – An element in a claim for a combination may be
expressed as a means or step for performing a specified function without the recital of
structure, material, or acts in support thereof, and such claim shall be construed to cover the
corresponding structure, material, or acts described in the specification and equivalents
thereof.

The following is a quotation of pre-AIA 35 U.S.C. 112, sixth paragraph:
An element in a claim for a combination may be expressed as a means or step for performing
a specified function without the recital of structure, material, or acts in support thereof, and
such claim shall be construed to cover the corresponding structure, material, or acts
described in the specification and equivalents thereof.

Use of the word "means" (or "step for") in a claim with functional language

creates a rebuttable presumption that the claim element is to be treated in accordance

with 35 U.S.C. 112(f) (pre-AIA 35 U.S.C. 112, sixth paragraph).  The presumption that

35 U.S.C. 112(f) (pre-AIA 35 U.S.C. 112, sixth paragraph) is invoked is rebutted when

the function is recited with sufficient structure, material, or acts within the claim itself to

entirely perform the recited function.

Absence of the word "means" (or "step for") in a claim creates a rebuttable

presumption that the claim element **is not** to be treated in accordance with 35 U.S.C.

112(f) (pre-AIA 35 U.S.C. 112, sixth paragraph).  The presumption that 35 U.S.C. 112(f)

(pre-AIA 35 U.S.C. 112, sixth paragraph) is not invoked is rebutted when the claim

Application/Control Number: 15/049,315                                    Page 5
Art Unit: 3731

Regarding claim 11, Figueroa discloses (**Figures 1-4 and 16**) discloses an
injector body (**20**) comprising: a bore (**24**) defined by an interior wall; a nozzle (**99**)
formed at a distal end of the injector body; and a plunger (**18**) slideable in the bore
(**Figure 1**), the plunger comprising a plunger tip (**128**) that includes a first groove and a
second groove nested within the first groove (**see annotated figure above**).

Regarding claim 12, the second groove is formed at a first end of the first groove
(**see annotated figure above**).

Regarding claim 13, a second end of the first groove opposite the first end is
configured to capture a trailing haptic of an intraocular lens disposed in the injector
body, and wherein the second groove is adapted to capture a proximal end of an optic
of the intraocular lens [**Since Figueroa discloses all of the structural elements in the
same arrangement as claimed including a plunger tip having a first groove and a
second groove, then it is fully configured in doing this**].

Regarding claim 14, the plunger comprises a plunger rod (**122**), and wherein at
least a portion (**140a**) of the plunger rod is angularly offset from a longitudinal axis of the
plunger rod (**Figure 3**).


**Claims 21-22 are rejected under 35 U.S.C. 102(a)(1) as being anticipated by
Kudo (US Pub No. 2011/0288557).**

A537

Application/Control Number: 15/049,315                                                    Page 6
Art Unit: 3731



Regarding claim 21, Kudo discloses (**Figures 1-6B**) an injector body (**2**) comprising: a bore defined by an interior wall; a nozzle (**11**) formed at a distal end of the injector body; and a plunger (**3**) slideable in the bore (**Figure 1**), the plunger comprising a plunger tip (**Figure 3**) and a longitudinal axis, the plunger tip comprising: a first protrusion (**18**) extending distally from a first side of the plunger tip; and a hinge (**see annotated figure above**) disposed at a proximal end of the first protrusion, the

Application/Control Number: 15/049,315                                          Page 7
Art Unit: 3731

first protrusion extending at an oblique angle relative to the longitudinal axis (**Figures 3 and 4B**) and pivotable about the hinge (**Paragraph 0056**) (**Figures 4A-6B**).

　　　　Regarding claim 22, further comprising a first groove (**see annotated figure above**) disposed adjacent to second protrusion (**see annotated figure above**) and adapted to receive an optic of an intraocular lens [**Since Kudo discloses all of the structural elements in the same arrangement as claimed, then it is fully adapted in doing this**].


### *Claim Rejections - 35 USC § 103*

　　　　In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory basis for the rejection will not be considered a new ground of rejection if the prior art relied upon, and the rationale supporting the rejection, would be the same under either status.

　　　　The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102 of this title, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.  Patentability shall not be negated by the manner in which the invention was made.


**Claim 3 is rejected under 35 U.S.C. 103 as being unpatentable over Kobayashi (US Pub No. 2007/0270945) as applied to claim 2 above.**

Application/Control Number: 15/049,315                                    Page 17
Art Unit: 3731

information for unpublished applications is available through Private PAIR only.  For

more information about the PAIR system, see http://pair-direct.uspto.gov. Should you

have questions on access to the Private PAIR system, contact the Electronic Business

Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO

Customer Service Representative or access to the automated information system, call

800-786-9199 (IN USA OR CANADA) or 571-272-1000

/M. J./
Examiner, Art Unit 3731

/CHRISTOPHER L TEMPLETON/
Primary Examiner, Art Unit 3731

**A540**

Doc code: IDS
PTO/SB/08a (03-15)
Doc description: Information Disclosure Statement (IDS) Filed

Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 15049315 |
| --- | --- | --- |
| | Filing Date | 2016-02-22 |
| | First Named Inventor | Van Noy et al. |
| | Art Unit | 3731 |
| | Examiner Name | NYA |
| | Attorney Docket Number | PAT056534-US-NP |

| | | U.S.PATENTS | | | | Remove |
| --- | --- | --- | --- | --- | --- | --- |
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 4681102 | B1 | 1987-07-21 | BARTELL MICHAEL T | |
| | 2 | 4765329 | B1 | 1988-08-23 | Cumming et al. | |
| | 3 | 4852566 | B1 | 1989-08-01 | Callahan et al. | |
| | 4 | 5195526 | B1 | 1993-03-23 | MICHELSON GARY K | |
| | 5 | 5275604 | B1 | 1994-01-04 | Rheinish, et. al. | |
| | 6 | 5425734 | B1 | 1995-06-20 | BLAKE LARRY W | |
| | 7 | 5494484 | B1 | 1996-02-27 | FEINGOLD VLADIMIR | |
| | 8 | 5499987 | B1 | 1996-03-19 | FEINGOLD VLADIMIR | |

EFS Web 2.1.17

A541

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| Application Number | 15049315 |
|---|---|
| Filing Date | 2016-02-22 |
| First Named Inventor | Van Noy et al. |
| Art Unit | 3731 |
| Examiner Name | NYA |
| Attorney Docket Number | PAT056534-US-NP |

| | | | | | |
|---|---|---|---|---|---|
| 13 | 20080200921 | A1 | 2008-08-21 | DOWNER DAVID A | |
| 14 | 20080312661 | A1 | 2008-12-18 | DOWNER ET AL. | |
| 15 | 20090005788 | A1 | 2009-01-01 | RATHERT BRIAN D | |
| 16 | 20090018548 | A1 | 2009-01-15 | CHARLES STEVEN T | |
| 17 | 20090030425 | A1 | 2009-01-29 | SMILEY ET AL. | |
| 18 | 20090054904 | A1 | 2009-02-26 | HOLMEN JORGEN | |
| 19 | 20090171366 | A1 | 2009-07-02 | TANAKA MASAYOSHI | |
| 20 | 20090191087 | A1 | 2009-07-30 | KLEIN ET AL. | |
| 21 | 20090240257 | A1 | 2009-09-24 | MEYER ROLF | |
| 22 | 20100125278 | A1 | 2010-05-20 | WAGNER CHRISTOPHER E | |
| 23 | 20100161049 | A1 | 2010-06-24 | INOUE MASANOBU | |

A542

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 15049315 |
|---|---|---|
| | Filing Date | 2016-02-22 |
| | First Named Inventor | Van Noy et al. |
| | Art Unit | 3731 |
| | Examiner Name | NYA |
| | Attorney Docket  Number | PAT056534-US-NP |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

A certification statement is not submitted herewith.

### SIGNATURE
 A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Darien Reddick/ | Date (YYYY-MM-DD) | 2016-04-27 |
|---|---|---|---|
| Name/Print | Darien Reddick | Registration Number | 57956 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# EXHIBIT 28

**P A T E N T**

Docket No. PAT057575-US-NP

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| In re Patent Application of: | |
| Brown et al. | Conf. No.:  4169 |
| | |
| Serial No.:  15/838,946 | Art Unit:    3771 |
| | |
| Filing Date:  December 12, 2017 | Examiner:  Anh Tieu Dang |
| | |
| Title:  Intraocular Lens Injector | |

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia  22313-1450

**RESPONSE TO NON-FINAL OFFICE ACTION OF JUNE 28, 2019**

This is in reply to the Non-Final Office Action dated June 28, 2019, for which a reply is due on September 28, 2019.   Accordingly, this reply is timely filed.   Reconsideration and allowance of the pending claims, as amended, in light of the remarks presented herein are respectfully requested.   Please amend the above-identified application as follows:

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this paper.

The **Remarks** begin on page 5 of this paper.

Application No.: 15/838,946                                  Docket No.: PAT057575-US-NP

## CONCLUSION

Assignee submits that each of the pending claims are allowable in light of the responses made herein. Accordingly, Assignee requests reconsideration of the rejections levied and ultimately allowance of the pending claims.

* * * * * *

The undersigned representative requests any extension of time that may be deemed necessary to further the prosecution of this application.

The undersigned representative authorizes the Commissioner to charge any additional fees under 37 C.F.R. 1.16 or 1.17 that may be required, or credit any overpayment, to Deposit Account No. **010682**, referencing **Attorney Docket No. PAT057575-US-NP.**

In order to facilitate the resolution of any issues or questions presented by this paper, the Examiner may directly contact the undersigned by phone to further the discussion.

Respectfully Submitted

/Joseph Weatherbee/

Joseph Weatherbee

Attorney for Applicant

**Address for Correspondence:**

Joseph Weatherbee
Alcon, Inc.
IP Legal (TB4-8)
6201 South Freeway
Fort Worth, Texas 76134-2099
(415)307-4837

6

A546

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 15838946 |
|---|---|---|
| | Filing Date | 2017-12-12 |
| | First Named Inventor | Brown |
| | Art Unit | 3731 |
| | Examiner Name | NYA |
| | Attorney Docket Number | PAT057575-US-NP |

| U.S.PATENTS | | | | | Remove |
|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 4600003 | | 1986-07-15 | LOPEZ | |
| | 2 | 6406455 | B1 | 2002-06-18 | WILLIS ET AL | |
| | 3 | 6742236 | B1 | 2004-06-01 | DION ET AL | |
| | 4 | 7717874 | B2 | 2010-05-18 | LANDAU ET AL | |
| | 5 | 8574196 | B2 | 2013-11-05 | STAMMEN ET AL | |
| | 6 | 8668734 | B2 | 2014-03-11 | HILDEBRAND ET AL | |
| | 7 | 8956408 | B2 | 2015-02-17 | SMILEY ET AL | |
| | 8 | 8968396 | B2 | 2015-03-03 | MATTHEWS ET AL | |

A547

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | 15838946 |
| Filing Date | | 2017-12-12 |
| First Named Inventor | | Brown |
| Art Unit | | 3731 |
| Examiner Name | | NYA |
| Attorney Docket Number | | PAT057575-US-NP |

| | 9 | 20090036898 | A1 | 2009-02-05 | ICHINOHE |
|---|---|---|---|---|---|
| | 10 | 20150066043 | A1 | 2015-03-05 | NALLAKRISHNAN |
| | 11 | 20110288557 | A1 | 2011-11-24 | KUDO |

If you wish to add additional U.S. Published Application citation information please click the Add button. **Add**

**Remove**

## FOREIGN PATENT DOCUMENTS

| Examiner Initial* | Cite No | Foreign Document Number³ | Country Code² i | Kind Code⁴ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T⁵ |
|---|---|---|---|---|---|---|---|---|
| | 1 | 0870486 | EP | A2 | 1998-10-14 | KANESAKA ET AL | | |
| | 2 | 1344503 | EP | A1 | 2002-03-15 | WORST ET AL | | |
| | 3 | 1144031 | EP | A1 | 2001-10-17 | MINIOR ET AL | See corresponding US6406455 | |
| | 4 | 1360947 | EP | A1 | 2003-05-02 | KOBAYASHI | | |
| | 5 | 2816985 | EP | A1 | 2014-12-31 | BROWN ET AL | SEE CORRESP US2013310843 | |
| | 6 | 1409177 | EP | B1 | 2005-12-28 | DION ET AL | SEE CORRESP US6742236 | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 15838946 |
| | Filing Date | 2017-12-12 |
| | First Named Inventor | Brown |
| | Art Unit | 3731 |
| | Examiner Name | NYA |
| | Attorney Docket  Number | PAT057575-US-NP |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

