## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| HOYA CORPORATION, HOYA SURGICAL OPTICS, INC., HOYA LAMPHUN LTD., and HOYA MEDICAL SINGAPORE PTE LTD.,<br><br>Plaintiffs<br><br>v.<br><br>ALCON INC., ALCON LABORATORIES, INC., ALCON RESEARCH, LLC, and ALCON VISION LLC,<br><br>Defendants.<br><br>ALCON LABORATORIES, INC., ALCON RESEARCH, LLC, and ALCON VISION LLC,<br><br>Counterclaim Plaintiffs,<br><br>v.<br><br>HOYA CORPORATION, HOYA SURGICAL OPTICS, INC., HOYA LAMPHUN LTD., and HOYA MEDICAL SINGAPORE PTE LTD.,<br><br>Counterclaim Defendants. | No. 3:20-cv-3629-M<br><br>**REDACTED PUBLIC VERSION** |

## MEMORANDUM OPINION AND ORDER

Before the Court is Alcon's Motion for Partial Summary Judgment (ECF No. 330) and HOYA's Motion to Exclude Certain Opinions of Carrie Distler, Timothy Bumbalough, Stephen G. Kunin, and Arthur Erdman, Ph.D. (ECF No. 341).[1]

---

[1] Also pending before the Court is Alcon's Motion to Exclude Certain Opinions from Plaintiffs' Experts (ECF No. 343), which the Court will address separately.

On December 13, 2023, the Court heard oral argument on the pending Motions.  ECF No. 396, 397.  On the record, the Court granted Alcon summary judgment of noninfringement as to claim 25 of U.S. Patent No. 9,901,442, and granted Alcon summary judgment on the issue of marking.  ECF No. 397.

For the reasons below, Alcon's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, and HOYA's Motion to Exclude is **GRANTED IN PART** and **DENIED IN PART**.  Although this Opinion may not contain any confidential information, the Court will, out of an abundance of caution, conditionally enter it under seal because the underlying motions and related documents, discussed below, were filed under seal.  By **January 26, 2024,** the parties are **ORDERED** to file a joint status report that states whether any party believes this Opinion contains any confidential information that should remain sealed and, if so, attaches for the Court's consideration a proposed redacted public version of the Opinion.

## I.     BACKGROUND

In December 2020, Plaintiffs HOYA Corporation, HOYA Surgical Optics, Inc., HOYA Lamphun Ltd., and HOYA Medical Singapore Pte Ltd. (collectively, "HOYA") sued Defendants Alcon Inc., Alcon Laboratories, Inc., Alcon Research, LLC, and Alcon Vision, LLC (collectively "Alcon") for patent infringement, asserting six patents.[2]  Alcon filed declaratory judgment counterclaims, seeking judgments of noninfringement and invalidity of the asserted patents.

The asserted patents relate to "intraocular lens" ("IOL") technology, and specifically, IOL insertion devices and methods.  An IOL is an artificial lens for the eye, and via surgery, can be implanted in the eye to replace the eye's natural lens as a treatment for cataracts.  Foldable

---

[2] U.S. Patent Nos. 9,907,647 ("the '647 patent"); 9,901,442 ("the '442 patent"); 9,980,811 ("the '811 patent"); 9,655,718 ("the '718 patent"); 9,877,826 ("the '826 patent"); and 10,039,668 ("the '668 patent") (collectively, the "asserted patents").

IOLs are made from soft, flexible material that may be inserted into the eye through a small incision.  *See, e.g.*, '668 patent, at 1:37–40.  In such cases, the insertion device may include a plunger which folds an IOL and pushes it through a nozzle into the eye via an incision that is smaller than the diameter of the IOL.  *Id.* at 1:40–47.

### A.    Asserted Claims

The six asserted patents consist of three groups: (1) the standalone '647 patent, (2) the '718 patent family, and (3) the '668 patent family.

### 1.    The '647 patent

The '647 Patent, titled "Intraocular Lens Insertion Device and Method for Controlling Movement of the Intraocular Lens," was filed on July 29, 2015, and issued on March 6, 2018. The '647 patent purports to claim priority to Japanese application 2007-182535, filed on July 11, 2007.  The Abstract of the '647 Patent states:

> Provided is an intraocular lens insertion device capable of omitting a repeated operation after the intraocular lens is inserted into the eye. The intraocular lens insertion device (1) comprises a lens setting part (11) for mounting an intraocular lens (5) having an optic (6) and one or two or more supporting portions (7a and 7b) disposed at the outer edge of the optic (6), a plunger (4) for pushing out the intraocular lens (5) mounted in the lens setting part (11), and a nozzle (13) for releasing the intraocular lens (5) pushed out by the plunger (4). This plunger (4) includes a lens contact portion (32) for abutting against the outer edge of the optic (6), and a pushing portion (33) for pushing out the supporting portion (7b) arranged in the backward direction of a lens advancing axis (A).

'647 patent, Abstract.

HOYA asserts that Alcon infringes claims 1–4, 6–7, and 10–13 of the '647 patent, both literally and through the doctrine of equivalents.  Claim 1 of the '647 patent recites the following elements:

> A method of operating an insertion device including a main body, a nozzle, and a tapered transition portion proximal of the nozzle, the method comprising the steps of:

3

applying force to an intraocular lens, located within the main body and having an optic, a leading loop haptic with a fixed end at the optic and a free end, and a trailing loop haptic with a fixed end at the optic and a free end, with a plunger, including a distal portion with a lens contact surface and a slot that extends proximally from the lens contact surface, in such a manner that a portion of the trailing loop haptic is located within the slot while being bent toward the nozzle by the distal portion and the free end of the trailing loop haptic points toward the nozzle; and

pushing the intraocular lens into the nozzle with the plunger.

'647 patent, cl. 1.

The Court construed "slot," as it appears in claims 1, 4, and 10–13 of the '647 patent, to mean "groove in the plunger having a bottom face, two side faces, and a back face," and "elongate slot," in claims 10, 12, and 13, to mean "groove in the plunger that is longer than it is wide, having a bottom face, two side faces, and a back face."  ECF No. 184 at 61.  The Court further construed "lens contact surface" in claims 1, 4, 7, 12, and 13, to mean "surface on the plunger configured to push the intraocular lens," and "located within the main body" in claims 1 and 12 as having its plain and ordinary meaning.  *Id.*

### 2.  The '718 patent family

The '718, '826 and '442 Patents are from the same patent family, referred to herein as the '718 patent family.  Each of these patents is titled "Intraocular Lens Insertion Device," and purports to claim priority to Japanese application 2009-001493, filed on January 7, 2009.  The Abstracts of the '718 patent family are identical and state:

There is provided an intraocular lens insertion device capable of appropriately regulating the motion of a rear supporting portion during a process of moving an intraocular lens, and reducing the possibility of reoperation being required after the intraocular lens is inserted into an eye. An intraocular lens insertion device 1 comprises a main body 2, and a slider 3 and a plunger 4 that are attached to the main body 2. Further, the intraocular lens insertion device 1 is of a preset type in which an intraocular lens 5 is placed inside the main body 2 in advance. The slider 3 includes a first abutting portion 21 for pushing up a supporting portion 7 (rear supporting portion 7a) arranged on a rear side of an optical part 6 with respect to a

lens advancement axis A, and second abutting portions 22a, 22b abutting against an outer edge of a rear portion of the optical part 6.

'718 patent, Abstract.

The '718 Patent was filed on December 8, 2013, and issued on May 23, 2017. HOYA asserts that Alcon literally infringes claims 1, 4, 8–13, and 15–16 of the '718 patent.[3] Claim 1 of the '718 patent recites the following elements:

> A method for use with an intraocular lens, including an optic, a forward haptic having an end and a rear haptic having an end, that is located within an insertion device defining a lens travelling axis and including a nozzle, a transition section and a plunger that moves forwardly toward the nozzle and includes a forward region with a side wall and a bottom wall that together define a slot that extends rearwardly and is configured to receive a portion of the rear haptic, the method comprising the steps of:
>
>> pushing the end of the rear haptic upwardly and forwardly relative to the optic;
>>
>> pushing the end of the rear haptic over the optic, while the portion of the optic over which the rear haptic passes remains unfolded, with the forward region of the plunger such that a portion of the rear haptic is bent and received in the slot that extends rearwardly;
>>
>> folding the optic such that there is a space between folded portions of the optic; and
>>
>> pushing the intraocular lens through the nozzle with the forward region of the plunger while the end of the rear haptic is in the space between the folded portions of the optic.