## SIGNATURE
A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Darien Reddick/ | Date (YYYY-MM-DD) | 2018-03-27 |
| Name/Print | Darien Reddick | Registration Number | 57,956 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | 15838946 |
| Filing Date | | 2017-12-12 |
| First Named Inventor | | Brown |
| Art Unit | | 3731 |
| Examiner Name | | NYA |
| Attorney Docket  Number | | PAT057575-US-NP |

## U.S.PATENTS

Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 4573998 | B1 | 1986-03-04 | MAZZOCCO THOMAS R | |
| | 2 | 4681102 | B1 | 1987-07-21 | BARTELL MICHAEL T | |
| | 3 | 4702244 | B1 | 1987-10-27 | MAZZOCCO THOMAS R | |
| | 4 | 4765329 | B1 | 1988-08-23 | REDWITZ ROBERT F | |
| | 5 | 4852566 | B1 | 1989-08-01 | BURNES JAMES E | |
| | 6 | 5195526 | B1 | 1993-03-23 | MICHELSON GARY K | |
| | 7 | 5275604 | B1 | 1994-01-04 | TONKS ALLAN R | |
| | 8 | 5425734 | B1 | 1995-06-20 | BLAKE LARRY W | |

| | | | | | |
|---|---|---|---|---|---|
| | **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | | | Application Number | 15838946 |
| | | | | Filing Date | 2017-12-12 |
| | | | | First Named Inventor | Brown |
| | | | | Art Unit | 3731 |
| | | | | Examiner Name | NYA |
| | | | | Attorney Docket Number | PAT057575-US-NP |

| | | | | | |
|---|---|---|---|---|---|
| | 30 | 20100036385 | A1 | 2010-02-11 | CLOUGH JOHN |
| | 31 | 20100125278 | A1 | 2010-05-20 | WAGNER CHRISTOPHER E |
| | 32 | 20100161049 | A1 | 2010-06-24 | INOUE MASANOBU |
| | 33 | 20100280521 | A1 | 2010-11-04 | BRYAN PHILIP L |
| | 34 | 20100312254 | A1 | 2010-12-09 | PROULX MARSHALL KEITH |
| | 35 | 20110144653 | A1 | 2011-06-16 | PANKIN DMITRY |
| | 36 | 20110190777 | A1 | 2011-08-04 | HOHL EMIL |
| | 37 | 20120221102 | A1 | 2012-08-30 | SUZUKI YASUHIKO |
| | 38 | 20100010452 | A1 | 2010-01-14 | PAQUES MICHEL |
| | 39 | 20100280521 | A1 | 2010-11-04 | BRYAN PHILIP L |
| | 40 | 20100312254 | A1 | 2010-12-09 | PROULX MARSHALL KEITH |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 15838946 |
| | Filing Date | 2017-12-12 |
| | First Named Inventor | Brown |
| | Art Unit | 3731 |
| | Examiner Name | NYA |
| | Attorney Docket Number | PAT057575-US-NP |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Darien Reddick/ | Date (YYYY-MM-DD) | 2018-02-19 |
| Name/Print | Darien Reddick | Registration Number | 57,956 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# EXHIBIT 29

**IN THE UNITED STATES PATENT
AND TRADEMARK OFFICE**

| | | | | | |
|---|---|---|---|---|---|
| First Named Inventor: Auld | | | Art Unit | : | 3731 |
| Serial No. : | 15/072,023 | | Examiner | : | Tyson, Melanie Ruano |
| Filed | : | March 16, 2016 | Conf. No. | : | 5426 |
| Title | : | INTRAOCULAR LENS INSERTER | | | |

Attorney Docket No. PAT057102-US-NP

Mail Stop **Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

<u>REPLY TO ACTION OF APRIL 20, 2018</u>

Application No.: 15/072,023
Filed: March 16, 2016
Attorney Docket No. PAT057102-US-NP

CONCLUSION

It is believed that all of the pending claims have been addressed. Further, any circumstance in which the Applicant has (a) addressed certain comments of the Examiner does not mean that the Applicant concedes other comments of the Examiner, (b) made arguments for the patentability of some claims does not mean that there are not other good reasons for patentability of those claims and other claims, or (c) amended or canceled a claim does not mean that the Applicant concedes any of the Examiner's positions with respect to that claim or other claims.

In view of the above, and for other reasons clearly apparent, Applicant respectfully submits that the Application is in condition for allowance and requests such a Notice.

If any extension of time is required to enter this response, Applicant hereby petitions for any such extension of time. The Commissioner is hereby authorized to charge any fees or costs associated with this response and to credit any excess payments to Deposit Account No. 010682.

Respectfully submitted,

July 18, 2018                                          /Darien Reddick/
Date                                                  Darien Reddick
                                                      Reg. No. 57,956
                                                      Attorney for Applicant

**Address for Correspondence:**

Darien Reddick
Alcon Research, Ltd.
IP Legal (TB4-8)
6201 South Freeway
Fort Worth, Texas 76134-2099
(817) 615-5342
Patent.docketing@alcon.com

9

**A555**

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | |
|---|---|
| Application Number | 15072023 |
| Filing Date | 2016-03-16 |
| First Named Inventor | AULD, et al. |
| Art Unit | 5426 |
| Examiner Name | |
| Attorney Docket Number | PAT057102-US-NP |

### U.S.PATENTS

Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code¹ | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 2547099 | B1 | 1951-04-03 | SMOOT JOHN H | |
| | 2 | 4429421 | B1 | 1984-02-07 | LEVY CHAUNCEY F | |
| | 3 | 4573998 | B1 | 1986-03-04 | MAZZOCCO THOMAS R | |
| | 4 | 4615703 | B1 | 1986-10-07 | CALLAHAN, et al. | |
| | 5 | 4619256 | B1 | 1986-10-28 | HORN GERALD | |
| | 6 | 4634423 | B1 | 1987-01-06 | BAILEY, et al. | |
| | 7 | 4699140 | B1 | 1987-10-13 | HOLMES, et al. | |
| | 8 | 4715373 | B1 | 1987-12-29 | MAZZOCCO, et al. | |

| | | | | | Application Number | 15072023 |
|---|---|---|---|---|---|---|

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| Filing Date | 2016-03-16 |
|---|---|
| First Named Inventor | AULD, et al. |
| Art Unit | 5426 |
| Examiner Name | |
| Attorney Docket Number | PAT057102-US-NP |

| | | | | | |
|---|---|---|---|---|---|
| | 71 | 20100106160 | A1 | 2010-04-29 | TSAI GEORGE |
| | 72 | 20100121340 | A1 | 2010-05-13 | DOWNER DAVID A |
| | 73 | 20100125278 | A1 | 2010-05-20 | WAGNER CHRISTOPHER E |
| | 74 | 20100125279 | A1 | 2010-05-20 | KARAKELLE MUTLU |
| | 75 | 20100160926 | A1 | 2010-06-24 | ARTSYUKHOVICH ALEX |
| | 76 | 20100161049 | A1 | 2010-06-24 | INOUE MASANOBU |
| | 77 | 20100185206 | A1 | 2010-07-22 | ICHINOHE, et al. |
| | 78 | 20100204704 | A1 | 2010-08-12 | DAVIES, et al. |
| | 79 | 20100204705 | A1 | 2010-08-12 | BROWN, et al. |
| | 80 | 20100217273 | A1 | 2010-08-26 | SOMEYA, et al. |
| | 81 | 20100217274 | A1 | 2010-08-26 | LEE, et al. |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 15072023 |
|---|---|---|
| | Filing Date | 2016-03-16 |
| | First Named Inventor | AULD, et al. |
| | Art Unit | 5426 |
| | Examiner Name | |
| | Attorney Docket  Number | PAT057102-US-NP |

| | | | | | |
|---|---|---|---|---|---|
| 104 | 20110270264 | A1 | 2011-11-03 | SHOJI, et al. | |
| 105 | 20110288557 | A1 | 2011-11-24 | KUDO, et al. | |
| 106 | 20110295264 | A1 | 2011-12-01 | COLE, et al. | |
| 107 | 20110313425 | A1 | 2011-12-22 | HAN MYOUNG SOO | |
| 108 | 20120016374 | A1 | 2012-01-19 | HAN MYOUNG SOO | |
| 109 | 20120016375 | A1 | 2012-01-19 | PETERSON ROD T | |
| 110 | 20120022547 | A1 | 2012-01-26 | HILDERBRAND, et al. | |
| 111 | 20120022548 | A1 | 2012-01-26 | ZACHARIAS JAIME | |
| 112 | 20120071888 | A1 | 2012-03-22 | PUTALLAZ, et al. | |
| 113 | 20120130390 | A1 | 2012-05-24 | DAVIES NATHANIEL | |
| 114 | 20120158007 | A1 | 2012-06-21 | BROWN, et al. | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 15072023 |
|---|---|---|
| | Filing Date | 2016-03-16 |
| | First Named Inventor | AULD, et al. |
| | Art Unit | 5426 |
| | Examiner Name | |
| | Attorney Docket Number | PAT057102-US-NP |

| EXAMINER SIGNATURE | | | |
|---|---|---|---|
| Examiner Signature | | Date Considered | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

| | |
|---|---|
| | Application Number | 15072023 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Filing Date | 2016-03-16 |
| | First Named Inventor | AULD, et al. |
| | Art Unit | 5426 |
| | Examiner Name | |
| | Attorney Docket Number | PAT057102-US-NP |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Darien Reddick/ | Date (YYYY-MM-DD) | 2016-12-07 |
|---|---|---|---|
| Name/Print | Darien Reddick | Registration Number | 57,956 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

A560

# EXHIBIT 30

**IN THE UNITED STATES PATENT
AND TRADEMARK OFFICE**

| | | | | | | |
|---|---|---|---|---|---|---|
| Inventor(s): | | Auld et al. | | Art Unit | : | 3731 |
| Serial No. | : | 14/678,826 | | Examiner | : | Szpira, Julie Ann |
| Filed | : | April 3, 2015 | | Conf. No. | : | 4082 |
| Title | : | INTRAOCULAR LENS INSERTER | | | | |

Attorney Docket No. PAT057067-US-NP

Mail Stop **Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

<u>REPLY TO ACTION OF AUGUST 10, 2017</u>

Application No.: 14/678,826
Filed:  April 3, 2015
Attorney Docket No. PAT057067-US-NP

<u>CONCLUSION</u>

It is believed that all of the pending claims have been addressed.  Further, any circumstance in which the Applicant has (a) addressed certain comments of the Examiner does not mean that the Applicant concedes other comments of the Examiner, (b) made arguments for the patentability of some claims does not mean that there are not other good reasons for patentability of those claims and other claims, or (c) amended or canceled a claim does not mean that the Applicant concedes any of the Examiner's positions with respect to that claim or other claims.

In view of the above, and for other reasons clearly apparent, Applicant respectfully submits that the Application is in condition for allowance and requests such a Notice.

If any extension of time is required to enter this response, Applicant hereby petitions for any such extension of time.  The Commissioner is hereby authorized to charge any fees or costs associated with this response and to credit any excess payments to Deposit Account No. 010682.