*Id.* at cl. 1.

The '826 patent was filed on May 19, 2017, and issued on January 30, 2018. HOYA asserts a claim of literal infringement as to claims 1–6, 12–14, and 16 of the '826 patent. Claim 1 of the '826 patent recites the following elements:

> A method performed by an intraocular lens insertion device on an intraocular lens, the intraocular lens including an optic, a forward haptic having an end and a rear

---

[3] The Joint Pretrial Order filed by the parties indicates that HOYA asserts that Alcon infringes each of the asserted patents both literally and under the doctrine of equivalents. *See* ECF No. 391. However, during the December 13, 2023, hearing, HOYA conceded that it was asserting an infringement theory under the doctrine of equivalents only as to the '647 patent, and asserting literal infringement only as to the remainder of the asserted patents.

haptic having an end, the insertion device including a nozzle, a transition section and a plunger having a forward region with a side wall and a bottom wall that together define an indentation and is configured to receive a portion of the rear haptic, the method comprising the steps of:

> pushing the rear haptic such that the end of the rear haptic moves upwardly and forwardly relative to the optic;

> pushing the rear haptic such that the end of the rear haptic passes over the optic, while the portion of the optic over which the rear haptic passes remains unfolded, with the forward region of the plunger in such a manner that the rear haptic is bent and a portion of the rear haptic is received in the indentation;

> folding a portion of the optic such that there is a space between folded portions of the optic; and

> pushing the intraocular lens through the nozzle with the forward region of the plunger while the end of the rear haptic is in the space between the folded portions of the optic.

'826 patent, cl. 1.

The '442 Patent was filed on May 19, 2017, and issued on February 27, 2018. HOYA asserts 1–5, 9, 11–17, 21, and 23–25 of the '442 patent. Claim 1 of the '442 patent recites:

An intraocular lens insertion apparatus, comprising:

a main body;

an intraocular lens including an optic and haptics, each haptic having a free end, stored in the main body in such a manner that one of the haptics is a proximal haptic and one of the haptics is a distal haptic;

a nozzle associated with the main body and configured to be inserted into an eye; and

a plunger, carried within the main body and movable relative to the main body from a first position to a second position at the nozzle, including a lens contact portion and a recess that is located above the lens contact portion, that extends proximally from the lens contact portion, that has a first lateral side that is open, a second lateral side that is closed by a lateral wall, and an open distal end, wherein the plunger is configured to hold a portion of the proximal haptic in the recess when the proximal haptic is bent such that the free end of the proximal haptic is positioned over the optic.

'442 patent, cl. 1.

6

The Court construed the preamble in claims 1 and 12 of the '718 patent and claims 1 and 12 of the '826 patent to be limiting.  ECF No. 184 at 61.  For purposes of claims 1 in both the '718 and '826 patents, the Court construed "bottom wall" to mean "wall defining the lowest lateral side of the slot or indention"," and "side wall" to mean "wall defining a lateral side of the slot or indention extending upwardly from the bottom wall."  *Id.*

The Court also construed claim 12 of the '718 patent and claim 12 of the '826 patent, which recite:

| '718 patent, claim 12 | '826 patent, claim 12 |
|---|---|
| 12. A method . . . comprising the steps of: | 12. A method . . .  comprising the steps of: |
| **[Step 1]** folding the optic with the insertion device such that there is a space between folded portions of the optic;<br>**[Step 2]** moving the end of the rear haptic over the optic and into the space between the folded portions of the optic with the plunger;<br>**[Step 3]** moving the end of the forward haptic into the space between the folded portions of the optic with the insertion device; and<br>**[Step 4]** pushing the intraocular lens with the plunger through the nozzle with the ends of the forward and rear haptics in the space between the folded portions of the optic. | **[Step 2]** moving the free end of the rear haptic, from a position rearward of the optic, over the optic and into a space between **[Step 1]** folded portions of the optic with the plunger;<br><br>**[Step 3]** moving the free end of the forward haptic into the space between **[Step 1]** the folded portions of the optic with the transition section; and<br><br>**[Step 4]** pushing the intraocular lens with the plunger through the nozzle with the free ends of the forward and rear haptics in the space between the folded portions of the optic. |

The Court construed these claims as follows:

Step 2 and Step 3 are not required to occur in the recited order, but neither Step 2 nor Step 3 can start until the optic has been folded such that there is a space between folded portions of the optic for a haptic (Step 1).  Step 4 cannot start until after Steps 2 and 3 have started.  Other than the starting order identified above, none of the steps have to be entirely completed in order for the next step to start.

*Id.* at 45.

For the '442 patent, the Court construed the term "lateral wall" in claims 1, 5, 13, and 17 to have its plain and ordinary meaning, and "associated with the main body" in claims 1 and 13 to mean "part of the main body."[4]  *Id.* at 62.

### 3.    The '668 patent family

The '668 and '811 patents are from the same patent family, referred to here as the '668 patent family.  Each of these patents is titled "Ocular Implant Insertion Apparatus and Methods," and purports to claim priority to Japanese application 2010-132952, filed on June 10, 2010.  The Abstracts of the '668 patent family are identical and state:

> An exemplary ocular implant insertion system includes a case and a preloaded ocular implant insertion apparatus. The apparatus includes first and second movable structures that move the ocular implant in a predetermined sequence. The respective configurations of the case and the ocular implant insertion apparatus are such that the ocular implant insertion apparatus is not removable from the case when the ocular implant insertion apparatus is in the pre-use state and is removable after the first movable structure has moved at least a portion of the optical implant.

'668 patent, Abstract.

The '668 patent was filed on March 16, 2016, and issued on August 7, 2018.  HOYA asserts claims 1–5, 10, and 12–17 of the '668 patent.  Claim 1 of the '668 patent recites:

> An intraocular lens insertion apparatus, comprising:

> an outer body that defines a lens movement direction, that includes a nozzle and a lens placement section with lens supporting surfaces having portions that are spaced from one another in a spacing direction that is perpendicular to the lens movement direction, and that is configured to store an intraocular lens, having an optic with a diameter and haptics with respective free ends, in such a manner that diametrically opposed portions of the optic are on the lens supporting surface portions that are spaced in the spacing direction that is perpendicular to the lens movement direction, one of the haptics is a proximal haptic, and one of the haptics is a distal haptic; and

---

[4] In addition, the Court construed certain terms in claim 25 of the '442 patent, but because the Court has already granted summary judgment of noninfringement, it does not recite those constructions here.

a plunger, at least a portion of which is carried within the outer body, that is movable relative to the outer body and which has a distal region that defines a longitudinal axis, the distal region including

a bottom wall having an upper surface and defining a width in a direction transverse to the longitudinal axis of the distal region,

a lens contact surface extending downwardly from the bottom wall upper surface,

a top wall defining a width in a direction transverse to the longitudinal axis of the distal region that is less than the width of the bottom wall, and

a lateral wall that extends from the bottom wall to the top wall in a direction perpendicular to the spacing direction that is perpendicular to the lens movement direction,

the top wall, bottom wall and lateral wall together defining a recess that is located above the bottom wall, that extends proximally from the lens contact surface, that has a first lateral side that is open, a second lateral side that is closed by the lateral wall, and an open distal end, and that is configured to hold a portion of the proximal haptic when the proximal haptic is bent such that the free end is positioned over the optic.

*Id.* at cl. 1.

The '811 patent was filed on May 30, 2017, and issued on May 29, 2018. HOYA asserts claims 1–5, 10, and 12–17 of the '811 patent. Claim 1 of the '811 patent recites the following elements:

An intraocular lens insertion apparatus, comprising:

an outer body including a lens placement section and a nozzle and defining a lens movement direction;

an intraocular lens, having an optic with a diameter and haptics with respective free ends, stored in the lens placement section in such a manner that the optic diameter is perpendicular to the lens movement direction, one of the haptics is a proximal haptic and one of the haptics is a distal haptic; and

a plunger, at least a portion of which is carried within the outer body, that is movable relative to the outer body and which has a distal region that defines a longitudinal axis, the distal region including

a bottom wall having an upper surface and defining a width in a direction transverse to the longitudinal axis of the distal region,

> a lens contact surface extending downwardly from the bottom wall upper surface,
>
> a top wall defining a width in a direction transverse to the longitudinal axis of the distal region that is less than the width of the bottom wall, and
>
> a lateral wall that extends from the bottom wall to the top wall in a direction perpendicular to the optic diameter that is perpendicular to the lens movement direction,
>
> the top wall, bottom wall and lateral wall together defining a recess that is located above the bottom wall, that extends proximally from the lens contact surface, that has a first lateral side that is open, a second lateral side that is closed by the lateral wall, and an open distal end, and that is configured to hold a portion of the proximal haptic when the proximal haptic is bent such that the free end is positioned over the optic.