Respectfully submitted,


November 2, 2017
Date

/Darien Reddick/
Darien Reddick
Reg. No. 57,956
Attorney for Applicant


**Address for Correspondence:**

Darien Reddick
Alcon Research, Ltd.
IP Legal (TB4-8)
6201 South Freeway
Fort Worth, Texas 76134-2099
(817) 615-5342
Patent.docketing@alcon.com

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 14678826 |
| Filing Date | 2015-04-03 |
| First Named Inventor | Auld |
| Art Unit | 3731 |
| Examiner Name | Szpira, Julie Ann |
| Attorney Docket Number | PAT057067-US-NP |

## U.S.PATENTS  [Remove]

| Examiner Initial* | Cite No | Patent Number | Kind Code¹ | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 2547099 | B1 | 1951-04-03 | SMOOT JOHN H | |
| | 2 | 4429421 | B1 | 1984-02-07 | LEVY CHAUNCEY F | |
| | 3 | 4573998 | B1 | 1986-03-04 | MAZZOCCO THOMAS R | |
| | 4 | 4615703 | B1 | 1986-10-07 | COWEN TIMOTHY B | |
| | 5 | 4619256 | B1 | 1986-10-28 | HORN GERALD | |
| | 6 | 4634423 | B1 | 1987-01-06 | BAILEY JR PAUL F | |
| | 7 | 4699140 | B1 | 1987-10-13 | HOLMES MARTIN J | |
| | 8 | 4715373 | B1 | 1987-12-29 | FRENCHIK MARY T | |

EFS Web 2.1.17

A564

Application Number 14678826

| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | 14678826 |
|---|---|---|---|---|
| | | | Filing Date | 2015-04-03 |
| | | | First Named Inventor | Auld |
| | | | Art Unit | 3731 |
| | | | Examiner Name | Szpira, Julie Ann |
| | | | Attorney Docket Number | PAT057067-US-NP |

| | 75 | 20100160926 | A1 | 2010-06-24 | ARTSYUKHOVICH ALEX | |
|---|---|---|---|---|---|---|
| | 76 | 20100161049 | A1 | 2010-06-24 | INOUE MASANOBU | |
| | 77 | 20100185206 | A1 | 2010-07-22 | KUDOH KAZUNORI | |
| | 78 | 20100204704 | A1 | 2010-08-12 | RING MICHAEL | |
| | 79 | 20100204705 | A1 | 2010-08-12 | YAN DENGZHUA DAN | |
| | 80 | 20100217273 | A1 | 2010-08-26 | KUDOH KAZUNORI | |
| | 81 | 20100217274 | A1 | 2010-08-26 | MATUSAITIS TOMAS | |
| | 82 | 20100228260 | A1 | 2010-09-09 | CALLAHAN WAYNE B | |
| | 83 | 20100228261 | A1 | 2010-09-09 | EAGLES DANIEL C | |
| | 84 | 20100256651 | A1 | 2010-10-07 | CHITRE KAUSTUBH S | |
| | 85 | 20100280521 | A1 | 2010-11-04 | BRYAN PHILIP L | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 14678826 |
|---|---|---|
| | Filing Date | 2015-04-03 |
| | First Named Inventor | Auld |
| | Art Unit | 3731 |
| | Examiner Name | Szpira, Julie Ann |
| | Attorney Docket Number | PAT057067-US-NP |

| | 86 | 20100286704 | A1 | 2010-11-11 | KUDOH KAZUNORI | |
| | 87 | 20100305577 | A1 | 2010-12-02 | MUCHHALA SUSHANT | |
| | 88 | 20100312254 | A1 | 2010-12-09 | PROULX MARSHALL KEITH | |
| | 89 | 20110046633 | A1 | 2011-02-24 | PANKIN DMITRY | |
| | 90 | 20110046634 | A1 | 2011-02-24 | RATHERT BRIAN | |
| | 91 | 20110046635 | A1 | 2011-02-24 | PANKIN DMITRY | |
| | 92 | 20110082463 | A1 | 2011-04-07 | INOUE MASANOBU | |
| | 93 | 20110098717 | A1 | 2011-04-28 | INOUE MASANOBU | |
| | 94 | 20110144653 | A1 | 2011-06-16 | PANKIN DMITRY | |
| | 95 | 20110152872 | A1 | 2011-06-23 | BIDDLE GRAHAM W | |
| | 96 | 20110152873 | A1 | 2011-06-23 | SHEPHERD DAVID J | |

| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | 14678826 |
|---|---|---|---|---|
| | | | Filing Date | 2015-04-03 |
| | | | First Named Inventor | Auld |
| | | | Art Unit | 3731 |
| | | | Examiner Name | Szpira, Julie Ann |
| | | | Attorney Docket Number | PAT057067-US-NP |

| | 97 | 20110172676 | A1 | 2011-07-14 | CHEN BILL |
|---|---|---|---|---|---|
| | 98 | 20110190777 | A1 | 2011-08-04 | HOHL EMIL |
| | 99 | 20110213380 | A1 | 2011-09-01 | HAN MYOUNG SOO |
| | 100 | 20110224677 | A1 | 2011-09-15 | SUZUKI YASUHIKO |
| | 101 | 20110245840 | A1 | 2011-10-06 | CULLEN JON P |
| | 102 | 20110264101 | A1 | 2011-10-27 | INOUE MASANOBU |
| | 103 | 20110264103 | A1 | 2011-10-27 | COLE |
| | 104 | 20110270264 | A1 | 2011-11-03 | INOUE MASANOBU |
| | 105 | 20110288557 | A1 | 2011-11-24 | NODA MASAHIRO |
| | 106 | 20110295264 | A1 | 2011-12-01 | COLE MARK S |
| | 107 | 20110313425 | A1 | 2011-12-22 | HAN MYOUNG SOO |

A567

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 14678826 |
|---|---|---|
| | Filing Date | 2015-04-03 |
| | First Named Inventor | Auld |
| | Art Unit | 3731 |
| | Examiner Name | Szpira, Julie Ann |
| | Attorney Docket Number | PAT057067-US-NP |

| | 20 | 2015154049 | WO | A1 | 2015-10-08 | AULD | | ☐ |
|---|---|---|---|---|---|---|---|---|
| | 21 | 2016208725 | WO | A1 | 2016-12-29 | SHUJI | | ☒ |
| | 22 | 9637152 | WO | A1 | 1996-11-28 | CHAMBERS THOMAS J | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button | **Add**

| NON-PATENT LITERATURE DOCUMENTS | | | **Remove** |

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | | |

If you wish to add additional non-patent literature document citation information please click the Add button | **Add**

| EXAMINER SIGNATURE | | | |
|---|---|---|---|
| Examiner Signature | | Date Considered | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 14678826 |
|---|---|---|
| | Filing Date | 2015-04-03 |
| | First Named Inventor | Auld |
| | Art Unit | 3731 |
| | Examiner Name | Szpira, Julie Ann |
| | Attorney Docket Number | PAT057067-US-NP |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

✕ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

✕ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Darien Reddick/ | Date (YYYY-MM-DD) | 2017-10-11 |
|---|---|---|---|
| Name/Print | Darien Reddick | Registration Number | 57,956 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# EXHIBIT 31

**IN THE UNITED STATES PATENT**
**AND TRADEMARK OFFICE**

| | | | | | |
|---|---|---|---|---|---|
| Applicant | : | Auld | Art Unit | : | 3731 |
| Serial No. | : | 14/402,778 | Examiner | : | Dang, Anh Tieu |
| Filed | : | November 21, 2014 | Conf. No. | : | 1768 |
| Title | : | INTRAOCULAR LENS INSERTER | | | |

Attorney Docket No. PAT056548-US-PCT

Mail Stop **Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

<u>REPLY TO ACTION OF OCTOBER 3, 2016</u>

Application No.: 14/402, 778
Filed: November 21, 2014
Attorney Docket No. PAT056548-US-PCT

same reasons Claims 1 and 14 are allowable as well as for the additional subject matter recited respectively therein. Applicant respectfully requests withdrawal of the rejection.

## CONCLUSION

It is believed that all of the pending claims have been addressed. Further, any circumstance in which the Applicant has (a) addressed certain comments of the Examiner does not mean that the Applicant concedes other comments of the Examiner, (b) made arguments for the patentability of some claims does not mean that there are not other good reasons for patentability of those claims and other claims, or (c) amended or canceled a claim does not mean that the Applicant concedes any of the Examiner's positions with respect to that claim or other claims.

In view of the above, and for other reasons clearly apparent, Applicant respectfully submits that the Application is in condition for allowance and requests such a Notice.

If any extension of time is required to enter this response, Applicant hereby petitions for any such extension of time. The Commissioner is hereby authorized to charge any fees or costs associated with this response and to credit any excess payments to Deposit Account No. 010682.

Respectfully submitted,

December 12, 2016                         /Darien Reddick/
Date                                                Darien Reddick
                                                      Reg. No. 57,956
                                                      Attorney for Applicant

**Address for Correspondence:**

Darien Reddick
Alcon Research, Ltd.
IP Legal (TB4-8)
6201 South Freeway
Fort Worth, Texas 76134-2099
(817) 615-5342
Patent.docketing@alcon.com

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 14402778 |
| | Filing Date | 2014-11-21 |
| | First Named Inventor | Auld |
| | Art Unit | 3731 |
| | Examiner Name | Dang, Anh Tieu |
| | Attorney Docket Number | PAT056548-US-PCT |

| | | | U.S.PATENTS | | Remove | |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 2547099 | B1 | 1951-04-03 | SMOOT JOHN H | |
| | 2 | 4429421 | B1 | 1984-02-07 | LEVY CHAUNCEY F | |
| | 3 | 4573998 | B1 | 1986-03-04 | MAZZOCCO THOMAS R | |
| | 4 | 4615703 | B1 | 1986-10-07 | CALLAHAN, et al. | |
| | 5 | 4619256 | B1 | 1986-10-28 | HORN GERALD | |
| | 6 | 4634423 | B1 | 1987-01-06 | BAILEY, et al. | |
| | 7 | 4699140 | B1 | 1987-10-13 | HOLMES, et al. | |
| | 8 | 4715373 | B1 | 1987-12-29 | MAZZOCCO, et al. | |

A573

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 14402778 |
| | Filing Date | 2014-11-21 |
| | First Named Inventor | Auld |
| | Art Unit | 3731 |
| | Examiner Name | Dang, Anh Tieu |
| | Attorney Docket Number | PAT056548-US-PCT |

| | | | | | |
|---|---|---|---|---|---|
| 74 | 20100125279 | A1 | 2010-05-20 | KARAKELLE MUTLU | |
| 75 | 20100160926 | A1 | 2010-06-24 | ARTSYUKHOVICH ALEX | |
| 76 | 20100161049 | A1 | 2010-06-24 | INOUE MASANOBU | |
| 77 | 20100185206 | A1 | 2010-07-22 | ICHINOHE, et al. | |
| 78 | 20100204704 | A1 | 2010-08-12 | DAVIES, et al. | |
| 79 | 20100204705 | A1 | 2010-08-12 | BROWN, et al. | |
| 80 | 20100217273 | A1 | 2010-08-26 | SOMEYA, et al. | |
| 81 | 20100217274 | A1 | 2010-08-26 | LEE, et al. | |
| 82 | 20100228260 | A1 | 2010-09-09 | CALLAHAN, et al. | |
| 83 | 20100228261 | A1 | 2010-09-09 | FEINGOLD, et al. | |
| 84 | 20100256651 | A1 | 2010-10-07 | JANI, et al. | |

| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 14402778 |
|---|---|---|---|
| | | Filing Date | 2014-11-21 |
| | | First Named Inventor | Auld |
| | | Art Unit | 3731 |
| | | Examiner Name | Dang, Anh Tieu |
| | | Attorney Docket Number | PAT056548-US-PCT |

| | 96 | 20110152873 | A1 | 2011-06-23 | SHEPHERD DAVID J | |
|---|---|---|---|---|---|---|
| | 97 | 20110172676 | A1 | 2011-07-14 | CHEN BILL | |
| | 98 | 20110190777 | A1 | 2011-08-04 | HOHL EMIL | |
| | 99 | 20110213380 | A1 | 2011-09-01 | HAN MYOUNG SOO | |
| | 100 | 20110224677 | A1 | 2011-09-15 | NIWA, et al. | |
| | 101 | 20110245840 | A1 | 2011-10-06 | SEYBOTH, et al. | |
| | 102 | 20110264101 | A1 | 2011-10-27 | INOUE MASANOBU | |
| | 103 | 20110264102 | A1 | 2011-10-27 | COLE, et al. | |
| | 104 | 20110270264 | A1 | 2011-11-03 | SHOJI, et al. | |
| | 105 | 20110288557 | A1 | 2011-11-24 | KUDO, et al. | |
| | 106 | 20110295264 | A1 | 2011-12-01 | COLE, et al. | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 14402778 |
|---|---|---|
| | Filing Date | 2014-11-21 |
| | First Named Inventor | Auld |
| | Art Unit | 3731 |
| | Examiner Name | Dang, Anh Tieu |
| | Attorney Docket Number | PAT056548-US-PCT |

| 11 | 2015144870 | WO | A1 | 2015-10-04 | SANOFI-AVENTIS DEUTSCHLAND GMBH | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button [Add]

## NON-PATENT LITERATURE DOCUMENTS [Remove]

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | | |

If you wish to add additional non-patent literature document citation information please click the Add button [Add]

## EXAMINER SIGNATURE

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 14402778 |
| Filing Date | 2014-11-21 |
| First Named Inventor | Auld |
| Art Unit | 3731 |
| Examiner Name | Dang, Anh Tieu |
| Attorney Docket Number | PAT056548-US-PCT |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

A certification statement is not submitted herewith.