'811 patent, cl. 1.

In claim 1 of the '668 patent and claim 1 of the '811 patent, the Court construed "bottom wall" to have its plain and ordinary meaning, "distal region" to mean "end of the plunger that faces the eye," and "that defines a longitudinal axis" to mean "that defines a lens advancement axis." ECF No. 184 at 61–62. In addition, the Court construed "planar" in claim 11 of the '668 patent and claim 11 of the '811 patent to have its plain and ordinary meaning.

### B.  Accused Products

HOYA contends that Alcon's UltraSert IOL insertion devices allegedly infringe at least one claim of the asserted patents. The UltraSert is Alcon's third-generation preloaded IOL insertion device, for insertion of Alcon's single-piece, foldable "AcrySoft" IOL lens.

## II.  LEGAL STANDARDS

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the movant shows that there is no genuine issue as to any material fact, the burden shifts to the nonmoving party to produce competent evidence showing the existence of a genuine issue as to a material

10

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). The Court views all evidence in the light most favorable to the party opposing the motion. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1331 (Fed. Cir. 2006).

Under Federal Rule of Evidence 702, a witness who is qualified as an expert may testify in the form of an opinion or otherwise if (1) the expert's specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue, (2) the testimony is based on sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the expert has reliably applied the principles and methods to the facts of the case. When evaluating a party's challenge to an opponent's expert witness, the Court assumes the role of gatekeeper to ensure the relevance and reliability of the expert's testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Reliable testimony must be grounded "in the methods and procedures of science" and signify knowledge beyond "subjective belief or unsupported speculation." *Id.* at 590. The proponent of expert testimony must establish its reliability by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 174–76 (1987). However, the question of whether the expert is credible, or the opinion is correct, is generally a question for the fact finder, not the court. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

## III.   ANALYSIS

### A.   Alcon's Motion for Partial Summary Judgment

Alcon moves for summary judgment on several issues: infringement, willfulness, anticipation as to the '826 patent, priority as to the '647 patent, and marking. During oral argument, the Court granted Alcon summary judgment of noninfringement as to claim 25 of the '442 patent, and summary judgment on the issue of marking as to the '442, '811, and '668

11

patents.  As a result of the Court's marking ruling, HOYA is not entitled to any damages for alleged infringement of those patents occurring prior to the filing of this lawsuit on December 11, 2020.  The Court now addresses the remainder of Alcon's Motion for Partial Summary Judgment.  Because the Court is granting summary judgment of noninfringement as to the '647 patent, it does not reach Alcon's arguments regarding priority of the '647 patent.

        **1.**        **Noninfringement**

Alcon seeks summary judgment of noninfringement on five grounds.  The Court will address each in turn.

        a.    "[I]n a direction perpendicular"

Alcon moves for summary judgment of noninfringement for all asserted claims of the '668 and '811 patents, arguing that there is no evidence that UltraSert satisfies limitations in these claims requiring a lateral wall extending "in a direction perpendicular."  The Court agrees.

The '668 patent and '811 patent each contain only one independent claim, claim 1.  In both patents, claim 1 recites a "lateral wall that extends from the bottom wall to the top wall in a direction perpendicular" to either "the spacing direction" ('668 patent) or "the optic diameter" ('811 patent).  '668 patent, cl. 1; '811 patent, cl. 1.  Both patents further require that the "spacing direction" or "optic diameter" (depending on the particular patent) be "perpendicular to the lens movement direction."

Alcon argues that HOYA has presented no evidence that these limitations in the independent claims of the 668 and '811 patents are met in the UltraSert, justifying summary judgment of noninfringement.  Alcon contends that, in reaching her infringement opinion for these limitations, HOYA's infringement expert, Dr. Cameron, provides no evidence showing that the alleged lateral wall extends perpendicular to the "spacing direction" or "optic diameter" that

is, in turn, "perpendicular to the lens movement direction."  As further evidence of noninfringement, Alcon points to deposition testimony of Dr. Cameron, where she agrees that the word "perpendicular" means "90 degrees," and to the report of Alcon's expert, Mr. Bumbalough, who says that he measured the lateral wall of the UltraSert and found it to be tilted at an 84- to 85-degree angle, which Alcon argues does not satisfy the "in a direction perpendicular" limitations.  ECF No. 331-5 at Appx.142–45, 565.  In response, HOYA contends that nothing in the claims or specification of the '668 or '811 patents require that the relevant angle be exactly 90 degrees, and provides a supplemental declaration from Dr. Cameron, in which she opines that "the direction of the lateral wall in relation to the spacing direction/optic diameter is near enough to 90 degrees to appear perpendicular to the naked eye, thus meeting the required limitation."  ECF No. 340-6 at Appx.2742.

The Court concludes that there is no summary judgment evidence that the accused products meet the "[i]n a direction perpendicular" limitations in the independent claims of the '668 and '811 patents, justifying summary judgment of noninfringement on all asserted claims of the '668 and '811 patent.  Dr. Cameron's supplemental declaration, attached to HOYA's Response to Alcon's Motion for Partial Summary Judgment (filed on September 15, 2023), is an untimely attempt to supplement her infringement opinion after the expert discovery deadline, and that untimely filing neither substantially justified nor harmless; as a result, the Court does not consider it.  *See* Fed. R. Civ. P. 26(a), 37(c)(1).  Opening expert reports were due on April 14, 2023, and rebuttal expert reports were due on June 5, 2023; Dr. Cameron's opening and rebuttal reports were served on those dates.  HOYA never moved to supplement Dr. Cameron's reports. In addition, the Court concludes that Dr. Cameron's explanation for the failure to provide the opinions in her supplemental declaration earlier—namely, that "Alcon never identified what they

13

contended the angle of the lateral wall compared to the other directions to be, nor identified what angles would or would not meet, in their view, the perpendicular claim requirement"—is irrelevant.  ECF No. 340-6 at Appx. 2745 ¶ 15.  As the party asserting infringement, HOYA bears the burden of pleading and proving infringement, including establishing how each limitation in every asserted claim is met in the accused products.  Thus, in its infringement case, HOYA is obliged to present evidence that all limitations of the claims asserted in the '668 and '811 patents are met in the UltraSert, including the requirement that the lateral wall extend "in a direction perpendicular," regardless of Alcon's noninfringement arguments.  *See, e.g.*, *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1095 (Fed. Cir. 2008) ("[T]he burden remains with the patentee to prove infringement, not on the defendant to disprove it.").

Apart from Dr. Cameron's now-excluded supplemental declaration, HOYA provides no evidence that the "in a direction perpendicular" limitations are met in the UltraSert.  HOYA points to paragraphs of Dr. Cameron's opening report in which HOYA contends that she explains how the limitation is met in the UltraSert,[5] but after reviewing those paragraphs, the Court concludes that they do not create a genuine issue of material fact on this issue.  *See* ECF No. 331-2 at Appx.160–276 ("Cameron Opening Rep.") ¶¶ 932–33 ('668 patent); *id.* at ¶¶ 1038–39 ('811 patent).  For both claim 1 of the '668 patent and claim 1 of the '811 patent, Dr. Cameron references the "in a direction perpendicular" limitation only when reciting the claim language:

> The distal region of the plunger contained in Alcon's UltraSert includes a lateral wall that extends from the bottom wall to the top wall in a direction that is perpendicular to the spacing direction, which is itself perpendicular to the lens movement direction. This can be seen both in CAD renderings showing the UltraSert's plunger tip in greater detail, and promotional videos released by Alcon showing use of the UltraSert[.]

---

[5] Hearing Tr. (ECF No. 398) at 16.

Cameron Opening Rep. ¶ 932 ('668 patent); *see also id.* ¶ 1038 ('811 patent).

Dr. Cameron's report then provides three images, of which the "lateral wall" is identified in only the first:



*See* ALCON_NDTX_00108022 (exploded and zoomed in screenshot of UltraSert CAD rendering, showing plunger tip detail) (annotated).

Cameron Opening Rep. ¶ 932 ('668 patent); *see also id.* ¶ 1038 ('811 patent).