## SIGNATURE
A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Darien Reddick/ | Date (YYYY-MM-DD) | 2016-12-06 |
|---|---|---|---|
| Name/Print | Darien Reddick | Registration Number | 57,956 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# EXHIBIT 32

**IN THE UNITED STATES PATENT
AND TRADEMARK OFFICE**

| | | | | | | |
|---|---|---|---|---|---|---|
| Applicant | : | Auld | | Art Unit | : | 3773 |
| Serial No. | : | 14/679,921 | | Examiner | : | Eastwood, David C. |
| Filed | : | April 6, 2015 | | Conf. No. | : | 7633 |
| Title | : | INTRAOCULAR LENS INSERTER | | | | |

Attorney Docket No. PAT056548-US-CNT02

Mail Stop: **AMENDMENT**
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia  22313-1450

<u>PRELIMINARY AMENDMENT</u>

Prior to examination, please amend the application as indicated on the following pages.

Serial No.:  14/679,921
Filing Date:  April 6, 2015
Attorney Docket No.:  PAT056548-US-CNT02

<u>REMARKS</u>

Following the Preliminary Amendment dated November 23, 2015, Claim 1 was pending. By this paper, Claim 1 without prejudice or disclaimer, and new Claims 31-59 are added. Support for the present amendments may be found throughout the Specification and claims as originally filed.  Accordingly, no new matter has been added.

Although the present communication may include alterations to the application or claims, or characterizations of claim scope or referenced art, Applicant is not conceding in this application that previously pending claims are not patentable.  Rather, the changes reflected herein are being made to facilitate expeditious prosecution of this application.   Applicant reserves the right to pursue at a later date any previously pending or other broader or narrower claims that capture any subject matter supported by the present disclosure.  Applicant has not made any disclaimers or disavowals of any subject matter supported by the present application.

Applicant believes no fees are required with the submission of this document.  If any extension of time is required, Applicant hereby requests the appropriate extension of time.  The Commissioner is hereby authorized to charge any fees or costs associated with this Preliminary Amendment and to credit any excess payments to Deposit Account No. 010682.

Respectfully submitted,

December 7, 2016
Date

/Darien Reddick/
Darien Reddick
Reg. No. 57,956
Attorney for Applicant

**Address for Correspondence:**

Darien Reddick
Alcon Research, Ltd.
IP Legal  (TB4-8)
6201 South Freeway
Fort Worth, Texas 76134-2099
(817) 615-5342

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | 14/679921 |
|---|---|---|---|
| | | Filing Date | April 6, 2015 |
| | | First Named Inventor | Jack R. Auld |
| | | Art Unit | 3773 |
| *(Multiple sheets used when necessary)* | | Examiner | Not Assigned |
| SHEET 1 OF 10 | | Attorney Docket No. | ATVIZ.001C1 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 1 | 2,547,099 | 04-03-1951 | Smoot | |
| | 2 | 2001-00070750 | 07-05-2001 | Hjertman et al. | |
| | 3 | 2001-0007942 | 07-12-2001 | Kikuchi et al. | |
| | 4 | 2001-0015593 | 08-23-2001 | Polla et al. | |
| | 5 | 2002-0193803 | 12-19-2002 | Portney | |
| | 6 | 2003-0187455 | 10-02-2003 | Kobayashi et al. | |
| | 7 | 2003-0212406 | 11-13-2003 | Kobayashi et al. | |
| | 8 | 2003-0212407 | 11-13-2003 | Kikuchi et al. | |
| | 9 | 2003-0216745 | 11-20-2003 | Brady et al. | |
| | 10 | 2004-0059343 | 03-25-2004 | Shearer et al. | |
| | 11 | 2004-0127911 | 07-01-2004 | Figueroa et al. | |
| | 12 | 2004-0215207 | 10-28-2004 | Cumming | |
| | 13 | 2004-0267359 | 12-30-2004 | Maker et al. | |
| | 14 | 2005-0033308 | 02-10-2005 | Callahan et al. | |
| | 15 | 2005-0171555 | 08-04-2005 | Tran et al. | |
| | 16 | 2005-0222577 | 10-06-2005 | Vaquero | |
| | 17 | 2005-0267403 | 12-01-2005 | Landau et al. | |
| | 18 | 2005-0283162 | 12-22-2005 | Stratas | |
| | 19 | 2005-0283163 | 12-22-2005 | Portney et al. | |
| | 20 | 2005-0283164 | 12-22-2005 | Wu et al. | |
| | 21 | 2006-0085013 | 04-20-2006 | Dusek et al. | |
| | 22 | 2006-0129125 | 06-15-2006 | Copa et al. | |
| | 23 | 2006-0142780 | 06-29-2006 | Pynson et al. | |
| | 24 | 2006-0142781 | 06-29-2006 | Pynson et al. | |
| | 25 | 2006-0167466 | 07-27-2006 | Dusek | |
| | 26 | 2006-0184181 | 08-17-2006 | Cole et al. | |
| | 27 | 2006-0264971 | 11-23-2006 | Akahoshi | |
| | 28 | 2006-0271063 | 11-30-2006 | Sunada et al. | |
| | 29 | 2006-0287655 | 12-21-2006 | Khuray et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

A581

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | 14/679921 |
|---|---|---|
| | Filing Date | April 6, 2015 |
| | First Named Inventor | Jack R. Auld |
| | Art Unit | 3773 |
| *(Multiple sheets used when necessary)* | Examiner | Not Assigned |
| SHEET 3 OF 10 | Attorney Docket No. | ATVIZ.001C1 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 59 | 2009-0036898 | 02-05-2009 | Ichinohe et al. | |
| | 60 | 2009-0043313 | 02-12-2009 | Ichinohe et al. | |
| | 61 | 2009-0112222 | 04-30-2009 | Barrows et al. | |
| | 62 | 2009-0198247 | 08-06-2009 | Ben Nun | |
| | 63 | 2009-0204122 | 08-13-2009 | Ichinohe et al. | |
| | 64 | 2009-0234366 | 09-17-2009 | Tsai et al. | |
| | 65 | 2009-0248031 | 10-01-2009 | Ichinohe et al. | |
| | 66 | 2009-0270876 | 10-29-2009 | Hoffmann et al. | |
| | 67 | 2009-0292293 | 11-26-2009 | Bogaert et al. | |
| | 68 | 2009-0318933 | 12-24-2009 | Anderson | |
| | 69 | 2010-0010498 | 01-14-2010 | Biddle et al. | |
| | 70 | 2010-0057095 | 03-04-2010 | Khuray et al. | |
| | 71 | 2010-0076450 | 03-25-2010 | Yoshida et al. | |
| | 72 | 2010-0082037 | 04-01-2010 | Kobayashi et al. | |
| | 73 | 2010-0087832 | 04-08-2010 | Seyboth | |
| | 74 | 2010-0094309 | 04-15-2010 | Boukhny et al. | |
| | 75 | 2010-0106160 | 04-29-2010 | Tsai | |
| | 76 | 2010-0121340 | 05-13-2010 | Downer | |
| | 77 | 2010-0125278 | 05-20-2010 | Wagner | |
| | 78 | 2010-0125279 | 05-20-2010 | Karakelle et al. | |
| | 79 | 2010-0160926 | 06-24-2010 | Artsyukhovich et al. | |
| | 80 | 2010-0161049 | 06-24-2010 | Inoue | |
| | 81 | 2010-0185206 | 07-22-2010 | Ichinohe et al. | |
| | 82 | 2010-0204704 | 08-12-2010 | Davies et al. | |
| | 83 | 2010-0204705 | 08-12-2010 | Brown et al. | |
| | 84 | 2010-0217273 | 08-26-2010 | Someya et al. | |
| | 85 | 2010-0217274 | 08-26-2010 | Lee et al. | |
| | 86 | 2010-0228260 | 09-09-2010 | Callahan et al. | |
| | 87 | 2010-0228261 | 09-09-2010 | Feingold et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

A582

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | 14/679921 |
|---|---|---|
| | Filing Date | April 6, 2015 |
| | First Named Inventor | Jack R. Auld |
| | Art Unit | 3773 |
| *(Multiple sheets used when necessary)* | Examiner | Not Assigned |
| SHEET 4 OF 10 | Attorney Docket No. | ATVIZ.001C1 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 88 | 2010-0256651 | 10-07-2010 | Jani et al. | |
| | 89 | 2010-0280521 | 11-04-2010 | Vaquero et al. | |
| | 90 | 2010-0286704 | 11-11-2010 | Ichinohe et al. | |
| | 91 | 2010-0305577 | 12-02-2010 | Muchhala et al. | |
| | 92 | 2010-0312254 | 12-09-2010 | Downer et al. | |
| | 93 | 2011-0046633 | 02-24-2011 | Pankin et al. | |
| | 94 | 2011-0046634 | 02-24-2011 | Rathert | |
| | 95 | 2011-0046635 | 02-24-2011 | Pankin et al. | |
| | 96 | 2011-0082463 | 04-07-2011 | Inoue | |
| | 97 | 2011-0098717 | 04-28-2011 | Inoue | |
| | 98 | 2011-0144653 | 06-16-2011 | Pankin et al. | |
| | 99 | 2011-0152872 | 06-23-2011 | Seyboth et al. | |
| | 100 | 2011-0152873 | 06-23-2011 | Shepherd | |
| | 101 | 2011-0172676 | 07-14-2011 | Chen | |
| | 102 | 2011-0190777 | 08-04-2011 | Hohl | |
| | 103 | 2011-0213380 | 09-01-2011 | Han | |
| | 104 | 2011-0224677 | 09-15-2011 | Niwa et al. | |
| | 105 | 2011-0245840 | 10-06-2011 | Seyboth et al. | |
| | 106 | 2011-0264101 | 10-27-2011 | Inoue et al. | |
| | 107 | 2011-0270264 | 11-03-2011 | Shoji et al. | |
| | 108 | 2011-0288557 | 11-24-2011 | Kudo et al. | |
| | 109 | 2011-0295264 | 12-01-2011 | Cole et al. | |
| | 110 | 2011-0313425 | 12-22-2011 | Han | |
| | 111 | 2012-0016374 | 01-19-2012 | Han | |
| | 112 | 2012-0016375 | 01-19-2012 | Peterson et al. | |
| | 113 | 2012-0022547 | 01-26-2012 | Hildebrand et al. | |
| | 114 | 2012-0022548 | 01-26-2012 | Zacharias | |
| | 115 | 2012-0071888 | 03-22-2012 | Putallaz et al. | |
| | 116 | 2012-0130390 | 05-24-2012 | Davies et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

A583

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | 14/679921 |
|---|---|---|---|
| | | Filing Date | April 6, 2015 |
| | | First Named Inventor | Jack R. Auld |
| | | Art Unit | 3773 |
| (Multiple sheets used when necessary) | | Examiner | Not Assigned |
| SHEET 10 OF 10 | | Attorney Docket No. | ATVIZ.001C1 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 262 | 8,308,799 | 11-13-2012 | Chen et al. | |
| | 263 | 8,500,681 | 08-06-2013 | Gonnelli et al. | |
| | 264 | 8,579,969 | 11-12-2013 | Zacharias | |
| | 265 | 8,617,099 | 12-31-2013 | Williamson | |
| | 266 | 8,657,835 | 02-25-2014 | Boukhny et al. | |
| | 267 | 8,721,702 | 05-13-2014 | Ramada et al. | |
| | 268 | 8,758,433 | 06-24-2014 | Cole et al. | |
| | 269 | RE40,185 | 03-25-2008 | Kikuchi et al. | |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 270 | WO 2007-0098622 | 09-07-2007 | SDI Surgical Device Int. GmbH | | |
| | 271 | WO 2007-0112130 | 10-04-2007 | Tissue Engineering Refraction, Inc. | | |
| | 272 | WO 2010-0028873 | 03-18-2010 | Meunier et al. | | |