None of these paragraphs in Dr. Cameron's report discuss the angle or perpendicularity of the lateral wall vis-à-vis the spacing direction or optic diameter (depending on the patent). Nor is there any image in which the relevant angle is identified, or shown in such a way that one could assess its perpendicularity.[6]  As a result, the Court concludes that Dr. Cameron's report does not create a fact question as to whether the "in a direction perpendicular" limitations of the '668 and '811 patents are met in the UltraSert.  Because HOYA points to no other admissible summary judgment evidence in support of its infringement theory as to these patents, the Court

---

[6] Dr. Cameron admitted in her deposition that she did not measure the angle in question.  ECF No. 331-5 at Appx.565.

finds that summary judgment of noninfringement is appropriate as to all asserted claims of the '668 and '811 patents.

HOYA's argument that the '668 and '811 patents do not require a showing of exact perpendicularity does not warrant a different outcome, given that HOYA has provided no admissible affirmative evidence that the relevant limitations are met.  Put differently, the Court need not reach the question of whether the "in a direction perpendicular" limitations can be satisfied by evidence of an angle that is generally or approximately perpendicular, given that, besides a conclusory recitation of the claim elements, Dr. Cameron does not provide *any* factual foundation for her infringement opinion as to these limitations in her opening report, let alone opine that the limitations are met because the wall generally extends in a perpendicular direction. *See Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc*., 589 F.3d 1179, 1183 (Fed. Cir. 2009) ("[A] patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement . . . .").  Moreover, such an argument would likely be unsuccessful, given that both parties' experts agree that perpendicular means 90 degrees, and Alcon has presented unrebutted evidence that the relevant angle is not 90 degrees.

b.  "Sequence of folding" claims

Alcon moves for summary judgment on claims 12, 13, 15, and 16 of the '718 patent and claims 12–14 and 16 of the '826 patent on the grounds that the UltraSert does not practice the claimed methods in the order required by the Court's claim construction.  After reviewing the evidence presented by HOYA, the Court finds that there is no genuine issue of material fact that the UltraSert does not infringe independent claims 12 of both the '718 and '826 patent, and thus does not infringe the dependent claims that depend from them.

Independent claim 12 in both the '718 and '826 patents describe methods consisting of four steps. Step 1 for both claims describe folding the optic, or IOL. *See* '718 patent at 13:24–25 ("folding the optic with the insertion device such that there is a space between folded portions of the optic"); '826 patent at 14:22 ("folded portions of the optic with the plunger"). Step 2 describe moving the end ('718 patent) or free end ('826 patent) of the rear haptic over the optic and into a space between the folded portions of the optic. *See* '718 patent at 13:26–27 ("moving the end of the rear haptic over the optic and into the space between the folded portions of the optic with the plunger"); '826 patent at 14:20–22 ("moving the free end of the rear haptic, from a position rearward of the optic, over the optic and into a space between"). The Court construed the '718 and '826 patents to require that the optic folding recited in Step 1 has to at least start before Step 2—movement of the rear haptic over the optic and into a space between the folded portions of the optic—may begin.

Alcon argues that summary judgment is appropriate because there is no genuine dispute that, when the allegedly infringing method recited in these claims is practiced in the UltraSert, Step 2 begins—*i.e.*, the rear haptic begins to move—before the optic starts to fold. According to Alcon, it is undisputed that when the plunger is advanced by the user, the rear haptic is the first part of the IOL that it touches; for support, Alcon points to Dr. Cameron's deposition testimony in which she agrees that, when the UltraSert plunger is advanced by the user, "the first thing the plunger touches inside the UltraSert is the rear haptic." ECF No. 331-5 at Appx.561; *see also id.* at Appx.529. Alcon further contends that Dr. Cameron agrees that the folding of the optic is achieved by the plunger pushing the optic into a narrowing section of the device, demarcated by a horizontal line on the UltraSert. *Id.* at Appx.559–60 (Dr. Cameron agreeing that the transition, narrowing section of the UltraSert begins at "a horizontal line that crosses the UltraSert");

Cameron Opening Rep. ¶ 575 ("[E]ntering the device's tapered transition section . . . serves to fold the edges of the optic such that there is a space between folded portions of the optic . . . ."). Moreover, Dr. Cameron agrees that the optic is unfolded before it enters the tapered transition section.  ECF No. 331-5 at Appx.560 (agreeing that the lens bay, where "the lens sits . . . unfolded," is before the transition section); *see also* Cameron Opening Rep. ¶ 508 ("Optics['] edges unfolded before entering tapered transition section." (discussing claim 1 of the '718 patent)).

        The Court agrees with Alcon that Dr. Cameron's opening report and deposition testimony establish that, when the plunger is depressed, the first thing to occur is the movement of the rear haptic towards and over the optic.  Moreover, this evidence shows that movement of the rear haptic occurs before the optic is folded "such that there is a space between folded portions of the optic for a haptic," as required by the Court's construction.[7]  For example, images in Dr. Cameron's report show the IOL sitting unfolded, before crossing the line on the device indicating the beginning of the transition section, with the end of the rear haptic clearly moved over the IOL, as shown in the middle image below:

---

[7] The Court notes that, in the excerpts of her opening report provided to the Court, Dr. Cameron occasionally seems to misapply the Court's claim construction. *See* Cameron Opening Rep. ¶¶ 577–79, 729–32.  The Court's construction requires that neither Step 2 nor Step 3 (movement of the rear and forward haptics, respectively), "can start until the optic has been folded such that there is a space between folded portions of the optic for a haptic."  ECF No. 184 at 45. However, in discussing claim 12 of the '718 patent and claim 12 of the '826 patent, Dr. Cameron emphasizes that the movement steps must not start "until the folding step has begun such that there is an <u>unfolded portion of the haptic</u>" over which the end or forward end of the haptic can be placed. *See, e.g.*, Cameron Opening Rep. ¶ 729 ("In keeping with the Court's construction regarding Claim 12 of the '826 Patent, the haptic movement step does not start until the folding step has begun such that there is an unfolded portion of the haptic over which the end of the rear haptic can be placed.").  However, as discussed, the Court's construction concerns the sequence of folding the *optic* vis-à-vis *movement* of the haptic; neither the Court's construction nor the claim language or specification of the '718 and '826 patents require or discuss folding of the haptic.



Cameron Opening Rep. ¶ 577 ('718 patent); *see also id.* ¶ 729 ('826 patent).

In its response, HOYA points only to a video demonstrating use of an UltraSert, HOYA00611427, from its expert Dr. Ethier, and annotated photographic stills taken from the video. ECF No. 340-1 at 16–19. The Court has reviewed this video,[8] and concludes that it does not create a genuine issue of material fact necessary to overcome Alcon's Motion for Partial Summary Judgment in this issue. Dr. Ethier's demonstration of UltraSert is consistent with Dr. Cameron's opinions, namely that the plunger touches and moves the rear haptic before the optic is pushed into the narrowing transition section and begins to fold.

At oral argument, HOYA also argued for the first time that "moving" in Step 2 occurs only when "the end of the rear haptic passes the circumference of the optic," relying in part on commentary from the Court's claim construction order distinguishing "moving" from "pushing" for purposes of claim 16 of the '718 patent.[9] Such a narrowing interpretation is inconsistent with

---

[8] The annotations on the still photos of the video in HOYA's Response, which are not from any expert report, constitute attorney argument. "Conclusory allegations and attorney arguments are insufficient to overcome a motion for summary judgment." *Ferring B.V. v. Barr Lab'ys, Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006).

[9] Claim 16 of the '718 patent recites, "[a] method as claimed in claim 12, further comprising the step of: prior to folding the optic such that there is a space is between folded portions of the optic, pushing the end of the rear haptic with the insertion device upwardly and forwardly relative to the optic." '718 patent, cl. 16. In its Claim Construction Order, the Court acknowledged that "pushing of the rear haptic can occur before folding, but that does not mean that all 'moving' steps can occur before folding." ECF No. 184 at 44.

the plain language of the claims, the specification, and the Court's construction, none of which reference or give significance to the optic's circumference to distinguish between the folding and movement steps.[10]   In particular, HOYA's proposed interpretation is impossible to square with the specific language of Step 2 in claim 12 of the '826 patent, which expressly recites "moving the free end of the rear haptic, <u>from a position rearward of the optic</u>, over the optic," and thus includes within its scope both movement of the haptic from a position rearward of the optic, as well a movement over the optic.  *See* '826 patent, cl. 12 (emphasis added).  Moreover, even if HOYA's proposed interpretation were correct—and it is not—the evidence before the Court from Dr. Cameron's report indicates that the end of the rear haptic crosses the optic's circumference before the optic moves into the narrowing transition section of the device, at which point folding of the optic begins.  *See* Cameron Opening Rep. ¶¶ 577, 729.