### NON PATENT LITERATURE DOCUMENTS

| Examiner Initials | Cite No. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and-or country where published. | T[1] |
|---|---|---|---|
| | 273 | International Search Report and Written Opinion in Application No. PCT-US2013-044183 mailed November 4, 2013 in 15 pages. | |

22518503

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

A584

# EXHIBIT 33

## Mr. Darien Lee Reddick



DR

Coun. at **Alcon Laboratories, Inc.**

Fort Worth, TX 76134

**Peer Reviews**
        **No Reviews**

UPDATE YOUR PROFILE

## Education & Credentials

| | |
|---|---|
| University Attended: | Colorado School of Mines, B.S., 1997 |
| Law School Attended: | University of Oklahoma, J.D., 2004 |
| Year of First Admission: | 2005 |
| Admission: | 2005, Maryland; 2005, District of Columbia; 2007, Texas; registered to practice before U.S. Patent and Trademark Office |
| ISLN: | 918303286 |

## Featured Attorneys



**Jennifer Holland Litke**
Member at Blaies & Hightower, L.L.P.
Fort Worth, TX U.S.A.
(1)    None

PHONE  CONTACT  WEBSITE

**Mack Ed Swindle**
Member at Whitaker Chalk Swindle &
Schwartz PLLC
Fort Worth, TX U.S.A.
    None

PHONE  CONTACT  WEBSITE

**Joseph Kimball II**
Member at Pettitt & Kimball, PLLC
Fort Worth, TX U.S.A.
(9)    None

817-987-6249  CONTACT  WEBSITE

## Responsibilities

Patents   Contracts

## Peer Reviews

This lawyer does not have peer reviews.

*Peer Reviews provided before April 15, 2008 are not displayed.

## Client Reviews

## Practice Areas in Fort Worth, TX

Criminal Law   Medical Malpractice   Regulatory Law   Workers Compensation   Aviation Law   Family Law   Contracts   Casinos and Gambling   Class Actions   Alcoholic Beverages

Debtor and Creditor   Class Actions

**NAVIGATION**

Search Attorneys/Law Firms

Browse by Areas of Practice

Browse by Location

**ABOUT US**

About Martindale-Hubbell

Customer Support

**FOR ATTORNEYS**

Grow Your Practice

About Our Network

Sales - Talk to an Expert

**CONSUMER WEBSITES**

Lawyers.com

Nolo.com

Avvo.com

 

Terms of Use | Site Map | Cookie Policy | IB Privacy Policy | Do Not Sell My Personal Information | Copyright © 2021 MH Sub I, LLC dba Internet Brands. All rights reserved.

The information provided on this site is not legal advice, does not constitute a lawyer referral service, and no attorney-client or confidential relationship is or should be formed by the use of this site. The attorney listings on the site are paid attorney advertisements. Your access of/to and use of this site is subject to additional Supplemental Terms.

# EXHIBIT 34

**Linked**in

Join now    Sign in

Darien Reddick



# Darien Reddick

Patent Attorney | Intellectual Property Counselor |
Patent Portfolio Manager

Dallas/Fort Worth Area · 122 connections

**Join to Connect**



FISH. **Fish & Richardson P.C.**

**University of Oklahoma College of Law**

---

## About

I am a highly accomplished Senior Legal Counsel who supports and protects businesses by providing sound legal advice in compliance with applicable laws. I have extensive experience with intellectual property matters, and I am adept in applying abstract principles of law to concrete facts of different cases. Additionally, I am devoted to creating effective legal strategies that will save companies from potential risks. Lastly, I am recognized for a strong work ethic, integrity, and a high degree of personal initiative.

---

## Activity



### Double tap the image if you see this illusion. Write in the comment what you see. Only few will see this.

Liked by **Darien Reddick**

**Linked**in

Join now    Sign in

Darien Reddick



Fish is proud to announce that Scott Flanz has joined the firm as a new #litigation associate in our New York office. Read about the experience he's...

Liked by **Darien Reddick**

Join now to see all activity

---

# Experience



### Of Counsel
Fish & Richardson P.C.

Dec 2018 - Aug 2019 · 9 months

Dallas/Fort Worth Area



### Director, Sr. Legal Counsel IP
Alcon

May 2010 - Oct 2018 · 8 years 6 months

Dallas/Fort Worth Area

While at Alcon, my responsibilities included implementing corporate strategy for IP assets; assessing technologies; delivering counsel in patent application filing determinations; initiating Freedom-To-Operate analyses for multiple medical devices and technologies; and delivered abreast legal analysis at each project gateway decision. Additionally, I was tasked with composing and negotiating numerous development, prototype, contract services, and confidentiality agreements.

My responsibilities also included:

• Managing a significant portion of a worldwide patent portfolio.
• Preparing and prosecuting patent applications, both nationally and internationally.
• Collaborating with inventors to maximize intellectual property value.
• Managing both local and foreign outside counsel in patent preparation and prosecution matters, including oppositions.

 **Linked**in

Darien Reddick



### Contract Attorney
Law Offices of James E. Walton, PLLC

Jul 2009 - May 2010 · 11 months

Burleson, Texas

I performed patent preparation and prosecution along with client counseling.

Technologies included:

Water Filtration Technology
Gaming Technology



### Associate
Fish & Richardson P.C.

Sep 2006 - Jul 2009 · 2 years 11 months

Dallas/Fort Worth Area

Counseled clients in developing a targeted patent portfolio including supervising patent preparation and prosecution activities; Conducted telephonic examiner and supervisor interviews to expedite prosecution; Drafted and prosecuted high priority patent applications; Conducted pre-litigation vetting of patents; Prepared "Offer to License"/Cease and Desist letters; Prepared non-infringement and invalidity opinions; Performed litigation support activities. Drafted technology transfer agreements;…

Show more ⌄

### Associate
Arent Fox

Sep 2004 - Aug 2006 · 2 years

Washington D.C. Metro Area

Drafted utility and design patent applications; Drafted responses to office actions, analysis letters, client reporting correspondence, and appeal briefs; Conducted in-person examiner interviews; Prepared non-infringement opinions.

While at Arent Fox, I worked on a variety of technologies including:

 Linked **in**

Join now    Sign in

Darien Reddick

• Automotive Technologies
• Microelectronic manufacturing

### Design Engineer

Honda Research and Development Americas, Inc.

Apr 1998 - Apr 2001 · 3 years 1 month

Raymond, Ohio

Component Design: Designed and developed chassis components for several Honda and Acura vehicles; Created production design drawings and associated documentation. Development/Management Activities: Coordinated testing of various chassis components with both internal test groups and outside suppliers; Analyzed and resolved production issues with suppliers; Analyzed, developed, and coordinated design changes in the manufacturing plants.

## Education

### University of Oklahoma College of Law

Doctor of Law - JD · Law

2001 - 2004

### Colorado School of Mines

Bachelor of Science - BS · Mechanical Engineering

1992 - 1997

## View Darien's full profile

See who you know in common

Get introduced

Contact Darien directly

**Linked** in              Join now     Sign in

Darien Reddick

# People also viewed



**Jared Smith**

Patent Litigation Attorney at Fish & Richardson P.C.

San Diego, CA



**Ajit Dang**

IP Counsel

Atlanta, GA



**Terri Martines**

Administrative Assistant/Litigation

Dallas, TX



**Tommy Jacks**

Of Counsel at Fish & Richardson P.C.

Austin, TX



**Christina McDonough**

Principal at Fish & Richardson P.C.

Boston, MA



**Jacob Pecht**

Associate at Fish & Richardson P.C.

Boston, MA



**John F Jones**

Supervisor at Ricoh USA, Inc.

Dallas-Fort Worth Metroplex



**Andrew Schrader**

Trial Lawyer

Los Angeles, CA



**Rodeen Talebi**

Attorney at Fish & Richardson P.C.

Dallas, TX



**Crystal Culhane, Ph.D., J.D.**

Patent Prosecution Attorney at Fish & Richardson P.C.

**Linked**

| Darien Reddick |
| --- |

## Others named **Darien Reddick**

**Darien Reddick**

-

Bethesda, MD

1 other named Darien Reddick is on LinkedIn

See others named **Darien Reddick**

## Darien's public profile badge

Include this LinkedIn profile on other websites

 **Darien Reddick**
Patent Attorney | Intellectual Property Counselor | Patent Portfolio Manager

 University of Oklahoma College of Law

View profile                          **Linked**

View profile badges

© 2021

Accessibility

Privacy Policy

Copyright Policy

Guest Controls

Language

About

User Agreement

Cookie Policy

Brand Policy

Community Guidelines

# EXHIBIT 35



**UltraSert™**
PRE-LOADED DELIVERY SYSTEM

# ULTRASERT™ PRE-LOADED DELIVERY SYSTEM

## Exceptional control for your AcrySof® IQ IOL implantations



### Smooth injection for controlled advancement*[1,2]

The spring-controlled **TensionGlide™ plunger** is designed to provide a consistent level of resistance for **smooth, one-handed injection.***[1,2]



### Preserved incisions with controlled insertion depth[1,3]

The **depth guard nozzle** is designed to preserve your intended incision architecture by **minimizing wound stretch** in incisions as small as 2.2mm.[3]



### Consistent delivery with controlled haptic configuration...[1,3]

The UltraSert™ Pre-loaded Delivery System **plunger tip** is engineered to **ensure the trailing haptic remains tucked during insertion.**[1,3]



### ...and controlled placement in the capsular bag[1,3]

The **plunger tip** extends 6.5 mm past the nozzle without adhering to the IOL for **consistent IOL placement** into the capsular bag.[1,3]

*Out of 42 cataract surgeons who tried UltraSert™ System prototypes in an artificial setting, the majority spontaneously used "smooth" to describe the advancement of the plunger.



a Novartis company



**A596**



# **Three simple steps** to prepare for controlled IOL delivery[1]



Fill-to line

## STEP 1: Inject OVD

Fill the front chamber with an approved viscoelastic.*

 

## STEP 2: Remove lens stop and plunger lock

Remove the blue lens stop, followed by the blue plunger lock.

 

## STEP 3: Advance and inspect

Advance the IOL into the haptic check position, where it's ready for inspection and delivery.

## **Experience the exceptional control of the UltraSert™ Pre-loaded Delivery System.**[1-3]

*Consult your Alcon sales representative for a list of approved OVDs.
1. AcrySof® IQ Aspheric IOL with the UltraSert™ Pre-loaded Delivery System Directions for Use.
2. UltraSert™ Delivery System Prototype Human Factor Testing, February 2015.
3. Comparative Assessment of IOL Delivery Systems. Alcon internal technical report: TDOC-0018957. Effective Date 19 May 2015.


a Novartis company



© 2015 Novartis    6/15    ACR15013FCi    S/IOL/1702/019

**A597**

# EXHIBIT 36

A598

# THE ULTRASERT® PRE-LOADED DELIVERY SYSTEM





New Optimized design. The UltraSert® Pre-loaded Delivery System is designed to **safeguard cataract surgical outcomes by protecting every detail of IOL delivery.**[1-4]





A599

# Enhances Operating Room Efficiency[1]

UltraSert® is ready for implantation in three steps[3], with an average surgical time of **less than a minute**.*,†,1

## Faster Surgical Time*,†,**,1

Mean total case time†

**UltraSert®**
**56 seconds**[1]
n=87   SD: 12.6 seconds



**MONARCH®**
**89 seconds**
n=101   SD: 34.6 seconds

 

**iTec**\*\*,‡
**95 seconds**
n=41   SD: 34.4 seconds

 

UltraSert® mean case is
**37% faster** vs. Monarch III manual[1] delivery sytem

### *How could UltraSert® enhance your patient throughput?*

The mean cataract surgery lasts 13 minutes 54 seconds.§,10 The time savings associated with the UltraSert® Pre-loaded Delivery System could allow you to perform one additional procedure per 25 cataract surgeries completed at your facility.*,1,10

*Derived using time and motion calculations based on the overall mean cataract surgical duration of 13.9 minutes. because UltraSert® procedures are 33 seconds shorter than monarch, a surgeon could perform an additional 0.99 cataract surgery for every 25 procedures performed at the mean duration with Monarch®.