The Court's construction is clear that Step 2—which, for both patents, describes moving the end of the rear haptic—cannot start until the optic has been folded such that there is a space between folded portions of the optic for a haptic.  As a result, movement of the rear haptic towards and over the optic before the optic has begun folding means that the claimed methods are not infringed.  Based on the undisputed evidence, Step 1 and Step 2 are not performed in the UltraSert in the sequence mandated by the Court's construction of the '718 and '826 patent, and thus summary judgment of noninfringement is appropriate for claims 12, 13, 15, and 16 of the '718 patent, and claims 12–14 and 16 of the '826 patent.

---

[10] In addition, such a narrowing interpretation is not necessary to distinguish "pushing" and "moving" for purposes of these claims.  Claim 16 is an additional step, and uses different language than claim 12; rather than the end of the rear haptic being moved "with the *plunger*," claim 16 recites pushing it "with the *insertion device* upwardly and forwardly relative to the optic."  *Compare* '718 patent, cl. 12, *with id.* cl. 16 (emphasis added).  As observed by the Court in its Claim Construction Order, the '718 patent describes using the "slider" to prepare the rear haptic by moving it "upwardly" and into a position so that it can be later moved in step 2 into the valley fold of the optic by the "plunger."  '718 patent at 10:29–30 ("[R]ear supporting portion 7a is pushed up therealong as the slider 40 is further moved to the advancement direction x . . . .").  Thus, HOYA's proposed limiting interpretation is not necessary to distinguish between "pushing" and "moving" the end of the rear haptic, as those terms are used in these patents.

c.   <u>"Slot" or "recess" that extends proximally</u>

Alcon moves for summary judgment of noninfringement on all asserted claims of the

'647, '442, '811, and '668 patents,[11] on the grounds that the UltraSert plunger lacks a "slot" or

"recess" that "extends proximally from" the lens contact surface or portion.  All asserted claims

of the '647, '442, '811, and '668 patents require the plunger to have a "slot" ('647 patent) or

"recess" ('442, '811, and '668 patents) "that extends proximally from"—*i.e.*, in a direction away

from the eye—the lens contact surface or portion.  Alcon argues that the accused structure in the

UltraSert extends from a point "distal"—*i.e.*, in a direction toward the eye—justifying summary

judgment.  The Court disagrees.

The '647, '442, '811, and '668 patents each describe a "slot" or a "recess."  For example,

claims 1 and 12 of the '647 patent recite a "method of operating an insertion device" comprising

a plunger that includes a "slot," shown at groove **34** in Figure 4, along with lens contact portion

**32.**:



<hr />

[11] Specifically, claims 1–4, 6–7, and 10–13 of the '647 patent; claims 1–5, 9, 11–17, 21, and 23–25 of the '442 patent; claims 1–5, 10, and 12–17 of the '668 patent; and claims 1–5, 10, and 12–17 of the '811 patent.  The Court has already granted summary judgment of noninfringement on all asserted claims of the '811 and '668 patents on different grounds.  In addition, the Court previously granted summary judgment of noninfringement as to claim 25 of the '442 patent.  ECF No. 397.

'647 patent at fig. 4 (highlight added).

The '442, '668, and '811 contain similar figures showing a "slot" or "recess" in the insertion device. *See* '442 patent, fig. 14; '668 patent, fig. 24; '811 patent, fig. 24.

Alcon argues that although the claim language for these asserted patents requires that the slot/recess extend proximally from the lens contact portion, the undisputed evidence and HOYA's infringement expert Dr. Cameron agree that UltraSert has a slot/recess that extends *distally* from the lens contact surface; *i.e.*, the recess "starts" at a point more distal than the lens contact surface, and thus extends distally from the lens contact surface, as shown in the following images:



ECF 331-1 at 29.

Alcon argues that the claim language—in particular, the requirement that the slot/recess "extends proximally <u>from</u> the lens contact surface/portion"—requires that the starting point of the slot/recess must be at the lens contact surface. For support, Alcon cites district court cases construing "from" to mean "starting at," including a case from Judge Bryson sitting by designation in Delaware. *See id.* at 28–29 (citing *ESCO Grp. LLC v. Deere & Co.*, 2023 WL 4199413, at *4 (D. Del. June 22, 2023) (Bryson, J. sitting by designation); *PrinterOn Inc. v.*

*BreezyPrint Corp.*, 93 F. Supp. 3d 658, 683 (S.D. Tex. 2015)).  Thus, because Dr. Cameron agreed at her deposition that part of the recess on the UltraSert's plunger "starts at a portion forward of the lens contact portion," Alcon contends none of these asserted claims reciting a slot or recess extending proximally from the lens contact portion are infringed.  *See* ECF No. 331-5 at Appx.563–64.

However, HOYA has presented evidence showing that the alleged slot/recess in the UltraSert also extends from the lens contact surface in a proximal direction, away from the eye. To grant summary judgment of noninfringement on this issue, the Court would have to agree with Alcon that the plain and ordinary meaning of "from" means a starting point, and thus a slot/recess that "extends proximally from" means a slot/recess that begins at the lens contact surface and *only* extends proximally from that point.

Neither the specifications nor the claim language support such an interpretation, in part because the claims are "comprising" claims, and thus may contain structures in addition to those recited in the claims.  *See Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 260 Fed. App'x 316, 322 (Fed. Cir. 2008) ("The transitional term 'comprising' . . . is inclusive or open-ended and does not exclude additional, unrecited elements").  In addition, the plain and ordinary meaning of "from" does not appear to be so settled in the case law so as to be determinative; as Alcon conceded during oral argument, it did not provide and is not aware of any Federal Circuit authority for the proposition that "from" always means "the starting point."  ECF No. 398 at 16–17.  Nor is the Court persuaded to reach the same result as Judge Bryson in the *ESCO* case.  *See* 2023 WL 4199413, at *3–4.  The Court agrees "it would not be proper to say, for example, that someone is traveling 'from the courthouse to his office' when that person actually begins his journey three blocks away from the courthouse."  *See id.*  However, if someone has multiple stops in his or her journey—for instance, the park, courthouse, then office—the Court believes it

23

would not be improper to characterize the second leg as a journey "from the courthouse to the office" simply because the person initially travelled from the park.

In the absence of more persuasive authority that "from" always means "the starting point," the Court declines to grant summary judgment of noninfringement on these grounds.

### d.  "Pushing the end of the rear haptic"

Alcon seeks summary judgment of noninfringement on claims 1, 4, and 8–11 of the '718 patent.  Independent claim 1—and claims 4, and 8–11, which depend on claim 1—recites the step of "pushing the end of the rear haptic upwardly and forwardly relative to the optic."  Alcon argues that HOYA and its expert, Dr. Cameron, take the position that the UltraSert plunger pushes the middle of the rear haptic, as opposed to the end, and thus the limitation is not met.

The Court disagrees.  In her report, Dr. Cameron identifies the parts of UltraSert's operation that she believes demonstrate this step of "pushing the end of the rear haptic" in the method recited in claim 1.  Cameron Opening Rep. ¶¶ 486–89.  During her deposition, she agreed that the UltraSert plunger "hits the middle of the trailing haptic," and as the plunger is "pushing on the trailing haptic, the end of the haptic is being pushed up a ramp inside the UltraSert."  ECF No. 331-5 at Appx.558.  Neither the claim language nor the specification state that contact must be specifically made with the end of the rear haptic to achieve "pushing the end of the rear haptic upwardly and forwardly."  As a result, it is a fact question for the jury whether, as Dr. Cameron opines, this limitation can be satisfied by UltraSert's plunger making contact with the middle of the rear haptic, which in turn pushes the end of the rear haptic.

### e.  "Slot" / "Elongate Slot"

All asserted claims of the '647 patent require a plunger with a "slot" or "elongate slot."  Alcon seeks summary judgment on HOYA's claims for infringement, both literal and under the doctrine of equivalents, on all asserted claims of the '647 patent, on the grounds that UltraSert's

plunger does not have a slot with a "bottom face, two side faces, and a back face" as required by the Court's construction.

The '647 patent describes an IOL insertion device that uses a slot on a plunger; as the plunger is depressed, the slot captures the end of a trailing rear haptic, as shown in Figure 6b of the '647 patent, where 7b is the rear supporting portion (*i.e.*, the rear haptic) and 30 is the rod of the plunger:



'647 patent, fig. 6B.