*Prospective observational, multicenter, time and motion study comparing duration and economic efficiencies of cataract surgeries with different IOL delivery systems at three hospitals in France and two hospitals in Spain (n=239).  α Tested with the previous version of UltraSert® delivery system (Version 2).
†Mean total case time includes duration of delivery device preparation, IOL delivery and IOL positioning/unfolding for UltraSert® (n=87), MONARCH® (n=101) and iTec‡ (n=41). $p < 0.005$.
**UltraSert® and iTec‡ were not statistically compared in a head-to-head study.
‡Trademarks are the property of their respective owners.
§Cost per surgical case is calculated by multiplying surgery time by the direct hourly fees for each human resource attending the operating room. $p < 0.05$.
¶Potential increase in cataract throughput without increasing surgeon and staff capacity, calculated from estimated total UltraSert® time savings per surgery day.

A600

# Delivers Consistent Haptic Folding[2]



## UltraSert® Leading Haptic Configurations[*,2] (Porcine Eyes)

Percentage of deliveries

- DT (Deep Tuck): 8%
- TL (Tuck Looped): 90%
- L (Looped): 1%
- S (Straight): 2%

Tucked delivery configurations | Other delivery configurations

*Leading haptic configuration was evaluated when the IOL reached the haptic folding feature inside the nozzle lumen. In each case, VISCOAT® OVD was used in temperatures from about 20°C up to about 23°C. n=184-187. Testing completed with the newly designed UltraSert® 3 mm nozzle tip.

By delivering on every detail, UltraSert® may help reduce intraoperative variability.

- Leading haptic configuration was **deliverable every time** in a study of more than 180 UltraSert® implantations[2]
- **Maintains injection force stability** [†,8,]
  - TensionGlide™ plunger mitigates risk of sudden, forceful IOL ejection[8]

UltraSert® results in **desired consistent leading haptic configuration** in **98%** of implantations.[*]

α Tested with the previous version of UltraSert® delivery system (Version 2)

**A601**



# Safeguards Incision Size[3-7]

UltraSert® features a proprietary depth guard nozzle designed to help you **optimize outcomes by preserving post-implantation incision size.**[3-7]

- Allows implantation through incisions as small as **2.2 mm**[3-6]
  - Facilitates wound-assist implantations[3-6]
  - Minimizes incision stretch throughout the implantation process[3-6]
- **3 mm nozzle tip** designed to increase control and freedom of choice in surgical technique



**Depth guard**

*Designed to minimize the possibility of wound stretch* [3-6]



**Mean Post-implantation Incision Size (Patient Eyes)\*,5,6**

*Before IOL implantation, corneal incisions were made (2.2 mm knife for IOL implantation with UltraSert®, iTec† and iSert† 250/251; 2.4 mm knife for IOL implantation with MONARCH® III) and initial incision size was measured and documented. Post-IOL implantation incision size was measured and documented via the same process. UltraSert® (n=19) presented with a significantly smaller mean corneal incision size after IOL implantation compared with iTec† (n=26), iSert† 250/251 (n=26) and MONARCH® III (n=28). For each, $p < 0.001$. Testing completed with first-generation UltraSert® (2 mm nozzle tip).
†Trademarks are the property of their respective owners.



**Mean Post-implantation Incision Enlargement\*\*,7 (Porcine Eyes)**

**UltraSert®**
- Significantly **smaller** post-implantation incision size than iTec,† iSert† 250/251 and MONARCH® III\*,5,6

- **Smaller** incision enlargement vs. Vivinex†,\*\*,7

\*\*Before IOL implantation, corneal incisions were made (2.2 mm knife for IOL implantation with UltraSert®; 2.0 mm knife for IOL implantation with Vivinex†) and initial incision size was measured and documented. Post-IOL implantation incision size was measured and documented via the same process. UltraSert® (n=10) presented with a smaller mean incision enlargement compared with Vivinex† (n=10). $p = 0.019$. Testing completed with first-generation UltraSert® (2 mm nozzle tip).



# Protects IOL Sterility and Optic Integrity[3,9]

UltraSert® is designed to protect IOL implantation. The system **eliminates the need for extensive lens handling** before implantation.[9]

• Designed to reduce risk of contamination[3,9]

• Designed to minimize damage to IOL optic

Pre-loaded delivery devices are shown to result in a **significantly lower incidence of postoperative endophthalmitis** than forceps-inserted IOLs.[9]



Preloded delivery systems provide **better sterility** compared to manual delivery systems reducing the risk of potential complications[9]

*Based on feedback from a total of 139 ophthalmologists from the US and EU obtained during an Alcon-sponsored user preference study. On a scale of 0–100, surgeons rated the phrase "Single-use, pre-loaded device which means the sterility of the IOL won't be compromised" for its importance. This phrase received a higher score than all others tested.



# A New Level of Performance in Three Simple Steps*,3

**STEP 1:**
**Push to inject OVD**



Viscoelastic Port

"Fill-to" Line

**STEP 2:**
**Pull to remove lens stop and plunger lock**

 

**STEP 3:**
**Push to fold, then inspect**



Fill-to Line

**7 SECONDS**

**Take at least 7 seconds** to complete this lens-folding step, or improper folding and lens damage may occur



**Delivering the IOL**



**5 SECONDS**

Take **at least 5 seconds** to transfer IOL from "Fill-to" line into the eye



**3 MINUTES**

**Deliver within 3 minutes** after the lens is in position at the nozzle line

*Refer to UltraSert® Pre-loaded Delivery System Directions for Use for full step-by-step directions.

1. Multicenter Evaluation of Time, Operational, and Economic Efficiencies of AcrySof Aspheric IOL with the UltraSert® Preloaded IOL Delivery System. Alcon data on file, available on request. TDOC-0054890. Effective date: Feb 2018. 2. Alcon Data on File, available on request. TDOC-0053876 (July 11, 2017). 3. AcrySof® IQ UltraSert® Pre-loaded Delivery System Directions for Use. 4. Alcon Data on File, available on request. CR-ILN296-P001 (November 29, 2016). 5. Mendicute J, Amzallag T, Martinez A. Multicenter clinical assesment of 3 IOL preloaded delivery system. Paper presented at ASCRS Congress; May 5-9, 2017; Los Angeles, CA. 6. Amzallag T, Mendicute J, Martinez A. Multicenter Clinical Assessment of a Pre-loaded IOL Delivery System. Paper presented at ASCRS Congress; May 5-9, 2017; Los Angeles, CA. 7. Alcon data on file, available on request. TDOC-0053373 (March 7, 2017). 8. Alcon data on file, available on request. TDOC-0052465 (June 13, 2016). 9. Weston K, Nicholson R, Bunce C, Yang YF. An 8-year retrospective study of cataract surgery and postoperative endophthalmitis: injectable intraocular lenses may reduce the incidence of postoperative endophthalmitis. Br J Ophthalmol. 2015;99(10):1377-1380. 10. Rothschild PR, et al. Patients' subjective assessment of the duration of cataract surgery: a case series. BMJ Open 2013;3:e002497. doi:10.1136/bmjopen-2012-002497.



© 2018 Novartis    4/18    GL-ULS-17-MK-1747-EU



UltraSert®
PRE-LOADED DELIVERY SYSTEM

*Advancing*
CATARACT SURGERY

**A604**

# EXHIBIT 37

**FDA**

FDA Home[3] Medical Devices[4] Databases[5]

# MAUDE Adverse Event Report: ALCON MANUFACTURING, LTD. ACRYSOF IQ TORIC INTRACOCULAR LENS



510(k)[7]|DeNovo[8]|Registration & Listing[9]   |Adverse Events[10]    |Recalls[11]|PMA[12]|HDE[13]|Classification[14]|Standards[15]

CFR Title 21[16]|Radiation-Emitting Products[17]|X-Ray Assembler[18]|Medsun Reports[19]|CLIA[20]|TPLC[21]

**ALCON MANUFACTURING, LTD. ACRYSOF IQ TORIC INTRACOCULAR LENS**    Back to Search Results

**Model Number** SN6AT4
**Device Problems** IOL (Intraocular Lens) Implant (851); Adverse Event Without Identified Device or Use Problem (2993)
**Patient Problem** Postoperative refraction, unexpected (2642)
**Event Date** 09/01/2011
**Event Type** Injury
**Event Description**
A surgeon reported a pt with an unexpected outcome following intraocular lens (iol) implant surgery. Add'l info has been requested.

**Manufacturer Narrative**
Eval summary: the product was not returned for analysis. Results from the product lot history record review indicated the lot met release criteria. The root cause could not be identified by the investigation. There have been no other complaints reported in the lot number. Add'l info was requested on 12/02/2011 and 12/05/2011 by phone, fax, and mail. A completed questionnaire has not been received. (b)(4).

**Search Alerts/Recalls**[22]

New Search | Submit an Adverse Event Report[23]

**Brand Name** ACRYSOF IQ TORIC
**Type of Device** INTRACOCULAR LENS
**Manufacturer (Section D)** ALCON MANUFACTURING, LTD.
6065 Kyle Lane
Huntington WV 25702
**Manufacturer (Section G)** ALCON RESEARCH, LTD/HUNTINGTON
6065 Kyle Lane
Huntington WV 25702
**Manufacturer Contact** Paul Nitschmann
6201 South Freeway
R3-16
Fort Worth, TX 76134
8176152440
**MDR Report Key** 2391866
**MDR Text Key** 2453705
**Report Number** 1119421-2011-01582
**Device Sequence Number** 1
**Product Code** HQL [24]
**Combination Product (Y/N)** N
**Reporter Country Code** US
**PMA/PMN Number** P930014
**Number of Events Reported** 1
**Summary Report (Y/N)** N
**Report Source** Manufacturer
**Source Type** Health Professional
**Reporter Occupation**

**Type of Report** Initial

**Report Date** 12/01/2011

***1* Device Was Involved in the Event**

***1* Patient Was Involved in the Event**

**Date FDA Received** 12/20/2011

**Is This An Adverse Event Report?** Yes

**Is This A Product Problem Report?** No

**Device Operator** HEALTH PROFESSIONAL

**Device EXPIRATION Date** 07/31/2016

**Device MODEL Number** SN6AT4

**Device LOT Number** 12080777

**Was Device Available For Evaluation?** No

**Is The Reporter A Health Professional?** Yes

**Date Manufacturer Received** 12/01/2011

**Was Device Evaluated By Manufacturer?** Device Not Returned To Manufacturer

**Date Device Manufactured** 09/01/2011

**Is The Device Single Use?** Yes

**Is this a Reprocessed and Reused Single-Use Device?** No

**Type of Device Usage** Initial

**Patient TREATMENT DATA**
**Date Received: 12/20/2011 Patient Sequence Number: 1**

Links on this page:

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. https://www.fda.gov/Medical-Devices
5. https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/medical-device-databases
6. /scripts/cdrh/devicesatfda/index.cfm
7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm
8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm
9. /scripts/cdrh/cfdocs/cfRL/rl.cfm
10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm
11. /scripts/cdrh/cfdocs/cfRES/res.cfm
12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm
13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm
14. /scripts/cdrh/cfdocs/cfPCD/classification.cfm
15. /scripts/cdrh/cfdocs/cfStandards/search.cfm
16. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm
17. /scripts/cdrh/cfdocs/cfPCD_RH/classification.cfm
18. /scripts/cdrh/cfdocs/cfAssem/assembler.cfm
19. /scripts/cdrh/cfdocs/Medsun/searchReportText.cfm
20. /scripts/cdrh/cfdocs/cfClia/Search.cfm
21. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm
22. https://www.fda.gov/medical-devices/medical-device-safety/medical-device-recalls
23. https://www.accessdata.fda.gov/scripts/medwatch/

24. ../cfPCD/classification.cfm?start_search=&ProductCode=HQL

Page Last Updated: 02/28/2021

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

Accessibility  Contact FDA  Careers  FDA Basics  FOIA  No FEAR Act  Nondiscrimination  Website Policies / Privacy