As recognized by the Court in its Claim Construction order, a POSITA would understand that the "slot" recited in the asserted claims is the "groove" described in the specification as having a bottom face, two side faces, and back face; the groove's "simple structure" ensures "a portion of the trailing loop haptic is located within the slot while being bent toward the nozzle by the distal portion." *Id*. at cl. 1, *see also id.* at 9:1–3. The groove's structure is shown in the follow exemplary embodiments, specifically groove 34 in figure 4 and groove 51 in figure 7:





*Id.* at figs. 4, 7 (highlight added).

Alcon contends that it is entitled to summary judgment on HOYA's claim for literal infringement of all asserted claims of the '647 patent, on the grounds that the alleged "slot" in the UltraSert has only one "side" face adjacent to the "bottom" face when used in its operational orientation, rather than two as required by the Court's construction.  Alcon argues that, in her infringement theory for these claims, HOYA's infringement expert, Dr. Cameron, improperly disregards the portion of the Court's construction denoting orientation, and instead arbitrarily identifies the bottom face as being on the side of the plunger:



Cameron Opening Rep. ¶ 231.

HOYA responds that the Court's construction does not specify what the bottom and side faces are oriented in relation to, and that it is a factual dispute whether the faces are oriented to the plunger (as Alcon contends) or to the haptic (as Dr. Cameron opines).  HOYA contends that the intrinsic evidence of the '647 patent "makes clear" that the faces of the slot are oriented around the rear haptic.  ECF No. 340-1 at 27.

This dispute is resolved by the Court's claim construction.  At claim construction, the parties disputed the meaning of "slot"; HOYA contended that it should be construed as "an opening or groove," whereas Alcon contended that the correct construction was "groove formed by a bottom face and a pair of guides in parallel on both sides."[12]

In construing this limitation, the Court rejected HOYA's proposal that a "slot" could simply constitute an opening, and concluded instead that a POSITA would understand that the slot has a bottom face, two side faces, and a back face.  In reaching this construction, the Court relied on intrinsic evidence, including figures depicting exemplary embodiments of a groove

---

[12] Alcon also argued that "slot" was indefinite under 35 U.S.C. § 112, but the Court concluded otherwise.  ECF No. 184 at 19–20.

included in a plunger (*see* '647 patent, figs. 4, 7), and disclosures in the specification that the slot requires a groove with faces that "catch[] the trailing supporting portion 7b."  ECF No. 184 at 20 (citing '647 patent at 8:7–10, 9:1–3, 7–11, 46–49); *see, e.g.*, '647 patent at 9:7–11 ("In addition, the bottom face of the groove 34 on the pushing portion 33 is formed by a concave face, thereby catching the trailing supporting portion 7b guided to the groove 34 without causing damage." (emphasis added)).  In fashioning its construction, the Court intentionally incorporated language to capture the essential structure of the "slot" as recited in the specification, including the adoption of descriptors from the specification connoting orientation of the slot/groove within the device, *i.e.*, that it has a "bottom" face capable of catching the haptic, akin to a shovel or scoop. *See, e.g.*, *id.* at 7:5–8 ("[T]he groove 34 has a concave bottom face and connects to the guides 35,35 at the opening end of the side face 34b converging from the opening toward the bottom face 34a . . . .").

Having rejected HOYA's proposal that "slot" does not require any faces or particular orientation, the Court will not permit Dr. Cameron to reargue claim construction to the jury under the guise that the orientation inherent in the word "bottom" does not require that the face in question actually be on the bottom of the plunger.  To conclude otherwise would effectively render the Court's construction meaningless, as demonstrated by the fact that in articulating her infringement theories for the various asserted claims, Dr. Cameron will use different, inconsistent descriptors for the same structure in the UltraSert, depending on the claim; for example, the portions of the UltraSert identified as the "bottom wall" and "lateral side" when discussing the '668 patent are simultaneously identified as the "side face" and "bottom face," respectively, when Dr. Cameron is discussing the '647 patent.  *Compare* Cameron Opening Rep. ¶ 934, *with id.* ¶ 231.  In making this observation, the Court is not suggesting that limitations in

different patent families must be construed the same way; instead, the concern is that Dr. Cameron's seeming flexibility with applying constructions that denote orientation obviates any significance that those limitations have.

Here, the Court has construed "slot" as requiring a bottom face, two side faces, and a back face.  Bottom connotes orientation, *i.e.*, the "lowest" portion.  By arguing that the specification "makes clear" that the bottom face need not be on the bottom, HOYA is attempting to reargue claim construction to the jury through its expert, which is not permitted.  *See, e.g.*, *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).  The Court further rejects HOYA's argument that surgeons are instructed to rotate the UltraSert during operation, so as to change the orientation of the slot; the directions for use pointed to by HOYA instruct surgeons to rotate the entire device, and thus the relative orientation of the slot as to the device remains the same.  *See* ECF No. 331-2 at Appx.87–89.  Summary judgment for Alcon is thus appropriate on HOYA's claims of literal infringement of all asserted claims of the '647 patent.

The Court further concludes that summary judgment is appropriate on HOYA's claims for infringement of the '647 patent under the doctrine of equivalents, on the grounds that HOYA has not carried its burden in showing that its claimed equivalent does not impermissibly ensnare the prior art.  Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21, 29 (1997).  However, a patentee may not assert "a scope of equivalency that would encompass, or ensnare, the prior art."  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314,

1322 (Fed. Cir. 2009). Ensnarement of the prior art can be assessed through a hypothetical claim

analysis, which is a two-step process: first, "a hypothetical claim that literally covers the accused

device" is constructed; second, prior art introduced by the accused infringer is assessed to

"determine whether the patentee has carried its burden of persuading the court that the

hypothetical claim is patentable over the prior art." *Id.* at 1324–25; *see also Intendis GMBH v.*

*Glenmark Pharms. Inc*., USA, 822 F.3d 1355, 1363 (Fed. Cir. 2016).

   For purposes of HOYA's theory of infringement of the '647 patent under the doctrine of

equivalents, Dr. Cameron opines that the hypothetical claim replaces the word "slot" in claim 1

with "groove in the plunger having three side faces and a back face." Cameron Opening Rep.

¶ 298. Alcon contends that summary judgment is appropriate on two grounds. First, Dr.

Cameron provides only a conclusory opinion as to how the UltraSert literally infringes this

hypothetical claim, and admitted in her deposition that she was "not sure how to articulate" how

a shape could have three side faces. *See id.* ¶ 299; ECF No. 331-5 at Appx.554. Second, Alcon

has presented fives pieces of prior art that it contends are ensnared by Dr. Cameron's

hypothetical claim, thereby shifting the burden to HOYA to show that the hypothetical claim

does not read on the prior art.

   The Court finds that HOYA has failed to carry its burden in conducting the hypothetical

claim analysis to demonstrate that its claimed equivalent does not ensnare the prior art. *See*

*Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co*., 204 F.3d 1360, 1365 (Fed. Cir. 2000) ("[W]hile

the accused infringer must come forward with evidence that the hypothetical claim reads on the

prior art, once the patentee makes out a prima facie case of infringement by equivalence, the

ultimate burden of persuasion rests on the patentee to show that the hypothetical claim does not

read on the prior art."); *see also id.* at 1363 ("Whether an asserted scope of equivalents would

30

impinge on prior art is an issue of law . . . .").  As an initial matter, Dr. Cameron's opinion that her hypothetical "three sides" claim would be literally infringed is conclusory and insufficient, particularly in light of her deposition testimony indicating an inability to even describe the hypothetical "groove with three sides and a back."  Indeed, her hypothetical claim seems nothing more than an attempt to sidestep the Court's construction requiring a "bottom" face, despite the Court having already rejected HOYA's proposal to that effect during claim construction.

Moreover, HOYA has not carried its burden in showing that the hypothetical claim is not ensnared by the prior art.  Alcon's expert, Mr. Bumbalough, identified prior art that he believed would be ensnared by Dr. Cameron's hypothetical claim, including by showing how he believes the hypothetical claim would have been obvious from the prior art.  *See, e.g.*, ECF No. 331-2 at Appx.102–07.  Having done so, the burden shifted to HOYA to show that the hypothetical claim does not read on the prior art.  However, Dr. Cameron provides only conclusory statements that she does not believe the hypothetical claim is ensnared, and provides no analysis specifically refuting the prior art identified by Alcon.  *See* Cameron Opening Rep. ¶¶ 299–302.  Accordingly, HOYA has not carried its burden in convincing the Court that its proposed hypothetical claim is patentable over the prior art identified by Alcon, and thus summary judgment on infringement of the '647 patent under the doctrine of equivalents is appropriate as well.