U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA



For Government  For Press

Combination Products  Advisory Committees  Science & Research  Regulatory Information  Safety  Emergency Preparedness  International Programs  News & Events  Training and Continuing Education  Inspections/Compliance  State & Local Officials  Consumers  Industry  Health Professionals  FDA Archive

U.S. Department of **Health & Human Services**

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. https://www.fda.gov/

4. https://www.fda.gov/Medical-Devices

5. https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/medical-device-databases

6. /scripts/cdrh/devicesatfda/index.cfm

7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm

8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm

9. /scripts/cdrh/cfdocs/cfRL/rl.cfm

10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm

11. /scripts/cdrh/cfdocs/cfRES/res.cfm

12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm

13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm

14. /scripts/cdrh/cfdocs/cfPCD/classification.cfm

15. /scripts/cdrh/cfdocs/cfStandards/search.cfm

16. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm

17. /scripts/cdrh/cfdocs/cfPCD_RH/classification.cfm

18. /scripts/cdrh/cfdocs/cfAssem/assembler.cfm

19. /scripts/cdrh/cfdocs/Medsun/searchReportText.cfm

20. /scripts/cdrh/cfdocs/cfClia/Search.cfm

21. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm

22. https://www.fda.gov/medical-devices/medical-device-safety/medical-device-recalls

23. https://www.accessdata.fda.gov/scripts/medwatch/

24. ../cfPCD/classification.cfm?start_search=&ProductCode=HQL

# EXHIBIT 38



FDA Home[3] Medical Devices[4] Databases[5]

## Premarket Approval (PMA)

510(k)[7] |DeNovo[8]|Registration & Listing[9]    |Adverse Events[10]    |Recalls[11]|PMA[12]|HDE[13]|Classification[14]|Standards[15]

CFR Title 21[16]|Radiation-Emitting Products[17]|X-Ray Assembler[18]|Medsun Reports[19]|CLIA[20]|TPLC[21]

New Search[22]                                  Back to Search Results

Note: This medical device record is a PMA supplement. A supplement may have changed the device description/function or indication from that approved in the original PMA. Be sure to look at the original PMA[23] record for more information.

| | |
|---|---|
| **Device** | AcrySof Single Piece Intraocular Lenses |
| **Generic Name** | Intraocular Lens |
| **Regulation Number** | 886.3600[24] |
| **Applicant** | |
| | ALCON LABORATORIES, INC. |
| | 6201 South Freeway Dr. |
| | Fort Worth, TX 76134 |
| **PMA Number** | P930014 |
| **Supplement Number** | S115 |
| **Date Received** | 09/12/2018 |
| **Decision Date** | 10/11/2018 |
| | |
| **Product Code** | HQL[25] |
| | |
| **Advisory Committee** | Ophthalmic |
| **Supplement Type** | 30-Day Notice |
| **Supplement Reason** | Process Change - Manufacturer/Sterilizer/Packager/Supplier |
| **Expedited Review Granted?** | No |
| | |
| **Combination Product** | No |

### Approval Order Statement

Modifications to the control and monitoring program of the Environmental Controlled Areas for the AcrySof® IQ ReSTOR® Intraocular Lenses (Model Number, SN6AD1) and the AcrySof® Single Piece Intraocular Lenses (Models SN60AT, SA60AT, SN60WF, SA60WF, SN6AT3-T9) at the Alcon Cork, Ireland manufacturing facility.

---

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. https://www.fda.gov/

4. https://www.fda.gov/Medical-Devices

5. https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/medical-device-databases

6. /scripts/cdrh/devicesatfda/index.cfm

7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm

8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm

9. /scripts/cdrh/cfdocs/cfRL/rl.cfm

10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm

11. /scripts/cdrh/cfdocs/cfRES/res.cfm

12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm

13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm

14. /scripts/cdrh/cfdocs/cfPCD/classification.cfm

15. /scripts/cdrh/cfdocs/cfStandards/search.cfm

16. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm

17. /scripts/cdrh/cfdocs/cfPCD_RH/classification.cfm

18. /scripts/cdrh/cfdocs/cfAssem/assembler.cfm

19. /scripts/cdrh/cfdocs/Medsun/searchReportText.cfm

20. /scripts/cdrh/cfdocs/cfClia/Search.cfm

21. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm

22. /scripts/cdrh/cfdocs/cfpma/pma.cfm

23. /scripts/cdrh/cfdocs/cfpma/pma.cfm?
start_search=1&PMANumber=P930014&SupplementType=NONE

24. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm?FR=886.3600

25. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?start_search=1&ProductCode=HQL

Page Last Updated: 03/08/2021

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

Accessibility Contact FDA Careers FDA Basics FOIA No FEAR Act Nondiscrimination Website Policies / Privacy



U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)

Contact FDA

     

For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

 U.S. Department of **Health & Human Services**

Links on this page:

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. https://www.fda.gov/

4. https://www.fda.gov/Medical-Devices

5. https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/medical-device-databases

6. /scripts/cdrh/devicesatfda/index.cfm

7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm

8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm

9. /scripts/cdrh/cfdocs/cfRL/rl.cfm

10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm

11. /scripts/cdrh/cfdocs/cfRES/res.cfm

12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm

13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm

14. /scripts/cdrh/cfdocs/cfPCD/classification.cfm

15. /scripts/cdrh/cfdocs/cfStandards/search.cfm

16. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm

17. /scripts/cdrh/cfdocs/cfPCD_RH/classification.cfm

18. /scripts/cdrh/cfdocs/cfAssem/assembler.cfm

19. /scripts/cdrh/cfdocs/Medsun/searchReportText.cfm

20. /scripts/cdrh/cfdocs/cfClia/Search.cfm

21. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm

22. /scripts/cdrh/cfdocs/cfpma/pma.cfm

23. /scripts/cdrh/cfdocs/cfpma/pma.cfm?start_search=1&PMANumber=P930014&SupplementType=NONE

24. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm?FR=886.3600

25. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?start_search=1&ProductCode=HQL

# EXHIBIT 39



FDA Home[3] Medical Devices[4] Databases[5]

## Premarket Approval (PMA)

 510(k)[7] DeNovo[8] | Registration & Listing[9] | Adverse Events[10] | Recalls[11] | PMA[12] | HDE[13] | Classification[14] | Standards[15]
CFR Title 21[16] | Radiation-Emitting Products[17] | X-Ray Assembler[18] | Medsun Reports[19] | CLIA[20] | TPLC[21]

New Search[22]　　　　　　　　　　　　　　　　　Back to Search Results

Note: This medical device record is a PMA supplement. A supplement may have changed the device description/function or indication from that approved in the original PMA. Be sure to look at the original PMA[23] record for more information.

| | |
|---|---|
| **Device** | AcrySof IQ Aspheric IOL With The UltraSert Pre-Loaded Delivery System |
| **Generic Name** | Intraocular Lens |
| **Regulation Number** | 886.3600[24] |
| **Applicant** | ALCON LABORATORIES, INC.<br>6201 South Freeway Dr.<br>Fort Worth, TX 76134 |
| **PMA Number** | P930014 |
| **Supplement Number** | S096 |
| **Date Received** | 10/26/2016 |
| **Decision Date** | 01/13/2017 |
| **Product Code** | HQL[25] |
| **Advisory Committee** | Ophthalmic |
| **Supplement Type** | Real-Time Process |
| **Supplement Reason** | Labeling Change - Indications/Instructions/Shelf Life/Tradename |
| **Expedited Review Granted?** | No |
| **Combination Product** | No |

### Approval Order Statement

Approval for modifying the physician directions for use to include instructions for removing the IOL from the injector.

Links on this page:

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. https://www.fda.gov/Medical-Devices
5. https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/medical-device-databases

6. /scripts/cdrh/devicesatfda/index.cfm

7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm

8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm

9. /scripts/cdrh/cfdocs/cfRL/rl.cfm

10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm

11. /scripts/cdrh/cfdocs/cfRES/res.cfm

12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm

13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm

14. /scripts/cdrh/cfdocs/cfPCD/classification.cfm

15. /scripts/cdrh/cfdocs/cfStandards/search.cfm

16. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm

17. /scripts/cdrh/cfdocs/cfPCD_RH/classification.cfm

18. /scripts/cdrh/cfdocs/cfAssem/assembler.cfm

19. /scripts/cdrh/cfdocs/Medsun/searchReportText.cfm

20. /scripts/cdrh/cfdocs/cfClia/Search.cfm

21. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm

22. /scripts/cdrh/cfdocs/cfpma/pma.cfm

23. /scripts/cdrh/cfdocs/cfpma/pma.cfm?start_search=1&PMANumber=P930014&SupplementType=NONE

24. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm?FR=886.3600

25. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?start_search=1&ProductCode=HQL

Page Last Updated: 03/08/2021

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

Accessibility Contact FDA Careers FDA Basics FOIA No FEAR Act Nondiscrimination Website Policies / Privacy



U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA



For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive

 U.S. Department of Health & Human Services

Links on this page:

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain

2. http://www.addthis.com/bookmark.php

3. https://www.fda.gov/

4. https://www.fda.gov/Medical-Devices

5. https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/medical-device-databases

6. /scripts/cdrh/devicesatfda/index.cfm

7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm

8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm

9. /scripts/cdrh/cfdocs/cfRL/rl.cfm

10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm

11. /scripts/cdrh/cfdocs/cfRES/res.cfm

12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm

13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm

14. /scripts/cdrh/cfdocs/cfPCD/classification.cfm

15. /scripts/cdrh/cfdocs/cfStandards/search.cfm

16. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm

17. /scripts/cdrh/cfdocs/cfPCD_RH/classification.cfm

18. /scripts/cdrh/cfdocs/cfAssem/assembler.cfm

19. /scripts/cdrh/cfdocs/Medsun/searchReportText.cfm

20. /scripts/cdrh/cfdocs/cfClia/Search.cfm

21. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm

22. /scripts/cdrh/cfdocs/cfpma/pma.cfm

23. /scripts/cdrh/cfdocs/cfpma/pma.cfm?start_search=1&PMANumber=P930014&SupplementType=NONE

24. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm?FR=886.3600

25. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?start_search=1&ProductCode=HQL

# EXHIBIT 40

**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

## Assignment abstract of title for Application 13476556

| Invention title/Inventor | Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|---|
| PLUNGER SYSTEM FOR INTRAOCULAR LENS SURGERY | 9463089 | 20130310843 | 13476556 | | |
| Kyle Brown, David Anthony Downer | Oct 11, 2016 | Nov 21, 2013 | May 21, 2012 | | |

## Assignments (2 of 2 total)

### Assignment 2

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 051454/0788 | Nov 11, 2019 | Dec 10, 2019 | 1602 | 122 |

**Conveyance**
CONFIRMATORY DEED OF ASSIGNMENT EFFECTIVE APRIL 8, 2019

**Assignors**
NOVARTIS AG

**Correspondent**
PEARNE & GORDON LLP
1801 EAST 9TH STREET
SUITE 1200
CLEVELAND, OH 44114-3108

**Assignee**
ALCON INC.
RUE LOUIS-D'AFFRY 6
FRIBOURG 1701
SWITZERLAND

### Assignment 1

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 028242/0508 | May 10, 2012 | May 21, 2012 | 1 | 5 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
BROWN, KYLE
DOWNER, DAVID ANTHONY

**Correspondent**
ALCON
IP LEGAL, TB4-8
6201 SOUTH FREEWAY
FORT WORTH, TX 76134

**Assignee**
NOVARTIS AG
LICHTSTRASSE 35
BASEL CH-4056
SWITZERLAND

A619

**uspto**

**UNITED STATES
PATENT AND TRADEMARK OFFICE**

## Assignment abstract of title for Application 14402778

| Invention title/Inventor | Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|---|
| INTRAOCULAR LENS INSERTER | 9724191 | 20150088149 | 14402778 | | |
| Jack R. Auld | Aug 08, 2017 | Mar 26, 2015 | Nov 21, 2014 | | |

## Assignments (2 of 2 total)

### Assignment 2

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 051257/0278 | Nov 11, 2019 | Dec 11, 2019 | 26 | 13 |

**Conveyance**
CONFIRMATORY DEED OF ASSIGNMENT EFFECTIVE APRIL 8, 2019

**Assignors**
ALCON PHARMACEUTICALS LTD.

**Correspondent**
PEARNE & GORDON LLP
1801 EAST 9TH STREET
SUITE 1200
CLEVELAND, OH 44114-3108

**Assignee**
ALCON INC.
RUE LOUIS-D'AFFRY 6
FRIBOURG 1701
SWITZERLAND

### Assignment 1

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 034211/0346 | Nov 18, 2014 | Nov 19, 2014 | 1 | 5 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
AULD, JACK R.