For the forgoing reasons, the Court grants summary judgment of noninfringement on all asserted claims of the '647 patent, both literally and under the doctrine of equivalents.

### 2.    Willful Infringement

Alcon moves for summary judgment on willfulness, arguing that HOYA cannot prove willful infringement as a matter of law.  HOYA responds that the question of willfulness should go to the jury because there are fact questions regarding Alcon's knowledge of the asserted

patents and intent to infringe them.  Given that the Court has already decided that summary judgment of noninfringement is warranted as to all asserted claims of the '647, '668, and '811 patents, the only remaining patents for which willfulness is relevant are the '718, '826, and '442 patents.

"To willfully infringe a patent, the patent must exist and one must have knowledge of it." *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985).  At minimum, the evidence presented at summary judgment is insufficient to create a genuine issue of material fact as to whether Alcon had pre-suit knowledge of the '718, '826, and '442 patents.  HOYA points to evidence purporting to show that Alcon conducted surveillance of its competitors and was aware of HOYA's iSert product, which HOYA contends practices the asserted patents, but all but one of the emails relied on by HOYA predate by several years the 2017 and 2018 issuance dates of the '718, '826, and '442 patents, and thus are not probative of knowledge or willful infringement of those patents.  *See* ECF No. 340-1 at 32–34 (citing Appx.2084–87 (2015 email), Appx.2034–37 (2013 email), Appx.2038 (2014 email), Appx.2044 (2011 email), Appx.2081–83 (2016 email)); *see also Gustafson, Inc. v. Intersystems Indus. Prod., Inc.*, 897 F.2d 508, 510 (Fed. Cir. 1990) ("[A] party cannot be held liable for "infringement", and thus not for "willful" infringement, of a nonexistent patent . . . .").  The one email HOYA points to within the relevant time period does not reference the '718, '826, and '442 patents specifically nor discuss the iSert or UltraSert products, and thus is insufficient to create a fact question of pre-suit knowledge.  *See* ECF No. 340-4 at Appx.2090–97.

HOYA also points to alerts circulated within Alcon referencing family members of the asserted patents and the fact that Alcon has cited other HOYA patents and patent applications in its own prosecutions; however, none of this evidence indicates that Alcon was alerted to or cited

the '718, '826, and '442 patents specifically.  "Knowledge of a patent portfolio generally is not the same thing as knowledge of a specific patent."  *Finjan, Inc. v. Cisco Sys. Inc.*, No. 17-CV-00072-BLF, 2017 WL 2462423, at *5 (N.D. Cal. June 7, 2017); *see also Intell. Ventures II LLC v. Sprint Spectrum, L.P.*, No. 217CV00662JRGRSP, 2019 WL 1987172, at *2 (E.D. Tex. Apr. 12, 2019) ("[K]nowledge of other patents in the same portfolios, with some of those being within the same family as the asserted patents, [is] insufficient to defeat a motion for summary judgment for pre-suit willfulness."), *report and recommendation adopted*, No. 217CV00661JRGRSP, 2019 WL 1979866 (E.D. Tex. May 3, 2019).  Thus, there is no genuine issue of material fact that Alcon lacked pre-suit knowledge of the asserted patents, which is dispositive of the pre-suit willfulness inquiry.[13]  *See Gustafson*, 897 F.2d at 511 ("[A] party cannot be found to have 'willfully' infringed a patent of which the party had no knowledge.").

Moreover, the Court concludes that there is no genuine issue of material fact as to whether Alcon intended to infringe the asserted patents after receiving knowledge of the asserted patents upon the filing of the Complaint.  "To establish willfulness, the patentee must show the accused infringer had a specific intent to infringe at the time of the challenged conduct."  *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021).  Here, there is no evidence of any intentional infringement or conduct amounting to willful infringement, *i.e.*, conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."  *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016).  For instance, there is no evidence that Alcon copied HOYA's products or patents, or

---

[13] HOYA also obliquely references prior litigation between the parties in Europe as an additional reason why Alcon would be aware of HOYA's portfolio.  ECF No. 240-1 at 36–37.  However, HOYA provides no details regarding this prior litigation, such as the date it was filed, the relevant patents, or accused products.  Accordingly, this alleged prior litigation is not probative of willfulness.

subjectively determined that it infringed the asserted patents but continued to sell the accused products anyway.

Instead, the record indicates that, at most, Alcon has continued to sell the accused UltraSert product after the Complaint was filed in December 2020 and Alcon became aware of HOYA's infringement claims.  Such conduct, without more, is insufficient to create a fact question as to willfulness, particularly given that the UltraSert was first released in 2015, years before suit.  *See, e.g.*, *Gustafson*, 897 F.2d at 511 ("Nor is there a universal rule that to avoid willfulness one must cease manufacture of a product immediately upon learning of a patent, or upon receipt of a patentee's charge of infringement, or upon the filing of suit."); *bioMerieux, S.A. v. Hologic, Inc*., No. CV 18-21-LPS, 2020 WL 759546, at *12 (D. Del. Feb. 7, 2020) ("That Defendants continued to market the products they sold . . . does not show that they subjectively intended to infringe Plaintiffs' patents.").  HOYA's cited cases, which concern whether allegations of post-suit conduct are sufficient to state a claim for willful infringement at the pleading stage, are inapposite.  *See, e.g.*, *ZitoVault, LLC v. Int'l Bus. Machs. Corp*., 2018 WL 2971131, at *3 (N.D. Tex. Mar. 29, 2018) (Lynn, J.).

### 3.    Anticipation of the '826 patent

Alcon argues that claims 1–6 of the '826 patent are anticipated as a matter of law by the 2005 and 2007 versions of Alcon's AcrySert product, a predecessor of the UltraSert.  Alcon further argues that, if the Court declines to grant summary judgment of noninfringement on claims 1, 4, and 8–11 of the '718 patent, then AcrySert also anticipates claims 1, 4, and 8–11 of the '718 patent, for the same reasons as the '826 patent.[14]  HOYA responds that both the 2005

---

[14] In this Order, the Court has granted Alcon summary judgment of noninfringement as to claims 12, 13, 15, and 16 of the '718 patent, but denied summary judgment on claims 1, 4, and 8–11 of the '718 patent.

and 2007 versions of AcrySert do not disclose at least two critical limitations of the challenged claims, and thus anticipation must be decided by the jury.

"Although anticipation under 35 U.S.C. § 102 is a question of fact, it may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1321 (Fed. Cir. 2008). "A patent claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference." *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1038 (Fed. Cir. 2011).

Claim 1 of the '826 is a method claim, and claims 2–6 depend from it. HOYA contends that there are fact questions as to whether the AcrySert contains "a plunger having a forward region with a side wall and a bottom wall that together define an indentation and is configured to receive a portion of the rear haptic," and that the AcrySert performs the step of "pushing the rear haptic such that the end of the rear haptic passes over the optic, while the portion of the optic over which the rear haptic passes remains unfolded, with the forward region of the plunger in such a manner that the rear haptic is bent and a portion of the rear haptic is received in the indentation."

Regarding the first element—whether the AcrySert contains a plunger "with a side wall and a bottom wall that together define an indentation" for receiving a portion of the rear haptic, Alcon points to the following image which it claims depicts the AcrySert plunger, with the 2007 AcrySert plunger purportedly on the left and the 2005 version on the right:



ECF No. 331-1 at 47 (citing ECF No. 331-3 at Appx.341).

The Court notes that this image comes not from Alcon's expert, but rather a presentation identified by Alcon as "AcrySert Delivery System Update, June 2005." *See* ECF No. 331-2- at 3 (Table of Contents). This particular slide is titled "Proposed Plunger Changes." ECF No. 331-3 at Appx.341. In addition, the annotations in this image are not in the underlying exhibit, and thus constitute attorney argument. *See id*. Other evidence cited by Alcon in support of its anticipation theory consists of a report from its expert, Mr. Bumbalough, relying on a similar image of the 2005 AcrySert (ECF No. 331-2 at Appx.48–50), directions for use and marketing materials for the AcrySert, and deposition testimony and a declaration from Mr. Brown, an Alcon employee who is a named inventor on U.S. Patent No. 7,156,854 ("*Brown*"), which Alcon contends covers the AcrySert.