**Correspondent**
JONATHAN PREJEAN
6201 SOUTH FREEWAY
IP LEGAL
FORT WORTH, TX 76134

**Assignee**
ALCON PHARMACEUTICALS, LTD.
ROUTE DES ARSENAUX 41
FRIBOURG 1701
SWITZERLAND

**uspto** UNITED STATES
PATENT AND TRADEMARK OFFICE

# Assignment abstract of title for Application 14678826

| Invention title/Inventor | Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|---|
| INTRAOCULAR LENS INSERTER | 10010408 | 20150282928 | 14678826 | | |
| Jack R. Auld, John C. Huculak, | Jul 03, 2018 | Oct 08, 2015 | Apr 03, 2015 | | |
| Matthew Douglas McCawley, Matthew | | | | | |
| Braden Flowers | | | | | |

# Assignments (2 of 2 total)

## Assignment 2

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 051257/0278 | Nov 11, 2019 | Dec 11, 2019 | 26 | 13 |

**Conveyance**
CONFIRMATORY DEED OF ASSIGNMENT EFFECTIVE APRIL 8, 2019

**Assignors**
ALCON PHARMACEUTICALS LTD.

**Correspondent**
PEARNE & GORDON LLP
1801 EAST 9TH STREET
SUITE 1200
CLEVELAND, OH 44114-3108

**Assignee**
ALCON INC.
RUE LOUIS-D'AFFRY 6
FRIBOURG 1701
SWITZERLAND

## Assignment 1

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 039716/0773 | Sep 12, 2016 | Sep 13, 2016 | 1 | 6 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
ALTAVIZ, LLC.

**Correspondent**
ALCON RESEARCH, LTD.
6201 SOUTH FREEWAY
IP-LEGAL
FORT WORTH, TX 76134

**Assignee**
ALCON PHARMACEUTICALS, LTD.
6201 SOUTH FREEWAY
IP-LEGAL
FORT WORTH, TEXAS 76134

**uspto** UNITED STATES
PATENT AND TRADEMARK OFFICE

# Assignment abstract of title for Application 15072023

| Invention title/Inventor | Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|---|
| INTRAOCULAR LENS INSERTER | 10172706 | 20170119522 | 15072023 | | |
| JOHN CHRISTOPHER HUCULAK, | Jan 08, 2019 | May 04, 2017 | Mar 16, 2016 | | |
| MATTHEW BRADEN FLOWERS, JACK | | | | | |
| ROBERT AULD, MATTHEW DOUGLAS | | | | | |
| MCCAWLEY, JAMES LESCOULIE | | | | | |

# Assignments (3 of 3 total)

## Assignment 3

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 051454/0788 | Nov 11, 2019 | Dec 10, 2019 | 1602 | 122 |

**Conveyance**
CONFIRMATORY DEED OF ASSIGNMENT EFFECTIVE APRIL 8, 2019

**Assignors**
NOVARTIS AG

**Correspondent**
PEARNE & GORDON LLP
1801 EAST 9TH STREET
SUITE 1200
CLEVELAND, OH 44114-3108

**Assignee**
ALCON INC.
RUE LOUIS-D'AFFRY 6
FRIBOURG 1701
SWITZERLAND

## Assignment 2

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 038544/0908 | May 11, 2016 | May 11, 2016 | 1 | 5 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
ALCON PHARMACEUTICALS LTD.

**Correspondent**
ALCON RESEARCH, LTD.
6201 SOUTH FREEWAY, IP LEGAL
FORT WORTH, TX 76134

**Assignee**
NOVARTIS AG
LICHTSTRASSE 35
BASEL 4056
SWITZERLAND

## Assignment 1

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 038544/0818 | Mar 17, 2016 | May 11, 2016 | 1 | 6 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
AULD, JACK ROBERT

**Correspondent**
ALCON RESEARCH, LTD.

**A622**

HUCULAK, JOHN CHRISTOPHER
MCCAWLEY, MATTHEW DOUGLAS
FLOWERS, MATTHEW BRADEN
LESCOULIE, JAMES

6201 SOUTH FREEWAY, IP LEGAL
FORT WORTH, TX 76134

**Assignee**
ALCON PHARMACEUTICALS LTD.
RUE LOUIS-D'AFFRY 6
FRIBOURG 1701
SWITZERLAND

A623



# Assignment abstract of title for Application 14679921

| Invention title/Inventor | Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|---|
| INTRAOCULAR LENS INSERTER | 10188506 | 20160067036 | 14679921 | | |
| Jack R. Auld | Jan 29, 2019 | Mar 10, 2016 | Apr 06, 2015 | | |

# Assignments (3 of 3 total)

## Assignment 3

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 051257/0278 | Nov 11, 2019 | Dec 11, 2019 | 26 | 13 |

**Conveyance**
CONFIRMATORY DEED OF ASSIGNMENT EFFECTIVE APRIL 8, 2019

**Assignors**
ALCON PHARMACEUTICALS LTD.

**Correspondent**
PEARNE & GORDON LLP
1801 EAST 9TH STREET
SUITE 1200
CLEVELAND, OH 44114-3108

**Assignee**
ALCON INC.
RUE LOUIS-D'AFFRY 6
FRIBOURG 1701
SWITZERLAND

## Assignment 2

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 040213/0756 | Oct 28, 2016 | Nov 03, 2016 | 1 | 5 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
ALTAVIZ, LLC

**Correspondent**
ALCON RESEARCH, LTD.
6201 SOUTH FREEWAY
IP LEGAL
FORT WORTH, TX 76134

**Assignee**
ALCON PHARMACEUTICALS LTD.
RUE LOUIS-D'AFFRY 6, CASE POSTALE
FRIBOURG 1701
SWITZERLAND

## Assignment 1

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 037554/0445 | May 17, 2014 | Jan 21, 2016 | 1 | 4 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
AULD, JACK R.

**Correspondent**
KNOBBE MARTENS OLSON & BEAR
LLP
2040 MAIN STREET

14TH FLOOR
IRVINE, CA 92614

**Assignee**
ALTAVIZ, LLC
2 PARK PLAZA
SUITE 450
IRVINE, CALIFORNIA 92614



UNITED STATES
PATENT AND TRADEMARK OFFICE

## Assignment abstract of title for Application 15838946

| Invention title/Inventor | Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|---|
| INTRAOCULAR LENS INJECTOR | 10568735 | 20180200046 | 15838946 | | |
| Tu Cam Tran, Stephen J Van Noy, Kyle Brown, Yinghui Wu | Feb 25, 2020 | Jul 19, 2018 | Dec 12, 2017 | | |

## Assignments (7 of 7 total)

### Assignment 7

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 051454/0788 | Nov 11, 2019 | Dec 10, 2019 | 1602 | 122 |

**Conveyance**
CONFIRMATORY DEED OF ASSIGNMENT EFFECTIVE APRIL 8, 2019

**Assignors**
NOVARTIS AG

**Correspondent**
PEARNE & GORDON LLP
1801 EAST 9TH STREET
SUITE 1200
CLEVELAND, OH 44114-3108

**Assignee**
ALCON INC.
RUE LOUIS-D'AFFRY 6
FRIBOURG 1701
SWITZERLAND

### Assignment 6

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 044742/0231 | Jun 27, 2017 | Jan 26, 2018 | 1 | 4 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
ALCON RESEARCH, LTD.

**Correspondent**
ALCON RESEARCH, LTD.
6201 SOUTH FREEWAY
IP-LEGAL
FORT WORTH, TX 76134

**Assignee**
NOVARTIS AG
LICHTSTRASSE 35
BASEL 4056
SWITZERLAND

### Assignment 5

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 044955/0752 | Jun 20, 2017 | Feb 16, 2018 | 1 | 4 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
VAN NOY, STEPHEN J

**Correspondent**
ALCON RESEARCH, LTD.
6201 SOUTH FREEWAY

IP-LEGAL
FORT WORTH, TX 76134

**Assignee**
ALCON RESEARCH, LTD.
6201 SOUTH FREEWAY
FORT WORTH, TEXAS 76134

## Assignment 4

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 044742/0158 | Jun 20, 2017 | Jan 26, 2018 | 1 | 4 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**                                    **Correspondent**
VAN NOY, STEPHEN J                               ALCON RESEARCH, LTD.
                                                 6201 SOUTH FREEWAY
                                                 IP-LEGAL
                                                 FORT WORTH, TX 76134

**Assignee**
ALCON RESEARCH LTD.
6201 SOUTH FREEWAY
FORT WORTH, TEXAS 76134

## Assignment 3

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 044955/0800 | Jan 25, 2017 | Feb 16, 2018 | 1 | 4 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**                                    **Correspondent**
ALCON RESEARCH, LTD.                             ALCON RESEARCH, LTD.
                                                 6201 SOUTH FREEWAY
                                                 IP-LEGAL
                                                 FORT WORTH, TX 76134

**Assignee**
NOVARTIS AG
LICHTSTRASSE 35
BASEL 4056
SWITZERLAND

## Assignment 2

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 044955/0571 | Jan 20, 2017 | Feb 16, 2018 | 1 | 6 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**                                    **Correspondent**
BROWN, KYLE                                      ALCON RESEARCH, LTD.
TRAN, TU                                         6201 SOUTH FREEWAY
WU, YINGHUI                                      IP-LEGAL
                                                 FORT WORTH, TX 76134

**Assignee**
ALCON RESEARCH, LTD.
6201 SOUTH FREEWAY
FORT WORTH, TEXAS 76134

## Assignment 1

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|

**A627**

044742/0115                    Jan 04, 2017          Jan 26, 2018              1                    6

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**                                    **Correspondent**
BROWN, KYLE                                      ALCON RESEARCH, LTD.
TRAN, TU                                         6201 SOUTH FREEWAY
WU, YINGHUI                                      IP-LEGAL
                                                 FORT WORTH, TX 76134

**Assignee**
ALCON RESEARCH, LTD.
6201 SOUTH FREEWAY
FORT WORTH, TEXAS 76134

**A628**



UNITED STATES
PATENT AND TRADEMARK OFFICE

## Assignment abstract of title for Application 15049315

| Invention title/Inventor | Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|---|
| INTRAOCULAR LENS INJECTOR DAVID ANTHONY DOWNER, YINGHUI WU, STEPHEN J. VAN NOY, KYLE BROWN | 10588780 Mar 17, 2020 | 20160256316 Sep 08, 2016 | 15049315 Feb 22, 2016 | | |

## Assignments (3 of 3 total)

### Assignment 3

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 051454/0788 | Nov 11, 2019 | Dec 10, 2019 | 1602 | 122 |

**Conveyance**
CONFIRMATORY DEED OF ASSIGNMENT EFFECTIVE APRIL 8, 2019

**Assignors**
NOVARTIS AG

**Correspondent**
PEARNE & GORDON LLP
1801 EAST 9TH STREET
SUITE 1200
CLEVELAND, OH 44114-3108

**Assignee**
ALCON INC.
RUE LOUIS-D'AFFRY 6
FRIBOURG 1701
SWITZERLAND

### Assignment 2

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 037789/0946 | Feb 22, 2016 | Feb 22, 2016 | 1 | 6 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
ALCON RESEARCH, LTD.

**Correspondent**
ALCON
6201 SOUTH FREEWAY
IP LEGAL
FORT WORTH, TX 76134

**Assignee**
NOVARTIS AG
LICHTSTRASSE 35
BASEL 4056
SWITZERLAND

### Assignment 1

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 037789/0846 | Sep 28, 2015 | Feb 22, 2016 | 1 | 17 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
VAN NOY, STEPHEN J.

**Correspondent**
ALCON

**A629**

DOWNER, DAVID A.
BROWN, KYLE
WU, YINGHUI

6201 SOUTH FREEWAY
IP LEGAL
FORT WORTH, TX 76134

**Assignee**
ALCON RESEARCH, LTD.
6201 SOUTH FREEWAY
FORT WORTH, TEXAS 76134

**A630**