The Court concludes that genuine issues of material fact preclude summary judgment on Alcon's anticipation claims as to the '826 and '718 patents. As an initial matter, there appears to be a dispute as to whether the plungers depicted in the image above reflect the AcrySert plungers in question. *See, e.g.*, ECF No. 340-7 at Appx.2922–23 (Rebuttal Report of Dr. Cameron) ("Mr.

Bumbalough does not sufficiently establish the plunger shape of the AcrySert that was commercially sold for either the 2005 or 2007 version. . . .  Mr. Bumbalough relies on internal Alcon presentations that have screenshots of a CAD file of unknown origin and for which there is no indication they were made public.").  As such, there is a fact question as to whether the AcrySert plungers contain an indentation with the requisite side and bottom walls recited in claim 1 of the '826 patent.  Regarding the second challenged claim limitation—pushing the rear haptic with "a portion of the rear haptic . . .  received in the indentation—Dr. Cameron provides images from videos, relied on by Mr. Bumbalough as depicting the AcrySert in use, which appear to depict the rear haptic abutting against the front surface of the distal tip of the plunger, rather than going into the alleged indentation.  ECF No. 331-2 at 293.

Accordingly, the Court finds there are factual disputes regarding anticipation of claim 1 of the '826 patent by Alcon's AcrySert product, thus precluding summary judgment on all remaining asserted claims of the '826 and '718 patents.

## B.    HOYA's Motion to Exclude

HOYA moves to exclude opinions of Alcon's damages expert, Ms. Distler, relating to an allegedly non-comparable licensing agreement and a pre-suit damages assessment.  HOYA also moves to exclude opinions of Alcon's experts, Dr. Erdman and Mr. Kunin, about procedures of the United States Patent and Trademark Office, which relate to the parties' dispute regarding the priority date of the '647 patent.  Because the Court is granting of summary judgment of noninfringement as to the '647 patent, HOYA's motion to exclude the opinions of Dr. Erdman and Mr. Kunin is **DENIED** as moot.[15]

---

[15] If the issue concerning Dr. Erdman's and Mr. Kunin's testimony was not rendered moot by the Court's prior opinions, the Court previously held during oral argument that only the Court, and not the jury, would hear portions of Dr. Erdman's and Mr. Kunin's contested testimony relating solely to the contents of the '647 patent file history,

1.      Altaviz Agreement

HOYA moves to exclude the opinions of Alcon's damages expert, Ms. Distler, regarding

the Altaviz Agreement, an agreement between Alcon and Altaviz to license intellectual property

for an injector device that uses a powered delivery mechanism.  HOYA's expert, Mr. Bone,

states in his report that the Altaviz Agreement is not a comparable license agreement; HOYA

contends that Alcon's expert Ms. Distler agrees that the Altaviz Agreement relates to non-

comparable technology, and thus must be excluded.

In determining a reasonable royalty through the framework of a hypothetical negotiation,

parties frequently rely on comparable licensing agreements.  *See Georgia–Pacific Corp. v. U.S.*

*Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see also Radio Steel & Mfg. Co. v.*

*MTD Prods., Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986) ("The determination of a reasonabl[e]

royalty . . . is based . . . on the royalty to which a willing licensor and a willing licensee would

have agreed at the time the infringement began.").  Assessing the comparability of licenses

requires "consideration of whether the license at issue involves comparable technology, is

economically comparable, and arises under comparable circumstances as the hypothetical

negotiation." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1373 (Fed. Cir. 2020).

The Court has reviewed the parties' arguments and Ms. Distler's opinions regarding the

Altaviz Agreement, and concludes that Ms. Distler has made a baseline showing of

comparability of the Altaviz Agreement and the factors relevant to the hypothetical negotiation.

*See id.* at 1374.  In her report, Ms. Distler assesses the comparability of the technology covered

by the Altaviz Agreement and the asserted patents, noting that although there are some

technological differences, the Altaviz Agreement is comparable in that it is in the same "IOL

---

requirements of the Manual of Patent Examining Procedure, and technical procedural requirements of the U.S. Patent
and Trademark Office and whether they were met.  *See* ECF No. 398 at 89–90.

injector" field as the asserted patents, and is limited to the injector device covered by the asserted patent.  ECF No. 354-2 at Appx.251–54.  Ms. Distler also discusses economic comparability, such as the fact that the Altaviz Agreement ████████████████████████████████████

████████████████████████████████████████████████████████████████

███████  whereas the license in the hypothetical negotiation would be a bare, non-exclusive license to the asserted patents.  *Id.*

Ms. Distler's opinions acknowledging the similarities and differences between the Altaviz Agreement and the hypothetical negotiation establishes a baseline of comparability sufficient under Federal Circuit precedent to be admissible; any further concerns regarding comparability can be addressed through cross examination.  *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility.").  HOYA's request to exclude Ms. Distler's opinions on this ground is thus denied.

2.   Preliminary damages assessment

HOYA moves to exclude Ms. Distler's damages opinions to the extent based on a preliminary damages assessment conducted by HOYA prior to suit.[16]  Specifically, the preliminary damages assessment consists of a bare dollar number, without any context or information as to how that number was calculated, which was presented to management as part

---

[16] The preliminary damages assessment, contained within a document referred to as the "Finance Document," was the subject of a Motion to Compel Production of Improperly Clawed Back and Withheld Documents filed by Alcon, which was referred to Judge Horan.  ECF No. 287.  Judge Horan concluded that HOYA's production of the Finance Document without redactions was not inadvertent, and thus ordered production of the Finance Document in an unredacted form, which included the preliminary damages assessment.  ECF No. 310.  HOYA filed objections to Judge Horan's Order, which the Court has reviewed and overruled.  After the December 13, 2023, hearing in this case, HOYA submitted *in camera* a detailed explanation regarding the creation of the preliminary damages assessment, which this Court has reviewed.

of a report on this potential litigation; in her report, Ms. Distler uses that number to derive an implied per-unit royalty.  *See* ECF No. 342-2 at Appx.206.

During her deposition, Ms. Distler conceded she did not know how the pre-suit damages assessment was calculated, by whom, the temporal applicability (*i.e.*, through trial or over the life of the asserted patents), or any other information about the sales figures, data, royalty base, or methodology used to calculate it.  ECF No. 342-2 at Appx.59.  As a result, Ms. Distler's testimony that relies on the preliminary damages assessment to calculate a per-unit royalty falls short of Rule 702's requirements that expert testimony be "based on sufficient facts or data" and "the product of reliable principles and methods," and that "the expert has reliably applied the principles and methods to the facts of the case."  *See* Fed. R. Evid. 702; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) ("[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" (quoting *Daubert*, 509 U.S. at 592)).  Ms. Distler lacks critical information about the basis for her opinion that would be necessary for HOYA to effectively cross-examine her, and thus cross-examination would not cure these deficiencies in reliability.

Accordingly, Ms. Distler is precluded from relying on the preliminary damages assessment and testifying to any opinions based on that assessment.[17]

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** summary judgment to Alcon on HOYA's claims of infringement of claims 1–4, 6–7, and 10–13 of the '647 patent (both literally and under

---

[17] Specifically, the following portions of Ms. Distler's rebuttal report are excluded: ¶¶ 81 (fourth bullet point, starting "As of June 2021 . . . ."), 204 n.741, 295, 301 (the following sentence is excluded: "In addition, HOYA had performed a preliminary damages assessment, where the implied royalty rate could be calculated as $1.98 per unit over the longest life of the asserted patents.").

the doctrine of equivalents); claims 12, 13, and 15–16 of the '718 patent; claims 12–14, and 16 of the '826 patent; claim 1, 5, 10, and 12–17 of the '668 patent; and claim 1, 5, 10, and 12–17 of the '811 patent.  The Court further **GRANTS** summary judgment to Alcon on HOYA's claims for willful infringement on all asserted patents.  The remainder of Alcon's Motion for Partial Summary Judgment is **DENIED.**  The remaining asserted claims are claims 1, 4, and 8–11 of the '718 patent, claims 1–6 of the '826 patent, and claims 1–5, 9, 11–17, 21, and 23–24 of the '442 patent.  The Court **GRANTS** HOYA's Motion to Exclude Ms. Distler's opinions based on HOYA's preliminary damages assessment, and **DENIES** the remainder of the Motion.

   **SO ORDERED**.

   January 11, 2024.

             BARBARA M. G. LYNN
             SENIOR UNITED STATES DISTRICT JUDGE